UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. __3:15-cv-666__ |
| | § | |
| KROENKE SPORTS & ENTERTAINMENT, | § | JURY TRIAL DEMANDED |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff NIC SALOMON files this Original Complaint ("Complaint") against Defendants KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE"), OUTDOOR CHANNEL HOLDINGS, INC. ("Outdoor") and PACIFIC NORTHERN CAPITAL LLC ("PNC"). (KSE, Outdoor and PNC shall sometimes be collectively referred to as "Defendants") as follows:

## PARTIES

1.     Plaintiff Nic Salomon ("Plaintiff" or "Mr. Salomon"), is citizen of the State of Texas who resides in Dallas, Texas.

2.     Defendant KSE is a Delaware limited liability company that maintains its principal place of business in Denver, Colorado.  KSE is an entertainment and management group that owns and operates, among other assets, the Pepsi Center, the Paramount Theatre, Dick's Sporting Goods Park, the Colorado Avalanche (NHL), Denver Nuggets (NBA), Colorado Mammoth (NLL), and Colorado Rapids (MLS).  KSE's sole member and owner is KMC Center, LLC, a Missouri limited liability company, whose sole member and owner is the KMS Revocable Trust.  The sole grantor,

trustee and beneficiary of the KMS Revocable Trust is E. Stanley Kroenke ("Kroenke"), a citizen of the State of Missouri.  Accordingly, KSE is a citizen of the state of Missouri for purposes of determining diversity of citizenship jurisdiction of these proceedings. Kroenke owns the NFL's St. Louis Rams and owns a majority stake in the English soccer club Arsenal.  KSE may be served at The Corporation Trust Company through its registered agent at Corporation Trust Center, 1209 Orange Street in Willington, Delaware  19801, or at Kroenke Sports & Entertainment, LLC, Pepsi Center, 1000 Chopper Circle, Denver, Colorado  80204, Attention: Jim Martin, President and CEO, Stephen Stieneker, EVP and General Counsel.

3.     Defendant Outdoor is a Delaware corporation that previously maintained its principal place of business in Temecula, California and, upon information and belief, currently maintains its principal place of business in the State of Colorado.  Outdoor is an entertainment and media company that owned the Outdoor television network which is devoted primarily to traditional outdoor activities such as hunting, fishing, and shooting sports and other outdoor-related lifestyle programming.  Outdoor may be served at 1000 Chopper Circle, Denver, CO 80204, Attention: Jim Liberatore, CEO. Outdoor may be served via its registered agent, Corporation Service Company, at 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

4.     Defendant PNC is a California limited liability company that maintains its principal place of business in Santa Ana, California.  Upon information and belief, PNC's members either are citizens of states other than the State of Texas or are citizens or subjects of a foreign state. PNC is a private equity investment firm that may be served at 1595 East 17th Street in Santa Ana, California  92705, Attention:  Kelly Holowaty, Managing Director.

## JURISDICTION AND VENUE

5.     Original jurisdiction exists under 28 U.S.C. § 1332.  The dispute is between citizens of different states or between citizens of a state and a foreign state and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

6.     This Court has personal jurisdiction over each of the Defendants because they either have engaged in business in this State or they have committed tortious and wrongful acts in this State.  Personal jurisdiction also exists because of Defendants' continuous and systematic contacts with the State of Texas.

7.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Salomon's claims occurred in this judicial district, and/or a substantial part of property that is the subject of this action is situated in this judicial district.

## NATURE OF THE CASE

8.     Defendants obstructed and interfered with Mr. Salomon's efforts to purchase the aerial camera business of two companies (the "Aerial Camera Business") – SkyCam, LLC ("SkyCam") and CableCam, LLC ("CableCam").   SkyCam and CableCam are wholly owned subsidiaries of Outdoor. Mr. Salomon served as manager for finances and operations of the Aerial Camera Business from July 2006 until January 2009 and President of SkyCam and CableCam from 2009 until May 2014. During that time, Mr. Salomon and his management team developed the Aerial Camera Business into a valuable, growing venture.  In early 2012, after Outdoor asked Mr. Salomon to find potential buyers for the Aerial Camera Business, Mr. Salomon and his investor group PNC submitted an offer on February 26, 2013, to buy the Aerial Camera Business, which Outdoor accepted and was signed by all the parties on February 27, 2013.

9.      After Mr. Salomon submitted his offer, Outdoor agreed to deal exclusively with Mr. Salomon and his investor group regarding the sale of the Aerial Camera Business.  Despite this agreement, Outdoor and KSE negotiated the sale of the entirety of Outdoor to KSE, including the Aerial Camera Business to which Mr. Salomon devoted nearly seven years of his life.  At the same time, KSE and Outdoor assisted and encouraged PNC to violate its fiduciary duties to Mr. Salomon by entering into secret, side agreements that would allow KSE to purchase the entirety of Outdoor, including the Aerial Camera Business, and prevent Mr. Salomon from closing on his purchase of the Aerial Camera Business.

10.     Defendant ultimately succeeded in thwarting Mr. Salomon's efforts to buy the Aerial Camera Business, resulting in significant financial injury to Mr. Salomon which disrupted his career by preventing Mr. Salomon from acquiring the valuable, growing Aerial Camera Business that was built and developed under his direction.

## FACTUAL BACKGROUND

### *The Aerial Camera Businesses – SkyCam and CableCam*

11.     Starting in 2006, Mr. Salomon managed the finances and operations of the Aerial Camera Business, and served formally as the President of the Aerial Camera Business starting in 2009.  SkyCam and CableCam currently operate from shared facilities in Fort Worth, Texas. Mr. Salomon worked to consolidate the Aerial Camera Business and develop or acquire the patents necessary to do so.  The Aerial Camera Business principally provides suspended aerial camera services to media networks for the production of sporting and entertainment events.  SkyCam and CableCam design, manufacture, and operate movable aerial platforms, including the development of new technology related to these platforms.

12.     With their technology and unique services, SkyCam and CableCam play a significant role in changing the way sports and other entertainment programming are broadcast to fans both domestically and internationally.  During an entertainment or sporting event, the camera platforms are suspended above the playing or viewing field and are remotely controlled by specially-trained personnel who have the ability to move the cameras in up to three dimensions. Under the direction of Mr. Salomon and his management team, SkyCam and CableCam became financially successful ventures that were the fastest-growing business segment of Outdoor.

***Outdoor Asks Mr. Salomon to Present an Offer to Buy SkyCam and CableCam***

13.     In or around March 2012, Tom Hornish, the then Chief Executive Officer of Outdoor, met with Mr. Salomon to inform him that SkyCam and CableCam were considered to be non-core businesses of Outdoor.  Hornish encouraged Mr. Salomon to put together an investment group to make an offer to buy SkyCam and CableCam.

14.     After being asked by Outdoor to present an offer to buy the Aerial Camera Business, Mr. Salomon searched for capital to support a potential management buyout or related transaction for the purchase of the Aerial Camera Business.  In doing so, Mr. Salomon contacted PNC about providing capital or making an investment in the purchase of the Aerial Camera Business.

15.     In April 2012, PNC and Mr. Salomon, acting as an individual on behalf of the divisional management team of SkyCam and CableCam, entered into a Non-Disclosure Agreement to permit PNC to evaluate a potential transaction to purchase the Aerial Camera Business from Outdoor, while simultaneously protecting the Aerial Camera Business confidential information that PNC reviewed in the process.  Over the next several months, PNC evaluated the opportunity to participate in the purchase of the Aerial Camera Business.

16.     In June 2012 Noble Financial Capital Markets ("Noble Capital"), a third-party capital markets company, was hired by Outdoor to explore its strategic alternatives, including the intended sale by Outdoor of the Aerial Camera Business.

### *Mr. Salomon Introduces PNC to the SkyCam and CableCam Sale Process*

17.     In or around September 2012, Mr. Salomon received permission from Tom Hornish, CEO of Outdoor, to introduce PNC to the sale process.  After receiving permission to introduce PNC as a potential investor group from Noble, *and at the request of Noble,* Mr. Salmon continued to conduct management presentations and interact with all groups that showed interest as potential purchasers of the Aerial Camera Business.

18.     In or around January 2013, Mr. Salomon notified and discussed with Hornish and Cathy Lee, the then General Counsel of Outdoor, his intent to present a bid with PNC to buy the Aerial Camera Business.  Mr. Salomon also notified Noble Capital.  Mr. Salomon's intention to present an offer with PNC to buy the Aerial Camera Business was again discussed in communications that included Tom Allen, the Chief Financial Officer of Outdoor, and David Bolls, Deputy General Counsel of Outdoor.

### *Mr. Salomon and PNC Sign Term Sheet with Outdoor to Buy the Aerial Camera Business*

19.     On February 26, 2013, Mr. Salomon, PNC, and Outdoor entered into a Term Sheet for Salomon and PNC to purchase the Aerial Camera Business from Outdoor.  The Term Sheet is signed by Mr. Salomon on his own behalf, by Kelly Holowaty as Managing Director of PNC, and by Tom Hornish as CEO of Outdoor.  A true and correct copy of the Term Sheet is attached as Exhibit "A."

20.     The purchase price for the Aerial Camera Business assets is identified in the Term Sheet as a total amount of up to $4.05 million, which includes $3.65 million in cash at closing and

some additional payments for ongoing litigation and royalties as described in the Term Sheet. The Term Sheet states that the transaction would be structured as an asset purchase agreement that includes the operating assets of the Aerial Camera Business and excludes only certain assets identified in the Term Sheet. The purchaser is identified in the Term Sheet as an acquisition entity to be formed by Mr. Salomon and PNC.

***Outdoor Agrees to a Binding Exclusivity Period with Mr. Salomon and PNC***

21.     The Term Sheet contains an exclusivity provision benefiting Mr. Salomon and PNC, which precluded Outdoor, SkyCam, and CableCam from negotiating or agreeing to sell any equity interest in the Aerial Camera Business or any material part of the assets of the Aerial Camera Business to any party other than Mr. Salomon and PNC. Specifically, under the exclusivity provision, Outdoor, SkyCam, and CableCam agreed that until April 15, 2013, they would not –

> directly or indirectly (i) solicit, facilitate, encourage, or accept any offers to acquire any equity or debt interest in SkyCam or CableCam or any material part of the assets of the business of SkyCam or CableCam; (ii) negotiate or correspond with third parties regarding existing or unsolicited offers to acquire any equity or debt interest or any part of the business of SkyCam or CableCam, other than to advise such third parties that exclusive discussions are being pursued with another party; and (iii) sell or agree to sell any equity or debt interest in any part of SkyCam or CableCam to any part other than Mr. Salomon and PNC.

22.     Under the Term Sheet's exclusivity provision, Outdoor further agreed to cease any negotiations, discussions, or correspondence (whether direct or indirect) related to the potential acquisition of any entity or debt interest in SkyCam, and CableCam by any party other than Mr.

Salomon and PNC.  The parties also agreed to use their best efforts to close the transaction no later than April 15, 2013, the last day of the exclusivity period.

23.     The exclusivity provision is expressly identified as "a binding legal agreement upon the parties."  Under the exclusivity provision, Outdoor agreed that Salomon is entitled to all legal and equitable relief for any breach of the provisions of the agreement, including injunction (without the necessity of posting bond) and specific performance, as well as both actual and consequential damages.

***Defendants Facilitate Sale of Entire Business of Outdoor to KSE Without Excluding the Aerial Camera Business From the Transaction***

24.     Despite the exclusivity obligations in the Term Sheet, Outdoor participated during the exclusivity period in negotiations with other parties to sell the entire business of Outdoor, including SkyCam and CableCam.

25.     On November 15, 2012, Outdoor signed a merger agreement with Intermedia Outdoors Holdings, LLC ("Intermedia") for Intermedia to acquire the stock of Outdoor.  Outdoor filed a proxy statement for the Intermedia merger on February 12, 2013.

26.     On February 27, 2013, KSE made an unsolicited offer to purchase the stock of Outdoor at an all-cash price that was higher than the Intermedia offer.  On March 1, 2013, KSE publicly announced its offer to purchase the stock of Outdoor.  This was the first time Mr. Salomon became aware of KSE's offer to acquire Outdoor Channel.

27.     On or around March 1, 2013, Outdoor's General Counsel called Mr. Salomon to inform him that Outdoor was disregarding the Term Sheet because the interest of Outdoor to accept an offer to purchase all the stock of the entire company took precedence over the sale of the Aerial Camera Business.    On March 4, 2013, Outdoor publicly acknowledged its receipt of the KSE

offer and indicated that it expected the KSE proposal would be considered superior to the Intermedia proposal.

28.     On March 13, 2013, Outdoor entered into a merger agreement with KSE providing a definitive and binding agreement for the sale of Outdoor's business, including the Aerial Camera Business.

29.     Thereafter, on March 21, 2013, Outdoor, acting in concert with PNC and without Mr. Salomon's consent or signature, signed an agreement purportedly amending the Term Sheet ("Amendment") to effectively eliminate the exclusive dealing provision to the material detriment of Mr. Salomon.   The Amendment granted KSE the right to discontinue the transaction contemplated by the Term Sheet.  Mr. Salomon was not made aware of the Amendment until April 9, 2013.  A true and correct copy of the Amendment is attached as Exhibit "B."

30.     At a special meeting of stockholders of Outdoor on May 8, 2013, the KSE merger agreement was approved for KSE to acquire all of the stock of Outdoor and for Outdoor to become a wholly-owned subsidiary of KSE.

**CAUSES OF ACTION AGAINST OUTDOOR CHANNEL**
**COUNT 1:  BREACH OF CONTRACT**

31.     Pleading affirmatively and alternatively, Plaintiff alleges breach of contract against Outdoor and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

32.     Outdoor breached the Term Sheet by, among other reasons, negotiating with KSE and agreeing to sell SkyCam and CableCam, and the Aerial Camera Business, to KSE during the time period in which Outdoor agreed to exclusively deal with Mr. Salomon and PNC, failing to cease negotiations and discussions with KSE regarding the potential acquisition of an equity

interest in SkyCam, CableCam and the Aerial Camera Business, and failing to use its best efforts to close the sale of the Aerial Camera Business to Mr. Salomon and PNC by no later than April 15, 2013.

33.     As a result of Outdoor's breach of its contractual duties, Mr. Salomon incurred damages for which he now sues.  Mr. Salomon requests that Outdoor be ordered to pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill.

## CAUSES OF ACTION AGAINST KSE
## COUNT 2:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

34.     Pleading affirmatively and alternatively, Plaintiff alleges tortious interference with existing contract against KSE to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

35.     KSE had actual knowledge of the Term Sheet and Mr. Salomon's personal interest in it, and KSE had knowledge of facts and circumstances that would lead a reasonable person to believe that there was a contract regarding the sale by Outdoor of SkyCam and CableCam, its wholly owned subsidiaries, and the Aerial Camera Business in which Mr. Salomon had an interest.

36.     KSE wilfully and intentionally interfered with the Term Sheet among Outdoor, Mr. Salomon, and PNC by inducing or causing Outdoor to breach its contractual obligations to Mr. Salomon.

37.     KSE's interference proximately caused injuries to Mr. Salomon, for which he now sues and seeks from KSE all actual, consequential and economic damages, including but not limited to lost profits and goodwill.  Mr. Salomon also seeks exemplary damages.

## COUNT 3:  TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

38.     Pleading affirmatively and alternatively, Plaintiff alleges tortious interference with prospective relations against KSE and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

39.     Mr. Salomon had a business relationship with PNC and Outdoor regarding the sale of the Aerial Camera Business which, to the extent not addressed by binding provisions of the Term Sheet, had not yet been reduced to a formal contract.  To the extent not addressed by binding provisions of the Term Sheet, there was a reasonable probability that the business relationship among Mr. Salomon, PNC, and Outdoor would be reduced to a formal contract or business relationship.  KSE had actual knowledge of Mr. Salomon's business relationship with PNC and Outdoor regarding the sale and purchase of the Aerial Camera Business, and KSE either desired to bring about the interference with that business relationship or knew that the interference was certain or substantially certain to result from its conduct, which was independently tortious.

40.     KSE's actions proximately caused injury to Mr. Salomon, for which he now sues. Mr. Salomon requests that KSE be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from KSE's wrongful conduct.  Mr. Salomon also seeks exemplary damages.

## COUNT 4:  FRAUD

41.     Pleading affirmatively and alternatively, Plaintiff alleges fraud against KSE and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

42.     KSE represented that it was not interested (or that it did not know if it was interested) in ownership of the Aerial Camera Business and would continue to work with Mr. Salomon and PNC to complete a contract consistent with the Term Sheet. Apparently relying upon

KSE's representations, on March 21, 2013, PNC and Outdoor, without Mr. Salomon's consent or

signature, executed the Amendment to effectively eliminate the exclusive dealing provision.

Although the closing deadline of the Term Sheet was extended, KSE never acted to complete the

Term Sheet sale. Upon information and belief, KSE's material representations were false, and

known to be false when made, or made recklessly, as a positive assertion, and without knowledge

of its truth.

43.     As a result of Outdoor's fraud, Mr. Salomon incurred damages for which he now

sues. Mr. Salomon requests that Outdoor be ordered to pay all actual, consequential and economic

damages, including but not limited to lost profits and goodwill. Mr. Salomon also seeks exemplary

damages

## COUNT 5:  INDUCEMENT OF AND ASSISTANCE IN
## (AIDING AND ABETTING) BREACH OF FIDUCIARY DUTIES

44.     Pleading affirmatively and alternatively, Plaintiff alleges inducement of and

assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor and, to the

extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

45.     Outdoor and KSE were aware: that PNC and Mr. Salomon had a venture to acquire

the Aerial Camera Business from Outdoor; and that, as venture partners, each owed fiduciary

duties to the other.

46.     KSE and Outdoor knowingly assisted, encouraged, and participated in PNC's

breach of its fiduciary duties owed to Mr. Salomon in connection with their purchase of the Aerial

Camera Business.  Such assistance and encouragement was a substantial factor in causing PNC's

breach of fiduciary duties to Mr. Salomon.   As a result of Outdoor's and KSE's knowing

assistance, encouragement, participation and inducement of PNC's breach of fiduciary duties to

Mr. Salomon, Mr. Salomon sustained damages for which Defendants KSE and Outdoor are jointly and severally liable.

47.     These breaches of fiduciary duties to Mr. Salomon have proximately caused both damages to Mr. Salomon and benefits to the Defendants, for which he now sues.  Mr. Salomon requests that the Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from their wrongful conduct.  Mr. Salomon also seeks exemplary damages.

## CAUSES OF ACTION AGAINST PNC
## COUNT 6:  BREACH OF FIDUCIARY DUTY

48.     Pleading affirmatively and alternatively, Plaintiff alleges breach of fiduciary duty against PNC and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

49.     PNC and Mr. Salomon entered into a joint venture and/or partnership in connection with the acquisition of the Aerial Camera Business from Outdoor.

50.     As Mr. Salomon's joint venture and/or partners, PNC owed fiduciary duties to Mr. Salomon, including but not limited to, the duty of loyalty and utmost good faith, fairness, and honesty; the duty of candor and full disclosure; the duty to refrain from self-dealing and competition with the partnership/joint venture; and the duty of fair, honest dealing.  PNC breached those fiduciary duties by, among other reasons, negotiating and entering into the Amendment without Mr. Salomon's knowledge or consent that eliminated the exclusivity provision of the Term Sheet.

51.     These breaches of fiduciary duties to Mr. Salomon have proximately caused damages to Mr. Salomon and perhaps benefits to PNC, for which he now sues.  Mr. Salomon

requests that PNC be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from PNC's wrongful conduct. Mr. Salomon also seeks exemplary damages.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS
## COUNT 7: UNJUST ENRICHMENT

52. Pleading affirmatively and alternatively, Plaintiff alleges unjust enrichment against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

53. Defendants have unjustly enriched themselves, to Mr. Salomon's detriment, by the acts, omissions, and torts described in this Complaint.

54. Mr. Salomon requests an accounting and that Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from Defendants' wrongful conduct.

## COUNT 8: CIVIL CONSPIRACY

55. Pleading affirmatively and alternatively, Plaintiff alleges a civil conspiracy against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

56. To the extent they were not acting as principal and agent, Defendants conspired individually and/or collectively to accomplish unlawful purposes, including but not limited to the acts, omissions, and torts described in this Complaint, and to accomplish lawful purposes by unlawful means, including but not limited to the acts, omissions, and torts described in this Complaint.

57.     The foregoing had a meeting of the minds on the object or course of action, and at least one member of the conspiracy committed at least one unlawful, overt act to further the object or course of action.

58.     Mr. Salomon suffered injury as a proximate result of these wrongful acts.

59.     As such, Mr. Salomon requests that Defendants be held jointly and severally liable and be ordered to disgorge all profits and pay all actual, consequential and economic damages, resulting from their wrongful conduct, including but not limited to lost profits and goodwill. Because their actions were intentional, malicious, and grossly negligent, an award of exemplary damages is appropriate.

## CONDITIONS PRECEDENT

60.     To the extent that there are any conditions precedent to be satisfied, Plaintiff has satisfied or will satisfy such conditions prior to trial.

## ATTORNEYS' FEES

61.     Mr. Salomon requests that this Court award his costs and reasonable attorneys' fees pursuant to Section 38.001 et. seq. of the Texas Civil Practice & Remedies Code.

## EXEMPLARY DAMAGES

62.     Defendants acted with fraud, malice, and/or gross negligence toward Mr. Salomon. Defendants thus are liable for exemplary damages as authorized by Chapter 41 of the Texas Civil Practice & Remedies Code.

2535366.6

## JURY DEMAND

63.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Salomon demands

a trial by jury on all applicable issues.

## PRAYER FOR RELIEF

Mr. Salomon respectfully requests that the Defendants be cited to appear and answer

herein, and that Mr. Salomon have judgment against the Defendants for the following relief:

a.      compensatory, consequential, and incidental damages resulting from
        Defendants' tortious conduct, including but not limited to lost profits and
        goodwill;

b.      compensatory, consequential, and incidental damages resulting from
        Outdoor's breach of its contractual duties;

c.      restitution of Defendants' wrongfully-obtained gains;

d.      a constructive trust of proceeds that Defendants directly or indirectly
        obtained from their wrongful conduct;

e.      an accounting;

f.      prejudgment and post-judgment interest;

g.      attorneys' fees through trial and any appeal of this matter;

h.      costs;

i.      punitive and exemplary damages;

j.      general relief; and

k.      such other and further relief, both at law and in equity, to which Mr.
        Salomon is justly entitled.

Dated:  February 27, 2015.

GRAY REED & McGRAW, P.C.


By:_____/s/ Cleveland G. Clinton_____
     CLEVELAND G. CLINTON
     State Bar No. 04399900
     WILLIAM B. CHANEY
     State Bar No. 04108500
     WILLIAM N. DRABBLE
     State Bar No. 24074154

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: 214-954-4135
Facsimile: 214-953-1332

ATTORNEYS FOR PLAINTIFF,
NIC SALOMON