UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-00666-M |
| | § | |
| KROENKE SPORTS & ENTERTAINMENT, | § | JURY TRIAL DEMANDED |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff NIC SALOMON files this Second Amended Complaint ("Complaint") against

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE"), OUTDOOR CHANNEL HOLDINGS,

INC. ("Outdoor") and PACIFIC NORTHERN CAPITAL LLC ("PNC") (KSE, Outdoor and PNC shall

sometimes be collectively referred to as "Defendants") as follows:

## PARTIES

1.      Plaintiff Nic Salomon ("Plaintiff" or "Mr. Salomon"), is a citizen of the State of

Texas who resides in Dallas, Texas.

2.      Defendant KSE is a Delaware limited liability company, which maintains its

principal place of business in Denver, Colorado.  KSE is an entertainment and management group

that owns and operates, among other assets, the Pepsi Center, the Paramount Theatre, Dick's

Sporting Goods Park, the Colorado Avalanche (NHL), Denver Nuggets (NBA), Colorado

Mammoth (NLL), and Colorado Rapids (MLS).  KSE's sole member and owner is KMC Center,

LLC, a Missouri limited liability company, whose sole member and owner is the KMS Revocable

EXHIBIT "A"

Trust.  The sole grantor, trustee and beneficiary of the KMS Revocable Trust is E. Stanley Kroenke ("Kroenke"), a citizen of the State of Missouri.  Accordingly, KSE is a citizen of the state of Missouri for purposes of determining diversity of citizenship jurisdiction of these proceedings. Kroenke owns the NFL's St. Louis Rams and owns a majority stake in the English soccer club Arsenal.  KSE has been served and has appeared in this case.

3.     Defendant Outdoor is a Delaware corporation that previously maintained its principal place of business in Temecula, California and, upon information and belief, currently maintains its principal place of business in the State of Colorado.  Outdoor is an entertainment and media company that owned the Outdoor television network which is devoted primarily to traditional outdoor activities such as hunting, fishing, and shooting sports and other outdoor-related lifestyle programming, together with the aerial camera business.  Outdoor has been served and has appeared in this case.

4.     Defendant PNC is a California limited liability company that maintains its principal place of business in Santa Ana, California.  Upon information and belief, PNC's members either are citizens of states other than the State of Texas or are citizens or subjects of a foreign state. PNC is a private equity investment firm.  PNC has been served and appeared in this case.

## JURISDICTION AND VENUE

5.     Original jurisdiction exists under 28 U.S.C. § 1332.  The dispute is between citizens of different states or between citizens of a state and a foreign state and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

6.     This Court has personal jurisdiction over each of the Defendants because they either have engaged in business in this State or they have committed tortious and wrongful acts in this State.  Personal jurisdiction also exists because of Defendants' continuous and systematic contacts

with the State of Texas.  None of the defendants filed a timely Rule 12(b)(2) motion challenging this Court's personal jurisdiction over them.

7.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Salomon's claims occurred in this judicial district, and/or a substantial part of property that is the subject of this action is situated in this judicial district.  None of the defendants filed a timely Rule 12(b)(3) motion challenging the venue of this action before this Court.

## NATURE OF THE CASE

8.     Outdoor agreed in principle to sell two of its related businesses to Mr. Salomon and his investor group, PNC.  As part of that agreement, Outdoor contracted to deal exclusively with Mr. Salomon and PNC, not to entertain any competing offers and not to disclose to any third party (e.g., KSE) the exclusive negotiations.  Knowing of the exclusivity agreement, KSE, nevertheless, brushed aside Outdoor's contractual obligations and PNC's fiduciary duties to Mr. Salomon. Desiring to prevent Outdoor's sale of the two related businesses from occurring, KSE induced Outdoor and PNC contractually to position KSE to veto the sale to Mr. Salomon and PNC.  KSE then acquired the two businesses for itself.

9.     KSE obstructed and interfered with Mr. Salomon's efforts to purchase from Outdoor the aerial camera business of two companies (the "Aerial Camera Business") – SkyCam, LLC ("SkyCam") and CableCam, LLC ("CableCam").  SkyCam and CableCam are wholly owned subsidiaries of Outdoor.

10.    Mr. Salomon served as manager of finances and operations of the Aerial Camera Business from July 2006 until January 2009 and President of SkyCam and CableCam from 2009 until May 2014. During that time, Mr. Salomon and his management team developed the Aerial

Camera Business into a valuable, growing venture.  In early 2012, after Outdoor asked Mr. Salomon to find potential buyers for the Aerial Camera Business, Mr. Salomon and his investor group PNC submitted an offer on February 26, 2013, to buy the Aerial Camera Business, which Outdoor accepted and was signed by all the parties on February 27, 2013.

11.     Upon acceptance by Outdoor of Mr. Salomon's offer, Outdoor agreed to deal exclusively with Mr. Salomon and PNC regarding the sale of the Aerial Camera Business. Specifically, Outdoor agreed to not directly or indirectly: (1) solicit, facilitate, or accept any offers to acquire a debt or equity interest in the Aerial Camera Business or any material part of its assets; (2) negotiate or correspond with parties other than PNC and Mr. Salomon regarding offers to acquire any debt or equity interest in or any part of the business of the Aerial Camera Business; or (3) sell or agree to sell any equity or debt interest in any part of the Aerial Camera Business to parties other than PNC and Mr. Salomon. (*See* Ex. A at 2).

12.     The day after Mr. Salomon's offer was signed Outdoor and KSE began discussions regarding KSE's acquisition of all of Outdoor's assets, including the Aerial Camera Business to which Mr. Salomon devoted nearly seven years of his life.  At the same time, KSE and Outdoor assisted and encouraged PNC to violate its fiduciary duties to Mr. Salomon by entering into secret, side agreements to give KSE (not Outdoor) the authority to repudiate the exclusivity relationship and sale to Mr. Salomon and PNC and then to purchase the entirety of Outdoor, including the Aerial Camera Business, for KSE.

13.     Defendants succeeded in thwarting Mr. Salomon's efforts to buy the Aerial Camera Business, resulting in significant financial injury to Mr. Salomon which prevented Mr. Salomon from acquiring the valuable, growing Aerial Camera Business that was built and developed under his direction.

## FACTUAL BACKGROUND

### *The Aerial Camera Businesses – SkyCam and CableCam*

14.     Starting in 2006, Mr. Salomon managed the finances and operations of the Aerial Camera Business, and served formally as the President of the Aerial Camera Business starting in 2009.  SkyCam and CableCam currently operate from shared facilities in Fort Worth, Texas. Mr. Salomon worked to consolidate the Aerial Camera Business and to develop or acquire the patents necessary to do so.  The Aerial Camera Business principally provides suspended aerial camera services to media networks for the production of sporting and entertainment events.  SkyCam and CableCam design, manufacture, and operate movable aerial platforms, including the research and development of new technology related to these platforms.

15.     With their technology and unique services, SkyCam and CableCam play a significant role in changing the way sports and other entertainment programming are broadcast to fans both domestically and internationally.  During an entertainment or sporting event, the camera platforms are suspended above the playing or viewing field and are remotely controlled by specially-trained personnel who have the ability to move the cameras in up to three dimensions. Under the direction of Mr. Salomon and his management team, SkyCam and CableCam's financial success made them the fastest-growing business segment of Outdoor.

### *Outdoor Asks Mr. Salomon to Present an Offer to Buy SkyCam and CableCam*

16.     In or around March 2012, Tom Hornish, the then Chief Executive Officer of Outdoor, met with and advised Mr. Salomon that SkyCam and CableCam were viewed as Outdoor's non-core businesses, and would be spun off.  Hornish encouraged Mr. Salomon to assemble an investment group to offer to buy SkyCam and CableCam.

17.     After being encouraged by Outdoor, Mr. Salomon searched for capital to support a potential management buyout or related transaction to purchase the Aerial Camera Business.  Mr. Salomon contacted PNC about providing capital or investing in the purchase of the Aerial Camera Business.

18.     In April 2012, PNC and Mr. Salomon, acting individually on behalf of the divisional management team of SkyCam and CableCam, executed a Non-Disclosure Agreement to permit PNC to evaluate purchasing the Aerial Camera Business from Outdoor, while simultaneously protecting the Aerial Camera Business's confidential information that PNC received and reviewed in the process.  In the spring and early summer of 2012, PNC evaluated the purchase of the Aerial Camera Business.

19.     In June 2012, Outdoor retained a third-party capital markets company Noble Financial Capital Markets ("Noble Capital") to explore strategic alternatives for the Aerial Camera Business, including Outdoors' intended sale of that "non-core business."

**Mr. Salomon Introduces PNC to the SkyCam and CableCam Sale Process**

20.     In or around September 2012, Outdoor's CEO Hornish authorized Mr. Salomon to introduce PNC to the sale process.  After receiving Hornish and Noble's permission to introduce PNC as a potential investor group, *and at the request of Noble,* Mr. Salomon continued to conduct management presentations and interact with all groups that showed interest as potential purchasers of the Aerial Camera Business.

21.     In or around January 2013, Mr. Salomon conferred with Hornish and Cathy Lee, the then General Counsel of Outdoor, and advised them of his intent to present a bid with PNC to buy the Aerial Camera Business.  Mr. Salomon also notified Noble Capital.  Mr. Salomon's intent to present an offer with PNC to buy the Aerial Camera Business was again discussed in later

communications that included Tom Allen, the Chief Financial Officer of Outdoor, and David Bolls, Deputy General Counsel of Outdoor.

***Mr. Salomon and PNC Sign Term Sheet with Outdoor to Buy the Aerial Camera Business***

22.     On February 27, 2013, Mr. Salomon, PNC, and Outdoor executed a Term Sheet agreeing for Salomon and PNC to purchase the Aerial Camera Business from Outdoor. A true and correct copy of the Term Sheet is attached as Exhibit "A." Tom Hornish signed the Term Sheet as CEO of Outdoor. Mr. Salomon and Kelly Holowaty, as Managing Director of PNC, signed the Term Sheet "[f]or the Purchaser."   The Term Sheet defined the "Purchaser" as "[a]n Acquisition entity . . . to be formed by PNC in conjunction with [Mr. Salomon]." Salomon and PNC were the intended owners of the Purchaser. As the Term Sheet acknowledges, the Purchaser had not been formed as of February 27, 2013.

23.     The purchase price for the Aerial Camera Business assets is identified in the Term Sheet as a total amount of up to $4.05 million, which included $3.65 million in cash at closing and some additional payments for ongoing litigation and royalties as described in the Term Sheet.  The Term Sheet states that the transaction would be structured as an asset purchase agreement that would include the operating assets of the Aerial Camera Business and exclude only certain assets identified in the Term Sheet. The parties also agreed to use their best efforts to close the transaction no later than April 15, 2013, the last day of the "Exclusivity Period" discussed below.

24.     Furthermore, the Term Sheet expressly provides that it "may not be amended or modified except by a writing signed by each of the parties hereto."

***Outdoor Agrees to a Binding Exclusivity Period with Mr. Salomon and PNC***

25.     The Term Sheet also contains an exclusivity provision benefiting Mr. Salomon and PNC, which precluded Outdoor, SkyCam, and CableCam from negotiating or agreeing to sell any

equity interest in the Aerial Camera Business or any material part of the assets of the Aerial Camera Business to any party other than Mr. Salomon and PNC.  Under the exclusivity provision, and expressly "[i]n consideration of Purchaser continuing to spend time and incur professional fees and other expenses related to the acquisition" (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. A), each of Outdoor, SkyCam, and CableCam agreed that until April 15, 2013, they and their "directors, officers, affiliates, and representatives will not, directly or indirectly":–

 (i)  solicit, facilitate, encourage, or accept any offers to acquire any equity or debt interest in SkyCam or CableCam or any material part of the assets of the business of SkyCam or CableCam;

 (ii)  negotiate or correspond with third parties regarding existing or unsolicited offers to acquire any equity or debt interest or any part of the business of SkyCam or CableCam, other than to advise such third parties that exclusive discussions are being pursued with another party; and

 (iii)  sell or agree to sell any equity or debt interest in any part of SkyCam or CableCam to any part other than Mr. Salomon and PNC.

*Id.*

26. Under the Term Sheet's exclusivity provision, Outdoor further agreed to "cease any negotiations, discussions, or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of any entity or debt interest" in SkyCam or CableCam by any party other than Mr. Salomon and PNC.  (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. B). Outdoor agreed that it would advise any interested parties that it was pursuing exclusive discussions with another party (but in no event would reveal the Purchaser's identity).  *Id.* The exclusivity provision contained no exceptions, even though Mr. Salomon later discovered that Outdoor was then entertaining merger offers from KSE.

27. As an exception to language designating the Terms Sheet as non-binding, the exclusivity provision is expressly identified as "a binding legal agreement upon the parties."

(Term Sheet, Ex. A, at p. 4, "Non-Binding").   Under the exclusivity provision, Outdoor agreed

that Salomon is entitled to all legal and equitable relief for any breach of the provisions of the

agreement, including injunction (without the necessity of posting bond) and specific performance,

as well as both actual and consequential damages.  (Term Sheet, Ex. A, at p. 3, "Exclusivity", para.

D).

***Defendants Outdoor and KSE Facilitate Sale of Entire Business of Outdoor to KSE Without
Excluding the Aerial Camera Business From the Sale***

28.     In contravention of the exclusivity obligations in the Term Sheet, Outdoor

participated during the Exclusivity Period in negotiations with other parties to sell the entire

business of Outdoor, including SkyCam and CableCam.

29.     On November 15, 2012, and well after Outdoor commenced efforts to sell the

Aerial Camera Business (see ¶¶'s 17 – 21) Outdoor signed a merger agreement with Intermedia

Outdoors Holdings, LLC ("Intermedia") for Intermedia to acquire the stock of Outdoor at $8.00

per share. Outdoor's February 12, 2103, proxy statement reflected Intermedia was not merging

with Outdoor to acquire the Aerial Camera Business. Rather, the proxy statement expressly

recognized that the Aerial Camera Business would likely be sold as its financial projections

"exclude[d] the projected financial results of [Outdoor's Aerial Camera Business . . . given

[Outdoor's] announcement in June 2012 that it was exploring strategic alternatives for the

business, which process [was] still ongoing." (See excerpts of See Outdoor Channel Holdings, Inc.

Schedule 14A, February 12, 2013, attached as Exhibit "B") Consequently, Intermedia expected

and acknowledged that the Aerial Camera Business would be sold to a third party, either before or

after the merger.

30.     On February 27, 2013, the same day that Salomon and PNC executed the Term

Sheet, KSE made an unsolicited offer to purchase the stock of Outdoor at $8.75 per share.  On

March 1, 2013, KSE publicly announced its offer to purchase the stock of Outdoor. (See Outdoor Channel Holdings, Inc. Form 8K (with exhibit), March 4, 2013, attached as Exhibit "C") This was the first time Mr. Salomon was made aware of KSE's offer to acquire Outdoor Channel.

31.     Unlike Intermedia, KSE intended to acquire the Aerial Camera Business with Outdoor. On March 4, 2013 (during the exclusivity period), Outdoor's General Counsel called Mr. Salomon to inform him that Outdoor's position was to disregard the Term Sheet because the interest of Outdoor to accept an offer to purchase all the stock of the entire company took precedence over the sale of the Aerial Camera Business.  On March 4, 2013, Outdoor publicly acknowledged its receipt of the KSE offer and, over Intermedia's opposition, indicated that it expected the KSE proposal would be considered superior to the Intermedia proposal.

32.     Notwithstanding KSE's proposal and its General Counsel's representations to Mr. Salomon, Outdoor continued to negotiate with Mr. Salomon and PNC.  Both before and after the statements by Outdoor's General Counsel, and as the stated consideration for the exclusivity provisions to which Mr. Salomon agreed (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. A), Mr. Salomon "continu[ed] to spend time and incur professional fees and other expenses related to the acquisition," as discussed in more detail below, to finalize the purchase of SkyCam and CableCam.

33.     On March 1, after execution of the Term Sheet and also after KSE's announced bid for Outdoor, Mr. Salomon provided PNC with a list of items required for the due diligence. (See Exhibit "D").  Two days later, on March 3, and a day before Mr. Salomon's conversation with Outdoor's General Counsel, Mr. Salomon expended time and effort to provide PNC with a transaction plan that addressed the formation of the Purchaser as contemplated by the Term Sheet. (See Exhibit "E").  After Mr. Salomon's conversation with Outdoor's General Counsel in early March, Outdoor continued to proceed under the Term Sheet and provided Mr. Salomon and PNC

with an initial draft of the asset purchase agreement ("APA") contemplated by the Term Sheet, as well as its response to the due-diligence requests. (See Exhibit "F").

34.     On March 10, Mr. Salomon provided PNC with a proposed equity structure for the Purchaser. (See Exhibit "G").  Mr. Salomon and PNC's representative traveled to New York City to meet with a potential additional investor on March 12. The next day, Mr. Salomon spent time and effort to complete a draft of revisions to the APA and sent it to PNC for review on March 13. (See Exhibit "H").

35.     Also on March 13, (during the Term Sheet's Exclusivity Period, which prohibited "negotiations, discussions or correspondence" related to acquisition), Outdoor entered into a merger agreement with KSE, providing a definitive and binding agreement for the sale of Outdoor's business, including the Aerial Camera Business. Outdoor also provided Intermedia with an opportunity to counter KSE's offer. (See Outdoor Channel Holdings, Inc. Form 8K (with exhibit 99.2), March 13, 2013, attached as Exhibit "I").

36.     On March 14, Mr. Salomon began communicating with PNC's attorneys at Royer Cooper Cohen Braunfeld concerning the revisions to the APA. (See Exhibit "H").  Salomon also consulted with his own attorneys with regard to the APA and incurred legal fees in doing so.

37.      On March 20, Mr. Salomon, PNC, and Noble Financial participated in a conference call to discuss the draft APA prepared by Outdoor and revised by Salomon and PNC. (See Exhibit "J")  Following their conversation, PNC and Noble Financial reportedly had a separate call where the.y coordinated a follow up call between Hornish and PNC to occur on March 21. While Mr. Salomon did not participate in that call, PNC later informed him that PNC and Outdoor had "worked out most of the issues" on the APA and had agreed to extend the exclusivity period by

thirty days to give "more time to focus on the integration."  (See Exhibit "K").  Mr. Salomon was not informed about any agreement to give control of the term sheet to KSE.

38.     Thereafter, on March 21, 2013 (during the exclusivity period which directed Outdoor Channel and its officers not to negotiate or correspond with the third parties to acquire any part of SkyCam or CableCam) Outdoor, acting in concert with PNC and without Mr. Salomon's consent or signature, signed an agreement purportedly amending the Term Sheet ("Amendment") to effectively eliminate the exclusive dealing provision to the material detriment of Mr. Salomon and to give the purported new purchaser KSE control of the Term Sheet. A true and correct copy of the Amendment is attached as Exhibit "L." In pertinent part, the Amendment provides:

> E.     The parties agree that if, at any point during the exclusivity period, [KSE] concludes that it will not consent to the Proposed Transaction, PNC shall release [Outdoor] from its exclusivity obligations and PNC shall forever waive its rights, if any, under the Term Sheet to seek equitable relief or any other remedies available at law or equity.

Kelly Holowaty signed the Amendment on behalf of PNC, and Hornish signed the Amendment on Outdoor's behalf. Both PNC and Outdoor executed the Amendment during the exclusivity period. By entering into the Amendment with PNC (and not the Purchaser), Outdoor recognized PNC's rights as one of the parties to the Term Sheet's Exclusivity Provision but ignored Salomon's rights.

39.     On March 25, just four days after the Amendment, during the original exclusivity period and before the closing of the merger between KSE and Outdoor, Hornish directed Mr. Salomon to contact David Gluck, KSE's current executive vice-president for new business development. Gluck arranged to visit SkyCam and CableCam's shared facility in Fort Worth to learn more about the Aerial Camera Business. During his conversation with Mr. Salomon, Gluck disclosed that, despite Outdoor's exclusivity obligations, and prohibition against disclosing the

Purchaser's identity, he was aware of the Term Sheet but that KSE was allegedly undecided on plans concerning the proposed sale of the Aerial Camera Business to Mr. Salomon and PNC. At the time, neither Hornish nor Gluck disclosed to Mr. Salomon that the Amendment had been executed and that KSE, prior to its merger with Outdoor, had been given veto rights regarding the sale of the Aerial Camera Business.

40.     On March 28, Mr. Salomon emailed PNC, stating that he was continuing to work on an operating model for the Purchaser and requested that PNC provide a proposed capitalization table. PNC replied with limited information.  (See Exhibit "M").

41.     Mr. Salomon first learned of the Amendment on April 9, 2013.  When Mr. Salomon objected to his exclusion, Hornish asked him to ratify the Amendment by executing a "Side Letter Agreement and Amendment." Mr. Salomon refused.  (See Exhibit "N").

42.     The amendment granting veto rights to KSE and the conduct in disclosing information regarding the termination contemplated by the Term Sheet were undertaken at times that KSE did not have superior rights with regard to the Aerial Camera Business, as demonstrated by subsequent events described below.

43.     On May 3, 2013, Intermedia countered KSE's offer and proposed to purchase all of the shares of Outdoor at $9.75 per share. Three days later, Outdoor's board announced that Intermedia's offer was superior to KSE's and notified KSE of its intent to terminate the merger agreement, subject to KSE's opportunity to counter. (See Outdoor Channel Holdings, Inc. Schedule 14A, May 6, 2013, attached as Exhibit "O")

44.     On May 7, Outdoor adjourned the meeting of the shareholders that had been called to approve the KSE merger agreement. (See Outdoor Channel Holdings, Inc. Schedule 14A, May 7, 2013, attached as Exhibit "P").

45.     As of May 7, Outdoor expected to terminate the KSE merger agreement and to merge with Intermedia, subject to KSE's right to counter, yet, the Amendment still granted to KSE the ability to terminate Outdoor's planned sale of the Aerial Camera Business.

46.     KSE submitted a counteroffer and increased the purchase price for Outdoor's shares to $10.25 per share. Outdoor's board announced that it considered KSE's latest proposal to be superior, amended the KSE merger agreement, increased the breakup fee, added restrictions to consider further "superior proposals" and recommended that Outdoor's shareholders vote to approve it. (See Outdoor Channel Holdings, Inc. Form 8K, May 8, 2013, attached as Exhibit "Q").

47.     At a special meeting of Outdoor's stockholders on May 16, 2013, (after the conclusion of the first exclusivity extension period, but prior to the termination of the second extension period) Outdoor approved the KSE merger agreement for KSE to acquire all of the stock of Outdoor and for Outdoor to become a wholly-owned subsidiary of KSE.

48.     Prior to the end of the original exclusivity provision, KSE prevented Outdoor from honoring its obligation to use its best efforts to close the transaction contemplated by the Term Sheet. Although Mr. Salomon took steps consistent with his obligation under the Term Sheet to "spend time and incur professional fees and other expenses" to complete a transaction (in fact, Mr. Salomon incurred thousands of dollars in legal fees alone), Outdoor breached the Term Sheet's exclusivity provisions and allowed KSE to refuse to consummate the sale of the Aerial Camera Business as outlined in the Term Sheet. As a result, the Purchaser was never formed.

## CAUSES OF ACTION AGAINST OUTDOOR CHANNEL
## COUNT 1:  BREACH OF CONTRACT

49.     Pleading affirmatively and alternatively, Plaintiff alleges breach of contract against Outdoor and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

50.     The Exclusivity Provision of the Term Sheet is a valid and enforceable contract between Outdoor, PNC, and Plaintiff. PNC and Plaintiff were promoters of the Purchaser and signed the Term Sheet on its behalf. The Purchaser, however, had not been formed when the Term Sheet was signed and was never formed. Accordingly, PNC and Plaintiff are individually parties and entitled to enforce the Term Sheet's Exclusivity Provision.

51.     Outdoor breached the Term Sheet's Exclusivity Provision by, among other things, (1) negotiating, discussing, and corresponding with KSE regarding the sale of the Aerial Camera Business after February 27, 2013, (2) agreeing to sell SkyCam and CableCam, and the Aerial Camera Business, to KSE during the time period in which Outdoor agreed to exclusively deal with Mr. Salomon and PNC, (3) failing to cease negotiations and discussions with KSE regarding the potential acquisition of an equity interest in SkyCam, CableCam and the Aerial Camera Business, and (4) disclosing to KSE the existence of PNC and Mr. Salomon, and the details of the term sheet, and (5) granting KSE the right to veto the sale of the Aerial Camera Business to PNC and Plaintiff.

52.     As a result of Outdoor's breach of its contractual duties, Mr. Salomon incurred damages for which he now sues.  Mr. Salomon requests that Outdoor be ordered to pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill.

## CAUSES OF ACTION AGAINST KSE
## COUNT 2:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

53.     Pleading affirmatively and alternatively, Plaintiff alleges against KSE a tortious interference with Plaintiff's existing contract and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

54.     KSE had actual knowledge of the Term Sheet and Mr. Salomon's personal interest in it. KSE had knowledge of facts and circumstances that would lead a reasonable person to believe that there was a contract regarding the sale by Outdoor of SkyCam and CableCam, its wholly owned subsidiaries, and the Aerial Camera Business in which Mr. Salomon had an interest.

55.     KSE willfully and intentionally interfered with the Term Sheet's Exclusivity Provision.  KSE induced or caused Outdoor to breach its contractual obligations to negotiate exclusively with PNC and Plaintiff. KSE induced Outdoor to discuss and negotiate the sale of the Aerial Camera Business and grant KSE the right to disapprove of the sale to Plaintiff and PNC, by offering Outdoor, upon information and belief, superior terms or other incentives.

56.     KSE's interference proximately caused injuries to Mr. Salomon, for which he now sues and seeks from KSE all actual, consequential and economic damages, including but not limited to lost profits and goodwill.  Mr. Salomon also seeks exemplary damages.

## COUNT 3:  TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

57.     Pleading affirmatively and alternatively, Plaintiff alleges against KSE tortious interference with prospective relations and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

58.     Mr. Salomon had a business relationship with PNC and Outdoor regarding the sale of the Aerial Camera Business which, to the extent not addressed by binding provisions of the Term Sheet, had not yet been reduced to a formal contract.  To the extent not addressed by binding

provisions of the Term Sheet, there was a reasonable probability that the business relationship among Mr. Salomon, PNC, and Outdoor would be reduced to a formal contract or business relationship.  As the Amendment demonstrates, KSE had actual knowledge of Mr. Salomon's business relationship with PNC and Outdoor regarding the sale and purchase of the Aerial Camera Business, and KSE either desired to bring about the interference with that business relationship or knew that interference was certain or substantially certain to result from its conduct. KSE induced Outdoor to breach its contractual obligation to negotiate exclusively with Mr. Salomon and PNC and then caused the execution of the Amendment, which purported to grant KSE the right to disavow the sale of the Aerial Camera Business. KSE's conduct—tortiously interfering with the Exclusivity Provision and inducing PNC to breach its fiduciary duties to Mr. Salomon—was independently tortious.

59.    KSE's actions proximately caused injury to Mr. Salomon, for which he now sues. Mr. Salomon requests that KSE be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from KSE's wrongful conduct.  Mr. Salomon also seeks exemplary damages.

## COUNT 4:  INDUCEMENT OF AND ASSISTANCE IN
## (AIDING AND ABETTING) BREACH OF FIDUCIARY DUTIES

60.    Pleading affirmatively and alternatively, Plaintiff alleges inducement of and assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

61.    Outdoor and KSE were aware: that PNC and Mr. Salomon had a venture to acquire the Aerial Camera Business from Outdoor; and that, as venture partners, each owed fiduciary duties to the other, including the duties of scrupulous honesty and full disclosure. The joint venture between PNC and Mr. Salomon was apparent from the face of the Term Sheet, which reflected a

joint bid to purchase the Aerial Camera Business and stated that the Purchaser was to be formed by both Mr. Salomon and PNC.

62.     KSE and Outdoor knowingly assisted, encouraged, and participated in PNC's breach of its fiduciary duties owed to Mr. Salomon in connection with their purchase of the Aerial Camera Business by inducing PNC to sign the Amendment without Mr. Salomon's knowledge or consent. The Amendment purported to grant to the prospective purchaser KSE the right to reject the sale of the Aerial Camera Business to Mr. Salomon and PNC. Such assistance and encouragement was a substantial factor in causing PNC's breach of fiduciary duties to Mr. Salomon.  As a result of Outdoor's and KSE's knowing assistance, encouragement, participation and inducement of PNC's breach of fiduciary duties to Mr. Salomon, Mr. Salomon sustained damages for which Defendants KSE and Outdoor are jointly and severally liable.

63.     These breaches of fiduciary duties to Mr. Salomon have proximately caused both damages to Mr. Salomon and benefits to the Defendants, for which he now sues.  Mr. Salomon requests that the Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from their wrongful conduct.  Mr. Salomon also seeks exemplary damages.

<div align="center">

**CAUSES OF ACTION AGAINST PNC**
**COUNT 5:  BREACH OF FIDUCIARY DUTY**

</div>

64.     Pleading affirmatively and alternatively, Plaintiff alleges breach of fiduciary duty against PNC and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

65.     PNC and Mr. Salomon entered into a joint venture and/or partnership in connection with the acquisition of the Aerial Camera Business from Outdoor. PNC and Mr. Salomon agreed

to jointly bid to purchase the Aerial Camera Business and it was expected that each would own an interest in the Purchaser.

66.     As Mr. Salomon's joint venture and/or partners, PNC owed fiduciary duties to Mr. Salomon, including but not limited to, the duty of loyalty and utmost good faith, fairness, and honesty; the duty of candor and full disclosure; the duty to refrain from self-dealing and competition with the partnership/joint venture; and the duty of fair, honest dealing.  PNC breached those fiduciary duties by, among other reasons, negotiating and entering into the Amendment without Mr. Salomon's knowledge or consent that purported to allow the prospective purchaser KSE to eliminate the Exclusivity Provision of the Term Sheet.

67.     These breaches of fiduciary duties to Mr. Salomon have proximately caused damages to Mr. Salomon and perhaps benefits to PNC, for which he now sues.  Mr. Salomon requests that PNC be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from PNC's wrongful conduct.  Mr. Salomon also seeks exemplary damages.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS
## COUNT 6:  UNJUST ENRICHMENT

68.     Pleading affirmatively and alternatively, Plaintiff alleges unjust enrichment against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

69.     Defendants have unjustly enriched themselves, to Mr. Salomon's detriment, by the acts, omissions, and torts described in this Complaint.

70.     Mr. Salomon requests an accounting and that Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from Defendants' wrongful conduct.

## COUNT 7:  CIVIL CONSPIRACY

71.     Pleading affirmatively and alternatively, Plaintiff alleges a civil conspiracy against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

72.     To the extent they were not acting as principal and agent, Defendants conspired individually and/or collectively to accomplish unlawful purposes, including but not limited to the acts, omissions, and torts described in this Complaint, and to accomplish lawful purposes by unlawful means, including but not limited to the acts, omissions, and torts described in this Complaint.

73.     The foregoing had a meeting of the minds on the object or course of action, and at least one member of the conspiracy committed at least one unlawful, overt act to further the object or course of action.

74.     Mr. Salomon suffered injury as a proximate result of these wrongful acts.

75.     As such, Mr. Salomon requests that Defendants be held jointly and severally liable and be ordered to disgorge all profits and pay all actual, consequential and economic damages, resulting from their wrongful conduct, including but not limited to lost profits and goodwill. Because their actions were intentional, malicious, and grossly negligent, an award of exemplary damages is appropriate.

## CONDITIONS PRECEDENT

76.     To the extent that there are any conditions precedent to be satisfied, Plaintiff has satisfied or will satisfy such conditions prior to trial.

## ATTORNEYS' FEES

77.     Mr. Salomon requests that this Court award his costs and reasonable attorneys' fees pursuant to Section 38.001 et. seq. of the Texas Civil Practice & Remedies Code.

## EXEMPLARY DAMAGES

78.     Defendants acted with fraud, malice, and/or gross negligence toward Mr. Salomon. Defendants thus are liable for exemplary damages as authorized by Chapter 41 of the Texas Civil Practice & Remedies Code.

## JURY DEMAND

79.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Salomon demands a trial by jury on all applicable issues.

## PRAYER FOR RELIEF

Mr. Salomon respectfully requests that the Defendants be cited to appear and answer herein, and that Mr. Salomon have judgment against the Defendants for the following relief:

a.     compensatory, consequential, and incidental damages resulting from Defendants' tortious conduct, including but not limited to lost profits and goodwill;

b.     compensatory, consequential, and incidental damages resulting from Outdoor's breach of its contractual duties;

c.     restitution of Defendants' wrongfully-obtained gains;

d.     a constructive trust of proceeds that Defendants directly or indirectly obtained from their wrongful conduct;

e.     an accounting;

f.     prejudgment and post-judgment interest;

g.     attorneys' fees through trial and any appeal of this matter;

h.     costs;

i.       punitive and exemplary damages;

j.       general relief; and

k.      such other and further relief, both at law and in equity, to which Mr. Salomon is justly entitled.

Dated:  September 9, 2016.

GRAY REED & McGRAW, P.C.


By:    */s/ Cleveland G. Clinton*
         CLEVELAND G. CLINTON
         State Bar No. 04399900
         WILLIAM B. CHANEY
         State Bar No. 04108500
         JIM MOSELEY
         State Bar No. 14569100
         WILLIAM N. DRABBLE
         State Bar No. 24074154

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: 214-954-4135
Facsimile: 214-953-1332
      cclinton@grayreed.com
      wchaney@grayreed.com
      jmoseley@grayreed.com
      wdrabble@grayreed.com

ATTORNEYS FOR PLAINTIFF NIC SALOMON

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day of ninth day of September, 2016, I electronically filed Plaintiff's Second Amended Complaint using the Court's CM/ECF Filing System. The Clerk of the Court will send notification of the filing to counsel of record, which constitutes service under Local Rule 5.1(d).

*/s/ Cleveland G. Clinton*
CLEVELAND G. CLINTON



**PACIFIC NORTHERN**
CAPITAL
Investing Thoughtfully

PRIVATE AND CONFIDENTIAL

February 26, 2013

Mr. Tim McQuay
Managing Director
Noble Financial Capital Markets
355 South Grand Avenue
Suite 1750
Los Angeles, CA 90071

Dear Tim:

Nic Salomon and Pacific Northern Capital (collectively "PNC") are pleased to have the opportunity to present this revised Term Sheet ("Term Sheet") in acquiring the ownership interests of Outdoor Channel Holdings, Inc.'s aerial cameras businesses SkyCam LLC and CableCam LLC (the "Company"). Based on our general knowledge of the business, the information provided to us, and the subsequent conversations we have had with you and management, we are impressed with the performance of the business over the last few years, the strength of the management team, and the potential opportunities to expand the business going forward. We are providing this Term Sheet to you to evidence the intention of PNC to proceed with negotiations designed to complete a purchase of the Company substantially in the manner outlined herein.

PNC is fully prepared to provide the resources, both financially and professionally, to pursue new growth opportunities with the Company, both through acquisitions and internal initiatives. PNC views the Company's existing management team as an instrumental asset in implementing the growth plan and ensuring the continued level of operating expertise, innovation, and professionalism.

<u>Summary of Proposed Terms</u>

| | |
|---|---|
| **Company:** | SkyCam LLC and CableCam LLC ("Skycam and Cablecam" or collectively, the "Company") |
| **Purchaser:** | An Acquisition entity (the "Purchaser") to be formed by PNC in conjunction with Nic Salomon, current President of Skycam and Cablecam |
| **Purchase Price:** | Purchaser is prepared to acquire substantially all of the assets of Skycam and Cablecam (the "Transaction") from Outdoor Channel Holdings, Inc. ("Outdoor Channel") for a total purchase price ("Purchase Price") of up to $4.05MM.  The Purchase Price will be comprised of (i) $3.65MM in cash at close; (ii) the Litigation payment as described below; and (iii) the Royalty as described below. |
| | This Purchase Price is based on the Company having achieved an estimated 2012 Adjusted Free Cash Flow of at least $0.7MM (calculated as 2012 Adjusted EBITDA8C of approximately $1.3MM, less projected annual Maintenance Capex of $0.6MM), prior to taking into account increases in SG&A for standalone finance, accounting and human resource related costs.  The Purchase Price contemplates that Purchaser may fund an additional estimated $2.5 million capital investment in the Company over 2 years for development of a next generation Skycam system and the creation of an engineering and operations infrastructure.  The Purchaser's proposed Transaction includes the rights to the Company's IP for its government, military, security, agriculture and other non-sports |

3238 East Holt Avenue
West Covina, CA 91791
Tel: (626) 214-3155
Fax: (717) 591-8517

544 San Antonio Road
Mountain View, CA 94040
Tel: (650) 559-8811
Fax: (650) 641-3982

**EXHIBIT "A"**

PACIFIC
NORTHERN

Page 2

markets.

The Purchase Price assumes that Skycam and Cablecam will be run in the ordinary course of business until Closing, including the continuation of all business development and government market development activities. The Company will deliver $200,000 of working capital (or provide a credit to the Purchase Price equal to such amount) consistent with the Company's past practices and projected revenue growth. Outdoor Channel will allow a credit to the purchase price in an amount equal to any deferred revenues (i.e. payments received or due at the closing date for events or services not yet provided as of the closing date, less any related revenue earned through the closing date), net of any related costs incurred through the closing date. For purposes of clarity, any amounts received from ESPN or NBC or any other network, or from AMEWAS related to the Navair project, for which services not been fully performed as of the date of the closing, less any progress payments towards those related costs of revenues, shall be deducted as a credit to the Purchase Price at closing.

In addition, the Purchase Price will be increased at Closing for any non-budgeted capital expenditures funded by Outdoor Channel in its sole discretion (up to a maximum of $80,000) between the date of this Term Sheet and Closing if considered necessary and in the best interests of the Company by Nic Salomon as President of the Company.

**Structure:**
The Transaction will be structured as an asset purchase of operating assets and the Actioncam judgment but excluding certain assets as described below. Only ordinary course liabilities will be assumed.

**Financing:**
The Transaction will be financed by cash proceeds from PNC at Closing.

**Real Estate:**
Skycam's lease of the building in Tulsa (where there are currently no Company operations), associated liabilities and the accompanying sublease to another tenant will not be included as assets in the Transaction. As a condition to Closing, Outdoor Channel shall be released from its guaranty regarding the Fort Worth lease.

**Litigation Payment:**
The litigation claim will be included as an asset in the Transaction. However, Purchaser will provide Outdoor Channel with a retained 50 percent interest in the rights to economic recovery of the outstanding Actioncam litigation claim as further described below. Purchaser will retain the exclusive right to manage any ongoing litigation in the case. Outdoor Channel will cooperate in all aspects of the litigation as requested by Purchaser on a go forward basis. Any Purchaser-driven costs associated with the future Actioncam litigation will be the responsibility of Purchaser. Upon both the completion of the litigation in favor of Skycam and/or the expected liquidation of Actioncam LLC (or alternatively the sale of Actioncam to Purchaser), Purchaser will pay Outdoor Channel additional Transaction consideration of $100,000 (less any settlement proceeds already received by Outdoor Channel). Any costs incurred by Purchaser associated with the future Actioncam litigation will be deducted from any settlement proceeds prior to calculating the amount due to Outdoor Channel.

**Royalty:**
For a period of 12 months following the closing, Purchaser will pay Outdoor Channel a 20% royalty on revenue (excluding bill-back revenue from venue-driven charges and on site third party equipment rentals) from any incremental CBS regular season NFL and SEC events covered by the Company, which have not been regularly covered by Company in the past. For purposes of specificity, Skycam and Cablecam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game. With an estimated 30 NFL and SBC "A" games on CBS during the regular season, this additional consideration over 12

PACIFIC
NORTHERN

**Page 3**

months could exceed $300,000 (30 games x approximately $10,000 of revenue royalty per game) to Outdoor Channel.

**Due Diligence Requirements:**

Due diligence will begin immediately upon execution of this term sheet (e.g. legal due diligence, review of existing contracts and litigation, and business due diligence).

**Conditions to Closing:**

- Verification of historical profitability and confirmation that Company has achieved 2012 Adjusted Free Cash Flow of at least $0.7MM;
- Completion of business, accounting and legal due diligence to Purchaser's satisfaction;
- Execution of definitive transaction documentation acceptable to each party in its sole discretion.

**Exclusivity:**

A. In consideration of Purchaser continuing to spend time and incur professional fees and other expenses related to the acquisition, each of Outdoor Channel and the Company agree that until April 15, 2013, that they and any of their directors, officers, affiliates and representatives will not, directly or indirectly:

   (i) Solicit, facilitate, encourage or accept any offers to acquire any equity or debt interest in Skycam or Cablecam or the whole or any material part of the assets of the business of Skycam or Cablecam, nor engage or procure any person to do so on their behalf;

   (ii) Negotiate or correspond with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of Skycam or Cablecam, other than to advise them that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed), nor engage or procure any person to do so on its behalf;

   (iii) Sell or agree to sell any equity or debt interest (including any new issue of debt or equity) in any part of the Company to any other party than Purchaser or its nominee, and Outdoor Channel and its subsidiaries will procure that their respective directors, officers, affiliates, employees, advisors and representatives will also act accordingly.

B. Outdoor Channel and its subsidiaries jointly and severally undertake that they will forthwith cease any negotiations, discussions or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the Company by any other party than Purchaser or its nominee and that it will advise any such parties that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed).

C. Each of these undertakings in this Exclusivity section shall be read and construed independently of all other undertakings and, if any undertaking is held to be invalid or unenforceable, the remaining undertakings shall continue to apply to the extent that they shall not also be found to be invalid.

D. The parties agree that Purchaser shall be entitled to equitable relief, including injunction (without the necessity of posting bond) and specific performance, in the event of any breach of the provisions of this agreement, in addition to all other remedies available at law or in equity, including monetary damages, both actual and consequential.

**Transaction Timing:**

The parties will use their best efforts to achieve a signing of definitive documents and Closing no later than April 15, 2013. However, PNC will use its best efforts to target and work towards signing definitive documents and Closing by March 25, 2013.

Purchaser believes that because of its funding source and relationship to the management of Skycam and Cablecam, it is in a strong position relative to other interested parties in providing both speed and certainty of close. Purchaser believes the speed of a transaction is of the essence to preserve the value of the Company by ensuring capital availability for the development of a next generation Skycam system ahead of targeted prototype delivery

Page 4

in the Fall of 2013.

**Confidentiality:**   Both parties are covered by confidentiality agreements, which have already been put in place.

The Proposed Terms contained herein are contingent upon these Terms remaining confidential between the parties.

**Non-Binding:**   Except for the provisions of "Exclusivity" above, which is a binding legal agreement upon the parties, this Term Sheet is a statement of mutual intention; it is not intended to be legally binding, and does not constitute a binding contractual commitment with respect to any transaction.   Without limiting the foregoing, the failure of Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive agreements in accordance with this Term Sheet shall not be construed as a breach of this Term Sheet by any party hereto.   A legally binding obligation with respect to the investment contemplated hereby will arise only upon execution and delivery of definitive documents by Outdoor Channel and Purchaser, subject to the terms and conditions set forth therein. Accordingly, until definitive agreements are entered into, except as expressly set forth above, no party will be under any legal obligation with respect to this Term Sheet, and no withdrawal from or termination of negotiations for the transaction contemplated by this term sheet prior to signing definitive agreements, for whatever reason, or for no reason, shall be determined to be in bad faith and any such withdrawal or termination shall not give any party a cause of action against the other party.

This letter of intent (i) may not be amended or modified except by a writing signed by each of the parties hereto, and (ii) may be executed in one or more counterparts, each of which will be deemed an original but all of which together shall constitute one and the same instrument.

For the Purchaser on ___*2/27*___, 2013:          Accepted and Agreed on ___*2/26*___, 2013:

Nic Salomon                                        Outdoor Channel Holdings, Inc.

and Pacific Northern Capital


By: _____          By: _____

Nic Salomon                                        Tom Hornish

CEO

Outdoor Channel Holdings, Inc.


By: _____

Kelly Holoway

Managing Director

Pacific Northern Capital

DEFM14A 1 d485446ddefm14a.htm DEFM14A

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————————

# SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

———————————

Filed by the Registrant ☒                     Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to §240.14a-12

# OUTDOOR CHANNEL HOLDINGS, INC.
#### (Name of Registrant as Specified In Its Charter)

###### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:

          _____

    (2)   Aggregate number of securities to which transaction applies:

          _____

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

          _____

    (4)   Proposed maximum aggregate value of transaction:

**EXHIBIT "B"**

(5)   Total fee paid:

_____

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

        Amount Previously Paid:

        _____
        Form, Schedule or Registration Statement No.:

        _____
        Filing Party:

        _____
        Date Filed:

        _____

**Table of Contents**

# Outdoor Channel Holdings, Inc.



## MERGER PROPOSED—YOUR VOTE IS VERY IMPORTANT

Dear Stockholder,

On November 15, 2012, the board of directors of Outdoor Channel Holdings, Inc., a Delaware corporation ("Outdoor Channel"), unanimously approved and Outdoor Channel signed a definitive Agreement and Plan of Merger (the "merger agreement") with InterMedia Outdoors Holdings, LLC, a Delaware limited liability company ("IMOTSC").

As part of the proposed transaction, Outdoor Channel and IMOTSC will become separate, indirect wholly owned subsidiaries of InterMedia Outdoor Holdings, Inc., a newly-created Delaware holding corporation ("IMOH"). IMOTSC is a privately held multimedia company focused on outdoor enthusiasts. As a result of the transactions contemplated in the merger agreement, InterMedia Partners VII, L.P. ("InterMedia Partners"), currently a controlling member of IMOTSC, and related parties of InterMedia Partners will hold approximately 67.6% of the outstanding common stock of IMOH, and current holders of Outdoor Channel's common stock will hold the remaining 32.4% of IMOH's common stock. IMOH is financing the cash portion of the merger consideration to be received by holders of Outdoor Channel common stock in part through a $140 million term loan facility. Following the consummation of the mergers, IMOH will also have access to a $10 million revolving credit facility. Outdoor Borrower, LLC, a Delaware limited liability company and wholly owned subsidiary of IMOH, has entered into a commitment letter with CIT Finance, LLC relating to the proposed debt financing. As a condition to completing the transaction, IMOH intends to apply for a listing of its common stock for trading on The Nasdaq Global Market ("NASDAQ"), and it is anticipated that its symbol will be "OUTD."

Upon the consummation of the mergers, each outstanding share of Outdoor Channel common stock will be automatically converted into and will represent the right to receive the following consideration, pursuant to an election made by each stockholder, subject to proration in certain circumstances as described below (and subject to certain adjustments for cash to be paid in lieu of any fractional shares and the like as set forth in the merger agreement): (x) $8.00 in cash, without interest, with respect to each share of Outdoor Channel common stock for which an election to receive cash has been made; (y) one share of IMOH common stock with respect to each share of Outdoor Channel common stock for which an election to receive stock has been made; or (z) with respect to each share of Outdoor Channel common stock for which an election to receive mixed stock and cash has been made or for each share of Outdoor Channel common stock for which no election has been made, a combination of (A) $4.46 in cash, without interest and (B) that portion of a share of IMOH common stock equal to 0.443. You will need to make an election regarding the consideration you will receive for your shares of Outdoor Channel by March 4, 2013. If you do not, then you will receive the mix of cash and stock of IMOH described in clause (z) of the preceding sentence if the merger agreement is adopted by the stockholders.

Upon the consummation of the mergers, holders of IMOTSC common units will be entitled to receive 23,854,227 shares of IMOH common stock in the aggregate in exchange for IMOTSC common units, subject to various adjustments set forth in the merger agreement. Shares of IMOH common stock shall be allocated among the holders of IMOTSC common units in accordance with the merger agreement and the IMOTSC limited liability company agreement.

At the special meeting, Outdoor Channel stockholders will be asked to vote on the adoption of the merger agreement described in this proxy statement/prospectus. Adoption of the merger agreement requires the affirmative vote of the holders of a majority of the outstanding shares of Outdoor Channel common stock entitled to vote.

Perry T. Massie, Thomas H. Massie, and entities affiliated with Messrs. Massie (collectively, the "Massie Parties") hold approximately 36% of the shares of outstanding Outdoor Channel common stock. In connection with the merger agreement, on November 15, 2012, IMOH entered into a support agreement (the "Support Agreement") with the Massie Parties, the members of the Outdoor Channel board of directors and the executive officers of Outdoor Channel (collectively, the "Supporting Parties"). Under the Support Agreement, the Supporting Parties have agreed to vote their shares of Outdoor Channel common stock (i) in favor of the adoption of the merger agreement; (ii) in favor of any proposal to adjourn or postpone any meeting of the Outdoor Channel stockholders if there are not sufficient votes for approval of the matters described in the preceding clause (i); and (iii) except with the written consent of IMOH, against (x) any Alternative Proposal (as defined in the merger agreement) with respect to Outdoor Channel that would impede the mergers or (y) any other action or proposal involving Outdoor Channel that would reasonably be expected to prevent or materially impede, interfere with or delay the mergers.

On November 15, 2012, the last full trading day before the merger agreement was signed, the closing sales price of Outdoor Channel common stock, which trades on NASDAQ under the symbol "OUTD," was $7.19 per share.

**Outdoor Channel's board of directors has unanimously determined that the merger agreement and the proposed transaction are advisable to and in the best interests of Outdoor Channel stockholders, and recommends that its stockholders vote "FOR" adoption of the merger agreement, "FOR" approval, on an advisory (non-binding) basis, of the "golden parachute" compensation payable or that could become payable to the named executive officers of Outdoor Channel in connection with the mergers and "FOR" approval of the proposal to adjourn the Outdoor Channel special meeting, if necessary, to solicit additional proxies if there are not sufficient votes at the time of the Outdoor Channel special meeting to adopt the merger agreement.** The proposed transaction is conditioned upon the adoption of the merger agreement by Outdoor Channel stockholders, receipt of applicable regulatory approvals and other conditions described in the attached proxy statement/prospectus.

It is important that your shares are represented at the special meeting, whether or not you plan to attend the meeting. Abstentions and failures to vote will have the same effect as votes "against" the proposal to adopt the merger agreement. **Accordingly, complete, date, sign and return promptly your proxy card or voting instruction card in the enclosed postage pre-paid envelope.** You may attend the special meeting and vote your shares in person if you wish, even though you have previously returned your proxy.

**This document describes the special meeting, the proposed transaction, the documents related to the proposed transaction and other related matters that an Outdoor Channel stockholder ought to know before voting on the proposals described herein and should be retained for future reference. Please carefully read this entire document, including the "Risk Factors" section beginning on page 34, for a discussion of the risks relating to**

the proposed transaction. You also can obtain information about Outdoor Channel from documents that it has filed with the Securities and Exchange Commission. See "Where You Can Find More Information" for instructions on how to obtain such information.

Sincerely,

Perry T. Massie, Co-Chairman of the Board

*Outdoor Channel Holdings, Inc.*

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the common stock of IMOH to be issued under this proxy statement/prospectus or determined if this proxy statement/prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

---

The date of this document is February 12, 2013 and it is first being mailed or otherwise delivered to Outdoor Channel stockholders on or about February 12, 2013.

Table of Contents

IMOTSC's nor any other independent registered public accounting firms have examined, compiled or performed any procedures with respect to the accompanying prospective financial information and, accordingly, do not express an opinion or any other form of assurance with respect thereto. The Report of the Independent Public Registered Accounting Firm for IMOTSC included in this offering document and the Report of the Independent Registered Public Accounting Firm for Outdoor Channel incorporated by reference in this offering document relate to the historical financial information of IMOTSC and Outdoor Channel, respectively. Such reports do not extend to the prospective financial information and should not be read to do so.

### Outdoor Channel Financial Projections

The following is a summary of the Outdoor Channel financial projections prepared by Outdoor Channel's management and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor. The Outdoor Channel financial projections set forth below exclude projected financial results of Outdoor Channel's aerial cameras business, which are set forth below separately, given Outdoor Channel's announcement in June 2012 that it was exploring strategic alternatives for the business, which process is still ongoing.

| (in millions) | Fiscal Quarter Ending December 31, 2012E | Fiscal Years Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $   19.9 | $70.5 | $74.0 | $77.6 | $81.2 | $85.1 |
| Adjusted EBITDA(1) | $    2.9 | $10.6 | $11.9 | $13.2 | $14.5 | $15.9 |
| Unlevered Free Cash Flow(1) | $    1.0 | $ 5.5 | $ 6.3 | $ 7.2 | $ 7.7 | $ 8.7 |

(1)   Adjusted EBITDA, or earnings before interest, taxes, depreciation and amortization, and Unlevered Free Cash Flow, as used in the Outdoor Channel financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### Aerial Camera Financial Projections

The following is a summary of the financial projections of the aerial camera business of Outdoor Channel prepared by Outdoor Channel's management and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor.

| (in millions) | Fiscal Quarter Ending December 31, 2012E | Fiscal Years Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $    6.2 | $11.7 | $12.1 | $12.6 | $13.1 | $13.6 |
| Adjusted EBITDA(1) | $    2.0 | $ 1.2 | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.5 |
| Unlevered Free Cash Flow(1) | $    0.9 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 |

(1)   Adjusted EBITDA and Unlevered Free Cash Flow, as used in the Aerial Camera financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### IMOH Financial Projections

The following is a summary of the IMOH financial projections prepared by management of IMOTSC and Outdoor Channel, and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor. The IMOH financial projections reflect the business of IMOH on a pro forma basis assuming consummation of the mergers. The IMOH financial projections set forth below exclude projected financial results of Outdoor Channel's aerial cameras business, which are set forth above separately, given Outdoor Channel's announcement

82

Table of Contents

in June 2012 that it was exploring strategic alternatives for the business, which process is still ongoing. Further, the IMOH financial projections do not reflect estimated cost synergies, net of the cost to achieve such synergies, which are separately set forth below, and tax attributes with a net present value of approximately $38.0 to 40.3 million that are anticipated to be retained by IMOH due to IMOTSC's significant tax basis that will be amortized over a period of many years and net operating loss carryforwards.

| (in millions) | Fiscal Years Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $181.8 | $191.0 | $204.2 | $220.4 | $239.5 |
| Adjusted EBITDA(1) | $ 41.4 | $ 46.0 | $ 53.7 | $ 63.1 | $ 74.9 |
| Unlevered Free Cash Flow(1) | $ 23.3 | $ 25.9 | $ 30.6 | $ 36.2 | $ 43.4 |

(1)  Adjusted EBITDA and Unlevered Free Cash Flow, as used in the IMOH financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### Net Cost Synergies Projections

The following is a summary of the projections of estimated cost synergies, net of integration and implementation costs and after taxes, anticipated to be realized by IMOH in the mergers as prepared by the management of IMOTSC and Outdoor Channel, and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor.

| (in millions) | Fiscal Years Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2013E | 2014E | 2015E | 2016E | 2017E |
| Net Cost Synergies | $(0.4) | $ 3.4 | $ 5.1 | $ 5.1 | $ 5.1 |

(1)  Net Cost Synergies, as used in the net cost synergies projections, is a financial measure that is not presented in accordance with GAAP.

### Opinion of Outdoor Channel's Financial Advisor

Outdoor Channel has retained Lazard to act as Outdoor Channel's financial advisor in connection with the mergers. As part of this engagement, Outdoor Channel's Board requested that Lazard evaluate the fairness, from a financial point of view, of the consideration to be paid in the Outdoor Channel merger to holders of Outdoor Channel common stock. On November 15, 2012, at a meeting of Outdoor Channel's Board held to evaluate the mergers, Lazard rendered to Outdoor Channel's Board an oral opinion, confirmed by delivery of a written opinion dated November 15, 2012, to the effect that, as of that date and based upon and subject to the assumptions, factors and qualifications set forth in such opinion, the consideration to be paid in the Outdoor Channel merger to holders of Outdoor Channel common stock (other than holders who are entitled to and properly demand an appraisal of their shares of Outdoor Channel common stock) was fair, from a financial point of view, to such holders.

The full text of Lazard's written opinion, dated November 15, 2012, to Outdoor Channel's Board, which sets forth, among other things, the procedures followed, assumptions made, matters considered and qualifications and limitations on the scope of review undertaken by Lazard in connection with its opinion, is attached to this proxy statement/prospectus as Annex B and is incorporated into this proxy statement/prospectus by reference. **Lazard's engagement and its opinion were for the benefit of Outdoor Channel's Board (in its capacity as such) and Lazard's opinion was rendered to Outdoor Channel's Board in connection with its evaluation of the Outdoor Channel merger consideration from a financial point of view and did not address any other aspects of the mergers. Lazard's opinion did not address the relative merits of the mergers as compared to any other transaction or business strategy in which Outdoor Channel might engage or the merits of the**

8-K 1 d495755d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported):
March 4, 2013**

---

# OUTDOOR CHANNEL HOLDINGS, INC.

### (Exact name of registrant as specified in its charter)

---

| DELAWARE | 000-17287 | 33-0074499 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**43445 Business Park Drive
Temecula, California 92590**
(Address of principal executive offices, including zip code)

**(951) 699-6991**
(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☒  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**EXHIBIT "C"**

**Item 8.01 Other Events**

On March 4, 2013, Outdoor Channel issued a press release acknowledging receipt of an unsolicited, nonbinding proposal from Kroenke Sports & Entertainment, LLC ("Kroenke") to acquire all of its outstanding shares of common stock in an all-cash transaction at a price of $8.75 per share, subject to the completion of limited confirmatory due diligence and the execution of a definitive merger agreement. The text of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

The full text of the letter proposal from Kroenke is furnished as Exhibit 99.2 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

**(d)   Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release dated as of March 4, 2013, issued by Outdoor Channel Holdings, Inc. |
| 99.2 | Letter from Kroenke Sports & Entertainment, LLC, to the Board of Directors of Outdoor Channel Holdings, Inc., dated as of February 27, 2013 |

### SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OUTDOOR CHANNEL HOLDINGS, INC.

Date: March 4, 2013

/s/ Catherine C. Lee

Catherine C. Lee
Exec. VP, General Counsel and
Corporate Secretary

EX-99.1 2 d495755dex991.htm EX-99.1

**Exhibit 99.1**

### OUTDOOR CHANNEL HOLDINGS RECEIVES UNSOLICITED ACQUISITION PROPOSAL

**TEMECULA, Calif.—March 4, 2013—**Outdoor Channel Holdings, Inc. (NASDAQ: OUTD)(the "Company" or "Outdoor Channel") today acknowledged that it received an unsolicited, nonbinding, written proposal (the "Alternative Proposal") from Kroenke Sports & Entertainment, LLC ("Kroenke") to acquire all of its outstanding shares of common stock in an all-cash transaction at a price of $8.75 per share, subject to the completion of limited confirmatory due diligence and the execution of a definitive merger agreement.

The Company confirmed that Outdoor Channel's board of directors (the "Board") believes that the Alternative Proposal is *bona fide* and the Board, in consultation with its outside legal counsel and financial advisors, has determined in good faith that the Alternative Proposal would reasonably be expected to result in a "Superior Proposal" as such term is defined in the InterMedia Agreement. Accordingly, Outdoor Channel's board has authorized discussions with Kroenke regarding the Alternative Proposal. There is no assurance that these discussions will result in a definitive agreement with Kroenke or a binding offer with respect to a transaction for Outdoor Channel by Kroenke, or of the timing of any such agreement or offer and the terms on which any such agreement or offer may be made.

As previously announced, Outdoor Channel entered into the Agreement and Plan of Merger, dated as of November 15, 2012 (the "InterMedia Agreement"), with InterMedia Outdoors Holdings, LLC, InterMedia Outdoor Holdings, Inc. ("IMOH"), Outdoor Merger Sub, LLC and Outdoor Merger Corp. pursuant to which Outdoor Channel stockholders would receive, pursuant to an election made by each stockholder, either (x) $8.00 in cash, without interest and subject to proration, (y) one share of IMOH common stock, subject to proration, or (z) a combination of (A) $4.46 in cash, without interest, and (B) that portion of a share of IMOH common stock equal to 0.443.

The Board advises stockholders not to take any action at this time with respect to the Alternative Proposal. The Board is not withdrawing its recommendation with respect to the InterMedia transaction, or proposing to do so, and is not making any recommendation with respect to the Kroenke proposal. At this time, the Board reaffirms its recommendation that Outdoor Channel's stockholders vote in favor of the adoption of the InterMedia Agreement.

A copy of Kroenke's proposal to Outdoor Channel will be filed with the Securities and Exchange Commission.

#### About Outdoor Channel Holdings, Inc.

The Company owns and operates Outdoor Channel and Winnercomm Inc. and offers programming that captures the excitement of hunting, fishing, shooting, adventure and the Western lifestyle and can be viewed on multiple platforms including high definition, video-on-demand, as well as on a dynamic broadband website. Winnercomm is one of America's leading and highest quality producers of live sporting events and sports series for cable and broadcast television. The Company also owns and operates the SkyCam and CableCam aerial camera systems which provide dramatic overhead camera angles for major sports events, including college and NFL football.

#### Safe Harbor Statement

Certain matters discussed in this news release, with the exception of historical matters, may be forward- looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of risks and uncertainties that could cause results to differ materially from those anticipated as of the date of this release. You should understand that the following important factors, in

Case 3:15-cv-00666-M    Document 63    Filed 08/31/17    Page 38 of 139    PageID 708

addition to those risk factors disclosed in the Company's current and periodic reporting filed with the SEC and those discussed in "Risk Factors" in the Registration Statement on Form S-4 filed by IMOH with respect to the proposed transaction and in the documents which are incorporated by reference therein, could affect the future results of the Company and IMOH after the consummation of the transaction, and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- failure of Company stockholders to adopt the merger agreement;
- the risk that the businesses will not be integrated successfully;
- the risk that synergies will not be realized;
- the risk that the combined company following this transaction will not realize on its financing strategy;
- litigation in respect of either company or the mergers; and
- disruption from the mergers making it more difficult to maintain certain strategic relationships.

The Company also cautions the reader that undue reliance should not be placed on any forward-looking statements, which speak only as of the date of this release. The Company undertakes no duty or responsibility to update any of these forward-looking statements to reflect events or circumstances after the date of this report or to reflect actual outcomes.

### IMPORTANT INFORMATION FOR INVESTORS AND SECURITYHOLDERS

*This communication is being made in respect of a proposed business combination involving Outdoor Channel and IMOTSC. In connection with the proposed transaction, the Registration Statement on Form S-4, as amended (Registration No. 333-185106), filed by IMOH on November 21, 2012 with the SEC, that includes the proxy statement of Outdoor Channel and that also constitutes a prospectus of IMOH, was declared effective on February 11, 2013.*

*On February 12, 2013, Outdoor Channel commenced the mailing of the definitive proxy statement/prospectus with respect to the transaction to stockholders of Outdoor Channel. OUTDOOR CHANNEL URGES INVESTORS TO READ THE DEFINITIVE PROXY STATEMENT/PROSPECTUS AND OTHER DOCUMENTS INCLUDED AND INCORPORATED THEREIN AND FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION.*

*Investors and security holders will be able to obtain free copies of the definitive proxy statement/prospectus and other documents filed with the SEC by Outdoor Channel through the web site maintained by the SEC at www.sec.gov. Free copies of the definitive proxy statement/prospectus and other documents filed with the SEC can also be obtained on Outdoor Channel's website at www.outdoorchannel.com.*

### PROXY SOLICITATION

*Outdoor Channel and its respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Outdoor Channel stockholders in favor of the acquisition. A description of the interest of Outdoor Channel's directors and executive officers in Outdoor Channel is set forth in the proxy statement/prospectus and the other documents included and incorporated by reference therein. You can find information about Outdoor Channel's executive officers and directors in its annual report on Form 10-K filed with the SEC on March 9, 2012. You can obtain free copies of these documents from Outdoor Channel in the manner set forth above.*

CONTACT: OUTDOOR CHANNEL HOLDINGS, INC.

For Company:

Tom Allen
Executive Vice President, Chief Operating Officer /
Chief Financial Officer
800-770-5750

For Investors:

Chris Plunkett
Brainerd Communicators, Inc.
212-986-6667

For Media:

Nancy Zakhary
Brainerd Communicators, Inc.
212-986-6667

-2-

Case 3:15-cv-00666-M   Document 63   Filed 08/31/17   Page 40 of 139   PageID 710

EX-99.2 3 d495755dex992.htm EX-99.2

**Exhibit 99.2**



February 27, 2013

Board of Directors
Outdoor Channel Holdings, Inc.
43455 Business Park Drive
Temecula, CA 92590

Attn:   Thomas E. Hornish
        Perry T. Massie
        Roger L. Werner

Gentlemen:

We are pleased to submit this preliminary proposal to acquire Outdoor Channel Holdings, Inc., subject to the terms and conditions discussed below. Based on our knowledge of Outdoor Channel gathered from publicly available information, as well as our experience in the industry, we are prepared to acquire 100% of the outstanding shares of Outdoor Channel stock in an all-cash transaction, at a price of $8.75 per common share. Furthermore, we believe it will be possible to reflect additional value in our proposal once we have completed certain limited confirmatory due diligence on the company. We are confident that, given the opportunity, your stockholders will enthusiastically support our proposal.

As you may be aware, we are affiliated with Mr. E. Stanley Kroenke, the chairman and owner of The Kroenke Group, a private real estate investment and development company with properties located throughout the United States and Canada, as well as one of the leading owners in professional sports. Mr. Kroenke is the owner of the St. Louis Rams of the NFL, the majority owner of the Arsenal Football Club of the EPL, the owner of the Denver Nuggets of the NBA, the owner of the Colorado Avalanche of the NHL and the owner of the Colorado Rapids of the MLS. Mr. Kroenke also owns and operates sports and entertainment venues in Colorado, including the Pepsi Center, Dick's Sporting Goods Park and the Paramount Theatre. In television operations, Mr. Kroenke owns Altitude Sports & Entertainment, a regional television network based in Denver, Colorado and 50% of World Fishing Network, which operates primarily out of the Altitude network operating center in Centennial, Colorado.

As these investments and experiences demonstrate, we are well positioned to execute on our proposal and complete a transaction with your company. In addition, we and Mr. Kroenke are highly impressed with your company and are eager to partner for a transaction; Mr. Kroenke, in fact, personally owns 1.25 million shares of your common stock.

We believe our proposal constitutes not only an "Alternative Proposal" but also a "Superior Proposal" pursuant to your merger agreement with InterMedia Outdoors Holdings, Inc. Our proposal represents a premium of 16.7% to $7.50, the closing price of a share of the company's common stock today, February 27, 2013, and a premium of 21.7% to $7.19, the closing price on November 15, 2012 (the last trading day before announcement of the InterMedia transaction).

**1000 Chopper Circle, Denver, Colorado 80204    303.405.1100    PepsiCenter.com**

        

W/2069321

February 27, 2013
Page 2

Our purchase price of $8.75 per share is plainly more favorable, from a financial point of view, to the company's stockholders than the cash price of $8.00 per share that the company's stockholders may elect under the merger agreement. Furthermore, we are confident that the same holds true in comparing our purchase price against either (a) the one share of InterMedia common stock into which a share of Outdoor Channel stock may be converted or (b) the $4.46 in cash plus 0.443 portion of a share of InterMedia common stock into which a share of Outdoor Channel stock may be converted. In fact, the analysis of the fairness opinion of Lazard Fréres & Co. LLC, as described in your proxy statement, fully supports our conclusion that our proposal of $8.75 per share in cash is financially more favorable than the blended value of the InterMedia merger consideration.

Put simply, compared to the merger agreement with InterMedia, our all-shares/all-cash proposal provides clear, immediate value for all company stockholders, without imposing a cutback on the amount of cash any single stockholder could receive and without forcing stockholders to retain a stub minority equity security of uncertain value (in a company in which former independent public stockholders are likely to represent less than 21% of the total equity).

Our proposal is subject only to completion of limited confirmatory due diligence (which we are prepared to commence immediately) and execution of a definitive merger agreement; likewise, we will deliver high certainty of closing and see no regulatory impediments to a prompt closing. We anticipate that our merger agreement will be based substantially on your existing merger agreement with InterMedia, although our proposed agreement would be more favorable to the company's stockholders in two important respects.

First, our proposed merger agreement would not have any uncertainty tied to financing. We are a financially strong company and have the necessary resources to consummate this transaction; while we may seek bank financing, we do not require it and we would not propose to place the risk of such financing on your stockholders. By contrast, as you well know, your merger agreement with InterMedia provides that you are not entitled to seek specific performance to cause InterMedia to close unless, among other conditions, approximately $150 million in new debt financing has been (or will be) funded. Second, unlike your merger agreement with InterMedia, our proposed merger agreement would not cap your ability to seek monetary damages (or specific performance) in the event we were to willfully breach the agreement. These improved terms show our commitment to completing a transaction with your company.

We want to emphasize to the Outdoor Channel board of directors how serious we are about this proposal and how committed we are to a combination of our two companies. We have already engaged Allen & Company LLC as our financial advisor and Wachtell, Lipton, Rosen & Katz as our legal advisor, and they are prepared to begin work immediately to assist us in completing our limited confirmatory due diligence and to finalize an agreed transaction. In light of the stockholder meeting on March 13, 2013 to consider the InterMedia merger agreement, we believe it is in the best interests of all parties to begin discussions immediately, so you and your stockholders will be able to take full advantage of the value represented by our proposal. We (and our advisors) stand fully ready to commit the resources necessary to complete these steps expeditiously, and we are prepared to enter into a confidentiality agreement with you on the terms required by Section 9.3 of your merger agreement with InterMedia.

February 27, 2013
Page 3

We have great respect for Outdoor Channel and the accomplishments of your management team and employees and are excited by the prospects of building together on your strong foundation. We are confident in our ability to combine successfully our two companies to enhance opportunities for growth, which is why we are able to make this proposal of superior value for your stockholders.

Please note that this letter is not meant to, and does not, create or constitute any legally binding obligation, liability or commitment by us concerning a proposed transaction, and, other than any confidentiality agreement we may enter into with you, there will be no legally binding agreement between us regarding the proposed transaction unless and until we enter into a definitive merger agreement with you.

We are pleased to be able to offer this Superior Proposal to your stockholders. We are confident that our proposal presents a compelling opportunity for both our companies and look forward to your response; due to the short time before the March 13, 2013 stockholder meeting, we would appreciate your response before 5:00 p.m. (New York time) on Friday, March 1, 2013. If you have any questions or would like to clarify any aspect of our proposal, please do not hesitate to call either Paul Gould at Allen & Company, at (212) 339-2283, or Andrew Nussbaum at Wachtell, Lipton, Rosen & Katz, at (212) 403-1269.

Sincerely,

Kroenke Sports & Entertainment, LLC

By:      /s/ James A. Martin
Name: James A. Martin
Title:   President and Chief Executive Officer

Re: - Yahoo Mail

**Re:**

Friday, March 1, 2013 12:38 AM

**From:** "Nic Salomon" <nsalomon2@yahoo.com>

**To:** jeff.holowaty@pacificncap.com

**Cc:** kelly@pncapitalllc.com

**1 Files**   15KB   Download All
XLSX  15KB

Additional
Diligence
Items

Save

Jeff,

Please see attached for a revised follow-up diligence list.  Tab 1 has a full list (including the docs I tracked down and organized today with no need for Outdoor Channel to get involved).

Tab 2 is what I recommend we submit to Noble Financial tomorrow for Outdoor Channel to provide (subject to your review/comment of course).  Perhaps we can discuss tomorrow before you send them Tab 2.

Thanks.

Nic

--- On Wed, 2/27/13, Nic Salomon <nsalomon2@yahoo.com> wrote:

> From: Nic Salomon <nsalomon2@yahoo.com>
> Subject:
> To: jeff.holowaty@pacificncap.com
> Cc: kelly@pncapitalllc.com
> Date: Wednesday, February 27, 2013, 10:13 PM
> Jeff,
> Please see attached for a DRAFT follow up diligence request
> list.  This is still rough so let's discuss tomorrow
> and refine as needed.
>
> I have an operational transition plan in the works as
> well.  Will target to have a draft to you by Friday for
> review.
>
> I traded emails with Roger today.  Thanked him for his
> support and let him know we got a term sheet signed.
> He was happy to hear the news and said we would talk
> soon.
>
> Have a great evening.
>
> -Nic

**EXHIBIT "D"**

| | Additional Diligence Requests - 3/1/13 | Responsibility |
|---|---|---|
| | **IP / Technology** | |
| Complete | Updated patent, trademark and IP list for all entities | IP counsel |
| Complete | Detail on new provisional patents filed since data room upload (primarily second screen patent) | Nic |
| Complete | Detail on virtual trading card patent research | Nic |
| Complete | Arbitration documentation related to attempts to purchase Skycam.com domain name | Nic |
| Complete | Next generation camera system development proposal from Sequoia Technologies | Nic |
| | **IT** | |
| Request is in to IT | Provide copies of contracts for Phone System (C2M), Internet Lines (Cogent), Phone Service (C-Beyond), Cable (DirecTV) | OC IT / Legal |
| Request is in to IT | Inventory of all cell phones, laptops and other IT equipment used at Skycam/Cablecam or provided for us in Temecula; confirm if there is anything that CANNOT transfer | OC IT |
| | **HR** | |
| In progress | Update org chart | Nic/Marci |
| | Current Employee Handbook (only if updated after 2009) | Melinda |
| | Summary and details of current 401K plan and other benefits plans | Melinda |
| | Any severance / termination agreements for former aerial camera employees | Melinda |
| | Signed Employment Proprietary Information and Inventions, Confidentiality and Non-Competition agreements with current and former employees and consultants | Melinda |
| Complete | O1 Visa Support Letter for Pablo | |
| | H1B Visa sponsorship documentation for Santosh; anything required to transfer H1B sponsorship | Melinda |
| | 2 year salary and bonus history for all aerial camera employees | Melinda |
| | Current job descriptions on file for all aerial camera personnel | Melinda |
| | Correspondence, memoranda or notes concerning any labor or employment disputes | Melinda |
| Requested from Barney & Barney 2/28 | Summary of current insurance policies (D&O, Property, Benefits, Disability) | Nic |
| | **General Business** | |
| Complete | Government strategic planning documents | Nic |
| Complete | Business development and strategic plans | Nic |
| Complete | Utility details (account information with each provider) | Nic |
| Complete | Wavecam patent assignment documentation | Nic |

**Finance / Accounting**

| | | |
|---|---|---|
| Complete | ESPN historical event usage summary | Nic |
| Complete | Historical price and volume data by network | Nic |
| Complete | Spreadsheet of ESPN scheduled contract payments | Nic |
| | A/R and A/P aging report for Skycam and Cablecam (most recent month) | OC |
| | Asset lists from general ledger for Skycam and Cablecam (most recent month) | |
| | Deferred revenue account by customer - primarily Navy/AMEWAS & ESPN (most recent month) | OC |
| | Navy/AMEWAS historical (actual) and projected financials by quarter through end of project; Spreadsheet showing revenue and profit recognition calculations for same periods | OC |
| | All permits, licenses, approvals and entitlements regarding current and future projects or services. Specifically, please provide copy of all business licenses | OC |
| | Title reports for any real property owned by Skycam or Cablecam | OC |
| | Audit reports containing audited financials of Skycam and Cablecam for 2010, 2011 and 9 months ended 2012 | OC |
| | Skycam and Cablecam tax returns since inception (2009/2010/2011) | OC |

**Legal**

| | | |
|---|---|---|
| Complete | List of corporate attorneys with contact information | Nic |
| | Describe any encumberances to the transfer of Skycam and Cablecams' assets out of Skycam, Cablecam, Winnercomm or Outdoor Channel? | Cathy Lee |
| | Confirm ownership structure of Skycam and Cablecam. Is Winnercomm still the Managing Member or is it Outdoor Channel Holdings? | Cathy Lee |
| | Are there any guarantees outstanding from Skycam or Cablecam or related to Skycam and Cablecam (not already disclosed)? | Cathy Lee |
| | Any updated information Outdoor Channel has related to outstanding sales tax dispute with State of California and/or license agreement with Garrett Brown? | Cathy Lee |
| | Copy of Engagement letter with Noble Financial (to extent there are any obligations impacting the buyer of Skycam and Cablecam's assets or the sale of those assets) | Cathy Lee |
| | Other material documents or information NOT in data room which, in Outdoor Channel's judgment, are significant with respect to the aerial camera business and its affiliated entities, or, which should be considered and reviewed in making disclosures regarding the business and financial condition of the business to prospective investors | Cathy Lee |
| | Details of any materials customer disputes or complaints related to Skycam/Cablecam that are not in the data room | Cathy Lee |
| | Details of any threatened or actual litigation related to Skycam/Cablecam that are not in the data room | Cathy Lee |

**Additional Diligence Requests - 3/1/13**
**PNC & Nic Salomon**

**HR**

1. Current Employee Handbook (only if updated after 2009)
2. Summary and details of current 401K plan and other benefits plans
3. Any severance / termination agreements for former aerial camera employees
4. Signed Employment Proprietary Information and Inventions, Confidentiality and Non-Competition agreements with current and former employees and consultants
5. H1B Visa sponsorship documentation for Santosh; anything required to transfer H1B sponsorship
6. 2 year salary and bonus history for all aerial camera employees
7. Current job descriptions on file for all aerial camera personnel
8. Correspondence, memoranda or notes concerning any labor or employment disputes

**Finance / Accounting**

1. A/R and A/P aging report for Skycam and Cablecam (most recent month)
2. Asset lists from general ledger for Skycam and Cablecam (most recent month)
3. Deferred revenue account by customer - primarily Navy/AMEWAS & ESPN (most recent month)
4. Navy/AMEWAS historical (actual) and projected financials by quarter through end of project; Spreadsheet showing revenue and profit recognition calculations for same periods
5. All permits, licenses, approvals and entitlements regarding current and future projects or services. Specifically, please provide copy of all business licenses
6. Title reports for any real property owned by Skycam or Cablecam
7. Audit reports containing audited financials of Skycam and Cablecam for 2010, 2011 and 9 months ended 2012
8. Skycam and Cablecam tax returns since inception (2009/2010/2011)

**Legal**

1. Describe any encumberances to the transfer of Skycam and Cablecams' assets out of Skycam, Cablecam, Winnercomm or Outdoor Channel?
2. Confirm ownership structure of Skycam and Cablecam. Is Winnercomm still the Managing Member or is it Outdoor Channel Holdings?
3. Are there any guarantees outstanding from Skycam or Cablecam or related to Skycam and Cablecam (not already disclosed)?
4. Any updated information Outdoor Channel has related to outstanding sales tax dispute with State of California and/or license agreement with Garrett Brown?
5. Copy of Engagement letter with Noble Financial (to extent there are any obligations impacting the buyer of Skycam and Cablecam's assets or the sale of those assets)
6. Other material documents or information NOT in data room which, in Outdoor Channel's judgment, are significant with respect to the aerial camera business and its affiliated entities, or, which should be considered and reviewed in making disclosures regarding the business and financial condition of the business to prospective investors
7. Details of any materials customer disputes or complaints related to Skycam/Cablecam that are not in the data room
8. Details of any threatened or actual litigation related to Skycam/Cablecam that are not in the data room

Re: - Yahoo Mail                                                                                      Page 1 of 2

**Re:**                                                                              Sunday, March 3, 2013 5:33 PM

From: "Nic Salomon" <nsalomon2@yahoo.com>

To: jeff.holowaty@pacificncap.com

Cc: kelly@pncapitalllc.com

**1 Files**    14KB    Download All
XLSX   14KB

Aerial
Camera
transition

Save

Jeff,

Please see attached for a draft aerial camera transition plan for us to review together on Tuesday. The items in orange are the ones which require some
coordination with Outdoor Channel.

Safe travels to Dallas. Let's connect tomorrow and figure out scheduling for Tuesday.

Nic

--- On Fri, 3/1/13, Nic Salomon <nsalomon2@yahoo.com> wrote:

> From: Nic Salomon <nsalomon2@yahoo.com>
> Subject: Re:
> To: jeff.holowaty@pacificncap.com
> Cc: kelly@pncapitalllc.com
> Date: Friday, March 1, 2013, 11:48 PM
> Guys - This could get even more
> interesting.
>
> http://www.heraldonline.com/2013/03/01/4659945/kroenke-sports-entertainment-llc.html
>
>
> --- On Thu, 2/28/13, Nic Salomon <nsalomon2@yahoo.com>
> wrote:
>
> > From: Nic Salomon <nsalomon2@yahoo.com>
> > Subject: Re:
> > To: jeff.holowaty@pacificncap.com
> > Cc: kelly@pncapitalllc.com
> > Date: Thursday, February 28, 2013, 11:38 PM
> > Jeff,
> > Please see attached for a revised follow-up diligence
> > list. Tab 1 has a full list (including the docs I
> tracked
> > down and organized today with no need for Outdoor
> Channel to
> > get involved).
> >
> > Tab 2 is what I recommend we submit to Noble Financial
> > tomorrow for Outdoor Channel to provide (subject to
> your
> > review/comment of course). Perhaps we can discuss
> tomorrow
> > before you send them Tab 2.
> >
> > Thanks.
> >
> > Nic
> >
> > --- On Wed, 2/27/13, Nic Salomon <nsalomon2@yahoo.com>
> > wrote:
> >
> > > From: Nic Salomon <nsalomon2@yahoo.com>
> > > Subject:
> > > To: jeff.holowaty@pacificncap.com
> > > Cc: kelly@pncapitalllc.com
> > > Date: Wednesday, February 27, 2013, 10:13 PM
> > > Jeff,
> > > Please see attached for a DRAFT follow up
> > diligence
> > > request
> > > list. This is still rough so let's discuss
> > tomorrow
> > > and refine as needed.
> > >
> > > I have an operational transition plan in the works

**EXHIBIT "E"**

Aerial Camera Ownership Transition Plan
CONFIDENTIAL
3-Mar-13

| Category | Topics | Details | Notes |
|---|---|---|---|
| Deal Structuring | Separate entity for government business (with at least 1 key government focused patent application) | Key for long term JV, government contracting reasons | |
| | Put IP in holding company (possibly offshore) with leaseback arrangements | Separate IP from operating companies | |
| | Decision on LLC vs. Inc. - probably Inc. holding company with LLCs underneath (review tax consequences, ease of setup, capitalization considerations - stock options, facilitate possible JV with rightsholders in future) | Gamelevel (Holdings), Inc, Skycam Technologies LLC, Cablecam Technologies, LLC, Skycam Government Services, LLC, Skycam Research Lab, LLC | |
| | Outline controlling officers of entities | | |
| | Board structure / voting structure | | |
| | Domain name considerations (skycam.tv vs. skycam.com, gamelevel.com) | gamelevel.com domain name offer due by Friday; will also research trademark possibilities with IP attorney | skycam.com does not appear to be attainable for a reasonable price (without litigation) |
| Employment/HR | Employment agreements for key personnel | | |
| | Comp changes for key personnel | | |
| | Incentive structures in place for key personnel and employees; Mitigate negative tax consequences of structure | | |
| | Hire CFO/Accountant/AP+AR Clerk (CFO possibly on interim basis to bridge to close) | Range of CFO candidates identified | Jeff - any suggestions? |
| | Discuss need for new Engineering/Operations personnel | Steve has a few people already identified as part of next gen project | Keith Denoyer, Tim Demers, Tom Marksmeyer |
| | HR Documentation / Employee Handbook / NDAs / Invention Assignments / HR Administration | Ben Simpson | Outsource to 3rd party? Any Pacific Northern resources? |
| | Update all payroll company documentation for new entity / tax ID (upon change of control) | | |
| | 401K vesting / new plan in place | Does 401K from OC vest upon change of control? | Melinda is checking with plan administrator |
| Investors | Outside investors (strategic investors, friends/family pool) | To discuss | |
| Insurance | Quote for new D&O policy (significant protection required with large liability policy) | | Pacific Northern suggestion for this?; Nic has a number of good broker relationships |
| | Property/Casualty insurance | | Pacific Northern suggestion for this?; Nic has a number of good broker relationships |

| | | | |
|---|---|---|---|
| | Medical/dental/vision/workers comp/short term and long term disability insurance | Workers comp insurance needs to cover contractors; Also need International policy for Property & Medical + Ransom policy; Are there issues to be aware of (based on coverages, company size) from new health care law? | Pacific Northern suggestion for this?; Nic has a number of good broker relationships |
| **Information Technology** | Change over control of mobile phones and billing | | Summary of devices/plans has been requested from IT |
| | Hire new company locally to host email and navigate switch over from Outdoor Channel | Possibly arrange for a short transition services agreement to cover a small gap? Do we need to purchase any equipment (servers, etc)? | Request is in to IT to identify any equipment that cannot come with the business |
| | Switch over control of domains for websites | Check with IT on current hosting providers | |
| | Switch over control of all laptops and on site IT infrastructure to Skycam personnel | Possibly hire 3rd party service provider? | Tim Demers possible to take this over? |
| **Legal Counsel** | New engagement letters with IP, labor, litigation and M&A attorneys | | |
| | Litigation decision (M&T deal) is critical | This will be a key issue with Outdoor | |
| **Finance/ Accounting** | Review 2013 Budget | | |
| | Detailed Operations Growth Model | May need to refine a growth model to solicit additional investment | CFO project (if there is time) |
| | New Accounting System | Explore cost for stand alone ReqLogic software vs. completely new system | Pacific Northern input? |
| | New Credit Cards, Bank Accounts, T&E System | | JPMorgan Chase, Wells Fargo, Comerica are local possibilites |
| **Acquisitions** | Sequoia Due Diligence / Deal Structuring / Loan Info | visit to Seattle this Thursday; will get bank loan details | Interim consulting agreement is now in place |
| **Export License** | No action required unless Brazil requires Cineflex gimbal | | |
| **Operations** | Change over Internet, Local and Long Distance Phone, Cable, Phone System, Gas, Security, Copy Machine, Electric accounts | Nic has recent bills for each provider with contact information | Contracts have been requested from IT (for the ones we don't have) |
| | Coordinate PTO Payouts or alternative arrangement (may be required legally for Outdoor Channel to pay out) | Need to figure this out with Outdoor Channel HR | |
| | Customer notifications of new entity, contract assignments, AP/AR addresses, etc | Can accomplish immediately once deal closes | |
| | Some key contracts will require work/review ahead of time in order to close | Tindall Lease, NFL Network | |
| **Real Estate** | New Dallas or FW office, or alternatively office expansion | | |

**APA**

Determine specifically which assets to list and the carve outs

Don't assume Tulsa lease or related docs, or litigation contingent fee agreement; carve out or escrow for sales tax liability

Negotiate terms and conditions (limit OC warranties due to management involvement)

RE: Kroenke/Outdoor Channel - Yahoo Mail                                                     Page 1 of 2

**RE: Kroenke/Outdoor Channel**                                    Wednesday, March 6, 2013 8:09 PM

From: "Nic Salomon" <nsalomon2@yahoo.com>

To: "Charles D.Powell" <cpowell@fulbright.com>   "WilliamWood" <wwood@fulbright.com>

Cc: "BrianBoyle" <bboyle@fulbright.com>   "DavidHanss" <dhanss@fulbright.com>

Willie / David / Brian,
Thanks for your time today. Outdoor Channel delivered us an Asset Purchase Agreement yesterday and after our call today sent a response on most of
our remaining due diligence questions. I will continue to keep you informed on anything I hear from OC, and will keep a look out for the SEC filing on my
end as well.

Best,
Nic

— On **Wed, 3/6/13, Wood, William <wwood@fulbright.com>** wrote:

From: Wood, William <wwood@fulbright.com>
Subject: RE: Kroenke/Outdoor Channel
To: "Nic Salomon" <nsalomon2@yahoo.com>, "Powell, Charles D." <cpowell@fulbright.com>
Cc: "Boyle, Brian" <bboyle@fulbright.com>, "Hanss, David" <dhanss@fulbright.com>
Date: Wednesday, March 6, 2013, 5:00 PM

Nic,

Good to talk with you this afternoon. We will be on the lookout for the Kroenke/Outdoor Channel SEC filing. Please let us know if you
hear anything further from Outdoor Channel's General Counsel regarding Outdoor Cannel's intent to go forward with closing the transaction
reflected in the February 26 term sheet.

Regards,

Willie

**William D. Wood**, *Partner*
**FULBRIGHT** & *Jaworski L.L.P.* • Fulbright Tower • 1301 McKinney, Suite 5100 • Houston, Texas 77010-3095
T: 713 651 5537 • F: 713 651 5246 • wwood@fulbright.com • www.fulbright.com/wwood
**From:** Nic Salomon [mailto:nsalomon2@yahoo.com]
**Sent:** Wednesday, March 06, 2013 8:52 AM
**To:** Wood, William; Powell, Charles D.
**Subject:** RE: Call

We can use:

4:30PM Central
Dial-In: 800 315 0312
Conference ID: 513362

--- On **Wed, 3/6/13, Powell, Charles D. <*cpowell@fulbright.com*>** wrote:

From: Powell, Charles D. <cpowell@fulbright.com>
Subject: RE: Call
To: "Wood, William" <wwood@fulbright.com>, "'nsalomon2@yahoo.com'" <nsalomon2@yahoo.com>
Date: Wednesday, March 6, 2013, 8:00 AM

Cold you circulate a call in?

**Charles D. Powell**, *Partner*
**FULBRIGHT** & *Jaworski L.L.P.* • Fulbright Tower • 1301 McKinney, Suite 5100 • Houston, Texas 77010-3095
T: 713 651 5431 • F: 713 651 5246 • cpowell@fulbright.com • www.fulbright.com/cpowell

**From:** Wood, William
**Sent:** Wednesday, March 06, 2013 8:00 AM
**To:** Powell, Charles D.; 'nsalomon2@yahoo.com'
**Subject:** Re: Call

It does

**EXHIBIT "F"**

**From**: Powell, Charles D.
**Sent**: Wednesday, March 06, 2013 07:47 AM
**To**: 'Nic Salomon' <nsalomon2@yahoo.com>
**Cc**: Wood, William
**Subject**: RE: Call

Works for me. Willie?

**Charles D. Powell**, *Partner*
**FULBRIGHT** & *Jaworski L.L.P.* • Fulbright Tower • 1301 McKinney, Suite 5100 • Houston, Texas 77010-3095
T: 713 651 5431 • F: 713 651 5246 • cpowell@fulbright.com • www.fulbright.com/cpowell
**From**: Nic Salomon [mailto:nsalomon2@yahoo.com]
**Sent**: Tuesday, March 05, 2013 8:24 PM
**To**: Powell, Charles D.
**Cc**: Wood, William
**Subject**: Re: Call

How about 4:30? If that works I will be reachable in the office. Thanks!

---

**From**: Powell, Charles D. <cpowell@fulbright.com>;
**To**: Nic Salomon (nsalomon2@yahoo.com) <nsalomon2@yahoo.com>;
**Cc**: Wood, William <wwood@fulbright.com>;
**Subject**: Call
**Sent**: Tue, Mar 5, 2013 10:21:29 PM

Nic:

Could we have a call tomorrow at 4 to discuss strategy and next communication with Outdoor Channel?

Regards,

Chuck

**Charles D. Powell**, *Partner*
**FULBRIGHT** & *Jaworski L.L.P.* • Fulbright Tower • 1301 McKinney, Suite 5100 • Houston, Texas 77010-3095
T: 713 651 5431 • F: 713 651 5246 • cpowell@fulbright.com • www.fulbright.com/cpowell

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to any party any transaction or tax-related matter[s].

---

*Fulbright & Jaworski L.L.P. will join forces with Norton Rose on June 1, 2013, offering significant depth of experience across Africa, Asia, Australia, Canada, Central Asia, Europe, Latin America, the Middle East, and the United States.*

This email message and any attachments are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

To reply to our email administrator directly, send an email to postmaster@fulbright.com.

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to any party any transaction or tax-related matter[s].

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to any party any transaction or tax-related matter[s].

Re: proposed equity structure and draft sources/uses - Yahoo Mail                    Page 1 of 1

**Re: proposed equity structure and draft sources/uses**                    Tuesday, March 12, 2013 10:38 AM

From:  "Nic Salomon" <nsalomon2@yahoo.com>

To:  "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

Roger that.  That works well.  I'll see you there.

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
To: nsalomon2@yahoo.com
Sent: Tuesday, March 12, 2013 6:52 AM
Subject: Re: proposed equity structure and draft sources/uses

I will be around 57th st. for a meeting at 2pm and should be finished by 3pm.  To save time, why don't we meet in the lobby of the Four
Seasons hotel on 57th (Madison Ave. area) at around 3pm.

-------- Original Message --------
Subject:: Re: proposed equity structure and draft sources/uses
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Mar 11, 2013 8:48 PM
To:: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,"kelly.holowaty@pacificnc.com"
<kelly.holowaty@pacificnc.com>
CC:

Jeff - the 4PM meeting with Brad is at their HQ:

110 East 59th Street, Suite 2100
(59th and Park)

How about we meet in the lobby of the Waldorf Astoria at 3PM (50th and Park)?  Then we can walk to a good place from there.


From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
To: nsalomon2@yahoo.com; kelly.holowaty@pacificnc.com
Sent: Monday, March 11, 2013 11:53 AM
Subject: Re: proposed equity structure and draft sources/uses

Thank Nic.  We will review.

Let's plan on meeting tomorrow around 3pm somewhere close to where we are meeting Brad at 4pm.

-------- Original Message --------
Subject:: proposed equity structure and draft sources/uses
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Mar 10, 2013 9:35 PM
To:  "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,"kelly.holowaty@pacificnc.com"
<kelly.holowaty@pacificnc.com>
CC:

Jeff / Kelly,

Please see attached for a proposed equity structure for the transaction.  This structure limits downside for investors, while providing
incentives to management for creating significant value.  I have also included a draft sources/uses to give you an overview of the
valuation.

I'm still working on a proposed comp plan structure.

Jeff - I look forward to discussing more on Tuesday (please let me know when you will be in the city and the best time/place to meet).

Thanks.

Nic

**EXHIBIT "G"**

CONFIDENTIAL - DRAFT 3/10/13

**Proposed Equity Structure**

| | | | | |
|---|---|---|---|---|
| Cash Funding for Transaction | 5,625,000 | | | |
| Initial Shares Issued | 10,000 | 1x | 2x | 3x |
| Strike Price Per Share | $562.50 | $562.50 | $1,125.00 | $1,687.50 |
| Valuation | - | 5,625,000 | 11,250,000 | 16,875,000 |

**Equity incentives to management**

| | Founder equity (value already created) | Founder options (value from time of transaction) | 2x options (value for significant growth) | 3x options (value for significant growth) | Founder equity (value already created) | Founder options (value from time of transaction) | 2x options (value for significant growth) | 3x options (value for significant growth) |
|---|---|---|---|---|---|---|---|---|
| Nic Salomon | 870 | 639 | 284 | 316 | 8.0% | 5.0% | 2.0% | 2.0% |
| Steve Wharton | - | 384 | 142 | 158 | 0.0% | 3.0% | 1.0% | 1.0% |
| Ben Simpson | - | 256 | 71 | 79 | 0.0% | 2.0% | 0.5% | 0.5% |
| David Gutzman | - | 128 | 71 | 79 | 0.0% | 1.0% | 0.5% | 0.5% |
| Hank Steinbrecher | - | 256 | 71 | 79 | 0.0% | 2.0% | 0.5% | 0.5% |
| Hold Back (CFO / Employees) | - | 256 | 781 | 868 | 0.0% | 2.0% | 5.5% | 5.5% |
| **Total** | **870** | **1,918** | **1,421** | **1,579** | **8.0%** | **15.0%** | **10.0%** | **10.0%** |
| | | | | | | | | |
| New Shares Issued | 870 | 1,918 | 1,421 | 1,579 | | | | |
| | | | | | | | | |
| Ending Share Balance | 10,870 | 12,788 | 14,209 | 15,787 | | | | |
| Check | 8.0% | 15.0% | 10.0% | 10.0% | | | | |
| | | | | | | | | |
| Notes | Anti-dilutive Vest over 2 years | Anti-dilutive Vest over 3 years | Regular dilution Vest over 3 years | Regular dilution Vest over 3 years | | | | |

| | Company sale price | Value of founder shares | Value of option shares | Value of 2x option shares | Value of 3x option shares | Total Cash to Investors | Total Profit to Investors | Total Return to Investors | % Equity to Mgmt |
|---|---|---|---|---|---|---|---|---|---|
| | $5,625,000 | $450,000 | $0 | $0 | $0 | $5,175,000 | -$450,000 | -8.0% | 8.0% |
| 2x | $11,250,000 | $900,000 | $843,750 | $0 | $0 | $9,506,250 | $3,881,250 | 69.0% | 15.5% |
| 3x | $16,875,000 | $1,350,000 | $1,687,500 | $562,500 | $0 | $13,275,000 | $7,650,000 | 136.0% | 21.3% |
| 4x | $22,500,000 | $1,800,000 | $2,531,250 | $1,125,000 | $562,500 | $16,481,250 | $10,856,250 | 193.0% | 26.8% |
| 5x | $28,125,000 | $2,250,000 | $3,375,000 | $1,687,500 | $1,125,000 | $19,687,500 | $14,062,500 | 250.0% | 30.0% |
| 6x | $33,750,000 | $2,700,000 | $4,218,750 | $2,250,000 | $1,687,500 | $22,893,750 | $17,268,750 | 307.0% | 32.2% |
| 7x | $39,375,000 | $3,150,000 | $5,062,500 | $2,812,500 | $2,250,000 | $26,100,000 | $20,475,000 | 364.0% | 33.7% |

**Rationale for structure:**

Founder shares structure provides limited downside to current investors as only 8% of equity is diluting the initial investment ($438,000 of dilution)

Founder options require investors to recover the initial investment before being in the money

Remaining equity requires investors to generate return of 2x and 3x their money in order for them to be in the money

This structure provides dry powder for incentives for staff (at discretion of CEO / Board)

**Vesting:**

To be based on employment (not performance targets). Performance targets are addressed with 1x, 2x and 3x strike prices.

**Anti-Dilution:**

Anti-Dilution is important for Founder equity to ensure Founders cannot get diluted out with new capital

Any concerns about anti-dilution can be alleviated by investors with new capital raises on attractive terms (which can offset the dilution); valuation of business is currently very attractive and should allow for this

**Skycam Government Services:**

Still need to think about if this should be a separate entity / ownership structure???

CONFIDENTIAL - DRAFT 3/10/13

| Sources | | Uses | |
|---|---|---|---|
| Initial capital (prior to def.rev, WC, other adjustments) | 3,650,000 | Purchase assets from OC | 3,650,000 |
| Litigation payment (cash to balance sheet) | 100,000 | Pay transaction expenses | 250,000 |
| Injunction payment (cash to balance sheet) | 75,000 | Cash on balance sheet | 1,725,000 *Note: we may be able to fund this as needed* |
| Excess working capital need (estimate) | 200,000 | | *rather than all at once* |
| Transaction expenses (including accounting software) | 250,000 | | |
| Sequoia acquisition post close (estimate including transaction costs) | 700,000 | | |
| Remaining next gen capital funding ($1.3MM over 2 years) | 650,000 | | |
| *(Note: included in capex budget with EBITDA funding, so mitigates equity funding need)* | | | |
| **Total** | **5,625,000** | **Total** | **5,625,000** |

| | |
|---|---|
| Firm Value / 2012 EBITDA (prior to stand alone costs) | 3.83 |
| Firm Value / 2012 Recurring FCF (prior to stand alone costs) | 6.48 |
| Firm Value / 2013 EBITDA | 4.42 |
| Firm Value / 2013 Recurring FCF | 8.19 |

**Additional valuation considerations: Talented executive team, Strategic relationships, Valuable brand, Market leadership position, Robust patent portfolio, Sports platform, Large market sizes,**
**Purchase price includes assets of Sequoia technologies + personnel cost for at least 2 years, Skycam invested $1.2MM in new systems in 2012**

| Skycam 2012 Actuals (prior to any late OC adjustments) | | Skycam 2013 Management Budget | |
|---|---|---|---|
| Revenue | 12,017,619 | Revenue | 12,704,519 |
| Project Level Gross Margin | 5,189,671 | Project Level Gross Margin | 5,553,290 |
| *% margin* | *43.2%* | *% margin* | *43.7%* |
| EBITDA (without corporate and move costs) | 1,468,299 | EBITDA | 1,273,986 includes $400K of standalone/finance/acctng |
| *% margin* | *12.2%* | *% margin* | *10.0%* |
| Capex (estimate) | 1,800,000 | Capex | 1,517,000 (excludes Sequoia acquisition funded with equity) |
| Maintenance Capex (estimate) | 600,000 | Maintenance Capex | 587,000 |
| Free Cash Flow | -331,701 | Free Cash Flow | -243,014 |
| Recurring Free Cash Flow | 868,299 | Recurring Free Cash Flow | 686,986 |

Fw: Call - Yahoo Mail

**Fw: Call**

Thursday, March 14, 2013 7:43 PM

From: "Nic Salomon" <nsalomon2@yahoo.com>

To: "cpowell@fulbright.com" <cpowell@fulbright.com>

**1 Files     171KB     Download All**

DOC 171KB

Asset
Purchase
Agreemen

Save

The version I sent around is attached. Thanks for all your feedback. Will keep you up to date.

----- Forwarded Message -----
**From:** Nic Salomon <nsalomon2@yahoo.com>
**To:** "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>; Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>;
"rbraunfeld@rccblaw.com" <rbraunfeld@rccblaw.com>
**Sent:** Thursday, March 14, 2013 7:42 PM
**Subject:** Re: Call

Guys,
Please see attached for a revised markup. It includes some changes to my initial draft + certain comments from Fulbright (including some
notes on their comments for you to consider in your draft). If you can incorporate what you think makes sense into your draft and send
around, that would allow us to work off of your master version on the call tomorrow. Thanks.

Nic

**From:** Nic Salomon <nsalomon2@yahoo.com>
**To:** "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>; Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>;
"rbraunfeld@rccblaw.com" <rbraunfeld@rccblaw.com>
**Sent:** Thursday, March 14, 2013 6:48 PM
**Subject:** Re: Call

Guys,
I am re-directing this email chain to my Yahoo account (please direct all future communications here).
Do you have your draft of the APA that I can review? I will send you mine in a couple hours.

Thanks.

Nic

-----Original Message-----
**From:** jeff.holowaty@pacificncap.com [mailto:jeff.holowaty@pacificncap.com]
**Sent:** Thursday, March 14, 2013 5:20 PM
**To:** Nic Salomon
**Cc:** rbraunfeld@rccblaw.com; kelly.holowaty@pacificnortherncapital.com
**Subject:** Call

Nic - I just missed your call. I spoke with our attorney (Roger - copied on email) and we would like to have a call with you tomorrow at
12:30pm EST. The goal is to have our call and then turn any changes and send back a marked up agreement by end of day tomorrow.

Roger - please send out a dial in number.

Thanks,

Jeff

**EXHIBIT "H"**

CDP Comments 3/13/13

## ASSET PURCHASE AGREEMENT

among:

**SKYCAM, LLC,**
a Delaware limited liability company

**CABLECAM, LLC,**
a Delaware limited liability company;

and

**PURCHASER, INC.,**
a _____ corporation

Dated as of March __, 2013

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of March __, 2013, by and among: CABLECAM, LLC, a Delaware corporation ("*CableCam*"), SKYCAM, LLC, a Delaware corporation ("*SkyCam*" and together with CableCam, the "*Sellers*") and _____, a _____ corporation (the "*Purchaser*"). Certain capitalized terms used in this Agreement are defined in Exhibit A.

### RECITALS

A.  SkyCam owns certain assets used in its business of developing, deploying, operating, leasingservicing, marketing, manufacturing and otherwise operating SkyCam's aerial camera suspension system (collectively, the "*SkyCam Business*").

B.  CableCam owns certain assets used in its business of developing, deploying, operating, leasingservicing, marketing, manufacturing and otherwise operating CableCam's aerial camera suspension system (collectively, the "*CableCam Business*" and together with the SkyCam Business, the "*Businesses*").

C.  Each of the Sellers desire to sell substantially all of its assets to the Purchaser and the Purchaser desires to purchase all or substantially all of the assets and operations of each of the Sellers, and assume certain specified liabilities of each Seller, as they pertain to the Purchased Assets (as defined herein) as of the Closing date (as defined herein) on the terms set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein and for good and valuable consideration, the parties to this Agreement, intending to be legally bound, agree as follows:

1. SALE OF ASSETS; RELATED TRANSACTIONS.

1.1 **Sale of Assets.** The Seller shall cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, at the Closing (as defined below), good and valid title to the Purchased Assets (as defined below), free of any Encumbrances, on the terms and subject to the conditions set forth in this Agreement. For purposes of this Agreement, "*Purchased Assets*" shall mean and include all of the followingfollowing assets of the Sellers (excluding those assets excluded from this sale pursuant to Section 1.2):

(a) The "*SkyCam Assets*," which shall include, without limitation:

(i) all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the SkyCam System;

CDP Comments 3/13/13

(ii) all rights, titles and interests that SkyCam has or may have to Intellectual Property, including without limitation, the Intellectual Property owned, used, useful or developed in connection with the ownership of the SkyCam System and the operation of the SkyCam Business (the "*SkyCam Intellectual Property*"). The SkyCam Intellectual Property is set forth on Schedule 1.1(a)(ii).

(iii)the Actioncam Claim, as further contemplated in Section 5.3 herein;

(iv)all of SkyCam's rights in and to certain computer software used in the SkyCam Business, including but not limited to source and object codes for operating and controlling all aspects of the SkyCam System;

(v) all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the SkyCam System;

(vi)all real estate leasehold interests set forth in the Leases;

(vii) the contracts to which SkyCam is a party or beneficiary as listed on Schedule 1.1(a)(vi) ("*SkyCam Contracts*").

(viii) all other property, equipment, rights, interests, claims and assets which are related to, used or useful in connection with the operation of the SkyCam Business or the ownership, maintenance, development, exploitation or improvement of the SkyCam System.

(b) The "*CableCam Assets*," which shall include, without limitation:

> **Formatted:** Font: Bold, Italic

(i) all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the CableCam System;

(ii) all rights, titles and interests that CableCam has or may have to Intellectual Property, including without limitation, Intellectual Property owned, used, useful or developed in connection with the ownership of the CableCam System and the operation of the CableCam Business (the "*CableCam Intellectual Property*"). The CableCam Intellectual Property is set forth on Schedule 1.1(b)(ii).

(iii)all of CableCam's rights in and to certain computer software used in the CableCam Business, including but not limited to source and object codes for operating and controlling all aspects of the CableCam System;

(iv)all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the CableCam System;

2

CDP Comments 3/13/13

(v) the contracts to which CableCam is a party listed on Schedule 1.1(b)(v) ("*CableCam Contracts*" and together with SkyCam Contracts, the "*Seller Contracts and each a Seller Contracts*")

**Formatted:** Font: Italic

(vi) all other property, equipment, rights, interests, claims and assets which are related to, used or useful in connection with the operation of the CableCam Business or the ownership, maintenance, development, exploitation or improvement of the CableCam System.

**1.2 Excluded Assets.** Other than the Purchased Assets, no other asset of any of the Sellers shall be transferred and sold to Purchaser pursuant to this Agreement, including, without limitation, the following (the "*Excluded Assets*"):

(a) all rights that accrue or will accrue to any Seller under this Agreement;

(b) Inventory and supplies used in connection with the Businesses which are disposed of in the ordinary course of business prior to the Closing Date;

(c) Sellers' corporate record books containing minutes of meetings of the management committee and meetings of members and such other records as have to do exclusively with Sellers' organization or stock capitalization not related primarily to the Businesses;

(d) all of the Sellers' rights to refunds of all or any part of any Taxes paid by Seller prior to, at or after the Closing Date;

(e) all of the Sellers' Tax Returns;

(f) all documents relating to the formation, capitalization and borrowings of the Sellers; and all other financial records of the Sellers which do not relate primarilyexclusively to the Sellers' ownership and operation of the CableCam Assets, the SkyCam Assets or the Businesses;

(g) all of Seller's Accounts Receivable and cash on hand, in bank accounts or otherwise as of the Closing Date; and

(h) any other assets set forth on Schedule 1.2(h).

**1.3 Purchase Price, Payment and Related Matters.**

(a) The total purchase price ("*Purchase Price*") for the Purchased Assets shall be up to $4,050,000 and shall be comprised of (i) $3,650,000 cash; (ii) the McAfee Injunction Success FeeLitigation Payment described in Section 5.3 hereof; and (iii) the Royalty described in Section 5.4 hereof.

**Formatted:** Underline

(b) The Purchase Price shall be adjusted ("*Purchase Price Adjustments*") as follows:

3

CDP Comments 3/13/13

(i) any deferred revenue received by the Sellers but not yet recognized or earned by the Sellers shall be deducted from the Purchase Price at Closing ("***Deferred Revenue***") as set forth on Schedule 1.3(b)(i);

(ii) any and all expenses prepaid by the Sellers relating to services to be rendered to Businesses after the Closing Date shall be added to the Purchase Price;

(iii) the McAfee Injunction Success Fee in the amount of $75,000, if paid by the Sellers or OUTD before the Closing Date, shall be added to the Purchase Price;

(iv) working capital in the amount of $200,000, to be provided by Sellers, shall be deducted from the Purchase Price; and

(v) Any Extraordinary Capital Expenditures shall be added to the Purchase Price.

(c)     As consideration for the sale of the Assets to the Purchaser:

(i) at the Closing, the Purchaser shall pay the Purchase Price after effecting the Purchase Price Adjustments [Will these be capable of calculation at closing or should there be a post-closing adjustment mechanism? – PLEASE ADD MECHANISM FOR PROVISION OF AN ESTIMATE AT CLOSE AND A TRUE-UP POST CLOSE], to the Sellers or its designated designee for the Assets and the Assumed Liabilities;

(ii) at the Closing, the Purchaser shall assume the Assumed Liabilities by delivering to the Seller an Assumption Agreement in substantially the form of Exhibit B (the "***Assumption Agreement***").

(d)     For purposes of this Agreement "Assumed Liabilities" shall mean only the following liabilities of the Sellers:

(i) all accounts payable of the each of the Sellers that arose from bona fide transactions entered into in the Ordinary Course of Business that relate to services rendered after the Closing Date;

(ii) the obligations arising on or after the Closing Date of each of the Sellers under the SkyCam Contracts and the CableCam Contracts as identified on Schedule 1.1(a)(vii) and Schedule 1.1(b)(vii) to the Agreement, including expressly the Leases;

(iii) all the obligations of OUTD under the McAfee Agreement to , including payment of pay the McAfee Injunction Success Fee if such fee has not already been paid by OUTD prior to Closing (the remaining obligations of OUTD under the McAfee Agreement will remain the responsibility of OUTD subject to the provisions of Section 5.3);

4

CDP Comments 3/13/13

(iv) any Liability to any employee or former employee of the Sellers under or with respect to any Employee Benefit Plan or for severance pay that arises in connection with the consummation of this transaction or arises from a termination after Closing to the extent reflected in Schedule 2.13 ;

(v) All of the liabilities and obligations of Sellers arising under Seller Contracts, solely to the extent such obligations and liabilities arise and relate to events, acts or omissions occurring after the Closing Date and become due and payable after the Closing;

*provided, however,* that notwithstanding the foregoing, and notwithstanding anything to the contrary contained in this Agreement, the "Assumed Liabilities" shall not include, and the Purchaser shall not be required to assume or to perform or discharge:

(A) any Liability of the Sellers associated with the Broken Arrow Lease;

(B) any Liability of any other Person, except for the Sellers;

(C) any Liability of the Sellers arising out of or relating to the execution, delivery or performance of any of the Transactional Agreements;

(D) any Liability of the Sellers for any fees, costs or expenses of the type referred to in Section 6.3 (Expense of Sale) of Agreement;

(E) any Liability of the Seller arising from or relating to any action taken by the Seller, or any failure on the part of the Seller to take any action, at any time after the Closing Date; and

(F) any Liability of the Seller for the payment of any Taxes incurred or assessable prior to the Closing Date.

**1.4 Sales and Use Tax.** Purchaser shall be responsible for all sales and use taxes, if any, arising out of the sale of the Purchased Assets to Purchaser pursuant to this Agreement. Purchaser hereby waives compliance by Sellers with the provisions of the bulk transfer laws of any state.

**1.5 Allocation.** No later than 90 days after the Closing Date, Purchaser shall provide to the Sellers a statement allocating the Purchase Price among the Purchased Assets of the Businesses. If the Sellers disagree with Purchaser's calculation of the Purchase Price allocation, the Sellers may, within 15 days after delivery of Purchaser's calculation of the Purchase Price allocation, deliver a notice to Purchaser disagreeing with such calculation and setting forth Sellers' proposed Purchase Price allocation. Sellers and Purchaser shall, during the 15 day period following delivery of Sellers' notice of disagreement, use their reasonable best efforts to resolve such dispute and reach a mutually agreed Purchase Price allocation. The parties shall (i) prepare and, where applicable, file each report relating to the federal, state, local, foreign and other Tax consequences of the purchase and sale contemplated hereby (including the filing of IRS Form 8594 where relevant) in a manner consistent with their mutually agreed allocation (or, if no such

5

CDP Comments 3/13/13

agreement is reached in accordance with this Section 1.5, in accordance with an allocation determined in the Purchaser or either Seller's sole discretion) and (ii) take no position in any Tax Return or other Tax filing, proceeding, audit or otherwise which is inconsistent with such allocation, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code or pursuant to any analogous foreign legislation.

### 1.6    Closing.

(a)    The closing of the purchase and sale contemplated by this Agreement (herein called the "*Closing*") is occurring simultaneously with the execution and delivery of this Agreement on the date hereof (the "*Closing Date*"). The Closing shall be held at the offices of SkyCam and CableCam, or at such other place as may be agreed to by Purchaser and the Sellers.

(b) At the Closing:

> (i) Sellers shall execute and deliver to the Purchaser a bill of sale duly executed by each Seller, substantially in the form of Exhibit C;

> (ii) Purchaser shall pay to the Sellers the Purchase Price, adjusted for any Purchase Price Adjustments, payable by cashier's check or wire transfer as contemplated by Section 1.3(b);

> (iii) the Purchaser shall execute and deliver to the Seller the Assumption Agreement which includes expressly, the assumption of the McAfee Agreement by Purchaser;

> (iv) the Purchaser shall use commercially reasonable efforts to obtain and deliver to the Seller a fully executed Release from the applicable landlord, releasing OUTD from the Parent Guarantees and from any liabilities associated with the Leases, in a form mutually acceptable to the Parties; if the landlord is unwilling to release the Parent Guarantees, Purchaser will provide OUTD with a performance bond or other security reasonably acceptable to OUTD in the amount of three hundred thousand dollars ($300,000) or the amount of the remaining financial obligations due to the landlord under the Leases, whichever is lesser, for the remaining initial term of the Leases. The bond or other security will name OUTD as the sole beneficiary in the event of an uncured material financial default by Purchaser under the Leases in order to offset the risk of loss for OUTD;

> (v) all employees of Sellers shall be terminated and shall become employed by Purchaser (each, a "*Continuing Employee*") and all employees of Sellers shall cease participation in Seller Benefit Plans;

> (vi) the Purchaser shall have obtained employee benefit plans and insurance with sufficient coverage to permit the Purchaser to conduct the Businesses in substantially the same manner following the Closing Date, as was conducted by the Sellers prior to the Closing Date.

6

CDP Comments 3/13/13

## 2.    REPRESENTATIONS AND WARRANTIES OF THE SELLER.

Each Seller, jointly and severally, hereby represents and warrants, subject to such exceptions as are specifically disclosed in writing (and that reference the specific representation that they qualify) in the disclosure schedule supplied by each Seller to Purchaser, as follows [should Outdoor Channel join in reps since Sellers will have no assets to satisfy claims for breach? YES PLEASE ADD THIS IN]:

**2.1. Due Organization; No Subsidiaries; Etc.**  Such Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Such Seller has all requisite corporate authority and power to (1) own the Assets, (2) carry on the Businesses, and (3) execute and deliver this Agreement and consummate the transactions contemplated hereby and thereby.  Such Seller has all material licenses, permits and other similar regulatory approvals or authorizations to own the Assets and conduct its business, as presently owned and conducted.  Such Seller is duly qualified and in good standing in each of the jurisdictions in which it is required by the nature of its businesses or the ownership of the Assets to so qualify, except where the failure to be so qualified would not have a Material adverse effect on such Seller.

**2.2.    Title to Assets.**  Such Seller owns, and has good and valid title to, all the SkyCam Assets and CableCam Assets, as applicable and purported to be owned by it.  The Purchased Assets include all tangible and intangible assets and rights that are used or held for use in the operation or conduct of the Businesses, and are sufficient for the conduct of the Businesses by the Purchaser following the Closing in ~~substantially~~ the same manner as conducted by such Seller prior to the Closing Date.

**2.3.    Breach.**  Neither the execution nor delivery of this Agreement by such Seller nor the consummation of the transactions contemplated hereby will cause such Seller to be in breach of any of the material terms or conditions of such Seller's organizational documents or any other agreement, contract, lease, license, permit, governmental approval, instrument or commitment of such Seller.

**2.4.    Enforceability of Agreement.**  This Agreement constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by general equitable principles, bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

**2.5.    Required Consents; No Violation of Law.**  Except as set forth in Schedule 2.5, such Seller is not or will not be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with the execution and delivery of any of the Transactional Agreements or the consummation or performance of any of the Transactions. Such Seller has not violated any presently applicable federal, state, local foreign law, statute, order, rule or regulation, injunction, judgment or decree relating to the operation, conduct or ownership of the Assets or the business of such Seller.

7

CDP Comments 3/13/13

**2.6.    Real Property.** The Leases constitute all of the interests in real property held for use in connection with, necessary for the conduct of, or otherwise material to such Seller's Businesses. There are no eminent domain or other similar proceedings pending or, to any such Seller's Knowledge, threatened affecting any portion of the real property currently under lease. There is no writ, injunction, decree, order or judgment outstanding nor any action, claim, suit or proceeding, pending or, to any such Seller's Knowledge, threatened, relating to the lease, use, occupancy or operation by any Person of any such real property. The use and operation of the leased real property in the present conduct of such Seller's Businesses do not violate in any material respect any instrument or agreement affecting such real property. There is no violation of any covenant, condition, restriction, easement or order of any governmental authority having jurisdiction over such property or of any other Person entitled to enforce the same affecting such real property or the use or occupancy thereof.

**2.7.    Litigation and Related Matters.** Except as set forth on Schedule 2.7, there are no legal, administrative, arbitration, investigatory, injunctive or other proceedings, or any other claims or controversies, pending or, to the best knowledge of such Seller, threatened, against such Seller or relating in any manner to the Purchased Assets.

**2.8.    Contracts.** Such Seller is not in default under any m̶Material Seller C̶contract to which it is a party, and to such Seller's Knowledge, the other parties thereto are not in default and each Seller contract is a are valid and binding obligations of the parties thereto, in accordance with their terms. [This is fairly light for a contract rep. I'll send you the ABA standard form of agreement. IF THERE ARE SOME OTHER REPS THAT WE THINK ARE ABSOLUTELY NECESSARY, PLEASE INCLUDE AND LET'S DISCUSS, BUT LET'S KEEP IT LIGHT]

**2.9.    Financial Condition.**

(a)    Financial Statements. Schedule 2.9(a) sets forth the Seller Balance Sheet and the related statements of income and retained earnings for the period then ended. The Seller Balance Sheet and the related statements of income and retained earnings (i) were prepared in accordance with GAAP; (ii) fairly present in all material respects such Seller's financial condition and the results of its operations as of the relevant dates thereof and for the periods covered thereby; (iii) contain and reflect all necessary adjustments and accruals for a fair presentation in all material respects of such Seller's financial condition and the results of its operations for the periods covered by said financial statements; (iv) contain and reflect adequate provisions for all reasonably anticipated liabilities for all Taxes, with respect to the period then ended and all prior periods; and (v) with respect to contracts and commitments for the sale of goods or the provision of services by such Seller, contain and reflect in all material respects adequate reserves for all reasonably anticipated material losses and costs and expenses in excess of expected receipts.

(b)    No Undisclosed Liabilities. Except for (i) those liabilities specifically accrued or reserved against on the Seller Balance Sheet, (ii) those current liabilities for trade or business obligations incurred since the Seller Balance Sheet Date in the ordinary course of the business and consistent with past practices or (iii) those liabilities arising under Seller Contracts, Seller has, as of the date hereof, no direct or indirect indebtedness, liability, claim, loss, damage,

8

CDP Comments 3/13/13

deficiency, obligation or responsibility, contingent or otherwise, which individually or in the aggregate are material to the financial condition, assets, liabilities, business or operations of Seller.

## 2.10. Intellectual Property.

(a) For purposes of this Agreement, "***Sellers' Intellectual Property***" shall mean collectively the SkyCam Intellectual Property and the CableCam Intellectual Property. To such Seller's Knowledge, neither the use nor exploitation by the Purchaser of any of its Intellectual Property will infringe upon or violate any copyright, trade secret, patent, trademark, trade dress, or other proprietary right of any third party (within the United States or abroad) and no license of any third party intellectual property will be required by ~~Buyer~~ Purchaser to lawfully implement, use or exploit its Intellectual Property.

(b) To such Seller's Knowledge, such Seller has taken commercially reasonable steps to maintain the confidentiality of trade secrets and confidential information included in the Intellectual Property.

(c) Such Seller has good and valid title to all of its Intellectual Property, free of any Encumbrances, and has a valid right to use and otherwise exploit, and to license others to use and otherwise exploit, all of its Intellectual Property. Such Seller is not obligated to make any payment to any Person for the use or other exploitation of any of such its Intellectual Property. Such Seller is free to use, modify, copy, distribute, sell, license or otherwise exploit its Intellectual Property on an exclusive basis (other than Intellectual Property consisting of software licensed to such Seller under third party licenses generally available to the public, with respect to which such Seller's rights are not exclusive).

(d) All patents, trademarks, service marks and copyrights that are registered with any Governmental Body and held by such Seller are valid and subsisting. None of such Seller's Intellectual Property infringes or conflicts with its Intellectual Property owned or used by any other Person. Such Seller is not infringing, misappropriating or making any unlawful use of, and such Seller has not at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of, such Seller's Intellectual Property owned or used by any other Person. Except as disclosed in Schedule 2.10(d), to such Seller's Knowledge, no other Person is infringing, misappropriating or making any unlawful use of, its Intellectual Property.

(e) To such Seller's Knowledge, its Intellectual Property being transferred, assigned and/or licensed to Purchaser in this transaction constitutes all of the Intellectual Property necessary for Purchaser to operate the Businesses as presently conducted by such Seller. The Sellers have, and the Purchaser will acquire at the Closing, the unrestricted right to use the names "SkyCam" and "CableCam" and variations thereof.

9

CDP Comments 3/13/13

**2.11.  Insurance.** Such Seller has not received (i) any notice of cancellation of any policy or binder of insurance or refusal of coverage thereunder; (ii) any notice that any issuer of such policy or binder has filed for protection under applicable bankruptcy or insolvency laws or is otherwise in the process of liquidating or has been liquidated; or (iii) any other indication that any such policy or binder may be unwilling or unable to perform its obligations thereunder.

**2.12.  Tax Matters.**

(a)    Such Seller has (i) filed all Tax Returns required to be filed by it on or prior to the date hereof and (ii) paid all Taxes due and payable in respect of all periods up to and including the date hereof. Each Seller has timely and properly withheld or collected, paid over and reported all Taxes required to be withheld or collected by such Seller on or before the date hereof.

(b)    Except as set forth on Schedule 2.12(b), ~~To such Seller's Knowledge~~: (i) No Tax Authority has asserted any adjustment that could result in an additional Tax for which such Seller is or may be liable or that could result in a Lien on any of the Purchased Assets (collectively, "*Tax Liability*"); (ii) there is no pending audit, examination, investigation, dispute, proceeding or claim (collectively, "*Tax Proceeding*") relating to any Tax Liability; (iii) no statute of limitations with respect to any Tax has been waived or extended (unless the period to which it has been waived or extended has expired); (iv) there is no outstanding power of attorney authorizing anyone to act on behalf of such Seller in connection with any Tax Liability, Tax Return or Tax Proceeding; (v) there is no outstanding closing agreement, ruling request, request to consent to change a method of accounting, subpoena or request for information with or by any Tax Authority with respect to such Seller, its income, assets or business, or any Tax Liability; (vi) such Seller is not a party to any Tax sharing or Tax allocation agreement, arrangement or understanding; and (vii) such Seller has not received any notice from a Tax Authority asserting that Seller should file a Tax Return in any jurisdiction where it does not file

**2.13    Employee and Labor Matters.**

(a)    Schedule 2.13(a) accurately sets forth, with respect to each employee of such Seller (including any employee who is on a leave of absence or on layoff status): (i) the name and title of such employee; (ii) the aggregate dollar amounts of the compensation (including wages, salary, commissions, director's fees, fringe benefits, bonuses, profit-sharing payments and other payments or benefits of any type) received by such employee from such Seller; (iii) such employee's annualized compensation as of the date of this Agreement; (iv) the number of hours of sick-time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof; and (v) the number of hours of vacation time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof.

(b)    Schedule 2.13(b) accurately identifies each former employee of such Seller who is receiving or is scheduled to receive (or whose spouse or other dependent is receiving or is scheduled to receive) any benefits from such Seller relating to such former employee's employment with such Seller; and Schedule 2.13(b) accurately describes such benefits.

Formatted: Underline

10

CDP Comments 3/13/13

(c)     Except as set forth in Schedule 2.13(c), such Seller is not a party to or bound by, and has never been a party to or bound by, any employment contract or any union contract, collective bargaining agreement or similar Contract.

(d)     Such Seller has provided to Purchaser accurate and complete copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials relating to the employment of the current and former employees of such Seller.

**2.14   Brokers.** Noble has acted as agent for Sellers in this transaction, and Sellers will be solely responsible for any fees or commissions payable to Noble. Except as so stated, no broker, finder, agent or similar intermediary has acted for or on behalf of Sellers or is entitled to a fee or commission in connection with this Agreement or the transactions contemplated hereby.

**2.15   Full Disclosure.** None of the Transactional Agreements contains or will contain any untrue statement of fact; and none of the Transactional Agreements omits or will omit to state any fact necessary to make any of the representations, warranties or other statements or information contained therein not misleading. All of the information set forth in the Disclosure Schedule, and all other information regarding such Seller and its business, condition, assets, liabilities, operations, financial performance, net income and prospects that has been furnished to the Purchaser or any of the Purchaser's Representatives by or on behalf of the Seller or by any Representative of the Seller, is accurate and complete in all respects.

## 3.   REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.

The Purchaser represents and warrants, to and for the benefit of the Seller, as follows:

**3.1   Authority; Binding Nature Of Agreements.** The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its board of directors. The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under the Assumption Agreement, and the execution, delivery and performance of the Assumption Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its board of directors. This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms. Upon the execution and delivery of the Assumption Agreement at the Closing, the Assumption Agreement will constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their terms.

**3.2   Brokers.** The Purchaser has not become obligated to pay, and has not taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Transactions.

**3.3   Required Consents; No Violation of Law.** To the best of Purchaser's Knowledge, neither the execution nor delivery of this Agreement by Purchaser nor the consummation of the

11

CDP Comments 3/13/13

transactions contemplated hereby will require the consent or approval of any governmental or non-governmental third party.

## 4. CLOSING DELIVERABLES

**4.1     Closing Deliverables of Sellers**.  At the Closing, Sellers shall deliver to Purchaser the following documents:

(a)     Written evidence reasonably satisfactory that all Consents, authorizations, orders and approvals of any Governmental Body, if any, required in connection with the execution, delivery and performance of this Agreement has been obtained or made;

(b)     Written evidence reasonably satisfactory to Purchaser that any member or management committee approval required under applicable law and eachthe Seller's charter and other governing documents has been obtained;

(c)     Financial statements for the years ended December 31, 2012, December 31, 2011 and December 31, 2010 [Should be already provided as part of reps];

(d)     Seller Contracts, with such assignments thereof and Consents to assignments as are required pursuant to the terms of such Seller Contracts and are necessary to assure the full benefit thereof.

(e)     The Businesses' Records and Sellers shall take all requisite steps to put Purchaser in actual possession and operating control of the Purchased Assets and the Businesses.

(f)     A bill of sale with respect to all tangible assets

(e)(g)  [Patent assignment suitable for recording in USPTO].

**4.2     Closing Deliverables of Purchaser**.  At the Closing, Purchaser shall deliver to Sellers such other documents as are reasonably necessary for Sellers to effectuate and document the transactions contemplated hereby.

## 5. POST-CLOSING COVENANTS.

**5.1     Sellers' Access to Business Records**.  After the Closing, Purchaser shall afford to Sellers and their accountants, attorneys and other representatives reasonable access to the Businesses' Records and shall permit Sellers to make extracts and copies therefrom for the purpose of preparing such tax returns, financial statements (including audited financial statements) and other reports and filings of Sellers as may be required after the Closing and for other proper purposes approved by Purchaser acting reasonably and in good faith.

**5.15.2   Purchaser Access to Business Records**.  After the Closing, Sellers shall afford to Purchaser and their accountants, attorneys and other representatives reasonable access to the Businesses' Records and shall permit Purchaser to make extracts and copies therefrom for the

CDP Comments 3/13/13

purpose of preparing such tax returns, financial statements (including audited financial statements) and other reports and filings of Purchaser as may be required after the Closing and for other proper purposes approved by Seller acting reasonably and in good faith.

5.25.3 **Further Assurances**. Sellers from time to time after the Closing at the request of Purchaser (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of transfer and assignment, and take such other action as Purchaser may reasonably require to more effectively transfer and assign to, and vest in, Purchaser each of the Purchased Assets and to carry out the purposes of this Agreement. Purchaser from time to time after the Closing at the request of Sellers (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of assumption, and take such other action as Sellers may reasonably require to more effectively evidence the assumption by Purchaser of the Assumed Liabilities and to carry out the purposes of this Agreement.

5.35.4 **Actioncam Claim**. To allow OUTD to satisfy its obligations under the Contingent Fee Agreement it has in place with McAfee, Purchaser will provide OUTD the recovery of the first two hundred eighty one thousand, nine hundred two dollars ($281,902) of any attorney fees, expenses and damages recovered from Actioncam (the "Contingent Fee"). Upon recovery (if any), this amount will be paid directly to McAfee by Purchaser with written confirmation of the payment provided to OUTD. Further, Purchaser will provide OUTD with a 50 percent interest in any remaining proceeds recovered from Actioncam (also to be paid directly to McAfee) so that OUTD can satisfy its remaining obligations under the Contingent Fee Agreement. Prior to calculating any amounts payable to OUTD under this section 5.3 (including the Contingent Fee described above), Purchaser will be entitled to recover the aggregate reasonable attorney's fees and costs incurred by Purchaser in connection with the Actioncam Litigation following the Closing Date. Upon the final resolution of the Actioncam Litigation in favor of Skycam and/or the liquidation of the assets of Actioncam, LLC (or, alternatively, the sale of Actioncam or its assets to Purchaser), Purchaser shall pay OUTD up to one hundred thousand dollars ($100,000) (the "Litigation Payment"). The Litigation Payment will be reduced by the McAfee injunction Success Fee if the fee is paid by Purchaser after the Closing Date or alternatively if the fee is added to the Purchase Price pursuant to Section 1.3(b)(iii). The Litigation Payment will also be reduced by any proceeds recovered by OUTD as described in this section 5.4. fifty percent (50%) of the Net Litigation Award, such Net Litigation Award will not exceed one hundred thousand dollars ($100,000). For purposes herein, "Net Litigation Award" shall mean the difference between: (1) the aggregate award, damages, and/or recovery (whether sums or things of value are received pursuant to any demand upon or litigation against Actioncam, whether said sums are received pursuant to settlement, court proceedings, or otherwise), and/or the associated monetary value, awarded to SkyCam at the conclusion of the Actioncam Litigation; and (2) the aggregate reasonable attorneys' fees and costs incurred by Purchaser in connection with the Actioncam Litigation following the Closing Date. Notwithstanding the foregoing, after Closing: (i) Purchaser shall have the exclusive right to manage any ongoing litigation and OUTD shall cooperate in all aspects of the litigation as may reasonably be requested by the Purchaser; and (ii) any Actioncam Litigation related costs incurred by Purchaser shall be the sole responsibility of Purchaser.

**Formatted:** Underline

13

CDP Comments 3/13/13

5.45.5  **Royalty**.  For a period of 12 months following the Closing Date ("*Royalty Period*"), Purchaser shall pay OUTD a twenty percent (20%) fee ("*Royalty*") on revenue (excluding bill-back revenue from venue-driven charges and on site third party equipment rentals) from any incremental CBS regular season NFL and SEC events covered by the Purchaser which have not been regularly covered by Sellers in the past (more specifically, SkyCam and CableCam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game).

(a)  Purchaser shall make payments of Royalty to OUTD via wire transfer drawn on a United States bank designated by OUTD.  Royalty payments shall accrue as billed and be paid monthly throughout the Royalty Period.  Each monthly Royalty payment shall be made within thirty (30) days after the close of the foregoing month.  All amounts not paid within forty-five (45) days of the due date shall bear interest at the rate of twelve percent (12%) per year, or the maximum permitted by law, whichever is less, from the date due until paid.  All amounts expressed and due under this Agreement shall be in United States Dollars.  Notwithstanding the foregoing, the first Royalty payment shall be for the period from the Closing Date through the end of the first calendar quarter that is at least three months from the Closing Date.  For purposes of clarity, if the Closing Date is June 1, 2013, the first calendar quarter that is at least three months from the Closing Date will be September 30, 2013.  Thereafter, Royalty payments shall be paid to OUTD on a monthly basis.  Notwithstanding anything to the contrary in this Section 5.5, the Royalty shall only be due and payable to OUTD by Purchaser if and when all other liabilities and obligations of Sellers and OUTD arising from this agreement have been reasonably satisfied.

(b)  Concurrent with each Royalty payment, Purchaser shall deliver to OUTD via e-mail an itemized statement (the "*Monthly Report*") which is certified as accurate by an authorized representative of Purchaser.  The Monthly Report shall set forth the following: (i) the date and description of the event; (ii) the amount billed (exclusive of the bill-backs and third party rentals); (iii) the calculation of the amount of the Royalty payment due to OUTD.  Purchaser shall deliver a Monthly Report even if no payment is due.

5.4  **Consents**.  To the extent any of the approvals, Consents or waivers required to consummate the transactions contemplated by this Agreement, including, without limitation, the Consents and approvals required to assign any of Material Seller Contracts to Purchaser, have not been obtained by any of the Sellers as of the Closing Date, such Seller shall use its commercially reasonable efforts to do the following:

(a) Cooperate with Purchaser in any reasonable and lawful arrangements designed to provide the benefits of such Material Contracts to Purchaser as long as Purchaser promptly reimburses such Seller for all out-of-pocket payments or chargers made by such Seller in connection therewith; and

(b) Enforce, at the request of Purchaser and at the expense and for the account of Purchaser, any and all rights of such Seller arising from such interest against the other party or parties thereto (including the right to elect to terminate such interest in accordance with the terms thereof upon the written advice of Purchaser).

14

**5.4    Use of "SkyCam" and "CableCam" Names**. Notwithstanding anything to the contrary contained herein, the Sellers shall be entitled to use the "SkyCam" and "CableCam" names for ninety (90) days after the Closing in connection with payroll and general administrative activities relating to its transition out of operating the Businesses.

~~5.4~~5.5 **Transition Services.** For a period of sixty (60) days after the Closing, the Sellers and OUTD will provide Purchaser with ~~i~~information ~~t~~Technology, finance and accounting services and support as reasonably requested by Purchaser to facilitate the transition of the Businesses. An additional thirty (30) days of support, if needed, will be made available at the written request of Purchaser. LET'S ADD A NOTE THAT WE WILL BE REQUESTING THESE TRANSITION SERVICES AS PART OF A SHORT, SEPARATE AGREEMENT (NOT PART OF THIS DOCUMENT).

> **Formatted:** Font: Bold

**5.5    Confidentiality**. Except in connection with any dispute between the parties and subject to any obligation to comply with (a) any Applicable Law (b) any rule or regulation of any Authority or securities exchange or (c) any subpoena or other legal process to make information available to the Persons entitled thereto, all information obtained by any party about any other or any Affiliate of the other, and all of the terms and conditions of this Agreement, shall, for a period of one (1) year after the date of this Agreement, be kept in confidence by each party, and each party shall cause its shareholders, members, partners, directors, officers, managers, employees, agents and attorneys to hold such information confidential. Such confidentiality shall be maintained to the same degree as such party maintains its own confidential information and shall be maintained until such time, if any, as any such data or information either is, or becomes, published or a matter of public knowledge; provided, however, that from and after the Closing, Purchaser shall be under no obligation to maintain confidential any such information concerning Sellers. In the event either party becomes legally compelled to disclose any such information, it shall promptly provide the other with written notice of such requirement so that the other may seek a protective order or other remedy.

————**Publicity**. No publicity release or announcement concerning this Agreement or the transactions contemplated herein shall be issued without advance written approval of the form and substance thereof by Purchaser and Sellers; provided, however, that such restrictions shall not apply to any disclosure required by Authorities, Applicable Law or the rules of any securities exchange which may be applicable. After the Closing Date, the parties shall consult with each other before issuing any press release or public statement with respect to this Agreement or the transactions contemplated herein, and, except as may be required by Applicable Law or the rules of any securities exchange which may be applicable, will not issue any such press release or public statement prior to such consultation. Notwithstanding the foregoing, Purchaser and Sellers shall not be prevented or restricted in any way from notifying third parties at any time following the Closing that it has purchased the Businesses and the Purchased Assets and introducing itself as successor.

**6.    MISCELLANOUS.**

15

CDP Comments 3/13/13

**6.1    Survival of Representations and Covenants.** [This is a problem and is not market. Sellers and perhaps Outdoor Channel should compensate Purchaser for any losses arising out of the breach of any rep or warranty. Ballpark would be 20% of purchase price as a cap and 1% deductible – **LET'S PUT THIS FORMULA IN WITH AN INDEMNITY FOR BREACH OF REPS AND WARRANTIES, PLUS AN INDEMNITY WITH NO CAP ON LIABILITIES WE DON'T ASSUME.  PLUS WE SHOULD ADD A RECIPROCAL INDEMNITY ON US RELATED TO POST-CLOSE ITEMS** ]. Except for Section 2.2 (title), which shall survive for twelve (12) months following the Closing, none of the representations and warranties made by the Parties in this Agreement and in the certificates, documents and schedules delivered hereto shall survive the consummation of the transactions contemplated hereunder.

**6.2    Disclaimer of Warranties.** EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT, SELLERS ARE SELLING THE PURCHASED ASSETS (AND THE BUSINESSES REPRESENTED THEREBY) ON AN "AS IS, WHERE IS" BASIS AND DISCLAIM ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTEES, WHETHER EXPRESS OR IMPLIED.    SELLERS MAKE NO IMPLIED REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO OTHER IMPLIED WARRANTIES WHATSOEVER.

**6.3    Expenses of Sale.** Each party shall bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and related Transactional Agreements, and the consummation and performance of the transactions contemplated herein and therein. Any and all transfer, sales, use, documentary and similar taxes and recording and filing fees incurred in connection with the transactions contemplated herein shall be borne by Purchaser (and not by Sellers).

**6.4    Further Assurances.** Each party hereto shall execute and/or cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the Transactions.

**6.5    Notices.** Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

if to the Sellers:

SkyCam, LLC or
CableCam, LLC
c/o Outdoor Channel Holdings, Inc.
43445 Business Park Drive.
Temecula, CA 92590

16

Attn: General Counsel
Facsimile: 951-719-8975

if to the Purchaser:

_____
_____
_____
Facsimile: _____

**6.6     Time Of The Essence.** Time is of the essence of this Agreement.

**6.7     Headings.** The underlined headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

**6.8     Counterparts.** This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

**6.9     Governing Law; Venue.**

(a) This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of California (without giving effect to principles of conflicts of laws).

(b) Except as set forth in the last sentence of this Section 6.9, any claim or controversy arising out of or relating to this Agreement shall be settled by binding arbitration in Riverside, California under the auspices of the American Arbitration Association, in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator shall be final and binding and may be entered in any court having jurisdiction. The arbitrator shall have the power to order discovery reasonably necessary to enable the parties to participate effectively in the evidentiary hearing. The fees of the arbitrator and all other costs charged by the AAA shall be borne equally by the Sellers and Purchaser. All attorneys' fees and costs incurred by each party shall be paid by each party.

(c) This Agreement and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon the parties and their respective successors, assigns and legal representatives. Neither this Agreement, nor any rights or obligations of any party hereunder, may be assigned by a party without the prior written consent of the other party, such consent not to be unreasonably withheld.

**6.10     Waiver.**

(a) No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power,

17

right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b) No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

**6.11   Amendments.** This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Purchaser and the Seller.

**6.12   Severability.** In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**6.13   Entire Agreement.** The Transactional Agreements set forth the entire understanding of the parties relating to the subject matter thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter thereof.

**6.14   Construction.**

(a) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural; and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b) The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

18

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of.

**SkyCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

**CableCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

**[PURCHASER]**, a _____ corporation

By: _____

Its: _____

## EXHIBIT A

### CERTAIN DEFINITIONS

For purposes of the Agreement (including this Exhibit A):

**Accounts Receivable.** "Accounts Receivable" shall mean accounts receivable, whether billed or unbilled, generated in connection with the Businesses prior to and through the Closing Date.

**Actioncam Claim.** "Actioncam Claim" means those certain claims that SkyCam has against Actioncam, LLC and Patrick J. Bennett (collectively "*Actioncam*") in connection with the Actioncam Litigation.

**Actioncam Litigation.** "Actioncam Litigation" shall refer to that certain cause of action against Actioncam for damages in connection with misappropriation of trade secrets, breach of contract, and false representations as more specifically set out in Case No. 09-CV-294-GKF-FHM, pending in the Northern District of Oklahoma.

**Agreement.** "Agreement" shall mean the Asset Purchase Agreement to which this Exhibit A is attached (including the Disclosure Schedule), as it may be amended from time to time.

**Broken Arrow Lease.** "Broken Arrow Lease" shall mean that certain Lease Agreement by and between Case SkyCam, LLC and SkyCam, LLC dated February 13, 2006, as amended on July 1, 2006.

**Code.** "Code" shall mean the Internal Revenue Code of 1986, as amended.

**Consent.** "Consent" shall mean any approval, consent, ratification, permission, waiver or authorization.

**Contract.** "Contract" shall mean any written, oral, implied or other agreement, contract, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, certificate, purchase order, work order, insurance policy, benefit plan, commitment, covenant, assurance or undertaking of any nature.

**Encumbrance.** "Encumbrance" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, equity, trust, equitable interest, claim, preference, right of possession, lease, tenancy, license, encroachment, covenant, infringement, interference, Order, proxy, option, right of first refusal, preemptive right, community property interest, legend, defect, impediment, exception, reservation, limitation, impairment, imperfection of title, condition or restriction of any nature (including any restriction on the transfer of any asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset).

CDP Comments 3/13/13

**Entity.** "Entity" shall mean any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**ERISA.** "ERISA" shall mean the Employee Retirement Income Security Act of 1974.

**Excluded Assets.** "Excluded Assets" shall mean the assets identified on Exhibit C (to the extent owned by the Seller on the Closing Date).

**Extraordinary Capital Expenditures.** "Extraordinary Capital Expenditures" shall mean any non-budgeted capital expenditures funded by OUTD, in amounts up to a maximum of $80,000 that occur between February 26, 2013 and the Closing Date, as determined to be necessary and in the best interests of the Sellers by Nic Salomon in his role as President of the Sellers.

**GAAP.** "GAAP" shall mean generally accepted accounting principles.

**Governmental Authorization.** "Governmental Authorization" shall mean any: (a) permit, license, certificate, franchise, concession, approval, consent, ratification, permission, clearance, confirmation, endorsement, waiver, certification, designation, rating, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

**Governmental Body.** "Governmental Body" shall mean any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any, court or other tribunal); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

**Intellectual Property.** "Intellectual Property" shall mean any patent, patent application, trademark (whether registered or unregistered and whether or not relating to a published work), trademark application, trade name, fictitious business name, service mark (whether registered or unregistered), service mark application, copyright (whether registered or unregistered), copyright application, trade secret, know-how, customer list, franchise, system, computer software, invention, design, blueprint, business methodology, engineering drawing, proprietary product, technology, proprietary right or other intellectual property right or intangible asset required to operate the equipment and perform Sellers' obligations pursuant to the Seller Contracts.

2

CDP Comments 3/13/13

**Leases.** "Leases" shall collectively refer to the (i) Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Legal Requirement.** "Legal Requirement" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Liability.** "Liability" shall mean any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

**Material.** "Material" shall mean (i) with respect to any item, fact, condition or circumstance of a party, that such item, fact, condition or circumstance, individually or in the aggregate with other items, facts, conditions or circumstances affecting such party, would cause an adverse effect of Twenty-Five Thousand ($25,000) Dollars or more to the other party subsequent to the closing of the transactions contemplated by this Agreement or (ii) with respect to any contract or series of related contracts that in the aggregate represents the payment or receipt by any party thereto of Twenty-Five Thousand ($25,000) Dollars or more.

**McAfee Agreement.** "McAfee Agreement" shall mean that certain Contingent Fee Agreement between Outdoor Channel Holdings, Inc. and its affiliated entities, including without limitation, SkyCam, LLC and McAfee & Taft, a professional corporation of Oklahoma.

**McAfee Injunction Success Fee.** "McAfee Injunction Success Fee" shall mean that certain $75,000 that becomes immediately due and owed by SkyCam to McAfee & Taft pursuant to the McAfee Agreement upon: (1) a ruling by the federal court denying Actioncam's motion for new trial; or (2) by the federal court's lifting the stay on the injunction, as described in the federal court's final judgment.

**Order.** "Order" shall mean any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, writ or award issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Body or any arbitrator or arbitration panel; or (b) Contract with any Governmental Body entered into in connection with any Proceeding.

**OUTD.** "OUTD" shall mean Outdoor Channel Holdings, Inc., the ultimate parent company of the Sellers.

3

**Parent Guarantees.** "Parent Guarantees" refer collectively to (i) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to 650 North Freeway, Ltd. in connection with the Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to Tindall Properties, Ltd. in connection with the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Person.** "Person" shall mean any individual, Entity or Governmental Body.

**Proceeding.** "Proceeding" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding and any informal proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or any arbitrator or arbitration panel.

**Representatives.** "Representatives" shall mean officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

**Seller Contract.** "Seller Contract" shall mean any Contract relating to the customers set forth on Schedule 1.1(a)(v) and Schedule 1.1(b)(v): (a) to which the Seller is a party; (b) by which the Seller or any of its assets is or may become bound or under which the Seller has, or may become subject to, any obligation; or (c) under which such Seller has or may acquire any right or interest.

**Sellers' Intellectual Property.** "Seller's Intellectual Property" or a "Seller's Intellectual Property" shall refer to CableCam Intellectual Property and SkyCam Intellectual Property owned by, licensed to the Sellers (or a Seller), or otherwise used by the Sellers (or a Seller).

**Seller Benefit Plans.** "Seller Benefit Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, any deferred compensation, bonus, stock option, profit sharing, retirement, medical, health or life insurance, disability, sick leave, cafeteria or flexible spending, vacation or severance agreements, arrangements, programs or plans maintained by any Seller.

**Sellers' Knowledge.** "Sellers' Knowledge" or a "Seller's Knowledge" means the actual knowledge of any of Nicolas Salomon, Thomas Hornish and Thomas Allen obtained in the ordinary course of the performance of their respective duties as officers of the Sellers.

**Tax.** "Tax" shall mean any tax (including any income tax, franchise tax, capital gains tax, estimated tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, occupation tax, inventory tax, occupancy tax, withholding tax or payroll tax), levy, assessment, tariff, impost, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), that is, has been or may in the future be (a) imposed, assessed or collected by or under the authority of any Governmental Body, or (b) payable pursuant to any tax-sharing agreement or similar Contract.

4

CDP Comments 3/13/13

**Tax Return.** "Tax Return" shall mean any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**Transactional Agreements.** "Transactional Agreements" shall mean: (a) the Agreement; (b) the Assumption Agreement; and (c) the Bill of Sale.

**Transactions.** "Transactions" shall mean (a) the execution and delivery of the respective Transactional Agreements, and (b) all of the transactions contemplated by the respective Transactional Agreements, including: (i) the sale of the Purchased Assets by the Sellers to the Purchaser in accordance with the Agreement; (ii) the assumption of the Assumed Liabilities by the Purchaser pursuant to the Assumption Agreement; and (iii) the performance by the Sellers and the Purchaser of their respective obligations under the Transactional Agreements, and the exercise by the Sellers and the Purchaser of their respective rights under the Transactional Agreements.

5

**EXHIBIT B**

ASSUMPTION AGREEMENT

**EXHIBIT C**

BILL OF SALE

**SCHEDULE 1.1(a)(ii)**

SKYCAM INTELLECTUAL PROPERTY

## SCHEDULE 1.1(a)(vii)

### SKYCAM CONTRACTS

Need schedule of all contracts (including contracts mutually signed by Cablecam)

Question for attorneys: what do we need to include as listed contracts? NDAs? IC agreements? Or do we just need contracts with the entities?

**SCHEDULE 1.1(b)(ii)**

CABLECAM INTELLECTUAL PROPERTY

**SCHEDULE 1.1(b)(v)**

CABLECAM'S CONTRACTS

Need schedule of all contracts (including contracts mutually signed by Skycam)

**SCHEDULE 1.2(h)**

**EXCLUDED ASSETS**

Tulsa Lease and Sublease

Formatted: Left

McAfee & Taft Contingent Fee Agreement (except for obligations as specifically described in Sections 1.3 and 5.3)

The Company's email servers which are shared with Outdoor Channel in Temecula

## SCHEDULE 1.3(b)(i)

### DEFERRED REVENUES

Any amounts received from ESPN or NBC or any other network, or from AMEWAS related to the Navair project, for which services not been fully performed as of the date of the closing, less any payments towards those related costs of revenues, shall be deducted as a credit to the Purchase Price at closing.

CDP Comments 3/13/13

**SCHEDULE 1.5**

**ALLOCATION**

2

CDP Comments 3/13/13

**SCHEDULE 2.5**

**REQUIRED CONSENTS**

2

**SCHEDULE 2.7**

**LITIGATION**

SCHEDULE 2.10(a)

FINANCIAL STATEMENTS

SCHEDULE 2.10(d)

INTELLECTUAL PROPERTY DISCLOSURE

SCHEDULE 2.12(b)

TAX MATTERS

List sales tax claim

CDP Comments 3/13/13

**SCHEDULE 2.13**

**EMPLOYEE AND LABOR MATTERS**

2

**SCHEDULE 1.4**

ALLOCATION

-1-

8-K 1 d501922d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

---

## FORM 8-K

---

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported):**

**March 13, 2013**

---

# OUTDOOR CHANNEL HOLDINGS, INC.
**(Exact name of registrant as specified in its charter)**

---

| DELAWARE | 000-17287 | 33-0074499 |
|:---:|:---:|:---:|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**43455 Business Park Drive
Temecula, California 92590**
**(Address of principal executive offices, including zip code)**

**(951) 719-8800**
**(Registrant's telephone number, including area code)**

---

**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**EXHIBIT "I"**

**Item 1.01 Entry into a Material Definitive Agreement**

KSE Merger Agreement

On March 13, 2013, Outdoor Channel Holdings, Inc., a Delaware corporation ("Outdoor Channel") entered into a definitive merger agreement with Kroenke Sports & Entertainment, LLC, a Delaware limited liability company ("KSE"), and KSE Merger Sub, Inc. a Delaware corporation and direct wholly-owned subsidiary of KSE (the "KSE Merger Agreement"). Under the terms of the KSE Merger Agreement, at the closing, Merger Sub will merge with and into Outdoor Channel, with Outdoor Channel as the surviving corporation (the "KSE Merger"). As a result of the consummation of the KSE Merger, Outdoor Channel will become a wholly-owned subsidiary of KSE and shares of Outdoor Channel common stock will no longer be listed for trading on NASDAQ.

The execution of the KSE Merger Agreement followed the determination by the Outdoor Channel Board of Directors that the terms of KSE proposal constituted a Superior Proposal under the terms of the Agreement and Plan of Merger dated as of November 15, 2012 (the "InterMedia Merger Agreement") by and among Outdoor Channel, InterMedia Outdoors Holdings, LLC, InterMedia Outdoor Holdings, Inc. ("IMOH") and certain indirect wholly-owned subsidiaries of IMOH (collectively, "InterMedia"). Prior to entering into the KSE Merger Agreement, Outdoor Channel terminated the InterMedia Merger Agreement and paid InterMedia a termination fee of $6.5 million as required by the terms of the InterMedia Merger Agreement. See Item 1.02 below. The Outdoor Channel Board of Directors also unanimously approved the KSE Merger Agreement.

Upon the consummation of the KSE Merger, subject to the terms of the KSE Merger Agreement, each share of Outdoor Channel common stock issued and outstanding immediately prior to the effective time of the KSE Merger (other than shares held in treasury stock, shares held by any direct or indirect subsidiary of Outdoor Channel, shares held by KSE or any of its subsidiaries and shares for which holders have properly perfected and not withdrawn a demand for appraisal pursuant to Delaware General Corporation Law) will be automatically converted into and thereafter represent the right to receive $8.75 in cash, without interest (the "Merger Consideration").

Options to acquire Outdoor Channel common stock issued by Outdoor Channel and outstanding as of the effective time of the KSE Merger, whether vested or unvested at such time, will be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product of (x) the excess, if any of the Merger Consideration over the per share exercise price of such option and (y) the number of shares of common stock subject to such Outdoor Channel option.

Other equity awards issued by Outdoor Channel and outstanding as of the effective time of the KSE Merger, whether vested or unvested at such time, will be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product of (x) the Merger Consideration and (y) the number of shares of common stock subject to such Outdoor Channel equity award.

Consummation of the KSE Merger is subject to certain conditions, including, among others, adoption of the KSE Merger Agreement by the Outdoor Channel stockholders, satisfaction of certain regulatory approvals (including expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), approval of the Federal Communications Commission of the transfer of Outdoor Channel's FCC license in connection with the KSE Merger (or alternatively, receipt of a third party lease that enables Outdoor Channel to provide the same services as it provides under its existing FCC license), no material adverse change to Outdoor Channel or KSE and other customary closing conditions.

Outdoor Channel is subject to customary "no-shop" restrictions on its ability to solicit alternative acquisition proposals from third parties and to provide information to and participate in discussions and engage in negotiations with third parties regarding alternative acquisition proposals. However, prior to stockholder approval of the Merger, the no-shop provision is subject to a customary "fiduciary out" provision that allows Outdoor Channel, under certain circumstances, to provide information to and to participate in discussions and engage in negotiations with third parties with respect to an unsolicited alternative acquisition proposal that the Outdoor Channel Board of Directors has determined is, or would reasonably be expected to result in, a "Superior Proposal" (as defined in the KSE Merger Agreement).

The KSE Merger Agreement contains certain termination rights for Outdoor Channel and KSE. Outdoor Channel will be required to pay KSE a termination fee of $1.0 million upon termination of the KSE Merger Agreement under specified circumstances, including termination by Outdoor Channel to enter into an acquisition agreement that constitutes a Superior Proposal or termination by KSE because the Outdoor Channel Board of Directors adversely changes its recommendation to stockholders to vote in favor of the KSE Merger or takes certain other related adverse actions.

Mr. E. Stanley Kroenke has agreed to guarantee the payment obligations of KSE under the KSE Merger Agreement. Mr. Kroenke shall be released from his guarantee if and to the extent that KSE receives a legal, valid, binding and enforceable financing commitment on customary terms, or a bank guarantee substituting for his obligations thereunder, in each case acceptable to Outdoor Channel, from a major money center bank to finance the transactions contemplated by the KSE Proposal.

The KSE Merger Agreement is included with this filing only to provide investors with information regarding the terms of the KSE Merger Agreement, and not to provide investors with any factual information regarding the parties or their respective businesses. The KSE Merger Agreement should not be read alone, but should instead be read in conjunction with the other information regarding the parties and the KSE Merger that will be contained in or incorporated by reference in a proxy statement that Outdoor Channel will be filing with the U.S. Securities and Exchange Commission ("SEC") in connection with the Merger, as well as in the Forms 10-K, Forms 10-Q and other filings Outdoor Channel makes with the SEC. The representations and warranties contained in the KSE Merger Agreement were made solely for the benefit of the parties to the KSE Merger Agreement and were negotiated for the purpose of allocating contractual risk among the parties to the KSE Merger Agreement rather than to establish matters as facts. The representations and warranties may also be subject to a contractual standard of materiality or material adverse effect different from those generally applicable to stockholders and reports and documents filed with the SEC and in some cases may be qualified by disclosures made by one party to the other, which are not necessarily reflected in the KSE Merger Agreement. For the foregoing reasons, the representations, warranties and covenants or any descriptions of those provisions should not be read alone or relied upon as characterizations of the actual state of facts or condition of Outdoor Channel and KSE or any of their respective subsidiaries or affiliates.

The foregoing description of the KSE Merger Agreement and the transactions contemplated thereby does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the KSE Merger Agreement attached hereto as Exhibit 2.1, which is incorporated herein by reference.

<u>Support Agreement</u>

Concurrently with the execution of the KSE Merger Agreement, Thomas H. Massie, Perry T. Massie and certain of their affiliated entities (the "Massie Parties"), the members of the Outdoor Channel Board of Directors and the executive officers of Outdoor Channel, representing approximately 41% of the outstanding Outdoor Channel common stock (collectively, the "Supporting Parties"), entered into a support agreement with KSE (the "Support Agreement") pursuant to which such parties agreed, among other things, to vote their shares of Outdoor Channel common stock: (i) in favor of the adoption of the KSE Merger Agreement, the KSE Merger and the other transactions contemplated by the KSE Merger Agreement; (ii) in favor of any proposal to adjourn or postpone any meeting of the Outdoor Channel stockholders if there are not sufficient votes for approval of the matters described in the preceding clause (i); and (iii) except with the written consent of KSE, against (x) any Alternative Proposal (as defined in the KSE Merger Agreement) with respect to Outdoor Channel that would impede the merger or (y) any other action or proposal involving Outdoor Channel (or any subsidiary of Outdoor Channel) that would reasonably be expected to prevent or materially impede, interfere with or delay the KSE Merger.

In addition, under the Support Agreement, the Supporting Parties agree, among other things:

- to waive any rights of appraisal or rights to dissent from the Outdoor Channel merger that they may have;

- to revoke any and all previous voting proxies granted with respect to their Outdoor Channel shares and grant a proxy appointing KSE as attorney-in-fact with respect to such shares; and

- not to, subject to certain exceptions (i) sell, transfer, pledge, encumber, tender, gift, assign or otherwise dispose of their shares of Outdoor Channel common stock, (ii) grant any proxies or powers of attorney or enter into any other voting agreements with respect to its Outdoor Channel common stock, (iii) enter into or deposit their Outdoor Channel common stock into a voting trust or take any other action which would diminish the voting power of such shares or (iv) commit or agree to take any of the foregoing actions, prior to the termination of the Support Agreement.

The Support Agreement will terminate automatically upon the termination of the KSE Merger Agreement. In addition, the Supporting Parties may terminate the Support Agreement at any time following a Board Recommendation Change (as defined in the KSE Merger Agreement) made in accordance with the terms of the KSE Merger Agreement.

The foregoing description of the Support Agreement is qualified in its entirety by the full text of the Support Agreement attached hereto as Exhibit 99.1, which is incorporated herein by reference.

**Item 1.02 Termination of Material Definitive Agreement**

On March 13, 2013, prior to entering into the KSE Merger Agreement, Outdoor Channel terminated the InterMedia Merger Agreement in accordance with its terms. A description of the material terms of the InterMedia Merger Agreement is contained in Outdoor Channel's Current Report on Form 8-K filed with the SEC on November 16, 2012 and is incorporated herein by reference. In connection with the termination of the InterMedia Merger Agreement, Outdoor Channel paid InterMedia a $6.5 million fee in accordance with the terms thereof.

In connection with the termination of the InterMedia Merger Agreement, the Support Agreement concurrently entered into by the Massie Parties and the members of the Outdoor Channel Board of Directors and the executive Officers of Outdoor Channel at the time of the execution of the InterMedia Merger Agreement was automatically terminated pursuant to its terms.

**Item 8.01 Other Events**

On March 13, 2013, Outdoor Channel issued a press release announcing the execution of the KSE Merger Agreement and termination of the InterMedia Merger Agreement. A copy of the press release is attached hereto as Exhibit 99.2 and incorporated herein by reference.

**Safe Harbor Statement**

Certain matters discussed in this Current Report on Form 8-K, with the exception of historical matters, may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. In some cases, forward-looking statements can be identified by words such as "anticipates," "estimates," "expects," "believes," "plans," "predicts," and similar terms. These statements are subject to a number of risks and uncertainties that could cause results to differ materially from those anticipated as of the date of this release. You should understand that the following important factors, in addition to those risk factors disclosed in Outdoor Channel's current and periodic reporting filed with the SEC could affect the future results of Outdoor Channel and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- failure of the Outdoor Channel stockholders to adopt the KSE Merger Agreement;

- the risk that the other conditions to closing of the merger may not be satisfied;

- the merger may involve unexpected costs, liabilities or delays;

- risks that the merger disrupts current plans and operations and the potential difficulties in employee retention as a result of the merger;

- the business of Outdoor Channel may suffer as a result of uncertainty surrounding the merger, including the merger making it more difficult to maintain certain strategic relationships;

- the risk that the merger may not be consummated by the expected closing date or at all; and

- risks relating to litigation in respect of the merger.

Outdoor Channel also cautions the reader that undue reliance should not be placed on any forward-looking statements, which speak only as of the date of this release. Outdoor Channel undertakes no duty or responsibility to update any of these forward-looking statements to reflect events or circumstances after the date of this report or to reflect actual outcomes.

**IMPORTANT INFORMATION FOR INVESTORS AND SECURITYHOLDERS**

*This communication is being made in respect of a proposed business combination involving Outdoor Channel and KSE. In connection with this proposed transaction Outdoor Channel plans to file with the SEC and furnish to its stockholders a proxy statement. The proxy statement will contain important information about the proposed transaction and related matters.*

*OUTDOOR CHANNEL URGES INVESTORS TO CAREFULLY READ IN ITS ENTIRETY THE DEFINITIVE PROXY STATEMENT AND OTHER DOCUMENTS INCLUDED AND INCORPORATED BY REFERENCE THEREIN AS THEY ARE MADE AVAILABLE TO OUTDOOR CHANNEL STOCKHOLDERS BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.*

*Investors and security holders will be able to obtain free copies of the proxy statement when made available and other documents filed with the SEC by Outdoor Channel through the web site maintained by the SEC at www.sec.gov. Free copies of the proxy statement when made available and other documents filed with the SEC can also be obtained on Outdoor Channel's website at www.outdoorchannel.com.*

**PROXY SOLICITATION**

*Outdoor Channel and its respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Outdoor Channel stockholders in favor of the merger. When made available, a description of the interest of Outdoor Channel's directors and executive officers in Outdoor Channel will be set forth in the proxy statement and the other documents included and incorporated by reference therein. You can find information about Outdoor Channel's executive officers and directors in its annual report on Form 10-K filed with the SEC on March 9, 2012. You can obtain free copies of these documents from Outdoor Channel in the manner set forth above.*

**Item 9.01 Financial Statements and Exhibits**

**(d) Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger dated March 13, 2013, by and among Kroenke Sports & Entertainment, LLC, KSE Merger Sub, Inc. and Outdoor Channel Holdings, Inc. |
| 99.1 | Form of Support Agreement dated as of March 13, 2013, by and among KSE, the Massie Parties and each of the directors and executive officers of Outdoor Channel |
| 99.2 | Press Release, issued by Outdoor Channel, Holdings, Inc., dated March 13, 2013 |

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OUTDOOR CHANNEL HOLDINGS, INC.

Date: March 13, 2013

/s/ Catherine C. Lee
Catherine C. Lee
Exec. VP, General Counsel and Corporate Secretary

INDEX TO EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger dated March 13, 2013, by and among Kroenke Sports & Entertainment, LLC, KSE Merger Sub and Outdoor Channel Holdings, Inc. |
| 99.1 | Form of Support Agreement dated as of March 13, 2013, by and among KSE, the Massie Parties and each of the directors and executive officers of Outdoor Channel |
| 99.2 | Press Release, issued by Outdoor Channel, Holdings, Inc., dated March 13, 2013 |

EX-99.2 4 d501922dex992.htm EX-99.2

**Exhibit 99.2**

## Outdoor Channel Agrees to be Acquired by Kroenke Sports & Entertainment

TEMECULA, Calif., March 12, 2013 (GLOBE NEWSWIRE)—Outdoor Channel Holdings, Inc. (Nasdaq:OUTD) (the "Company" or "Outdoor Channel") today announced that it entered into a definitive merger agreement (the "KSE Agreement") with Kroenke Sports & Entertainment, LLC ("KSE") pursuant to which KSE will acquire all of the outstanding shares of common stock of Outdoor Channel in an all-cash transaction at a price of $8.75 per share. This per share price represents a premium of approximately 15.9% to Outdoor Channel's closing stock price on March 1, 2013, which was the last trading day prior to the public disclosure of the KSE proposal, and approximately 21.7% to Outdoor Channel's closing stock price on November 15, 2012, which was the last trading day prior to Outdoor Channel's announcement that it had entered into a definitive merger agreement (the "InterMedia Agreement") with InterMedia Outdoors Holdings, LLC ("InterMedia").

"Our board of directors has unanimously determined that the proposed all-cash merger with KSE offers superior value for our stockholders," said Tom Hornish, Outdoor Channel's President and Chief Executive Officer. "We are pleased that Kroenke Sports & Entertainment has agreed to purchase Outdoor Channel."

As previously announced, KSE submitted its binding offer to acquire Outdoor Channel and on March 6, 2013, Outdoor Channel notified InterMedia of its intention to terminate the InterMedia Agreement (subject to InterMedia's right, pursuant to the InterMedia Agreement, to propose, within four business days of such notice, changes to the terms of the InterMedia Agreement so that the KSE proposal would no longer constitute a Superior Proposal (as defined in the InterMedia Agreement)). Following the expiration of this four business-day period, the Outdoor Channel board determined that the KSE proposal continued to constitute a Superior Proposal and, as a result, immediately prior to entering into the KSE Agreement, Outdoor Channel terminated the InterMedia Agreement. In accordance with the terms of the InterMedia Agreement, Outdoor Channel paid InterMedia Outdoors Holdings, LLC a $6.5 million termination fee.

The transaction, which is expected to be completed in the second quarter of 2013, is subject to the satisfaction of customary closing conditions, including the receipt of requisite regulatory approvals and adoption of the KSE Agreement by Outdoor Channel's stockholders. Outdoor Channel's largest stockholders, Perry T. Massie, Thomas H. Massie and their affiliated entities and Outdoor Channel's directors and executive officers, who currently represent a combined ownership of approximately 41% of the Company, each have agreed to vote in favor of the transaction, subject to certain exceptions.

The special meeting of stockholders of Outdoor Channel to adopt the InterMedia Agreement, which was originally scheduled for March 13, 2013, and which the Company announced it intended to adjourn to March 22, 2013, has been cancelled.

Lazard is serving as exclusive financial advisor to Outdoor Channel in connection with the transaction. Wilson Sonsini Goodrich & Rosati, P.C. is legal advisor to Outdoor Channel in connection with the transaction. Allen & Company LLC is serving as exclusive financial advisor to KSE in connection with the transaction. Wachtell, Lipton, Rosen & Katz is legal advisor to KSE in connection with the transaction.

### About Outdoor Channel Holdings, Inc.

Outdoor Channel Holdings, Inc. owns and operates Outdoor Channel and Winnercomm, Inc. Nielsen estimated that Outdoor Channel had approximately 39.1 million cable, satellite and telco subscribers for March 2013. Outdoor Channel offers programming that captures the excitement of hunting, fishing, shooting, adventure and the Western lifestyle and can be viewed on multiple platforms including high definition, video-on-demand, as well as on a dynamic broadband website. Winnercomm is one of America's leading and highest quality producers of live sporting events and sports series for cable and broadcast television. The Company also owns and operates the SkyCam and CableCam aerial camera systems which provide dramatic overhead camera angles for major sports events, including college and NFL football.

### About KSE

Denver-based Kroenke Sports & Entertainment is one of the world's leading ownership, entertainment and management groups. As owners and operators of Pepsi Center, the Paramount Theatre, Dick's Sporting Goods Park, the Colorado Avalanche (NHL), Denver Nuggets (NBA), Colorado Mammoth (NLL) and Colorado Rapids (MLS), KSE's sports and entertainment assets are second to none. Additional properties under KSE's umbrella include Altitude Sports & Entertainment, a 24-hour regional television network; Altitude Authentics, the company's official retail provider; and TicketHorse, the official ticketing provider for KSE teams and venues.

### Safe Harbor Statement

Certain matters discussed in this news release, with the exception of historical matters, may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. In some cases, forward-looking statements can be identified by words such as "anticipates," "estimates," "expects," "believes," "plans," "predicts," and similar terms. These statements are subject to a number of risks and uncertainties that could cause results to differ materially from those anticipated as of the date of this release. You should understand that the following important factors, in addition to those risk factors disclosed in the Company's current and periodic reporting filed with the U.S. Securities and Exchange Commission (the "SEC") could affect the future results of the Company and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- failure of Company stockholders to adopt the KSE Agreement;

- the risk that the other conditions to closing of the merger may not be satisfied;

- the merger may involve unexpected costs, liabilities or delays;

- risks that the merger disrupts current plans and operations and the potential difficulties in employee retention as a result of the merger;

- the business of the Company may suffer as a result of uncertainty surrounding the merger;

- the risk that the merger may not be consummated by the expected closing date of the merger or at all;

- litigation in respect of the merger; and

- disruption from the merger making it more difficult to maintain certain strategic relationships.

The Company also cautions the reader that undue reliance should not be placed on any forward-looking statements, which speak only as of the date of this release. The Company undertakes no duty or responsibility to update any of these forward-looking statements to reflect events or circumstances after the date of this report or to reflect actual outcomes.

### *IMPORTANT INFORMATION FOR INVESTORS AND SECURITYHOLDERS*

*This communication is being made in respect of a proposed business combination involving Outdoor Channel and KSE. In connection with this proposed transaction Outdoor Channel plans to file with the SEC and furnish to its stockholders a proxy statement. The proxy statement will contain important information about the proposed transaction and related matters.*

*OUTDOOR CHANNEL URGES INVESTORS TO CAREFULLY READ IN ITS ENTIRETY THE DEFINITIVE PROXY STATEMENT AND OTHER DOCUMENTS INCLUDED AND INCORPORATED BY REFERENCE THEREIN AS THEY ARE MADE AVAILABLE TO OUTDOOR CHANNEL STOCKHOLDERS BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.*

*Investors and security holders will be able to obtain free copies of the proxy statement when made available and other documents filed with the SEC by Outdoor Channel through the web site maintained by the SEC at www.sec.gov. Free copies of the proxy statement when made available and other documents filed with the SEC can also be obtained on Outdoor Channel's website at www.outdoorchannel.com.*

### *PROXY SOLICITATION*

*Outdoor Channel and its respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Outdoor Channel stockholders in*

*favor of the merger. When made available, a description of the interest of Outdoor Channel's directors and executive officers in Outdoor Channel will be set forth in the proxy statement and the other documents included and incorporated by reference therein. You can find information about Outdoor Channel's executive officers and directors in its annual report on Form 10-K filed with the SEC on March 9, 2012. You can obtain free copies of these documents from Outdoor Channel in the manner set forth above.*

CONTACT: For Outdoor Channel:

    Tom Allen
    Executive Vice President, Chief Operating Officer/
    Chief Financial Officer
    800-770-5750
    tallen@outdoorchannel.com

    Investors:
    Chris Plunkett
    Brainerd Communicators, Inc.
    212-986-6667
    plunkett@braincomm.com

    Media:
    Nancy Zakhary
    Brainerd Communicators, Inc.
    212-986-6667
    nancy@braincomm.com

    For KSE:

    T. Collins
    Vice President, Communications
    (303) 405-1352
    tcollins@pepsicenter.com

**RE: Summary of today's discussion with Noble**                                 Wednesday, March 20, 2013 7:42 PM

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificcap.com>

To: "Nic Salomon" <nsalomon2@yahoo.com>

Cc: "Kelly Holowaty" <kelly.holowaty@pacificnortherncapital.com>

Nic- this is fine for now. I spoke to Tim and have a call with Hornish tomorrow afternoon - just me and him. I will give you a call in the morning.

Jeff

-------- Original Message --------
Subject: Summary of today's discussion with Noble
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Wed, March 20, 2013 5:01 pm
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificcap.com>
Cc: Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>

Jeff / Kelly,
Please see below a DRAFT email which I think should summarize our call with Noble today. If you have any feedback before I send, please let me know. I have Roger engaged on the Kroenke issue - he has advised me to be patient and let the deal play out naturally. My response back was to request that his team get through the negotiations on the complex issues in the APA (consistent with the term sheet) and to provide definitive communication (or at least a timeline for that communication) of where things stand with Kroenke. I also suggested the Kroenke could be a good strategic partner for the business and that we would be interested to explore that.

Best,
Nic

Tom / Tom / Cathy,
In order to keep things moving and to continue to move closer on the terms of the Skycam/Cablecam Asset Purchase Agreement, I would like to follow up with you with my notes and comments from the call we had today with Noble on the APA.

Below I will outline each issue that was discussed, and then identify the OUTD position (as I understood it to be communicated by Noble) as well as the Purchaser's position (as communicated by myself and PNC).I will also include some background on certain issues that will be helpful in having a dialogue

**1.Accounts Receivable and Accounts Payable**

**Seller position:** All A/R and A/P at time of close will be responsibility of Seller.Seller does not want to provide A/R and A/P schedules.

**Purchaser position:**Same as Seller, except that Purchaser is requesting that a schedule of A/P and A/R be included in the APA so there is accountability on this topic (for the protection and benefit of both parties).

**Proposed next steps:**Noble said they would request A/R and A/P schedules from Seller.

**2.Fort Worth Lease Guarantee**

**Seller position:** Seller would like to make the removal of this guarantee a requirement to close a Transaction.

**Purchaser position:** Purchaser is offering to make commercially reasonable efforts to remove this guarantee.If the Landlord refuses to consent, Purchaser is open to providing these same commercially reasonable efforts back to Seller to offset the guarantee.

**Background information:** Seller is aware of the difficulty in negotiating with this Landlord from when these leases were put in place 2 years ago.The Landlord currently has a guarantee from a public company with a significant amount of cash and no debt, and the new guarantor under the Seller's announced merger transaction is expected to be a new entity with almost no limits on access to capital resources.There is a possibility that the Landlord is not willing to be reasonable and give up this security for any reasonable amount of new security Seller can provide to Purchaser (this is out Purchaser's control).This item was added to term sheet by Seller the day before it was signed as a requirement with no prior discussion.

**Proposed next steps:**Purchaser is willing to make commercially reasonable efforts to replace the guarantee and would like Seller to work with Purchaser in a spirit of good faith to accomplish this.Perhaps Seller and Purchaser can discuss and agree on a commercially reasonable security that Purchaser can propose to Landlord.

**3.Transition Services**

**EXHIBIT "J"**

RE: Summary of today's discussion with Noble - Yahoo Mail

Page 2 of 3

Case 3:15-cv-00666-M   Document 63   Filed 08/31/17   Page 110 of 139   PageID 780

**Seller position:** Seller would like to know exactly what these are and make sure they are properly compensated.Seller is amenable to this request subject to learning the scope and proposed consideration.

**Purchaser position:** Purchaser can provide this scope and cost for consideration and discussion as due diligence continues.

**Proposed next steps:** Purchaser to provide more details on this to Seller.

### 4.McAfee & Taft Agreement

**Seller position:** Seller is asking Purchaser to assume this Contingent Fee Agreement as part of a Transaction.Seller is open to having Purchaser recover any new legal fees and honoring the terms of the Agreement before splitting any recovery proceeds under a Transaction.

**Purchaser position:**Purchaser signed a term sheet that was very clear in stating "only ordinary course liabilities will be assumed".The liabilities under this Contingent Fee Agreement are not ordinary course liabilities.In a show of good faith, Purchaser has offered to change the Agreement in the term sheet and be responsible for the $75,000 Injunction Relief Fee, and further assume the financial obligations of the Contingent Fee Agreement as long as any new legal fees incurred by Purchaser are the first money recovered any Settlement Proceeds, and that the Seller's remaining financial interest in Settlement Proceeds would go to honor Seller's liabilities under the Contingent Fee Agreement.Purchaser is also interested to engage McAfee& Taft to continue its legal work in the case.

**Background information:** This Contingent Fee Agreement was made between Outdoor Channel and McAfee & Taft in November 2011, and Skycam/Cablecam management was not a party to the discussion or the terms of the Agreement. The details of the Agreement were only provided to Skycam/Cablecam management as part of the due diligence process for this Transaction.Skycam/Cablecam management has contacted McAfee & Taft to try to understand the contingent fee balance under this agreement.These contingent fees are approximately $475,000 + the $75,000 Injunctive Relief Fee. McAfee has indicated that if they were to get paid out, they would settle for just having their unpaid fees covered ($350,000 + the $75,000 Injunctive Relief Fee).

**Proposed next steps:**Purchaser would like Seller to work with Purchaser in good faith to find an amenable solution with McAfee & Taft that works for all parties.This is going to require some compromise and creativity.Seller created this agreement with McAfee & Taft and is in the best position to help structure a solution to this issue which is not an ordinary course liability.

### 5.Sales / Transfer Taxes

**Seller position:** Seller believes these should be the responsibility of Purchaser.

**Purchaser position:**Purchaser has asked for an estimate of what these costs are expected to be, and also asked for clarification to make sure these Sales/Transfer Taxes relate only to Taxes from the time of Transaction close (nothing prior to the date of close).

**Proposed next steps:**Noble to ask Seller to provide cost estimate and clarification.

### 6.Deferred Revenue

**Seller position:** Seller would like to change the Deferred Revenue calculation as defined in the term sheet to give a credit back to the Seller for the amount of any usages under the ESPN contract that go unused as of July 31, 2013.

**Purchaser position:** The Seller's request amounts to a purchase price increase (of a TBD amount).This would take away Revenue from the Purchaser that is earned and recorded after the assets have transferred.This is contrary to the agreement in the term sheet.

As a general request, Purchaser would like Seller to provide updated schedules of the deferred revenue balances as well as a detailed budget showing the revenue and expense recognition on the NAVAIR contract so that the adjustments for Deferred Revenue can be tracked accordingly.

**Background information:** The number of usages in the ESPN contract is typically driven by the series length of the NBA Playoffs and Finals (if they go less than 7 games, ESPN sometimes has some remaining usages from the season which get recorded as revenue at the end of the contract year which is July 31).Each usage is valued at $40,000– for the current year of the contract (as of 3/20/13), there are 18.5 usages remaining ahead of the College Lacrosse Championships, NBA Playoffs and Finals.

**Proposed next steps:** Noble to ask Seller to provide updated Deferred Revenue schedules and related budgets for the APA schedules.The purchase price adjustment Seller is proposing is not what was agreed in the term sheet, and Purchaser would like to have Seller honor what has agreed in the term sheet.

### 7.Severance

**Seller position:** Seller would like to have Severance associated with a transaction be the responsibility of the Purchaser.

**Purchaser position:** Purchaser believes this is probably ok, with the exception of the liability for any regularly accrued compensation and benefits (such as PTO) through the closing date. Without this clarification, this would amount to a purchase price adjustment for liabilities that have nothing to do with the new Purchaser.

**Proposed next steps:** Noble to ask Seller to modify this issue to adjust for accrued compensation and benefits.

### 8.Indemnification

https://us-mg6.mail.yahoo.com/neo/b/message?sMid=88&fid=Buyout%25202012%252d2...   8/24/2016

Case 3:15-cv-00666-M   Document 63   Filed 08/31/17   Page 111 of 139   PageID 781

**Seller position:** Since Skycam/Cablecam management is part of the Purchaser, Seller believes that indemnifications should be very limited.

**Purchaser position:** Puchaser believes it has asked for Indemnifications that are consistent with what is standard in the market for similar transactions.PNC is of the position that they are buying a business, not just the management.Skycam/Cablecam management is willing to try to bridge the gap with the Purchaser, including representing that they have provided Purchaser will all the information they have related to the business, but Skycam/Cablecam management has no way to represent that Seller has provided all the information they have.Seller will have to represent to this. Purchaser is willing to negotiate the indemnification provisions in good faith.

**Proposed next steps:** To continue to be discussed as the APA is negotiated.

**RE: Summary of today's discussion with Noble**

Wednesday, March 20, 2013 7:42 PM

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

To: "Nic Salomon" <nsalomon2@yahoo.com>

Cc: "Kelly Holowaty" <kelly.holowaty@pacificnortherncapital.com>

Nic- this is fine for now.  I spoke to Tim and have a call with Hornish tomorrow afternoon - just me and him.  I will give you a call in the morning.

Jeff

-------- Original Message --------
Subject: Summary of today's discussion with Noble
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Wed, March 20, 2013 5:01 pm
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
Cc: Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>

Jeff / Kelly,

Please see below a DRAFT email which I think should summarize our call with Noble today.  If you have any feedback before I send, please let me know.  I have Roger engaged on the Kroenke issue - he has advised me to be patient and let the deal play out naturally.  My response back was to request that his team get through the negotiations on the complex issues in the APA (consistent with the term sheet) and to provide definitive communication (or at least a timeline for that communication) of where things stand with Kroenke.  I also suggested the Kroenke could be a good strategic partner for the business and that we would be interested to explore that.

Best,
Nic


Tom / Tom / Cathy,

In order to keep things moving and to continue to move closer on the terms of the Skycam/Cablecam Asset Purchase Agreement, I would like to follow up with you with my notes and comments from the call we had today with Noble on the APA.

Below I will outline each issue that was discussed, and then identify the OUTD position (as I understood it to be communicated by Noble) as well as the Purchaser's position (as communicated by myself and PNC).I will also include some background on certain issues that will be helpful in having a dialogue

**1.Accounts Receivable and Accounts Payable**

**Seller position:** All A/R and A/P at time of close will be responsibility of Seller.Seller does not want to provide A/R and A/P schedules.

**Purchaser position:**Same as Seller, except that Purchaser is requesting that a schedule of A/P and A/R be included in the APA so there is accountability on this topic (for the protection and benefit of both parties).

**Proposed next steps:**Noble said they would request A/R and A/P schedules from Seller.

**2.Fort Worth Lease Guarantee**

**Seller position:** Seller would like to make the removal of this guarantee a requirement to close a Transaction.

**Purchaser position:** Purchaser is offering to make commercially reasonable efforts to remove this guarantee.If the Landlord refuses to consent, Purchaser is open to providing these same commercially reasonable efforts back to Seller to offset the guarantee.

**Background information:** Seller is aware of the difficulty in negotiating with this Landlord from when these leases were put in place 2 years ago.The Landlord currently has a guarantee from a public company with a significant amount of cash and no debt, and the new guarantor under the Seller's announced merger transaction is expected to be a new entity with almost no limits on access to capital resources.There is a possibility that the Landlord is not willing to be reasonable and give up this security for any reasonable amount of new security Seller can provide to Purchaser (this is out Purchaser's control).This item was added to term sheet by Seller the day before it was signed as a requirement with no prior discussion.

**Proposed next steps:**Purchaser is willing to make commercially reasonable efforts to replace the guarantee and would like Seller to work with Purchaser in a spirit of good faith to accomplish this.Perhaps Seller and Purchaser can discuss and agree on a commercially reasonable security that Purchaser can propose to Landlord.

**3.Transition Services**

**EXHIBIT "K"**

**Seller position:** Seller would like to know exactly what these are and make sure they are properly compensated.Seller is amenable to this request subject to learning the scope and proposed consideration.

**Purchaser position:** Purchaser can provide this scope and cost for consideration and discussion as due diligence continues.

**Proposed next steps:** Purchaser to provide more details on this to Seller.

### 4.McAfee & Taft Agreement

**Seller position:** Seller is asking Purchaser to assume this Contingent Fee Agreement as part of a Transaction.Seller is open to having Purchaser recover any new legal fees and honoring the terms of the Agreement before splitting any recovery proceeds under a Transaction.

**Purchaser position:**Purchaser signed a term sheet that was very clear in stating "only ordinary course liabilities will be assumed".The liabilities under this Contingent Fee Agreement are not ordinary course liabilities.In a show of good faith, Purchaser has offered to change the Agreement in the term sheet and be responsible for the $75,000 Injunction Relief Fee, and further assume the financial obligations of the Contingent Fee Agreement as long as any new legal fees incurred by Purchaser are the first money recovered any Settlement Proceeds, and that the Seller's remaining financial interest in Settlement Proceeds would go to honor Seller's liabilities under the Contingent Fee Agreement.Purchaser is also interested to engage McAfee& Taft to continue its legal work in the case.

**Background information:** This Contingent Fee Agreement was made between Outdoor Channel and McAfee & Taft in November 2011, and Skycam/Cablecam management was not a party to the discussion or the terms of the Agreement. The details of the Agreement were only provided to Skycam/Cablecam management as part of the due diligence process for this Transaction.Skycam/Cablecam management has contacted McAfee & Taft to try to understand the contingent fee balance under this agreement.These contingent fees are approximately $475,000 + the $75,000 Injunctive Relief Fee. McAfee has indicated that if they were to get paid out, they would settle for just having their unpaid fees covered ($350,000 + the $75,000 Injunctive Relief Fee).

**Proposed next steps:**Purchaser would like Seller to work with Purchaser in good faith to find an amenable solution with McAfee & Taft that works for all parties.This is going to require some compromise and creativity.Seller created this agreement with McAfee & Taft and is in the best position to help structure a solution to this issue which is not an ordinary course liability.

### 5.Sales / Transfer Taxes

**Seller position:** Seller believes these should be the responsibility of Purchaser.

**Purchaser position:**Purchaser has asked for an estimate of what these costs are expected to be, and also asked for clarification to make sure these Sales/Transfer Taxes relate only to Taxes from the time of Transaction close (nothing prior to the date of close).

**Proposed next steps:**Noble to ask Seller to provide cost estimate and clarification.

### 6.Deferred Revenue

**Seller position:** Seller would like to change the Deferred Revenue calculation as defined in the term sheet to give a credit back to the Seller for the amount of any usages under the ESPN contract that go unused as of July 31, 2013.

**Purchaser position:** The Seller's request amounts to a purchase price increase (of a TBD amount).This would take away Revenue from the Purchaser that is earned and recorded after the assets have transferred.This is contrary to the agreement in the term sheet.

As a general request, Purchaser would like Seller to provide updated schedules of the deferred revenue balances as well as a detailed budget showing the revenue and expense recognition on the NAVAIR contract so that the adjustments for Deferred Revenue can be tracked accordingly.

**Background information:** The number of usages in the ESPN contract is typically driven by the series length of the NBA Playoffs and Finals (if they go less than 7 games, ESPN sometimes has some remaining usages from the season which get recorded as revenue at the end of the contract year which is July 31).Each usage is valued at $40,000– for the current year of the contract (as of 3/20/13), there are 18.5 usages remaining ahead of the College Lacrosse Championships, NBA Playoffs and Finals.

**Proposed next steps:** Noble to ask Seller to provide updated Deferred Revenue schedules and related budgets for the APA schedules.The purchase price adjustment Seller is proposing is not what was agreed in the term sheet, and Purchaser would like to have Seller honor what has agreed in the term sheet.

### 7.Severance

**Seller position:** Seller would like to have Severance associated with a transaction be the responsibility of the Purchaser.

**Purchaser position:** Purchaser believes this is probably ok, with the exception of the liability for any regularly accrued compensation and benefits (such as PTO) through the closing date. Without this clarification, this would amount to a purchase price adjustment for liabilities that have nothing to do with the new Purchaser.

**Proposed next steps:** Noble to ask Seller to modify this issue to adjust for accrued compensation and benefits.

### 8.Indemnification

**Seller position:** Since Skycam/Cablecam management is part of the Purchaser, Seller believes that indemnifications should be very limited.

**Purchaser position:** Puchaser believes it has asked for Indemnifications that are consistent with what is standard in the market for similar transactions.PNC is of the position that they are buying a business, not just the management.Skycam/Cablecam management is willing to try to bridge the gap with the Purchaser, including representing that they have provided Purchaser will all the information they have related to the business, but Skycam/Cablecam management has no way to represent that Seller has provided all the information they have.Seller will have to represent to this. Purchaser is willing to negotiate the indemnification provisions in good faith.

**Proposed next steps:** To continue to be discussed as the APA is negotiated.

**Re: Update**                                                                          Monday, March 25, 2013 6:26 PM

From:  "Nic Salomon" <nsalomon2@yahoo.com>

To:  "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

Cc:  "Kelly Holowaty" <kelly.holowaty@pacificnortherncapital.com>

Roger that.

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
To: Nic Salomon <nsalomon2@yahoo.com>
Cc: Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>
Sent: Monday, March 25, 2013 5:31 PM
Subject: RE: Update

This is exactly what I was concerned about.  I would have the meeting, but strongly state that you and management have
partnered with PNC and are moving forward with closing a transaction.  I guess we would entertain the possibility of them joining
as a minority investor.

Jeff

-------- Original Message --------
Subject: Re: Update
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Mon, March 25, 2013 3:03 pm
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
Cc: Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>

Update - Tom Hornish emailed me this afternoon and put me in touch with a Dallas based executive (David Gluck) from
Kroenke's group.  David is scheduled to come to our facility in Fort Worth tomorrow morning for a visit.  When David called
me, I asked him the purpose of the meeting and he said it was just to see our facility and learn more about our business.  David
said he is aware of the LOI and doesn't yet know what they plan to do about this.
Only background info I could find on David is:
*David Gluck, senior vice president for new business and chief legal officer, formerly general counsel at Liberty Sports and also
with Fox Sports Net;*
http://www.bizjournals.com/denver/stories/2004/02/09/daily10.html?page=all

My thought is to engage the Kroenke group on being an investor in the management deal (without ceding any rights to the larger
deal).  Of course, if you have any thoughts on how you want me to handle this meeting, please let me know.  I don't see a way
around having the meeting as this was coordinated by Tom Hornish.

Also, I'm about 80% complete with an operating model.  Should have something that we can all review/discuss later this week.

Thanks.

Nic

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
To: Nic Salomon <nsalomon2@yahoo.com>
Cc: Kelly Holowaty <kelly.holowaty@pacificnortherncapital.com>
Sent: Thursday, March 21, 2013 3:59 PM
Subject: Update

Nic - I had a good conversation with Tom about the APA.  We worked out most of the issues.  He agreed to extend the
LOI 30 days which give us some more time to focus on the integration.  He also will keep us updated when he hears from
Kroenke.

Kelly and I had a last minute board meeting come up on Monday so we will have to postpone our trip..sorry.  We will
come back to you with some other dates that work.

Let's continue to move forward.

Maybe next week we can review the operating model...I would like to get a sense of what things look like with Sequoia,
other capex, growth, etc.

Thanks,

Jeff

March 21, 2013

Pacific Northern Capital
3218 East Holt Avenue
West Covina, CA 91791

Ladies and Gentlemen:

This letter amendment ("*Amendment*"), effective as of March 21, 2013, amends that Term Sheet (the
"*Term Sheet*") between Outdoor Channel Holdings, Inc. and Pacific Northern Capital ("*PNC*")
concerning PNC's proposed acquisition of certain assets of SkyCam, LLC and CableCam, LLC
("*Proposed Transaction*"). Unless otherwise noted, all defined terms in this Amendment shall have the
same meanings as set forth in the Term Sheet.

The parties hereto, intending to be legally bound hereby, agree as follows:

1. Extension of Exclusivity. The exclusivity section set forth on page 3 of the Term Sheet shall be
   amended as follows:

   a. The date "April 15, 2013," referenced in the third line of paragraph A shall be deleted in
      its entirety and shall be replaced with "May 15, 2013 ("Exclusivity End Date")."

   b. The following sentence shall be added as the last sentence of paragraph B:

   "If PNC determines in good faith that (i) the parties have agreed to substantially all of the
   terms and conditions governing the Proposed Transaction and (ii) the Proposed Transaction is
   proceeding towards completion, then the Exclusivity End Date shall be extended to June 15,
   2013 upon PNC's delivery of written notice of such determination to Outdoor Channel."

   c. The following sentence shall be added in its entirety, as a new paragraph, at the end of
      the Exclusivity section:

   "E.  The parties agree that if, at any point during the exclusivity period, Kroenke Sports &
   Entertainment, LLC concludes that it will not consent to the Proposed Transaction, PNC shall
   release Outdoor Channel from its exclusivity obligations and PNC shall forever waive its
   rights, if any, under the Term Sheet to seek equitable relief or any other remedies available at
   law or in equity."

   Except as expressly modified by this Amendment, the Term Sheet shall remain unmodified and in
full force and effect. This Amendment may be executed in one or more counterparts, each of which shall
be deemed to be an original but all of which together shall constitute one and the same instrument

**EXHIBIT "L"**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date set forth above.

OUTDOOR CHANNEL HOLDINGS, INC.

By: _____

Tom Hornish, President and CEO

AGREED TO AND ACCEPTED
as of the date first above written:

PACIFIC NORTHERN CAPITAL

By: _____
Name: Kelly Holcomb
Title: Managing Director

**RE: update 3/28**

Tuesday, April 9, 2013 10:55 AM

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

To: "Nic Salomon" <nsalomon2@yahoo.com>

"kelly.holowaty@pacificnortherncapital.com" <kelly.holowaty@pacificnortherncapital.com>

Nic - I sent Tom an email last Friday asking for an update...he replied mentioning he has not heard back yet...I will forward you that email. Also, when I spoke with Tom a few weeks back, we agreed to extend the term sheet to May 15 with an additional 30 day option.

Jeff

-------- Original Message --------
Subject: Re: update 3/28
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Tue, April 09, 2013 7:58 am
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,
"kelly.holowaty@pacificnortherncapital.com"
<kelly.holowaty@pacificnortherncapital.com>

Jeff / Kelly,

I still have not heard any more feedback from either Kroenke or Outdoor Channel. Today I am putting together a draft term sheet extension and will send around later today for your sign off before I send to Hornish.

Regards,
Nic

**From:** "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
**To:** nsalomon2@yahoo.com; kelly.holowaty@pacificnortherncapital.com
**Sent:** Thursday, March 28, 2013 6:06 PM
**Subject:** Re: update 3/28

Thanks for the update. We were thinking of around $4mm for PNC and leaving $2mm for other strategic investors (Roger and Brad). Send me the model when you are complete and we can discuss specifics. I am traveling for the holiday weekend but will call you Monday.

Thanks,

Jeff

-------- Original Message --------
Subject:: update 3/28
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Mar 28, 2013 9:34 AM
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,"Kelly Holowaty"
<kelly.holowaty@pacificnortherncapital.com>
CC:

Jeff / Kelly,

I continue to work on the operating model this week. On your end, can you please provide me with your proposed capitalization table so we can work that into our financial analysis for potential strategic investors (IMAX and Kroenke)? For total capital in the deal, let's assume the transaction value in the term sheet + $2.5MM of additional capital (next gen development including Sequoia acquisition, working capital needs and up front transaction-related expenses/costs). We may also want to syndicate out some equity at a higher valuation if you want to offset some of the management dilution on the front end of the deal. We should also think about structure and how it may be impacted by a future potential investment from the NFL VC fund (if that becomes a reality down the road). If you would like to get on the phone to discuss this, please let me know.

As for other items, I will leave it in your hands to press Outdoor Channel for a revised APA (unless you want me to lead the charge). I have great options for insurance, benefits plans, and new banking relationships in the works, and plan to interview CPA firms in the near future as well.

With the business, things are progressing well for Confederations Cup in Brazil and the NBA Playoffs/Finals. We have a 2-day trip to Capitol Hill next week for government strategic planning, and then we have meetings with our key clients April 8-11 at the NAB trade show in Las Vegas.

**EXHIBIT "M"**

On the Kroenke situation, I had the meeting with David Gluck on Tuesday and explained to him the business (but did not disclose anything related to the transaction or the investor group per the restrictions in the term sheet - I informed him there was an exclusive term sheet in place). I don't have a good read on what their plans are - they are waiting for their CEO to return from vacation at the end of next week to discuss.

If there is any update on your end, please let me know

Nic

**RE: update 3/28**

Tuesday, April 9, 2013 10:55 AM

From: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

To: "Nic Salomon" <nsalomon2@yahoo.com>

"kelly.holowaty@pacificnortherncapital.com" <kelly.holowaty@pacificnortherncapital.com>

Nic - I sent Tom an email last Friday asking for an update...he replied mentioning he has not heard back yet...I will forward you that email. Also, when I spoke with Tom a few weeks back, we agreed to extend the term sheet to May 15 with an additional 30 day option.

Jeff

-------- Original Message --------
Subject: Re: update 3/28
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Tue, April 09, 2013 7:58 am
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,
"kelly.holowaty@pacificnortherncapital.com"
<kelly.holowaty@pacificnortherncapital.com>

Jeff / Kelly,

I still have not heard any more feedback from either Kroenke or Outdoor Channel. Today I am putting together a draft term sheet extension and will send around later today for your sign off before I send to Hornish.

Regards,
Nic

**From:** "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>
**To:** nsalomon2@yahoo.com; kelly.holowaty@pacificnortherncapital.com
**Sent:** Thursday, March 28, 2013 6:06 PM
**Subject:** Re: update 3/28

Thanks for the update. We were thinking of around $4mm for PNC and leaving $2mm for other strategic investors (Roger and Brad). Send me the model when you are complete and we can discuss specifics. I am traveling for the holiday weekend but will call you Monday.

Thanks,

Jeff

-------- Original Message --------
Subject:: update 3/28
From: Nic Salomon <nsalomon2@yahoo.com>
Date: Mar 28, 2013 9:34 AM
To: "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>,"Kelly Holowaty"
<kelly.holowaty@pacificnortherncapital.com>
CC:

Jeff / Kelly,

I continue to work on the operating model this week. On your end, can you please provide me with your proposed capitalization table so we can work that into our financial analysis for potential strategic investors (IMAX and Kroenke)? For total capital in the deal, let's assume the transaction value in the term sheet + $2.5MM of additional capital (next gen development including Sequoia acquisition, working capital needs and up front transaction-related expenses/costs). We may also want to syndicate out some equity at a higher valuation if you want to offset some of the management dilution on the front end of the deal. We should also think about structure and how it may be impacted by a future potential investment from the NFL VC fund (if that becomes a reality down the road). If you would like to get on the phone to discuss this, please let me know.

As for other items, I will leave it in your hands to press Outdoor Channel for a revised APA (unless you want me to lead the charge). I have great options for insurance, benefits plans, and new banking relationships in the works, and plan to interview CPA firms in the near future as well.

With the business, things are progressing well for Confederations Cup in Brazil and the NBA Playoffs/Finals. We have a 2-day trip to Capitol Hill next week for government strategic planning, and then we have meetings with our key clients April 8-11 at the NAB trade show in Las Vegas.

**EXHIBIT "N"**

On the Kroenke situation, I had the meeting with David Gluck on Tuesday and explained to him the business (but did not disclose anything related to the transaction or the investor group per the restrictions in the term sheet - I informed him there was an exclusive term sheet in place). I don't have a good read on what their plans are - they are waiting for their CEO to return from vacation at the end of next week to discuss.

If there is any update on your end, please let me know

Nic

**Skycam Amendment**

Tuesday, April 9, 2013 11:21 AM

From:   "jeff.holowaty@pacificncap.com" <jeff.holowaty@pacificncap.com>

To:   "Nic Salomon" <nsalomon2@yahoo.com>

1 Files   80KB   Download All
PDF   80KB

Signed
Skycam
Amendme

Save

FYI

DEFA14A 1 d533118ddefa14a.htm DEFA14A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

_____

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

_____

Filed by the Registrant ☒   Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐ Definitive Proxy Statement

☒ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

# Outdoor Channel Holdings, Inc.
### (Name of Registrant as Specified In Its Charter)

#### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

 (1) Title of each class of securities to which transaction applies:

  _____

 (2) Aggregate number of securities to which transaction applies:

  _____

 (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  _____

 (4) Proposed maximum aggregate value of transaction:

  _____

 (5) Total fee paid:

  _____

**EXHIBIT "O"**

☐   Fee paid previously with preliminary materials:

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount Previously Paid:

_____

(2)   Form, Schedule or Registration Statement No:

_____

(3)   Filing party:

_____

(4)   Date filed:

_____

EXPLANATORY NOTE:

On May 6, 2013, Outdoor Channel Holdings, Inc. ("Outdoor Channel") issued a press release announcing that its board of directors unanimously determined that the May 3, 2013 proposal submitted by InterMedia Outdoors Holdings, LLC and IMTOC Merger Sub, Inc. to acquire all outstanding shares of Outdoor Channel common stock in an all-cash transaction at a price of $9.75 per share constitutes a "Superior Proposal" as such term is defined in Outdoor Channel's merger agreement with Kroenke Sports & Entertainment, LLC and KSE Merger Sub, Inc. dated as of March 13, 2013. A copy of the press release is included below.

C-2

## OUTDOOR CHANNEL DETERMINES THAT INTERMEDIA PROPOSAL
## IS A SUPERIOR PROPOSAL

**TEMECULA, Calif.—May 6, 2013**—Outdoor Channel Holdings, Inc. (NASDAQ: OUTD) (the "Company" or "Outdoor Channel") today announced that its board of directors, after consultation with the Company's outside legal counsel and financial advisor, unanimously determined that the May 3, 2013 proposal submitted by InterMedia Outdoors Holdings, LLC and IMTOC Merger Sub, Inc. (together, "InterMedia") to acquire all outstanding shares of Outdoor Channel common stock in an all-cash transaction at a price of $9.75 per share constitutes a "Superior Proposal" as such term is defined in Outdoor Channel's merger agreement with Kroenke Sports & Entertainment, LLC ("KSE") and KSE Merger Sub, Inc. dated as of March 13, 2013 (the "KSE Agreement"). The definitive terms and conditions of a merger agreement detailing this proposal have been fully negotiated, and financing commitments have been obtained by InterMedia. The receipt by InterMedia of financing is not a condition to the closing of the proposed InterMedia merger. In addition, there are no contractual limitations on remedies available to Outdoor Channel against InterMedia in the event of a financing failure.

In accordance with the terms of the KSE Agreement, Outdoor Channel has notified KSE of its intention to terminate the KSE Agreement, subject to KSE's right to propose, within four business days of such notice, changes to the terms of the KSE Agreement that would, in the good faith judgment of the Outdoor Channel board (after consultation with outside legal counsel and financial advisors), cause the InterMedia proposal to no longer constitute a Superior Proposal.

At this time the KSE Agreement remains in effect, and the Outdoor Channel board has not changed its recommendation with respect to the KSE transaction. If the InterMedia proposal continues to constitute a Superior Proposal after the expiration of the four business-day period ending at 5:00 p.m., Pacific Time, May 9, 2013, Outdoor Channel expects to terminate the KSE Agreement and to enter into the merger agreement with InterMedia. In such event, Outdoor Channel would be required to pay KSE a break-up fee in the amount of $1,000,000.

Stockholders do not need to take any action at this time. If a stockholder has previously submitted its proxy card or voted by internet or telephone and does not currently wish to change its vote, no further action is required by such stockholder. If a stockholder would like to vote or change its vote, please refer to the instructions provided in the definitive proxy statement which was mailed to Outdoor Channel stockholders on or about April 12, 2013. Stockholders are urged to carefully review the definitive proxy statement and the other materials included or incorporated by reference therein as these materials include additional information regarding the transaction.

The Outdoor Channel board cautions that there can be no assurance that the InterMedia proposal will lead to the termination of the KSE Agreement and the execution of a merger agreement with InterMedia, or that the InterMedia proposal will be approved or consummated.

Lazard is serving as exclusive financial advisor to the Company in connection with the transaction. Wilson Sonsini Goodrich & Rosati, P.C. is legal advisor to the Company.

## About Outdoor Channel Holdings, Inc.

Outdoor Channel Holdings, Inc. owns and operates Outdoor Channel and Winnercomm Inc. Nielsen estimated that Outdoor Channel had approximately 39.8 million cable, satellite and telco subscribers for May 2013. Outdoor Channel offers programming that captures the excitement of hunting, fishing, shooting, adventure and the Western lifestyle and can be viewed on multiple platforms including high definition, video-on-demand, as well as on a dynamic broadband website. Winnercomm is one of America's leading and highest quality producers of live sporting events and sports series for cable and broadcast television. The Company also owns and operates the SkyCam and CableCam aerial camera systems which provide dramatic overhead camera angles for major sports events, including college and NFL football.

### *Safe Harbor Statement*

Certain matters discussed in this press release, with the exception of historical matters, may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. In some cases, forward-looking statements can be identified by words such as "anticipates," "estimates," "expects," "believes," "intends," "plans," "predicts," and similar terms. These statements are subject to a number of risks and uncertainties that could cause results to differ materially from those anticipated as of the date of this release. You should understand that the following important factors could cause outcomes to differ materially from those expressed or implied in the forward-looking statements:

- KSE making a proposal of changes to the terms of the KSE Agreement that would cause the InterMedia proposal to no longer constitute a Superior Proposal;

- failure of the Company to terminate the KSE Agreement;

- failure of the Company to execute a merger agreement with InterMedia;

- failure of the Company stockholders to approve a merger agreement with InterMedia;

- failure to consummate a merger with InterMedia; and

- litigation in respect of the merger.

The Company also cautions the reader that undue reliance should not be placed on any forward-looking statements, which speak only as of the date of this release. The Company undertakes no duty or responsibility to update any of these forward-looking statements to reflect events or circumstances after the date of this report or to reflect actual outcomes.

### *IMPORTANT INFORMATION FOR INVESTORS AND SECURITYHOLDERS*

*This communication is being made in respect of a proposed business combination involving Outdoor Channel and KSE. In connection with this proposed transaction Outdoor Channel has filed a definitive proxy statement with the SEC on April 11, 2013 which was mailed to Outdoor Channel stockholders on or about April 12, 2013. The definitive proxy statement contains important information about the proposed merger and related matters.*

-2-

*OUTDOOR CHANNEL URGES INVESTORS TO CAREFULLY READ IN ITS ENTIRETY THE DEFINITIVE PROXY STATEMENT AND OTHER DOCUMENTS INCLUDED AND INCORPORATED BY REFERENCE THEREIN BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.*

*Investors and security holders can obtain free copies of the definitive proxy statement and other documents filed with the SEC by Outdoor Channel through the web site maintained by the SEC at www.sec.gov, or through Outdoor Channel's website at www.outdoorchannel.com.*

**PROXY SOLICITATION**

*Outdoor Channel and its respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Outdoor Channel stockholders in favor of the merger. A description of the interests of Outdoor Channel's directors and executive officers in Outdoor Channel is set forth in the definitive proxy statement and the other documents included and incorporated by reference therein. You may find information about Outdoor Channel's executive officers and directors in its amendment to its annual report on Form 10-K filed with the SEC on April 29, 2013. You may obtain free copies of these documents from Outdoor Channel in the manner set forth above.*

*CONTACT: For Company:*
*Tom Allen*
*Executive Vice President, Chief Operating Officer/*
*Chief Financial Officer*
*800-770-5750*
*tallen@outdoorchannel.com*

*For Investors:*
*Brad Edwards*
*Brainerd Communicators, Inc.*
*212-986-6667*
*edwards@braincomm.com*

*For Media:*
*Nancy Zakhary*
*Brainerd Communicators, Inc.*
*212-986-6667*
*nancy@braincomm.com*

-3-

DEFA14A 1 defa14a_050713.htm DEFINITIVE ADDITIONAL MATERIALS

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934**

Filed by the Registrant ☒
Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐      Preliminary Proxy Statement

☐      **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐      Definitive Proxy Statement

☒      Definitive Additional Materials

☐      Soliciting Material Pursuant to §240.14a-12

# Outdoor Channel Holdings, Inc.
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)Title of each class of securities to which transaction applies:

_____

    (2)Aggregate number of securities to which transaction applies:

_____

    (3)Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the
amount on which the filing fee is calculated and state how it was determined):

_____

    (4)Proposed maximum aggregate value of transaction:

_____

    (5)Total fee paid:

☐ Fee paid previously with preliminary materials.

    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which
☐ the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or
Schedule and the date of its filing.

**EXHIBIT "P"**

(1)Amount Previously Paid:

_____

(2)Form, Schedule or Registration Statement No:

_____

(3)Filing party:

_____

(4)Date filed:

**EXPLANATORY NOTE:**

On May 7, 2013, Outdoor Channel Holdings, Inc. ("Outdoor Channel") issued a press release announcing that intends to adjourn the special meeting of its stockholders in connection with the Company's sale to Kroenke Sports & Entertainment, LLC. A copy of the press release is included below.

## OUTDOOR CHANNEL ANNOUNCES INTENT TO ADJOURN SPECIAL MEETING

**TEMECULA, Calif.—May 7, 2013**—Outdoor Channel Holdings, Inc. (NASDAQ: OUTD)(the "Company" or "Outdoor Channel") today announced that it intends to adjourn its special meeting of stockholders, which is scheduled to be held at 9:00 a.m., Pacific Time, on May 8, 2013, without conducting any business, to a date and time to be determined. The location of such reconvened special meeting will remain Outdoor Channel's facilities located at 43455 Business Park Drive in Temecula, California.

The special meeting is being called to seek stockholder approval of, among other things, the adoption of Outdoor Channel's merger agreement with Kroenke Sports & Entertainment, LLC ("KSE") and KSE Merger Sub, Inc. dated as of March 13, 2013 (the "KSE Agreement"). The proposals set out in Outdoor Channel's notice of special meeting of stockholders dated April 12, 2013 will be considered and voted on at such time as the adjourned special meeting of stockholders is reconvened.

As previously announced, the Outdoor Channel board of directors, after consultation with its outside legal counsel and financial advisor, unanimously determined that the May 3, 2013 proposal submitted by InterMedia Outdoors Holdings, LLC and IMTOC Merger Sub, Inc. (together, "InterMedia") to acquire all outstanding shares of Outdoor Channel common stock in an all-cash transaction at a price of $9.75 per share constitutes a "Superior Proposal" as such term is defined in the KSE Agreement, notice of which was delivered to KSE on May 4, 2013. Pursuant to the KSE Agreement, KSE has a right to propose, within four business days of such notice, changes to the terms of the KSE Agreement that would, in the good faith judgment of the Outdoor Channel board (after consultation with outside legal counsel and financial advisors), cause the InterMedia proposal to no longer constitute a Superior Proposal.

In light of this announcement, Outdoor Channel has determined that it is in the best interests of its stockholders to adjourn the special meeting of stockholders to vote on the approval of the adoption of the KSE Agreement, among other things, until after May 9, 2013 – the date by which this four business-day period will expire. KSE has agreed to the adjournment of the special meeting.

Stockholders do not need to take any action at this time. Outdoor Channel will make additional disclosures in advance of the reconvened special meeting, and stockholders will have an opportunity to change their vote at any time prior to the vote at the reconvened special meeting. If a stockholder has previously submitted its proxy card or voted by internet or telephone and does not currently wish to change its vote, no further action is required by such stockholder. If a stockholder would like to vote or change its vote, please refer to the instructions provided in the definitive proxy statement which was mailed to Outdoor Channel stockholders on or about April 12, 2013. Stockholders are urged to carefully review the definitive proxy statement and the other materials included or incorporated by reference therein as these materials include additional information regarding the transaction.

Lazard is serving as exclusive financial advisor to the Company in connection with the transaction. Wilson Sonsini Goodrich & Rosati, P.C. is legal advisor to the Company.

## About Outdoor Channel Holdings, Inc.

Outdoor Channel Holdings, Inc. owns and operates Outdoor Channel and Winnercomm Inc. Nielsen estimated that Outdoor Channel had approximately 39.8 million cable, satellite and telco subscribers for May 2013. Outdoor Channel offers programming that captures the excitement of hunting, fishing, shooting, adventure and the Western lifestyle and can be viewed on multiple platforms including high definition, video-on-demand, as well as on a dynamic broadband website. Winnercomm is one of America's leading and highest quality producers of live sporting events and sports series for cable

and broadcast television. The Company also owns and operates the SkyCam and CableCam aerial camera systems which provide dramatic overhead camera angles for major sports events, including college and NFL football.

### *Safe Harbor Statement*

Certain matters discussed in this press release, with the exception of historical matters, may be forward- looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. In some cases, forward-looking statements can be identified by words such as "anticipates," "estimates," "expects," "believes," "intends," "plans," "predicts," and similar terms. These statements are subject to a number of risks and uncertainties that could cause results to differ materially from those anticipated as of the date of this release. You should understand that the following important factors could cause outcomes to differ materially from those expressed or implied in the forward-looking statements:

- KSE making a proposal of changes to the terms of the KSE Agreement that would cause the InterMedia proposal to no longer constitute a Superior Proposal;
- failure of the Company to terminate the KSE Agreement;
- failure of the Company to execute a merger agreement with InterMedia;
- failure of the Company stockholders to approve a merger agreement with InterMedia;
- failure to consummate a merger with InterMedia; and
- litigation in respect of the merger or rights to adjourn special meeting.

The Company also cautions the reader that undue reliance should not be placed on any forward-looking statements, which speak only as of the date of this release. The Company undertakes no duty or responsibility to update any of these forward-looking statements to reflect events or circumstances after the date of this report or to reflect actual outcomes.

### *IMPORTANT INFORMATION FOR INVESTORS AND SECURITYHOLDERS*

*This communication is being made in respect of a proposed business combination involving Outdoor Channel and KSE. In connection with this proposed transaction Outdoor Channel plans to file with the SEC and furnish to its stockholders a proxy statement. The proxy statement will contain important information about the proposed transaction and related matters.*

*OUTDOOR CHANNEL URGES INVESTORS TO CAREFULLY READ IN ITS ENTIRETY THE DEFINITIVE PROXY STATEMENT AND OTHER DOCUMENTS INCLUDED AND INCORPORATED BY REFERENCE THEREIN AS THEY ARE MADE AVAILABLE TO OUTDOOR CHANNEL STOCKHOLDERS BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.*

*Investors and security holders will be able to obtain free copies of the proxy statement when made available and other documents filed with the SEC by Outdoor Channel through the web site maintained by the SEC at www.sec.gov. Free copies of the proxy statement when made available and other documents filed with the SEC can also be obtained on Outdoor Channel's website at www.outdoorchannel.com.*

### *PROXY SOLICITATION*

*Outdoor Channel and its respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Outdoor Channel stockholders in favor of the merger. A description of the interest of Outdoor Channel's directors and executive officers in Outdoor Channel is set forth in the definitive proxy statement mailed to Outdoor Channel stockholders on or around April 12, 2013 and the other documents included and incorporated by reference therein. You can find information about Outdoor Channel's executive officers and directors in its amendment to its annual report on Form 10-K filed with the SEC on March 9, 2012. You can obtain free copies of these documents from Outdoor Channel in the manner set forth above.*

*CONTACT: For Company:*
*Tom Allen*
*Executive Vice President, Chief Operating Officer/*
*Chief Financial Officer*
*800-770-5750*
*tallen@outdoorchannel.com*

*For Investors:*
*Brad Edwards*
*Brainerd Communicators, Inc.*
*212-986-6667*
*edwards@braincomm.com*

*For Media:*
*Nancy Zakhary*
*Brainerd Communicators, Inc.*
*212-986-6667*
*nancy@braincomm.com*

-4-

8-K 1 d536065d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

---

## FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of**
**The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported):**

**May 8, 2013**

---

# OUTDOOR CHANNEL HOLDINGS, INC.
**(Exact name of registrant as specified in its charter)**

---

| **DELAWARE** | **000-17287** | **33-0074499** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**43455 Business Park Drive**
**Temecula, California 92590**
(Address of principal executive offices, including zip code)

**(951) 699-6991**
(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**EXHIBIT "Q"**

**Item 1.01 Entry into a Material Definitive Agreement**

Second Amendment to Merger Agreement

On May 8, 2013, Outdoor Channel Holdings, Inc. ("Outdoor Channel") entered into Amendment No. 2 to the Agreement and Plan of Merger by and among Outdoor Channel, Kroenke Sports & Entertainment, LLC ("KSE") and KSE Merger Sub, Inc.(the "Second Amendment"). The Second Amendment modifies the previously announced Agreement and Plan of Merger, dated as of March 13, 2013, which was previously amended on May 2, 2013 (as amended, the "Merger Agreement").

Outdoor Channel's board of directors unanimously approved the Second Amendment and recommended that the Outdoor Channel stockholders vote to adopt the Merger Agreement at the special meeting of Outdoor Channel stockholders.

The Second Amendment increases the consideration to be paid to Outdoor Channel's stockholders for their shares of Outdoor Channel common stock if the merger is completed to $10.25 per share in cash from $9.35 per share in cash. Additionally, under the terms of the Second Amendment, the termination fee that Outdoor Channel will be required to pay KSE upon termination of the amended merger agreement under specified circumstances, including termination by KSE in the event that the Outdoor Channel board of directors changes its recommendation and no longer recommends that the Outdoor Channel stockholders vote in favor of the adoption of the amended merger agreement, has been increased to $7.5 million from $1 million. Further, under the Second Amendment, the Outdoor Channel board cannot terminate the Merger Agreement for a Superior Proposal (as defined in the Merger Agreement), but instead Outdoor Channel must, unless KSE agrees otherwise, submit a proposal for the adoption of the Merger Agreement at a special meeting of the Outdoor Channel stockholders, even in the event of a change of board recommendation.

The foregoing description of the Second Amendment is qualified in its entirety by the full text of the Second Amendment attached hereto as Exhibit 2.1, which is incorporated herein by reference.

Amendment to Support Agreement

Concurrently with the execution of the Second Amendment, Thomas H. Massie, Perry T. Massie and certain of their affiliated entities (the "Massie Parties"), the members of the Outdoor Channel Board of Directors and the executive officers of Outdoor Channel, collectively representing approximately 41% of the outstanding Outdoor Channel common stock (collectively, the "Supporting Parties"), entered into an amendment to the support agreement (the "Support Agreement Amendment") previously entered into by such parties with KSE on March 13, 2013 (as amended, the "Support Agreement"). Under the terms of the Support Agreement, the Supporting Parties agreed, among other things, to vote their shares of Outdoor Channel common stock: (i) in favor of the adoption of the Merger Agreement, the merger and the other transactions contemplated by the Merger Agreement; (ii) in favor of any proposal to adjourn or postpone any meeting of the Outdoor Channel stockholders if there are not sufficient votes for approval of the matters described in the preceding clause (i); and (iii) except with the written consent of KSE, against (x) any Alternative Proposal (as defined in the Merger Agreement) with respect to Outdoor Channel that would impede the merger or (y) any other action or proposal involving Outdoor Channel (or any subsidiary of Outdoor Channel) that would reasonably be expected to prevent or materially impede, interfere with or delay the merger. The Support Agreement Amendment amended the Support Agreement to provide that the Supporting Parties will have no right to terminate the Support Agreement and will continue to be bound by their obligations thereunder, including their voting obligations described in the immediately foregoing sentence, in the event that the Outdoor Channel board of directors changes its recommendation.

The foregoing description of the Support Agreement Amendment is qualified in its entirety by the full text of the Support Agreement Amendment attached hereto as Exhibit 99.1, which is incorporated herein by reference.

**Item 8.01 Other Events**

On May 8, 2013, Outdoor Channel issued a press release announcing entry into the Second Amendment and the Outdoor Channel board of directors' recommendation that Outdoor Channel stockholders vote to approve the adoption of the Merger Agreement at the special meeting of Outdoor Channel stockholders.

Outdoor Channel also confirmed that its special meeting of stockholders has been adjourned and that Outdoor Channel anticipates that the special meeting will be held next week. The location of the reconvened special meeting will remain Outdoor Channel's facilities located at 43455 Business Park Drive in Temecula, California.

A copy of the press release is attached hereto as Exhibit 99.2 and incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

**(d)  Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Amendment No.2, dated as of May 8, 2013, to the Agreement and Plan of Merger dated March 13, 2013, as amended, by and among Kroenke Sports & Entertainment, LLC, KSE Merger Sub, Inc. and Outdoor Channel Holdings, Inc. |
| 99.1 | Amendment No. 1 to Support Agreement dated as of March 13, 2013, by and among KSE, the Massie Parties and each of the directors and executive officers of Outdoor Channel |
| 99.2 | Press Release, issued by Outdoor Channel, Holdings, Inc., dated May 8, 2013 |

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OUTDOOR CHANNEL HOLDINGS, INC.

Date: May 8, 2013                    /s/ Catherine C. Lee
                                     Catherine C. Lee
                                     Exec. VP, General Counsel and Corporate Secretary

## INDEX TO EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Amendment No.2, dated as of May 8, 2013, to the Agreement and Plan of Merger dated March 13, 2013, as amended, by and among Kroenke Sports & Entertainment, LLC, KSE Merger Sub, Inc. and Outdoor Channel Holdings, Inc. |
| 99.1 | Amendment No. 1to Support Agreement dated as of March 13, 2013, by and among KSE, the Massie Parties and each of the directors and executive officers of Outdoor Channel |
| 99.2 | Press Release, issued by Outdoor Channel, Holdings, Inc., dated May 8, 2013 |