## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S BRIEF IN SUPPORT OF THEIR <u>MOTION FOR SUMMARY JUDGMENT</u>

TO THE HONORABLE BARBARA M. G. LYNN, UNITED STATES DISTRICT COURT CHIEF JUDGE

By:

| | |
|---|---|
| Paul C. Watler | Kevin D. Evans |
| State Bar No. 00784334 | *Admitted pro hac vice* |
| Shannon Zmud Teicher | Nicholas W. Dowd |
| State Bar No. 24047169 | *Admitted pro hac vice* |
| JACKSON WALKER L.L.P. | ARMSTRONG TEASDALE LLP |
| 2323 Ross Avenue, Suite 600 | 4643 South Ulster Street, Suite 800 |
| Dallas, Texas 75201 | Denver, CO 80237 |
| Telephone: 214.953.6000 | Telephone: 720.200.0676 |
| Facsimile: 214.953.5822 | Facsimile: 720.200.0679 |
| Email: pwatler@jw.com | Email: kdevans@armstrongteasdale.com |
| steicher@jw.com | ndowd@armstrongteasdale.com |

Attorneys for Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC.

November 5, 2018

**TABLE OF CONTENTS**

I.      FIFTH CIRCUIT AND TEXAS LAW SOUNDLY REJECT PLAINTIFF'S LEGAL THEORY ........................................................................................1

II.     SUMMARY OF PLAINTIFF'S CLAIMS ........................................................2

III.    STATEMENT OF UNDISPUTED FACTS ....................................................5

     A.    The Parties .............................................................................................5

     B.    Outdoor's Potential Sale Of The Aerial Camera Business ....................6

          1.    Outdoor Considers Selling The Aerial Camera Business, While Also Receiving And Considering Offers To Sell Itself ..............................6

          2.    Outdoor Signs A Nonbinding Term Sheet With Plaintiff And PNC ..........7

          3.    Outdoor Continues To Negotiate With Plaintiff And PNC Regarding A Sale Of The Aerial Camera Business Even After KSE Makes An Unsolicited Offer To Acquire Outdoor ...................................10

          4.    Plaintiff And PNC Fail To Sign Definitive Agreements With Outdoor For The Sale Of The Aerial Camera Business ...........................13

     C.    KSE Acquires Outdoor And Relevant Post-Acquisition Facts.............15

IV.   ARGUMENT....................................................................................................16

     A.    Standards Governing Defendants' Motion For Summary Judgment....................16

     B.    Outdoor Did Not Breach The Exclusivity Section Of The Term Sheet ...............17

          1.    Applicable Law .......................................................................................17

          2.    Texas And Fifth Circuit Law Do Not Support Plaintiff's Breach Of Contract Or Other Theories .....................................................................18

          3.    The Term Sheet Allowed Any Party To Terminate Negotiations Without Liability....................................................................................21

          4.    There Is No Disputed Issue Of Material Fact Regarding Outdoor's Actions Related To The Term Sheet; Outdoor Did Not Breach The Term Sheet ...............................................................................................21

               a.    Outdoor's Discussions With KSE Regarding a Potential Merger did not Violate the Exclusivity Section of the Term Sheet...............................................................................22

b.    Outdoor did not Agree to Sell the Aerial Camera Business to KSE or Anyone Else During the Term Sheet's Exclusivity Period; in Fact, Outdoor Never Agreed to do so at any Time After February 27, 2013 .............................................. 25

c.    Outdoor and KSE Only Negotiated and Discussed KSE's Interest in Acquiring Outdoor—not the Aerial Camera Business ........................................................................... 28

d.    The Term Sheet did not Prevent Outdoor From Disclosing the Existence of Plaintiff, PNC, or the Term Sheet to KSE .......... 29

e.    KSE Never "Vetoed" any Sale of the Aerial Camera Business Prior to the Merger ........................................................... 30

5.    Plaintiff's Alleged Damages Are Entirely Speculative And Without Evidentiary Support ...................................................... 31

C.    KSE Did Not Tortiously Interfere With An Existing Contract Between Plaintiff And Outdoor ........................................................................... 33

1.    Applicable Law ..................................................................... 33

2.    KSE Did Not Interfere With Any Contract Between Outdoor And Plaintiff, Or Induce Outdoor To Do Anything Regarding Attempted Sale Of The Aerial Camera Business ...................................... 34

D.    KSE Did Not Tortiously Interfere With A Prospective Business Relation Between Plaintiff And Outdoor ........................................................... 36

1.    Applicable Law ..................................................................... 36

2.    There Is No Evidence Of Interference By KSE ........................................ 37

3.    Plaintiff Does Not Allege Or Have Evidence Of Independently Tortious Conduct By KSE ....................................................... 38

E.    Defendants Did Not Aid Or Abet A Breach Of Fiduciary Duty By PNC ............ 40

1.    Applicable Law ..................................................................... 40

2.    Outdoor And KSE Did Not Induce PNC To Breach A Fiduciary Duty Or Assist PNC In Breaching A Fiduciary Duty .............................. 41

F.    Defendants Are Entitled To Summary Judgment On Plaintiff's "Unjust Enrichment" Claim ............................................................................. 42

1.    Unjust Enrichment Is Not An Independent Cause Of Action ................... 42

       2.      Even If Unjust Enrichment Is An Independent Cause Of Action, Plaintiff's Claim Fails ................................................................................43

   G.    There Is No Evidence Of An Agreement Among Defendants And PNC That Defendants Engaged In Any Unlawful Act, Or That Plaintiff Suffered Any Damages .........................................................................................44

   H.    Plaintiff's Disgorgement "Claim" Is Insupportable ...............................................45

V.    CONCLUSION .................................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACS Investors, Inc. v. McLaughlin*,
  943 S.W.2d 426 (Tex. 1997)....................................................................................33, 34, 35

*Am. Realty Trust, Inc. v. Matisse Partners, L.L.C.*,
  No. Civ.A.3:00−CV−1801−G, 2002 WL 1489543 (N.D. Tex. July 10, 2002)..............46, 47

*Bartucci v. Jackson*,
  Civil Action No. 04-2977, 2006 WL 2631925 (E.D. La. Sept. 13, 2006)................................1

*Capital Parks, Inc. v. Southeastern Adver. And Sales Sys., Inc.*,
  30 F.3d 627 (5th Cir. 1994) ......................................................................................... *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................................16

*Clearview Props., L.P. v. Prop. Texas SC One Corp.*,
  287 S.W.3d 132 (Tex. App.—Houston [14th Dist.] 2009)....................................................31

*Community Initiatives, Inc. v. Chase Bank of Texas*,
  153 S.W.3d 270 (Tex. App.—El Paso 2004)........................................................................37

*Davis-Lynch, Inc. v. Moreno*,
  667 F.3d 539 (5th Cir. 2012) ...............................................................................................45

*Docudata Records Mgmt. Servs., Inc. v. Wieser*,
  966 S.W.2d 192 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)........................... *passim*

*Engel v. Teleprompter Corp.*,
  703 F.2d 127 (5th Cir. 1983) .........................................................................................19, 20

*Gonzalez v. Mission Am. Ins. Co.*,
  795 S.W.2d 734 (Tex. 1990)................................................................................................24

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
  832 S.W.2d 39 (Tex. 1992)..................................................................................................44

*Hoffman v. L & M Arts*,
  838 F.3d 568 (5th Cir. 2016) ...............................................................................................48

*Hunn v. Dan Wilson Homes, Inc.*,
  Civil Action No. 5:12-CV-081-C, 2013 WL 12128677 (N.D. Tex. Sept. 23,
  2013) ..................................................................................................................................45

*Ingram v. Beneficial Fin. Inc.*,
  Civil Action No. 3:13-CV-4037-L, 2015 WL 1443110 (N.D. Tex. Mar. 30,
  2015) ..........................................................................................................................43

*Interstate Contracting Corp. v. City of Dallas, Tex.*,
  407 F.3d 708 (5th Cir. 2005) ..............................................................................18, 24

*Johnson v. Wells Fargo Bank, NA*,
  999 F. Supp. 2d 919 (N.D. Tex. 2014) ......................................................................49

*Kellermann v. Avaya, Inc.*,
  530 F. App'x 384 (5th Cir. 2013) ...........................................................17, 18, 21

*Marcus, Stowell & Beye Gov't Secs., Inc. v. Jefferson Inv. Corp.*,
  797 F.2d 227 (5th Cir. 1986) .....................................................................................48

*Meadows v. Hartford Life Ins. Co.*,
  492 F.3d 634 (5th Cir. 2007) ....................................................................41, 45, 49

*Mission Trading Co., Inc. v. Lewis*,
  Civil Action No. H-16-3368, 2017 WL 6935824 (S.D. Tex. July 31, 2017) .........43

*New York Life Ins. Co. v. Miller*,
  114 S.W.3d 114 (Tex. App.—Austin 2003) .............................................................34

*Orthoflex, Inc. v. Thermo Tek, Inc.*,
  Nos. 3:11–CV–0870–D, 3:10–CV–2618–D, 2013 WL 4045206 (N.D. Tex.
  Aug. 9, 2013) .............................................................................................................24

*Paramount Commc'ns Inc. v. QVC Network Inc.*,
  637 A.2d 34 (Del. 1994) ............................................................................................25

*Patterson v. Long Beach Mortg. Co.*,
  Civil Action No. 3:07–CV–1602–O–BH, 2009 WL 4884151 (N.D. Tex. Dec.
  15, 2009) ....................................................................................................................44

*Sanchez v. Target Corp.*,
  3:15-CV-1034-P, 2016 WL 3453635 (N.D. Tex. Jan. 20, 2016) .............................16

*Spence v. Glock, Ges.m.b.H.*,
  227 F.3d 308 (5th Cir. 2000) .....................................................................................17

*Tenneco, Inc. v. Ent. Prods. Co.*,
  925 S.W.2d 640 (Tex. 1996).........................................................................2, 20, 25

*ThermoTek, Inc. v. WMI Enters., LLC*,
  Civil Action No. 3:10-CV-2618-D, 2011 WL 1485421 (N.D. Tex. Apr. 19,
  2011) ..........................................................................................................................33

*Tollett v. JPMorgan Chase Bank, N.A.*,
  No. 11-14-00228-CV, 2016 WL 5340225 (Tex. App.—Eastland Sept. 22,
  2016) ...............................................................................................................................31

*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) .........................................................................................................16

*Wal–Mart Stores, Inc. v. Sturges*,
  52 S.W.3d 711 (Tex. 2001) .........................................................................................39, 40

*Walker v. Geithner*,
  400 F. App'x 914 (5th Cir. 2010) (per curiam) .........................................................17, 21, 31

*Whitfield v. Nelson*,
  No. 3:13-CV-2230-BN, 2014 WL 1243805 (N.D. Tex. Mar. 26, 2014) ..........................45, 49

**Statutes**

Delaware General Corporation Law Section 251(b) ..................................................................28

*"One of the central purposes of the motion for summary judgment in the federal system is as a device for unmasking frivolous claims and putting a swift end to meritless litigation."*[1]

## I.  FIFTH CIRCUIT AND TEXAS LAW SOUNDLY REJECT PLAINTIFF'S LEGAL THEORY

Plaintiff's claims in this lawsuit all rely on and flow from a basic, but irreparably flawed premise: that an agreement preventing Defendant Outdoor Channel Holdings, Inc. ("Outdoor") from discussing or negotiating or agreeing to a sale of two of its wholly-owned subsidiaries during a two and one-half month period also prevented Outdoor from discussing or negotiating or agreeing to a merger by Outdoor and acquisition of all Outdoor stock.  The Fifth Circuit and Texas Courts both reject the central theory on which Plaintiff's entire case is based.

In *Capital Parks, Inc. v. Southeastern Adver. And Sales Sys., Inc.*, 30 F.3d 627 (5th Cir. 1994), the Fifth Circuit affirmed dismissal of an action brought by the holder of a right of first refusal to acquire a wholly-owned subsidiary of the defendant.  The plaintiff claimed that an acquisition of the subsidiary's parent corporation by a third party violated that right of first refusal. The Fifth Circuit explained that "the transfer of the parent corporation's stock and assets . . . [did] not affect the ownership of assets held by the subsidiary," and therefore did not implicate the plaintiff's right to purchase the subsidiary.  *Id.* at 629.

The same is true under Texas law.  In *Docudata Records Mgmt. Servs., Inc. v. Wieser*, 966 S.W.2d 192 (Tex. App.—Houston [1st Dist.] 1998, pet. denied), the court reversed a judgment granted to an employee whose employment contract entitled him to a bonus upon the "sale" of a subsidiary of the defendant.  The plaintiff argued that a share exchange involving the subsidiary's parent company constituted a sale of the subsidiary.  *Id.* at 196–97.  In rejecting that theory, the

---

[1] *Bartucci v. Jackson*, Civil Action No. 04-2977, 2006 WL 2631925, at *4 (E.D. La. Sept. 13, 2006) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)) (internal quotation marks omitted).

court explained "a parent corporation and its subsidiaries are distinct legal entities" and "a sale of all the stock in a corporation does not constitute a sale of the corporation's assets." *Id.* at 197; *see also Tenneco, Inc. v. Ent. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (citations omitted) (Affirming summary judgment and noting that, "[i]n holding that the sale of a corporation's stock does not trigger rights of first refusal, we join courts from other jurisdictions that have considered the issue.  We also recognize the insight of commentators who have long maintained that stock sales do not invoke preemptive rights.  A contrary conclusion is an unwarranted impingement on the free transfer of stock.").

As explained more fully below, these binding precedents compel the conclusion that Plaintiff's theory of liability, which is based entirely on the acquisition of all Outdoor stock in May 2013 by a subsidiary of Defendant Kroenke Sports & Entertainment, LLC ("KSE"), is fundamentally flawed.  Defendants therefore are entitled to summary judgment on each of Plaintiff's claims asserted against them.

## II.  SUMMARY OF PLAINTIFF'S CLAIMS

After over three and one-half years since filing this case, three complaints, and extensive and costly discovery (during which Defendants KSE and Outdoor ( collectively, "Defendants") produced over 62,000 pages of documents, gave three depositions, answered another 44 written deposition questions, answered 18 interrogatories, and answered 50 requests for admission)[2], Plaintiff Nic Salomon ("Plaintiff") simply cannot demonstrate a viable cause of action. Defendants thus move for summary judgment under FEDERAL RULE OF CIVIL PROCEDURE 56 on each of Plaintiff's claims asserted against them in the Second Amended Complaint ("SAC").

---

[2] Defendants also took 12 depositions and produced two expert reports.

This case arises out of Plaintiff's failed effort in 2013 to acquire two Outdoor subsidiaries, SkyCam LLC ("SkyCam") and CableCam LLC ("CableCam," collectively, the "Aerial Camera Business"). (*See* Ex. A-1, SAC, ECF #63, App. 007–030). The relevant provisions of the Term Sheet on which Plaintiff bases this case, and which were drafted in their entirety by Plaintiff and his partner Pacific Northern Capital ("PNC")—a now defunct private equity company that Plaintiff worked with to try and help finance the attempted acquisition—provide, in part, that until such time as definitive agreements for sale of the Aerial Camera Business were entered into (and definitive agreements were never signed by Outdoor, Plaintiff and PNC), any party could terminate negotiations, for any reason or no reason, and ***without liability***. (*See* Ex. A-2, SAC, Ex. A, ECF #63, App. 031–035).

Plaintiff claims that Outdoor violated his purported "rights" under the Term Sheet signed by Outdoor on the one hand, and Plaintiff and PNC for a never formed "Purchaser" on the other. (Ex. A-1, SAC ¶¶ 49–52, ECF #63, App. 022). Plaintiff also claims that KSE, a subsidiary of which merged with and acquired all Outdoor stock, purposely scuttled Outdoor's negotiations with Plaintiff so, according to Plaintiff, KSE could obtain the Aerial Camera Business for itself. (*Id.* ¶¶ 53–59, App. 023–24). The undisputed evidence, however, belies Plaintiff's claims in their entirety.

Plaintiff alleges that Outdoor violated the "Exclusivity" section of the Term Sheet (which obligated Outdoor to communicate and negotiate only with PNC and Plaintiff between February 27 and April 15, 2013 for sale of the Aerial Camera Business). (*Id.* at ¶¶ 25–27, App. 014–16). However, the unrefuted evidence is that Outdoor ***did not communicate or negotiate with anyone other than Plaintiff and PNC to sell the Aerial Camera Business after February 27, 2013 and in fact Outdoor did not sell the Aerial Camera Business to anyone***; indeed, a subsidiary of

Outdoor continued to own the Aerial Camera Business after the merger with KSE. *See infra* Section III.C.

Plaintiff's failure to acquire the Aerial Camera Business was not the result of any interference by KSE or, as Plaintiff insists, because KSE was granted "veto" power over a sale of the Aerial Camera Business. (*See* Ex. A-1, SAC ¶¶ 8, 42, 51, ECF #63, App. 010, 020, 022). Indeed, the undisputed evidence shows just the opposite—that if Plaintiff, PNC and Outdoor had reached definitive agreements consistent with the provisions of the Term Sheet, KSE would have consented to the sale. (*See* Ex. A-3, Transcript of August 30, 2018 Deposition of James Martin ("Martin Tr.") at 49:3–50:4, App. 042–43). However, PNC and Plaintiff never reached an agreement with Outdoor for the sale of the Aerial Camera Business, and thus there was never a definitive agreement to which KSE was asked to consent. (*See* Ex. A-4, Plaintiff's Supplemental Responses To Defendants' Requests For Admission ("Plaintiff's Admissions") No. 2, App. 049). Moreover, as PNC representative Jeff Holowaty testified, and as explained below, PNC and Plaintiff never secured funding for the entire purchase price of the Aerial Camera Business. (Ex. A-5, Transcript of July 17, 2018 Deposition of Jeff Holowaty ("Holowaty Tr.") at 117:12–118:15, App. 073–74).

Plaintiff's theory in this case also is utterly inconsistent with the very language in the Term Sheet that he and PNC drafted; namely, that until such time as definitive agreements (e.g., an asset purchase agreement) were signed, any party could terminate negotiations for any reason, or for no reason, and ***without liability***. (Ex. A-2, SAC, Ex. A, ECF #63, App. 035). Plaintiff may be disappointed that he was unable to purchase the Aerial Camera Business, but his belief that he had some irrefutable right to do so is without any legal basis or evidentiary support.

The undisputed evidence in this case demonstrates conclusively that: (1) Outdoor did not breach the "Exclusivity" section of the Term Sheet; (2) KSE did not induce Outdoor to violate any provision of the Term Sheet or otherwise prevent Plaintiff from reaching an agreement with Outdoor to acquire the Aerial Camera Business; and (3) neither Outdoor nor KSE ever worked in secret with PNC or "conspired" to undermine Plaintiff's "rights" under the Term Sheet.  There is no dispute of material fact on these issues and the Court should enter judgment in favor of Defendants on each of Plaintiff's claims.[3]

## III.  STATEMENT OF UNDISPUTED FACTS

### A.   THE PARTIES

Outdoor owns and operates Outdoor Channel, a cable television network that provides programming related to a wide range of outdoor activities such as hunting and fishing.  (Ex. A-9, Transcript of June 20, 2018 Deposition of Thomas Allen ("Allen Tr.") at 29:12–23, App. 140). Prior to May 17, 2013, Outdoor was a publicly-traded company, whose stock was traded on the Nasdaq stock exchange.  (Ex. A-3, Martin Tr. at 159:15–24, App. 044).

Outdoor also owned and operated the Aerial Camera Business.  (Ex. A-10, Transcript of August 22, 2018 Deposition of David Gluck ("Gluck Tr.") at 31:7–15, App. 148).   The Aerial Camera Business provides remotely controlled aerial camera services used in the production of sporting and entertainment events.  (Ex. A-11, Transcript of June 13, 2018 Deposition of Thomas

---

[3] Soon after discovery commenced, Defendants learned that Plaintiff had misappropriated voluminous amounts of documents and information from Defendants and the Aerial Camera Business prior to being terminated in May 2014, and provided various of that information to his lawyers to use in preparing Plaintiff's Complaints in this case.  (*See* Ex. A-6, ECF #94, App. 075–95).  This discovery in December 2017 led to a number of filings and additional discovery aimed at determining the scope of Plaintiff's misconduct and appropriate sanctions therefor.  (*See, e.g.*, Exs. A-6 & A-7, ECF #94 & #102, App. 075–117).   Currently pending before the Court is Defendants' motion to dismiss Plaintiff's claims as a sanction for his misappropriation and use of Defendants' documents and information (consistent with how other courts have addressed such misconduct).  (*See* Ex. A-8, ECF #232, App. 118–137).

Hornish ("Hornish Tr.") at 23:13–24:18, App. 160–61).  Plaintiff was President of the Aerial

Camera Business from 2009 until May 2014, when his employment was terminated for

performance reasons.  (See Ex. A-10, Gluck Tr. at 228:9–229:12, App. 156–57).

KSE is a Denver, Colorado-based sports and entertainment holding company.  (Ex. A-3,

Martin Tr. at 16:6–16, App. 038).  On May 17, 2013, a KSE subsidiary acquired all of Outdoor's

outstanding public stock and Outdoor merged into that subsidiary.  (*Id.* at 159:15–24, App. 044).[4]

**B.      OUTDOOR'S POTENTIAL SALE OF THE AERIAL CAMERA BUSINESS**

**1.      Outdoor Considers Selling The Aerial Camera Business, While Also Receiving And Considering Offers To Sell Itself**

In 2012, Outdoor commenced efforts to explore strategic alternatives for the Aerial Camera

Business, including a potential sale of the Aerial Camera Business.  (Ex. A-11, Hornish Tr. at

24:19–25:2, App. 161–62).  Outdoor retained Noble Capital Markets ("Noble"), an investment

banking firm, to assist it with finding potential buyers.  (*Id.* at 27:20–25, App. 163).  Outdoor and

Noble met and communicated with various potential buyers between June 2012 and February 27,

2013.  (Ex. A-13, Transcript of July 11, 2018 Deposition of Tim McQuay ("McQuay Tr.") at

68:11–79:3, App. 186–97).

Outdoor also discussed the possibility of Plaintiff acquiring the Aerial Camera Business if

he could assemble an investment group to fund the acquisition.  (Ex. A-11, Hornish Tr. 98:3–15,

App. 173).  Plaintiff did not have the financial resources to fund such an acquisition by himself.

(Ex. A-4, Plaintiff's Admission No. 26, App. 055).

---

[4] PNC also is a defendant in this case.  (*See* Ex. A-1, SAC ¶ 4, ECF #63, App. 009).  PNC was a real estate and private equity investment firm (it is now defunct) that worked with Plaintiff on a potential purchase of the Aerial Camera Business from Outdoor.  (Ex. A-5, Holowaty Tr. at 12:12–20; 33:22–34:10, App. 061–63).  PNC did not file a response to Plaintiff's SAC and an entry of default against PNC was entered on November 6, 2017.  (*See* Ex. A-12, ECF #84, App. 182–83).

While Outdoor explored a possible sale of the Aerial Camera Business, Outdoor itself also received offers to merge with or be acquired by other companies.  (Ex. A-11, Hornish Tr. at 49:17–21, App. 164).  On November 15, 2012, Outdoor entered into a merger agreement with InterMedia Outdoor Holdings, LLC ("InterMedia"), pursuant to which InterMedia would acquire all of Outdoor's outstanding common stock (the "InterMedia Merger Agreement").  (Ex. A-14, November 15, 2012 Agreement and Plan of Merger, App. 198–212).  On February 12, 2013, Outdoor issued a proxy statement relating to the InterMedia Merger Agreement which, among other things, acknowledged that Outdoor was "exploring strategic alternatives" for the Aerial Camera Business (the "February 12 Proxy Statement").  (Ex. A-15, February 12, 2013 Outdoor Proxy Statement, App. 213–20).  However, as Plaintiff has admitted, the February 12 Proxy Statement did not state that Outdoor definitely or even likely would sell the Aerial Camera Business either before or after the close of the InterMedia merger.  (Ex. A-16, Transcript of May 16, 2018 Deposition of Nicolas Salomon ("Salomon May Tr. Vol. I") at 100:16–102:11, App. 223–25).  Indeed, the February 12 Proxy Statement noted that the sale process "[was] still ongoing." (Ex. A-15, February 12, 2013 Outdoor Proxy Statement, App. 219).

### 2.     Outdoor Signs A Nonbinding Term Sheet With Plaintiff And PNC

On January 16, 2013, Jeff Holowaty of PNC sent Noble a copy of "our term sheet to acquire the ownership interest of Skycam and Cablecam."  (Ex. A-17, Transcript of May 16, 2018 Deposition of Nicolas Salomon ("Salomon May Tr. Vol. II") at 138:18–139:6, App. 240–41; Ex. A-18, Depo Ex. 26, App. 256–61).  Plaintiff and PNC prepared this initial draft of the term sheet. (Ex. A-17, Salomon May Tr. Vol. II at 130:17–139:6, App. 232–41).  Plaintiff forwarded the draft term sheet to Tom Hornish, Outdoor's CEO, and Tom Allen, Outdoor's CFO.  (*Id.* at 139:7–9, App. 241).  Following negotiations between PNC and Noble regarding price and other terms of the potential acquisition, Jeff Holowaty sent Noble a revised draft of the term sheet, on February

5, 2013.  (*Id.* at 151:9–152:6, App. 242–43).   Outdoor provided a revised draft on February 8,

2013, and negotiations continued regarding working capital and other issues.  (*Id.* at 167:9–168:21,

App. 244–45).

On February 27, 2013, Outdoor, Plaintiff, and PNC executed the Term Sheet, which was

intended to "evidence the intention of PNC [defined in the Term Sheet as Plaintiff and Pacific

Northern Capital] to proceed with negotiations designed to complete a purchase of the [Aerial

Camera Business] substantially in the manner outlined [therein]."  (Ex. A-2, SAC, Ex. A, ECF

#63, at 1, App. 032).  The Term Sheet set forth parameters of a potential sale of the Aerial Camera

Business to an "Acquisition entity (the "Purchaser") to be formed by PNC in conjunction with

[Plaintiff]," including a purchase price of up to $4.05 million.  (*Id.*, App. 032).

With the exception of certain specified provisions in the "Exclusivity" section, the Term

Sheet was expressly nonbinding and "[did] not constitute a binding contractual commitment with

respect to any transaction."  (*Id.* at 4, App. 035).   The Term Sheet made clear that Outdoor was

under no existing obligation to sell the Aerial Camera Business to Plaintiff and PNC:

> A legally binding obligation with respect to the investment contemplated hereby
> will arise only upon execution and delivery of definitive documents by Outdoor
> Channel and Purchaser, subject to the terms and conditions set forth therein.
> Accordingly, until definitive agreements are entered into, except as expressly set
> forth above, no party will be under any legal obligation with respect to this Term
> Sheet, and ***no withdrawal from or termination of negotiations for the transaction
> contemplated by this [T]erm [S]heet prior to signing definitive agreements, for
> whatever reason, or for no reason, shall be determined to be in bad faith and any
> such withdrawal or termination shall not give any party a cause of action against
> the other party***.

(*Id.*, App. 035 (emphasis added)).   Indeed, the parties specifically agreed that "the failure of

Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive

agreements in accordance with this Term Sheet ***shall not be construed as a breach of this Term

Sheet by any party hereto***."  (*Id.*, App. 035 (emphasis added)).   Thus, prior to the signing of

"definitive agreements," Outdoor could withdraw from negotiations at any time, for any reason, or for no reason, and without liability.  As Plaintiff admits, Outdoor, Plaintiff and PNC never signed definitive agreements, and thus Outdoor was free to terminate negotiations at any time. (Ex. A-4, Plaintiff's Admission No. 3, App. 049).  That said, the undisputed evidence is that Outdoor remained willing to negotiate with Plaintiff and PNC for potential sale of the Aerial Camera Business right up to the May 17, 2013 merger of Outdoor with the KSE subsidiary.  (Ex. A-19, Transcript of June 12, 2018 Deposition of Cathy Lee ("Lee Tr.") at 42:23–43:9, App. 264–65).

The only binding provision of the Term Sheet was the "Exclusivity" section.  That section required Outdoor to negotiate exclusively with Plaintiff and PNC for a specified period.  More specifically, Outdoor agreed that until April 15, 2013, it would not directly or indirectly:

> (i)    Solicit, facilitate, encourage, or accept an offers to acquire any equity or debt interest in [the Aerial Camera Business] or the whole or any material part of the assets of the business of [the Aerial Camera Business], nor engage or procure any person to do so on their behalf;

> (ii)    Negotiate or correspond with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of [the Aerial Camera Business], other than to advise them that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed), nor engage or procure any person to do so on its behalf;

> (iii)    Sell or agree to sell any equity or debt interest (including any new issue of debt or equity) in any part of the [Aerial Camera Business] to any other party than Purchaser or its nominee, and Outdoor Channel and its subsidiaries will procure that their respective directors, officers, affiliates, employees, advisors and representatives will also act accordingly.

(Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  Outdoor also agreed that it would "cease any negotiations, discussions or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the [Aerial Camera Business]"

with third parties and would advise such parties that exclusive discussions were being pursued, without disclosing the identity of the "Purchaser." (*Id.*, App. 034)

These Non-Binding and Exclusivity sections, which lie at the heart of this case, were drafted in their entirety by Plaintiff and PNC.  The language of these sections in the executed version of the Term Sheet is identical to that which appeared in the version that PNC and Plaintiff provided to Noble and Outdoor on January 16, 2013.  (*Compare* Ex. A-18, Salomon May Tr. Vol. II, Depo Ex. 26, App. 258–61 *with* Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  Indeed, Plaintiff admits that he was responsible for drafting the language of these relevant provisions.  (Ex. A-17, Salomon May Tr. Vol. II at 128:22–25, App. 231; Ex. A-4, Plaintiff's Admission No. 1, App. 049).

On February 26, 2013, Outdoor CEO Tom Hornish signed the Term Sheet on behalf of Outdoor.  (*See* Ex. A-2, SAC, Ex. A at 4, ECF #63, App. 035).  Plaintiff and PNC Managing Director Kelly Holowaty each signed the Term Sheet the next day on behalf of an unnamed and unformed "Purchaser." (*Id.*, App. 035).  The Term Sheet specified that it could not be "amended or modified except by a writing signed by each of the parties [thereto]." (*Id.*, App. 035).

### 3. Outdoor Continues To Negotiate With Plaintiff And PNC Regarding A Sale Of The Aerial Camera Business Even After KSE Makes An Unsolicited Offer To Acquire Outdoor

On February 27, 2013, the same day that the Term Sheet was fully executed, KSE made an unsolicited, preliminary offer to purchase all of Outdoor's outstanding public stock. (Ex. A-11, Hornish Tr. at 60:21–61:6, App. 167–68).  Outdoor's Board of Directors considered the offer and deemed it superior to the offer that InterMedia had made in November 2012.  (*Id.* at 61:11–13, App. 168).  KSE's preliminary offer was announced publicly on March 1, 2013, and on March 13, 2013, KSE and Outdoor entered into a binding merger agreement (the "KSE Merger Agreement"). (Ex. A-20, March 13, 2013 Agreement and Plan of Merger, App. 280–92).

Even after entering into a merger agreement with KSE, Outdoor continued to negotiate a potential sale of the Aerial Camera Business with Plaintiff and PNC. (Ex. A-19, Lee Tr. at 98:7–12, App. 279; Ex. A-1, SAC ¶ 32, App. 017). On March 5, 2013, Outdoor provided Plaintiff and PNC with a draft Asset Purchase Agreement. (*See* Ex. A-11, Hornish Tr. at 56:8–24, App. 165; Ex. A-21, Depo. Ex. 107, App. 293–333). Plaintiff and PNC responded to Outdoor's proposed Asset Purchase Agreement with a heavily revised draft, which Mr. Hornish described during his deposition as "a sea of red." (*See* Ex. A-11, Hornish Tr. at 57:4–12, App. 166). Mr. Hornish explained that "the changes were – it was so much different than what we were thinking, that we never had a meeting of the minds." (*Id.*, App. 166). Likewise, Ms. Lee described Plaintiff's and PNC's revisions as "very, very, very extensive" and that Outdoor, Plaintiff, and PNC were not "anywhere close" to finalizing an agreement. (Ex. A-19, Lee Tr. at 42:1–17, App. 264; Ex. A-22, Depo. Ex. 108, App. 334–400). Nevertheless, Outdoor remained willing to try and work out a final Asset Purchase Agreement. (Ex. A-11, Hornish Tr. at 57:13–17, App. 166; Ex. A-19, Lee Tr. at 42:3–43:9, App. 264–65).

In fact, Outdoor *attempted* to provide Plaintiff and PNC with more time in which to reach an agreement by agreeing to extend the exclusivity period by another month. On March 21, 2013, Outdoor and PNC signed a letter purporting to extend the Term Sheet's exclusivity period from April 15, 2013 to May 15, 2013 (the "March 21 Letter"). (Ex. A-23, ECF #63, Ex. L, App. 401–03). This Letter also provided that "if, at any point during the exclusivity period, [KSE] conclude[d] that it [would] not consent to the Proposed Transaction, PNC [would] release [Outdoor] from its exclusivity obligations." (*Id.*, App. 402). The March 21 Letter was signed by Tom Hornish on behalf of Outdoor, and Kelly Holowaty on behalf of PNC, but was not signed by Plaintiff. (*Id.*, App. 403). Plaintiff admits that without his signature, the March 21 Letter was not

effective and did not modify the Term Sheet.  (Ex. A-17, Salomon May Tr. Vol. II at 203:22–204:4, App. 249–50; Ex. A-4, Plaintiff's Admission No. 39, App. 057).

From this *attempt* to extend the Term Sheet's exclusivity period and provide more time for negotiations to continue, Plaintiff infers a vast conspiracy—one that months of discovery (and the over 21 GB of documents that Plaintiff stole before filing suit) has failed to substantiate.  First, Plaintiff claims that the Letter was executed in "secret" and that Outdoor and PNC deliberately tried to cut him out.  (Ex. A-1, SAC ¶ 12, ECF #63, App. 011; Ex. A-17, Salomon May Tr. Vol. II at 199:2–7, App. 248).  However, both Outdoor and PNC have stated that the failure to obtain Plaintiff's signature on the March 21 Letter was unintentional.  (*See* Ex. A-5, Holowaty Tr. at 95:24–98:4, App. 067–70; Ex. A-11, Hornish Tr. at 104:9–106:4, App. 177–79; Ex. A-19, Lee Tr. at 61:15–62:21, App. 269–70).  The Outdoor personnel involved in preparing the Letter have all testified that Plaintiff's omission was an oversight, that they believed PNC was acting on behalf of the "Purchaser," which included both PNC and Plaintiff, and that PNC would have informed Plaintiff about the March 21 Letter.  (Ex. A-11, Hornish Tr. at 76:3–77:12, 103:15–106:4, App. 169–70, 179–79; Ex. A-19, Lee Tr. at 61:15–62:21, App. 269–70).  In fact, after Outdoor realized the omission, they attempted to correct the oversight by obtaining Plaintiff's agreement to the March 21 Letter.  (Ex. A-11, Hornish Tr. at 100:19–101:8, App. 174–75).  Plaintiff refused, and thus the expiration of the exclusivity period remained April 15, 2013.  (Ex. A-17, Salomon May Tr. Vol II at 203:22–204:4, App. 249–50).  Plaintiff has no evidence showing that Outdoor and PNC purposely attempted to execute the Letter for any nefarious reason.

The undisputed evidence also reveals that KSE had no involvement with the March 21 Letter, and did not even know about it until after the fact.  Indeed, Catherine Lee, Outdoor's former general counsel, testified that she drafted the Amendment without ever discussing it with KSE.

(Ex. A-19, Lee Tr. at 60:13–61:5; 87:21–88:11, App. 268–69, 273–74).   Mr. Gluck of KSE likewise testified that he had no involvement regarding the Letter and was not aware of its existence until after it had been signed.  (Ex. A-10, Gluck Tr. at 82:1–83:5; 86:14–23, App. 152–54).

### 4.      Plaintiff And PNC Fail To Sign Definitive Agreements With Outdoor For The Sale Of The Aerial Camera Business

Outdoor continued to negotiate with Plaintiff and PNC regarding a sale of the Aerial Camera Business even after receiving KSE's unsolicited offer and entering into a merger agreement with KSE.  It is not the case, as Plaintiff has alleged, that Outdoor "allowed KSE to refuse to consummate the sale of the Aerial Camera Business as outlined in the term sheet." Rather, the undisputed evidence demonstrates conclusively that Outdoor negotiated with Plaintiff and PNC in good faith, but there was never a definitive sale agreement for KSE to even consider.

Indeed, Plaintiff admits that a final agreement was never reached with Outdoor, and thus KSE was never in a position to "refuse" to consent to a sale of the Aerial Camera Business to Plaintiff.  (See Ex. A-17, Salomon May Tr. Vol. II at 286:24–287:6, App. 254–55).  Plaintiff further admits that after he became aware of the March 21 Letter on April 9, 2013, his relationship with PNC deteriorated and their efforts towards preparing an agreement to present to Outdoor also broke down.  (Ex. A-24, Transcript of May 17, 2018 Deposition of Nicolas Salomon ("Salomon May Tr. Vol. III") at 389:14–18, App. 408).

Moreover, Plaintiff and PNC were not even able to reach an agreement among themselves as to how an acquisition would be financed, the structure of the acquisition entity, or how ownership of the acquisition entity would be shared.  Plaintiff and PNC never formed the "Purchaser" contemplated by the Term Sheet and never agreed on an equity structure for the Purchaser.  (Ex. A-17, Salomon May Tr. Vol. II at 217:4–218:15, App. 251–52; Ex. A-24,

Salomon May Tr. Vol. III at 415:18–416:13, App. 410–11).   Jeff Holowaty, the PNC representative extensively involved in the negotiations with Plaintiff and Outdoor, also testified that PNC was not willing itself to finance the entire acquisition of the Aerial Camera Business, and that while additional investors were solicited, no other potential investors agreed to contribute any funding.  (Ex. A-5, Holowaty Tr. at 50:17–52:23, App. 064–66).

Furthermore, the undisputed evidence is that if Plaintiff and PNC *had* presented Outdoor with a definitive agreement consistent with the Term Sheet, KSE would have consented to the sale. James Martin, KSE's President and CEO, was responsible for deciding whether to consent to any sale of the Aerial Camera Business.  (Ex. A-3, Martin Tr. at 50:5–13, App. 043).   When asked about KSE's position prior to May 17, 2013 (when the acquisition of Outdoor closed) regarding any sale of the Aerial Camera Business to Plaintiff and PNC, Mr. Martin responded:  "Outdoor management was negotiating the deal.  I did not insert myself in the negotiations.  If they had brought a deal to us, [and] it was in compliance with the term sheet, we would have approved the deal."  (*Id*. at 49:3–12, App. 042).

It is crystal clear what Plaintiff is attempting to do in this case.  Because he and PNC could not reach agreement amongst themselves on fundamental aspects of their relationship (e.g., the equity structure of any acquisition entity or even the legal structure of the acquisition entity), because funding for the acquisition could not be fully secured, because Plaintiff and PNC could not come to terms on definitive purchase agreements with Outdoor, and because the very language drafted by Plaintiff and PNC allowed Outdoor under the circumstances to terminate negotiations with Plaintiff and PNC at any time without liability, Plaintiff attempts to invent a case out of whole cloth, the facts and evidence be damned.  It is time for this charade to end.

C.     KSE ACQUIRES OUTDOOR AND RELEVANT POST-ACQUISITION FACTS

As explained above, KSE made an unsolicited preliminary offer to acquire Outdoor on February 27, 2013 and executed the KSE Merger Agreement on March 13, 2013.  (Ex. A-10, Gluck Tr. at 43:9–16, 74:6–18, App. 149, 151).  On April 30, 2013, InterMedia made another offer to acquire Outdoor at a higher per share price than KSE's initial offer.  (Ex. A-25, Transcript of June 7, 2018 Deposition of Roger Werner ("Werner Tr.") at 51:9–52:6, App. 416–17; Ex. A-26, Depo Ex. 84, App. 422–27).  In response, on May 2, 2013, KSE increased its offer to Outdoor.  (Ex. A-26, Depo Ex. 84, App. 424).  Between May 3 and May 8, 2013, KSE and InterMedia made still further competing offers to acquire Outdoor.  (*Id.*, App. 424).  On May 8, 2013, Outdoor's Board determined that KSE's final offer of $10.25 per share was in the best interest of Outdoor's shareholders, and the KSE Merger Agreement was amended to reflect the increased cash consideration.  (*Id.*, App. 424).

On May 17, 2013, Outdoor's stockholders voted in favor of the KSE Merger Agreement, a KSE subsidiary acquired all of Outdoor's outstanding public stock the same day, and Outdoor was merged into that subsidiary.  (Ex. A-3, Martin Tr. at 159:15–160:2, App. 044–45). ***Throughout this entire process***, the Aerial Camera Business remained a wholly-owned subsidiary of Outdoor; in other words, Outdoor never sold the Aerial Camera Business ***to anyone***.  (*Id*. at 37:12–16, App. 039).

Sometime after May 17, 2013, the decision was made that Outdoor would not sell the Aerial Camera Business to Plaintiff and PNC, or to any other buyers who had expressed interest in the business.  (Ex. A-3, Martin Tr. at 47:16–48:18, App. 040–41).  In any event, the exclusivity

provisions of the Term Sheet had long since expired on April 15, 2013.[5]  (Ex. A-24, Solomon May Tr. Vol. III at 392:9–18, App. 409).

Plaintiff remained the President of the Aerial Camera Business for roughly another year after KSE's acquisition of Outdoor.  (Ex. A-10, Gluck Tr. at 227:11–17, App. 155).  KSE eventually determined in May 2014 to terminate Plaintiff's employment because, among other reasons, "he was constantly not doing what he was asked to do to the point of almost insubordination" and his superiors had "the feeling that he was never honest with anybody in the company."  (*Id.* at 228:13–229:12, App. 156–57).

## IV.  ARGUMENT

### A.    STANDARDS GOVERNING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating "the absence of a genuine issue for trial and identifying those portions of the record that demonstrate such absence."  *See Celotex*, 477 U.S. at 323; *Sanchez v. Target Corp.*, 3:15-CV-1034-P, 2016 WL 3453635, at *1 (N.D. Tex. Jan. 20, 2016).  In considering the motion, the court views the evidence "in the light most favorable to the [nonmoving party]."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

When the party seeking summary judgment makes an initial showing, the nonmoving party must come forward with "competent summary judgment evidence" demonstrating the existence

---

[5] Even if the March 21 Letter had been effective, which the parties agree it was not, it would have extended the exclusivity period of the Term Sheet only to May 15, 2013.

of a genuine fact issue. *Sanchez*, 2016 WL 3453635, at *1. The nonmoving party cannot defeat the motion unless he comes forward with specific evidence demonstrating a genuine issue of material fact such that a reasonable jury might return a verdict in his favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 247–48 (1986)).

"Even if there is a dispute regarding *some* material facts, a movant may obtain summary judgment if he can prove there is no evidence to support one or more essential elements of the non-moving party's claim." *Walker v. Geithner*, 400 F. App'x 914, 916 (5th Cir. 2010) (per curiam) (emphasis added). As explained below, Defendants are entitled to summary judgment on each of Plaintiff's claims.

## B.   OUTDOOR DID NOT BREACH THE EXCLUSIVITY SECTION OF THE TERM SHEET

### 1.   Applicable Law

Count 1 of the SAC is a breach of contract claim against Outdoor predicated on the "Exclusivity" section of the Term Sheet. "Under Texas law[6], '[t]he elements of a breach of contract claim are (1) the existence of a valid contract between plaintiff and the defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach.' " *Kellermann v. Avaya, Inc.*, 530 F. App'x 384, 388 (5th Cir. 2013) (citing *In re Staley*, 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.)).

---

[6] Based on previous briefing, the parties agree that Texas law governs Plaintiff's breach of contract claim, as well as his various other tort claims. (*See* Ex. A-27, Defendants' Motion To Dismiss Plaintiff's Second Amended Complaint, ECF #74, App. 428–52; Ex. A-28, Plaintiff's Response To Defendants' Motion To Dismiss, ECF #80, App. 453–82). In the absence of a choice of law provision in the Term Sheet, Texas's "most significant relationship test" determines which State's law governs the claims in this diversity action. *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000). Given that Plaintiff is a Texas resident and the Aerial Camera Business is based in Texas, Texas law bears the most significant relationship with the claims and issues presented in this case.

"Whether a party has breached a contract is a question of the law for the court, not a question of fact for the jury." *Id.* (quoting *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).   The court determines what conduct the contract requires of the parties, and submits disputed fact questions regarding a party's performance under the contract to the jury.  *Id.*  Thus, "[w]hile the factual determination of what actions were taken [by the parties] is for the fact finder, whether those actions constitute a breach of contract is a question of law for the court." *Id.* (quoting *In re Cano Petrol., Inc.*, 277 S.W.3d 470, 473 (Tex. App.—Amarillo 2009, orig. proceeding)).

Under Texas law, a "court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." *Interstate Contracting Corp. v. City of Dallas, Tex.*, 407 F.3d 708, 712 (5th Cir. 2005) (citing *Leasehold Expense Recovery, Inc. v. Mothers Work Inc.*, 331 F.3d 452, 456 (5th Cir. 2003)).  If there is a question regarding the contract's construction, "the court examines the contract's wording in context of the surrounding circumstances." *Id.* (citing *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982)).  "If the contract is then susceptible to only one interpretation, it is unambiguous." *Id.*

### 2.   Texas And Fifth Circuit Law Do Not Support Plaintiff's Breach Of Contract Or Other Theories

Plaintiff's claim that Outdoor violated the Term Sheet's Exclusivity section is premised on the theory that Outdoor's conversations, negotiations, and eventual agreement with KSE regarding KSE's acquisition of all Outdoor stock ran afoul of the Exclusivity section's prohibitions concerning discussions and negotiations with third parties about a sale of the Aerial Camera Business.  Plaintiff necessarily reads the Exclusivity section's language preventing Outdoor from engaging in discussions or negotiations regarding an "acquisition of an equity or debt interest" in

the Aerial Camera Business as encompassing also the acquisition of an equity or debt interest *in Outdoor*, the Aerial Camera Business's parent company.  However, such an interpretation conflicts with Texas and Fifth Circuit law, as well as the plain language of that section and the intent of the parties under the circumstances at the time the Term Sheet was drafted and executed.

In *Capital Parks,* the Fifth Circuit considered and rejected substantially the same theory as the one Plaintiff asserts in this case.  30 F.3d at 628–29.  There the defendant, Southeastern, contracted with Capital Parks, Inc. to grant Capital a right of first refusal to purchase Waco, one of Southeastern's wholly-owned subsidiaries.  *Id.* at 628.  Southeastern later received an offer from a third party (Loewen) to purchase all of Southeastern's outstanding stock.  *Id.*  Capital then sued to enjoin the proposed transaction, arguing that the sale of Southeastern to Loewen triggered Capital's right of first refusal to purchase Waco.  *Id.*

In affirming the district court's dismissal of Capital's claim, the Fifth Circuit explained that Waco was a separate legal entity from Southeastern and the language of Loewen's offer "contemplate[d] only a transfer of all of Southeastern's stock and assets to Loewen."  *Id.* at 629. "The Loewen offer merely involve[d] the transfer of the parent corporation's stock and assets, and therefore [did] not affect the ownership of assets held by the subsidiary."  *Id.*  Accordingly, the Loewen offer was "only a transfer of the control, but not the ownership, of Waco's stock and assets," and did not trigger Capital's right of first refusal.  *Id.*; *see also Engel v. Teleprompter Corp.*, 703 F.2d 127, 131 (5th Cir. 1983) (holding that "transfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary" and reversing judgment granted to holders of rights of first refusal in a subsidiary corporation whose parent company's stock was sold to a third party).

Texas State courts also have recognized that parents and their subsidiaries are legally distinct entities, and that a sale or transfer of ownership in a parent corporation does not implicate rights or obligations concerning the subsidiary.  In *Docudata Records*, the court reversed a judgment awarded to a plaintiff who sought to recover under a bonus provision in his employment contract that was triggered upon a sale of the defendant's subsidiary (Docudata).  966 S.W.2d at 194–96.  The plaintiff claimed that an exchange of stock in the subsidiary's parent company (LRS) with another corporation constituted a "sale" of Docudata, entitling him to receive a bonus.  *Id.* The court rejected this theory, observing that Docudata and LRS were legally distinct entities and that "a sale of all stock in a corporation does not constitute a sale of the corporation's assets."  *Id.* at 197.  The court explained that regardless of whether the stock exchange constituted a "sale" of LRS, "LRS continued to own 100% of Docudata's stock," and "[a]s such, Docudata's ownership remained unaffected."  *Id.* at 198.  Thus, the court concluded that Docudata never was sold and the plaintiff was not entitled to recover under the bonus provision of his employment contract.  *Id.* at 198–99; *see also Tenneco*, 925 S.W.2d at 646 (affirming district court's grant of summary judgment to defendants upon determination that a transaction involving a corporation did not trigger the plaintiffs' preferential right to acquire an ownership interest in an asset owned by the corporation).

The situation here is substantially the same.  The Aerial Camera Business was composed of entities legally distinct from their parent company, Outdoor.  While the Exclusivity section prevented Outdoor from negotiating or agreeing to sell the Aerial Camera Business to anyone other than Plaintiff, *Capital Parks* and *Docudata* make clear that a transaction involving a transfer of a parent company's assets and stock does not implicate those provisions.  Thus, the various breaches of the Exclusivity section that Plaintiff alleges relating to Outdoor's dealings with KSE up to and

including the eventual merger on May 17, 2013 in no way implicated or violated Outdoor's obligations under that section of the Term Sheet.

### 3.   The Term Sheet Allowed Any Party To Terminate Negotiations Without Liability

The Term Sheet also provided that "the failure of Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive agreements in accordance with this Term Sheet shall not be construed as a breach of this Term Sheet." (Ex. A-2, SAC, Ex. A at 4, ECF #63, App. 035). Outdoor could withdraw from or terminate negotiations with Plaintiff and PNC "for whatever reason, or for no reason," prior to the signing of "definitive agreements." (*Id.*, App. 035). Plaintiff does not dispute that the parties never entered into a "definitive agreement" for the sale of the Aerial Camera Business. (Ex. A-4, Plaintiff's Admission Nos. 2–3, App. 049). So much for Plaintiff's breach of contract claim.

### 4.   There Is No Disputed Issue Of Material Fact Regarding Outdoor's Actions Related To The Term Sheet; Outdoor Did Not Breach The Term Sheet

There is no material dispute of fact as to the actions taken by Defendants, Plaintiff, and PNC relevant to Outdoor's performance under the Term Sheet, and therefore the Court may decide Plaintiff's breach of contract claim as a matter of law. *See Kellermann*, 530 F. App'x at 388. Further, there is no dispute that the Term Sheet was a nonbinding agreement, except as to its Exclusivity section, which was only effective during a specified two and one-half month period (i.e., until April 15, 2013). (Ex. A-4, Plaintiff's Admission Nos. 4, 39, App. 050, 057). The only issues to be decided are whether the Exclusivity section can be given the insupportable reading advocated by Plaintiff—a reading with which not even the representative of PNC (Plaintiff's purported partner) agrees, (*see* Ex. A-5, Holowaty Tr. at 104:21–105:19, App. 071–72)—and whether Outdoor complied with that section as properly construed. If the Court determines based

on the undisputed evidence that Outdoor did not breach the Exclusivity section, summary judgment should be granted in favor of Outdoor on Count 1.  *See Geithner*, 400 F. App'x at 916.

In the SAC, Plaintiff alleges five separate ways in which Outdoor purportedly breached the Exclusivity section of the Term Sheet; each of Plaintiff's suggestions are belied by the undisputed evidence, the law, and the plain language of that section.  (Ex. A-1, SAC ¶ 51, ECF #63, App. 022).   According to Plaintiff, Outdoor breached by: (1) "negotiating, discussing, and corresponding" with KSE regarding the sale of the Aerial Camera Business after February 27, 2013; (2) "agreeing to sell . . . the Aerial Camera Business to KSE" during the exclusivity period of the Term Sheet; (3) "failing to cease negotiations and discussions with KSE regarding the potential acquisition of an equity interest" in the Aerial Camera Business; (4) "disclosing to KSE the existence of PNC and Plaintiff, and the details of the Term Sheet"; and (5) granting KSE the right to "veto" the sale of the Aerial Camera Business to PNC and Plaintiff.  *(*Ex. A-1, SAC ¶ 51, ECF #63, App. 022).  Defendants address each of these allegations in turn.

### a. *Outdoor's Discussions With KSE Regarding a Potential Merger did not Violate the Exclusivity Section of the Term Sheet*

Plaintiff proffers an insupportable reading of the Exclusivity section and the language that Plaintiff and PNC drafted in its entirety.  The Exclusivity section states that Outdoor would not negotiate or correspond with third parties "in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of [the Aerial Camera Business]."  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  Similarly, that section states that Outdoor would cease "negotiations, discussions, or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the [Aerial Camera Business]."  (*Id.*)  The undisputed evidence reveals that Outdoor did not negotiate, discuss, or

correspond with KSE (or anyone else for that matter) about a sale of the Aerial Camera Business after February 27, 2013.[7]

Outdoor never engaged in any negotiation, discussion, or correspondence with KSE relating to KSE acquiring an "equity or debt interest" in the Aerial Camera Business.  All of Outdoor's discussions with KSE between February 27, 2013, when KSE made an unsolicited offer to acquire *Outdoor*, and May 17, 2013, related to KSE's efforts to acquire *Outdoor*.  (Ex. A-19, Lee Tr. at 84:19–24, App. 272).  Plaintiff admits that he is unaware of Outdoor ever discussing, negotiating, or corresponding with KSE after February 27, 2013 about KSE acquiring the Aerial Camera Business directly and can produce no evidence indicating otherwise.  (Ex. A-4, Plaintiff's Admissions Nos. 20–22, App. 053–54).  Thus, Outdoor did not discuss, negotiate, or correspond with a party other than Plaintiff and PNC about an acquisition of the Aerial Camera Business in violation of the Term Sheet's Exclusivity section.  *See supra* Section IV.B.2 (explaining that an acquisition of a parent corporation does not constitute an acquisition or change of ownership of the subsidiary).

Plaintiff may attempt to argue (as he has in discovery) that because the introductory clause of the Exclusivity section uses the phrase "directly or indirectly" prior to describing the conduct prohibited by that section through April 15, 2013, the Exclusivity section prohibits dealings between KSE and Outdoor for the acquisition of all Outdoor stock.  (*See* Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034; Ex. A-17, Salomon May Tr. Vol. II at 179:23–180:23, App. 246–47).  However, the linguistically sound reading of the Exclusivity section, particularly in light of the

---

[7] In fact, although Outdoor received a term sheet from a third party for a potential purchase of the Aerial Camera Business and for a higher purchase price on February 27, 2013 after the Term Sheet was fully signed, Outdoor informed that third party that Outdoor already had entered into a term sheet and could not discuss sale of the Aerial Camera Business with that third party.  (*See* Ex. A-9, Allen Tr. at 50:6–54:2, App.141–45).

case law discussed above in Section IV.B.2, is that the adverbs "directly or indirectly" modify only the initial verbs in paragraphs (A)(i)–(iii), ***not*** the "acquire any equity or debit interest in the [Aerial Camera Business]" language that comes later in those provisions.  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  For example, while the Exclusivity section prevented Outdoor from "indirectly" negotiating or discussing an acquisition of the Aerial Camera Business with a third party, through an intermediary like Noble, it did ***not*** prohibit negotiations or discussions about a sale of Outdoor. (*Id.*, App. 034)  Thus, paragraph (A)(ii) of the Exclusivity section applies only to negotiations or correspondence with third parties relating to offers to ***directly*** acquire an "equity or debt interest" in the Aerial Camera Business.  (*Id.*, App. 034)  There is no evidence that Outdoor ever engaged in such negotiations or correspondence with KSE or anyone other than Plaintiff and PNC after February 27, 2013.

Moreover, to the extent there is any ambiguity as to the scope of the Term Sheet's Exclusivity section, such language should be construed strictly against Plaintiff, who along with PNC was the drafter of the entire section.  *See Orthoflex, Inc. v. Thermo Tek, Inc.*, Nos. 3:11–CV–0870–D, 3:10–CV–2618–D, 2013 WL 4045206, at *3 (N.D. Tex. Aug. 9, 2013) ("[A] writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties.") (quoting *Austin Co. v. Vaughn Bldg. Corp.*, 643 S.W.2d 113, 115 (Tex. 1982)); *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) ("It is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used.").  Moreover, the surrounding circumstances make clear that the Term Sheet cannot have the meaning that Plaintiff would ascribe to it.  *See Interstate Contracting*, 407 F.3d at 712 (holding that a contract's wording may be considered in light of the surrounding circumstances

and will be deemed unambiguous if the contract is susceptible to only one meaning given those circumstances).

Two key contextual points establish that the Exclusivity section was intended to relate only to a direct sale of the Aerial Camera Business, and *not* a sale of *Outdoor*. ***First***, when Plaintiff and PNC drafted the Term Sheet and the parties executed it, Outdoor already had agreed to sell all of its stock to InterMedia. (Ex. A-19, Lee Tr. at 45:15–46:16, App. 266–67). Consequently, Outdoor was in ongoing discussions with InterMedia relating to the acquisition. Further, had the InterMedia Merger Agreement closed, InterMedia would have acquired Outdoor, which would have included the Aerial Camera Business as subsidiaries of Outdoor in the event those subsidiaries had not been sold. Thus, under Plaintiff's view, any discussion between Outdoor and InterMedia relating to the acquisition would have been a breach of the Exclusivity section. Outdoor would not and did not agree to such terms.

***Second***, the Outdoor Board had fiduciary duties to the Outdoor shareholders, including the obligation to consider proposals for all Outdoor stock superior to the InterMedia offer. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for stockholders—and they must exercise their fiduciary duties to further that end."). Plaintiff's now contorted interpretation of the Exclusivity section would result in a breach by the Board of its obligations to the Outdoor shareholders to maximize the offer for Outdoor stock.

> **b.      Outdoor did not Agree to Sell the Aerial Camera Business to KSE or Anyone Else During the Term Sheet's Exclusivity Period; in Fact, Outdoor Never Agreed to do so at any Time After February 27, 2013**

Plaintiff's claim that Outdoor breached the Exclusivity section by "agreeing to sell . . . the Aerial Camera Business" to KSE during the exclusivity period is refuted by the simple and

undisputed fact that Outdoor never sold the Aerial Camera Business to anyone. (Ex. A-1, SAC ¶ 25, ECF #63, App. 025). As discussed above, the transaction in which KSE acquired all of Outdoor's stock and assets did not constitute an agreement to sell Outdoor's subsidiaries, the Aerial Camera Business. *See Capital Parks*, 30 F.3d at 628–29; *see also Tenneco*, 925 S.W.3d at 645 (citations omitted) ("The purchaser of stock in a corporation does not purchase any portion of the corporation's assets[.]"); *Docudata*, 966 S.W.2d at 197 ("A purchase of stock in a corporation does not constitute a purchase of the corporate assets. . . . Similarly, a sale of all the stock in a corporation does not constitute a sale of the corporate assets."). Indeed, when the exclusivity period expired on April 15, 2013, the Aerial Camera Business remained wholly-owned subsidiaries of Outdoor; and when Outdoor was acquired by and merged with a KSE subsidiary on May 17, 2013, the Aerial Camera Business remained Outdoor subsidiaries. (*See* Ex. A-11, Hornish Tr. at 107:19–108:10, App. 180–81). This fact alone demonstrates the fatal flaw in Plaintiff's breach of contract claim.

Because Plaintiff cannot show that Outdoor disposed of the Aerial Camera Business to KSE or anyone else (again, the Aerial Camera Business remained subsidiaries of Outdoor even after the merger), he relies on a theory that the Exclusivity section prohibited Outdoor from "indirectly" selling the Aerial Camera Business by selling ***its own stock*** to KSE or anyone else without somehow "excluding" the Aerial Camera Business from the deal. (*See* Ex. A-24, Salomon May Tr. Vol. III at 364:20–365:7, App. 406–07; Ex. A-10, Gluck Tr. at 68:15–20, App. 150). Plaintiff's theory is baseless for several reasons.

***First***, the language of the Exclusivity section imposed no obligation on Outdoor to "exclude" or "carve out" the Aerial Camera Business in the event that Outdoor sold itself to a third party. The Exclusivity section says only that Outdoor could not sell or agree to sell an equity or

debt interest *in the Aerial Camera Business*, which Outdoor never did.  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).   Even PNC, through its representative Jeff Holowaty, which was a signatory to the Term Sheet and drafted the Exclusivity section along with Plaintiff in its entirety, has testified that the Term Sheet did not require Outdoor to "carve the [A]erial [C]amera [B]usiness out of any sale of its stock."  (*See* Ex. A-5, Holowaty Tr. at 104:21–105:6, App. 071–72).

*Second*, under Plaintiff's interpretation, Outdoor would have been in violation of the Exclusivity section the moment the Term Sheet was signed, given that Outdoor had already agreed to sell itself to InterMedia.  (Ex. A-19, Lee Tr. at 45:15–46:16, App. 266–67).  Plaintiff was aware of the InterMedia Merger Agreement when he and PNC prepared the Term Sheet.  (*See* Ex. A-16, Salomon May Tr. Vol. I at 108:4–8, App. 228).  To try and end run this result, Plaintiff claims that the Aerial Camera Business was carved out of the InterMedia Merger Agreement, noting that the February 12 Proxy Statement to Outdoor shareholders provided separate financial projections for the Aerial Camera Business and the rest of Outdoor because Outdoor was exploring "strategic alternatives" for the Aerial Camera Business through a process that was "still ongoing."  (*Id.* at 100:16–101:12, App. 223–24; Ex. A-15, February 12 Proxy Statement, App. 219).  However, neither the February 12 Proxy Statement nor the InterMedia Merger Agreement contained any provision stating that the Aerial Camera Business would be sold before the close of the InterMedia Merger Agreement; if the Aerial Camera Business was not sold it would have remained a subsidiary of Outdoor at the time InterMedia acquired all Outdoor stock.  (Ex. A-16, Salomon May Tr. Vol. I at 106:22–107:5, App. 226–27).

*Third*, under Plaintiff's theory, which would treat the sale of an equity interest in Outdoor as a sale of an equity interest in the Aerial Camera Business, Outdoor would have violated the Term Sheet's Exclusivity section by selling or issuing a single share of its own stock to a third

party or even to an Outdoor employee through an employee incentive plan—a truly absurd proposition for a publicly traded company such as Outdoor.  Again, Texas courts have recognized that a "purchase of stock in a corporation does not constitute a purchase of the corporate assets." *Docudata Records*, 966 S.W.2d at 197 (citing *Tenneco*, 925 S.W.2d at 645).

*Fourth*, Plaintiff's interpretation is inconsistent with Delaware corporate law relating to *merger* agreements and transactions, such as the one Outdoor entered into with KSE.[8]  Section 251(b) of Delaware's General Corporation Law describes the process for effecting a *merger.*  Notably, in a merger, shares in the target company are either *converted* or *exchanged*; nowhere in Section 251 do the words "sale" or "sell" appear.  *See* DGCL § 251(b).  Moreover, once a board approves a merger agreement, it is not effective until it is approved by a vote of the corporation's shareholders.  DGCL § 251(c).  Thus, the KSE Merger Agreement was not effective until it was approved by Outdoor's stockholders.  This did not take place until May 17, 2013—over one month after expiration of the Term Sheet's exclusivity period.  Accordingly, even if the Outdoor-KSE merger somehow constituted an "indirect" "sale" of the Aerial Camera Business, it did not take place until after the exclusivity period had lapsed.  (*See* Ex. A-2, SAC, Ex. A ECF #63, at 3, App. 034).

> c.    ***Outdoor and KSE Only Negotiated and Discussed KSE's Interest in Acquiring Outdoor—not the Aerial Camera Business***

Plaintiff's allegation that Outdoor violated the Exclusivity section by "failing to cease negotiations and discussions with KSE regarding the potential acquisition of an equity interest in . . . the Aerial Camera Business" is substantially the same as his allegation that Outdoor violated

---

[8] Outdoor Channel Holdings, Inc., Kroenke Sports & Entertainment, LLC, and the merger subsidiary created by KSE, were all incorporated under Delaware law and Delaware corporate law governed the KSE Merger Agreement.  (*See* Ex. A-20, KSE Merger Agreement at 1, 59, App. 282, 289).

the Exclusivity section by "negotiating, discussing, and corresponding with KSE regarding the sale of the Aerial Camera Business," and fails for the same reasons.  *See supra* Section IV.B.3.a. The Exclusivity section only prohibited discussions or negotiations with third parties relating to potential acquisition *of the Aerial Camera Business*; it did not prohibit any discussions or negotiations relating to a sale of *Outdoor* stock.  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034). Outdoor's discussions and negotiations with KSE all fell into the latter category, not the former. KSE only ever offered to acquire all of Outdoor's stock and never made any offer to acquire an "equity or debt interest" in the Aerial Camera Business.  (Ex. A-25, Werner Tr. at 109:8–110:12, App. 418–19).  Accordingly, Plaintiff cannot maintain a breach of contract claim on the ground that Outdoor "fail[ed] to cease negotiations and discussions" regarding a potential acquisition of the Aerial Camera Business, given the absence of any evidence that Outdoor ever engaged in such negotiations in the first place.  (Ex. A-19, Lee Tr. at 94:13–23, App. 275; Ex. A-1, SAC ¶ 51, ECF #63, App. 022).

> ### d.   The Term Sheet did not Prevent Outdoor From Disclosing the Existence of Plaintiff, PNC, or the Term Sheet to KSE

For many of the same reasons already discussed, the fact that KSE became aware of Plaintiff, PNC, or the Term Sheet does not constitute a breach of the Exclusivity section by Outdoor.

Section A(ii) of the Exclusivity section required Outdoor to refrain from engaging in negotiations and discussions with third parties in relation to a potential acquisition of the Aerial Camera Business, other than to advise such third parties that "exclusive discussions are being pursued with another party" and "in no event [was] Purchaser's identity [to] be disclosed."  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  Section B contains similar restrictions, requiring Outdoor to cease any negotiations "in relation to the potential acquisition of an equity or debt

interest in the [Aerial Camera Business]" with "any other party than Purchaser."  (*Id*., App. 034)
The section further required Outdoor to "advise *any such parties* that exclusive discussions are
being pursued with another party" but that in no event would Purchaser's identity be disclosed.
(*Id.* (emphasis added), App. 034)

Both of these provisions restricted how Outdoor could communicate with third parties
interested in acquiring *the Aerial Camera Business*—a class of parties that did not include KSE,
whose only interest was in acquiring *Outdoor*.  *See Capital Parks*, 30 F.3d at 628–29 (declining
to treat third party's acquisition of parent company as an acquisition of the parent's subsidiary).
Thus, the requirements in the Exclusivity section on how Outdoor was to deal with parties
interested in making competing offers for the Aerial Camera Business did not govern how or what
Outdoor could communicate with KSE.  The fact that KSE became aware of Plaintiff, PNC, and
the Term Sheet during the course of performing due diligence in connection with the KSE Merger
Agreement therefore does not constitute a violation of the Term Sheet.

> ### e.      *KSE Never "Vetoed" any Sale of the Aerial Camera Business Prior to the Merger*

Plaintiff also claims that Outdoor breached the Exclusivity section because, he alleges, the
March 21 Letter impermissibly gave KSE "veto" rights over a sale of the Aerial Camera Business.
As discussed above, KSE was not a party to that Letter, did not participate in its drafting, and was
not even aware of its existence until after its execution.  (Ex. A-10, Gluck Tr. at 82:1–7, App. 152;
Ex. A-19, Lee Tr. at 60:14–61:5, App. 268–69).  Moreover, KSE was never asked to consent to
any sale; it could not "veto" that with which it was never presented.  And the undisputed evidence
reveals that if KSE had been presented with an asset purchase agreement consistent with the Term
Sheet, KSE would have consented to a sale of the Aerial Camera Business to Plaintiff and PNC.

(Ex. A-3, Martin Tr. at 49:3–12, App. 042).  Thus, even if the March 21 Letter was enforceable, Plaintiff simply was not harmed thereby.

Because Plaintiff lacks evidentiary support for his claim of an alleged breach of the Exclusivity section of the Term Sheet by Outdoor, and relies on an untenable interpretation of that section, the Court should grant Outdoor's request for summary judgment on Count 1 of the SAC.

### 5.   Plaintiff's Alleged Damages Are Entirely Speculative And Without Evidentiary Support

Alternatively, even if Plaintiff were able to offer evidence sufficient to create a material issue of fact as to whether Outdoor breached the Exclusivity section of the Term Sheet, summary judgment still would be appropriate given that Plaintiff cannot offer sufficient evidence that he was damaged by any purported breach.  As the Fifth Circuit held in *Geithner*, "[e]ven if there is a dispute regarding *some* material facts, a movant may obtain summary judgment if he can prove there is no evidence to support one or more essential elements of the non-moving party's claim." 400 F. App'x at 916 (emphasis added).  Thus, where a plaintiff fails to provide evidence that he suffered damages as a result of an alleged breach, the defendant is entitled to summary judgment. *See Tollett v. JPMorgan Chase Bank, N.A.*, No. 11-14-00228-CV, 2016 WL 5340225, at *2–3 (Tex. App.—Eastland Sept. 22, 2016) (granting summary judgment to defendant on breach of contract claim where plaintiffs "failed to bring forth any evidence to show that they had sustained damages as a result of [defendant's] alleged breach"); *Clearview Props., L.P. v. Prop. Texas SC One Corp.*, 287 S.W.3d 132, 139–140 (Tex. App.—Houston [14th Dist.] 2009) ("If the alleged breach of contract did not cause the plaintiff's damages, then there can be no recovery for breach of contract.").

Here, Plaintiff cannot show that even if Outdoor breached the Exclusivity section of the Term Sheet (and it did not), he suffered any damages as a result.  More specifically, he cannot

prove that but for Outdoor's interactions with KSE, he would have acquired the Aerial Camera Business.  Nor can Plaintiff show that KSE's awareness of "the existence of PNC and [Plaintiff]" or of the Term Sheet caused Plaintiff to suffer an injury of any kind.  (Ex. A-1, SAC ¶ 51, ECF #63, App. 022).  Plaintiff and PNC never formed the "Purchaser" contemplated by the Term Sheet, never agreed upon an equity structure for the Purchaser, and never reached agreement with Outdoor and signed definitive documents (including as asset purchase agreement) to acquire the Aerial Camera Business.  (Ex. A-17, Salomon May Tr. Vol. II at 217:4–219:9, App. 251–53; Ex. A-4, Plaintiff's Admission No. 3, App. 049).   As noted above, Outdoor remained willing to negotiate with Plaintiff and PNC right up to the closure of the merger with a KSE subsidiary on May 17, 2013.  (Ex. A-19, Lee Tr. at 42:23–43:9, App. 264–65).  Moreover, PNC representative Jeff Holowaty testified that PNC was not going to fund the entire acquisition price, and while Plaintiff and PNC tried to find other investors, they were unsuccessful; in other words, Plaintiff was never in a position to consummate any purchase and cannot present any evidence of readily available funds.  (Ex. A-5, Holowaty Tr. at 50:17–52:23, App. 064–66).  The inability of Plaintiff and PNC to form the Purchaser, fund a purchase, and negotiate and sign definitive agreements with Outdoor—failures that cannot be attributed to Defendants—demonstrate that even if Outdoor's discussions with KSE were prohibited under the Exclusivity section of the Term Sheet (and they were not), they did not prevent a deal from happening.  Plaintiff therefore cannot show that he suffered any injury as a result of any alleged breach by Outdoor.

Likewise, even if Plaintiff were able to establish that Outdoor granted KSE a "veto" right and that doing so breached the Exclusivity section of the Term Sheet, he cannot show that he suffered any damages as a result.  (Ex. A-1, SAC ¶ 51, ECF #63, App. 022).  For one thing, the parties agree that the March 21 Letter was not binding because Plaintiff did not sign it.  (Ex. A-4,

Plaintiff's Admission No. 39, App. 057). Moreover, even if KSE possessed the power to "veto" a sale of the Aerial Camera Business, Plaintiff makes no allegation and has no evidence that KSE ever "vetoed" any sale of the Aerial Camera Business to Plaintiff and PNC (in fact, the undisputed evidence is that KSE did not do so). (Ex. A-19, Lee Tr. at 80:4–15; 95:23–96:10, App. 271, 276–77). As Plaintiff admits, he and PNC never reached definitive agreements with Outdoor for a sale of the Aerial Camera Business. (Ex. A-4, Plaintiff's Admissions No. 2–3, App. 049). Consequently, no agreements were ever presented to KSE that it could then "veto." KSE personnel even testified that if Outdoor and Plaintiff **had** reached definitive agreements consistent with the Term Sheet, KSE would have approved the deal. (*See* Ex. A-3, Martin Tr. at 49:3–50:4, App. 042–43). Accordingly, Plaintiff cannot claim that he suffered any injury or damages as a result of any purported "veto" right that KSE may have possessed.

This failure by Plaintiff to demonstrate damages resulting from the alleged breach of contract by Outdoor provides alternative, independent grounds on which to grant Outdoor's request for summary judgment on Count 1 of the SAC.

## C. KSE DID NOT TORTIOUSLY INTERFERE WITH AN EXISTING CONTRACT BETWEEN PLAINTIFF AND OUTDOOR

### 1. Applicable Law

Count 2 of the SAC is a claim for tortious interference with an existing contract against KSE. Under Texas law, such a tortious interference claim has four elements: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or damage occurred." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *see also ThermoTek, Inc. v. WMI Enters., LLC*, Civil Action No. 3:10-CV-2618-D, 2011 WL 1485421, at *8 (N.D. Tex. Apr. 19, 2011). "Ordinarily, merely inducing a contract obligor to do what it has a

right to do is not actionable interference." *ACS Investors*, 943 S.W.2d at 430 (citing *C.E. Servs.*

*Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985)).

> **2.     KSE Did Not Interfere With Any Contract Between Outdoor And Plaintiff, Or Induce Outdoor To Do Anything Regarding Attempted Sale Of The Aerial Camera Business**

Plaintiff's claim against KSE for tortious interference with existing contract fails for many

of the same reasons discussed above in connection with Plaintiff's breach of contract claim against

Outdoor.  Plaintiff alleges that KSE "willfully and intentionally interfered with the Term Sheet's

Exclusivity Provision," by "induc[ing] or caus[ing] Outdoor to breach its contractual obligations

to negotiate exclusively with PNC and Plaintiff" and by "induc[ing] Outdoor to discuss and

negotiate the sale of the Aerial Camera Business and grant KSE the right to disapprove of the sale

to Plaintiff and PNC."  (Ex. A-1, SAC ¶ 55, ECF #63, App. 023).  Plaintiff lacks any evidence

supporting his claims that Outdoor breached the Exclusivity section or that KSE was the cause.

KSE could not have induced breach of the Exclusivity section because Outdoor did not

breach any contractual obligations it owed to Plaintiff thereunder.  (Ex. A-19, Lee Tr. at 97:19–

98:6, App. 278–79; Ex. A-11, Hornish Tr. at 95:12–96:4, App. 171–72).  Outdoor simply did not

breach the Exclusivity section.  *See supra* Section IV.B.  Therefore, any claim premised on KSE

having "induced" or "caused" such a breach also must fail.  *See New York Life Ins. Co. v. Miller*,

114 S.W.3d 114, 125–26 (Tex. App.—Austin 2003) (reversing judgment against defendants New

York Life and Coffey, a New York Life agent, after explaining that "because New York Life did

not breach its agreement with [plaintiff], Coffey is not liable for tortious interference with those

agreements").  Moreover, KSE cannot be liable for tortious interference with any agreement

between Outdoor and Plaintiff because even if KSE did cause some action by Outdoor, merely

inducing a contract obligor to do something it has a right to do is not actionable interference.  *ACS*

*Investors*, a Texas Supreme Court case that in many ways resembles the circumstances at issue

here, demonstrates this flaw in Plaintiff's claim.  *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 428–31 (Tex. 1997).

In *ACS Investors*, a company called First Texas acquired a company called the "AMS Division" from an individual named McLaughlin, and as part of the acquisition agreement, granted McLaughlin an option to buy back a 49% equity stake in the AMS Division at the end of a five-year period.  *Id.* at 428.  However, First Texas subsequently sold the AMS Division to ACS, in a transaction that severed McLaughlin's purchase option.  *Id.* 429–30.  After McLaughlin sued ACS and others for tortious interference, a jury found (and the Texas Court of Appeals affirmed) that "ACS tortiously interfered with the McLaughlin Agreement by purchasing the AMS Division from First Texas."  *Id.* at 429.  The Texas Supreme Court overturned the judgment, holding that even though ACS was aware of the agreement between McLaughlin and First Texas, First Texas had a right to sell the AMS Division, therefore the sale could not form the basis of a tortious interference claim.  *Id.* at 430–31.  In other words, "ACS merely negotiated for First Texas to do what it had a right to do under the McLaughlin Agreement."  *Id.*

This case is similar, in that Outdoor did not engage in any prohibited acts.  As noted above, Outdoor's discussions and conversations with KSE regarding a merger with Outdoor and acquisition of all Outdoor stock were not prohibited by any provision of the Term Sheet, and were consistent with the fiduciary obligations Outdoor owed its shareholders.  (Ex. A-13, McQuay Tr. at 68:3–6, App. 186; Ex. A-25, Werner Tr. at 43:16–44:5, 114:20–115:21, App. 414–15, 420–21).  And even if KSE ***had*** induced Outdoor not to sell the Aerial Camera Business to Plaintiff and PNC (and the undisputed evidence is that KSE did not do so), and was aware of the Term Sheet between Outdoor and Plaintiff, Outdoor had an express right under the Term Sheet (under the very language drafted by Plaintiff and PNC) to withdraw from or terminate negotiations with Plaintiff for any

reason or for no reason.  (Ex. A-2, SAC, Ex. A at 3, ECF #63, App. 034).  Thus, any exercise by

Outdoor of the right not to sell the Aerial Camera Business, even if induced by KSE, cannot serve

as the basis for a tortious interference with existing contract claim.

To the extent Plaintiff's tortious interference with existing contract claim relies on KSE's

purported involvement in the March 21 Letter, such a claim likewise should be rejected.  As

discussed in the following section, Plaintiff has no evidence that KSE played any role in the

drafting or execution of the March 21 Letter, and the undisputed evidence is to the contrary.

Moreover, the March 21 Letter, which was without legal effect, would have done nothing more

than *extend* the Term Sheet's exclusivity period and acknowledge KSE's consent rights under the

KSE Merger Agreement.  Furthermore, as noted above, the undisputed evidence was that KSE

would have approved of the sale to Plaintiff and PNC had they entered into definitive agreements

consistent with the Term Sheet.

Finally, as with his breach of contract claim, Plaintiff's tortious interference claim also

must fail because he cannot establish that any "actual loss and damage" occurred as a result of any

alleged interference.

For these reasons, the Court should grant KSE's request for summary judgment on Count

2 of the SAC.

**D.    KSE DID NOT TORTIOUSLY INTERFERE WITH A PROSPECTIVE BUSINESS RELATION
BETWEEN PLAINTIFF AND OUTDOOR**

**1.    Applicable Law**

Count 3 of the SAC is a claim against KSE for tortious interference with a prospective

business relationship between Plaintiff, PNC, and Outdoor.  To prove such a claim, Plaintiff must

establish: "(1) a reasonable probability that the parties would have entered into a contractual

relationship; (2) an independently tortious or unlawful act by the defendant[s] that prevented the

relationship from occurring; (3) the defendant[s] did the act with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the interference." *Community Initiatives, Inc. v. Chase Bank of Texas*, 153 S.W.3d 270, 283–284 (Tex. App.—El Paso 2004).

Count 3 is based on Plaintiff's claim that he and Outdoor would have entered into an agreement for the sale of the Aerial Camera Business. This claim too, however, is defective and without support for at least two reasons. First, there is no evidentiary support for the purported acts of interference that Plaintiff alleges KSE committed. Second, even if KSE had engaged in the conduct of which Plaintiff accuses it, such conduct is not independently tortious and therefore is not actionable under a tortious interference with prospective business relations theory.

## 2. There Is No Evidence Of Interference By KSE

Plaintiff lacks any evidence that KSE interfered with the prospective sale of the Aerial Camera Business to PNC and him. The SAC alleges that KSE interfered with the prospective sale by "induc[ing] Outdoor to breach its contractual obligation to negotiate exclusively with [Plaintiff] and PNC and then caused the execution of the [March 21] Amendment, which purported to grant KSE the right to disavow the sale of the Aerial Camera Business." (Ex. A-1, SAC ¶ 58, ECF #63, App. 025). However, as Defendants already have demonstrated, there is no evidence that KSE induced Outdoor to breach any contractual duty it owed to Plaintiff or that KSE had any involvement whatsoever in the drafting or execution of the March 21 Letter between Outdoor and PNC. (*See* Ex. A-19, Lee Tr. at 60:13–61:5; 87:21–88:11, App. 268–69, 273–74; Ex. A-10, Gluck Tr. at 82:1–83:5; 86:14–23, App. App. 152–54).

Plaintiff's claim that KSE interfered with the prospective sale of the Aerial Camera Business by inducing Outdoor to breach the Exclusivity section of the Term Sheet fails for the

reasons set forth in Section III.B, i.e., Outdoor did *not* breach the Term Sheet and therefore KSE could not have induced any such breach.  Moreover, the undisputed evidence in this case shows that KSE did not influence, direct, or control Outdoor in any way with respect to the disposition of the Aerial Camera Business prior to May 17, 2013.  As KSE's President and CEO James Martin explained during his deposition, the decision as to whether Outdoor would sell the Aerial Camera Business belonged to Outdoor's management, and if an agreement had been reached with Plaintiff and PNC consistent with the Term Sheet, KSE would have consented to that sale.  (*See* Ex. A-3, Martin Tr. at 49:3–50:4, App. 042–43).

Plaintiff therefore cannot demonstrate the existence of a factual dispute as to whether KSE interfered with a prospective business relationship between Plaintiff and Outdoor (it did not).  And because the evidence shows KSE would have consented to a sale if presented with the opportunity, Plaintiff also cannot demonstrate that he suffered any injury or damages.  Accordingly, summary judgment should be granted in KSE's favor.

### 3.   Plaintiff Does Not Allege Or Have Evidence Of Independently Tortious Conduct By KSE

Alternatively, Plaintiff cannot demonstrate that KSE engaged in any conduct or activity that was independently tortious.  In *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001), the Texas Supreme Court went to great lengths to clarify the distinction between tortious interference with an existing contract and tortious interference with a prospective business relation, and what kind of conduct is actionable under each.  The *Sturges* court explained that when there is not yet a contractual relationship between the plaintiff and a third party and the relationship is only prospective, interference with that relationship by the defendant is actionable only if it is independently tortious or wrongful.  *Id.* at 726.  By this the court meant that the conduct "was

wrongful by some legal measure other than the fact of the interference itself." *Id.* at 720 (quoting *Della Penna v. Toyota Motor Sales, Inc.*, 902 P.2d 740, 751 (Cal. 1995)).

As the *Sturges* court observed, successful tortious interference with prospective business relations claims typically involve violent, fraudulent, or defamatory conduct. *See id.* at 725–26. As an example, the court offered a situation in which the defendant threatened a prospective customer of the plaintiff with bodily harm if he did business with the plaintiff. *See id.* at 713, 726. In such a scenario, the plaintiff could not sue the defendant for assault (it was the customer who was assaulted), but could potentially recover for the tortious interference with the prospective business relation. *Id.*

*Sturges* involved claims by a group of plaintiffs who had been in negotiations with the owners of a food store business (Fleming) to lease them a tract of land on which to build a store, going as far as signing a letter of intent with Fleming. *Id.* at 714. The tract was subject to covenants that permitted the previous owner, Wal-Mart, to approve modifications to a pre-existing site plan for the tract. *Id.* at 713–14. Plaintiffs sought approval for a modification to the site plan that would permit the food store to be built on the property, which Wal-Mart initially indicated would be granted. *Id.* at 714. However, Wal-Mart decided that it wanted to acquire the property for itself, so it could expand a Wal-Mart on an adjacent property. *Id.* Wal-Mart then informed Fleming that if it could not acquire the property, it would close its store on the adjacent lot and relocate. *Id.* Fleming was not interested in opening a store on the property without an adjacent Wal-Mart, and it cancelled the letter of intent and abandoned its plan to lease the property from the plaintiffs. *Id.*

Plaintiffs sued Wal-Mart for tortious interference with their prospective lease agreement and were awarded damages, which the court of appeals affirmed. *Id.* at 714–15. The Texas Supreme Court reversed. While there was no dispute that Wal-Mart told Fleming it would relocate

its store if it could not acquire the property, Plaintiff argued that the statement was false or fraudulent.  *Id.* at 727.  However, the court found that there was no evidence to support that assertion.  *Id* at 728.  Further, the court concluded that the record contained "no evidence to indicate that Wal-Mart intended the plaintiffs any harm other than what they would necessarily suffer by Wal-Mart's successful acquisition of [the property], which they were both pursuing, by entirely lawful means."  *Id*.  Thus, the *Sturges* court held that there was "no evidence to support a judgment for the plaintiffs on their interference claim."  *Id.*

Again, Plaintiff lacks evidence showing that KSE engaged in the activities alleged in the SAC.  But even if such evidence did exist, it would be insufficient to show that KSE committed an independently tortious or wrongful act.  None of the allegations against KSE involve fraudulent or illegal activity or conduct that could stand on its own as a tort sufficient to sustain a tortious interference with prospective business relations claims.  Indeed, KSE's conduct was that of a competitor to the InterMedia offer to acquire all Outdoor stock, and there certainly is nothing remotely nefarious about that.

Plaintiff's claim of tortious interference with prospective business relations is belied by the undisputed evidence and is fatally deficient under Texas law.  The Court therefore should grant KSE's request for summary judgment on Count 3 of the SAC.

## E.   DEFENDANTS DID NOT AID OR ABET A BREACH OF FIDUCIARY DUTY BY PNC

### 1.   Applicable Law

Count 5 of the SAC is a claim against Outdoor and KSE for "aiding and abetting" breach of fiduciary duties.  Under Texas law, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."  *Meadows v. Hartford Life Ins. Co*., 492 F.3d 634, 639 (5th Cir. 2007) (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (affirming dismissal of

plaintiff's claims under Rule 12(b)(6)).  To establish a claim of knowing participation in a breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship."  *Id.* (citing *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721–22 (Tex. App. 2001)).

### 2.     Outdoor And KSE Did Not Induce PNC To Breach A Fiduciary Duty Or Assist PNC In Breaching A Fiduciary Duty

Plaintiff claims that KSE and Outdoor  "knowingly assisted, encouraged, and participated in PNC's breach of its fiduciary duties owed to [Plaintiff] in connection with their [attempted] purchase of the Aerial Camera Business by inducing PNC to sign the [March 21] Amendment without [Plaintiff's] knowledge or consent."  (Ex. A-1, SAC ¶ 62, ECF #63, App. 025).

Plaintiff lacks any evidence showing that Outdoor or KSE were aware that they were participating in any alleged breach of a fiduciary relationship, even assuming PNC owed Plaintiff any such duties.  Plaintiff's claim is based entirely on the March 21 Letter, and the undisputed evidence is that KSE played no part in (and was not even aware of) that Letter until after the fact.  *See supra* Section IV.D.2.  Furthermore, Plaintiff can present no evidence that Outdoor was aware that was it participating in any breach of a fiduciary relationship, if PNC's signing of the March 21 Letter was a breach at all.  Rather, the Outdoor personnel involved in the drafting and signing of the March 21 Letter all have testified that the failure to obtain Plaintiff's signature on the document was an oversight.  (*See* Ex. A-5, Holowaty Tr. at 95:23–98:4, App. 067–70; Ex. A-11, Hornish Tr. at 104:9–106:4, App. 177–79; Ex. A-19, Lee Tr. at 61:15–62:21, App. 269–70).  As Ms. Lee testified, Outdoor had been "negotiating primarily with PNC, and [Plaintiff] was no longer involved," so Outdoor "inadvertently forgot" to obtain Plaintiff's signature.  (Ex. A-19, Lee Tr. at 62:1–7, App. 270)  The following exchange from Ms. Lee's deposition demonstrates that Outdoor

neither intended to cause any harm to Plaintiff by executing the March 21 Letter, nor was it aware

that any violation of the relationship between Plaintiff and PNC might result:

| MR. EVANS: | Was there any intent by Outdoor to deceive Mr. Salomon? |
| MS. LEE: | Absolutely not. |
| MR. EVANS: | Was there any intent by Outdoor to conceal anything from Mr. Salomon? |
| MS. LEE: | No. |
| MR. EVANS: | Was there any intent by Outdoor to cut Mr. Salomon out of the effort to acquire the Aerial Camera Business? |
| MS. LEE: | No. |
| MR. EVANS: | Did -- is it fair to say that Outdoor expected PNC to communicate the contents of [the March 21 Letter] with Mr. Salomon? |
| MS. LEE: | Yes. |

(Ex. A-19, Lee Tr. at 62:8–21, App. 270).   Mr. Hornish, who signed the March 21 Letter on

Outdoor's behalf, provided similar testimony, and also said that no one from KSE told Outdoor to

exclude Plaintiff from the March 21 Letter.   (Ex. A-11, Hornish Tr. at 76:13–77:12, App. 169–

70).  There is no contrary evidence.

Accordingly, the Court should grant summary judgment in favor of Defendants on Count

5 of the SAC.

## F.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S "UNJUST ENRICHMENT" CLAIM

### 1.    Unjust Enrichment Is Not An Independent Cause Of Action

Count 6 of the SAC is a claim against Defendants and PNC for "Unjust Enrichment."  As

Defendants explained in their motion to dismiss the SAC, unjust enrichment is not a standalone

legal claim.  (*See* Ex. A-27, ECF #74 at 15-16, App. 447–48).  Several state and federal courts in

Texas, including this Court, have held that "[u]njust enrichment is [a] theory of liability, not an

independent cause of action under Texas law."  *See Ingram v. Beneficial Fin. Inc.*, Civil Action

No. 3:13-CV-4037-L, 2015 WL 1443110, at *13 (N.D. Tex. Mar. 30, 2015) (citing *Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 716, 724–26 (N.D. Tex. 2011); *Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009); *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied)).[9]   For this reason alone, the Court should grant summary judgment in favor of Defendants on Count 6 of the SAC.

**2.      Even If Unjust Enrichment Is An Independent Cause Of Action, Plaintiff's Claim Fails**

Plaintiff cannot sustain a claim of unjust enrichment, even if such a claim may serve as an independent cause of action.   This is because "there can be no recovery for unjust enrichment under a quasi-contract or contract implied-in-law theory when a valid, express contract covers the subject matter of the parties' dispute."   *See Patterson v. Long Beach Mortg. Co.*, Civil Action No. 3:07–CV–1602–O–BH, 2009 WL 4884151, at *8 (N.D. Tex. Dec. 15, 2009) (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 71, 684 (Tex. 2000); *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)).   There can be no argument here that the subject matter of the parties' dispute is the Exclusivity section of the Term Sheet.   Accordingly, summary judgment on Plaintiff's unjust enrichment claim should be granted in Defendants' favor.   *See id.* (granting summary judgment on unjust enrichment claim to defendant who established "the presence of a valid contract covering the parties' dispute").

---

[9] While there is some disagreement on this issue, a Texas federal court recently observed that "[m]ost of the Texas courts of appeals and federal courts that have considered the question under Texas law have rejected the existence of an independent cause of action for unjust enrichment." *Mission Trading Co., Inc. v. Lewis*, Civil Action No. H-16-3368, 2017 WL 6935824, at *6 (S.D. Tex. July 31, 2017) (quoting David Dittfurth, Restitution in Texas: Civil Liability for Unjust Enrichment, 54 S. Tex. L. Rev. 225, 238 (2012)) (dismissing Plaintiff's unjust enrichment claim after being "persuaded" by the view that "unjust enrichment is not a separate cause of action under Texas law").

Further, even if the Court were to decide unjust enrichment is an independent cause of action and conclude that this dispute is not governed by the Exclusivity section of the Term Sheet, Plaintiff has no evidence to establish that he is entitled to recover anything under an unjust enrichment theory.  Unjust enrichment is appropriate in cases where there is no valid contract in place, and the defendant obtained a benefit from the plaintiff "by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Here, there is no evidence showing that KSE or Outdoor obtained any "benefit" from Plaintiff. (Ex. A-1, SAC ¶ 63, ECF #63, App. 025).  Even the SAC contains nothing more than a vague allegation that "Defendants have unjustly enriched themselves, to [Plaintiff's] detriment." (*Id.* at ¶ 69, App. 026).  Moreover, even if Outdoor or KSE had obtained a benefit from Plaintiff, there is no evidence that such a benefit was procured by fraud, duress, or by taking an undue advantage. Accordingly, the Court should grant Defendants' request for summary judgment on Plaintiff's unjust enrichment claim.

## G.   THERE IS NO EVIDENCE OF AN AGREEMENT AMONG DEFENDANTS AND PNC THAT DEFENDANTS ENGAGED IN ANY UNLAWFUL ACT, OR THAT PLAINTIFF SUFFERED ANY DAMAGES

Plaintiff's claim of civil conspiracy in Count 7 of the SAC, involving Outdoor, KSE, and PNC, also must fail because, as discussed above, he lacks evidence to establish that Defendants committed a tort.  A civil conspiracy claims requires:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages to the plaintiff as a proximate result.  *See Whitfield v. Nelson*, No. 3:13-CV-2230-BN, 2014 WL 1243805, at *3 (N.D. Tex. Mar. 26, 2014) (citation omitted). Thus, "liability for a civil conspiracy depends on participation in an underlying tort."  *Id.* at *3. The plaintiff must show "that the defendant committed an act that, if done alone, would give rise to a cause of action."  *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 553 (5th Cir. 2012) (reversing

district court's grant of summary judgment to plaintiff on its civil conspiracy claim where there

was insufficient evidence that defendants engaged in an overt, unlawful act).

As demonstrated by the foregoing discussion, neither KSE nor Outdoor engaged in any

unlawful, overt acts, and Plaintiff does not have any evidence to the contrary.  *See Meadows v.*

*Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) (observing that under Texas law, "civil

conspiracy is a derivative tort" and dismissing claim where plaintiff failed to allege an underlying

tort)).  Moreover, there is no evidence whatsoever in the record supporting a "meeting of the

minds" as to any common plan or objective among KSE, Outdoor, and PNC.  *See Hunn v. Dan*

*Wilson Homes, Inc.*, Civil Action No. 5:12-CV-081-C, 2013 WL 12128677, at *11–12 (N.D. Tex.

Sept. 23, 2013) (granting summary judgment to defendants where the record lacked any evidence

beyond "mere speculation" of a "meeting of the minds between the alleged conspirators to cause

any damages or injury to [the plaintiff]").  KSE had no involvement in the March 21 Letter and

Outdoor lacked any intent to injure Plaintiff by executing the Letter without his signature.  *See*

*supra* Section IV.D.2.  Finally, as explained above, Plaintiff cannot demonstrate that he suffered

any injury as a result of any action taken by Outdoor or KSE.  Accordingly, the Court should grant

Defendants' request for summary judgment on Plaintiff's civil conspiracy claim.

## H.   PLAINTIFF'S DISGORGEMENT "CLAIM" IS INSUPPORTABLE

Should any of Plaintiff's claims proceed to trial, and even if Defendants are found to be

liable on any, Plaintiff's damages would be limited to those that he actually suffered.  Plaintiff

claims at various points in the SAC that Defendants should be required to "disgorge all profits,"

but provides no explanation of what profits he believes Defendants must disgorge.  (*See* Ex. A-1,

SAC ¶¶ 59, 63, 70, 75 ECF #63, App. 024–25, 026–27).  Plaintiff failed to clarify this issue in his

initial disclosures or his interrogatory responses, even as supplemented on August 24, 2018.  (*See*

Ex. A-29, Plaintiff's Second Amended Initial Disclosures at 8–10, App. 491–93; Ex. A-30,

Plaintiff's Third Supplemental Answers To Defendants' Interrogatories, App. 498–500).   He claims that he intends to seek his own "lost profits," as well as "the value of any benefit that PNC received as a result of executing the [March 21 Letter]," but says nothing about improper benefits or profits received by Outdoor or KSE that should be disgorged.   (Ex. A-29, Plaintiff's Second Amended Initial Disclosures at 8, App. 491).   For this reason alone, Plaintiff's pursuit of a disgorgement theory against Defendants must be rejected.   *See Am. Realty Trust, Inc. v. Matisse Partners, L.L.C.*, No. Civ.A.3:00−CV−1801−G, 2002 WL 1489543, at *1−7 (N.D. Tex. July 10, 2002) (precluding plaintiffs' from presenting damages theory where the plaintiffs "had all the necessary facts to disclose damage theory months ago, and . . . never provided proper support for their damages calculations").

Not until Plaintiff submitted an "expert" witness report on September 14, 2018 did Plaintiff provide any indication of the type of "profit" that he believes Defendants should have to disgorge or how the amount of disgorgement should be calculated, and even then Plaintiff's purported expert did so in throw away fashion in one paragraph of a 42-page report.  (*See* Ex. A-31, Sept. 14, 2018 Expert Witness Report of Kevin Kreitzman ("Kreitzman Report"), App. 503–07).[10] Simply "assuming liability," Plaintiff's purported expert provides calculations of Plaintiff's supposed "benefit of the bargain" damages arising from Outdoor's alleged breach of contract.  (*See id.* at 5, App. 505).  The Report provides calculations (again based on pure speculation and flawed methodology) ranging between approximately $2 and $2.8 million.  (*See id.*, App. 505).  But the Kreitzman Report then makes the incredible claim that Outdoor also should have to disgorge

---

[10] Defendants deposed Mr. Kreitzman in San Francisco on October 24, 2018.  As he did throughout his Report, Mr. Kreitzman confirmed that his damages opinions are based on nothing more than pure speculation and fundamentally flawed methodology.  As a result, Defendants will be filing a motion to exclude Mr. Kreitzman's testimony at any trial pursuant to FED. R. EVID. 702.

***$58.14 million plus prejudgment interest of $11.45 million, for a total of $69.59 million***.   (*Id.* at

6, 30, App. 506–07).   Plaintiff reaches this absurd figure by claiming that Outdoor breached the

Exclusivity section of the Term Sheet by "accept[ing] a competing offer by KSE that included an

offer to buy the Aerial Camera Business," and therefore the entire difference in value between

InterMedia's offer in November 2012 to acquire Outdoor at $8.00 per share and KSE's final offer

to acquire Outdoor at $10.25 per share must be disgorged.   (*Id.* at 30, App. 507).   Even putting

aside Plaintiff's attempt to assert a disgorgement theory that dwarfs in the extreme his alleged

actual damages with no notice or explanation beyond one paragraph in a so-called expert witness

report, Plaintiff's theory is defective as a matter of law.

As the Fifth Circuit has recognized, Texas law does "not allow a disgorgement remedy for

a breach-of-contract claim."   *See Hoffman v. L & M Arts*, 838 F.3d 568, 585 (5th Cir. 2016).   "In

Texas, '[t]he universal rule for measuring damages for the breach of a contract is just compensation

for the loss or damage *actually sustained*.' "   *Id.* (quoting *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d

268, 278 (5th Cir. 2009)).   Thus, disgorgement as a theory of recovery on a breach of contract

claim is "legally non-viable" and must be rejected.   *See id.* (reversing damages award on breach

of contract claim that "reflected a disgorgement remedy").

Plaintiff makes clear both in the Kreitzman Report and during Mr. Kreitzman's deposition

that his disgorgement claim is tied to Outdoor's alleged breach of the Term Sheet's Exclusivity

section.   (*See* Ex. A-31, Kreitzman Report at 30, App. 507 (explaining that Outdoor "accepted a

competing offer by KSE that included an offer to buy the Aerial Camera Business despite the

agreement by Outdoor in the term sheet" and thereby "received considerable benefit"); Ex. A-32,

Transcript of Oct. 24, 2018 Deposition of Kevin Kreitzman ("Kreitzman Tr.") (Rough Draft) at

114:25–115:7, App. 512 ("[T]his is what Outdoor gained by being willing to not honor that

transaction."). Because Plaintiff's disgorgement theory is expressly predicated on his breach-of-contract claim, it is therefore barred under Texas law.

Plaintiff's other alleged causes of action also do not support a disgorgement claim. *First*, Plaintiff may not seek disgorgement as a remedy for his tortious interference claims. Under Texas law, "[t]he measure of damages for . . . interference with contract[s] is the same as it is for breach of contract." *See Marcus, Stowell & Beye Gov't Secs., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 231–32 (5th Cir. 1986) (citing *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex. App.—El Paso 1977, writ ref'd n.r.e.). Thus, Plaintiff's recovery must be limited to the amount of actual loss suffered. *See id.* **Second**, as explained above, Plaintiff cannot claim "unjust enrichment" when there is a valid, express contract governing the subject matter of the dispute. *See Johnson v. Wells Fargo Bank*, *NA*, 999 F. Supp. 2d 919, 929 (N.D. Tex. 2014). Here, Plaintiff cannot dispute that the Exclusivity section of the Term Sheet governs his claims in this case. **Third**, a civil conspiracy claim requires proof that the plaintiff sustained damages proximately caused by illegal, overt acts committed by the conspirators, showing once more that recovery is limited to plaintiff's actual damages. *See Whitfield v. Nelson*, No. 3:13-CV-2230-BN, 2014 WL 1243805, at \*3 (N.D. Tex. Mar. 26, 2014). Defendants could find no case in which a plaintiff was permitted to recover under a civil conspiracy claim for damages that he did not himself suffer as a result of the conspiracy.

Nor can plaintiff disgorge Outdoor's profits under his breach of fiduciary duty or aiding and abetting claims. While disgorgement is sometimes permitted in breach of fiduciary duty cases, there are no allegations that Outdoor owed or breached any such duty to Plaintiff. The "aiding and abetting" cause of action, meanwhile, is premised on the idea that when a third party knowingly participates in another's breach of fiduciary duty it "becomes a joint tortfeasor with the fiduciary and is liable as such." *See Meadows*, 492 F.3d at 639. This means that Defendants are at most

liable to the same extent as PNC for its alleged breach of fiduciary duty to Plaintiff—a claim premised on PNC's "entering into the [March 21 Letter] without [Plaintiff's] knowledge or consent." (*See* Ex. A-1, SAC ¶ 66, ECF #63, App. 026).  Plaintiff cannot show that PNC received any monetary benefit for entering into the March 21 Letter—precisely because PNC received no such benefit, and thus Defendants are not liable in any way under this theory.  The difference in value between InterMedia's initial offer and KSE's final offer was not a benefit that PNC received (in fact, again, Plaintiff fails to demonstrate that PNC received any benefit by signing the March 21 Letter).  Therefore Plaintiff's aiding and abetting cause of action also fails to support Plaintiff's disgorgement theory.

## V.  CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC. respectfully request that the Court grant summary judgment in their favor on Counts 1, 2, 3, 5, 6, and 7 of the Second Amended Complaint, preclude Plaintiff from pursuing a disgorgement theory of recovery, and award Defendants such other and further relief as the Court deems appropriate.

*[Remainder of page intentionally left blank]*

Respectfully submitted,

Date:  November 5, 2018                    By:      *s/Kevin D. Evans*
                                                    Kevin D. Evans
                                                    *Admitted pro hac vice*
                                                    Nicholas W. Dowd
                                                    *Admitted pro hac vice*
                                                    ARMSTRONG TEASDALE LLP
                                                    4643 South Ulster Street, Suite 800
                                                    Denver, CO 80237
                                                    Telephone:  720.200.0676
                                                    Facsimile:  720.200.0679
                                                    Email:  kdevans@armstrongteasdale.com
                                                            ndowd@armstrongteasdale.com

                                                    and

                                                    Paul C. Watler
                                                    State Bar No. 00784334
                                                    Shannon Zmud Teicher
                                                    State Bar No. 24047169
                                                    JACKSON WALKER L.L.P.
                                                    2323 Ross Avenue, Suite 600
                                                    Dallas, Texas 75201
                                                    Telephone:  214.953.6000
                                                    Facsimile:  214.953.5822
                                                    Email:  pwatler@jw.com
                                                            steicher@jw.com

                                                    Attorneys for Defendants KROENKE SPORTS
                                                    & ENTERTAINMENT, LLC and
                                                    OUTDOOR CHANNEL HOLDINGS, INC.

**CERTIFICATE OF SERVICE**

This is to certify that on this 5th day of November, 2018, I caused the foregoing **BRIEF IN SUPPORT OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT** to be electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.

/s/*Kevin D. Evans*
Kevin D. Evans