**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS KROENKE SPORTS &**
**ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

| Exhibit No. | App. No. | Document Description |
|---|---|---|
| A | App. 001–App. 006 | Affidavit Of Kevin D. Evans In Support Of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.'s Motion For Summary Judgment |
| A-1 | App. 007–App. 030 | Copy of Plaintiff's Second Amended Complaint (ECF #63) |
| A-2 | App. 031–App. 035 | Copy of Exhibit A to Plaintiff's Second Amended Complaint (the "Term Sheet") |
| A-3 | App. 036–App. 045 | Excerpted Transcript of the August 30, 2018 Deposition of James Martin |
| A-4 | App. 046–App. 058 | Plaintiff's January 10, 2018 Supplemental Responses to Defendants' Requests For Admission |
| A-5 | App. 059–App. 074 | Excerpted Transcript of the July 17, 2018 Deposition of Jeff Holowaty |
| A-6 | App. 075–App. 095 | Copy of Defendants' January 24, 2018 Emergency Motion To Stay Proceedings And Set A Schedule For Expedited Limited Discovery (ECF #94) |

| Exhibit No. | App. No. | Document Description |
|---|---|---|
| A-7 | App. 096–App. 117 | Copy of Defendants' February 6, 2018 Motion To Compel Return Of Company Documents (ECF #102) |
| A-8 | App. 118–App. 137 | Copy of Defendants' September 28, 2018 Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process (ECF #232) |
| A-9 | App. 138–App. 145 | Excerpted Transcript of the June 20, 2018 Deposition of Thomas Allen |
| A-10 | App. 146–App. 158 | Excerpted Transcript of the August 22, 2018 Deposition of David Gluck |
| A-11 | App. 159–App. 181 | Excerpted Transcript of the June 13, 2018 Deposition of Thomas Hornish |
| A-12 | App. 182–App. 183 | Copy of the November 6, 2017 Clerk's Entry of Default entered against Pacific Northern Capital, LLC (ECF#84) |
| A-13 | App. 184–App. 197 | Excerpted Transcript of the July 11, 2018 Deposition of Tim McQuay |
| A-14 | App. 198–App. 212 | Excerpted copy of the November 15, 2012 Agreement and Plan of Merger between InterMedia Outdoor Holdings, Inc. and Outdoor Channel Holdings, Inc. (the "InterMedia Merger Agreement") |
| A-15 | App. 213–App. 220 | Excerpted copy of the February 12, 2013 Proxy Statement issued by Outdoor Channel Holdings, Inc. (the "February 12 Proxy Statement") |
| A-16 | App. 221–App. 228 | Excerpted Transcript of the May 16, 2018 Deposition of Nic Salomon (Vol. I) |
| A-17 | App. 229–App. 255 | Excerpted Transcript of the May 16, 2018 Deposition of Nic Salomon (Vol. II) |
| A-18 | App. 256–App. 261 | Copy of a January 16, 2013 email bearing Bates numbers KSE/OC:000169–173 marked as Exhibit 26 during Nic Salomon's May 16, 2018 deposition |
| A-19 | App. 262–App. 279 | Excerpted Transcript of the June 12, 2018 Deposition of Catherine Lee |

| Exhibit No. | App. No. | Document Description |
|---|---|---|
| A-20 | App. 280–App. 292 | Excerpted copy of the March 13, 2013 Agreement and Plan of Merger between Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc. |
| A-21 | App. 293–App. 333 | Copy of March 5, 2013 email and attachment bearing Bates numbers KSE/OC:036080–036119 marked as Exhibit 107 during the June 12, 2018 deposition of Catherine Lee |
| A-22 | App. 334–App. 400 | Copy of revised Asset Purchase Agreement marked as Exhibit 108 during the June 12, 2018 deposition of Catherine Lee |
| A-23 | App. 401–App. 403 | Copy of Exhibit L to Plaintiff's Second Amended Complaint (the "March 21 Letter") |
| A-24 | App. 404–App. 411 | Excerpted Transcript of the May 17, 2018 Deposition of Nic Salomon (Vol. III) |
| A-25 | App. 412–App. 421 | Excerpted Transcript of the June 7, 2018 Deposition of Roger Werner |
| A-26 | App. 422–App. 427 | Copy of the May 10, 2013 email and attachment bearing Bates numbers KSE/OC:000386–390 marked as Exhibit 84 during the June 7, 2018 deposition of Roger Werner |
| A-27 | App. 428–App. 452 | Copy of Defendants' September 15, 2017 Motion To Dismiss the Second Amended Complaint (ECF #74) |
| A-28 | App. 453–App. 482 | Copy of Plaintiff's October 6, 2017 Response in Opposition to Defendants' Motion To Dismiss (ECF #80) |
| A-29 | App. 483–App. 494 | Copy of Plaintiff's August 24, 2018 Second Amended Initial Disclosures |
| A-30 | App. 495–App. 502 | Copy of Plaintiff's August 24, 2018 Third Supplemental Answers to Defendants' First Set Of Interrogatories |
| A-31 | App. 503–App. 507 | Excerpted copy of the September 14, 2018 Expert Report prepared by Kevin Kreitzman |
| A-32 | App. 508–App. 513 | Excerpted Rough Transcript of the October 24, 2018 Deposition of Kevin Kreitzman |

Respectfully submitted,

Date:  November 5, 2018

By:   *s/Kevin D. Evans*
Kevin D. Evans
*Admitted pro hac vice*
Nicholas W. Dowd
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone:  720.200.0676
Facsimile:  720.200.0679
Email:  kdevans@armstrongteasdale.com
            ndowd@armstrongteasdale.com

and

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  214.953.6000
Facsimile:  214.953.5822
Email:  pwatler@jw.com
            steicher@jw.com

Attorneys for Defendants KROENKE SPORTS
& ENTERTAINMENT, LLC and
OUTDOOR CHANNEL HOLDINGS, INC.

<u>CERTIFICATE OF SERVICE</u>

      This is to certify that on this 5th day of November, 2018, I caused the foregoing **APPENDIX IN SUPPORT OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT** to be electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.

/s/*Kevin D. Evans*
Kevin D. Evans

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF KEVIN D. EVANS

| | |
|---|---|
| STATE OF COLORADO | § |
| | § |
| CITY AND COUNTY OF DENVER | § |

I, Kevin D. Evans, declare under penalty of perjury as follows:

1.     I am lead counsel of record for Defendants KROENKE SPORTS & ENTERTAINMENT,
LLC ("KSE") and OUTDOOR CHANNEL HOLDINGS, INC. ("Outdoor") (collectively,
"Defendants"). I submit this Affidavit in connection with Defendants' Motion For Summary
Judgment.

2.     The operative complaint in this matter is Plaintiff's Second Amended Complaint
("SAC"), ECF #63, a copy of which is attached hereto as Exhibit 1.

3.     Attached to the SAC as Exhibit A is a copy of a nonbinding "Term Sheet"
executed on February 27, 2013 by Outdoor, Plaintiff, and Plaintiff's partner, Pacific Northern
Capital LLC ("PNC") relating to a potential sale to Plaintiff and PNC of two Outdoor wholly-
owned subsidiaries, SkyCam LLC and CableCam LLC (together, the "Aerial Camera Business").
A copy of the Term Sheet is attached hereto as Exhibit 2.

4. On August 30, 2018, counsel for Plaintiff deposed James Martin, the Chief Executive Officer and President of KSE. A copy of the relevant portions of Mr. Martin's deposition transcript is attached hereto as Exhibit 3.

5. A copy of Plaintiff's January 10, 2018 Supplemental Responses to Defendants' Requests For Admission is attached hereto as Exhibit 4.

6. On July 17, 2018, counsel for Defendants deposed Jeff Holowaty of PNC. A copy of the relevant portions of Mr. Holowaty's deposition transcript is attached hereto as Exhibit 5.

7. On January 24, 2018, after learning that Plaintiff had misappropriated a substantial volume of documents and information from Defendants and the Aerial Camera Business prior to his termination, Defendants filed an emergency motion and for expedited limited discovery into Plaintiff's misconduct, ECF #94. A copy of that motion is attached hereto as Exhibit 6.

8. On February 6, 2018, Defendants filed a motion to compel Plaintiff to return the documents and information that he had taken from Defendants and the Aerial Camera Business, ECF #102. A copy of that motion is attached hereto as Exhibit 7.

9. On September 28, 2018, Defendants moved to dismiss Plaintiff's claims as a sanction for his misappropriation and misuse of documents belonging to Defendants and the Aerial Camera Business, ECF #232, a copy of which is attached hereto as Exhibit 8.

10. On June 20, 2018, counsel for Defendants deposed Thomas Allen, Outdoor's former Chief Financial Officer. A copy of the relevant portions of Mr. Allen's deposition transcript is attached hereto as Exhibit 9.

11.     On August 22, 2018, counsel for Plaintiff deposed David Gluck, an employee of KSE Media Ventures. A copy of the relevant portions of Mr. Gluck's deposition transcript is attached hereto as Exhibit 10.

12.     On June 13, 2018, counsel for Defendants deposed Thomas Hornish, the former Chief Executive Officer of Outdoor. A copy of the relevant portions of Mr. Hornish's deposition transcript is attached hereto as Exhibit 11.

13.     On November 6, 2017, an entry of default was entered against PNC, ECF #84, a copy of which is attached hereto as Exhibit 12.

14.     On July 11, 2018, counsel for Defendants deposed Tim McQuay of Noble Financial Capital Markets. A copy of the relevant portions of Mr. McQuay's deposition transcript is attached hereto as Exhibit 13.

15.     On November 15, 2012, Outdoor entered into a merger agreement with InterMedia Outdoor Holdings, Inc. (the "InterMedia Merger Agreement"), pursuant to which InterMedia would acquire all of Outdoor's outstanding stock. A copy of the relevant portions of the InterMedia Merger Agreement is attached hereto as Exhibit 14.

16.     Following the InterMedia Merger Agreement, on February 12, 2013, Outdoor issued a proxy statement to its shareholders regarding the proposed plan of merger with InterMedia (the "February 12 Proxy Statement"). A copy of the relevant portions of the February 12 Proxy Statement is attached hereto as Exhibit 15.

17.     On May 16, 2018, counsel for Defendants deposed Plaintiff. A copy of the relevant portions of Volume I of Plaintiff's deposition transcript is attached hereto as Exhibit 16.

18. Also on May 16, 2018, counsel for Defendants deposed Plaintiff before a different court reporter. A copy of the relevant portions of Volume II of Plaintiff's deposition transcript is attached hereto as Exhibit 17.

19. During Plaintiff's May 16, 2018 deposition, Defendants introduced as Exhibit 26 a copy of a January 16, 2013 email from Plaintiff to Tom Hornish attaching an initial draft of the Term Sheet. A copy of that document, bearing Bates numbers KSE/OC:000169–173, is attached hereto as Exhibit 18.

20. On June 12, 2018, counsel for Defendants deposed Catherine Lee, the former General Counsel of Outdoor. A copy of the relevant portions of Ms. Lee's deposition transcript is attached hereto as Exhibit 19.

21. On March 13, 2013, KSE, a KSE merger subsidiary, and Outdoor entered into an Agreement and Plan of Merger (the "KSE Merger Agreement"). A copy of the relevant portions of the KSE Merger Agreement, as filed by Outdoor on March 13, 2013 with its SEC Form 8-K filing, is attached hereto as Exhibit 20.

22. During Catherine Lee's June 12, 2018 deposition, Defendants introduced as Exhibit 107 a copy of a March 5, 2013 email from Tim McQuay to Plaintiff and PNC attaching a proposed Asset Purchase Agreement for the Aerial Camera Business. A copy of that document, bearing Bates numbers KSE/OC:036080–036119, is attached hereto as Exhibit 21.

23. Defendants also introduced during Ms. Lee's deposition Exhibit 108, a draft of the Asset Purchase Agreement heavily revised by Plaintiff and PNC. A copy of that document is attached hereto as Exhibit 22.

24. Attached to the SAC as Exhibit L is a copy of a March 21, 2013 letter signed by Outdoor and PNC purporting to amend the Term Sheet (the "March 21 Letter"). A copy of the March 21 Letter is attached hereto as Exhibit 23.

25. On May 17, 2018, counsel for Defendants completed the deposition of Plaintiff commenced on May 16. A copy of the relevant portions of Volume III of Plaintiff's deposition transcript is attached hereto as Exhibit 24.

26. On June 7, 2018, counsel for Defendants deposed Roger Werner, the former Chairman of the Outdoor Board of Directors. A copy of the relevant portions of Mr. Werner's deposition transcript is attached hereto as Exhibit 25.

27. During Mr. Werner's deposition Defendants introduced as Exhibit 84 an email sent by Plaintiff on May 10, 2013 attaching an article regarding the bidding war between KSE and InterMedia to acquire Outdoor. A copy of that document, bearing Bates numbers KSE/OC:000386–390, is attached hereto as Exhibit 26.

28. On September 15, 2017, Defendants filed their motion to dismiss the SAC, ECF #74, a copy of which is attached hereto as Exhibit 27.

29. On October 6, 2017, Plaintiff filed his response in opposition to Defendants' motion to dismiss, ECF #80, a copy of which is attached hereto as Exhibit 28.

30. A copy of Plaintiff's August 24, 2018 Second Amended Initial Disclosures is attached hereto as Exhibit 29.

31. A copy of Plaintiff's August 24, 2018 Third Supplemental Answers to Defendants' First Set Of Interrogatories is attached hereto as Exhibit 30.

32. A copy of the relevant portions of the September 14, 2018 Expert Report prepared by Kevin Kreitzman on behalf of Plaintiff is attached hereto as Exhibit 31.

33.     On October 24, 2018, counsel for Defendants deposed Mr. Kreitzman.  A copy of

the relevant portions of Mr. Krietzman's rough deposition transcript is attached hereto as Exhibit

32.

34.     I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

Dated: November 5, 2018

Kevin D. Evans

SUBSCRIBED and SWORN TO
before me this ⟳ day of
November, 2018

Notary Public

ALYSSA R GILLIAM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184004126
MY COMMISSION EXPIRES JANUARY 24, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 1

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NIC SALOMON,                     §
                                   §
       Plaintiff,          §
                                   §

v.                                 §       CIVIL ACTION NO.
                                 §       3:15-CV-00666-M
                                 §

KROENKE SPORTS & ENTERTAINMENT, §      JURY TRIAL DEMANDED
LLC, OUTDOOR CHANNEL HOLDINGS, §
INC., and PACIFIC NORTHERN CAPITAL §
LLC,                             §
                               §
       Defendants.      §

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff NIC SALOMON files this Second Amended Complaint ("Complaint") against

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE"), OUTDOOR CHANNEL HOLDINGS,

INC. ("Outdoor") and PACIFIC NORTHERN CAPITAL LLC ("PNC") (KSE, Outdoor and PNC shall

sometimes be collectively referred to as "Defendants") as follows:

## PARTIES

1.     Plaintiff Nic Salomon ("Plaintiff" or "Mr. Salomon"), is a citizen of the State of

Texas who resides in Dallas, Texas.

2.     Defendant KSE is a Delaware limited liability company, which maintains its

principal place of business in Denver, Colorado. KSE is an entertainment and management group

that owns and operates, among other assets, the Pepsi Center, the Paramount Theatre, Dick's

Sporting Goods Park, the Colorado Avalanche (NHL), Denver Nuggets (NBA), Colorado

Mammoth (NLL), and Colorado Rapids (MLS). KSE's sole member and owner is KMC Center,

LLC, a Missouri limited liability company, whose sole member and owner is the KMS Revocable

EXHIBIT 8 App. 008

Trust. The sole grantor, trustee and beneficiary of the KMS Revocable Trust is E. Stanley Kroenke ("Kroenke"), a citizen of the State of Missouri. Accordingly, KSE is a citizen of the state of Missouri for purposes of determining diversity of citizenship jurisdiction of these proceedings. Kroenke owns the NFL's St. Louis Rams and owns a majority stake in the English soccer club Arsenal. KSE has been served and has appeared in this case.

3.　　Defendant Outdoor is a Delaware corporation that previously maintained its principal place of business in Temecula, California and, upon information and belief, currently maintains its principal place of business in the State of Colorado. Outdoor is an entertainment and media company that owned the Outdoor television network which is devoted primarily to traditional outdoor activities such as hunting, fishing, and shooting sports and other outdoor-related lifestyle programming, together with the aerial camera business. Outdoor has been served and has appeared in this case.

4.　　Defendant PNC is a California limited liability company that maintains its principal place of business in Santa Ana, California. Upon information and belief, PNC's members either are citizens of states other than the State of Texas or are citizens or subjects of a foreign state. PNC is a private equity investment firm. PNC has been served and appeared in this case.

## JURISDICTION AND VENUE

5.　　Original jurisdiction exists under 28 U.S.C. § 1332. The dispute is between citizens of different states or between citizens of a state and a foreign state and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

6.　　This Court has personal jurisdiction over each of the Defendants because they either have engaged in business in this State or they have committed tortious and wrongful acts in this State. Personal jurisdiction also exists because of Defendants' continuous and systematic contacts

with the State of Texas.  None of the defendants filed a timely Rule 12(b)(2) motion challenging this Court's personal jurisdiction over them.

7.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Salomon's claims occurred in this judicial district, and/or a substantial part of property that is the subject of this action is situated in this judicial district.  None of the defendants filed a timely Rule 12(b)(3) motion challenging the venue of this action before this Court.

## NATURE OF THE CASE

8.     Outdoor agreed in principle to sell two of its related businesses to Mr. Salomon and his investor group, PNC.  As part of that agreement, Outdoor contracted to deal exclusively with Mr. Salomon and PNC, not to entertain any competing offers and not to disclose to any third party (e.g., KSE) the exclusive negotiations.  Knowing of the exclusivity agreement, KSE, nevertheless, brushed aside Outdoor's contractual obligations and PNC's fiduciary duties to Mr. Salomon. Desiring to prevent Outdoor's sale of the two related businesses from occurring, KSE induced Outdoor and PNC contractually to position KSE to veto the sale to Mr. Salomon and PNC.  KSE then acquired the two businesses for itself.

9.     KSE obstructed and interfered with Mr. Salomon's efforts to purchase from Outdoor the aerial camera business of two companies (the "Aerial Camera Business") – SkyCam, LLC ("SkyCam") and CableCam, LLC ("CableCam").  SkyCam and CableCam are wholly owned subsidiaries of Outdoor.

10.    Mr. Salomon served as manager of finances and operations of the Aerial Camera Business from July 2006 until January 2009 and President of SkyCam and CableCam from 2009 until May 2014. During that time, Mr. Salomon and his management team developed the Aerial

Camera Business into a valuable, growing venture. In early 2012, after Outdoor asked Mr. Salomon to find potential buyers for the Aerial Camera Business, Mr. Salomon and his investor group PNC submitted an offer on February 26, 2013, to buy the Aerial Camera Business, which Outdoor accepted and was signed by all the parties on February 27, 2013.

11.     Upon acceptance by Outdoor of Mr. Salomon's offer, Outdoor agreed to deal exclusively with Mr. Salomon and PNC regarding the sale of the Aerial Camera Business. Specifically, Outdoor agreed to not directly or indirectly: (1) solicit, facilitate, or accept any offers to acquire a debt or equity interest in the Aerial Camera Business or any material part of its assets; (2) negotiate or correspond with parties other than PNC and Mr. Salomon regarding offers to acquire any debt or equity interest in or any part of the business of the Aerial Camera Business; or (3) sell or agree to sell any equity or debt interest in any part of the Aerial Camera Business to parties other than PNC and Mr. Salomon. (*See* Ex. A at 2).

12.     The day after Mr. Salomon's offer was signed Outdoor and KSE began discussions regarding KSE's acquisition of all of Outdoor's assets, including the Aerial Camera Business to which Mr. Salomon devoted nearly seven years of his life. At the same time, KSE and Outdoor assisted and encouraged PNC to violate its fiduciary duties to Mr. Salomon by entering into secret, side agreements to give KSE (not Outdoor) the authority to repudiate the exclusivity relationship and sale to Mr. Salomon and PNC and then to purchase the entirety of Outdoor, including the Aerial Camera Business, for KSE.

13.     Defendants succeeded in thwarting Mr. Salomon's efforts to buy the Aerial Camera Business, resulting in significant financial injury to Mr. Salomon which prevented Mr. Salomon from acquiring the valuable, growing Aerial Camera Business that was built and developed under his direction.

# FACTUAL BACKGROUND

### The Aerial Camera Businesses – SkyCam and CableCam

14.     Starting in 2006, Mr. Salomon managed the finances and operations of the Aerial Camera Business, and served formally as the President of the Aerial Camera Business starting in 2009.  SkyCam and CableCam currently operate from shared facilities in Fort Worth, Texas. Mr. Salomon worked to consolidate the Aerial Camera Business and to develop or acquire the patents necessary to do so.  The Aerial Camera Business principally provides suspended aerial camera services to media networks for the production of sporting and entertainment events.  SkyCam and CableCam design, manufacture, and operate movable aerial platforms, including the research and development of new technology related to these platforms.

15.     With their technology and unique services, SkyCam and CableCam play a significant role in changing the way sports and other entertainment programming are broadcast to fans both domestically and internationally.  During an entertainment or sporting event, the camera platforms are suspended above the playing or viewing field and are remotely controlled by specially-trained personnel who have the ability to move the cameras in up to three dimensions. Under the direction of Mr. Salomon and his management team, SkyCam and CableCam's financial success made them the fastest-growing business segment of Outdoor.

### Outdoor Asks Mr. Salomon to Present an Offer to Buy SkyCam and CableCam

16.     In or around March 2012, Tom Hornish, the then Chief Executive Officer of Outdoor, met with and advised Mr. Salomon that SkyCam and CableCam were viewed as Outdoor's non-core businesses, and would be spun off.  Hornish encouraged Mr. Salomon to assemble an investment group to offer to buy SkyCam and CableCam.

17.     After being encouraged by Outdoor, Mr. Salomon searched for capital to support a potential management buyout or related transaction to purchase the Aerial Camera Business.  Mr. Salomon contacted PNC about providing capital or investing in the purchase of the Aerial Camera Business.

18.     In April 2012, PNC and Mr. Salomon, acting individually on behalf of the divisional management team of SkyCam and CableCam, executed a Non-Disclosure Agreement to permit PNC to evaluate purchasing the Aerial Camera Business from Outdoor, while simultaneously protecting the Aerial Camera Business's confidential information that PNC received and reviewed in the process.  In the spring and early summer of 2012, PNC evaluated the purchase of the Aerial Camera Business.

19.     In June 2012, Outdoor retained a third-party capital markets company Noble Financial Capital Markets ("Noble Capital") to explore strategic alternatives for the Aerial Camera Business, including Outdoors' intended sale of that "non-core business."

***Mr. Salomon Introduces PNC to the SkyCam and CableCam Sale Process***

20.     In or around September 2012, Outdoor's CEO Hornish authorized Mr. Salomon to introduce PNC to the sale process.  After receiving Hornish and Noble's permission to introduce PNC as a potential investor group, *and at the request of Noble,* Mr. Salomon continued to conduct management presentations and interact with all groups that showed interest as potential purchasers of the Aerial Camera Business.

21.     In or around January 2013, Mr. Salomon conferred with Hornish and Cathy Lee, the then General Counsel of Outdoor, and advised them of his intent to present a bid with PNC to buy the Aerial Camera Business.  Mr. Salomon also notified Noble Capital.  Mr. Salomon's intent to present an offer with PNC to buy the Aerial Camera Business was again discussed in later

communications that included Tom Allen, the Chief Financial Officer of Outdoor, and David Bolls, Deputy General Counsel of Outdoor.

***Mr. Salomon and PNC Sign Term Sheet with Outdoor to Buy the Aerial Camera Business***

22.     On February 27, 2013, Mr. Salomon, PNC, and Outdoor executed a Term Sheet agreeing for Salomon and PNC to purchase the Aerial Camera Business from Outdoor. A true and correct copy of the Term Sheet is attached as Exhibit "A." Tom Hornish signed the Term Sheet as CEO of Outdoor. Mr. Salomon and Kelly Holowaty, as Managing Director of PNC, signed the Term Sheet "[f]or the Purchaser."   The Term Sheet defined the "Purchaser" as "[a]n Acquisition entity . . . to be formed by PNC in conjunction with [Mr. Salomon]." Salomon and PNC were the intended owners of the Purchaser. As the Term Sheet acknowledges, the Purchaser had not been formed as of February 27, 2013.

23.     The purchase price for the Aerial Camera Business assets is identified in the Term Sheet as a total amount of up to $4.05 million, which included $3.65 million in cash at closing and some additional payments for ongoing litigation and royalties as described in the Term Sheet.  The Term Sheet states that the transaction would be structured as an asset purchase agreement that would include the operating assets of the Aerial Camera Business and exclude only certain assets identified in the Term Sheet. The parties also agreed to use their best efforts to close the transaction no later than April 15, 2013, the last day of the "Exclusivity Period" discussed below.

24.     Furthermore, the Term Sheet expressly provides that it "may not be amended or modified except by a writing signed by each of the parties hereto."

***Outdoor Agrees to a Binding Exclusivity Period with Mr. Salomon and PNC***

25.     The Term Sheet also contains an exclusivity provision benefiting Mr. Salomon and PNC, which precluded Outdoor, SkyCam, and CableCam from negotiating or agreeing to sell any

equity interest in the Aerial Camera Business or any material part of the assets of the Aerial Camera Business to any party other than Mr. Salomon and PNC. Under the exclusivity provision, and expressly "[i]n consideration of Purchaser continuing to spend time and incur professional fees and other expenses related to the acquisition" (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. A), each of Outdoor, SkyCam, and CableCam agreed that until April 15, 2013, they and their "directors, officers, affiliates, and representatives will not, directly or indirectly":–

    (i)    solicit, facilitate, encourage, or accept any offers to acquire any equity or debt interest in SkyCam or CableCam or any material part of the assets of the business of SkyCam or CableCam;

    (ii)    negotiate or correspond with third parties regarding existing or unsolicited offers to acquire any equity or debt interest or any part of the business of SkyCam or CableCam, other than to advise such third parties that exclusive discussions are being pursued with another party; and

    (iii)    sell or agree to sell any equity or debt interest in any part of SkyCam or CableCam to any part other than Mr. Salomon and PNC.

*Id.*

26.    Under the Term Sheet's exclusivity provision, Outdoor further agreed to "cease any negotiations, discussions, or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of any entity or debt interest" in SkyCam or CableCam by any party other than Mr. Salomon and PNC. (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. B). Outdoor agreed that it would advise any interested parties that it was pursuing exclusive discussions with another party (but in no event would reveal the Purchaser's identity). *Id.* The exclusivity provision contained no exceptions, even though Mr. Salomon later discovered that Outdoor was then entertaining merger offers from KSE.

27.    As an exception to language designating the Terms Sheet as non-binding, the exclusivity provision is expressly identified as "a binding legal agreement upon the parties."

(Term Sheet, Ex. A, at p. 4, "Non-Binding"). Under the exclusivity provision, Outdoor agreed that Salomon is entitled to all legal and equitable relief for any breach of the provisions of the agreement, including injunction (without the necessity of posting bond) and specific performance, as well as both actual and consequential damages. (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. D).

### *Defendants Outdoor and KSE Facilitate Sale of Entire Business of Outdoor to KSE Without Excluding the Aerial Camera Business From the Sale*

28.    In contravention of the exclusivity obligations in the Term Sheet, Outdoor participated during the Exclusivity Period in negotiations with other parties to sell the entire business of Outdoor, including SkyCam and CableCam.

29.    On November 15, 2012, and well after Outdoor commenced efforts to sell the Aerial Camera Business (see ¶¶'s 17 – 21) Outdoor signed a merger agreement with Intermedia Outdoors Holdings, LLC ("Intermedia") for Intermedia to acquire the stock of Outdoor at $8.00 per share. Outdoor's February 12, 2103, proxy statement reflected Intermedia was not merging with Outdoor to acquire the Aerial Camera Business. Rather, the proxy statement expressly recognized that the Aerial Camera Business would likely be sold as its financial projections "exclude[d] the projected financial results of [Outdoor's Aerial Camera Business . . . given [Outdoor's] announcement in June 2012 that it was exploring strategic alternatives for the business, which process [was] still ongoing." (See excerpts of See Outdoor Channel Holdings, Inc. Schedule 14A, February 12, 2013, attached as Exhibit "B") Consequently, Intermedia expected and acknowledged that the Aerial Camera Business would be sold to a third party, either before or after the merger.

30.    On February 27, 2013, the same day that Salomon and PNC executed the Term Sheet, KSE made an unsolicited offer to purchase the stock of Outdoor at $8.75 per share. On

March 1, 2013, KSE publicly announced its offer to purchase the stock of Outdoor.  (See Outdoor Channel Holdings, Inc. Form 8K (with exhibit), March 4, 2013, attached as Exhibit "C") This was the first time Mr. Salomon was made aware of KSE's offer to acquire Outdoor Channel.

31.     Unlike Intermedia, KSE intended to acquire the Aerial Camera Business with Outdoor. On March 4, 2013 (during the exclusivity period), Outdoor's General Counsel called Mr. Salomon to inform him that Outdoor's position was to disregard the Term Sheet because the interest of Outdoor to accept an offer to purchase all the stock of the entire company took precedence over the sale of the Aerial Camera Business.  On March 4, 2013, Outdoor publicly acknowledged its receipt of the KSE offer and, over Intermedia's opposition, indicated that it expected the KSE proposal would be considered superior to the Intermedia proposal.

32.     Notwithstanding KSE's proposal and its General Counsel's representations to Mr. Salomon, Outdoor continued to negotiate with Mr. Salomon and PNC.  Both before and after the statements by Outdoor's General Counsel, and as the stated consideration for the exclusivity provisions to which Mr. Salomon agreed (Term Sheet, Ex. A, at p. 3, "Exclusivity", para. A), Mr. Salomon "continu[ed] to spend time and incur professional fees and other expenses related to the acquisition," as discussed in more detail below, to finalize the purchase of SkyCam and CableCam.

33.     On March 1, after execution of the Term Sheet and also after KSE's announced bid for Outdoor, Mr. Salomon provided PNC with a list of items required for the due diligence. (See Exhibit "D").  Two days later, on March 3, and a day before Mr. Salomon's conversation with Outdoor's General Counsel, Mr. Salomon expended time and effort to provide PNC with a transaction plan that addressed the formation of the Purchaser as contemplated by the Term Sheet. (See Exhibit "E").  After Mr. Salomon's conversation with Outdoor's General Counsel in early March, Outdoor continued to proceed under the Term Sheet and provided Mr. Salomon and PNC

with an initial draft of the asset purchase agreement ("APA") contemplated by the Term Sheet, as well as its response to the due-diligence requests. (See Exhibit "F").

34.     On March 10, Mr. Salomon provided PNC with a proposed equity structure for the Purchaser. (See Exhibit "G").  Mr. Salomon and PNC's representative traveled to New York City to meet with a potential additional investor on March 12. The next day, Mr. Salomon spent time and effort to complete a draft of revisions to the APA and sent it to PNC for review on March 13. (See Exhibit "H").

35.     Also on March 13, (during the Term Sheet's Exclusivity Period, which prohibited "negotiations, discussions or correspondence" related to acquisition), Outdoor entered into a merger agreement with KSE, providing a definitive and binding agreement for the sale of Outdoor's business, including the Aerial Camera Business. Outdoor also provided Intermedia with an opportunity to counter KSE's offer. (See Outdoor Channel Holdings, Inc. Form 8K (with exhibit 99.2), March 13, 2013, attached as Exhibit "I").

36.     On March 14, Mr. Salomon began communicating with PNC's attorneys at Royer Cooper Cohen Braunfeld concerning the revisions to the APA. (See Exhibit "H").  Salomon also consulted with his own attorneys with regard to the APA and incurred legal fees in doing so.

37.      On March 20, Mr. Salomon, PNC, and Noble Financial participated in a conference call to discuss the draft APA prepared by Outdoor and revised by Salomon and PNC. (See Exhibit "J")  Following their conversation, PNC and Noble Financial reportedly had a separate call where the.y coordinated a follow up call between Hornish and PNC to occur on March 21. While Mr. Salomon did not participate in that call, PNC later informed him that PNC and Outdoor had "worked out most of the issues" on the APA and had agreed to extend the exclusivity period by

thirty days to give "more time to focus on the integration." (See Exhibit "K"). Mr. Salomon was not informed about any agreement to give control of the term sheet to KSE.

38.     Thereafter, on March 21, 2013 (during the exclusivity period which directed Outdoor Channel and its officers not to negotiate or correspond with the third parties to acquire any part of SkyCam or CableCam) Outdoor, acting in concert with PNC and without Mr. Salomon's consent or signature, signed an agreement purportedly amending the Term Sheet ("Amendment") to effectively eliminate the exclusive dealing provision to the material detriment of Mr. Salomon and to give the purported new purchaser KSE control of the Term Sheet. A true and correct copy of the Amendment is attached as Exhibit "L." In pertinent part, the Amendment provides:

> E.     The parties agree that if, at any point during the exclusivity period, [KSE] concludes that it will not consent to the Proposed Transaction, PNC shall release [Outdoor] from its exclusivity obligations and PNC shall forever waive its rights, if any, under the Term Sheet to seek equitable relief or any other remedies available at law or equity.

Kelly Holowaty signed the Amendment on behalf of PNC, and Hornish signed the Amendment on Outdoor's behalf. Both PNC and Outdoor executed the Amendment during the exclusivity period. By entering into the Amendment with PNC (and not the Purchaser), Outdoor recognized PNC's rights as one of the parties to the Term Sheet's Exclusivity Provision but ignored Salomon's rights.

39.     On March 25, just four days after the Amendment, during the original exclusivity period and before the closing of the merger between KSE and Outdoor, Hornish directed Mr. Salomon to contact David Gluck, KSE's current executive vice-president for new business development. Gluck arranged to visit SkyCam and CableCam's shared facility in Fort Worth to learn more about the Aerial Camera Business. During his conversation with Mr. Salomon, Gluck disclosed that, despite Outdoor's exclusivity obligations, and prohibition against disclosing the

Purchaser's identity, he was aware of the Term Sheet but that KSE was allegedly undecided on plans concerning the proposed sale of the Aerial Camera Business to Mr. Salomon and PNC. At the time, neither Hornish nor Gluck disclosed to Mr. Salomon that the Amendment had been executed and that KSE, prior to its merger with Outdoor, had been given veto rights regarding the sale of the Aerial Camera Business.

40.     On March 28, Mr. Salomon emailed PNC, stating that he was continuing to work on an operating model for the Purchaser and requested that PNC provide a proposed capitalization table. PNC replied with limited information.  (See Exhibit "M").

41.     Mr. Salomon first learned of the Amendment on April 9, 2013.  When Mr. Salomon objected to his exclusion, Hornish asked him to ratify the Amendment by executing a "Side Letter Agreement and Amendment." Mr. Salomon refused.  (See Exhibit "N").

42.     The amendment granting veto rights to KSE and the conduct in disclosing information regarding the termination contemplated by the Term Sheet were undertaken at times that KSE did not have superior rights with regard to the Aerial Camera Business, as demonstrated by subsequent events described below.

43.     On May 3, 2013, Intermedia countered KSE's offer and proposed to purchase all of the shares of Outdoor at $9.75 per share. Three days later, Outdoor's board announced that Intermedia's offer was superior to KSE's and notified KSE of its intent to terminate the merger agreement, subject to KSE's opportunity to counter. (See Outdoor Channel Holdings, Inc. Schedule 14A, May 6, 2013, attached as Exhibit "O")

44.     On May 7, Outdoor adjourned the meeting of the shareholders that had been called to approve the KSE merger agreement. (See Outdoor Channel Holdings, Inc. Schedule 14A, May 7, 2013, attached as Exhibit "P").

45.     As of May 7, Outdoor expected to terminate the KSE merger agreement and to merge with Intermedia, subject to KSE's right to counter, yet, the Amendment still granted to KSE the ability to terminate Outdoor's planned sale of the Aerial Camera Business.

46.     KSE submitted a counteroffer and increased the purchase price for Outdoor's shares to $10.25 per share. Outdoor's board announced that it considered KSE's latest proposal to be superior, amended the KSE merger agreement, increased the breakup fee, added restrictions to consider further "superior proposals" and recommended that Outdoor's shareholders vote to approve it. (See Outdoor Channel Holdings, Inc. Form 8K, May 8, 2013, attached as Exhibit "Q").

47.     At a special meeting of Outdoor's stockholders on May 16, 2013, (after the conclusion of the first exclusivity extension period, but prior to the termination of the second extension period) Outdoor approved the KSE merger agreement for KSE to acquire all of the stock of Outdoor and for Outdoor to become a wholly-owned subsidiary of KSE.

48.     Prior to the end of the original exclusivity provision, KSE prevented Outdoor from honoring its obligation to use its best efforts to close the transaction contemplated by the Term Sheet. Although Mr. Salomon took steps consistent with his obligation under the Term Sheet to "spend time and incur professional fees and other expenses" to complete a transaction (in fact, Mr. Salomon incurred thousands of dollars in legal fees alone), Outdoor breached the Term Sheet's exclusivity provisions and allowed KSE to refuse to consummate the sale of the Aerial Camera Business as outlined in the Term Sheet. As a result, the Purchaser was never formed.

## CAUSES OF ACTION AGAINST OUTDOOR CHANNEL
## COUNT 1:  BREACH OF CONTRACT

49.　　Pleading affirmatively and alternatively, Plaintiff alleges breach of contract against Outdoor and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

50.　　The Exclusivity Provision of the Term Sheet is a valid and enforceable contract between Outdoor, PNC, and Plaintiff. PNC and Plaintiff were promoters of the Purchaser and signed the Term Sheet on its behalf. The Purchaser, however, had not been formed when the Term Sheet was signed and was never formed. Accordingly, PNC and Plaintiff are individually parties and entitled to enforce the Term Sheet's Exclusivity Provision.

51.　　Outdoor breached the Term Sheet's Exclusivity Provision by, among other things, (1) negotiating, discussing, and corresponding with KSE regarding the sale of the Aerial Camera Business after February 27, 2013, (2) agreeing to sell SkyCam and CableCam, and the Aerial Camera Business, to KSE during the time period in which Outdoor agreed to exclusively deal with Mr. Salomon and PNC, (3) failing to cease negotiations and discussions with KSE regarding the potential acquisition of an equity interest in SkyCam, CableCam and the Aerial Camera Business, and (4) disclosing to KSE the existence of PNC and Mr. Salomon, and the details of the term sheet, and (5) granting KSE the right to veto the sale of the Aerial Camera Business to PNC and Plaintiff.

52.　　As a result of Outdoor's breach of its contractual duties, Mr. Salomon incurred damages for which he now sues.  Mr. Salomon requests that Outdoor be ordered to pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill.

## CAUSES OF ACTION AGAINST KSE
## COUNT 2:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

53.     Pleading affirmatively and alternatively, Plaintiff alleges against KSE a tortious interference with Plaintiff's existing contract and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

54.     KSE had actual knowledge of the Term Sheet and Mr. Salomon's personal interest in it. KSE had knowledge of facts and circumstances that would lead a reasonable person to believe that there was a contract regarding the sale by Outdoor of SkyCam and CableCam, its wholly owned subsidiaries, and the Aerial Camera Business in which Mr. Salomon had an interest.

55.     KSE willfully and intentionally interfered with the Term Sheet's Exclusivity Provision.  KSE induced or caused Outdoor to breach its contractual obligations to negotiate exclusively with PNC and Plaintiff. KSE induced Outdoor to discuss and negotiate the sale of the Aerial Camera Business and grant KSE the right to disapprove of the sale to Plaintiff and PNC, by offering Outdoor, upon information and belief, superior terms or other incentives.

56.     KSE's interference proximately caused injuries to Mr. Salomon, for which he now sues and seeks from KSE all actual, consequential and economic damages, including but not limited to lost profits and goodwill.  Mr. Salomon also seeks exemplary damages.

## COUNT 3:  TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

57.     Pleading affirmatively and alternatively, Plaintiff alleges against KSE tortious interference with prospective relations and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

58.     Mr. Salomon had a business relationship with PNC and Outdoor regarding the sale of the Aerial Camera Business which, to the extent not addressed by binding provisions of the Term Sheet, had not yet been reduced to a formal contract.  To the extent not addressed by binding

provisions of the Term Sheet, there was a reasonable probability that the business relationship among Mr. Salomon, PNC, and Outdoor would be reduced to a formal contract or business relationship. As the Amendment demonstrates, KSE had actual knowledge of Mr. Salomon's business relationship with PNC and Outdoor regarding the sale and purchase of the Aerial Camera Business, and KSE either desired to bring about the interference with that business relationship or knew that interference was certain or substantially certain to result from its conduct. KSE induced Outdoor to breach its contractual obligation to negotiate exclusively with Mr. Salomon and PNC and then caused the execution of the Amendment, which purported to grant KSE the right to disavow the sale of the Aerial Camera Business. KSE's conduct—tortiously interfering with the Exclusivity Provision and inducing PNC to breach its fiduciary duties to Mr. Salomon—was independently tortious.

59.     KSE's actions proximately caused injury to Mr. Salomon, for which he now sues. Mr. Salomon requests that KSE be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from KSE's wrongful conduct. Mr. Salomon also seeks exemplary damages.

### COUNT 4: INDUCEMENT OF AND ASSISTANCE IN (AIDING AND ABETTING) BREACH OF FIDUCIARY DUTIES

60.     Pleading affirmatively and alternatively, Plaintiff alleges inducement of and assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

61.     Outdoor and KSE were aware: that PNC and Mr. Salomon had a venture to acquire the Aerial Camera Business from Outdoor; and that, as venture partners, each owed fiduciary duties to the other, including the duties of scrupulous honesty and full disclosure. The joint venture between PNC and Mr. Salomon was apparent from the face of the Term Sheet, which reflected a

joint bid to purchase the Aerial Camera Business and stated that the Purchaser was to be formed by both Mr. Salomon and PNC.

62. KSE and Outdoor knowingly assisted, encouraged, and participated in PNC's breach of its fiduciary duties owed to Mr. Salomon in connection with their purchase of the Aerial Camera Business by inducing PNC to sign the Amendment without Mr. Salomon's knowledge or consent. The Amendment purported to grant to the prospective purchaser KSE the right to reject the sale of the Aerial Camera Business to Mr. Salomon and PNC. Such assistance and encouragement was a substantial factor in causing PNC's breach of fiduciary duties to Mr. Salomon. As a result of Outdoor's and KSE's knowing assistance, encouragement, participation and inducement of PNC's breach of fiduciary duties to Mr. Salomon, Mr. Salomon sustained damages for which Defendants KSE and Outdoor are jointly and severally liable.

63. These breaches of fiduciary duties to Mr. Salomon have proximately caused both damages to Mr. Salomon and benefits to the Defendants, for which he now sues. Mr. Salomon requests that the Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from their wrongful conduct. Mr. Salomon also seeks exemplary damages.

## CAUSES OF ACTION AGAINST PNC
## COUNT 5:  BREACH OF FIDUCIARY DUTY

64. Pleading affirmatively and alternatively, Plaintiff alleges breach of fiduciary duty against PNC and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

65. PNC and Mr. Salomon entered into a joint venture and/or partnership in connection with the acquisition of the Aerial Camera Business from Outdoor. PNC and Mr. Salomon agreed

to jointly bid to purchase the Aerial Camera Business and it was expected that each would own an interest in the Purchaser.

66.     As Mr. Salomon's joint venture and/or partners, PNC owed fiduciary duties to Mr. Salomon, including but not limited to, the duty of loyalty and utmost good faith, fairness, and honesty; the duty of candor and full disclosure; the duty to refrain from self-dealing and competition with the partnership/joint venture; and the duty of fair, honest dealing.  PNC breached those fiduciary duties by, among other reasons, negotiating and entering into the Amendment without Mr. Salomon's knowledge or consent that purported to allow the prospective purchaser KSE to eliminate the Exclusivity Provision of the Term Sheet.

67.     These breaches of fiduciary duties to Mr. Salomon have proximately caused damages to Mr. Salomon and perhaps benefits to PNC, for which he now sues.  Mr. Salomon requests that PNC be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from PNC's wrongful conduct.  Mr. Salomon also seeks exemplary damages.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS
## COUNT 6:  UNJUST ENRICHMENT

68.     Pleading affirmatively and alternatively, Plaintiff alleges unjust enrichment against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

69.     Defendants have unjustly enriched themselves, to Mr. Salomon's detriment, by the acts, omissions, and torts described in this Complaint.

70.     Mr. Salomon requests an accounting and that Defendants be ordered to disgorge all profits and pay all actual, consequential and economic damages, including but not limited to lost profits and goodwill, resulting from Defendants' wrongful conduct.

## COUNT 7:  CIVIL CONSPIRACY

71.     Pleading affirmatively and alternatively, Plaintiff alleges a civil conspiracy against all Defendants and, to the extent not inconsistent, incorporates all allegations and claims in this Complaint by reference.

72.     To the extent they were not acting as principal and agent, Defendants conspired individually and/or collectively to accomplish unlawful purposes, including but not limited to the acts, omissions, and torts described in this Complaint, and to accomplish lawful purposes by unlawful means, including but not limited to the acts, omissions, and torts described in this Complaint.

73.     The foregoing had a meeting of the minds on the object or course of action, and at least one member of the conspiracy committed at least one unlawful, overt act to further the object or course of action.

74.     Mr. Salomon suffered injury as a proximate result of these wrongful acts.

75.     As such, Mr. Salomon requests that Defendants be held jointly and severally liable and be ordered to disgorge all profits and pay all actual, consequential and economic damages, resulting from their wrongful conduct, including but not limited to lost profits and goodwill. Because their actions were intentional, malicious, and grossly negligent, an award of exemplary damages is appropriate.

## CONDITIONS PRECEDENT

76.     To the extent that there are any conditions precedent to be satisfied, Plaintiff has satisfied or will satisfy such conditions prior to trial.

## ATTORNEYS' FEES

77.     Mr. Salomon requests that this Court award his costs and reasonable attorneys' fees pursuant to Section 38.001 et. seq. of the Texas Civil Practice & Remedies Code.

## EXEMPLARY DAMAGES

78.     Defendants acted with fraud, malice, and/or gross negligence toward Mr. Salomon. Defendants thus are liable for exemplary damages as authorized by Chapter 41 of the Texas Civil Practice & Remedies Code.

## JURY DEMAND

79.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Salomon demands a trial by jury on all applicable issues.

## PRAYER FOR RELIEF

Mr. Salomon respectfully requests that the Defendants be cited to appear and answer herein, and that Mr. Salomon have judgment against the Defendants for the following relief:

a.      compensatory, consequential, and incidental damages resulting from Defendants' tortious conduct, including but not limited to lost profits and goodwill;

b.      compensatory, consequential, and incidental damages resulting from Outdoor's breach of its contractual duties;

c.      restitution of Defendants' wrongfully-obtained gains;

d.      a constructive trust of proceeds that Defendants directly or indirectly obtained from their wrongful conduct;

e.      an accounting;

f.      prejudgment and post-judgment interest;

g.      attorneys' fees through trial and any appeal of this matter;

h.      costs;

i.      punitive and exemplary damages;

j.      general relief; and

k.      such other and further relief, both at law and in equity, to which Mr. Salomon is justly entitled.

Dated: September 9, 2016.

GRAY REED & McGRAW, P.C.

By: _/s/ Cleveland G. Clinton_

      CLEVELAND G. CLINTON
      State Bar No. 04399900
      WILLIAM B. CHANEY
      State Bar No. 04108500
      JIM MOSELEY
      State Bar No. 14569100
      WILLIAM N. DRABBLE
      State Bar No. 24074154

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: 214-954-4135
Facsimile: 214-953-1332
      cclinton@grayreed.com
      wchaney@grayreed.com
      jmoseley@grayreed.com
      wdrabble@grayreed.com

ATTORNEYS FOR PLAINTIFF NIC SALOMON

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day of ninth day of September, 2016, I electronically filed Plaintiff's Second Amended Complaint using the Court's CM/ECF Filing System. The Clerk of the Court will send notification of the filing to counsel of record, which constitutes service under Local Rule 5.1(d).

*/s/ Cleveland G. Clinton* _____

CLEVELAND G. CLINTON

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NIC SALOMON,** | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §     **CIVIL ACTION NO.** |
| | §     **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § |
| | § |
| Defendants. | § |

# EXHIBIT 2

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**



PRIVATE AND CONFIDENTIAL

February 26, 2013

Mr. Tim McQuay
Managing Director
Noble Financial Capital Markets
355 South Grand Avenue
Suite 1750
Los Angeles, CA 90071

Dear Tim:

Nic Salomon and Pacific Northern Capital (collectively "PNC") are pleased to have the opportunity to present this revised Term Sheet ("Term Sheet") in acquiring the ownership interests of Outdoor Channel Holdings, Inc.'s aerial cameras businesses SkyCam LLC and CableCam LLC (the "Company"). Based on our general knowledge of the business, the information provided to us, and the subsequent conversations we have had with you and management, we are impressed with the performance of the business over the last few years, the strength of the management team, and the potential opportunities to expand the business going forward. We are providing this Term Sheet to you to evidence the intention of PNC to proceed with negotiations designed to complete a purchase of the Company substantially in the manner outlined herein.

PNC is fully prepared to provide the resources, both financially and professionally, to pursue new growth opportunities with the Company, both through acquisitions and internal initiatives. PNC views the Company's existing management team as an instrumental asset in implementing the growth plan and ensuring the continued level of operating expertise, innovation, and professionalism.

### Summary of Proposed Terms

| | |
|---|---|
| **Company:** | SkyCam LLC and CableCam LLC ("Skycam and Cablecam" or collectively, the "Company") |
| **Purchaser:** | An Acquisition entity (the "Purchaser") to be formed by PNC in conjunction with Nic Salomon, current President of Skycam and Cablecam |
| **Purchase Price:** | Purchaser is prepared to acquire substantially all of the assets of Skycam and Cablecam (the "Transaction") from Outdoor Channel Holdings, Inc. ("Outdoor Channel") for a total purchase price ("Purchase Price") of up to $4.05MM. The Purchase Price will be comprised of (i) $3.65MM in cash at close; (ii) the Litigation payment as described below; and (iii) the Royalty as described below. |
| | This Purchase Price is based on the Company having achieved an estimated 2012 Adjusted Free Cash Flow of at least $0.7MM (calculated as 2012 Adjusted EBITDA$C of approximately $1.3MM, less projected annual Maintenance Capex of $0.6MM), prior to taking into account increases in SG&A for standalone finance, accounting and human resource related costs. The Purchase Price contemplates that Purchaser may fund an additional estimated $2.5 million capital investment in the Company over 2 years for development of a next generation Skycam system and the creation of an engineering and operations infrastructure. The Purchaser's proposed Transaction includes the rights to the Company's IP for its government, military, security, agriculture and other non-sports |

3238 East Holt Avenue
West Covina, CA 91791
Tel: (626) 214-3155
Fax: (717) 591-8517

544 San Antonio Road
Mountain View, CA 94040
Tel: (650) 989-8811
Fax: (650) 641-3982

EXHIBIT 55.032

PACIFIC
NORTHERN
CAPITAL

markets.

The Purchase Price assumes that Skycam and Cablecam will be run in the ordinary course of business until Closing, including the continuation of all business development and government market development activities. The Company will deliver $200,000 of working capital (or provide a credit to the Purchase Price equal to such amount) consistent with the Company's past practices and projected revenue growth. Outdoor Channel will allow a credit to the purchase price in an amount equal to any deferred revenues (i.e. payments received or due at the closing date for events or services not yet provided as of the closing date, less any related revenue earned through the closing date), net of any related costs incurred through the closing date. For purposes of clarity, any amounts received from ESPN or NBC or any other network, or from AMEWAS related to the Navair project, for which services not been fully performed as of the date of the closing, less any progress payments towards those related costs of revenues, shall be deducted as a credit to the Purchase Price at closing.

In addition, the Purchase Price will be increased at Closing for any non-budgeted capital expenditures funded by Outdoor Channel in its sole discretion (up to a maximum of $80,000) between the date of this Term Sheet and Closing if considered necessary and in the best interests of the Company by Nic Salomon as President of the Company.

**Structure:**  The Transaction will be structured as an asset purchase of operating assets and the Actioncam judgment but excluding certain assets as described below. Only ordinary course liabilities will be assumed.

**Financing:**  The Transaction will be financed by cash proceeds from PNC at Closing.

**Real Estate:**  Skycam's lease of the building in Tulsa (where there are currently no Company operations), associated liabilities and the accompanying sublease to another tenant will not be included as assets in the Transaction. As a condition to Closing, Outdoor Channel shall be released from its guaranty regarding the Fort Worth lease.

**Litigation Payment:**  The litigation claim will be included as an asset in the Transaction. However, Purchaser will provide Outdoor Channel with a retained 50 percent interest in the rights to economic recovery of the outstanding Actioncam litigation claim as further described below. Purchaser will retain the exclusive right to manage any ongoing litigation in the case. Outdoor Channel will cooperate in all aspects of the litigation as requested by Purchaser on a go forward basis. Any Purchaser-driven costs associated with the future Actioncam litigation will be the responsibility of Purchaser. Upon both the completion of the litigation in favor of Skycam and/or the expected liquidation of Actioncam LLC (or alternatively the sale of Actioncam to Purchaser), Purchaser will pay Outdoor Channel additional Transaction consideration of $100,000 (less any settlement proceeds already received by Outdoor Channel). Any costs incurred by Purchaser associated with the future Actioncam litigation will be deducted from any settlement proceeds prior to calculating the amount due to Outdoor Channel.

**Royalty:**  For a period of 12 months following the closing, Purchaser will pay Outdoor Channel a 20% royalty on revenue (excluding bill-back revenue from venue-driven charges and on site third party equipment rentals) from any incremental CBS regular season NFL and SEC events covered by the Company, which have not been regularly covered by Company in the past. For purposes of specificity, Skycam and Cablecam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game. With an estimated 30 NFL and SEC "A" games on CBS during the regular season, this additional consideration over 12

PACIFIC
NORTHERN

**Page 3**

months could exceed $300,000 (30 games x approximately $10,000 of revenue royalty per game) to Outdoor Channel.

**Due Diligence Requirements:**   Due diligence will begin immediately upon execution of this term sheet (e.g. legal due diligence, review of existing contracts and litigation, and business due diligence).

**Conditions to Closing:**

- Verification of historical profitability and confirmation that Company has achieved 2012 Adjusted Free Cash Flow of at least $0.7MM;
- Completion of business, accounting and legal due diligence to Purchaser's satisfaction;
- Execution of definitive transaction documentation acceptable to each party in its sole discretion.

**Exclusivity:**

A.  In consideration of Purchaser continuing to spend time and incur professional fees and other expenses related to the acquisition, each of Outdoor Channel and the Company agree that until April 15, 2013, that they and any of their directors, officers, affiliates and representatives will not, directly or indirectly:

   (i)  Solicit, facilitate, encourage or accept any offers to acquire any equity or debt interest in Skycam or Cablecam or the whole or any material part of the assets of the business of Skycam or Cablecam, nor engage or procure any person to do so on their behalf;

   (ii)  Negotiate or correspond with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of Skycam or Cablecam, other than to advise them that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed), nor engage or procure any person to do so on its behalf;

   (iii)  Sell or agree to sell any equity or debt interest (including any new issue of debt or equity) in any part of the Company to any other party than Purchaser or its nominee, and Outdoor Channel and its subsidiaries will procure that their respective directors, officers, affiliates, employees, advisors and representatives will also act accordingly.

B.  Outdoor Channel and its subsidiaries jointly and severally undertake that they will forthwith cease any negotiations, discussions or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the Company by any other party than Purchaser or its nominee and that it will advise any such parties that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed).

C.  Each of these undertakings in this Exclusivity section shall be read and construed independently of all other undertakings and, if any undertaking is held to be invalid or unenforceable, the remaining undertakings shall continue to apply to the extent that they shall not also be found to be invalid.

D.  The parties agree that Purchaser shall be entitled to equitable relief, including injunction (without the necessity of posting bond) and specific performance, in the event of any breach of the provisions of this agreement, in addition to all other remedies available at law or in equity, including monetary damages, both actual and consequential.

**Transaction Timing:**   The parties will use their best efforts to achieve a signing of definitive documents and Closing no later than April 15, 2013. However, PNC will use its best efforts to target and work towards signing definitive documents and Closing by March 25, 2013.

Purchaser believes that because of its funding source and relationship to the management of Skycam and Cablecam, it is in a strong position relative to other interested parties in providing both speed and certainty of close. Purchaser believes the speed of a transaction is of the essence to preserve the value of the Company by ensuring capital availability for the development of a next generation Skycam system ahead of targeted prototype delivery



Page 4

in the Fall of 2013.

**Confidentiality:**     Both parties are covered by confidentiality agreements, which have already been put in place.

The Proposed Terms contained herein are contingent upon these Terms remaining confidential between the parties.

**Non-Binding:**     Except for the provisions of "Exclusivity" above, which is a binding legal agreement upon the parties, this Term Sheet is a statement of mutual intention; it is not intended to be legally binding, and does not constitute a binding contractual commitment with respect to any transaction.   Without limiting the foregoing, the failure of Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive agreements in accordance with this Term Sheet shall not be construed as a breach of this Term Sheet by any party hereto.   A legally binding obligation with respect to the investment contemplated hereby will arise only upon execution and delivery of definitive documents by Outdoor Channel and Purchaser, subject to the terms and conditions set forth therein. Accordingly, until definitive agreements are entered into, except as expressly set forth above, no party will be under any legal obligation with respect to this Term Sheet, and no withdrawal from or termination of negotiations for the transaction contemplated by this term sheet prior to signing definitive agreements, for whatever reason, or for no reason, shall be determined to be in bad faith and any such withdrawal or termination shall not give any party a cause of action against the other party.

This letter of intent (i) may not be amended or modified except by a writing signed by each of the parties hereto, and (ii) may be executed in one or more counterparts, each of which will be deemed an original but all of which together shall constitute one and the same instrument.

For the Purchaser on  _2/27_ , 2013.          Accepted and Agreed on  _2/26_ , 2013:

Nic Salomon                                Outdoor Channel Holdings, Inc.

and Pacific Northern Capital


By:   _____          By:   _____

       Nic Salomon                              Tom Hornish
                                                CEO
                                                Outdoor Channel Holdings, Inc.


By:   _____

       Kelly Holoway
       Managing Director
       Pacific Northern Capital

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 3**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CIVIL ACTION NO. 3:15-CV-00666-M

_____

VIDEOTAPE DEPOSITION OF:   JAMES A. MARTIN
AUGUST 30, 2018

_____

NIC SALOMON,

PLAINTIFF,

V.

KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL
HOLDINGS, LLC, AND PACIFIC NORTHERN CAPITAL, LLC,

DEFENDANTS.

_____

PURSUANT TO NOTICE, THE VIDEOTAPE
DEPOSITION OF JAMES A. MARTIN WAS TAKEN ON BEHALF OF
THE PLAINTIFF AT 4643 SOUTH ULSTER STREET, SUITE 800,
DENVER, COLORADO 80237, ON AUGUST 30, 2018, AT
10:06 A.M., BEFORE TINA M. STUHR, REGISTERED
PROFESSIONAL REPORTER AND NOTARY PUBLIC WITHIN
COLORADO.

JOB NO. 137826

10:17:31  1    currently would it be fair to say that you oversee the

10:17:35  2    KSE business and -- and venue operations?

10:17:40  3         A.   Yes.

10:17:40  4         Q.   And can you give us a short explanation

10:17:42  5    of what that means?

10:17:44  6         A.   Well, I started with KSE running the TV

10:17:49  7    network, Altitude Sports & Entertainment.  That was in

10:17:53  8    2004.  In 2010 I took on the CEO role with the parent

10:17:56  9    company, Kroenke Sports & Entertainment.  Kroenke

10:18:02  10   Sports & Entertainment owns multiple sports franchises

10:18:09  11   in Denver, as well as multiple sports and

10:18:12  12   entertainment venues.  We also have various other

10:18:16  13   operating assets, including a ticketing company, the

10:18:20  14   TV network Altitude.  Following their acquisition, the

10:18:29  15   Outdoor Network, Sportsman Network, and their other

10:18:34  16   operations.

10:18:35  17        Q.   And so everything that you described, you

10:18:38  18   oversee the operations of all of these various

10:18:42  19   sporting and media entities; is that correct?

10:18:45  20        A.   Yes, with lots of help.

10:18:52  21        Q.   And just to do a quick rundown of all of

10:18:55  22   the various entities or organizations within the

10:19:01  23   Kroenke Sports & Entertainment family, first of all,

10:19:04  24   KSE owns and operates the Denver Nuggets of the

10:19:09  25   National Basketball Association; is that right?

10:40:49  1          Q.   And the final acquisition was completed

10:40:52  2     on May 17, 2013, correct?

10:40:54  3          A.   Yes.

10:40:55  4          Q.   And so it's your testimony that during

10:40:59  5     that period of time the decision on whether the aerial

10:41:06  6     camera business would be divested or sold, that was

10:41:10  7     your decision, correct?

10:41:12  8          MR. EVANS:  Objection to form.  Misstates

10:41:13  9     the evidence.

10:41:14 10          A.   It was the decision of Outdoor

10:41:16 11     management.  We didn't object.

10:41:22 12          Q.   (BY MR. IBRAHIM)  And I guess I'm trying

10:41:26 13     to understand.  So you know that during the

10:41:29 14     acquisition process the aerial camera business was not

10:41:33 15     sold, correct?

10:41:34 16          A.   Correct.

10:41:35 17          Q.   And it's your testimony that that

10:41:39 18     decision not to sell, that that was the decision of

10:41:42 19     Outdoor Channel management; is that right?

10:41:45 20          MR. EVANS:  Objection to form.  Misstates

10:41:46 21     the evidence.

10:41:47 22          A.   They never decided, in my belief, not to

10:41:50 23     sell.  They continued to pursue the proposed

10:41:58 24     transaction.

10:42:02 25          Q.   (BY MR. IBRAHIM)  And after the

10:52:08  1   witness about it.

10:52:09  2          MR. IBRAHIM:  Calm down and please be

10:52:10  3   respectful.

10:52:11  4          MR. EVANS:  I am perfectly calm, I'm

10:52:13  5   perfectly respectful, and I'll treat you the same way

10:52:15  6   you treat my witness.  You want to be calm, you want

10:52:17  7   to be cordial to my witness, you'll get the same

10:52:19  8   treatment from me.

10:52:20  9          Q.   (BY MR. IBRAHIM)  So let me ask you the

10:52:22 10   question again, sir.  At any point in time did you

10:52:24 11   make a representation to anyone that it was

10:52:28 12   Mr. Kroenke's decision on whether to sell the aerial

10:52:31 13   camera business?

10:52:33 14          MR. EVANS:  Objection.  Asked and

10:52:33 15   answered.

10:52:41 16          A.   During the acquisition process, the

10:52:43 17   process we've been talking about, no, he never made

10:52:46 18   that decision.  He never was involved in that

10:52:49 19   decision.  We never discussed that decision.  At some

10:52:54 20   point significantly later he did instruct we weren't

10:53:01 21   going to sell it to someone else.  We were going to

10:53:04 22   operate it.  Whether I made that representation to

10:53:08 23   anyone, I don't recall.

10:53:10 24          Q.   (BY MR. IBRAHIM)  Now, at what point in

10:53:12 25   time did Mr. Kroenke instruct that the aerial camera

10:53:17  1    business was not going to be sold and that KSE was

10:53:21  2    going to operate it?

10:53:22  3         A.   I believe I just answered that question.

10:53:24  4    It was sometime significantly later.  I do not recall

10:53:29  5    a specific date.

10:53:30  6         Q.   Was it more than two months after the

10:53:32  7    May 17, 2013, acquisition?

10:53:37  8         A.   Probably, but I don't recall a specific

10:53:39  9    time.

10:53:41  10        Q.   Was it more than three months later?

10:53:44  11             MR. EVANS:  Objection.  Asked and

10:53:44  12   answered.

10:53:45  13        A.   I don't recall a specific time.

10:53:48  14        Q.   (BY MR. IBRAHIM)  Was it more than a year

10:53:50  15   later?

10:53:50  16             MR. EVANS:  Objection.  Asked and

10:53:50  17   answered.

10:53:55  18        A.   No.  It was less than a year.

10:53:57  19        Q.   (BY MR. IBRAHIM)  Okay.  But I just want

10:53:59  20   the record to be clear, it's your testimony that prior

10:54:04  21   to May 17, 2013, it was not your decision or anyone

10:54:09  22   within KSE's decision as to whether the aerial camera

10:54:14  23   business would be sold; is that -- is that right?

10:54:17  24        A.   That's not what I represented, no.  I

10:54:18  25   believe we had certain consent rights, whether they

10:54:21 1  covered this or not, but we didn't object to the sale,

10:54:26 2  no.

10:54:30 3          Q.   Okay.  So prior to May 17, 2013, whose

10:54:38 4  decision was it as to whether the aerial camera

10:54:42 5  business would be sold to Mr. Salomon and PNC?

10:54:49 6          MR. EVANS:  Objection to form.  Misstates

10:54:50 7  the evidence.

10:54:55 8          A.   You seem to be looking for a single

10:54:57 9  individual.  Outdoor management was negotiating the

10:55:03 10  deal.  I did not insert myself in the negotiations.

10:55:06 11  If they had brought a deal to us, it was in compliance

10:55:12 12  with the term sheet, we would have approved the deal.

10:55:17 13          Q.   (BY MR. IBRAHIM)  And is it fair to say

10:55:19 14  that it was within KSE's legal authority to determine

10:55:25 15  whether a sale of the aerial camera business would

10:55:29 16  occur prior to May 17, 2013?

10:55:31 17          MR. EVANS:  Objection to form.  Calls for

10:55:33 18  a legal conclusion.

10:55:35 19          A.   You'll have to ask the lawyers.

10:55:37 20          Q.   (BY MR. IBRAHIM)  You don't know,

10:55:38 21  correct?

10:55:40 22          MR. EVANS:  Objection to form.

10:55:42 23          A.   I have my belief --

10:55:42 24          MR. EVANS:  Asks for a legal conclusion.

10:55:42 25          A.   -- but that's not what you're asking.

10:55:44    1          Q.   (BY MR. IBRAHIM)  What's your belief?

10:55:46    2          A.   My belief is we had certain consent

10:55:49    3    rights.  I don't know if it covered this or not.  If

10:55:52    4    we had been asked to consent, we would have consented.

10:55:58    5          Q.   And just so I have your testimony clear,

10:56:01    6    at some point in time for a period of time -- you

10:56:06    7    don't know the length of the period of time, but for

10:56:09    8    some period of time after the acquisition, it was your

10:56:13    9    decision, your decision, Mr. Martin's decision on

10:56:17   10    whether the aerial camera business would be sold; is

10:56:20   11    that correct?

10:56:21   12          A.   It was my decision as to whether KSE

10:56:24   13    would consent to a sale.

10:56:26   14          Q.   Okay.  And then there was some period of

10:56:29   15    time thereafter, and you don't know when that period

10:56:33   16    of time commenced, but at some point in time later it

10:56:38   17    became Mr. Kroenke's decision, correct?

10:56:43   18          A.   At some point in time later.  There's not

10:56:46   19    a specific change date.  At some point later, once we

10:56:52   20    had established operations, we're moving forward, I

10:56:56   21    would have not -- I would not have exercised authority

10:57:00   22    to sell it without speaking to Mr. Kroenke first.

10:57:05   23          Q.   Now, earlier you testified about certain

10:57:09   24    major decisions, certain major strategic decisions

10:57:14   25    that were within the decision-making purview of

14:35:07  1    e-mail from Ms. Hopkins to Cathy Lee, Randy Brown, Tom

14:35:13  2    Allen, and Tom Hornish.  Do you see that?

14:35:16  3         A.    Um-hum.

14:35:17  4         Q.    It says, "Good morning.  The press

14:35:17  5    release announcing Kroenke Sports & Entertainment's

14:35:20  6    acquisition of Outdoor Channel crossed the wire this

14:35:23  7    morning at 9:15 a.m. Eastern Time.  Attached is the

14:35:27  8    final version for your records."  Did I read that

14:35:30  9    correctly?

14:35:31  10        A.    Yes.

14:35:32  11        Q.    Do you have any reason to believe that

14:35:34  12   the two-page attachment to this e-mail is not the --

14:35:37  13   the final version of the press release that went out?

14:35:39  14        A.    No.

14:35:41  15        Q.    And here it says, "Denver, Colorado --

14:35:46  16   May 17, 2013 -- Kroenke Sports & Entertainment, LLC

14:35:51  17   ('KSE') today announced that it has completed the

14:35:56  18   previously-announced acquisition of Outdoor Channel

14:35:58  19   Holdings, Inc. (NASDAQ:  OUTD) ('Outdoor Channel') for

14:36:05  20   $10.25 per share in cash, pursuant to which Outdoor

14:36:09  21   Channel has become a wholly-owned subsidiary of KSE."

14:36:14  22              Is all of that true and correct as of

14:36:16  23   May 17, 2013, to the best of your knowledge?

14:36:18  24        A.    To the best of my knowledge, yes.

14:36:20  25        Q.    And it says, "Outdoor Channel has become

14:36:23   1   a wholly-owned subsidiary of KSE."  Do you see that?

14:36:29   2          A.   Outdoor Channel Holdings, yes.

14:36:33   3          Q.   Okay.  And do you have -- strike that.

14:36:37   4               You had some involvement in connection

14:36:39   5   with the -- the -- the final acquisition and the

14:36:46   6   closing documents associated with finalizing the

14:36:50   7   acquisition of Outdoor Channel Holdings, Inc. by KSE,

14:36:55   8   correct?

14:36:56   9          A.   Some involvement, yes.

14:36:57   10         Q.   Okay.  And there was either an agreement

14:36:58   11  or a series of agreements by which that was

14:37:01   12  effectuated, fair to say?

14:37:05   13         A.   That the acquisition was effectuated?

14:37:08   14         Q.   Correct.

14:37:09   15         A.   Yes.

14:37:09   16         Q.   And do you have a recollection of

14:37:11   17  whether, as part of the acquisition, KSE agreed to

14:37:16   18  assume the liabilities of Outdoor Channel Holdings,

14:37:19   19  Inc. that -- that existed prior to May 17, 2013?

14:37:25   20         A.   No.  KSE did not assume the obligations.

14:37:28   21  The obligations would remain with Outdoor Channel,

14:37:32   22  which was a separately owned subsidiary responsible

14:37:35   23  for its own obligations.

14:37:37   24         Q.   And that remains true today, correct?

14:37:39   25         A.   To my knowledge and belief, yes.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 4**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-00666-M |
| | § | |
| KROENKE SPORTS & ENTERTAINMENT, | § | JURY TRIAL DEMANDED |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL, | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S SUPPLEMEMENTAL OBJECTIONS AND RESPONSES TO
FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE
SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.**

TO:     Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.,
        by and through their attorneys of record, Paul C. Watler and Shannon Z. Teicher, Jackson
        Walker L.L.P., 2323 Ross Avenue, Suite 600, Dallas, Texas 75201, and Kevin D. Evans,
        Armstrong Teasdale LLP, 4643 South Ulster Street, Suite 800, Denver, Colorado 80237.

        Pursuant to Federal Rules of Civil Procedure 26 and 36, Plaintiff NIC SALOMON

("Plaintiff" or "Salomon") responds below to Defendants KROENKE SPORTS & ENTERTAINMENT,

LLC ("KSE") and OUTDOOR CHANNEL HOLDINGS, INC.'s ("Outdoor") First Set of Requests for

Admission.  Nothing contained in Plaintiff's responses and no information produced by Plaintiff

is intended to be, or shall be construed as, a waiver of privilege, protection or immunity from

production.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR
ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC
AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 1
4410090.1

App. 047

/s/ William B. Chaney
WILLIAM B. CHANEY
State Bar No. 04108500
wchaney@grayreed.com
CLEVELAND G. CLINTON
State Bar No. 04399900
cclinton@grayreed.com
WILLIAM N. DRABBLE
State Bar No. 24074154
wdrabble@grayreed.com

GRAY REED & McGRAW LLP
1601 Elm Street, Suite 4600
Dallas, Texas  75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332

ATTORNEYS FOR PLAINTIFF,
NIC SALOMON

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the persons listed below in accordance with Federal Rule of Civil Procedure 5 on this 10th day of January, 2018.

Kevin D. Evans
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado  80237
Email:  kdevans@armstrongteasdale.com

Paul C. Watler
Shannon Z. Teicher
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas  75201
Email:  pwatler@jw.com
Email:  steicher@jw.com

/s/ William B. Chaney
WILLIAM B. CHANEY

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 2
4410090.1

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Plaintiff objects to the definition of "InterMedia" because "any related entities" is vague and ambiguous. Plaintiff further objections to the definitions of "KSE," "Outdoor," "PNC" and "You" as vague, ambiguous, overly broad, and unduly burdensome. In responding to KSE and Outdoor's requests for admission, Salomon will construe "KSE," "Outdoor," "PNC" and "You" as meaning Kroenke Sports & Entertainment, LLC, Outdoor Channel Holdings, Inc., Pacific Northern Capital, LLC, and Nic Salomon, respectively, and their respective agents acting within the scope of their agency.

Subject to the foregoing objections, and without waiving or limiting the same, Plaintiff objects and responds to KSE and Outdoor's First Requests for Admission as follows:

## SUPPLEMENTAL OBJECTIONS AND
## RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION

1.    Admit that You and PNC drafted the Term Sheet.

**RESPONSE:**  Plaintiff admits that he and PNC prepared a draft of the Term Sheet; the final version of the Term Sheet was negotiated in consultation with Outdoor.

2.    Admit that You and PNC did not reach agreement with Outdoor on the terms and conditions of "definitive agreements" as that phrase is used in the Term Sheet.

**RESPONSE:**  Plaintiff admits that he and PNC did not reach agreement with Outdoor on all the terms and conditions of the "definitive agreements" as that phrase is used in the Term Sheet.

3.    Admit that "definitive documents," as that phrase is used in the Term Sheet, were not executed by Outdoor on the one hand, and PNC, You and/or "Purchaser," as that term is used in the Term Sheet, on the other.

**RESPONSE:**  Admit.

4.    With the exception of the "Exclusivity" provision, which KSE and Outdoor understand you contend was a legally binding obligation, admit that "[a] legally binding obligation with respect to the investment contemplated" by the Term Sheet did not arise.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR
ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC
AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 3
4410090.1

App. 049

**RESPONSE:**  Plaintiff admits that, with the exception of the Exclusivity Provision, he does not believe that the Term Sheet was an enforceable contract.

    5.    Admit that Outdoor owned the Aerial Camera Business at the time KSE acquired all Outdoor stock in May 2013.

**RESPONSE:**  Admit.

    6.    Admit that You are not aware of any solicitation by Outdoor after February 27, 2013 of any offers to acquire any equity or debt interest in the Aerial Camera Business.[1]

**RESPONSE:**  If, as Plaintiff understands and has alleged, KSE's tender offer for Outdoor was unsolicited, Plaintiff admits that he is not currently aware of any solicitation by Outdoor after February 27, 2013, of any offers to acquire any debt or equity interest in the Aerial Camera Business.

    7.    Admit that after February 27, 2013, Outdoor did not facilitate any offers to acquire any equity or debt interest in the Aerial Camera Business.

**RESPONSE:**  Denied.

    8.    Admit that You are not aware of any encouragement by Outdoor after February 27, 2013 of any offers to acquire any equity or debt interest in the Aerial Camera Business.[2]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any encouragement by Outdoor after February 27, 2013 of any offers to directly acquire any debt or equity interest in the Aerial Camera Business.

    With regard to (1) offers to indirectly acquire any debt or equity interest in the Aerial Camera Business by acquisition of its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

---

[1]    Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[2]    Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 4
4410090.1

App. 050

9.     Admit that after February 27, 2013, Outdoor did not accept any offer to acquire any equity or debt interest in the Aerial Camera Business.

**RESPONSE:**  Denied.

10.     Admit that You are not aware of any solicitation by Outdoor after February 27, 2013 of any offers to acquire the whole or any part of the assets of the Aerial Camera Business.[3]

**RESPONSE:**  If, as Plaintiff understands and has alleged, KSE's tender offer for Outdoor was unsolicited, Plaintiff admits that he is not currently aware of any solicitation by Outdoor after February 27, 2013, of any offers to acquire any part of the assets of the Aerial Camera Business.

11.     Admit that after February 27, 2013, Outdoor did not facilitate any offers to acquire the whole or any part of the assets of the Aerial Camera Business.

**RESPONSE:**  Denied.

12.     Admit that after February 27, 2013, Outdoor did not encourage any offers to acquire the whole or any part of the assets of the Aerial Camera Business.

**RESPONSE:**  Denied.

13.     Admit that You are not aware of any acceptance by Outdoor after February 27, 2013 of any offers to acquire the whole or any part of the assets of the Aerial Camera Business.[4]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any acceptance by Outdoor after February 27, 2013 of any offers to directly acquire the whole or any part of the assets of the Aerial Camera Business.

With regard to (1) offers to indirectly acquire the whole or any part of the assets of the Aerial Camera Business by acquisition of its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

---

[3]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[4]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR
ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC
AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 5
4410090.1

App. 051

14.    Admit that after February 27, 2013, Outdoor did not negotiate with any Third Party in relation to existing or unsolicited offers to acquire the equity or debt interest of the Aerial Camera Business.

**RESPONSE:**  Denied.

15.    Admit that You are not aware of any negotiation by or between Outdoor and any Third Party after February 27, 2013 in relation to existing or unsolicited offers to acquire any part of the Aerial Camera Business.[5]

**RESPONSE:**  Denied.

16.    Admit that after February 27, 2013, Outdoor did not correspond with any Third Party in relation to existing or unsolicited offers to acquire the equity or debt interest of the Aerial Camera Business.

**RESPONSE:**  Denied.

17.    Admit that You are not aware of any correspondence by or between Outdoor and any Third Party after February 27, 2013 in relation to existing or unsolicited offers to acquire any part of the Aerial Camera Business.[6]

**RESPONSE:**  Denied.

18.    Admit that You are not aware of any sale by Outdoor after February 27, 2013 of any equity or debt interest in any part of the Aerial Camera Business.[7]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any direct sale by Outdoor after February 27, 2013 of any debt or equity interest in the Aerial Camera Business.

With regard to (1) indirect sales of any debt or equity interest in the Aerial Camera Business by sale of its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S.

---

[5]    Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[6]    Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[7]    Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 6
4410090.1

App. 052

Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

19.     Admit that You are not aware of any agreement by or with Outdoor after February 27, 2013 to sell any equity or debt interest in any part of the Aerial Camera Business.[8]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any agreement by Outdoor after February 27, 2013 to directly sell any debt or equity interest in the Aerial Camera Business.

With regard to (1) agreements to indirectly sell any debt or equity interest in the Aerial Camera Business by sell of its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

20.     Admit that You are not aware of any negotiations by or with Outdoor after February 27, 2013 in relation to the potential acquisition of an equity or debt interest in the Aerial Camera Business by anyone other than You and PNC.[9]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any negotiations by or with Outdoor after February 27, 2013 in relation to the potential direct acquisition of an equity or debt interest in the Aerial Camera Business by anyone other than the Purchaser.

With regard to (1) negotiations to indirectly acquire an equity or debt interest in the Aerial Camera Business by acquiring its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

21.     Admit that You are not aware of any discussions by or with Outdoor after February 27, 2013 in relation to the potential acquisition of an equity or debt interest in the Aerial Camera Business by anyone other than You and PNC.[10]

---

[8]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[9]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[10]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 7
4410090.1

App. 053

**RESPONSE:**  Plaintiff admits that he is not currently aware of any discussion by or with Outdoor after February 27, 2013 in relation to the potential direct acquisition of an equity or debt interest in the Aerial Camera Business by anyone other than the Purchaser.

With regard to (1) discussions to indirectly acquire an equity or debt interest in the Aerial Camera Business by acquiring its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

22.  Admit that You are not aware of any correspondence by or with Outdoor after February 27, 2013 in relation to the potential acquisition of an equity or debt interest in the Aerial Camera Business by any party other than You and PNC.[11]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any correspondence by or with Outdoor after February 27, 2013 in relation to the potential direct acquisition of an equity or debt interest in the Aerial Camera Business by anyone other than the Purchaser.

With regard to (1) correspondence to indirectly acquire an equity or debt interest in the Aerial Camera Business by acquiring its parent company or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

23.  Admit that You are not aware of any offer made by KSE to acquire the assets of the Aerial Camera Business.[12]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any offers by KSE to directly acquire the assets of the Aerial Camera Business.

With regard to (1) offers to indirectly acquire the assets of the Aerial Camera Business or (2) SkyCam's or CableCam's granting of a security interest in any of their assets, including intellectual property, to secure indebtedness of any parent or affiliate, such as the Intellectual Property Security Agreements in favor of Deutsche Bank Trust Company of America dated

---

[11]  Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

[12]  Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 8
4410090.1

App. 054

November 7, 2014 and filed of record with the U.S. Patent and Trademark Office (Reel 034646, Frame 0120-128; Reel 034646, Frame 0189-198), Plaintiff denies this Request.

24.    Admit that KSE never made any offer to acquire the equity or debt interest of the Aerial Camera Business.

**RESPONSE:** Denied.

25.    Admit that in May 2013, You told Christopher Hallborg that you were "excited to see what KSE brings to the table."

**RESPONSE:** Plaintiff admits that he made the statement that he was "excited to see what KSE brings to the table" as part of a series of emails exchanged with Christopher Hallborg in May 2013.

26.    Admit that You personally did not have the financial ability to consummate a purchase of the Aerial Camera Business.

**RESPONSE:** Salomon admits he did not have the financial ability exclusively to consummate the purchase.

27.    Admit that as of February 27, 2013, You knew that Outdoor had entered into a merger agreement with InterMedia in November 2012, pursuant to which InterMedia had agreed to purchase all of the stock of Outdoor.

**RESPONSE:** Admit.

28.    Admit that after February 27, 2013, PNC informed You that it no longer wished to pursue acquisition of the Aerial Camera Business with You.

**RESPONSE:** Denied.

29.    Admit that the "Purchaser" referenced in the Term Sheet was never formed.

**RESPONSE:** Admit.

30.    Admit that the funding to finance any acquisition of the Aerial Camera Business pursuant to the Term Sheet was to come from PNC.

**RESPONSE:** Plaintiff admits that PNC was to provide primary funding to finance the acquisition of the Aerial Camera Business. Plaintiff was interested to invest in the Purchaser as well.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 9
4410090.1

App. 055

31.     Admit that since You filed your Original Complaint, You have sent text messages to Stephen Wharton.

**RESPONSE:**  Plaintiff objects to this request for admission as overly broad, because it contains no limitations on subject matter.

Subject to the foregoing objection, Plaintiff admits that he has sent text messages to Steve Wharton after filing his Original Complaint.

32.     Admit that prior to May 17, 2013, KSE did not "veto" the sale of the Aerial Camera Business.

**RESPONSE:** Denied.

33.     Admit that You are not aware of any communication (whether verbally or orally) prior to May 17, 2013 between KSE and PNC related to the Aerial Camera Business.[13]

**RESPONSE:**  Plaintiff admits that he is not currently aware of any communication (whether verbally or orally) prior to May 17, 2013, between KSE and PNC related to the Aerial Camera Business.

34.     Admit that You and PNC never agreed on the structure of the "Purchaser," as that term is used in the Term Sheet.

**RESPONSE:** Admit.

35.     Admit that Outdoor, You and PNC never agreed on the terms of an asset purchase agreement related to the Aerial Camera Business.

**RESPONSE:**  Plaintiff objects to this request for admission as cumulative and duplicative of Request 2.

Subject to the foregoing objection, Plaintiff admits that he and PNC did not reach agreement with Outdoor on all the terms and conditions of the asset purchase agreement.

36     Admit that on February 26 and 27, 2013, Outdoor was a publicly traded company.

**RESPONSE:** Admit.

37.     Admit that on March 4, 2013, You were informed by Outdoor's General Counsel Catherine Lee that Outdoor was withdrawing from the Term Sheet.

---

[13]     Following the parties' discovery conference, KSE and Outdoor reworded this Request for Admission on December 21, 2017.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 10
4410090.1

App. 056

**RESPONSE:** Denied.

38.    Admit that on March 4, 2013, You were informed by Outdoor's General Counsel Catherine Lee that Outdoor was terminating negotiations under the Term Sheet.

**RESPONSE:** Denied.

39.    Admit that because You did not sign the March 21, 2013 document referenced in Paragraph 38 of the SAC, that document did not amend or modify the Term Sheet with You.

**ANSWER:** Admit.

40.    Admit that in February 2013, any agreement limiting Outdoor's ability to sell all of its stock required approval of the Outdoor board of directors.

**RESPONSE:**   Plaintiff objects to this request for admission, because the phrase "Outdoor's ability to sell all of its stock" is vague and ambiguous. Plaintiff also objects to this request because it seeks the admission of a legal conclusion.

Subject to the foregoing objection, Plaintiff has made a reasonable inquiry and the information known or readily obtainable by Plaintiff is not sufficient to admit or deny this Request.

41.    Admit that in February 2013, any agreement affecting Outdoor's ability to sell all of its stock required approval of the Outdoor board of directors.

**RESPONSE:**   Plaintiff objects to this request for admission, because the phrase "Outdoor's ability to sell all of its stock" is vague and ambiguous. Plaintiff also objects to this request because it seeks the admission of a legal conclusion.

Subject to the foregoing objection, Plaintiff has made a reasonable inquiry, and the information known or readily obtainable by Plaintiff is not sufficient to admit or deny this Request.

42    Admit that between January 1, 2013 and May 17, 2013, the Outdoor board of directors did not approve any agreement that limited the ability of Outdoor to sell all of its stock.

**RESPONSE:**   Plaintiff objects to this request for admission, because the phrase "Outdoor's ability to sell all of its stock" is vague and ambiguous. Plaintiff also objects to this request because it seeks the admission of a legal conclusion.

Subject to the foregoing objection, Plaintiff has made a reasonable inquiry, and the information known or readily obtainable by Plaintiff is not sufficient to admit or deny this Request.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 11
4410090.1

App. 057

43.     Admit that between January 1, 2013 and May 17, 2013, the Outdoor board of directors did not approve any agreement that affected the ability of Outdoor to sell all of its stock.

**RESPONSE:**  Plaintiff objects to this request for admission, because the phrase "Outdoor's ability to sell all of its stock" is vague and ambiguous. Plaintiff also objects to this request because it seeks the admission of a legal conclusion.

Subject to the foregoing objection, Plaintiff has made a reasonable inquiry, and the information known or readily obtainable by Plaintiff is not sufficient to admit or deny this Request.

PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. – PAGE 12
4410090.1

App. 058

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 5

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
<u>**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| NIC SALOMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. |
| | ) 3:15-CV-00666-M |
| KROENKE SPORT & | ) |
| ENTERTAINMENT, LLC, OUTDOOR | ) |
| CHANNEL HOLDINGS, INC., and | ) |
| PACIFIC NORTHERN CAPITAL, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

VIDEOTAPED DEPOSITION OF JEFF DEAN HOLOWATY,
taken on behalf of the Defendants at 17332
Irvine Boulevard, Suite 220, Tustin, California,
commencing at 9:01 a.m., on Tuesday, July 17, 2018,
before Penny Sander, C.S.R. No. 4769, a Certified
Shorthand Reporter within and for the State of
California.

10:12:29  1    or, rather, the Fox Liberty Networks, you were the

10:12:35  2    president of Regional Network Operations for Liberty

10:12:38  3    Sports; is that correct?

10:12:41  4         A.    Correct.

10:12:41  5         Q.    And you managed Liberty Media

10:12:43  6    Corporation's owned and operated regional networks and

10:12:49  7    other sports network investments; is that right?

10:12:54  8         A.    Correct.

10:12:55  9         Q.    And you were also the vice president and

10:12:58  10   chief operating officer of Liberty Media Corporation

10:13:00  11   from 1991 through 1994; is that right?

10:13:04  12        A.    I believe those were the dates, yes.

10:13:06  13        Q.    Okay.  And with regards to your

10:13:10  14   education, you graduated from the University of

10:13:12  15   Wyoming in 1977 with a bachelor of science degree in

10:13:18  16   accounting; is that right?

10:13:19  17        A.    Correct.

10:13:20  18        Q.    And you graduated from the University of

10:13:23  19   Notre Dame Law School in 1980; is that right?

10:13:27  20        A.    Correct.

10:13:28  21        Q.    And after you graduated from law school,

10:13:31  22   did you take the bar exam in any state?

10:13:34  23        A.    Yes.

10:13:34  24        Q.    And were you licensed to practice law in

10:13:37  25   any state?

10:34:50  1      A.   Somewhere in that range.

10:34:51  2      Q.   Okay.  I'd like to know who are the

10:34:53  3  direct reports.

10:34:58  4      A.   Direct reports are our chief financial

10:35:02  5  operator, Bruce Glazer; our chief operating officer,

10:35:05  6  Matt Hutchings; our general counsel, Stephen

10:35:10  7  Stieneker; our chief ticketing officer, David Burke;

10:35:14  8  oh, and our executive VP of sponsorship sales, Ben

10:35:27  9  Boylan; and most recently human resources will be

10:35:33  10  reporting to me, but our head of human resources left,

10:35:37  11  so it's currently a vacant position.

10:35:42  12      Q.   Now, when --

10:35:43  13      A.   And my assistant reports to me.

10:35:48  14      Q.   What's your assistant's name?

10:35:51  15      A.   Taylor Gross.

10:35:53  16      Q.   Now, when we say that you report to

10:35:57  17  Mr. Kroenke, can you explain to us what that means?

10:36:04  18      A.   It means I report to Mr. Kroenke.

10:36:10  19      Q.   And my question is can you provide a

10:36:13  20  little bit more detail on -- on what that means?

10:36:23  21      A.   We discuss business operations.  I keep

10:36:26  22  him up to date.  I keep him informed.  Very major

10:36:35  23  decisions, I will consult with him on.  Day-to-day

10:36:40  24  operations he generally does not insert himself in.

10:36:50  25      Q.   Okay.  And is it fair for me to say that

| | | |
|---|---|---|
| 10:36:54 | 1 | part of your job is to provide input and advice to |
| 10:37:00 | 2 | Mr. Kroenke on various affairs of the company? |
| 10:37:07 | 3 | MR. EVANS:  Objection to form. |
| 10:37:09 | 4 | A.   It's a very broad question.  There are |
| 10:37:11 | 5 | things I -- I'm expected to provide input and advice |
| 10:37:16 | 6 | on.  There are things that are his purview.  So . . . |
| 10:37:21 | 7 | Q.   (BY MR. IBRAHIM)  And what are the things |
| 10:37:22 | 8 | that are his purview? |
| 10:37:25 | 9 | A.   Major strategic changes, transactions, |
| 10:37:32 | 10 | expansions into, you know, other sports teams, other |
| 10:37:38 | 11 | markets.  He's the owner.  Wants to be kept informed |
| 10:37:48 | 12 | of what's happening. |
| 10:37:50 | 13 | Q.   And would you characterize the |
| 10:37:53 | 14 | acquisition of Outdoor Channel Holdings as one of |
| 10:37:58 | 15 | those major decisions that is within Mr. Kroenke's |
| 10:38:01 | 16 | purview? |
| 10:38:02 | 17 | A.   I -- yes.  It was pretty much solely his |
| 10:38:05 | 18 | decision. |
| 10:38:06 | 19 | Q.   And the decision with regards to the |
| 10:38:10 | 20 | acquisition of Skycam and Cablecam, that would also |
| 10:38:15 | 21 | qualify as a major decision as you described it -- |
| 10:38:17 | 22 | A.   No. |
| 10:38:18 | 23 | Q.   -- within Mr. Kroenke's purview? |
| 10:38:20 | 24 | A.   No, because -- |
| 10:38:20 | 25 | MR. EVANS:  Well, let me object first. |

10:55:44  1          Q.   (BY MR. IBRAHIM)  What's your belief?

10:55:46  2          A.   My belief is we had certain consent

10:55:49  3   rights.  I don't know if it covered this or not.  If

10:55:52  4   we had been asked to consent, we would have consented.

10:55:58  5          Q.   And just so I have your testimony clear,

10:56:01  6   at some point in time for a period of time -- you

10:56:06  7   don't know the length of the period of time, but for

10:56:09  8   some period of time after the acquisition, it was your

10:56:13  9   decision, your decision, Mr. Martin's decision on

10:56:17 10   whether the aerial camera business would be sold; is

10:56:20 11   that correct?

10:56:21 12          A.   It was my decision as to whether KSE

10:56:24 13   would consent to a sale.

10:56:26 14          Q.   Okay.  And then there was some period of

10:56:29 15   time thereafter, and you don't know when that period

10:56:33 16   of time commenced, but at some point in time later it

10:56:38 17   became Mr. Kroenke's decision, correct?

10:56:43 18          A.   At some point in time later.  There's not

10:56:46 19   a specific change date.  At some point later, once we

10:56:52 20   had established operations, we're moving forward, I

10:56:56 21   would have not -- I would not have exercised authority

10:57:00 22   to sell it without speaking to Mr. Kroenke first.

10:57:05 23          Q.   Now, earlier you testified about certain

10:57:09 24   major decisions, certain major strategic decisions

10:57:14 25   that were within the decision-making purview of

10:57:17  1   Mr. Kroenke.  Do you recall that testimony?

10:57:19  2           A.   Yes.

10:57:20  3           Q.   Okay.  Now, if you and Mr. Kroenke had a

10:57:23  4   disagreement about one of these so-called major

10:57:27  5   decisions, am I correct in assuming that it would be

10:57:34  6   Mr. Kroenke's view and approach that would control?

10:57:37  7               MR. EVANS:  Objection to form.

10:57:39  8           A.   Ultimately, yes.

10:57:40  9           Q.   (BY MR. IBRAHIM)  Okay.  And so if you

10:57:42 10   and Mr. Kroenke, for example, had a disagreement on

10:57:45 11   whether a particular company or subsidiary of KSE

10:57:49 12   should be sold, Mr. Kroenke's decision on that matter

10:57:53 13   would be the controlling decision; isn't that right?

10:57:56 14               MR. EVANS:  Objection to form.

10:57:57 15           A.   He's the owner, yes.

10:57:59 16           Q.   (BY MR. IBRAHIM)  Okay.  And that's not

10:58:01 17   just a matter of social or a professional relationship

10:58:06 18   that you have with Mr. Kroenke, that's a matter of

10:58:10 19   corporate governance, correct?

10:58:12 20               MR. EVANS:  Objection to form.

10:58:13 21           A.   Correct.

10:58:14 22           Q.   (BY MR. IBRAHIM)  And let me ask this:

10:58:16 23   How is the ownership structure of KSE structured?

10:58:21 24           A.   I thought we had gone through that.

10:58:24 25   Mr. Kroenke is the ultimate owner.  The exact

52

10:58:27  1   organizational structure and what entities, I don't

10:58:30  2   recall.

10:58:31  3        Q.   Now, are you with Mr. Kroenke -- well,

10:58:36  4   strike that.

10:58:37  5             Does Mr. Kroenke have an office?

10:58:41  6        A.   Mr. Kroenke has multiple offices.

10:58:43  7             MR. EVANS:  Objection to form.

10:58:44  8        Q.   (BY MR. IBRAHIM)  Does he have a

10:58:45  9   principal office where he spends either a majority of

10:58:47 10   his time or more of his time than he does in other

10:58:50 11   offices?

10:58:51 12             MR. EVANS:  Objection to form.

10:58:52 13        A.   I couldn't speculate on the amount of

10:58:56 14   time he spends in various locations.

10:59:01 15        Q.   (BY MR. IBRAHIM)  How often -- well,

10:59:02 16   strike that.

10:59:03 17             You work in Denver, correct?

10:59:04 18        A.   Yes.

10:59:05 19        Q.   You work at the Pepsi Center; is that

10:59:07 20   right?

10:59:07 21        A.   Yes.

10:59:08 22        Q.   And I'm assuming Mr. Kroenke also has an

10:59:11 23   office at the Pepsi Center, right?

10:59:14 24        A.   He does.

10:59:14 25        Q.   And can you give us a sense of

95

12:09:41   1          Q.   And if that was sent by e-mail -- and you

12:09:44   2   don't recall whether you sent it by e-mail, right?

12:09:47   3          A.   I don't recall.

12:09:47   4          Q.   Now, if you had sent it to him by e-mail,

12:09:50   5   you would have given him some kind of a background

12:09:54   6   about why you're giving him the report; is that fair

12:09:58   7   to say?

12:09:58   8          A.   It's possible, yes.

12:10:00   9          Q.   And --

12:10:00  10          A.   It's likely.

12:10:01  11          Q.   And if you had given him a hard copy of

12:10:03  12   the report with your notes, you would assume that you

12:10:07  13   would have told him something about why you're giving

12:10:10  14   him a copy of that report with your notes, correct?

12:10:15  15          A.   Correct.

12:10:16  16          Q.   Okay.  But as you sit here today, you

12:10:19  17   don't remember what you told Mr. Kroenke about this

12:10:23  18   report and your notes, correct?

12:10:26  19          A.   I don't remember, no.

12:10:30  20          Q.   Let me show you what we'll mark as 343.

12:10:55  21          Actually, let me backtrack.  Let me show

12:11:01  22   what we've previously marked as 306.  Do you have 306

12:11:25  23   in front of you, sir?

12:11:27  24          A.   I do.

12:11:28  25          Q.   And I'll give you a moment to take a look

12:11:29  1    at it, but let me give you a question while you look

12:11:33  2    at it.  Is this the -- the management report that you

12:11:36  3    were referring to from the e-mail that you sent that

12:11:41  4    we were looking at earlier?

12:11:45  5         A.   It looks familiar.

12:11:47  6         Q.   Okay.  And is this the management report

12:11:50  7    that you gave to Mr. Kroenke on or about March 21,

12:11:56  8    2013, as referenced in Exhibit 305?

12:12:02  9         A.   I can't tell you specifically that it

12:12:04 10    was.  That was five years ago, but I believe it was.

12:12:08 11         Q.   Okay.  Well, I don't want you to guess.

12:12:11 12    Do you -- do you know whether this was the report that

12:12:13 13    you gave Mr. Kroenke or not?

12:12:14 14         A.   I don't know.

12:12:20 15         Q.   Now, do you recall having received this

12:12:22 16    report prior to March 21, 2013?

12:12:27 17         A.   As I say, it looks familiar.  I don't

12:12:29 18    remember exactly when we received it.

12:12:31 19         Q.   Is this a report that was prepared by

12:12:36 20    Outdoor Channel?

12:12:40 21         A.   I believe so.

12:12:41 22         Q.   This is not a report that someone from

12:12:43 23    KSE prepared, correct?

12:12:45 24         A.   No.  No, it's not.

12:12:48 25         Q.   Am I correct about that?

12:12:49  1          A.   Yes, you are correct.

12:12:50  2          Q.   And just to make sure I got your

12:12:52  3   testimony correct, as you sit here today, you don't

12:12:56  4   recall whether you received this report on or prior to

12:13:01  5   March 21, 2013; am I correct about that?

12:13:04  6          A.   I don't recall the date, no.

12:13:06  7          Q.   Okay.  And I'm also correct that you

12:13:08  8   don't remember whether this is the management report

12:13:11  9   that you made notes on and then handed a copy or

12:13:16 10   e-mailed a copy to -- to Mr. Kroenke?  Am I correct

12:13:18 11   about that?

12:13:19 12          A.   I don't recall.

12:13:29 13          Q.   Now, starting on the second paragraph,

12:13:31 14   we're not going to go through this -- the whole thing,

12:13:34 15   but here it says "Outdoor Channel's management

12:13:37 16   believes that the aerial camera business should be

12:13:40 17   divested from the network's business and operations at

12:13:43 18   this time because it is" and then there's a -- a list

12:13:47 19   of five things here.  Do you see that?

12:13:48 20          A.   Yes.

12:13:49 21          Q.   So my first question is:  The way this is

12:13:52 22   phrased, does that lead you to believe that it was

12:13:56 23   someone from Outdoor Channel's management that either

12:14:00 24   prepared this report or that this was communicating

12:14:03 25   thoughts from Outdoor Channel's management?

12:14:04  1      A.   Yes.

12:14:05  2      Q.   Okay.  And it -- it says that "the aerial

12:14:09  3  camera business should be divested from the network's

12:14:12  4  business and operations at this time because it is:

12:14:14  5  1, Non-Core; 2, Capital Intensive; 3, A seasonal

12:14:21  6  business with relatively low annual operating margins;

12:14:24  7  4, Facing increased competition; and 5, Currently

12:14:31  8  engaged with a potential buyer."  Did I read that

12:14:35  9  correctly?

12:14:35 10      A.   You did.

12:14:36 11      Q.   And is that consistent with what you

12:14:39 12  recall about what folks from Outdoor Channel

12:14:43 13  management were telling you about the aerial camera

12:14:47 14  business and why it should be divested?

12:14:49 15      A.   Yes.

12:14:50 16      Q.   Okay.  And here it also says that it --

12:14:54 17  it is "Currently engaged with a potential buyer."

12:14:58 18  What did you understand that to mean?

12:15:04 19      A.   The parties to the term sheet.

12:15:09 20      Q.   Meaning Mr. Salomon and PNC, correct?

12:15:13 21      A.   Correct.

12:15:14 22      Q.   And what did you understand the phrase

12:15:16 23  "currently engaged" to mean?

12:15:22 24      A.   Well, I'm not sure how you would -- what

12:15:28 25  definition you put on it.  It means they were having

104

12:22:15  1                    MR. EVANS:   Objection to form.

12:22:20  2            A.    I believe it says what it says.   What

12:22:24  3      their thinking and rationale was beyond that, I

12:22:28  4      couldn't tell you.

12:22:29  5            Q.    (BY MR. IBRAHIM)  At any point in time

12:22:31  6      prior to May 17, 2013, did you have any discussions

12:22:34  7      with anyone at Outdoor Channel that you recall that

12:22:39  8      was inconsistent with this sentence?

12:22:43  9            A.    I don't recall having any conversations

12:22:45 10      that were inconsistent with this, no.

12:22:48 11            Q.    Okay.

12:22:52 12            A.    I don't recall ever discussing PNC with

12:22:54 13      anybody.

12:22:55 14            Q.    Now, let's look at the heading

12:22:56 15      "Recommendation."   It says, "Based on our current

12:23:00 16      understanding of KSE's desire to continue" op -- "to

12:23:06 17      operate OC with its focus on outdoor programming, OC

12:23:12 18      management recommends that KSE consent to the

12:23:14 19      continued potential divestiture of the AC Business to

12:23:20 20      PNC or other potential suitors for all of the above

12:23:23 21      reasons."

12:23:24 22                    Do you recall anyone from Outdoor Channel

12:23:27 23      management ever issuing a recommendation contrary to

12:23:30 24      that?

12:23:33 25            A.    No.

105

12:23:38  1          Q.   And here it says, if -- "However, if KSE

12:23:43  2    believes that the AC Business has significant growth

12:23:46  3    potential and is willing to fund its capital needs,

12:23:50  4    then we believe it could possibly be a strategic asset

12:23:55  5    to KSE," and it goes on.  Do you see that?

12:23:59  6          A.   I see that.

12:24:00  7          Q.   Okay.  And do you recall any

12:24:01  8    conversations or discussions with anyone from Outdoor

12:24:04  9    Channel that was inconsistent with that?

12:24:11 10          A.   I don't recall.

12:24:25 11          MR. EVANS:  Ahmed, can I indulge you to

12:24:28 12    take a two-minute break?  I drank coffee and it's

12:24:32 13    time.

12:24:33 14          THE VIDEOGRAPHER:  The time is currently

12:24:34 15    12:24, and we are off the record.

12:24:37 16          (Recess taken, 12:24 p.m. to 12:28 p.m.)

12:28:16 17          THE VIDEOGRAPHER:  The time is currently

12:28:17 18    12:28 and we are back on the record.

12:28:20 19          Q.   (BY MR. IBRAHIM)  Now, sir, at some point

12:28:22 20    in time, did you become aware of an amendment that was

12:28:28 21    signed on or about March 21, 2013 by PNC?

12:28:38 22          A.   I became aware of an amendment, yes.

12:28:40 23          Q.   An amendment to the term sheet, correct?

12:28:42 24          A.   Yes.

12:28:42 25          Q.   And when did you become aware of that --

12:44:10   1    the deposition, right?

12:44:11   2            A.    Yes.

12:44:12   3            Q.    And what documents did you look at?

12:44:15   4            MR. EVANS:   I'm going to object to the

12:44:16   5    question on the grounds of privilege and work product.

12:44:19   6            MR. IBRAHIM:   Well, he's already

12:44:20   7    testified that he's used it to refresh his memory, so

12:44:23   8    that objection --

12:44:25   9            MR. EVANS:   And he got them from me.

12:44:26  10            MR. IBRAHIM:   Well, it doesn't matter.

12:44:27  11    If he used the documents to refresh his memory, then

12:44:27  12    that wouldn't be privileged.

12:44:29  13            MR. EVANS:   You should read the briefing

12:44:29  14    of your predecessor counsel before you make comments

12:44:31  15    like that.  If you want to agree -- if you want to

12:44:33  16    agree that that is -- is -- is not covered by an

12:44:40  17    attorney-client privilege or work product, I'll allow

12:44:40  18    him to answer, but then tomorrow's hearing is going to

12:44:43  19    be interesting.

12:44:43  20            MR. IBRAHIM:   Well, I'm not going to --

12:44:44  21    I'm not going to agree to anything.  All -- all I'm

12:44:46  22    saying is that are you instructing him not to answer

12:44:49  23    the question?

12:44:49  24            MR. EVANS:   Yes.

12:44:50  25            MR. IBRAHIM:   On the basis of

118

12:44:51  1    attorney-client and work product --

12:44:52  2                    MR. EVANS:  Yes.

12:44:52  3                    MR. IBRAHIM:  -- privilege?

12:44:53  4                    MR. EVANS:  Yes.

12:44:53  5                    MR. IBRAHIM:  Okay.

12:44:54  6          Q.   (BY MR. IBRAHIM)  And were there

12:44:55  7    documents that your attorney provided to you in

12:44:57  8    preparation for the deposition?

12:45:00  9          A.   Yes.

12:45:01  10         Q.   Okay.  And did he put those together in

12:45:04  11   a -- in a binder for you?

12:45:05  12         A.   Yes.

12:45:06  13         Q.   And was it a pretty thick binder?

12:45:08  14         A.   Yes.

12:45:09  15         Q.   How big was the binder?

12:45:14  16         A.   That (indicating).  I don't know how you

12:45:17  17   want me to answer that.  It was thick.

12:45:20  18         Q.   Well, can you show the camera how many --

12:45:22  19   how thick the binder was that you looked at?

12:45:22  20         A.   It was about that (indicating) thick.

12:45:23  21         Q.   Can you put the bottom finger so we can

12:45:24  22   see --

12:45:25  23         A.   It's the table.

12:45:26  24         Q.   Yeah.

12:45:26  25         A.   It's the table.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 6**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**EMERGENCY MOTION OF DEFENDANTS KROENKE SPORTS &**
**ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.**
**TO STAY PROCEEDINGS AND TO SET A SCHEDULE FOR EXPEDITED LIMITED**
**DISCOVERY AND HEARING, AND MEMORANDUM IN SUPPORT**

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  214.953.6000
Facsimile:  214.953.5822
Email:  pwatler@jw.com
        steicher@jw.com

Kevin D. Evans
*Admitted pro hac vice*
Emily B. Buckley
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone:  720.200.0676
Facsimile:  720.200.0679
Email:  kdevans@armstrongteasdale.com
        ebuckley@armstrongteasdale.com

Attorneys for Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and
OUTDOOR CHANNEL HOLDINGS, INC.

January 24, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND .................................................................................. 4

        A.      AGREEMENTS GOVERNING PLAINTIFF'S EMPLOYMENT ........................................... 4

        B.      PLAINTIFF'S DISCLOSURE OF THE MISAPPROPRIATED PROPERTY TO HIS
                ATTORNEYS ........................................................................................................ 6

III.    ARGUMENT ....................................................................................................... 7

        A.      PLAINTIFF'S DISCLOSURE TO HIS ATTORNEYS OF MISAPPROPRIATED
                PROPERTY, INCLUDING CONFIDENTIAL AND PROPRIETARY INFORMATION
                OF DEFENDANTS AND THE AERIAL CAMERA BUSINESS, REQUIRES
                IMMEDIATE ATTENTION ........................................................................................ 7

        B.      ALL PROCEEDINGS IN THIS MATTER NOT DIRECTLY RELATED TO THIS
                ISSUE SHOULD BE STAYED UNTIL THE ISSUE IS RESOLVED ..................................... 9

        C.      THE COURT SHOULD SET A LIMITED DISCOVERY SCHEDULE TO ALLOW
                DEFENDANTS' REQUESTED DISCOVERY .............................................................. 11

IV.     CONCLUSION ................................................................................................... 13

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support

i

## TABLE OF AUTHORITIES

**Cases**

*Amec Constr. Mgmt., Inc. v. Fireman's Fund Ins. Co.*, CIVIL ACTION
NO 13-00718-JJB-EWD, 2016 WL 7468808 (M.D. La. May 31, 2016) .................... 9, 10

*Clinton v. Jones*, 520 U.S. 681 (1997) ........................................................................... 9

*ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58 (M.D. La. 2016) .......................... 12

*Frisco Med. Ctr., LLP v. Bledsoe*, Case No. 4:12cv37, 2012 WL 12919154
(E.D. Tex. Feb. 24, 2012) ................................................................................. 12

*Glynn v. EDO Corp.*, Civil No. JFM-07-01660, 2010 WL 3294347
(D. Md. Aug. 20, 2010) ...................................................................................... 8

*Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777 (N.D. W. Va. 2006) ................................ 12

*Hill v. Hunt*, Civil Action No. 3:07-CV-02020-O, 2008 WL 4108120
(N.D. Tex. Sept. 4, 2008) ................................................................................... 8

*In re Am. Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992) ..................................................... 8

*In re Meador*, 968 S.W.2d 346 (Tex. 1998) ........................................................... 3, 8

*In re Mktg. Inv'rs Corp.*, 80 S.W.3d 44 (Tex. App.—Dallas 1998) ............................... 1, 2, 3, 8, 9

*IPVX Patent Holdings, Inc. v. 8X8, Inc.*, Case No: C 13-01707 SBA,
2013 WL 6000590 (N.D. Cal. Nov. 12, 2013) ...................................................... 10

*Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D. Wash. 2002) ..................................... 9

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) ...................................................... 9, 10

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235
(N.D. Tex. 2016) ............................................................................................. 11

*Redwood Software, Inc. v. Urbanik*, No. 1:12-CV-495 (LEK/DRH), 2012 WL 1097317
(N.D.N.Y. Mar. 30, 2012) ................................................................................. 12

*Rose v. Abraham*, No. 1:08-CV-00606-AWI-SMS, 2008 WL 3540542
(E.D. Cal. Aug. 13, 2008) ............................................................................. 12-13

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support

*Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386 (1995)..................................................9

*United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27 (D.D.C. 2004)......................................11

*Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016)......................................2, 7, 8

**Rules**

FED. R. CIV. P. 26(b) ............................................................................................................1, 11

FED. R. CIV. P. 26 (c)...........................................................................................................1, 11

**Treatise**

1 George E. Dixon *et al.*, McCormick on Evidence § 89 (4th ed. 1992).........................................3

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support

iii

Pursuant to Federal Rule of Civil Procedure 26(b) & (c), Defendants Kroenke Sports & Entertainment, LLC ("KSE") and Outdoor Channel Holdings, Inc. ("Outdoor," together with KSE, "Defendants") submit this Emergency Motion as a result of Plaintiff having **misappropriated** thousands of pages of Defendants' documents and over 21 GB of electronically stored information (including a voluminous amount of confidential and proprietary information), **specifically for use in this case**, and then sharing at least some of that material with his attorneys. Defendants only learned of this situation within the last three weeks, in connection with Plaintiff's response to Defendants' discovery requests. Defendants request a stay of this case and an expedited limited deposition schedule and hearing for the purpose of determining the extent of Plaintiff's misconduct and the remedy as a result thereof. *See In re Mktg. Inv'rs Corp.*, 80 S.W.3d 44 (Tex. App.—Dallas 1998, orig. proceeding).

## I.      INTRODUCTION

As detailed in recent filings before this Court and by his own admission, Plaintiff, the former President of Outdoor subsidiaries SkyCam, LLC and CableCam, LLC (collectively, the "Aerial Camera Business"), took (nee, misappropriated) over 21 GB of electronically stored information and over two boxes of hard copy materials, belonging to Defendants and the Aerial Camera Business, and retained those documents after his termination in May 2014. A voluminous amount of that material contains confidential and proprietary information of Defendants and the Aerial Camera Business.[1] We now know that Plaintiff also provided at least some of this material to a number of attorneys, including attorneys at Gray Reed & McGraw LLP ("Gray Reed")—Plaintiff's trial counsel in this case, Fulbright Jaworski LLP (n/k/a Norton

---

[1] Also included among the material Plaintiff took was attorney-client communications between KSE, Outdoor and the Aerial Camera Business, and their attorneys.

Emergency Motion Of Defendants Kroenke Sports & Entertainment, LLC And Outdoor Channel Holdings, Inc. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support

Rose Fulbright US LLP) ("Fulbright"), and other unidentified "prospective counsel." *See* Defendants' Motion To Compel Return Of Company Documents (ECF #88-1, filed 1/17/2018) ("Motion To Compel"); Plaintiff's Motion For Retention Order (ECF #89-1, filed 1/17/2018) and Sworn Declaration Of Nic Salomon (Exhibit "A" thereto) ("Salomon Dec.").

Not only does Plaintiff's misappropriation and improper retention of the above-referenced materials constitute a violation of a Confidential Information Agreement executed by Plaintiff, the employee handbooks pertaining to his former employment as President of the Aerial Camera Business (Motion To Compel, ECF #88-2, App. 0122–0248, Exs. 1-O, 1-P, 1-Q), and federal, State statutory and common law, but his disclosure of the misappropriated materials to Gray Reed, Fulbright, and to other attorneys not presently known may have significant and overarching implications on the remainder of this case; as such, this issue requires immediate adjudication. *See In re Mktg. Inv'rs Corp.*, 80 S.W.3d at 51–52 (disqualifying former employee's trial counsel where trial counsel failed to notify company that former employee was in possession of company's documents and company only learned of misappropriated documents through discovery). *See also Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1317 & 1324–25 (D. Utah 2016) (dismissing former employee's claims and counterclaims because he improperly took over 300 company documents in anticipation of litigation and used them to support his claims).

Despite efforts by Defendants to uncover the full extent of Plaintiff's disclosure of Defendants' property that Plaintiff misappropriated, Defendants still do not know, among other things, when such materials were disclosed to the above-referenced attorneys, and to what extent Plaintiff's trial counsel, Gray Reed, has made use of these materials in the course of this

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support    2

App. 081

litigation (Defendants requested this information from Gray Reed, but has received no response). Defendants and the Court need such information in order to determine the appropriate remedy.

Through this Motion, Defendants respectfully request that the Court stay all aspects of this case (except those related to the limited discovery Defendants request herein) and set a special scheduling order for the following discovery, to be permitted on an expedited basis:

➢ A deposition of Plaintiff;

➢ A deposition of a representative of Gray Reed;

➢ A deposition of a representative of Fulbright; and

➢ A deposition of a representative of "prospective counsel" with whom Plaintiff shared Defendants' documents.

The subject of each deposition would be limited to the facts and circumstances of Plaintiff's misappropriation and retention of Defendants' property, Plaintiff's disclosure of that property, and receipt, review, and use of Defendant's property by Plaintiff's counsel.[2] Defendants commit to taking this discovery within 14 days of the Court's order on this Emergency Motion (dependent on the availability of the deponents).

Defendants' Emergency Motion should be granted because: (1) a stay of all proceedings not directly related to discovery regarding Plaintiff's retention and disclosure of Defendants' confidential, proprietary, and privileged materials will prevent prejudice to Defendants; and (2) good cause exists for the Court to set a special scheduling order to allow Defendants to

---

[2] It should be noted that any such counsel who received such material had an obligation to notify Defendants of their receipt of the material, and to return it. *See In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) ("[T]he attorney-client privilege does not relieve an attorney from his or her ethical duty to turn over . . . misappropriated property received from a client." (citing 1 George E. Dixon *et al.*, McCormick on Evidence § 89 (4th ed. 1992)). *See also In re Mktg. Inv'rs Corp.*, 80 S.W.3d at 51 (same).

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support          3

determine the scope of Plaintiff's improper disclosure of property Plaintiff misappropriated from Defendants and the Aerial Camera Business, and to evaluate the appropriate relief as a result thereof. Defendants also request an expedited hearing on this Emergency Motion following the completion of the 4 depositions noted above.

## II. FACTUAL BACKGROUND

### A. AGREEMENTS GOVERNING PLAINTIFF'S EMPLOYMENT

As a condition of employment, Outdoor required employees, including Plaintiff, to sign a Confidential Information Agreement. (A copy of the May 6, 2009 Outdoor Channel Holdings, Inc. At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Confidential Information Agreement") executed by Plaintiff is included as Exhibit A to the Evans Affidavit In Support of this Emergency Motion ("Evans Aff."), App. 0004–0017). The Confidential Information Agreement provides, in pertinent part:

> 2. *Confidential Information*.
>
> A. *Company Information*. I agree that **during and after my employment with the Company**, **I will hold in the strictest confidence, and will not use** (except for the benefit of the Company during my employment) **or disclose** (except for the benefit of the Company during my employment) **to any person, firm, or corporation, any Company Confidential Information**. . . . I understand that "**Company Confidential Information**" means any non-public information that relates to the actual or anticipated business, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information; provided, however, Company Confidential Information does not include any of the foregoing items to the extent the same have become publicly known and made generally available through no wrongful act of mine or of others. I understand that nothing in this Agreement is intended to limit employees' rights to discuss

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support      4

App. 083

the terms, wages, and working conditions of their employment, as protected by applicable law.

\* \* \*

5. *Returning Company Documents.* **Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information**, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any and all of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors, or assigns, including, without limitation, those records maintained pursuant to Section 3.C. I also consent to an exit interview to confirm my compliance with this Section 5.

\* \* \*

11. *Audit.* . . . I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

(App. 0005, 0008–0009 , Ex. 1-A ¶¶ 2, 5, 11 (emphasis added)).

In addition, Plaintiff was on notice of the terms of the Employee Handbooks of Outdoor Channel Holdings, Inc. and The Outdoor Channel, Inc. ("Outdoor Handbook"), and the Employee Handbook of Kroenke Sports & Entertainment, LLC ("KSE Handbook"), which set forth Defendants' expectations that its property be kept confidential (during and after employment) and be returned to Defendants after termination of employment. (*See* Motion To Compel ECF #88-1). The Outdoor Handbooks and the KSE Handbook have been filed under seal at ECF #88-2, App. 0122–0248, Exs. 1-O, 1-P, Ex. 1-Q.

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support          5

App. 084

## B.    PLAINTIFF'S DISCLOSURE OF THE MISAPPROPRIATED PROPERTY TO HIS ATTORNEYS

There is *no* dispute that Plaintiff retained (improperly) voluminous amounts of Defendants' documents after his termination as President of the Aerial Camera Business, and then disclosed at least some of this material to third parties—specifically, his attorneys.  During the first week of January 2018, and following Defendants' request for production of documents, two different law firms retained by Plaintiff—Johnston Tobey Baruch, P.C. ("Johnston") and Gray Reed—produced to Defendants copies of documents in Plaintiff's and their possession. (Motion To Compel, App. 0002 & 0005, Ex. 1 ¶¶ 7 & 18).  Through the production of these documents, Defendants learned for the first time that Plaintiff had wrongfully taken and retained reams of confidential and proprietary documents, and other material, of Defendants and the Aerial Camera Business.  (*See id.*, App. 0002–0004, Ex. 1 ¶¶ 8 & 10).  For its part, Gray Reed made a document production to Defendants of hard copy documents and ESI consisting of over 5,400 pages which clearly contain documents belonging to Defendants and the Aerial Camera Business.  (Evans Aff. ¶¶ 4–5).  By letter dated January 12, 2018, Defendants' counsel advised Gray Reed of the control numbers of confidential and proprietary information of Defendants and the Aerial Camera Business contained within that production.  (App. 0038–0076, Ex. E).

Further, Plaintiff has admitted that prior to his termination, he indiscriminately and intentionally imaged the Aerial Camera Business computer he used during his employment, and retained the imaged material (comprised of over 21 GB of data) and hard copy documents after his termination specifically for use in this litigation.[3]  Plaintiff also has admitted that he provided various materials to his personal attorneys at Gray Reed, Fulbright, and other unidentified

---

[3] A screen shot of the over 21 GB of folders that Plaintiff misappropriated is attached as Exhibit B.  (App. 0018–0030).

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support                6

"prospective counsel." (Salomon Dec. ¶ 11, ECF #89-1, Ex. A).

Defendants have tried in vain to determine the extent and consequences of Plaintiff's misconduct. (*See* App. 0031–0037, Exs. C & D). For instance, in an effort to determine the extent of Plaintiff's disclosure of the property of Defendants and the Aerial Camera Business (including their confidential and proprietary information) to Gray Reed, and the use of said materials by Gray Reed, Defendants' counsel sent Gray Reed a letter on January 9, 2018 (App. 0034–0037, Ex. D) inquiring, among other things:

> ➢ When did Mr. Salomon first share with your firm any documents (including but not limited to those sent or received via his SkyCam, LLC email address) that he removed from the Aerial Camera Business, Outdoor, and/or KSE;

> ➢ Please identify all such documents that your client shared with your firm and when;

> ➢ Please state why your firm did not inform my clients (through me) of its receipt of such documents taken by Mr. Salomon;

> ➢ Please state whether anyone in your firm reviewed any such documents prior to, and/or used any such documents to prepare, any of the Complaints filed by your client in this case or your client's discovery responses, and if so, which such documents your firm reviewed/used and for what purpose; and

> ➢ If the answer to the preceding question is yes, please state why you believed it was appropriate to review and/or use any such documents that were improperly taken and retained by your client, particularly in light of your client's Confidential Information Agreement, the Outdoor Employee Handbook, and the KSE Employee Handbook, the terms and obligations of which your client was aware.

Gray Reed has not responded to any of those questions.

## III.   ARGUMENT

### A.   PLAINTIFF'S DISCLOSURE TO HIS ATTORNEYS OF MISAPPROPRIATED PROPERTY, INCLUDING CONFIDENTIAL AND PROPRIETARY INFORMATION OF DEFENDANTS AND THE AERIAL CAMERA BUSINESS, REQUIRES IMMEDIATE ATTENTION

Plaintiff's misappropriation and admitted use of Defendants' property in connection with this case is "an affront to the established rules of engagement and fair play in lawsuits."

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support          7

App. 086

*Schenkel*, 200 F. Supp. 3d at 1317 & 1324–25 (dismissing former employee's claims and counterclaims because he improperly took over 300 company documents in anticipation of litigation and used them to support his claims).  Plaintiff's attorneys compounded the problem when they refused to return Defendants' misappropriated property (even after Defendants' repeated demands for the return of this material).  *See In re Mktg. Inv'rs Corp.*, 80 S.W.3d at 51 (" '[T]he attorney-client privilege does not relieve an attorney from his or her ethical duty to turn over . . . misappropriated property received from a client.' " (quoting *In re Meador*, 968 S.W.2d at 353)).

A court is " *obliged* to take measures " when confronted with such misconduct.  *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992) (citation omitted). *See also Hill v. Hunt*, Civil Action No. 3:07-CV-02020-O, 2008 WL 4108120, at *2 (N.D. Tex. Sept. 4, 2008) (citing *In re Am. Airlines, Inc.*, 972 F.2d at 611) (same).  Federal courts employ a range of sanctions when presented with a party and/or counsel who wrongfully obtains and uses the confidential information of an opposing party in litigation.  *See generally*, *Glynn v. EDO Corp.*, Civil No. JFM-07-01660, 2010 WL 3294347, *3–4 (D. Md. Aug. 20, 2010) (discussing cases ordering the dismissal of claims, return of documents, and precluding the offending party from using "the wrongfully obtained information" as appropriate sanctions).  Depending upon the facts of the situation, a variety of sanctions may be appropriate including, but not limited to, dismissal of the action, disqualification of counsel, preclusion from use of misappropriated materials in litigation, and/or monetary sanctions.  *See Schenkel*, 200 F. Supp. 3d at 1317 (dismissing former employee's claims and counterclaims because he improperly took over 300 company documents in anticipation of litigation and then used them to support his claims); *Glynn*, 2010 WL 3294347, at *3–4 (imposing monetary sanctions on plaintiff and his counsel for improperly obtaining and

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support          8

App. 087

using defendant's internal materials); *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 431–33 (W.D. Wash. 2002) (dismissing plaintiff's claims against former employer where plaintiff used former employer's stolen confidential, proprietary, and privileged information in preparing his case), *aff'd*, 78 F. App'x 588 (9th Cir. 2003); *In re Mktg. Inv'rs Corp.*, 80 S.W.3d at 51–52 (disqualifying former employee's trial counsel where trial counsel failed to notify company that former employee was in possession of company's documents and company only learned of misappropriated documents through discovery). Given the gravity of this issue, Defendants reserve their right to pursue appropriate relief after they have a full understanding of the extent of Plaintiff's misappropriation and disclosure of their property, and the use that was made thereof.

**B.** **ALL PROCEEDINGS IN THIS MATTER NOT DIRECTLY RELATED TO THIS ISSUE SHOULD BE STAYED UNTIL THE ISSUE IS RESOLVED**

Until the extent of Plaintiff's disclosure and use of Defendants' property is known, all aspects of this case not directly related to the limited discovery Defendants seek through this Motion should be stayed. Federal district courts enjoy broad discretion in controlling their dockets and may stay proceedings as they deem fit. *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254. *See also Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 411 (1995) ("[W]e have long recognized that courts have inherent power to stay proceedings."). "Accordingly, when the interests of justice seem to require such action, a court may exercise its discretion to stay civil proceedings, postpone discovery, or impose protective orders and conditions." *Amec Constr. Mgmt., Inc. v. Fireman's Fund Ins. Co.*, CIVIL ACTION NO 13-

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support          9

App. 088

00718-JJB-EWD, 2016 WL 7468808, at *2 (M.D. La. May 31, 2016) (citation, internal quotation marks, and alteration omitted) (granting stay pending resolution of motion for disqualification of counsel).

A party seeking a stay must first "make a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 254. Defendants here would be exposed to risk of prejudice and irreparable harm without full evaluation and subsequent remedy of Plaintiff's disclosure and use of Defendants' property that Plaintiff misappropriated. As discussed herein, it is quite conceivable that Plaintiff's misconduct will warrant the imposition of sanctions, at least against Plaintiff, and up to and including dismissal of this case. Courts have stayed proceedings to facilitate the resolution of sanctions motions, including motions for the disqualification of counsel. *See Amec Constr. Mgmt., Inc*, 2016 WL 7468808, at *2(staying proceedings pending resolution of disqualification motion). *See also IPVX Patent Holdings, Inc. v. 8X8, Inc.*, Case No: C 13-01707 SBA, 2013 WL 6000590, at *2 (N.D. Cal. Nov. 12, 2013) (staying discovery pending resolution of disqualification motion). A stay of proceedings is also properly utilized to protect the confidential information of a party where a motion for disqualification of counsel is pending. *See id.* ("a limited stay of discovery is appropriate to prevent Plaintiff's counsel from obtaining technical and financial information about Defendant before a determination is made as to whether Plaintiff's counsel may continue to represent Plaintiff in this action").

Second, for a stay to be proper it must be limited to a time that is "reasonable" under the circumstances. *See Landis*, 299 U.S. at 257. Defendants request that the Court stay proceedings for the discrete purpose of evaluating Plaintiff's disclosure and the use of property he misappropriated from Defendants and the Aerial Camera Business. The requested stay is limited in duration and eminently reasonable. A short stay of proceedings to permit the requested

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support     10

App. 089

discovery will prevent further harm to Defendants caused by Plaintiff's misconduct and facilitate a timely and efficient resolution of the issue while preserving the Court's time and resources.

## C. THE COURT SHOULD SET A LIMITED DISCOVERY SCHEDULE TO ALLOW DEFENDANTS' REQUESTED DISCOVERY

FEDERAL RULES OF CIVIL PROCEDURE 26(b) and 26(c) grant the Court broad discretion to control the scope and volume of discovery. *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, at headnote 14 (N.D. Tex. 2016) (noting that "[r]ules 26(b) and 26(c) together grant the Court broad discretion to control and, as appropriate, limit the scope and volume of discovery"). Further, courts have substantial discretion to decide whether to grant formal discovery where disqualification of counsel is at issue. *United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27, 34 (D.D.C. 2004). Defendants presently are not moving for disqualification (at least not yet) precisely because they do not know the extent of Gray Reed's use of the misappropriated documents and information; Defendants require limited, expedited discovery in order to determine the full extent of any such use by Gray Reed or any of the other attorneys and firms with whom Plaintiff shared the documents and information he pilfered. Defendants reserve their right to seek an appropriate remedy at that time. Defendants request that the Court issue an order allowing Defendants to conduct the following necessary discovery on an expedited basis:

> ➢ A deposition of Plaintiff;
>
> ➢ A deposition of a representative of Gray Reed;
>
> ➢ A deposition of a representative of Fulbright; and
>
> ➢ A deposition of the "prospective counsel" with whom Plaintiff shared Defendants' documents.

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support     11

App. 090

The subject of each deposition would be limited to the facts and circumstances of Plaintiff's misappropriation and retention of Defendants' property, Plaintiff's disclosure of that property to those firms and attorneys, and receipt, review, and use of Defendant's property by those firms and attorneys. Defendants commit to taking these depositions within 14 days of the Court's order on this Motion (dependent on the availability of the deponents).

The limited, discrete discovery Defendants seek is not overbroad and is reasonable under the circumstances, especially in light of the failure by Plaintiff's counsel to return Defendant's property and provide the information and assurances requested in the January 8 and 9, 2018 letters from Defendants' counsel.[4]

The discrete discovery that Defendants seek will impose a minimal burden on Plaintiff, because the depositions will be limited in scope and duration, and Defendants agree to hold the depositions at a mutually agreeable location. *See ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 64 (M.D. La. 2016) (granting expedited discovery and finding that burden of deposition was minimized by restrictions upon duration and scope of the deposition); *Rose v. Abraham*, No. 1:08-CV-00606-AWI-SMS, 2008 WL 3540542, at *3 (E.D. Cal. Aug. 13, 2008)

---

[4] The risk of irreparable harm to which Defendants are exposed due to the action of Plaintiff similarly weighs in favor of permitting expedited discovery. Courts in this circuit and across the country have held that the taking and/or disclosure of confidential information and documents under similar circumstances constitute irreparable harm. *See, e.g.*, *Redwood Software, Inc. v. Urbanik*, No. 1:12-CV-495 (LEK/DRH), 2012 WL 1097317, at *3 (N.D.N.Y. Mar. 30, 2012) (finding risk of irreparable harm where former employee took confidential documents in violation of his confidentiality agreement); *Frisco Med. Ctr., LLP v. Bledsoe*, Case No. 4:12cv37, 2012 WL 12919154, at *1 (E.D. Tex. Feb. 24, 2012) (finding likelihood of immediate and irreparable injury and harm where former employee misappropriated confidential and proprietary information and trade secrets); *Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 786–88 (N.D. W. Va. 2006) (finding a "likelihood of eminent harm" where former employee disclosed confidential information to her attorney and requiring return of all confidential documents).

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support     12

(burden of expedited depositions did not outweigh benefits of discovery where scope was limited and party seeking discovery offered to take depositions at a mutually agreeable location).

Given the current circumstances of this case, good cause exists to allow Defendants to conduct limited discovery on an expedited basis in order to investigate the extent and effect of Plaintiffs' misconduct and to allow Defendants to seek the appropriate relief based upon the outcome of that discovery.

## IV.    CONCLUSION

WHEREFORE, Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC. respectfully request that the Court grant this Emergency Motion and enter an Order:

(a)    Setting a hearing on this Emergency Motion within 14 days of its filing;

(b)    Staying all aspects of this proceeding that are unrelated to the expedited discovery Defendants seek;

(c)    Setting an expedited schedule for the following depositions to be taken by Defendants, which will be limited in subject matter to the facts and circumstances of Plaintiff's misappropriation and retention of Defendants' property, Plaintiff's disclosure of that property, and receipt, review, and use of Defendant's property by the firms identified herein:

      (i)    A deposition of Plaintiff;

      (ii)    A deposition of a representative of Gray Reed;

      (iii)    A deposition of a representative of Fulbright; and

      (iv)    A deposition of "prospective counsel" with whom Plaintiff shared Defendants' documents; and

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule For Expedited Limited Discovery And Hearing, And Memorandum In Support      13

App. 092

(d)      Setting a hearing following the completion of such depositions to determine the

appropriate remedy as a result of Plaintiff's misconduct.

Respectfully submitted,

Date:  January 24, 2018            By:     *s/ Kevin D. Evans*
                                             Kevin D. Evans
                                             *Admitted pro hac vice*
                                           Emily B. Buckley
                                           *Admitted pro hac vice*
                                           ARMSTRONG TEASDALE LLP
                                           4643 South Ulster Street, Suite 800
                                           Denver, CO 80237
                                           Telephone:  720.200.0676
                                           Facsimile:  720.200.0679
                                           Email:  kdevans@armstrongteasdale.com
                                                      ebuckley@armstrongteasdale.com

                                           and

                                           Paul C. Watler
                                           State Bar No. 00784334
                                           Shannon Zmud Teicher
                                           State Bar No. 24047169
                                         JACKSON WALKER L.L.P.
                                         2323 Ross Avenue, Suite 600
                                           Dallas, Texas 75201
                                           Telephone:  214.953.6000
                                           Facsimile:  214.953.5822
                                           Email:  pwatler@jw.com
                                                       steicher@jw.com

                                           Attorneys for Defendants KROENKE SPORTS
                                           & ENTERTAINMENT, LLC and
                                           OUTDOOR CHANNEL HOLDINGS, INC.

Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support        14

App. 093

## CERTIFICATE OF CONFERENCE

On January 19, 2018, Defendants' counsel informed Plaintiff's counsel Gray Reed by email that Defendants intended to file this Emergency Motion during the first part of the week of January 22, 2018, and would "move for an immediate stay of this case and for an expedited discovery schedule and hearing on the question of the remedy for your client having shared with you documents he misappropriated from my clients."  The same day, Plaintiff's counsel Cleveland Clinton confirmed receipt of that email and stated that he would "consider and respond in due course."  During the morning of January 24, 2018, the undersigned sent another email to Mr. Clinton, informing him that Defendants would be filing this Emergency Motion today, and requesting Plaintiff's response.  As of the filing of this Emergency Motion, Plaintiff's counsel has not informed Defendants of Plaintiff's position.


/s/*Kevin D. Evans*
Kevin D. Evans


Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support          15

## CERTIFICATE OF SERVICE

This is to certify that on this 24th day of January, 2018, I caused the foregoing **EMERGENCY MOTION OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC. TO STAY PROCEEDINGS AND TO SET A SCHEDULE FOR EXPEDITED LIMITED DISCOVERY AND HEARING, AND MEMORANDUM IN SUPPOR**T to be electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have caused all counsel of record electronically as authorized by Rule 5(b)(2) of the FEDERAL RULES OF CIVIL PROCEDURE, via electronic and U.S. mail.


/s/ *Kevin D. Evans*
Kevin D. Evans


Emergency Motion Of Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC. To Stay Proceedings And To Set A Schedule
For Expedited Limited Discovery And Hearing, And Memorandum In Support          16

App. 095

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 7

### AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
### KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
### <u>HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | *Filed Electronically Under Seal* |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC
## AND OUTDOOR CHANNEL HOLDINGS, INC.'S
## MOTION TO COMPEL RETURN OF COMPANY DOCUMENTS
## AND MEMORANDUM IN SUPPORT THEREOF

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: 214.953.6000
Facsimile: 214.953.5822
Email: pwatler@jw.com
          steicher@jw.com

Kevin D. Evans
*Admitted pro hac vice*
Emily B. Buckley
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.200.0676
Facsimile: 720.200.0679
Email: kdevans@armstrongteasdale.com
          ebuckley@armstrongteasdale.com

Attorneys for Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and
OUTDOOR CHANNEL HOLDINGS, INC.

January 17, 2018

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................4

I.    DOCUMENTS IN POSSESSION OF PLAINTIFF AND PROVIDED TO JOHNSTON .........................4

II.   DOCUMENTS PRODUCED BY GRAY REED ...........................................................8

ARGUMENT ....................................................................................................................9

I.    DEFENDANTS ARE ENTITLED TO THE RETURN OF ALL DOCUMENTS TAKEN BY PLAINTIFF AND COPIES THEREOF ....................................................................10

II.   DEFENDANTS WILL SUFFER IRREPARABLE HARM IF THE DOCUMENTS CONTAINING CONFIDENTIAL AND PROPRIETARY INFORMATION ARE NOT RETURNED ..........................13

CONCLUSION ...............................................................................................................15

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To
Compel Return Of Company Documents And
Memorandum In Support Thereof

i

# TABLE OF AUTHORITIES

**Cases**

*Courtroom Scis., Inc. v. Andrews*, Civil Action No. 3:09-CV-251-O,
    2009 WL 1313274 (N.D. Tex. May 11, 2009) ..................................................13

*Dell v. Weatherford U.S., L.P.*, No. 2:09CV000012 BSM,
    2010 WL 1492794 (E.D. Ark. Apr. 14, 2010) .......................................... 14-15

*Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646 (E.D. Tex. 2015) ................................3

*Frisco Med. Ctr., LLP v. Bledsoe*, Case No. 4:12cv37,
    2012 WL 12919154 (E.D. Tex. Feb. 24, 2012) ..................................................13

*Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777 (N.D. W. Va. 2006) ............................13, 14

*Hill-McFadden v. Bank of Am., N.A.*, No. 3:06-cv-466-J-32HTS,
    2008 WL 2557543(M.D. Fla. June 20, 2008) ..................................................15

*In re Mktg. Inv'rs Corp.*, 80 S.W.3d 44 (Tex. App.—Dallas 1998) ..............................14

*In re Meador*, 968 S.W.2d 346 (Tex. 1998) ..................................................14

*Propath Servs., L.L.P. v. Ameripath, Inc.*, No. Civ.A.3:04-CV-1912-P,
    2004 WL 2389214 (N.D. Tex. Oct. 21, 2004) ..................................................13

*Redwood Software, Inc. v. Urbanik*, No. 1:12-CV-495 (LEK/DRH),
    2012 WL 1097317 (N.D.N.Y. Mar. 30, 2012) ..................................................13

*Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911 (4th Cir.1997) ..........................14

**Rules**

FED. R. CIV. P. 26(c) ..........................................................................................1

**Statutes**

18 U.S.C. § 1030 ..............................................................................................3

18 U.S.C. § 2707 ..............................................................................................3

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To
Compel Return Of Company Documents And
Memorandum In Support Thereof

ii

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 26(c), Plaintiffs KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE") and OUTDOOR CHANNEL HOLDINGS, INC. ("Outdoor," together with KSE, "Defendants"), submit this Motion To Compel Return Of Company Documents And Memorandum In Support Thereof.

## INTRODUCTION

During the first week of January 2018, and following Defendants' request for production of documents, two different law firms retained by Plaintiff Nic Salomon ("Plaintiff")—Johnston Tobey Baruch, P.C. ("Johnston") and Gray Reed McGraw LLP ("Gray Reed")—produced to Defendants copies of documents in Plaintiff's possession. (App. 0002 & 0005, Ex. 1, Affidavit Of Kevin D. Evans In Support Of Motion To Compel Return Of Company Documents ("Evans Aff.") ¶¶ 7 & 18). Through the production of these documents, Defendants learned for the first time that Plaintiff, the former President of Outdoor subsidiaries SkyCam, LLC and CableCam, LLC (collectively, the "Aerial Camera Business"), had wrongfully taken and retained reams of confidential and proprietary documents, and other material, of the Aerial Camera Business, Outdoor, and KSE. (See App. 0002–0005, Ex. 1, Evans Aff. ¶¶ 8–10, 19). For example, the hard copy documents produced by Johnston contain the following:

➢ 2012–2014 Company emails regarding—
  • Project initiatives;
  • Financial results and projections;
  • Business opportunities;
  • Negotiations with customers;
  • Project with the Navy, including financial and performance results;
  • Capex budget and spending;
  • Consulting arrangements;
  • Employee issues;
  • Cost proposals;
  • Patent and trademark issues;
  • Customer relationships;

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And
OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    1

- Contractual terms with various customers (including financial terms);
- Business updates;
- Project staffing plans;
- Internal operational issues;
- License transfer in the Czech Republic; and
- Project pricing

➢ 2012 Confidentiality and Nondisclosure Agreement with a prospective customer
➢ 2012 Business development summary
➢ 2013 Business plan
➢ 2013 Management Committee presentation (including financial information and strategic initiatives)
➢ 2013 SkyCam Executive Summary containing discussion of projects and financial information
➢ 2013 Communications with clients
➢ 2013 Outdoor Channel budget memo
➢ 2013 Customer Relationship and Technology presentation
➢ 2013 Financial issues
➢ 2013 Capex expenditures
➢ 2013 Profit and loss information
➢ 2013 SkyCam development budget
➢ Documents related to potential acquisitions in 2013 and 2014
➢ Analysis of 2009–2012 financial results
➢ 2004–2012 Historical financial summary
➢ 2014 Outdoor Channel budget summary
➢ 2014 ESPN new contract proposal and counterproposals, including financial analysis
➢ 2014 Capex budget and financial requests
➢ 2014 Renewal proposal ideas re ESPN and Fox, including pricing
➢ 2014 KSE/Aerial Camera Business Overview (references projects, project initiatives, and financial information)
➢ Internal KSE and Aerial Camera Business policies
➢ Proposed 2014 Aerial Camera Business budget
➢ Per game cost information
➢ Project budgets
➢ Customer invoices
➢ Historical capex information
➢ Employee contracts
➢ Form independent contractor services agreement
➢ Employee bonus and compensation information
➢ Dozens of attorney-client privileged communications relating to such things as patent and trademark issues, and a lawsuit against a competitor

(App. 0002–0004, Ex. 1, Evans Aff. ¶ 9; App. 0040–0058, Ex. 1-I).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                           2

Moreover, it is evident from the screen shot of the folder names on the thumb drive produced by Johnston (the folders contain over 12,000 files and 21 GB of data) that Plaintiff engaged in a wholesale, improper copying of his Aerial Camera Business computer and documents on the Outdoor server. (App. 0002–0004, Ex. 1, Evans Aff. ¶¶ 7–10; App. 0021–0033, Ex. 1-F). Similarly, Gray Reed produced confidential and proprietary documents and other property improperly taken and retained by Plaintiff. (App. 0005, Ex. 1, Evans Aff. ¶ 19).

As counsel for Defendants have informed Plaintiff's attorneys, Plaintiff took and retained these materials in violation of a Confidential Information Agreement executed by Plaintiff and the Employee Handbooks pertaining to his employment.[1] (App. 0034–0036, 0040–0058, 0062–0065 & 0069–0107, Exs. 1-G, 1-I, 1-K, & 1-M). Though Defendants have demanded the immediate return of such materials and various related assurances by Plaintiff, as of the filing of this Motion To Compel, Plaintiff has not returned a single document or provided the assurances demanded by Defendants. Defendants' Motion To Compel should be granted because: (1) Defendants are entitled to the return of these documents under the terms of the Confidential

---

[1] Further, Mr. Salomon's actions are in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, the Electronic Communications Privacy Act/Stored Communications Act ("ECPA"), 18 U.S.C. § 2707, and various Texas statutory provisions and common law. *See, e.g., Frisco Med. Ctr., L.L.P.* v. *Bledsoe,* 147 F. Supp. 3d 646, 658 – 59, 661 (E.D. Tex. 2015) (granting CFAA and ECPA summary judgment claims where plaintiff intentionally and knowingly accessed a protected computer without authorization (CFAA) and exceeded authorization to access a facility to "obtain[ ] and transmit[ ] numerous files, while they were in electronic storage" (ECPA)). As a result of Plaintiff's misconduct, and in accordance with his Confidential Information Agreement, Defendants are initiating arbitration before the Judicial Arbitration & Mediation Services, Inc. in California. Defendants are asserting violations of the afore-mentioned statutes and common law, and are seeking, among other things, their damages and losses, as well as disclosure of information such as the names of everyone/entity with whom Plaintiff here has shared the documents and/or information he wrongfully took (this includes disclosure of whether, and if so, what documents and/or information Plaintiff shared with Gray Reed, and when).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof          3

Information Agreement signed by Plaintiff; and (2) Defendants have a strong interest in protecting this information and will suffer irreparable harm if it is not returned.

## FACTUAL BACKGROUND

### I.    DOCUMENTS IN POSSESSION OF PLAINTIFF AND PROVIDED TO JOHNSTON

In a letter dated December 6, 2017, Coyt Randal Johnston informed counsel for Defendants that Plaintiff had retained Johnston "to represent [Plaintiff] with respect to documents under his control that may be relevant to the pending federal litigation between [Plaintiff and Defendants]." (App. 0007–0009, Ex. 1-A). Mr. Johnston's letter stated that Plaintiff had tendered the documents at issue and a scan of his computer hard drive to Johnston. (*Id*.) On December 8, 2017, counsel for Defendants advised Mr. Johnston that

> if Mr. Salomon obtained and/or took any documents and/or material (electronic or print) of or from KSE, Outdoor, or the Aerial Camera Business (for example, if he downloaded or copied any such documents and/or material and retained those documents and/or material after he was terminated), then he did so illegally and improperly. Mr. Salomon had no right to take and retain any documents and/or material of KSE, Outdoor, or the Aerial Camera Business, and we hereby demand the ***immediate*** return of all such documents and material, and any copies and/or scans that have been made thereof.

(App. 0010–0012, Ex. 1-B).

Counsel for Defendants also informed Mr. Johnston that if the requested material was not returned, Defendants would take action to secure its return. Further, Mr. Johnston was advised that neither he nor anyone else in his firm was authorized by KSE, Outdoor, or the Aerial Camera Business to retain or review any such Documents or to disclose any such Documents to anyone.

Through further correspondence on December 8 and December 11, 2017, Defendants and Plaintiff arrived at an agreed procedure with respect to the documents in Johnston's possession.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    4

(*See* App. 0016–0020, Exs. 1–D, 1–E).  ***Of particular note, Johnston did not inform Defendants' counsel that Plaintiff had engaged in a wholesale copying and taking of material on his computer and the Outdoor server.***   On December 18, 2017, the Court granted Defendants' unopposed motion for entry of an agreed protective order (ECF #85), and entered the Agreed Protective Order For The Treatment Of Certain Documents In The Possession Of Plaintiff's Counsel Johnston Tobey Baruch, P.C. (ECF #86 ("Agreed Protective Order")).   The Agreed Protective Order sets forth the following procedure:

> 1.    Johnston Tobey Baruch will provide copies of the Documents to counsel for Defendants within ten (10) days of the entry of this Agreed Protective Order. Johnston Tobey Baruch will not review the Documents except in accordance with the provisions of this Protective Order.
>
> a.    Prior to production of copies of the Documents to counsel for Defendants, Plaintiff will review the documents to determine if they contain personal documents of Plaintiff unrelated to this case, or documents that Plaintiff contends are privileged.  All Documents designated by Plaintiff as personal and unrelated to this case, or as privileged, will be provided to Johnston Tobey Baruch for review consistent with this Agreed Protective Order.   If Johnston Tobey Baruch concludes that Documents are privileged, it will produce a privilege log of those Documents to counsel for Defendants at the time of production of copies of the remaining Documents to counsel for Defendants.  If Johnston Tobey Baruch disagrees with Plaintiff's designation of a Document as personal and unrelated to this case, that Document will be included in the copies of Documents produced to counsel for Defendants.   No other Documents are to be reviewed by Johnston Tobey Baruch at that time.
>
> b.    Nothing in Section II.1.a is intended to constitute an admission by Defendants that any Documents withheld as privilege are in fact privileged. Indeed, there presently is a dispute between the parties as to whether Plaintiff has waived the attorney-client privilege and work product protection.
>
> 2.    After reviewing the Documents, counsel for Defendants will inform Johnston Tobey Baruch whether they believe Plaintiff improperly took and retained any Documents, and whether Defendants object to turn over of any Documents to anyone, including Gray Reed.  Counsel for Defendants also will inform Johnston Tobey Baruch whether they object to review of any designated

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                            5

App. 104

Documents (such as attorney-client privileged Documents) by Johnston Tobey Baruch.

3.      Only Mr. Johnston and his colleague Chad Baruch, also of Johnston Tobey Baruch, may review the objected-to documents identified by counsel for Defendants and to which Defendants agree Johnston Tobey Baruch may review.

4.      If there are Documents (such as attorney-client privileged Documents) that Defendants object to review by Johnston Tobey Baruch, those Documents will be presented to the Court for in camera review.

5.      If after reviewing the Documents identified as objectionable by Defendants and not subject to Section II.4 above, Johnston Tobey Baruch agrees with Defendants' position, then Johnston Tobey Baruch will destroy all copies of the objected-to documents in the firm's possession and certify in writing to Defendants that such destruction has been completed.  If Johnston Tobey Baruch does not agree with Defendants' position, then Johnston Tobey Baruch will notify Defendants of its disagreement, and Defendants will present the dispute to the Court within ten (10) business days.

6.      Johnston Tobey Baruch will not disclose the Documents to Gray Reed, or any other individual, person, or entity, absent Defendants' written permission or a Court order.  Furthermore, Johnston Tobey Baruch will not disclose any Documents (or any portion thereof) destroyed pursuant to Section 5 above or to which the Court sustains an objection by Defendants to anyone at any time.

7.      Should Johnston Tobey Baruch subsequently conclude that the Documents include any materials otherwise protected by the attorney-client privilege or work product doctrine, or any personal financial documents unrelated to this litigation, Plaintiff will be entitled—with timely notice by his counsel to counsel for Defendants—to assert the privilege and have the material returned without waiving Plaintiff's claim of privilege and without waiver of any claim by Defendants that the Documents in question are not privileged or that Plaintiff already had waived any claim of privilege thereto prior to his production of those Documents.   The parties intend this to be a "claw-back" agreement as contemplated by the federal rules of evidence and civil procedure.  By this agreement, Defendants do not concede the applicability of any asserted privilege. Should Defendants disagree with Mr. Salomon's assertion of privilege or entitlement to claw-back, the parties will present the dispute to the Court within ten (10) business days.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                                    6

App. 105

(Agreed Protective Order at 2 - 3).[2]

Pursuant to the Agreed Protective Order, on January 2, 2018, Defendants' counsel received from Johnston copies of two boxes of documents and a thumb drive that Salomon has in his possession. The thumb drive contains 21.4 GB of data (12,017 files and 1,560 folders/containers). (App. 0002, Ex. 1, Evans Aff. ¶ 7). Again, prior to negotiating the Agreed Protective Order, Johnston did not inform counsel for Defendants of the significant volume of materials Plaintiff took from the Aerial Camera Business, Outdoor and KSE, and then provided to Johnston. (App. 0004, *Id*. ¶ 11).

After reviewing the two boxes of hard copy documents and performing a high level review of the over 12,000 files saved to the thumb drive (the time and expense that would be associated with a document-by-document review of over 21 GB of documents improperly taken and retained by Plaintiff would be exorbitant), it was readily apparent to counsel for Defendants that Plaintiff had engaged in a wholesale and improper taking and retention of, among other things, a plethora of confidential and proprietary information belonging to the Aerial Camera Business, Outdoor, and KSE. (*See supra* at 1–3 and App. 0002–0004, Ex. 1, Evans Aff. ¶¶ 8–10). As a result, on January 8, 2018, counsel for Defendants informed Johnston that Plaintiff's misconduct violated his Confidential Information Agreement, the Outdoor Employee Handbook, and the KSE Employee Handbook, and constituted a violation of federal and State laws. (App.

---

[2] The Agreed Protective Order also provided: "Nothing in this Agreed Protective Order is intended to or does waive, forgo, or relinquish any claim by Defendants against Plaintiff related to the Documents. ¶ Entry of this Agreed Protective Order, or agreement to the procedure set forth herein, does not in any way waive any rights of KSE, Outdoor, or the Aerial Camera Business to the Documents or any information contained therein, including but not limited to any claim of trade secret, confidential information, proprietary information, or attorney-client or similar privilege." (*Id*. at 3).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    7

0034–0036, Ex.1-G).

In addition, pursuant to Section II.4 of the Agreed Protective Order, Defendants objected to Johnston reviewing any of the documents. That Section provides that "[i]f there are Documents . . . that Defendants object to review by Johnston Tobey Baruch, those Documents will be presented to the Court for in camera review." Given the significant volume of the documents at issue, and the clear cut nature of Plaintiff's misconduct, rather than ask the Court to waste valuable judicial resources to review two boxes of documents and 12,000 ESI files, in communications to Johnston on January 8, 9, and 12, 2018, Defendants demanded the immediate return of all documents Plaintiff tendered to Johnston. (*See* App. 0034–0036, 0040–61, Exs. 1-G, 1-I, 1-J). Plaintiff and Johnston have not returned the documents improperly taken and retained by Plaintiff, and provided the requested assurances. (App. 0004, Ex. 1, Evans Aff. ¶ 17).

## II.    DOCUMENTS PRODUCED BY GRAY REED

In addition to and separate from the documents provided to Defendants by Johnston, on January 5, 2018, Salomon's counsel of record, Gray Reed, produced documents in response to Defendants' document requests consisting of hard copy documents and over 1,500 files of ESI. (App. 0005, Ex. 1, Evans Aff. ¶ 18). Based on undersigned counsel's review of that January 5 production, it is clear that a significant amount of the produced materials consists of documents belonging to KSE, Outdoor, and the Aerial Camera Business that Plaintiff improperly took and then retained after his termination. On January 12, 2018, counsel for Defendants informed Gray Reed of the control numbers of the documents produced by Gray Reed that were improperly taken and retained by Plaintiff. (App. 0069–0107, Ex. 1-M). Not only did Salomon wrongly

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                                    8

take and retain these materials, he also disclosed them to a third party, Gray Reed, his counsel in this case, in contravention of the Confidential Information Agreement.  (*See* App. 0071, Ex. 1-M at 2).

Through correspondence on January 9 and 12, counsel for Defendants also demanded that Plaintiff and Gray Reed *immediately* return all identified material that Plaintiff removed from the Aerial Camera Business, Outdoor, and/or KSE, including any and all copies thereof, by the close of business on Friday, January 12, 2018.  (App. 0062–0065, 0069–0107, Exs. 1-K, 1-M).  As of the filing of this Motion, Plaintiff and Gray Reed have not complied with Defendant's demand that the documents be returned and appropriate assurances be provided. (App. 0065, Evans. Aff. ¶¶ 23 - 24).[3]

## ARGUMENT

Defendants' Motion should be granted because:  (1) Defendants are entitled to the return of the documents under the terms of the Confidential Information Agreement signed by Plaintiff (and the Employee Handbooks); and (2) Defendants will suffer irreparable harm if the documents are not returned.

Defendants have determined—and Plaintiff has not disputed—that Plaintiff removed and retained reams of documents containing, among other things, confidential and proprietary business information of the Aerial Camera Business, Outdoor, and KSE.  Further, Plaintiff has disclosed certain of this confidential and proprietary business information to his counsel of record, Gray Reed, in violation of the Confidential Information Agreement he signed.

---

[3] Defendants' January 9, 2018 letter also asked Gray Reed to answer certain questions regarding when Gray Reed received such documents and how those documents and/or the information in them has been used by the firm.  Gray Reed similarly declined to answer these questions.  (*See* App. 0062–0068, Exs. 1-K, 1-L).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    9

Defendants request that all of the information taken by Plaintiff (including all copies thereof) be returned.

## I. DEFENDANTS ARE ENTITLED TO THE RETURN OF ALL DOCUMENTS TAKEN BY PLAINTIFF AND COPIES THEREOF

As a condition of employment, Outdoor required employees, including Plaintiff, to sign a Confidential Information Agreement. (A copy of the May 6, 2009 Outdoor Channel Holdings, Inc. At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Confidential Information Agreement") executed by Plaintiff is included as Exhibit N to the Evans Affidavit, App. 0108–0121). The Confidential Information Agreement provides, in pertinent part:

> 2. *Confidential Information.*
>
> A. *Company Information.* I agree that **during and after my employment with the Company, I will hold in the strictest confidence, and will not use** (except for the benefit of the Company during my employment) **or disclose** (except for the benefit of the Company during my employment) **to any person, firm, or corporation, any Company Confidential Information**. . . . I understand that "**Company Confidential Information**" means any non-public information that relates to the actual or anticipated business, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information; provided, however, Company Confidential Information does not include any of the foregoing items to the extent the same have become publicly known and made generally available through no wrongful act of mine or of others. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.
>
> <div align="center">*      *      *</div>

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    10

5.   *Returning Company Documents.*   **Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information**, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any and all of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connetion with my employment with the Company, or otherwise belonging to the Company, its successors, or assigns, including, without limitation, those records maintained pursuant to Section 3.C.  I also consent to an exit interview to confirm my compliane with this Section 5.

*     *     *

11.   *Audit.* . . . I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

(App. 0109, 0112–0113, , Ex. 1-N ¶¶ 2, 5, 11 (emphasis added)).

In addition, Plaintiff was on knowledge of the terms of the Employee Handbooks of Outdoor Channel Holdings, Inc. and The Outdoor Channel, Inc. ("Outdoor Handbook"), which provide in relevant part:

All computers and the data stored on them are and remain at all times the property of the Company.  **As such, all messages created, sent or retrieved over the Internet or the Company's electronic mail system are the property of the Company** . . . .

*     *     *

**Should your employment be terminated, voluntarily or involuntarily, you are required to return all property owned by Outdoor Channel . . . prior to your departure**. . . .

(App. 0164 & 0170, 0214 & 0220, Exs. 1-O, 1-P at 38 & Termination of Employment (emphasis added)).

Defendants Kroenke Sports & Entertainment, LLC
And Outdoor Channel Holdings, Inc.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    11

The Employee Handbook of Kroenke Sports & Entertainment, LLC ("KSE Handbook")

sets forth an in relevant part:

**CONFIDENTIALITY**

Employees will have access to confidential and proprietary information of the Company and our clients. Disclosure of such information could seriously damage the Company's or a client's competitive position and therefore such action will not be tolerated. This non-disclosure applies during and after an employee's employment. Any copying, reproducing, or distributing of confidential information in any manner must be authorized by management. Confidential information remains the property of the Company and must be returned to the Company on demand**.**

\* \* \*

**Systems**

KSE's computer network, access to Internet, email and voice mail systems are business tools intended for employees to use in performing their job duties. Therefore, all documents and files are the property of KSE. All information regarding access to KSE's computer resources, such as user identifications, modem phone numbers, access codes and passwords are confidential Company information and may not be disclosed to non-Company personnel.

\* \* \*

Upon separation of employment, all communication tools should be returned to the Company.

\* \* \*

**Return of Company Property**

***Employees are expected to return all Company property in their possession or control immediately upon termination of employment for any reason.*** This includes keys, tools, credentials, electronics, equipment, or manuals they have received.

(App. 0228, 0233, 0242, Ex. 1-Q at pp. 6, 11, 20 (emphasis added)).

Under the plain terms of the Confidential Information Agreement, Outdoor Handbook,

and KSE Handbook, Defendants are clearly entitled to the return of their confidential and

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    12

App. 111

proprietary information, and other material wrongfully taken and retained by Plaintiff; indeed, Plaintiff was required to return all such property upon his termination. Despite Defendants' repeated demands for the return of this material, Plaintiff has refused.

## II. DEFENDANTS WILL SUFFER IRREPARABLE HARM IF THE DOCUMENTS CONTAINING CONFIDENTIAL AND PROPRIETARY INFORMATION ARE NOT RETURNED

As set forth in the Evans Affidavit, the documents in Plaintiff's, Johnston's, and Gray Reed's possession unquestionably contain confidential and proprietary business information. (App. 0002–0005, Ex. 1, Evans Aff. ¶¶ 8–10, 19). Courts in this circuit and across the country have held that the taking and/or disclosure of confidential information and documents under similar circumstances constitutes irreparable harm. *See, e.g.*, *Redwood Software, Inc. v. Urbanik*, No. 1:12-CV-495, (LEK/DRH), 2012 WL 1097317, at *3 (N.D.N.Y. Mar. 30, 2012) (finding risk of irreparable harm where former employee took confidential documents in violation of his confidentiality agreement); *Frisco Med. Ctr., LLP v. Bledsoe*, Case No. 4:12cv37, 2012 WL 12919154, at *1 (E.D. Tex. Feb. 24, 2012) (finding likelihood of immediate and irreparable injury and harm where former employee misappropriated confidential and proprietary information and trade secrets); *Courtroom Scis., Inc. v. Andrews*, Civil Action No. 3:09-CV-251-O, 2009 WL 1313274, at *14 (N.D. Tex. May 11, 2009) (recognizing that "[l]oss of confidentiality over client data is irreparable injury under Texas law"); *Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 786–88 (N.D. W. Va. 2006) (finding "a likelihood of eminent harm" where former employee disclosed confidential information to her attorney and requiring return of all confidential documents); *Propath Servs., L.L.P. v. Ameripath, Inc.*, No. Civ.A.3:04-CV-1912-P, 2004 WL 2389214, at *7 (N.D. Tex. Oct. 21, 2004) ( "in light of the

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                                    13

client lists, trade secrets and other highly confidential information, the Court finds Plaintiffs have met the burden of proving irreparable injury").

Here, not only has Plaintiff taken and retained Defendants' confidential and proprietary documents, but he also has disclosed certain of Defendants' confidential and proprietary documents to at least one third party: Gray Reed.[4] That Gray Reed is Plaintiff's attorney is irrelevant, as under the terms of the Confidential Information Agreement, Defendants' confidential information cannot be provided "***to any person, firm, or corporation***" regardless of whether that third party is an attorney. (App. 0109, Ex. 1-N at 1(emphasis added)). *See Zahodnick v. Int'l Bus. Machs. Corp.,* 135 F.3d 911, 915 (4th Cir.1997) (per curiam) (affirming summary judgment on former employer's counterclaim where ex-employee retained confidential materials after termination of his employment and forwarded those documents to his counsel); *Haught*, 417 F. Supp. 2d at 784 (finding breach of duty of confidentiality where confidential information was supplied to personal attorney). Further, "the attorney-client privilege does not relieve an attorney from his or her ethical duty to turn over . . . misappropriated property received from a client." *In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (citing 1 George E. Dix *et al.*, McCormick on Evidence § 89 (4th ed. 1992)). *See also In re Mktg. Inv'rs Corp.*, 80 S.W.3d 44, 51 (Tex. App.—Dallas 1998, orig. proceeding) (same).

In considering motions to compel in similar circumstances, federal courts have held that a former employee who wrongfully retained confidential information must return that information to the employer. *See Dell v. Weatherford U.S., L.P.*, No. 2:09CV000012 BSM, 2010 WL 1492794, at *2 (E.D. Ark. Apr. 14, 2010) (granting motion to compel and ordering former

---

[4] It is Defendants' present understanding that Johnston has not reviewed any of the documents which Plaintiff provided to the firm.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    14

employee plaintiff to return "all originals and copies of any documents containing proprietary and confidential information that she admittedly removed upon her termination"); *Hill-McFadden v. Bank of Am., N.A.*, No. 3:06-cv-466-J-32HTS, 2008 WL 2557543, at *2 (M.D. Fla. June 20, 2008) (granting motion to compel and ordering former employee plaintiff to reach an agreement with defendant concerning the production and return of confidential information).

Defendants have a strong interest in protecting their confidential and proprietary information, as well as their other property, from unauthorized possession or use by former employees for any purpose. Though Plaintiff has not (and cannot) dispute that he unlawfully took and retained Defendants' property, he has refused to return such material to Defendants, despite Defendants' repeated demands and his obligations under his Confidential Information Agreement. Plaintiff should not be allowed to retain these materials.

## CONCLUSION

Defendants respectfully request that the Court enter an Order compelling the return of all documents Plaintiff took from the Aerial Camera Business and/or Outdoor server, together with all copies thereof.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    15

Respectfully submitted,

Date:  January 17, 2018

By:   _s/ Kevin D. Evans_
Kevin D. Evans
_Admitted pro hac vice_
Emily B. Buckley
_Admitted pro hac vice_
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone:  720.200.0676
Facsimile:  720.200.0679
Email:  kdevans@armstrongteasdale.com
       ebuckley@armstrongteasdale.com

and

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  214.953.6000
Facsimile:  214.953.5822
Email:  pwatler@jw.com
       steicher@jw.com

Attorneys for Defendants KROENKE SPORTS
& ENTERTAINMENT, LLC and
OUTDOOR CHANNEL HOLDINGS, INC.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof       16

## CERTIFICATE OF CONFERENCE

This is to certify that, as explained above, Kevin D. Evans on January 9 and 12, 2018, demanded the return of Defendants' confidential and proprietary and other documents from Plaintiff, and from Coyt Randal Johnston at JOHNSTON TOBEY AND BARUCH, P.C., and from Cleveland G. Clinton, William B. Chaney, and William Drabble of GRAY REED, and informed both law firms that Defendants would pursue this motion to compel unless those documents were returned and appropriate assurances were provided by Plaintiff regarding dissemination of those documents. In addition, Mr. Evans sent all such counsel an email the morning of January 17, 2018, informing them again that this Motion would be filed. The documents were not returned and the assurances were not provided.

/s/ *Kevin D. Evans*
Kevin D. Evans

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    17

## CERTIFICATE OF SERVICE

This is to certify that on this 17th day of January, 2018, I electronically submitted the foregoing **DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION TO COMPEL RETURN OF COMPANY DOCUMENTS AND MEMORANDUM IN SUPPORT THEREOF** with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically as authorized by Rule 5(b)(2) of the FEDERAL RULES OF CIVIL PROCEDURE and Coyt Randal Johnston, JOHNSTON TOBEY BARUCH, P.C., 3308 Oak Grove Ave., Dallas, Texas 75204 via electronic and U.S. mail.

/s/ *Kevin D. Evans* ___
Kevin D. Evans

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC
And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Compel Return Of
Company Documents And Memorandum In Support Thereof                    18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 8**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION TO DISMISS PLAINTIFF'S CLAIMS AS A SANCTION FOR PLAINTIFF'S ABUSE OF JUDICIAL PROCESS RELATED TO HIS MISAPPROPRIATION AND USE OF DEFENDANTS' DOCUMENTS, AND BRIEF IN SUPPORT

TO THE HONORABLE BARBARA M. G. LYNN, UNITED STATES DISTRICT COURT CHIEF JUDGE

By:

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: 214.953.6000
Facsimile: 214.953.5822
Email: pwatler@jw.com
     steicher@jw.com

Kevin D. Evans
*Admitted pro hac vice*
Nicholas W. Dowd
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.200.0676
Facsimile: 720.200.0679
Email: kdevans@armstrongteasdale.com
     ndowd@armstrongteasdale.com

Attorneys for Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC.

September 28, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

I.     INTRODUCTION ................................................................................1

II.    BACKGROUND ..................................................................................2

    A.    HISTORY OF PLAINTIFF'S LAWSUIT AGAINST DEFENDANTS ....................2

    B.    PLAINTIFF MISAPPROPRIATED A VOLUMINOUS AMOUNT OF DOCUMENTS
        OF DEFENDANTS AND THE AERIAL CAMERA BUSINESS FOR THE PURPOSE
        OF USING THOSE DOCUMENTS TO BRING THIS CASE .................................3

    C.    DEFENDANTS' ATTEMPT TO QUESTION PLAINTIFF REGARDING HIS
        MISAPPROPRIATION AND MISUSE OF DEFENDANTS' DOCUMENTS AND
        INFORMATION INITIALLY WAS THWARTED BY PLAINTIFF'S IMPROPER
        INVOCATION OF ATTORNEY-CLIENT PRIVILEGE ......................................6

    D.    AN ARBITRATOR HAS CONCLUDED THAT PLAINTIFF VIOLATED STATE
        LAW, AWARDED DEFENDANTS DAMAGES, AND ORDERED PLAINTIFF TO
        RETURN ALL MISAPPROPRIATED MATERIAL ...........................................7

III.    ARGUMENT ......................................................................................8

    A.    FEDERAL COURTS HAVE INHERENT POWER TO DISMISS A CASE AS A
        RESULT OF CONDUCT SUCH AS PLAINTIFF'S ...........................................9

    B.    PLAINTIFF'S MISAPPROPRIATION AND MISUSE OF DEFENDANTS'
        DOCUMENTS AND INFORMATION WARRANTS DISMISSAL ......................12

IV.    CONCLUSION ..................................................................................14

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR
CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A
Sanction For Plaintiff's Abuse Of Judicial Process Related To His
Misappropriation And Use Of Defendants' Documents        App. 120

## TABLE OF AUTHORITIES

**Cases**

*Fuqua v. Horizon/CMS Healthcare Corp.*, 199 F.R.D. 200 (N.D. Tex. 2000) .............................9

*Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D. Wash. 2002)................................................1, 9

*James Wilson v. Wells Fargo Bank, Nat'l Ass'n*, Civil Action No. 3:13–CV–2257–O,
2015 WL 4191300 (N.D. Tex. July 1, 2015)....................................................................11

*Woodson v. Surgitek, Inc.* 57 F.3d 1406 (5th Cir. 1995) .................................................................9

*Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016)..................................... *passim*

*Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018)........................................................... *passim*

# I.    INTRODUCTION

Misappropriating an employer's documents to use to prepare and file suit against that employer constitutes "an affront to the established rules of engagement and fair play in lawsuits." *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1317 & 1324 (D. Utah 2016) (dismissing suit based on such misconduct), *aff'd*, 890 F.3d 868 (10th Cir. 2018).   *See also Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 430–35 (W.D. Wash. 2002) (dismissing claims by former employee who "stole documents" and "used those documents to advance his litigation"), *aff'd*, 78 F. App'x 588 (9th Cir. 2003).

This case replicates *Xyngular* and *Jackson* to a tee.  Here, Nic Salomon ("Plaintiff") purposefully, intentionally, and improperly took and retained a voluminous amount of documents and information belonging to his then-employer, defendant OUTDOOR CHANNEL HOLDINGS, INC. ("Outdoor") and its subsidiaries SkyCam, LLC and CableCam, LLC (the "Aerial Camera Business"), with the intent of using those documents and information against Outdoor and defendant KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE," with Outdoor, "Defendants") in this litigation.[1]  Indeed, an impartial Arbitrator already has concluded that by misappropriating Defendants' documents and information, Plaintiff breached fiduciary duties he owed to Defendants, violated California data protection laws, and violated the terms of his Confidential Information Agreement with Outdoor.[2]

---

[1] Prior to Plaintiff's theft of those documents, a KSE subsidiary had merged with Outdoor and acquired all Outdoor stock.

[2] The Arbitrator (a former California State court judge) entered an award ***against*** Mr. Salomon in excess of $440,000 as a result of his misconduct.  (*See* Sept. 6, 2018 JAMS Partial Final Award, attached as Exhibit 1-A, App. 0003–0047).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

Plaintiff compounded the harm caused by his abuse by attempting to conceal the truth about the purpose of his actions and avoid the consequences thereof. However, after the Court twice compelled Plaintiff to answer questions about his taking, disclosure and use of Defendants' documents, he was forced to concede that he and his lawyers used documents he misappropriated to prepare his various complaints in this case. (*See* Transcript of Sept. 19, 2018 Deposition of Nic Salomon ("Tr.") at 27:2–32:1; 82:18–85:6, attached as Exhibit 1-B, App. 0048–59). Defendants thus move for an order dismissing Plaintiff's claims with prejudice based on the Court's inherent authority to sanction the bad faith and abusive conduct in which Plaintiff engaged. *Xyngular*, 200 F. Supp. 3d at 1296, 1314 & 1317 (court noted that it had "an obligation to ensure the integrity of the[ ] proceedings"; to permit Plaintiff to do what he did here would "creat[e] perverse incentives for future litigants to brush aside the rules governing discovery" and "undermin[e] the legitimacy of [court] proceedings"). Dismissal of Plaintiff's claims, in light of the nature and severity of his misconduct, is appropriate, justified, and consistent with the precedent set by other federal courts who have encountered similar abuses of the judicial process.

## II.   BACKGROUND

The procedural history of this case, as well as the facts and circumstances regarding Defendants' discovery of Plaintiff's misconduct, have been detailed in prior filings related to this matter. (*See, e.g.*, ECF #136). Provided here is a summary of the factual and procedural background relevant to this Motion.

### A.   HISTORY OF PLAINTIFF'S LAWSUIT AGAINST DEFENDANTS

Plaintiff is the former President of the Aerial Camera Business. Plaintiff filed this lawsuit against Defendants and Pacific Northern Capital, LLC on February 27, 2015, alleging

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

App. 123

that Defendants violated purported rights under a nonbinding term sheet with Outdoor for the potential sale of the Aerial Camera Business. (ECF #1). The Court dismissed Plaintiff's Original Complaint and his Amended Complaint on standing grounds. (*See* ECF #26, #54). However, the Court held on August 31, 2017 that Plaintiff's Second Amended Complaint pleaded a plausible basis for standing and allowed his case to proceed. (*See* ECF #62).

**B.    PLAINTIFF MISAPPROPRIATED A VOLUMINOUS AMOUNT OF DOCUMENTS OF DEFENDANTS AND THE AERIAL CAMERA BUSINESS FOR THE PURPOSE OF USING THOSE DOCUMENTS TO BRING THIS CASE**

During December 2017, nearly three years after the commencement of this action, Defendants learned for the first time (i.e., Plaintiff theretofore had concealed his misconduct) that Plaintiff had imaged the entire contents of his Aerial Camera Business computer immediately prior to his termination, had copied at least two boxes of other physical documents, had emailed numerous other documents from his Aerial Camera Business email address to his personal email address, and had retained those documents following his termination. Defendants also discovered that the over 21 GB of electronically stored information and other information that Plaintiff had copied and kept post-termination contained a vast amount of confidential, proprietary, and even privileged information, and that various of this information also had been provided to Plaintiff's counsel—Fulbright & Jaworski L.L.P. and then Gray Reed & McGraw LLP ("Gray Reed").[3] Based on Plaintiff's reopened deposition last week (*see infra* at 6–7), Defendants now also know that Plaintiff's counsel used stolen material to prepare the complaints

---

[3] On February 15, 2018, Gray Reed moved to withdraw as Plaintiff's counsel due to "fundamental disagreements and an increasingly contentious relationship" with Plaintiff and because "the level of trust, candor, and cooperation . . . [was] no longer present." (ECF #110 at 3 & 5). After a hearing on March 20, 2018, the Court granted Gray Reed's motion to withdraw, effective April 3, 2018. (ECF #130). Plaintiff retained new counsel—the Avenatti law firm—in August 2018.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

filed by Plaintiff in this case. Upon discovering Plaintiff's misappropriation, Defendants immediately demanded that all copies and originals of Defendants' and the Aerial Camera Business documents taken by Plaintiff be returned.

On January 5, Plaintiff filed a "Motion For Retention Order," in which he stated that he was willing to return the material that he had taken from Defendants, but requested an order "requiring KSE and Outdoor to preserve that material while this case is still pending." (ECF #104 at 2). In support of his motion, Plaintiff submitted a sworn declaration in which Plaintiff *admitted*, among other things, that he:

> ➢ Printed and kept hard copy documents, and also copied the entire contents of his work computer (over 21 GB of material) onto a Toshiba external hard drive and took that material immediately prior to being terminated in May 2014;
>
> ➢ Retained the hard copy documents and external hard drive after his termination;
>
> ➢ Copied and retained these materials for use in bringing this litigation;
>
> ➢ Gave the external hard drive and hard copy documents to his attorneys at Fulbright & Jaworski L.L.P. (n/k/a Norton Rose Fulbright US, LLP) ("Fulbright") after his termination; and
>
> ➢ Provided hard copy documents to Fulbright, Gray Reed, and "prospective counsel" while he was seeking representation for this lawsuit.

(ECF #104, Sworn Declaration Of Nic Salomon ("Declaration") ¶¶ 5–11).

In light of the information obtained during January 2018, including Plaintiff's admissions in his Declaration, Defendants filed an emergency motion on January 24, 2018, asking the Court to stay proceedings and allow Defendants to engage in expedited limited discovery for the purpose of determining the extent of Plaintiff's misconduct and then move for appropriate sanctions. (*See* ECF #94, the "Emergency Motion"). The Emergency Motion explained that Plaintiff's improper taking and then disclosure of misappropriated material to his attorneys could

have significant implications for this litigation, including dismissal of Plaintiff's claims. (*See id.* at 2). The Emergency Motion also explained that determining the appropriate remedy would require investigation of the facts and circumstances surrounding Plaintiff's misappropriation and misuse of Defendants' documents and information. (*See id.* at 8–9). Defendants thus requested leave from the Court to depose Plaintiff, and the attorneys with whom Plaintiff shared documents that he had misappropriated. (*Id.* at 3).

On February 8, 2018, the Court issued an Order (the "February 8 Order") that, among other things, ordered Plaintiff to return the hard drive and documents that he had copied prior to his termination,[4] and granted Defendants' request for "depositions of Plaintiff, a representative of Fulbright, and a representative of 'prospective counsel' with whom Plaintiff shared KSE and Outdoor's documents." (ECF #108 at 6). Of particular import, the February 8 Order specified that the purpose of those depositions would be to "ascertain the facts and circumstances of Plaintiff's taking and retention of documents from KSE, Outdoor, and the [Aerial] Camera Business; *Plaintiff's disclosure of those documents*; and *the use of those documents by Plaintiff and his attorneys*." (*Id.* at 7 (emphasis added)). The February 8 Order also acknowledged that Defendants intended to take these depositions in order to pursue a motion for sanctions. (*See id.* (noting that the depositions of Plaintiff, Fulbright, and "prospective counsel" may provide Defendants "the information they need to move for disqualification or sanctions")).

---

[4] On February 23, 2018, Defendants received the hard drive onto which Plaintiff copied the entire contents of his Aerial Camera Business computer and two boxes of hard copy documents that Plaintiff took and kept after his termination. Defendants subsequently learned, however, that Plaintiff and Gray Reed still had retained a substantial amount of additional misappropriated material.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR
CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A
Sanction For Plaintiff's Abuse Of Judicial Process Related To His
Misappropriation And Use Of Defendants' Documents

App. 126

**C.** **DEFENDANTS' ATTEMPT TO QUESTION PLAINTIFF REGARDING HIS MISAPPROPRIATION AND MISUSE OF DEFENDANTS' DOCUMENTS AND INFORMATION INITIALLY WAS THWARTED BY PLAINTIFF'S IMPROPER INVOCATION OF ATTORNEY-CLIENT PRIVILEGE**

Pursuant to the February 8 Order, counsel for Defendants deposed Plaintiff on March 1, 2018, at the offices of Gray Reed. Defendants attempted to question Plaintiff on topics squarely within the scope of the February 8 Order, including as to the specific misappropriated documents that Plaintiff shared with his counsel and "prospective counsel," and the use Plaintiff and those attorneys made of those documents. However, despite the clarity of the Court's February 8 Order, Plaintiff refused to answer such questions, asserting attorney-client privilege at the direction of Gray Reed.

Based on Plaintiff's refusal to answer questions and violation of the February 8 Order, Defendants moved on March 9, 2018 for dismissal of Plaintiff's claims or, in the alternative, for an order re-opening Plaintiff's deposition and compelling him to answer questions about the disclosure and use of Defendants' documents and information. (*See* ECF #121; motion docketed under seal at ECF #136). While that motion was pending, Defendants further discovered that Plaintiff and Gray Reed still had documents and information belonging to Defendants in their possession, including emails that Plaintiff had forwarded from his Aerial Camera Business email account to his personal email accounts while he was President of the Aerial Camera Business.

The Court ordered a hearing be held on August 31, 2018 on Defendants' motion to dismiss or, in the alternative, to compel Plaintiff's deposition testimony. (ECF #198). At the hearing, the Court held that Plaintiff improperly had invoked attorney-client privilege to questions that Chief Judge Lynn already ordered be answered, and granted Defendants' request to re-open Plaintiff's deposition. (*See* ECF #216). The Court also ordered Plaintiff to pay Defendants' attorneys' fees and costs in having to pursue that motion.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

App. 127

On September 19, 2018, Defendants deposed Plaintiff for a second time regarding the disclosure and use of the documents and information that he took from Defendants. At the re-opened deposition, Plaintiff was not prepared to speak with specificity to all documents that he shared with his attorneys. Nevertheless, it became obvious why Plaintiff had tried to avoid answering certain questions at his deposition in March 2018.

Plaintiff admitted during his re-opened deposition that documents he had misappropriated from Defendants and the Aerial Camera Business had been given to his attorneys and used by his attorneys in the preparation of his complaints against Defendants in this case. Plaintiff stated that he initially provided misappropriated documents to his attorneys at Fulbright, who used those documents to prepare a draft of Plaintiff's Original Complaint. Plaintiff further conceded that he then also provided such documents to his attorneys at Gray Reed (which succeeded Fulbright as Plaintiff's counsel), and that Gray Reed also used those documents to prepare Plaintiff's Original Complaint as filed on February 27, 2015, as well as to draft the Amended Complaint and Second Amended Complaint. (*See* Ex. 1-B, Tr. at 27:2–32:1; 82:18–85:6, App. 0048–59). Thus, there is no dispute that Plaintiff and his attorneys used misappropriated documents to try to support and advance the claims Plaintiff has asserted in this lawsuit.

**D.     AN ARBITRATOR HAS CONCLUDED THAT PLAINTIFF VIOLATED STATE LAW, AWARDED DEFENDANTS DAMAGES, AND ORDERED PLAINTIFF TO RETURN ALL MISAPPROPRIATED MATERIAL**

Concurrent with their efforts to remedy the effects of Plaintiff's misconduct within this litigation, Defendants also pursued arbitration claims against Plaintiff pursuant to the arbitration provisions in Plaintiff's Confidential Information Agreement with Outdoor. In an arbitration proceeding before JAMS commenced in February 2018, Defendants and the Aerial Camera Business sought damages and other relief arising from Plaintiff's violation of the Confidential

Information Agreement, breach of fiduciary duty, and violations of California and Texas data protection laws.

Following an evidentiary hearing held on July 23, 2018, the JAMS Arbitrator issued an award in Defendants' favor (*see* Exhibit 1-A, App. 0003–0047). The Arbitrator concluded that Plaintiff violated California's Comprehensive Computer Data Access And Fraud Act, breached the terms of his Confidential Information Agreement, and breached the fiduciary duties that he owed to the Aerial Camera Business and Defendants here. (*See id.*, App. 0035–40). The Arbitrator thus ordered, among other things, that Plaintiff return all property of Defendants and the Aerial Camera Business still in his possession or control and that he pay Defendants damages in the amount of $440,126.48, plus pre- and postjudgment interest. (*See id.*, App. 0040–44).

\*     \*     \*

As explained below, Plaintiff's actions are precisely the type of misconduct and abuse of the judicial process that other federal courts have addressed by dismissing the offending party's claims. The Court in this case should do the same.

## III.    ARGUMENT

Plaintiff's actions, dating back to his improper copying and taking of Defendants' documents and information prior to his May 2014 termination, and up to the time of his second deposition in September 2018, constitute serious misconduct warranting terminating sanctions. Federal courts have recognized that such misconduct, aimed at bypassing the proper avenues for obtaining relevant information through the discovery procedures set out in the Federal Rules Of Civil Procedure, represents "an affront to the established rules of engagement and fair play in lawsuits" and "undermin[es] the integrity of the[ ] proceedings." *Xyngular*, 200 F. Supp. 3d at

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

App. 129

1314 & 1317.  Dismissal is therefore appropriate in order to cure the harm done to Defendants, punish Plaintiff's wrongdoing, and deter future litigants from doing the same.

## A.    FEDERAL COURTS HAVE INHERENT POWER TO DISMISS A CASE AS A RESULT OF CONDUCT SUCH AS PLAINTIFF'S

Federal courts possess the authority to issue sanctions both as provided under the Federal Rules, as well under the court's "inherent power to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Fuqua v. Horizon/CMS Healthcare Corp.*, 199 F.R.D. 200, 204 (N.D. Tex. 2000) (quoting *Woodson v. Surgitek, Inc.* 57 F.3d 1406, 1417 (5th Cir. 1995) (internal quotations omitted)).  Indeed, "[t]he Court's inherent power authorizes litigation-ending sanctions in instances of bad faith or willful abuse of the judicial process." *Id.*; *see also Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D. Wash. 2002) (exercising the court's "inherent power" to dismiss claims as a sanction against the plaintiff who "unlawfully obtained proprietary materials from [the defendant]" for use in the case), *aff'd*, 78 F. App'x 588 (9th Cir. 2003).  Moreover, as the District of Utah held, and the Tenth Circuit recently affirmed, a federal court may even exercise its inherent powers to dismiss a case for conduct that occurred prior to the start of the litigation (e.g., theft and use of documents), including by dismissing the offending party's claims. *See Xyngular v. Schenkel*, 890 F.3d 868, 872–73 (10th Cir. 2018).

In *Xyngular Corp. v. Schenkel*, the Tenth Circuit upheld the district court's dismissal of claims asserted by a party who, prior to the start of the litigation, misappropriated documents belonging to opposing parties and used those documents to further his claims against those parties. 890 F.3d at 870–72.  Schenkel was a shareholder and employee of Xyngular, a network marketing company. *Id.* at 871.  Schenkel believed that Xyngular's board was engaged in illegal self-dealing by overpaying for services provided by other companies such as GVMS, a company owned by Xyngular board members. *Id.*  He asked another Xyngular shareholder who worked as

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

an IT consultant at GVMS to provide him with documents substantiating his suspicions about the Xyngular board's alleged misconduct. *Id.* Then, after Xyngular sued Schenkel seeking a declaratory judgment regarding Schenkel's ownership interest in the company, Schenkel filed counterclaims alleging self-dealing by Xyngular's board and attaching several documents that he had received from the IT consultant as exhibits to his answer, counterclaim, and third-party complaint. *Id.* Xyngular subsequently moved for dismissal of Schenkel's counterclaims, alleging that Schenkel had encouraged the IT consultant to steal documents belonging to Xyngular, GVMS, and others. *Id.* at 871–72.

The district court found that Schenkel had encouraged the IT consultant to remove documents to be reviewed and used in support of his legal claims. *Id.* Further, the court found that although the IT consultant was authorized to access GVMS's servers, and that Schenkel was entitled to possess Xyngular documents, he was not entitled to receive the documents in the manner that he did because he did not utilize the proper procedures for inspecting the company's books and records. *Id.* at 872. Rather, the court concluded that Schenkel had acted willfully and in bad faith, and dismissed Schenkel's claims. *Id.*

Schenkel appealed the district court's decision to the Tenth Circuit, which affirmed the dismissal and explained that "a court may exercise its inherent powers to sanction bad-faith conduct that abuses the judicial process, including pre-litigation acts that directly affect a lawsuit." *Id.* at 873. The Tenth Circuit reviewed the district court's application of a multi-faceted analysis for determining whether the sanction of dismissal is appropriate in a particular case, which requires consideration of five factors: (1) the degree of prejudice to the moving party; (2) the amount of interference with the judicial process; (3) the culpability of the offending

party; (4) whether the court warned in advance that dismissal could result from the offending

party's conduct; and (5) the efficacy of lesser sanctions. *Id.*[5]

The Tenth Circuit held that the district court did not err in finding bad faith conduct or in

applying the five-factor analysis to determine that dismissal was appropriate. *Id.* at 874. ***First***,

the Tenth Circuit held there was sufficient evidence of bad faith given that Schenkel "did not

attempt to use the proper procedures for a shareholder to inspect corporate records, that he did so

anticipating litigation, and that he gathered documents that belonged not only to Xyngular but

also to his other potential opponents in this litigation." *Id.* ***Second***, there was prejudice to

Xyngular and the other parties even though some of the documents may have been subject to

discovery because "Schenkel's actions amounted to a circumvention of the discovery process

and its built-in protections for parties' interests." Further, the court noted that Schenkel's actions

had "led the parties to expend significant time and resources resolving the issue of the

misappropriated documents." *Id.* ***Third***, Schenkel's actions amounted to a "substantial

interference with the judicial process" given that, in anticipation of pursuing legal remedies,

Schenkel had "opted out of the proper discovery procedures." *Id.* ***Fourth***, Schenkel's

culpability was sufficiently established by the fact that he "made a calculated decision to obtain

the documents for strategic use in litigation." *Id.* ***Fifth***, the Tenth Circuit held that while

Schenkel did not receive an advance warning that dismissal could result as a sanction for his

---

[5] The analysis applied by the *Xyngular* court resembles that which courts in the Fifth Circuit have applied in cases involving dismissals under Rule 37 for violation of a discovery order. *See James Wilson v. Wells Fargo Bank, Nat'l Ass'n*, Civil Action No. 3:13–CV–2257–O, 2015 WL 4191300, at *4 (N.D. Tex. July 1, 2015) (listing factors including "willfulness or bad faith" conduct on the part of the offending party, substantial prejudice to the opposing party, and whether a lesser sanction would achieve the desired deterrent effect, as well as whether the violation is attributable to the client rather than the attorney).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR
CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A
Sanction For Plaintiff's Abuse Of Judicial Process Related To His
Misappropriation And Use Of Defendants' Documents

conduct, such a warning is not required before sanctions may be imposed.  *Id.* at 874–75.
**Finally**, the Tenth Circuit agreed that Schenkel's actions represented a "circumvention of the
discovery process" and that "any sanction short of dismissal would incentivize future litigants to
similarly misappropriate documents in anticipation of litigation."  *Id.* at 875.

## B.  PLAINTIFF'S MISAPPROPRIATION AND MISUSE OF DEFENDANTS' DOCUMENTS AND INFORMATION WARRANTS DISMISSAL

Plaintiff's conduct in this case is markedly similar to the conduct at issue in *Xyngular*
(and *Jackson*) and merits the same treatment.  Indeed, each of the factors that weighed in favor
of dismissal in *Xyngular* is present here as well.

**First**, Plaintiff acted willfully and in bad faith, as evidenced by the fact that he
surreptitiously copied documents and information belonging to Defendants, including
confidential, proprietary, and privileged information, then retained that information without
disclosure for nearly three and one-half years, and did so for the purpose of attempting to use
those documents and information against Defendants in this litigation.  As discussed above,
Plaintiff has conceded on multiple occasions that he took, retained, and provided Defendants'
documents to his attorneys to draft the complaints in this case.

**Second**, just as in *Xyngular*, Plaintiff's actions resulted in substantial prejudice to
Defendants because his "actions amounted to a circumvention of the discovery process and its
built-in protections for [Defendants'] interests."  *Xyngular*, 890 F.3d at 874.  For instance, had
Plaintiff followed proper procedures, Defendants could have objected to Plaintiff's receipt of
privileged, proprietary, confidential, and irrelevant information.  Moreover, Defendants have
been forced to expend significant time and resources in an effort to address the effects of
Plaintiff's misconduct, including by filing multiple motions with the Court, deposing Plaintiff

and certain of his attorneys, and deposing Plaintiff a second time after he improperly refused to answer questions at his first deposition.

*Third*, Plaintiff's actions represent a "substantial interference with the judicial process" (*id.*) in that Plaintiff aimed to bypass the proper discovery procedures for obtaining information from an opposing party. Plaintiff's conduct amounted to "an affront to the established rules of engagement and fair play in lawsuits." *Xyngular*, 200 F. Supp. 3d at 1317. Addressing Plaintiff's misconduct also has caused a significant disruption to the proceedings in this case and has demanded substantial time and attention from the Court to remediate the effects of Plaintiff's actions on this litigation.

*Fourth*, as discussed above, there is substantial evidence that Plaintiff acted with the requisite culpability. Like Schenkel, Plaintiff also "made a calculated decision to obtain the [misappropriated] documents for strategic use in litigation," *Xyngular*, 890 F.3d at 874, a fact which Plaintiff has conceded on more than one occasion. This demonstrates that Plaintiff acted willfully and in bad faith.

*Fifth*, while Plaintiff did not receive an advance warning that dismissal could result from his actions, such a factor is not dispositive and indeed did not prevent the court in *Xyngular* from finding dismissal to be appropriate in that case. Defendants note, however, that they first indicated that they would potentially seek dismissal of Plaintiff's claims in their request to the Court for limited discovery in January 2018. (*See* ECF #94). Since then, Plaintiff propounded the disruptive effects of his misconduct by refusing to answer questions at his initial deposition on these matters in violation of the Court's February 8 Order.

*Sixth*, dismissal, rather than a lesser sanction, is appropriate here because "any sanction short of dismissal would incentivize future litigants to similarly misappropriate documents in

anticipation of litigation," *Xyngular*, 890 F.3d at 875, thereby making a mockery of established rules of fair play and impugning the integrity of the judicial process.  The district court in *Xyngular* noted that Schenkel had "improperly obtained documents without meaningfully disclosing . . . which documents he possessed for over a year." 200 F. Supp. 3d at 1324.  Here, it was not until nearly three years after the commencement of the litigation (and over the one-half years since Plaintiff pilfered the documents) that Defendants' learned of Plaintiff's misappropriation and use of those documents.

Taken together, these factors demonstrate that while dismissal of Plaintiff's claims would represent a serious sanction, it is necessary in this case to adequately punish Plaintiff's misconduct, remedy the prejudice done to Defendants, and deter future litigants from engaging in similar behavior.[6]  The Court therefore should order that Plaintiff's claims against Defendants be dismissed with prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the Court should exercise its inherent authority to sanction Plaintiff's misconduct constituting an abuse of the judicial process and dismiss Plaintiff's claims against Defendants in this case in their entirety and with prejudice.

---

[6] To the extent the Court should evaluate an additional factor sometimes weighed by courts in the Fifth Circuit—whether the conduct at issue is attributable to the client, rather than his or her attorney—this factor also weighs in favor of dismissal given that Plaintiff acted on his own in misappropriating Defendants' documents and information, and was not instructed to do so by his attorneys.  (*See* Transcript of April 3, 2018 Deposition of William Wood at 15:24–16:11; 28:3–15, attached as Exhibit 1-C, App. 0060–0064).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

Respectfully submitted,

Date:  September 28, 2018                    By:      s/Kevin D. Evans
                                                      Kevin D. Evans
                                                      *Admitted pro hac vice*
                                                      Nicholas W. Dowd
                                                      *Admitted pro hac vice*
                                                      ARMSTRONG TEASDALE LLP
                                                      4643 South Ulster Street, Suite 800
                                                      Denver, CO 80237
                                                      Telephone:  720.200.0676
                                                      Facsimile:  720.200.0679
                                                      Email:  kdevans@armstrongteasdale.com
                                                               ndowd@armstrongteasdale.com

                                                      and

                                                      Paul C. Watler
                                                      State Bar No. 00784334
                                                      Shannon Zmud Teicher
                                                      State Bar No. 24047169
                                                      JACKSON WALKER L.L.P.
                                                      2323 Ross Avenue, Suite 600
                                                      Dallas, Texas 75201
                                                      Telephone:  214.953.6000
                                                      Facsimile:  214.953.5822
                                                      Email:  pwatler@jw.com
                                                               steicher@jw.com

                                                      Attorneys for Defendants KROENKE SPORTS
                                                      & ENTERTAINMENT, LLC and
                                                      OUTDOOR CHANNEL HOLDINGS, INC.

## CERTIFICATE OF SERVICE

This is to certify that on this 28th day of September, 2018, I caused the foregoing **DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION TO DISMISS PLAINTIFF'S CLAIMS AS A SANCTION FOR PLAINTIFF'S ABUSE OF JUDICIAL PROCESS RELATED TO HIS MISAPPROPRIATION AND USE OF DEFENDANTS' DOCUMENTS, AND BRIEF IN SUPPORT** to be electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.

/s/*Kevin D. Evans*
Kevin D. Evans

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion To Dismiss Plaintiff's Claims As A Sanction For Plaintiff's Abuse Of Judicial Process Related To His Misappropriation And Use Of Defendants' Documents

App. 137

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 9**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
<u>HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>**

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

3

4    NIC SALOMON,

5          Plaintiff,

6      vs.                        No. 3:15-CV-00666-M

7    KROENKE SPORTS & ENTERTAINMENT,

     LLC, OUTDOOR CHANNEL HOLDINGS,

8    INC., and PACIFIC NORTHERN

     CAPITAL, LLC,

9

          Defendants.

10

11

12    _____

13

14       VIDEOTAPED DEPOSITION OF THOMAS D. ALLEN

15            Irvine, California

16         Wednesday, June 20, 2018

17               VOLUME I

18

19   TRANSCRIPT MARKED CONFIDENTIAL - ATTORNEYS' EYES ONLY

20

21    Reported by:

     WINDY PICARD

22    CSR No. 12879

23    Job No. 2875084

24

25    PAGES 1-160

          CONFIDENTIAL - ATTORNEYS' EYES ONLY        1

CONFIDENTIAL

Page 29

1    can you just explain to me the types of businesses in

2    which Outdoor was engaged -- Outdoor and subsidiaries,

3    I should say?

4        A    I actually started with Outdoor Channel in a

5    consulting capacity in April, 2010.  The company and I

6    had agreed on -- on the substantive terms of my

7    employment, which was to begin as soon as I wrapped up

8    certain transactions at my then current company.

9            So, you know, from about April to July, I

10   spent most of my time understanding, obviously, the

11   company and its operations.

12           And the legacy business, if you will, for

13   Outdoor Channel really was its cable channel, which was

14   focused on hunting and fishing, very niche channel, if

15   you will, in the cable television content business.

16           In 2009, January, I believe, which would have

17   been almost a year and a half prior to my commencement

18   date at Outdoor Channel, the company acquired

19   Winnercomm Incorporated, which was based in Tulsa,

20   which was primarily a production company.

21           It produced both television shows and live

22   sporting events for an array of clients, which included

23   Outdoor Channel.

24           Outdoor Channel wasn't its sole client or

25   perhaps not even its largest client, but it was an

CONFIDENTIAL - ATTORNEYS' EYES ONLY        29

CONFIDENTIAL

Page 50

1    what the relationship was between those two entities

2    and who the buyer group actually was.

3         Q    Okay.  Do you see this document -- this

4    proposal is signed by Mr. Schneider?

5         A    I do.

6              MR. EVANS:  Bear with me for a second.  I want

7    to pull out another document to show you.   We're on

8    124.

9              Can I get you to mark that document as 124?

10        Q    Mr. Allen, we've shown you what we've marked

11   as Exhibit 124.  It's a two-page e-mail chain.  The

12   e-mail starting at the bottom of the first page is from

13   Ben Schneider.

14             This time Mr. Schneider's e-mail address is

15   Hotmail.com.  It's dated February 27 of 2013, and it's

16   to you and Mr. Hornish.

17             Do you see that?

18        A    I do.

19             (Deposition Exhibit 124 was marked for

20              identification by the court reporter.)

21        Q    Mr. Schneider writes, "I hope you don't mind

22   me reaching out directly, but given the circumstances,

23   I felt it was important to engage you directly to be

24   sure nothing was lost through intermediaries."

25             By the way, let me stop here and say that this

CONFIDENTIAL - ATTORNEYS' EYES ONLY       50

CONFIDENTIAL

Page 51

1     document came from your Outlook file.

2          Do you -- at Outdoor, do you have any

3     reason -- or do you recall this e-mail?

4     A    Only in the context of our review of it

5     earlier this week.

6     Q    Do you have any reason to doubt that this came

7     from your e-mail file at Outdoor?

8     A    No, I do not.

9     Q    Okay.  Mr. Schneider goes on to say, "I was

10    informed tonight by Tim McQuay that you elected to go

11    with the other group towards reaching a transaction for

12    Skycam, and I am, in a word, disappointed.

13         I am reaching out to ask you to reconsider and

14    offering to put money in escrow as well as a shorter

15    period of exclusivity to get to close."

16         Do you see that?

17    A    I do.

18    Q    And then if you can go to the second e-mail --

19    excuse me -- the second paragraph of this e-mail, it

20    starts at the bottom of the page and follows over to

21    the second page, where Mr. Schneider writes, "I was

22    surprised that I wasn't given a counter opportunity

23    (or," quote, "'look') before your team decided to move

24    in a different direction and sign with someone else, as

25    I was lead to believe that my bid was significantly

CONFIDENTIAL - ATTORNEYS' EYES ONLY        51

Page 52

1      higher than any other bid - and your priorities, as

2      explained to me, were, 1.  Valuation, 2.  Speed to

3      close, and, 3.  Certainty to close."

4           Do you see that?

5      A    I do.

6      Q    Do you recall why Mr. Schneider or IMAX or

7      SF Capital wasn't given an opportunity to counter the

8      offer made by PNC and Mr. Salomon?

9      A    I -- I don't have any specific recollection.

10     I would totally agree, as indicated by Mr. Schneider,

11     that our objections were valuations, speed to close,

12     and certainty to close.

13          There was no preferential treatment, that I

14     recall, given to any particular buyer.  It was really a

15     price issue for us and certainty to close.

16          I do have a general recollection that we had

17     had plenty of starts and stops with the IMAX team and

18     Ben Schneider in particular.

19          So any view on this would be just total, you

20     know, hindsight, surmising that we may have had less

21     confidence that these guys would get to the finish

22     line.

23          I'm also not -- it -- it looks like, from the

24     earlier part of the e-mail chain -- and I'm relying

25     totally on what I'm looking at in front of me -- that

CONFIDENTIAL - ATTORNEYS' EYES ONLY        52

Page 53

1    this may have come in after we had signed the

2    exclusivity and LOI with Nic Salomon, so we would

3    obviously have been precluded from having any further

4    discussions.

5        Q    That was going to be my next series of

6    question.

7             Your recollection, I will represent, appears

8    to me to be correct.  I think this was -- this e-mail

9    from Mr. Schneider did come in after the term sheet for

10   an unnamed purchaser or an unformed purchaser with

11   Mr. Salomon and PNC and was signed.

12            So Mr. Hornish writes, on the first page, on

13   February 27, 2013, back to Mr. Schneider, with a CC to

14   you, "Hi Ben, Appreciate you following up, but given

15   that we've entered into an exclusivity arrangement with

16   another party, we're not able to discuss anything

17   further with you at this time.

18            If/when things change, we will be certain to

19   let you know."

20            Do you see that?

21       A    I do.

22       Q    And did -- to your recollection, did, in fact,

23   Outdoor honor that exclusivity arrangement in the term

24   sheet with Mr. Salomon and PNC on behalf of an unnamed

25   purchaser?

Page 54

1    A    That's my recollection, that we did honor

2    that.

3    Q    Okay.  You write back -- at the top of the

4    page, from yourself -- an e-mail from yourself to

5    Robert Campbell, Tim McQuay, and Tom Hornish, on

6    02/28/2013 -- "Crap!"

7         Can you tell me what you meant by that?

8    A    Well, again, without specific recollection of

9    the e-mail five years later, it's pretty clear to me

10   that we saw this after we had signed an agreement,

11   potentially within 24 hours of the signing of that

12   agreement, an offer that was for nominally more, about

13   half a million dollars more, I believe, than the LOI

14   that we had signed with Nic.

15   Q    Do you recall whether Mr. Salomon was

16   assisting Noble in any discussions with Mr. Schneider

17   or the IMAX group?

18   A    I don't have any specific recollection.  What

19   I would say with a lot of confidence is that Nic would

20   have been involved in any of the diligence efforts by

21   any perspective buyer.

22        And those typically would have been conducted

23   by both telephone, e-mail, and personal visits to the

24   facilities in Fort Worth.

25        Any personal visits of perspective buyers to

CONFIDENTIAL - ATTORNEYS' EYES ONLY        54

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |


**EXHIBIT 10**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
NIC SALOMON,                    )
                               )
      PLAINTIFF,                )
                               )
VS.                            )  CASE NO. 3:15-CV-00666-M
                               )
KROENKE SPORTS &               )
ENTERTAINMENT, LLC, OUTDOOR    )
CHANNEL HOLDINGS, INC. AND     )
PACIFIC NORTHERN CAPITAL, LLC, )
                               )
      DEFENDANTS.              )
```

*************************************************

ORAL VIDEOTAPED DEPOSITION

DAVID BRIAN GLUCK

AUGUST 22, 2018

DALLAS, TEXAS

*************************************************

JOB NO. 137772

10:41 1  $8.75 per share, right?

2       A.    I don't recall.

3       Q.    And that offer was for all the shares of

4  Outdoor Chanel Holdings, Inc., correct?

10:41 5                 MR. EVANS:  Again, objection to form.

6       A.    I think that's correct.

7       Q.    (By Mr. Ibrahim)  And Outdoor Channels

8  Holdings, Inc. owned several subsidiaries, correct?

9       A.    Yes.

10:41 10      Q.    And one of those subsidiaries was SkyCam, LLC,

11  right?

12      A.    Yes.

13      Q.    And one of those subsidiaries was CableCam,

14  LLC, correct?

10:41 15      A.    Yes.

16      Q.    And so when KSE made an offer to purchase all

17  shares of Outdoor Channels -- Outdoor Channel Holdings,

18  Inc. that included any and all ownership interests that

19  Outdoor Channel Holdings, Inc. had in any of its

10:41 20  subsidiaries, correct?

21                 MR. EVANS:  Objection to form.

22      A.    I believe so.

23      Q.    (By Mr. Ibrahim)  Nothing was carved out,

24  right?

10:42 25                 MR. EVANS:  Objection to form.

10:57  1    Outdoor Channel at a price of $8.00, 75 percent -- $8.75

2    per share in cash, correct?

3                    MR. EVANS:  Objection to form.

4                    It's a preliminary proposal.  I don't know

10:57  5    if it makes any difference to you, but that's my

6    objection.  That's the reason I objected.

7        A.    Okay.  I'm sorry.

8              What's the question?

9        Q.    (By Mr. Ibrahim)  On February 27, 2013 KSE made

10:57 10    a preliminary proposal to purchase all of the outstanding

11    shares of common stock of Outdoor Channel Holdings, Inc.;

12    is that correct?

13        A.    I believe so, yes.

14        Q.    And the proposal was to acquire those shares

10:57 15    for $8.75 per share, correct?

16        A.    Yes.

17        Q.    And after the proposal was made the plan was to

18    perform confirmatory due diligence and -- well, strike

19    that.

10:58 20              So my question is:  After that proposal was

21    made KSE wanted to perform some due diligence, correct?

22        A.    Yes.

23        Q.    And based on your recollection were there

24    efforts to actually engage in due diligence?

10:58 25        A.    Yes.

11:31 1   February 27, 2013, correct?

2      A.   The initial one, yes.

3      Q.   Okay.  And then at some point prior to March

4   26, 2013 you found this term sheet and you read the

11:31 5   exclusivity provision, right?

6      A.   Yes.

7      Q.   Okay.  From that point in time when you

8   educated yourself on the -- on the exclusivity provision

9   isn't it true that KSE did not step aside and allow the

11:31 10   exclusive negotiations to continue to occur between PNC,

11   Mr. Salomon, and Outdoor Channel, correct?

12          MR. EVANS:  Objection to form.

13      A.   That's not correct.  We didn't stop Mr. Salomon

14   and PNC and Outdoor Channel from negotiating anything.

11:32 15      Q.   (By Mr. Ibrahim)  What -- what efforts did you

16   take to make sure that KSE was going to carve out the

17   sale of the aerial camera business to PNC and

18   Mr. Salomon?

19          MR. EVANS:  Objection to form.

11:32 20      A.   We had no obligation to do that.

21      Q.   (By Mr. Ibrahim)  In your mind you didn't think

22   that you had any obligation to allow that transaction to

23   play out; isn't that correct?

24      A.   That's not what you asked me.

11:32 25      Q.   Well, I'm asking you that now.

11:53 1                    MR. EVANS:  Objection; form.

2         A.    I'm sorry.

3               Could you restate that question?

4         Q.    (By Mr. Ibrahim)  Sure.

11:53 5         A.    It was --

6         Q.    On March 13, 2013 K -- strike that.

7               On March 13, 2013 Outdoor Channel accepted

8    KSE's offer to acquire all of Outdoor Channel's stock,

9    correct?

11:54 10                   MR. EVANS:  Objection; form.

11        A.    Outdoor Channel Holdings, Inc. I believe

12   accepted.  I think that's the right date.

13        Q.    (By Mr. Ibrahim)  Okay.  And there was a merger

14   agreement that had been put in place on March 12th or

11:54 15   March 13, 2013.

16               You recall that, right?

17        A.    Again, I think that's the right date.  I think

18   there was one.

19        Q.    Okay.  And part of the purpose of this meeting,

11:54 20   am I correct, was to continue the due diligence process

21   that had already been ongoing up to that point?

22        A.    Yes.

23        Q.    Okay.  And if I understand your testimony

24   correctly you don't recall whether there were any

11:54 25   discussions at all that occurred during this meeting on

12:02  1     Q.    (By Mr. Ibrahim)  Sir, when did you find out

    2  about this document?

    3                 MR. EVANS:  Asked and answered.

    4     A.    After March 21st, 2013.

12:03  5     Q.    (By Mr. Ibrahim)  How long after March 21st,

    6  2013 did you find out about this document?

    7     A.    Not more than a couple of months.

    8     Q.    How did you find out about this document?

    9     A.    I believe it was from Tom Hornish or Tom Allen,

12:03 10  one of the Tom's.

    11     Q.    Did one of the Tom's inform you about this

    12  document on the phone or by some other means?

    13     A.    I don't recall.

    14     Q.    And what did Mr. Hornish and/or Mr. Allen

12:03 15  communicate to you about this document?

    16     A.    The only thing I remember that they had said,

    17  whoever sent it or however they sent it, was that they

    18  had extended the exclusivity to April 15th -- I'm

    19  sorry -- May 15th.

12:04 20                 Excuse me.

    21     Q.    Did you have any anything to do with inducing

    22  Outdoor Channel to get Mr. Holowaty to sign this document

    23  on behalf of PNC?

    24                 MR. EVANS:  Objection; form.

12:04 25     A.    No.

12:04 1      Q.   (By Mr. Ibrahim)  Did you ever ask anybody at

2   Outdoor Channel to induce PNC to sign an amendment to the

3   term sheet?

4             MR. EVANS:  Objection to form.

12:04 5      A.   No.

6      Q.   (By Mr. Ibrahim)  Did you ever do anything --

7   strike that.

8         Did you have any conversation at all with

9   anyone at Outdoor Channel suggesting that an amendment to

12:05 10  the term sheet should be executed by PNC?

11            MR. EVANS:  Date?

12           MR. IBRAHIM:  Any point in time.

13           MR. EVANS:  Well, then I object to the

14   form, because you are talking about one question and you

12:05 15  are asking another.

16      A.   Are you referring to this amendment

17   (indicating)?

18      Q.   (By Mr. Ibrahim)  Any amendment.

19            MR. EVANS:  Then I object to form.

12:05 20     A.   Yes.  I had a discussion with Hornish or Allen

21   about another amendment.

22      Q.   (By Mr. Ibrahim)  Okay.  And what amendment was

23   that?

24      A.   I asked them why Nic wasn't a signatory to this

12:05 25  letter and we had a discussion about him becoming a

DAVID BRIAN MUCK - 09/21/2018

12:08  1        A.    The letter of intent except for the exclusivity

2   provision was not binding.

3        Q.    So there was a portion of the letter intent --

4   of intent that was binding and a portion that was not

12:08  5   binding, right?

6        A.    That's correct.

7        Q.    Okay.  And you believed that it was an issue

8   that Mr. Salomon had not signed the amendment because

9   this amendment was modifying or purporting to modify

12:08 10   binding provisions of the term sheet, right?

11                  MR. EVANS:  Objection to form.

12        A.    Like I said I was surprised that he hadn't sign

13   it.

14        Q.    (By Mr. Ibrahim)  If you had been handling the

12:09 15   amendment would you have required Mr.  Salomon to sign

16   this amendment that you have in front of you,

17   Exhibit 304?

18                  MR. EVANS:  Objection to form.

19        A.    I wasn't involved in the discussions between

12:09 20   Outdoor and Pacific Northern Capital and Nic, so it's

21   hard to speculate as to what I would have done.  I don't

22   know what they talked about when they were doing all

23   this, so I don't know.

24        Q.    (By Mr. Ibrahim)  And after you expressed this

12:09 25   surprise to Mr. Hornish and/or Mr. Allen one of them or

04:52  1          A.    The e-mail from Matt says:  But I don't think

       2   Mr. K wants to sell.

       3          Q.    Do you know why Mr. K, Mr. Kroenke, didn't want

       4   to sell?

04:52  5          A.    No.

       6          Q.    And who would know that information?

       7          A.    Jim.

       8          Q.    What about Mr. Kroenke?

       9                Would he know?

04:52 10          A.    I assume so.

      11          Q.    Now, Mr. Salomon you testified earlier was

      12   ultimately terminated from the company, correct?

      13          A.    Correct.

      14          Q.    And I might have the date off a little bit here

04:52 15   but I'm assuming that that occurred on or about May 5th,

      16   2014?

      17          A.    Sounds right.

      18          Q.    Okay.  And what -- well, strike that.

      19                Who made the decision that Mr. Salomon should

04:53 20   be terminated?

      21          A.    Jim Martin ultimately.

      22          Q.    And did he make that decision based on a

      23   recommendation from you?

      24          A.    It was from probably a number of people.

04:53 25          Q.    Okay.  Who are all the people that recommended

04:53 1    that Mr. Salomon be terminated, if you can recall?

2         A.    Scott Long, Matt Hutchings, perhaps

3    Bruce Glazer.

4         Q.    Anyone else that you can recall?

04:53 5         A.    No.

6         Q.    And did you believe he should have been

7    terminated?

8         A.    Yes.

9         Q.    And what were all the reasons, if there are

04:53 10   any, as to why Mr. Salomon was terminated?

11        A.    All the reasons?

12        Q.    Yes.

13        A.    Well, he was -- he was constantly not doing

14   what he was asked to do to the point of almost

04:54 15   insubordination.  He acted like he was -- that

16   Aerial Cameras was his own private fiefdom and that we

17   were interlopers.  He asked for -- he insisted on a

18   meeting with Jim Martin.  He asked for it on numerous

19   occasions.  We finally said:  Okay.  Fine.  You can come

04:54 20   talk to Jim and present whatever it is you want to.

21              He -- he could never give a straight answer to

22   any question that anybody ever asked him.  And, in fact,

23   in the middle of the meeting with Nic it was so

24   frustrating -- it's one I'm talking about with

04:55 25   Jim Martin.  It was in Denver.  It was Jim, me, Bruce.  I

04:55 1  think Scott may have been there.  Matt was there I'm

2  pretty sure -- and I have never seen Jim Martin do this.

3  I have known Jim for 20 something years.  He closed his

4  binder and walked out because Nic would never answer a

04:55 5  question with a straight answer.  He was never -- you

6  just got the feeling he was never honest with anybody in

7  the company.

8       And the company wasn't performing.  The aerial

9  camera business wasn't performing.  We lost I think a

04:55 10  million and a half or 2 million -- I can't remember the

11  exact number -- on the NAVAIR project that Nic had all --

12  all along said was going wonderfully, so --

13       Q.    Any other reasons you can think of as you sit

14  here today?

04:56 15       A.    Not right now, but --

16       Q.    This meeting that you are referring to where

17  Jim Martin walked out --

18       A.    Uh-huh.

19       Q.    -- when did that meeting occur?

04:56 20       A.    I don't recall.

21       Q.    Is there some milestone that you can recall

22  during 2013 from which we can come up with some type of

23  an estimate of when the meeting occurred?

24       So, for example, it occurred after the

04:56 25  acquisition --

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 11

## AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
## KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
## <u>HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3

4    NIC SALOMON,

5            Plaintiff,

6    vs.                        CIVIL ACTION NO.
                                3:15-CV-00666-M
7    KROENKE SPORTS & ENTERTAINMENT,
     LLC, OUTDOOR CHANNEL HOLDINGS,
8    INC., and PACIFIC NORTHERN
     CAPITAL LLC,

9

            Defendants.
10   _____

11

12

13                  CONFIDENTIAL

14      VIDEOTAPED DEPOSITION OF THOMAS E. HORNISH

15                   VOLUME I

16            San Diego, California

17          Wednesday, June 13, 2018

18

19

20

21

22   Reported by:
     DENISE MARLOW
23   CSR No. 11631

24

25   Job No. CS2875082

Page 23

1    these documents for both SkyCam and CableCam.  Not

2    once have I seen Mr. Salomon listed as a member, a

3    director of -- well, let me strike that -- let me

4    strike that question.

5         Not -- not -- let me -- let me put it this

6    way.  We've seen a number of these documents that

7    list members of -- or managers, excuse me, of the --

8    of CableCam and SkyCam, LLC, but not once do I see

9    Mr. Salomon listed as a manager of either one of

10   those companies.  Is that consistent with your

11   recollection?

12        A.  It is.

13        Q.  All right.  So let's get off these documents

14   and move into some substance here.  Can you explain

15   for me just the various businesses in which Outdoor

16   was engaged in during the -- let's say the period

17   2009 through the KSE acquisition of Outdoor stock in

18   May of 2013?

19        A.  Sure.  Primarily we were a Cable TV network

20   that focused on air time, and we would sell the air

21   time to producers who would want to produce their

22   own show, get their own advertisers, and then buy

23   air time on our network.  We would also produce our

24   own shows and then sell that advertising in those

25   shows on our own for our own advertising time.  And

Page 24

1    in that regard we had some vertical integration and

2    had acquired Winnercomm in 2009 to help produce

3    shows, for our own shows, not so much other people's

4    shows.  And in that product -- it was a production

5    company, high-quality graphics that we were very

6    interested in, and they had a good track record, had

7    done a lot of stuff for ESPN and everything.  And

8    with that acquisition had come the CableCam, SkyCam,

9    which was somewhat a non-core business to do --

10   produce shows but primarily for using the aerial

11   cameras, which entailed shows along -- football was

12   a main portion of it, but it also had included some

13   olympics and ski shows as well.

14       Q.  And the jury's going to hear a lot about

15   this, but the Aerial Camera Business, is it fair to

16   characterize it as the cameras in the sky above

17   events?

18       A.  It is.  It's on cables, suspended by cables.

19       Q.  All right.  So moving forward to the 2012

20   time period, which 2012 into 2013, that's really

21   kind of the meat of this case, was there a decision

22   made by Outdoor in 2012 to try to sell the Aerial

23   Camera Business?

24       A.  There was.  Strategically we saw it as

25   non-core, and we thought it was better to focus on

Page 25

1   the core business of production and airing of shows

2   on the cable TV network.

3        Q.   And what does that mean when you say

4   "non-core"?

5        A.   Our main business and -- and most of the

6   revenue and income and profit was coming from the

7   Outdoor Channel production -- not so much the

8   production, the sales of the air time on the network

9   was our main focus, and probably 90 to 95 percent of

10  our income derived from that, maybe even -- maybe

11  even more.

12       Q.   How was the Aerial Camera Business doing

13  from a financial standpoint as of 2012?

14       A.   Well, when we acquired it in '09, we

15  weren't -- it kind of came along with the

16  acquisition.  And then over time we kept following

17  it to see if we could grow it but never felt like it

18  was getting off the ground and taking off.  It was a

19  very nominal profitable business for all the time.

20            And the timeframe I think you were asking

21  was 2012?

22       Q.   As of 2012, yeah.

23       A.   Yeah, my recollection was it was -- it was

24  making very little, if any, profit.

25       Q.   Was it a capital-intensive business?

CONFIDENTIAL

Page 27

1      A.   Not true whatsoever, in my mind, because it

2   was never a fast-growing business if you define it

3   as the profitability.

4      Q.   And that was -- that was going to be my

5   question.  I mean, since you said it was only

6   marginal, if even profitable, how would that factor

7   into the suggestion that -- by Mr. Salomon that it

8   was the fastest growing business segment of Outdoor

9   stock?

10     A.   I would have never described it as such.

11     Q.   Okay.  Are you familiar with a company

12  called "Noble Financial Capital Markets"?

13     A.   I am.

14     Q.   And how are you familiar with that company?

15     A.   They were the only analysts for the most

16  part following Outdoor Channel Holdings when we were

17  a public company, who would then recommend to their

18  investors and put out reports on Outdoor Channel's

19  performance.

20     Q.   And was out -- was Noble Financial engaged

21  by Outdoor in 2012 to assist it in -- attempt --

22  attempted sale of the Aerial Camera Business?

23     A.   They were.  A different -- different part

24  than the analyst group, but as an investment bank,

25  they have different departments.

CONFIDENTIAL

Page 49

1      Q.  Mr. Salomon goes on to write, "PNC agreed to

2   all of OC's requests over multiple rounds of

3   negotiations and added 400K of cash to the front end

4   of the deal and adjusted the royalty to a percentage

5   of revenue calculation.  PNC was told the three

6   outstanding items were, one, close para, InterMedia

7   approval."  So let me sop there.

8          Do you recall a company called InterMedia?

9      A.  I do.

10     Q.  Okay.  So InterMedia Outdoor Holdings, that

11  sound familiar -- that name sounds familiar to you?

12     A.  Something like that.  I don't remember the

13  exact name.

14     Q.  Okay.  We'll just use InterMedia --

15     A.  Okay.

16     Q.  -- if we can, going forward.

17          Do you recall InterMedia in 2012 making an

18  offer to acquire all Outdoor stock?

19     A.  I recall it being more of a merger, and I

20  guess in effect they were acquiring -- we were

21  merging all of our shares into their company, yes.

22     Q.  Do you recall -- and we'll look at the

23  agreement, actually, a little later.  But do you

24  recall that in November 2012 there was a merger

25  agreement between InterMedia and Outdoor?

Page 56

1      A.   There was never a definitive agreement

2   signed.

3      Q.   Are you generally aware of the exchange of

4   an asset purchase agreement -- a draft asset

5   purchase agreement between Outdoor, PNC, and

6   Mr. Salomon?

7      A.   I am.

8      Q.   Let me show yes- -- what was marked during

9   Ms. Lee's deposition yesterday as Exhibit 107.  And

10  the top e-mail is from Mr. -- is dated March 5,

11  2013, is from Mr. McQuay at Noble to Mr. Jeff

12  Holowaty and Kelly Holowaty, with CCs to other

13  individuals at Noble, attaching a draft asset

14  purchase agreement.

15        Let me show you this document, Mr. Hornish,

16  and ask you if this is around the time when you

17  recall an asset purchase agreement being provided or

18  draft asset purchase agreement being provided to

19  Mr. Salomon and PNC.

20     A.   It is.

21     Q.   Do you know who from Outdoor's end was

22  involved in drafting that asset -- that draft asset

23  purchase agreement?

24     A.   Cathy Lee, our general counsel at that time.

25     Q.   Do you recall whether Mr. Salomon and PNC

Page 57

1   provided comments to the draft asset purchase

2   agreement?

3       A.  I believe they did.

4       Q.  Do you recall what your reaction was when

5   you received those comments from Mr. Salomon and

6   PNC?

7       A.  I felt like we didn't have a deal.

8       Q.  And why'd you feel that way?

9       A.  I was -- it was a red -- a sea of red, as we

10  call it.  All the changes were -- it was so much

11  different than what we were thinking, that we never

12  had a meeting of the minds.

13      Q.  Even though there was a -- the sea of red,

14  as you call it, and not a meeting of the minds, was

15  Outdoor still willing to continue to try to finalize

16  an asset purchase agreement?

17      A.  We were.

18      Q.  To your knowledge, did anyone from Outdoor

19  tell Mr. Salomon between February 27, 2013, which is

20  the date of the term sheet, and KSE's acquisition of

21  all Outdoor stock in May of 2013, that Outdoor would

22  no longer work with PNC and Salomon in an effort to

23  try to sell the Aerial Camera Business?

24      A.  No, we never said that.

25      Q.  Are you aware whether anybody from Noble

Page 60

1      Q.  Okay.  To your knowledge, as of the date of

2    the term sheet, February 26, 27, of 2013, was

3    Mr. Salomon aware of Exhibit 109, the merger

4    agreement with InterMedia?

5      A.  He was because we were a public company and

6    it was publicly known that we were doing this merger

7    with InterMedia.

8      Q.  Did you have any discussions with

9    Mr. Salomon about the merger agreement or the

10   planned deal with InterMedia?

11     A.  To the best of my recollection, we had

12   general discussions that we were trying to figure

13   out if InterMedia wants to sell it, and if he wants

14   to buy it, InterMedia might be open to that, but I

15   don't remember specifics.

16     Q.  Do you recall any discussions with

17   Mr. Salomon about the impact that the InterMedia

18   Outdoor merger agreement might have on his efforts

19   to acquire the Aerial Camera Business?

20     A.  Not specifically, no.

21     Q.  Let me ask you to turn to Exhibit 44.  And

22   before we get to Exhibit 44, let me just ask you a

23   few general questions.  Do you recall that there was

24   an unsolicited offer by KSE to acquire all Outdoor

25   stock?

Page 61

1      A.  Very well.

2      Q.  And I'll represent to you that just as a

3  sheer matter of coincidence, that offer was made on

4  February 27, 2013, which is the date the final

5  execution of the term sheet.

6      A.  That seems reasonable.

7      Q.  Okay.  So with that in mind -- oh, well, let

8  me ask you this first.  Do you recall the board

9  considering the KSE unsolicited offer?

10      A.  Oh, yes.  They had to.

11      Q.  Do you recall the board -- whether the board

12  found that offer superior to that of InterMedia?

13      A.  They did.

14      Q.  All right.  So with that in mind, let me ask

15  you some questions about Exhibit 44.  Now, Exhibit

16  44 is a March 7, 2013, e-mail from Mr. Salomon to

17  yourself with a CC to Ms. Lee.  And Mr. Salomon

18  writes, "Good afternoon, Tom.  I saw the press

19  release this morning that a definitive merger

20  agreement with KSE has been fully negotiated.

21  Pursuant to our term sheet, I want to make sure that

22  Outdoor Channel has communicated to KSE and

23  SkyCam -- KSE that SkyCam and CableCam are under an

24  exclusive LOI and that this is an issue that will

25  need to be resolved as part of a potential KSE

CONFIDENTIAL

Page 76

1   a few moments ago?

2       A.   Yes.

3       Q.   Now, this is only signed by Outdoor and PNC.

4   Do you know why that is the case?

5       A.   I think it goes back to our understanding

6   that Nic was not intricately involved, and even some

7   discussions with PNC that they weren't sure what

8   Nic's role was going to be going forward.

9       Q.   PNC made that comment to you?

10      A.   To the best of my recollection, they were --

11  they were unclear when I asked questions as to what

12  his role was going to be.

13      Q.   Is it fair to say that up to this point in

14  time, that Outdoor's and Noble's communications

15  regarding the term sheet and the asset purchase

16  agreement had been primarily with Pacific Northern

17  Capital and not Mr. Salomon?

18      A.   It is.

19      Q.   Was there any intent by Outdoor in preparing

20  Exhibit 111 and having PNC and not Mr. Salomon sign

21  it to deceive Mr. Salomon?

22      A.   None whatsoever.

23      Q.   Was there any intent by Outdoor to conceal

24  anything from Mr. Salomon?

25      A.   None whatsoever.

Page 77

1     Q.   Was there any intent by Outdoor to cut

2     Mr. Salomon out of the effort to acquire the Aerial

3     Camera Business?

4     A.   None whatsoever.

5     Q.   Did anyone from KSE tell Outdoor to exclude

6     Mr.  Salomon from Exhibit 111?

7     A.   No.

8     Q.   Did Outdoor expect PNC to communicate the

9     contents of Exhibit 111 to Mr. Salomon?

10    A.   I did, because that's who we were talking

11    with on behalf of the acquirer, which presumably

12    included Nic in some way.

13    Q.   Let me take that exhibit back from you and

14    ask you to take a look at Exhibit 80 again.  This is

15    the term sheet.  And I wanted to direct your

16    attention to the last page, the last paragraph.  And

17    I'll represent to you this last paragraph was added

18    by Mr. Salomon's lawyer at Fulbright & Jaworski.

19    "This letter of intent, one, may not be amended or

20    modified except by a writing signed by each of the

21    parties hereto; and, two, may be executed in one or

22    more counterparts, each of which will be deemed an

23    original but all of which together shall constitute

24    one and the same instrument."

25              So really the pertinent part for my next

Page 95

1   of that agreement, Outdoor contracted to deal

2   exclusively with Mr. Salomon and PNC, not to

3   entertain any competing offers, and not to disclose

4   to any third party, for example, KSE, the exclusive

5   negotiations."

6        What's your reaction to that statement?

7        A.   I agree that we would deal exclusively with

8   Mr. Salomon and PNC as to the sale of the camera

9   business, but it had nothing to do with the sale of

10  Outdoor Channel Holdings, as the owner of the camera

11  business.

12       Q.   In paragraph 8 Mr. Salomon goes on to write,

13  "Knowing of the exclusivity agreement, KSE

14  nevertheless brushed aside Out- -- Outdoor's

15  contractual obligations and PNC's fiduciary duties

16  to Mr. Salomon."

17       What's your reaction to that statement?

18       A.   I don't understand that comment.  I don't

19  even understand what the PNC's fiduciary duties to

20  Mr. Salomon would have been, with my understanding

21  that he wasn't really part of the buyer -- potential

22  buyer of the camera business under the term sheet

23  that we had signed.  And frankly, I have no

24  understanding of what it means with that we brushed

25  aside our contractual obligations to him.  I guess

Page 96

1   under the term sheet?  But we've never brushed

2   anything aside.  We committed and left him as the

3   exclusive bidder, potential buyer with PNC under --

4   of -- of the camera business.

5        Q.  He then goes on to say in paragraph 8,

6   Mr. Salomon does, "Desiring to prevent Outdoor sale

7   of the two related businesses from occurring, KSE

8   induced Outdoor and PNC contractually to position

9   KSE to veto the sale to Mr. Salomon and PNC."

10          What's your reaction to that statement?

11       A.  I have no knowledge of that whatsoever.

12   Although, frankly, I wasn't involved after the --

13   after we closed on the sale of Outdoor Channel

14   Holdings, and I don't know when he's talking about.

15       Q.  Well, let's limit it to the period before

16   the acquisition.

17       A.  I would vehemently say that that is not

18   true, that I'm aware of.

19       Q.  Okay.  Paragraph 9, Mr. Salomon writes, "KSE

20   obstructed and interfered with Mr. Salomon's effort

21   to purchase from Outdoor the Aerial Camera

22   Business."

23          What's your reaction to that?

24       A.  Not when I was there.

25       Q.  And you were there through the entire time

Page 98

1   out of --

2      A.   To my knowledge, no.

3      Q.   Can you turn to paragraph 16 on page 5.

4   Mr. Salomon writes, "In or around March 2012, Tom

5   Hornish, the then chief executive officer of

6   Outdoor, met with and advised Mr. Salomon that

7   SkyCam and CableCam reviewed as Outdoor's non-core

8   business and would be spun off."  I assume that's an

9   accurate statement.  Right?

10     A.   Yes.

11     Q.   Okay.  He then goes on to say, "Hornish

12  encouraged Mr. Salomon to assemble an investment

13  group to offer to buy SkyCam and CableCam."  Did you

14  encourage Mr. Salomon to do that?

15     A.   Yes.

16     Q.   Okay.  Paragraph 20, page 6, Mr. Salomon

17  writes, "In or around September 2012, Outdoor's CEO,

18  Hornish, authorized Mr. Salomon to introduce PNC to

19  the sale process."

20          What's your reaction to that statement?

21     A.   I -- that's fair.

22     Q.   Okay.  And then Mr. Salomon -- well, in

23  paragraph 28, page 9, Mr. Salomon writes, "In

24  contravention of the exclusivity obligations in the

25  term sheet, Outdoor participated during the

Page 100

1   to various parties.

2       Q.  Okay.  Did you have any nego- -- discussions

3   with anyone to sell the SkyCam and CableCam

4   business?

5       A.  No.

6       Q.  Okay.  Mr. Salomon writes in the last

7   sentence of paragraph 29 on page 9 that InterMedia

8   expected and acknowledged that the Aerial Camera

9   Business would be sold to a third party either

10  before or after the merger.  Do you know what

11  InterMedia's expectations and acknowledgments

12  regarding the sale of the Aerial Camera Business

13  were?

14      A.  As I stated earlier, I think they didn't

15  care.  But they didn't care if the business was sold

16  if it was for a fair price.

17      Q.  Did they expect it to be sold?

18      A.  I don't think they cared one way or another.

19      Q.  Okay.  Paragraph 41 on page 13, Mr. Salomon

20  writes, "Mr. Salomon first learned of the

21  amendment" -- that's the March 21, 2013, document we

22  looked at earlier -- "on April 9, 2013.  When

23  Mr. Salomon objected to his exclusion, Hornish asked

24  him to ratify the amendment by executing a side

25  letter of agreement and amendment.  Mr. Salomon

Page 101

1   refused."

2          What's your recollection of that discussion

3   or conversation?

4      A.  Very vague.  I remember that there was some

5   discussion about him not signing that amendment, and

6   we tried to ratify it with him.  But there was

7   still, in my mind, a real question as to his role in

8   the acquiror of the camera business, PNC.

9      Q.  Can I get you to turn to Exhibit 56.

10  Exhibit 56 is a e-mail chain, several -- several

11  e-mail chains, but -- e-mail exchanges, but I want

12  to focus on the e-mails in the first couple of

13  pages.  In particular we'll start with the one at

14  the bottom of the first page from Mr. Salomon to

15  yourself, CCs to Mr. Allen and Ms. Lee, on May 17 of

16  2013.  Mr. Salomon writes, "Tom, I am still having a

17  difficult time understanding your continuing attempt

18  to tie in our letter of intent, which you amended

19  without my consent or participation, to my efforts

20  as an officer to advance SkyCam's business.  Just so

21  we're clear, I'm reserving all of my rights in this

22  matter."

23          Do you recall receiving this e-mail?

24      A.  Vaguely.

25      Q.  Do you recall what Mr. Salomon meant when he

Page 103

1    discussions?

2        A.  Not specifics.

3        Q.  Could I get you to turn to Exhibit 58.

4    Exhibit 58 is another e-mail exchange between

5    Mr. Salomon and yourself.  There's a -- an e-mail at

6    the bottom of the first page.  It's from Francisco

7    Penafiel at Noble to Jeff Holowaty, Tim McQuay at

8    Noble, Kelly Holowaty, and Mr. Salomon, in which

9    Mr. Penafiel writes, "Gents, attached you will find

10   the executed amendment for the existing LOI.  Please

11   feel free to contact us in case of any questions."

12           Do you recall that there was an effort to

13   sign another amendment of the term sheet?

14       A.  Not specifically.

15       Q.  Mr. Salomon writes, apparently to you, and

16   says, "Tom" -- this is on June 3 -- "I continued to

17   be confused by you sending me these communications.

18   I'm not sure of your purpose but can only surmise

19   that it is an attempt to draw me back into a

20   transaction which has been modified by you and PNC

21   and somehow secure my approval of your actions.

22   Outdoor Channel and PNC negotiated and executed an

23   amendment to the term sheet previously negotiated by

24   me and to which I was a party.  These amendments

25   made material changes to our original agreement

Page 104

1  without my consent and involvement, and in fact the

2  initial amendment as well as the most recent

3  amendments remove me as a party and signatory.

4  Thanks for your understanding."

5       Did you have a conversation with Mr. Salomon

6  about this e-mail after he wrote it?

7       A.  I don't recall specifically, but I'm sure I

8  did.

9       Q.  Okay.  Maybe the top e-mail will help.  You

10 write back to Mr. Salomon on the same day, and you

11 say, "Nic, I must admit that I was the confused

12 person when you previously mentioned that we had

13 amended the LOI without your consent, because I had

14 forgotten that you were a signatory to it in your

15 personal capacity.  I apologize for that.  Now I

16 understand."  Let me stop there.

17      You say that you had forgotten that

18 Mr. Salomon was a signatory to it in -- in his

19 personal capacity.  Do you recall that Mr. Salomon

20 signed the term sheet, as did PNC, for a purchaser?

21      A.  That was my understanding, and I thought PNC

22 had authority to amend it on behalf of the

23 purchaser.

24      Q.  Okay.  And since it was entered into for

25 purchaser, can you -- what did you mean by that

Page 105

1   Mr. Salomon signed it in his personal capacity?

2        A.   Whenever there's a signatory, you -- you can

3   wear different hats, I guess, is the best way to

4   explain it.  And I had originally thought that he

5   was signing as -- on behalf of the purchaser, the

6   acquiror, yet -- or for PNC, for an entity yet to be

7   formed, not for him personally.  And then I later

8   learned that he had no personal skin in the game

9   anyhow, which made me even more firmly believe that

10  he was wearing two hats, one for the Aerial Camera

11  Business and one for the acquiror, the entity under

12  PNC that -- that would be acquiring the camera

13  business.

14       Q.   So -- but "personal capacity" suggests that

15  Mr. Salomon was entering into it on his own.  I'm

16  just a little confused by your use of that phrase.

17       A.   Well, and I didn't believe when I first

18  looked at the term sheet and -- as to who I needed

19  to sign the amendment.  I thought he was signing on

20  behalf of the entity, so I just needed the entity,

21  PNC's, approval to modify it.  And then as Nic

22  attempted to point out that he was signing in his

23  personal capacity, he had to explain that to me.  It

24  wasn't clear in the term sheet.

25       Q.   Okay.  So this was something that he had

CONFIDENTIAL

Page 106

1    told you subsequently?

2        A.   Yes.   But it contradicted my understanding

3    and discussions I had with PNC as to what Nic's role

4    was in this acquiror.

5        Q.   Gotcha.   You -- you go on to say that Cathy

6    Lee was preparing an acknowledgment correction for

7    you to sign if you agree to the prior two

8    amendments.   Do you recall Ms. Lee doing that?

9        A.   Vaguely.

10       Q.   Can you turn to Exhibit 59.   Is that the

11   document that you were referring to?

12       A.   Appears to be, yes.

13       Q.   Okay.   Do you recall whether Mr. Salomon

14   ever signed that?

15       A.   I don't recall.

16       Q.   Let me -- can I get you to turn back to

17   Exhibit 6?   That's the second amended complaint.

18   And I'm going to ask you to take a look at paragraph

19   48 on page 14.   Mr. Salomon writes, "Prior to the

20   end of the original exclusivity provision, KSE

21   prevented Outdoor from honoring its obligation to

22   use its best efforts to close the transaction

23   contemplated by the term sheet."

24            What's your reaction to that statement?

25       A.   I've got no understanding of that.   I mean,

Page 107

1   KSE never tried to do that.

2       Q.  KSE never, in your -- in your recollection,

3   tried to prevent Outdoor from honoring any

4   obligations under the term sheet?

5       A.  None whatsoever.

6       Q.  Mr. Salomon writes at the end of that

7   paragraph 48, "Outdoor breached the term sheet's

8   exclusivity provisions and allowed KSE to refuse to

9   consummate the sale of the Aerial Camera Business as

10  outlined in the term sheet."

11      What's your reaction to that statement?

12      A.  Again, we -- I never saw KSE refusing to

13  consummate the sale.

14      Q.  And in your opinion, did Outdoor breach the

15  term sheet's exclusivity provisions?

16      A.  None -- no, because we only had an

17  obligation as to the sale of the camera business,

18  not the sale of the parent.

19      Q.  And by the way, just so it's clear, on

20  May 17, 2013, when KSE acquired all of the stock of

21  Outdoor, who owned the Aerial Camera Business at

22  that time?

23      A.  I don't recall if it was Outdoor -- I'm

24  sorry, the structure that we had was a parent

25  company, Outdoor Channel Holdings, Inc., which is

Page 108

1  the entity that KSE purchased.  Then we had multiple

2  subsidiaries of The Outdoor Channel, Inc.,

3  Winnercomm, Inc., but I don't recall who held the

4  LLC camera business, two -- two entities, SkyCam and

5  CableCam, LLCs.  It was either The Outdoor Channel,

6  Inc., or Winnercomm, Inc., but I don't recall.

7      Q.  Okay.  But it was either -- it was either

8  Outdoor or Winnercomm, a subsidiary of Outdoor.

9  Right?

10     A.  Yes.

11     Q.  Okay.  If you could turn to paragraph 51 on

12  page 15, Mr. Salomon writes, "Outdoor breached the

13  term sheet's exclusivity provision by, among other

14  things," and then he goes on to list five different

15  ways that he claims Outdoor breached the term

16  sheet's exclusivity provision.  If you could read

17  those, and then when you're done reading those, give

18  me your reaction to Mr. Salomon's allegations.

19     A.  I think Mr. Salomon is missing the point of

20  subsidiaries in a corporate entity, because he's

21  talking as if we were selling the camera business to

22  KSE, and that is not what we were doing, since it

23  was a subsid- -- maybe even a second- or third-tier

24  subsidiary of Outdoor Channel Holdings that we were

25  selling.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 12

### AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
### KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
### <u>HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
## Dallas Division

|  | § |  |
|---|---|---|
|  | § |  |
| _____Nic Salomon_____ | § |  |
| Plaintiff | § |  |
|  | § |  |
| v. | § | Civil Action No. _3:15-cv-00666-M_____ |
|  | § |  |
|  | § |  |
|  | § |  |
| __Pacific Northern Capital, LLC et al__ | § |  |
| Defendant | § |  |

## CLERK'S ENTRY OF DEFAULT

The record reflects that service of the complaint has been made upon the Defendant named below:

Pacific Northern Capital, LLC

---

It appears from the record that service of the complaint has been made, that the Defendant has failed to answer or otherwise defend as directed within the time allowed, and that the Plaintiff has shown that failure through affidavit or otherwise.

Therefore, upon Plaintiff's request, DEFAULT is entered against the Defendant named above.

KAREN S. MITCHELL, CLERK
U.S. DISTRICT COURT


/s/ Erica Monk_____
By: Deputy Clerk on 11/6/2017

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NIC SALOMON, | § |
| | § |
|     Plaintiff, | § |
| | § |
| v. | §     **CIVIL ACTION NO.** |
| | §     **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § |
| | § |
|     Defendants. | § |

## EXHIBIT 13

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
<u>HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>**

CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4

5   NIC SALOMON,                    )   CIVIL ACTION NO.
                                    )   3:15-CV-666-M
6                   Plaintiff,      )
                                    )
7            vs.                    )
                                    )
8                                   )
                                    )
9   KROENKE SPORTS & ENTERTAINMENT, )
    LLC, OUTDOOR CHANNEL HOLDINGS,  )
10  INC., and PACIFIC NORTHERN CAPITAL )
    LLC,                            )
11                                  )
                    Defendants.     )
12  _____)

13

14

15

16        VIDEO-RECORDED DEPOSITION OF TIM MCQUAY

17                    CONFIDENTIAL

18              Pasadena, California

19            Wednesday, July 11, 2018

20

21

22

23   Reported By:

24   Elizabeth Schmidt

25   CSR No. 13598     Job No. CS2916027

CONFIDENTIAL

Page 68

1       Q    -- stock.

2       A    Right.

3       Q    Did you understand or did you believe that

4    this term sheet prohibited Outdoor in any way from

5    selling all of its stock?                                    10:35:00

6       A    No.

7       Q    Let me show you what's been marked as

8    Exhibit 37 in the case.  This is that IMAX document we

9    were referring to earlier.

10      A    Ah.                                                  10:35:21

11      Q    And I'm going to show you a couple of these.

12   This is the preliminary one.  On the second page of

13   this exhibit, Exhibit 37, there's an e-mail from you

14   sent on February 18, 2013, to Mr. Wechsler and

15   Mr. Schneider with a cc to Mr. Salomon regarding your     10:35:54

16   visit.  Do you recall sending this e-mail?

17      A    No.

18      Q    Any reason to doubt you sent the e-mail?

19      A    No.

20      Q    You write:                                          10:36:03

21            "Brad and Ben, thanks for taking

22            the time to meet with Nic, Steve,

23            and me today."

24           Do you recall who Steve was?

25      A    I don't remember his last name, but I think        10:36:12

Page 69

1    he was a member of aerial camera's management team and

2    was involved in an aspect of the business that had

3    some growth opportunity, and I don't remember what

4    that was.

5         Q    Does the name Steve Wharton ring a bell?    10:36:27

6         A    No.

7         Q    You say:

8              "I thought it was a productive

9              session and hope all is well."

10             So what was the purpose of meeting with    10:36:39

11   Wechsler and Schneider?

12        A    This allowed them to meet Nic and understand

13   the business better and let them begin their

14   investigative process.

15        Q    So this is the second management meeting we    10:36:52

16   referred to earlier.

17        A    Correct.

18        Q    This February 18 date is after the date that

19   Salomon announced that he intended to make a

20   management bid, and it's actually after the date that    10:37:04

21   PNC sent draft term sheets to Noble in connection with

22   their efforts to acquire the aerial camera business.

23   So why was Mr. Salomon involved to your knowledge in a

24   meeting with a potential competitor for the purchase

25   of the aerial camera business?    10:37:25

CONFIDENTIAL

Page 70

1        A     Well, this is the conflict that him deciding

2    to team up with a potential buyer creates.  We hadn't

3    signed a definitive agreement with anybody, but

4    clearly we were talking to other buyers.  Brad

5    Wechsler was interested on a personal basis in          10:37:40

6    investing in the company and wanted to do his

7    diligence.  And I'm sure we cleared this with Tom

8    Allen and Tom Hornish to have them meet with Nic to

9    see if they could gather enough information to

10   continue their interest in the company and submit a

11   bid.

12       Q    Was the takeaway from this meeting to your

13   recollection that Mr. Wechsler and Mr. Schneider were

14   requesting more information?

15       A    I don't remember that specific, but I'm       10:38:12

16   sure -- I remember they did ask for additional

17   information later on.

18       Q    If you turn to the first page of this

19   e-mail, it's the same date, February 18, where

20   Mr. Wechsler writes back:                              10:38:30

21              "Thanks, guys.  Good meeting and

22              very helpful.  Will be in touch

23              by tomorrow early afternoon.

24              Brad."

25          Mr. Schneider writes the same day with a cc     10:38:39

CONFIDENTIAL

Page 71

1    to you:

2              "Likewise.  Good meeting you and

3              appreciate your coming in on

4              holiday on short notice.  Look

5              forward to discussing next                    10:38:50

6              steps."

7         Do you recall those e-mails?

8    A    No.

9    Q    Any reason to doubt you received them?

10   A    No.                                                 10:38:55

11   Q    So what happened regarding the next steps

12   with Schneider and Wechsler to the extent you recall?

13   A    I recall having conversations with Schneider

14   and trying to determine what additional information

15   they'd need to be able to submit an offer.  I do        10:39:15

16   recall there being a tight time frame between the

17   negotiations we were having with PNC and these

18   meetings.  And this is when ultimately I think Brad

19   Wechsler decided not to proceed.

20   Q    Do you recall whether Noble was relying upon       10:39:36

21   Mr. Salomon to provide it with information in response

22   to questions that Mr. Schneider and Mr. Wechsler may

23   have had?

24   A    I don't recall.

25   Q    I think I may have mentioned this or asked         10:39:51

Page 72

1    this earlier.  Does the name SF Capital sound familiar

2    to you?

3        A    It doesn't.

4        Q    Let me show you what's previously been

5    marked in the case as Exhibit 123.  So Exhibit 123,          10:40:05

6    the second e-mail on the first page is from

7    Mr. Schneider to you.  It doesn't have a date, but I'm

8    assuming that this is February 26 or 27 based upon the

9    content of this e-mail and the attachment.

10       A    Uh-huh.                                             10:40:35

11       Q    Do you recall receiving this e-mail from

12   Mr. Schneider?

13       A    No.

14       Q    Any reason to doubt you received it?

15       A    No.                                                10:40:44

16       Q    Mr. Schneider writes:

17               "Tim, I've tried to reach you a

18               couple times.  Attached is our

19               proposal."

20           And then attached as the third page of this         10:40:55

21   document is a proposal on SF Capital Group, LLC,

22   letterhead to you dated February 26 of 2013.  Does

23   that help jog your memory at all?

24       A    I'm afraid not.

25       Q    Okay.  Then if you could look at the top           10:41:11

Page 73

1    e-mail on the first page.

2         A    Uh-huh.

3         Q    This is a letter -- an e-mail from you to

4    Mr. Allen and Mr. Hornish with cc's to Mr. Penafiel

5    and Mr. Campbell dated February 27, 2013, subject, bid       10:41:41

6    proposal.  Do you recall sending that e-mail?

7         A    No.

8         Q    Any reason to doubt you sent it?

9         A    No.

10        Q    You write:                                         10:41:52

11               "This came in last night.

12               Curiously, it is signed by Ben

13               Schneider, who is an employee of

14               IMAX.  Also, no mention of Brad

15               Wechsler's involvement, which we              10:42:08

16               were led to believe was part of

17               this group's interest.  We will

18               let Ben know we've gone with

19               another group."

20             Did you have a conversation with Outdoor         10:42:19

21    after you sent them this e-mail with this proposed --

22        A    I don't recall.

23        Q    Did you contact Mr. Schneider?

24        A    I don't recall.

25        Q    Can I get you to turn to page 4 of this          10:42:38

Page 74

1    exhibit, which is the second page of the SF Capital

2    term sheet.  See it says purchase price?

3         A    Yes.

4         Q    And Mr. Schneider writes:

5              "Based on the materials reviewed          10:42:53

6              to date, we would be prepared to

7              acquire the company from the

8              seller for $4.5 million."

9         Do you see that?

10        A    Yes.                                      10:43:01

11        Q    Which was the same price as the Aspen Group

12   had offered in the document we just saw a few moments

13   ago and over 800,000 more in cash than PNC and Salomon

14   offered.  Potentially nearly 500,000 more than the

15   most PNC and Salomon were prepared to pay,           10:43:18

16   4.05 million.

17        A    Right.

18        Q    Do you know the reason for such a

19   significant difference between the two bids?

20        A    No.                                        10:43:30

21        Q    Can you see why this sequence of events

22   might raise some eyebrows, particularly given

23   Mr. Salomon's involvement?

24        A    Yes.

25        Q    Do you recall having suspicions or concerns   10:43:46

CONFIDENTIAL

Page 75

1    in your mind at the time you received this as to what

2    may have been going on?

3         A    With Salomon?

4         Q    Yeah.

5         A    My recollection is that Schneider and          10:44:01

6    Wechsler were -- they were late to the transaction.

7    And I think that was the primary reason that having

8    gone through this as long as we had and as long as our

9    client had, the client just wanted something that had

10   a high degree of certainty of closing.  This didn't     10:44:26

11   have that.  But I don't remember this letter, as I

12   say.

13        Q    Let me show you what's been marked as

14   Exhibit 124 in the case.  And before I do that, do you

15   recall having any discussions with Outdoor about this   10:44:44

16   letter by SF Capital?

17        A    I remember conversations about Wechsler and

18   Schneider but not about SF Capital.

19        Q    Let me show you what's been marked as

20   Exhibit 124.  The top e-mail is from Mr. Allen to       10:45:06

21   Mr. Campbell, yourself, and Mr. Hornish on

22   February 28, 2013, and it follows a series of e-mails

23   between Mr. Schneider and Mr. Hornish and Mr. Allen.

24   And that's where I want to start at the bottom of the

25   first page.                                             10:45:33

CONFIDENTIAL

Page 76

```
 1              This is a February 27, 2013, e-mail from

 2      Mr. Schneider to Mr. Hornish and Mr. Allen where

 3      Mr. Schneider writes:

 4                  "I hope you don't mind me

 5                  reaching out directly, but given      10:45:45

 6                  the circumstances, I felt it was

 7                  important to engage you directly

 8                  to be sure nothing was lost

 9                  through intermediaries.  I was

10                  informed tonight by Tim McQuay        10:45:56

11                  that you had elected to go with

12                  the other group towards reaching

13                  a transaction for SkyCam, and I

14                  am, in a word, disappointed.  I

15                  am reaching out to ask you to         10:46:05

16                  reconsider and offering to put

17                  money in escrow as well as a

18                  shorter period of exclusivity to

19                  get to close."

20              Do you recall receiving this e-mail?      10:46:16

21      A    I don't.

22      Q    Any reason to doubt you received it?

23      A    No.

24      Q    Do you recall having a discussion with --

25      does this jog your memory in terms of whether you had
```

CONFIDENTIAL

Page 77

1    a discussion with Outdoor about the SF Capital

2    proposal?

3         A    I'm afraid it doesn't.

4         Q    At the bottom of that first page, there's a

5    sentence that begins "I was," and then it continues        10:46:35

6    onto the second page:

7                  " -- surprised that I wasn't

8                  given a counter opportunity or

9                  look before your team decided to

10                 move a different direction and              10:46:48

11                 sign with someone else as I was

12                 led to believe that my bid was

13                 significantly higher than any

14                 other bid and your priorities as

15                 explained to me were one,                  10:46:59

16                 valuation, two, speed to close,

17                 and three, certainty to close."

18           So Mr. Schneider writes he was led to

19    believe that his bid was significantly higher.  Do you

20    know who he's talking about in terms of who led him to   10:47:09

21    believe that?

22         A    No.

23         Q    Do you think Outdoor was having

24    communications directly with Schneider, or was that

25    through Noble?                                           10:47:20

CONFIDENTIAL

Page 78

```
 1        A     Probably through Noble.

 2        Q     Who at Noble was interacting with

 3   Mr. Schneider?

 4        A     I was mostly.

 5        Q     But that doesn't --                         10:47:28

 6        A     No.  Unfortunately it doesn't.

 7        Q     Do you know whether Mr. Schneider's group

 8   had, in fact, suggested a bid amount prior to

 9   February 27, 2013?

10        A     The only recollection I have, as I said, was   10:47:45

11   Schneider and Wechsler came down to Ft. Worth, that

12   Wechsler was the money source, if you will, and that

13   really nothing came of it.

14        Q     Do you recall ever having any discussions

15   with Mr. Salomon or PNC, either of the Holowatys,    10:48:09

16   about SF Capital and Mr. Schneider's bid or potential

17   bid?

18        A     No.

19        Q     So Mr. Hornish on the first page, middle

20   e-mail, writes back on the 27th to Mr. Schneider with   10:48:25

21   a cc to Mr. Allen and says:

22              "Hi, Ben.  Appreciate you

23              following up.  But given that

24              we've entered into an exclusivity

25              arrangement with another party,      10:48:41
```

CONFIDENTIAL

Page 79

1              we're not able to discuss

2              anything further with you at that

3              time."

4         And then Mr. Allen writes back, "Crap," on

5    which you were copied.  Do you recall having a          10:48:50

6    conversation with Mr. Allen about the sequence of

7    events here?

8         A    No.

9         Q    Switching gears with you a little bit.  Do

10   you recall whether the aerial camera business was       10:49:09

11   operating at a profit or a loss?

12        A    I recall it being profitable.

13        Q    I'll show you what's been marked,

14   Mr. McQuay, as Exhibit 157.

15        (Exhibit 157 was marked for identification.)

16   BY MR. EVANS:

17        Q    This is actually a document that has the

18   watermark for Noble.

19        A    Uh-huh.

20        Q    And it's a summary of operating results      10:49:45

21   through May 31, 2012.  So this was right before Noble

22   was engaged by Outdoor --

23        A    Right.

24        Q    -- in June 2012 time period.  Have you ever

25   seen this document before?                              10:50:00

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 14**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
<u>**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

Table of Contents

ANNEX A

# AGREEMENT AND PLAN OF MERGER

## BY AND AMONG

### INTERMEDIA OUTDOOR HOLDINGS, INC.,

### OUTDOOR MERGER SUB, LLC,

### OUTDOOR MERGER CORP.,

### OUTDOOR CHANNEL HOLDINGS, INC.

### AND

### INTERMEDIA OUTDOORS HOLDINGS, LLC,

### DATED AS OF NOVEMBER 15, 2012

A-1

**Table of Contents**

### AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of November 15, 2012 (this "<u>Agreement</u>"), is made by and among InterMedia Outdoor Holdings, Inc., a Delaware corporation ("<u>Parent</u>"), Outdoor Merger Sub, LLC, a Delaware limited liability company and an indirect wholly-owned Subsidiary of Parent ("<u>IM Merger Sub</u>"), Outdoor Merger Corp., a Delaware corporation and an indirect wholly-owned Subsidiary of Parent ("<u>OUTD Merger Sub</u>" and, together with IM Merger Sub, the "<u>Merger Subsidiaries</u>"), Outdoor Channel Holdings, Inc., a Delaware corporation ("<u>OUTD</u>"), and InterMedia Outdoors Holdings, LLC, a Delaware limited liability company ("<u>IM</u>"). IM, Parent and the Merger Subsidiaries are collectively referred to herein as the "<u>IM Parties</u>."

### W I T N E S S E T H :

WHEREAS, the Board of Directors of each of Parent, OUTD Merger Sub and OUTD and the respective governing bodies and members of each of IM Merger Sub and IM have approved the consummation of the business combinations provided for in this Agreement, pursuant to which (i) OUTD Merger Sub will merge with and into OUTD, with OUTD surviving (the "<u>OUTD Merger</u>"), whereby, upon the terms and subject to the conditions set forth herein, the shares of OUTD Common Stock will be converted into the right to receive the OUTD Merger Consideration and (ii) IM Merger Sub will merge with and into IM, with IM surviving (the "<u>IM Merger</u>" and, together with the OUTD Merger, the "<u>Mergers</u>"), whereby, upon the terms and subject to the conditions set forth herein, each equity interest of IM will be converted into the right to receive the IM Merger Consideration;

WHEREAS, the Board of Directors of Parent (the "<u>Parent Board</u>") has (i) determined that it is in the best interests of Parent and its stockholder, and declared it advisable, to enter into this Agreement, (ii) approved this Agreement and approved the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated hereby, including the Mergers, and (iii) authorized the proper officers of Parent to take appropriate action to cause the shares of IM Merger Sub and OUTD Merger Sub indirectly owned by Parent to be voted in favor of the adoption of this Agreement;

WHEREAS, the Board of Directors of OUTD (the "<u>OUTD Board</u>") has (i) determined that it is in the best interests of OUTD and its stockholders, and declared it advisable, to enter into this Agreement, (ii) approved this Agreement and approved the execution, delivery and performance by OUTD of this Agreement and the consummation of the transactions contemplated hereby, including the OUTD Merger, and (iii) resolved to recommend to OUTD's stockholders that they adopt this Agreement;

WHEREAS, the members of IM (the "<u>IM Members</u>") holding more than 50% of the Class A Common Units of IM have (i) determined that it is in the best interests of IM and the IM Members to enter into this Agreement, (ii) approved the execution, delivery and performance by IM of this Agreement and the consummation of the transactions contemplated hereby, including the IM Merger and (iii) executed an amendment to the Amended and Restated Limited Liability Company Operating Agreement of IM in the form previously provided to OUTD (as amended, the "<u>IM LLC Agreement</u>") to provide that the IM Merger Consideration, when and if payable pursuant to the terms of this Agreement, shall be treated as a "Distribution" in accordance with Article 10 of the IM LLC Agreement;

WHEREAS, the Board of Directors of OUTD Merger Sub has (i) determined that it is in the best interests of OUTD Merger Sub and its sole stockholder, and declared it advisable, to enter into this Agreement, (ii) approved this Agreement and approved the execution, delivery and performance by OUTD Merger Sub of this Agreement and the consummation of the transactions contemplated hereby, including the OUTD Merger and (iii) resolved to recommend to its sole stockholder that it approve the OUTD Merger and adopt this Agreement;

WHEREAS, the sole member of IM Merger Sub has (i) determined that it is in the best interests of IM Merger Sub to enter into this Agreement and (ii) approved this Agreement and approved the execution, delivery and performance by IM Merger Sub of this Agreement and the consummation of the transactions contemplated hereby, including the IM Merger;

A-5

Table of Contents

WHEREAS, for U.S. federal income tax purposes, it is intended that the Mergers, taken together, shall constitute an exchange described in Section 351 of the Code;

WHEREAS, as a condition and inducement to IM entering into this Agreement and incurring the obligations set forth herein, Parent, the IM Members, certain stockholders of OUTD and certain other parties, concurrently with the execution and delivery of this Agreement, are entering into the Registration Rights Agreement, in the form attached hereto as Exhibit A (as amended or modified from time to time in accordance with its terms, "Registration Rights Agreement");

WHEREAS, as a condition and inducement to IM entering into this Agreement and incurring the obligations set forth herein, certain stockholders of OUTD concurrently with the execution and delivery of this Agreement, have entered into (i) a Support Agreement, in the form attached as Exhibit B (as amended or modified from time to time in accordance with its terms, the "Support Agreement") and (ii) a Lock-Up Agreement, in the form attached as Exhibit C (as amended or modified from time to time in accordance with its terms, the "Lock-Up Agreement");

WHEREAS, as a condition and inducement to OUTD entering into this Agreement and incurring the obligations set forth herein, concurrently with the execution and delivery of this Agreement the IM Members have entered into the Lock-Up Agreement; and

WHEREAS, in connection with the transactions contemplated by this Agreement, the parties have agreed that the OUTD Board would, and the OUTD Board has, declared a special cash dividend of $0.25 per share on all of the issued and outstanding shares of OUTD Common Stock (as defined herein) payable to holders of record as of the close of business on November 27, 2012, payable on or about December 7, 2012 (the "Special Dividend").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

<div align="center">

ARTICLE I

THE MERGERS

</div>

Section 1.1 The OUTD Merger.

(a) At the Effective Time, OUTD Merger Sub shall be merged with and into OUTD in accordance with the DGCL, and upon the terms set forth in this Agreement, whereupon the separate existence of OUTD Merger Sub shall cease and OUTD shall be the surviving corporation (the "OUTD Surviving Corporation").

(b) As soon as practicable on the Closing Date, the parties shall file a certificate of merger, certified by the Secretary of OUTD in accordance with the DGCL (the "OUTD Merger Filing"), with the Delaware Secretary of State and make all other filings or recordings required by the DGCL in connection with the OUTD Merger. The OUTD Merger shall become effective at the Effective Time. As used herein, the term "Effective Time" means the time set forth in the OUTD Merger Filing in accordance with the DGCL and the Act.

(c) From and after the Effective Time, the OUTD Merger shall have the effects set forth in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, the OUTD Surviving Corporation shall possess all the rights, powers, privileges and franchises and be subject to all of the obligations, liabilities, restrictions and disabilities of OUTD and OUTD Merger Sub, all as provided under the DGCL.

<div align="center">

A-6

</div>

Table of Contents

Section 1.2 The IM Merger.

(a) At the Effective Time, IM Merger Sub shall be merged with and into IM in accordance with the Delaware Limited Liability Company Act 6 Del. C. §§18-101, et seq. (the "Act"), and upon the terms set forth in this Agreement, whereupon the separate existence of IM Merger Sub shall cease and IM shall be the surviving limited liability company (the "IM Surviving LLC" and together with the OUTD Surviving Corporation, the "Surviving Entities").

(b) Concurrently with the filing of the OUTD Merger Filing, the parties shall file a certificate of merger, certified by the Secretary of IM in accordance with the Act (the "IM Merger Filing"), with the Delaware Secretary of State and make all other filings or recordings required by the Act in connection with the IM Merger. The IM Merger Filing shall provide that the IM Merger shall become effective at the Effective Time.

(c) From and after the Effective Time, the IM Merger shall have the effects set forth in the applicable provisions of the Act. Without limiting the generality of the foregoing, from and after the Effective Time, the IM Surviving LLC shall possess all the rights, powers, privileges and franchises and be subject to all of the obligations, liabilities, restrictions and disabilities of IM and IM Merger Sub, all as provided under the Act.

Section 1.3 Closing. The closing of the Mergers (the "Closing") shall take place at 10:00 a.m., prevailing Eastern time, on a date to be specified by the parties, which shall be no later than the second Business Day after satisfaction or (to the extent permitted by applicable Law) waiver of all of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, it being understood that the occurrence of the Closing shall remain subject to the satisfaction or (to the extent permitted by applicable Law) waiver of such conditions at the Closing) at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, unless another time, date or place is agreed to in writing by the parties hereto). The date on which the Closing occurs is referred to herein as the "Closing Date."

Section 1.4 Organizational Documents.

(a) At the Effective Time, (i) the certificate of incorporation of OUTD in effect immediately prior to the Effective Time shall be amended by virtue of the OUTD Merger in the form set forth on Exhibit D and, as so amended, shall be the certificate of incorporation of the OUTD Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law, and (ii) the by-laws of OUTD shall be amended by virtue of the OUTD Merger in the form set forth on Exhibit E and, as so amended, shall be the by-laws of the OUTD Surviving Corporation, until thereafter changed or amended as provided therein, in the certificate of incorporation of OUTD Merger Sub or by applicable Law.

(b) At the Effective Time, the limited liability company agreement of IM Merger Sub, as in effect immediately prior to the Effective Time (with the name of the limited liability company appropriately changed to that of the IM Surviving LLC), shall be the limited liability company agreement of the IM Surviving LLC, until thereafter changed or amended as provided therein or by applicable Law.

(c) IM shall take all appropriate action so that, at the Effective Time, (i) the certificate of incorporation of Parent shall be amended and restated in the form set forth on Exhibit F hereto (the "Amended Parent Certificate of Incorporation") and (ii) the amended and restated by-laws of Parent shall be in the form attached as Exhibit G hereto (the "Amended Parent By-Laws").

Section 1.5 Board Composition; Officers and Managers.

(a) The directors of OUTD Merger Sub immediately prior to the Effective Time shall be the initial directors of the OUTD Surviving Corporation and the officers of OUTD immediately prior to the Effective Time shall be the initial officers of the OUTD Surviving Corporation, each to hold office in accordance with the certificate of incorporation and by-laws of the OUTD Surviving Corporation.

A-7

Table of Contents

(b) The managers of IM Merger Sub immediately prior to the Effective Time shall be the initial managers of the IM Surviving LLC and the officers of IM immediately prior to the Effective Time shall be the initial officers of the IM Surviving LLC, each to hold office in accordance with limited liability company agreement and the certificate of formation of the IM Surviving LLC.

(c) (i) IM shall cause the Board of Directors of Parent as of immediately following the Effective Time to be comprised of the following nine (9) individuals: (A) five (5) designated by IM (one of whom shall be the Executive Chairman), who shall initially be Peter Kern, Jerome Letter, Alan Sokol and two (2) individuals to be designated by IM, (B) three (3) designated by OUTD, who shall initially be Perry Massie, David Merritt and T. Bahnson Stanley and (C) the Chief Executive Officer of Parent, who are divided into three classes (with each of the individuals designated by OUTD assigned to a different class) and (ii) the individuals set forth on Exhibit H shall be the officers of Parent.

## ARTICLE II

## EFFECTS OF THE MERGERS ON THE CAPITAL STOCK OF OUTD AND THE EQUITY INTERESTS OF IM; EXCHANGE OF CERTIFICATES

Section 2.1 Effect on OUTD Capital Stock. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the OUTD Merger and without any action on the part of Parent, OUTD Merger Sub, OUTD or the holders of any shares of OUTD Common Stock:

(a) Conversion of OUTD Common Stock. Each share of OUTD Common Stock issued and outstanding immediately prior to the Effective Time, other than any shares of OUTD Common Stock to be cancelled pursuant to Section 2.1(b) and Dissenting Shares, will be automatically converted into and will thereafter represent the right to receive the following consideration, as adjusted to the extent necessary pursuant to Section 2.2 (in the aggregate for all shares of OUTD Common Stock (other than any shares of OUTD Common Stock to be cancelled pursuant to Section 2.1(b) and Dissenting Shares), the "OUTD Merger Consideration"):

(i) Each share of OUTD Common Stock with respect to which an election to receive cash has been made and not revoked prior to the Election Deadline (each such share, a "Cash Election Share") will be converted into the right to receive $8.00 in cash, without interest (the "OUTD Cash Consideration").

(ii) Each share of OUTD Common Stock with respect to which an election to receive stock has been made and not revoked prior to the Election Deadline (each such share, a "Stock Election Share") will be converted into the right to receive that portion of a share of Parent Common Stock equal to the OUTD Exchange Ratio (together with any fractional shares of Parent Common Stock to be paid in accordance with Section 2.11, the "OUTD Stock Consideration").

(iii) Each share of OUTD Common Stock with respect to which an election to receive mixed stock and cash has been made and not revoked prior to the Election Deadline (each such share, a "Mixed Election Share") or for which no election to receive cash or stock has been made prior to the Election Deadline (each such share, a "No Election Share") will, in each case, be converted into the right to receive (which shall hereinafter be referred to as the "OUTD Mixed Consideration") (A) $4.46 in cash, without interest (the "OUTD Mixed Consideration Cash"), and (B) that portion of a share of Parent Common Stock equal to 0.443 (together with any fractional shares of Parent Common Stock to be paid in accordance with Section 2.11, the "OUTD Mixed Consideration Stock").

From and after the Effective Time, the OUTD Common Stock converted into the OUTD Merger Consideration pursuant to this Section 2.1(a) will no longer remain outstanding and will automatically be cancelled and will cease to exist, and each holder of a certificate previously representing any such OUTD Common Stock or shares of OUTD Common Stock that are in non-certificated book-entry form (either case being referred to in this Agreement, to the extent applicable, as an "OUTD Certificate") will thereafter cease to have any rights with respect to such OUTD Common Stock except the right to receive the OUTD Merger Consideration.

A-8

**Table of Contents**

(b) <u>Cancellation of Certain Shares of OUTD Common Stock</u>. Each share of OUTD Common Stock held by OUTD as treasury stock, each share of OUTD Common Stock held by any direct or indirect Subsidiary of OUTD, and each share of OUTD Common Stock owned by Parent, IM, either Merger Subsidiary or any direct or indirect Subsidiary thereof, in each case as of immediately prior to the Effective Time, automatically shall be cancelled and cease to exist without any conversion thereof, and no consideration shall be paid with respect thereto.

(c) Notwithstanding any provision of this Agreement to the contrary, if and to the extent required by the DGCL, shares of OUTD Common Stock which are issued and outstanding immediately prior to the Effective Time and which are held by holders of such shares of OUTD Common Stock who have properly exercised appraisal rights with respect thereto (the "<u>Dissenting Shares</u>") in accordance with Section 262 of the DGCL, will not be converted into the right to receive the OUTD Merger Consideration, and holders of such Dissenting Shares will be entitled to receive in lieu of the OUTD Merger Consideration payment of the appraised value of such Dissenting Shares determined in accordance with the provisions of Section 262 of the DGCL unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to appraisal and payment under the DGCL. If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares will thereupon be treated as if they had been converted into and to have become exchangeable for, at the Effective Time, the right to receive the OUTD Cash Consideration payable in respect of Cash Election Shares, without any interest thereon. Notwithstanding anything to the contrary contained in this Section 2.1(c), if this Agreement is terminated prior to the Effective Time, then the right of any stockholder to be paid the fair value of such stockholder's Dissenting Shares pursuant to Section 262 of the DGCL will cease. OUTD will give Parent (i) prompt notice of any written demands received by OUTD for appraisal of Dissenting Shares, withdrawals of such demands and any other instruments served pursuant to the DGCL which are received by OUTD relating to such holder's rights of appraisal, and (ii) the opportunity to direct all negotiations and proceedings with respect to demands for appraisal under the DGCL. OUTD will not, except with the prior written consent of Parent (not to be unreasonably withheld, conditioned or delayed), make any payment with respect to any demand for appraisal or offer to settle or settle any such demands, and Parent will not commit to make any such payment or enter into any such settlement prior to the Effective Time without the prior written consent of OUTD.

(d) If after the date hereof and prior to the Effective Time, OUTD pays a stock dividend in, splits, combines into a smaller number of shares, or issues by reclassification any shares of OUTD Common Stock, then the OUTD Merger Consideration, the OUTD Stock Consideration, the OUTD Cash Consideration, the OUTD Mixed Consideration, the OUTD Exchange Ratio and any other similarly dependent items, as the case may be, will be appropriately adjusted to provide to the holders of the OUTD Common Stock the same economic effect as contemplated by this Agreement prior to such action, and as so adjusted will, from and after the date of such event, be the OUTD Merger Consideration, the OUTD Stock Consideration, the OUTD Cash Consideration, the OUTD Mixed Consideration, the OUTD Exchange Ratio or other dependent item, as applicable, subject to further adjustment in accordance with this provision.

Section 2.2 <u>Proration</u>.

(a) If the sum of (A) the product of the aggregate number of Cash Election Shares and the OUTD Cash Consideration (such product being the "<u>OUTD Elected Cash Consideration</u>") and (B) the Aggregate OUTD Mixed Consideration Cash exceeds the Available Cash Amount, then:

      (i) all Stock Election Shares will be converted into the right to receive the OUTD Stock Consideration;

      (ii) all Mixed Election Shares and all No Election Shares will be converted into the right to receive the OUTD Mixed Consideration; and

      (iii) a portion of the Cash Election Shares of each holder of OUTD Common Stock will be converted into the right to receive the OUTD Cash Consideration, with such portion being equal to the product

A-9

Table of Contents

obtained by multiplying (A) the number of such holder's Cash Election Shares by (B) a fraction, the numerator of which will be (1) the Available Cash Amount less (2) the Aggregate OUTD Mixed Consideration Cash, and the denominator of which will be the OUTD Elected Cash Consideration, with the remaining portion of such holder's Cash Election Shares being converted into the right to receive the OUTD Stock Consideration.

(b) If the sum of (A) the OUTD Elected Cash Consideration and (B) the Aggregate OUTD Mixed Consideration Cash is less than the Available Cash Amount (such difference being the "Shortfall Number"), then:

(i) all Cash Election Shares will be converted into the right to receive the OUTD Cash Consideration;

(ii) all Mixed Election Shares and all No Election Shares will be converted into the right to receive the OUTD Mixed Consideration; and

(iii) a portion of the Stock Election Shares of each holder of OUTD Common Stock (if any) will be converted into the right to receive the OUTD Cash Consideration, with such portion being equal to the product obtained by multiplying (x) the number of Stock Election Shares of such holder by (y) a fraction, the numerator of which is the Shortfall Number and the denominator of which is the product obtained by multiplying the aggregate number of Stock Election Shares by $8.00, with the remaining portion of such holder's Stock Election Shares being converted into the right to receive the OUTD Stock Consideration.

(c) In the event that (i) a holder of OUTD Common Stock has made an election to receive cash for 55.74% of such holder's aggregate outstanding shares (rounded to the nearest whole share) and has made an election to receive stock for 44.26% of such holder's aggregate shares (rounded to the nearest whole share), and (ii) indicates its intent on the Election Form to receive the equivalent of Mixed Consideration for all of such holder's shares, such holder's shares will not be subject to Sections 2.2(a)(iii) or 2.2(b)(iii).

Section 2.3 Elections.

(a) Concurrently with the mailing of the Proxy Statement/Prospectus to OUTD stockholders (the "Mailing Date"), an election form in such form as Parent will have specified prior to the Mailing Date and which is reasonably acceptable to OUTD (the "Election Form") will be mailed to each holder of record of shares of OUTD Common Stock (including shares underlying OUTD Equity Awards that become vested or settled on the Closing Date) as of the record date for the OUTD Stockholders' Meeting.

(b) Each Election Form will permit the holder (or the beneficial owner through customary documentation and instructions) to specify (i) the number of shares of such holder's OUTD Common Stock with respect to which such holder elects to receive the OUTD Stock Consideration, (ii) the number of shares of such holder's OUTD Common Stock with respect to which such holder elects to receive the OUTD Cash Consideration or (iii) the number of shares of such holder's OUTD Common Stock with respect to which such holder elects to receive the OUTD Mixed Consideration. In addition, if such holder holds multiple blocks of OUTD Common Stock, the Election Form will permit such holder to designate (i) the shares with respect to which each election is made, (ii) if the same election is made with respect to shares in more than one block, the order of priority of shares to which the election is to be effective in the event of proration and (iii) if no election is made, the order of priority of shares to be exchanged for cash. Any OUTD Common Stock with respect to which the Exchange Agent does not receive a properly completed Election Form during the period (the "Election Period") from the Mailing Date to 5:00 p.m., New York time, on the 10th day preceding the date of the OUTD Stockholders' Meeting or such other date as Parent and OUTD will, prior to the Closing, mutually agree (the "Election Deadline") will be deemed to be No Election Shares. In order to be effective, an Election Form must be accompanied by a letter of transmittal (which will specify that the delivery will be effected, and risk of loss and title will pass, only upon proper delivery of the OUTD Certificates (or effective affidavits of loss in lieu thereof) to the Exchange Agent) in such form as Parent and OUTD may reasonably agree together with the related OUTD Certificates (or effective affidavits of loss in lieu thereof).

A-10

**Table of Contents**

(c) Any election made pursuant to this Section 2.3 will have been properly made only if the Exchange Agent will have actually received a properly completed Election Form during the Election Period. Any Election Form may be revoked or changed by the person submitting it, by written notice received by the Exchange Agent during the Election Period. In the event an Election Form is revoked during the Election Period, the shares of OUTD Common Stock represented by such Election Form will be deemed to be No Election Shares, except to the extent a subsequent election is properly made during the Election Period. Subject to the terms of this Agreement and of the Election Form, the Exchange Agent will have reasonable discretion to determine whether any election, revocation or change has been properly or timely made and to disregard immaterial defects in the Election Forms, and any good faith decisions of the Exchange Agent regarding such matters will be binding and conclusive. None of Parent or OUTD or the Exchange Agent will be under any obligation to notify any Person of any defect in an Election Form.

(d) Parent shall make available one or more Election Forms as may reasonably be requested from time to time by all Persons who become holders (or beneficial owners) of OUTD Common Stock between the record date for the OUTD Stockholders' Meeting and the close of business on the Business Day prior to the Election Deadline, and the Company shall provide to the Exchange Agent all information reasonably necessary for it to perform as specified herein.

Section 2.4 <u>Surrender and Payment</u>.

(a) Prior to the Effective Time, Parent will appoint an exchange agent reasonably acceptable to OUTD (the "<u>Exchange Agent</u>") for the purpose of exchanging OUTD Certificates for OUTD Merger Consideration. As soon as reasonably practicable after the Effective Time, but in no event more than two Business Days following the Effective Time, Parent will send, or will cause the Exchange Agent to send, to each holder of record of No Election Shares as of the Effective Time, whose shares of OUTD Common Stock were converted into the right to receive the OUTD Merger Consideration, a letter of transmittal (which will specify that the delivery will be effected, and risk of loss and title will pass, only upon proper delivery of the OUTD Certificates (or effective affidavits of loss in lieu thereof) to the Exchange Agent) in such form as Parent and OUTD may reasonably agree, including instructions for use in effecting the surrender of OUTD Certificates (or effective affidavits of loss in lieu thereof) to the Exchange Agent in exchange for the OUTD Merger Consideration.

(b) At or prior to the Effective Time, Parent will cause to be deposited with the Exchange Agent, in trust for the benefit of the holders of shares of OUTD Common Stock, shares of Parent Common Stock and an amount of cash sufficient to be issued and paid in lieu of fractional shares pursuant to Section 2.11 and pursuant to Section 2.1 and Section 2.2, payable upon due surrender of the OUTD Certificates (or effective affidavits of loss in lieu thereof) pursuant to the provisions of this Article II. Following the Effective Time, Parent will make available to the Exchange Agent, when and as needed, cash sufficient to pay any dividends and other distributions pursuant to Section 2.4(g). All cash and book-entry shares representing shares of Parent Common Stock deposited with the Exchange Agent are referred to in this Agreement as the "<u>Exchange Fund</u>." The Exchange Agent will, pursuant to irrevocable instructions, deliver the appropriate OUTD Merger Consideration out of the Exchange Fund. The Exchange Fund will not be used for any other purpose. The Exchange Agent will invest any cash included in the Exchange Fund as directed by Parent; <u>provided</u>, that no such investment or losses thereon will affect the OUTD Merger Consideration payable to holders of shares of OUTD Common Stock entitled to receive such consideration or cash in lieu of fractional interests and Parent will promptly cause to be provided additional funds to the Exchange Agent for the benefit of holders of shares of OUTD Common Stock entitled to receive such consideration in the amount of any such losses. Any interest and other income resulting from such investments will be the property of, and paid to, Parent.

(c) Each holder of shares of OUTD Common Stock that have been converted into the right to receive the OUTD Merger Consideration, upon surrender to the Exchange Agent of an OUTD Certificate (or effective affidavits of loss in lieu thereof), together with a properly completed letter of transmittal, duly executed and completed in accordance with the instructions thereto, and such other documents as may reasonably be required

A-11

**Table of Contents**

by the Exchange Agent, will be entitled to receive in exchange therefor (i) the number of shares of Parent Common Stock representing, in the aggregate, the whole number of shares of Parent Common Stock, if any, that such holder has the right to receive and/or (ii) a check in the amount, if any, that such holder has the right to receive in cash, including cash payable in lieu of fractional shares payable pursuant to Section 2.11 and any dividends and other distributions payable pursuant to Section 2.4(g), pursuant to Section 2.1, Section 2.2 and this Article II. The OUTD Merger Consideration will be paid as promptly as practicable (by mail or, to the extent commercially practicable, made available for collection by hand if so elected by the surrendering holder of an OUTD Certificate) after receipt by the Exchange Agent of the OUTD Certificate and letter of transmittal in accordance with the foregoing, and in any event no later than three Business Days following the later to occur of (i) the Effective Time, and (ii) the Exchange Agent's receipt of the OUTD Certificate and letter of transmittal in accordance with the foregoing. No interest will be paid or accrued on any OUTD Merger Consideration, cash in lieu of fractional shares or on any unpaid dividends and distributions payable to holders of OUTD Certificates.

(d) If any cash payment is to be made to a Person other than the Person in whose name the applicable surrendered OUTD Certificate is registered, it will be a condition of such payment that the Person requesting such payment will pay any transfer or other similar Taxes required by reason of the making of such cash payment to a Person other than the registered holder of the surrendered OUTD Certificate or will establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable. If any portion of the OUTD Merger Consideration is to be registered in the name of a Person other than the Person in whose name the applicable surrendered OUTD Certificate is registered, it will be a condition to the registration thereof that the surrendered OUTD Certificate will be properly endorsed or otherwise be in proper form for transfer and that the Person requesting such delivery of the OUTD Merger Consideration will pay to the Exchange Agent any transfer or other similar Taxes required as a result of such registration in the name of a Person other than the registered holder of such OUTD Certificate or establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable.

(e) After the Effective Time, there will be no further registration of transfers of shares of OUTD Common Stock. From and after the Effective Time, the holders of OUTD Certificates representing shares of OUTD Common Stock outstanding immediately prior to the Effective Time will cease to have any rights with respect to such shares of OUTD Common Stock except as otherwise provided in this Agreement or by applicable Law. If, after the Effective Time, OUTD Certificates are presented to the Exchange Agent or Parent, they will be cancelled and exchanged for the consideration provided for, and in accordance with the procedures set forth in this Article II. Notwithstanding anything to the contrary contained in this Agreement, the OUTD Surviving Corporation is obligated to pay any dividends or make any other distributions with a record date prior to the Effective Time which may have been declared or made by OUTD on shares of OUTD Common Stock in accordance with the terms of this Agreement prior to the date hereof and which remain unpaid at the Effective Time.

(f) Any portion of the Exchange Fund that remains unclaimed by the holders of shares of OUTD Common Stock one year after the Effective Time will be returned to Parent, upon demand, and any such holder who has not exchanged his or her shares of OUTD Common Stock for the OUTD Merger Consideration in accordance with this Article II prior to that time will thereafter look only to Parent for delivery of the OUTD Merger Consideration in respect of such holder's shares of OUTD Common Stock. Notwithstanding the foregoing, none of Parent, IM, IM Merger Sub, OUTD Merger Sub, the OUTD Surviving Corporation or OUTD will be liable to any holder of shares of OUTD Common Stock for any OUTD Merger Consideration delivered to a public official pursuant to applicable abandoned property Laws. Any OUTD Merger Consideration remaining unclaimed by holders of shares of OUTD Common Stock immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Authority will, to the extent permitted by applicable Laws, become the property of Parent free and clear of any claims or interest of any Person previously entitled thereto.

(g) No dividends or other distributions with respect to shares of Parent Common Stock issued in the OUTD Merger will be paid to the holder of any unsurrendered OUTD Certificates until such OUTD Certificates are

A-12

Table of Contents

surrendered as provided in this Section 2.4. Following such surrender, subject to the effect of escheat, Tax or other applicable Laws, there will be paid, without interest, to the record holder of the shares of Parent Common Stock, if any, issued in exchange therefor (i) at the time of such surrender, all dividends and other distributions payable in respect of any such shares of Parent Common Stock with a record date after the Effective Time and a payment date on or prior to the date of such surrender and not previously paid and (ii) at the appropriate payment date, the dividends or other distributions payable with respect to such shares of Parent Common Stock with a record date after the Effective Time but with a payment date subsequent to such surrender. For purposes of dividends or other distributions with respect to shares of Parent Common Stock, all shares of Parent Common Stock to be issued pursuant to the OUTD Merger will be entitled to dividends pursuant to the immediately preceding sentence as if issued and outstanding as of the Effective Time.

(h) Parent and the Exchange Agent shall be entitled to deduct and withhold from any consideration payable pursuant to this Agreement to any Person who was a holder of OUTD Common Stock immediately prior to the Effective Time such amounts as Parent or the Exchange Agent is required to deduct and withhold with respect to the making of such payment under the Code or any other provision of federal, state, local or foreign Tax Law. To the extent that amounts are so withheld (and paid to the applicable Governmental Authority) by Parent or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom such consideration would otherwise have been paid.

(i) In the event any OUTD Certificates shall have been lost, stolen or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen or destroyed OUTD Certificates, upon the making of an affidavit of that fact by the holder thereof, such OUTD Merger Consideration as may be required pursuant to Section 2.1 and Section 2.2, cash for fractional shares pursuant to Section 2.11 and any dividends or distributions payable pursuant to Section 2.4(g); provided, however, that Parent may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed OUTD Certificates to deliver an agreement of indemnification in form reasonably satisfactory to Parent, or, if reasonably required by Parent, a bond in such reasonable sum as Parent may direct, as indemnity against any claim that may be made against Parent or the Exchange Agent in respect of OUTD Certificates alleged to have been lost, stolen or destroyed.

Section 2.5 OUTD Equity Awards.

(a) Prior to the Effective Time, the OUTD Board (or, if appropriate, any committee administering the OUTD Incentive Plan) shall adopt such resolutions or take such other actions as may be required to effect the following:

(i) adjust the terms of all options to purchase OUTD Common Stock (the "OUTD Stock Options") outstanding immediately prior to the Effective Time granted under any equity or equity-based compensation plan or arrangement of OUTD (each, an "OUTD Incentive Plan"), whether vested or unvested, as necessary to provide that, at the Effective Time, each OUTD Stock Option outstanding immediately prior to the Effective Time shall be assumed and converted into an option to acquire shares of Parent Common Stock, on the same terms and conditions as were applicable under such OUTD Stock Option, including vesting (taking into account any acceleration of vesting that may occur as a result of the Transaction) (each, as so adjusted, an "OUTD Assumed Stock Option"), except that (A) each such OUTD Assumed Stock Option shall represent the right to acquire that whole number of shares of Parent Common Stock (rounded down to the next whole share) equal to the number of Shares of OUTD Common Stock subject to the related OUTD Stock Option multiplied by the OUTD Exchange Ratio and (B) the option price per share of Parent Common Stock under each OUTD Assumed Stock Option shall be an amount equal to the option price per share of OUTD Common Stock subject to the related OUTD Stock Option in effect immediately prior to the Effective Time divided by the OUTD Exchange Ratio (the option price per share, as so determined, being rounded up to the next whole cent); and

(ii) provide that each equity award (other than an OUTD Stock Option) entitling the holder thereof to acquire OUTD Common Stock pursuant to the OUTD Incentive Plan (a "OUTD Equity Award") shall be

A-13

Table of Contents

converted into an equity award entitling the holder thereof to receive shares of Parent Common Stock (a "OUTD Assumed Equity Award"), on the same terms and conditions as were applicable to such OUTD Equity Award, including vesting (taking into account any acceleration of vesting that may occur as a result of the Transaction) except that each OUTD Assumed Equity Award shall represent the right to acquire that whole number of shares of Parent Common Stock (rounded down to the next whole share) equal to the number of shares of OUTD Common Stock subject to an OUTD Equity Award multiplied by the OUTD Exchange Ratio.

(b) Except to the extent required under the respective terms of the OUTD Equity Awards, all restrictions or limitations on transfer and vesting with respect to the OUTD Equity Awards awarded under the OUTD Incentive Plan, to the extent that such restrictions or limitations shall not have already lapsed, shall remain in full force and effect with respect to such OUTD Equity Awards after giving effect to the Transaction and the assumption by Parent as set forth above.

(c) At the Effective Time, by virtue of the OUTD Merger, the OUTD Incentive Plan shall be assumed by Parent, with the result that all obligations of OUTD under the OUTD Incentive Plan, including with respect to awards outstanding at the Effective Time thereunder, shall be obligations of Parent following the Effective Time. Prior to the Effective Time, Parent shall take all necessary actions for the assumption of the OUTD Incentive Plan, including the reservation, issuance and listing of Parent Common Stock in a number at least equal to the number of shares of Parent Common Stock that will be subject to OUTD Assumed Equity Awards. As soon as practicable following the Effective Time, but in no event later than two Business Days, Parent shall, in accordance with applicable federal securities Laws, prepare and file with the SEC a registration statement on Form S-8 (or another appropriate form selected by Parent) registering a number of shares of Parent Common Stock determined in accordance with the preceding sentence. Such registration statement shall be kept effective (and the current status of the prospectus or prospectuses required thereby shall be maintained) at least for so long as OUTD Assumed Equity Awards remain outstanding.

Section 2.6 OUTD Merger Sub Common Stock. At the Effective Time, each share of capital stock of OUTD Merger Sub held by Borrower immediately prior to the Effective Time shall be cancelled and extinguished and converted into one validly issued, fully paid and non-assessable share of common stock of the OUTD Surviving Corporation.

Section 2.7 Effect on IM Units. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the IM Merger and without any action on the part of Parent, IM Merger Sub, IM or the holders of any equity interests of IM:

(a) Conversion of IM Units.

(i) The Class A Common Units and Class E Common Units of IM issued and outstanding immediately prior to the Effective Time, other than any Class A Common Units or Class E Common Units of IM to be cancelled pursuant to Section 2.7(b), shall be automatically converted into the right to receive 23,854,227 shares of Parent Common Stock (in the aggregate, and together with any cash in respect of any fractional shares of Parent Common Stock payable in accordance with Section 2.11, the "IM Merger Consideration") to be allocated among the holders of Class A Common Units and Class E Common Units of IM issued and outstanding immediately prior to the Effective Time in accordance with each such holder's pro rata percentage set forth on Exhibit I. Notwithstanding anything to the contrary herein, the parties acknowledge and agree that IM and its Affiliates shall revise Exhibit I, if necessary, two Business Days prior to the Closing, to provide for the distribution of the IM Merger Consideration in accordance with the IM LLC Agreement.

(ii) As a result of the IM Merger, at the Effective Time, each holder of Class A Common Units and Class E Common Units of IM shall cease to have any rights with respect thereto, except the right to receive the applicable IM Merger Consideration payable in respect of the Class A Common Units or Class E Common Units of IM, as applicable.

A-14

Table of Contents

(b) Cancellation of Certain Equity Interests of IM. Any outstanding Class A Common Units or Class E Common Units of IM held by any direct or indirect Subsidiary of IM, Parent, OUTD, IM Merger Sub or any direct or indirect Subsidiary of Parent, OUTD or IM Merger Sub, in each case as of immediately prior to the Effective Time, automatically shall be cancelled and cease to exist without any conversion thereof, and no consideration shall be paid with respect thereto.

(c) Adjustments to IM Merger Consideration. The IM Merger Consideration shall be adjusted to reflect fully the appropriate effect of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities convertible into Parent Common Stock, OUTD Common Stock or any equity interests of IM), reorganization, recapitalization, reclassification or other similar change with respect to Parent Common Stock, OUTD Common Stock or any equity interests of IM having a record date on or after the date hereof and prior to the Effective Time.

Section 2.8 Payment of IM Merger Consideration.

(a) At the Effective Time, Parent shall issue to each holder of IM Units that have been converted into the right to receive the IM Merger Consideration the number of shares of Parent Common Stock representing, in the aggregate, the whole number of shares of Parent Common Stock, if any, that such holder has the right to receive in accordance with each such holder's pro rata percentage set forth on Exhibit I together with any fractional shares of Parent Common Stock to be paid in accordance with Section 2.11. No interest will be paid or accrued on any IM Merger Consideration payable to holders of IM Units.

(b) After the Effective Time, there will be no further registration of transfers of IM Units. From and after the Effective Time, the holders of IM Units outstanding immediately prior to the Effective Time will cease to have any rights with respect to such IM Units except as otherwise provided in this Agreement or by applicable Law. Notwithstanding anything to the contrary contained in this Agreement, the IM Surviving LLC is obligated to pay any dividends or make any other distributions with a record date prior to the Effective Time which may have been declared or made by IM on IM Units in accordance with the terms of this Agreement prior to the date hereof and which remain unpaid at the Effective Time.

(c) Parent shall be entitled to deduct and withhold from any consideration payable pursuant to this Agreement to any Person who was a holder of IM Units immediately prior to the Effective Time such amounts as Parent is required to deduct and withhold with respect to the making of such payment under the Code or any other provision of federal, state, local or foreign Tax Law. To the extent that amounts are so withheld (and paid to the applicable Governmental Authority) by Parent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom such consideration would otherwise have been paid.

Section 2.9 IM Class E Common Units. Prior to the Effective Time, IM shall take all actions necessary for the distribution to be made of the IM Merger Consideration to the holders of the Class E Common Units in accordance with the terms of this Agreement, including without limitation, delivery to the holders of the Class E Common Units of IM appropriate notices setting forth such holders' rights pursuant to any equity or equity-based compensation plan or arrangement of IM and obtaining any required consents.

Section 2.10 IM Merger Equity Interests. Each equity interest of IM Merger Sub issued and outstanding immediately prior to the Effective Time shall, at the Effective Time, be cancelled and extinguished and converted into one validly issued, fully paid and non-assessable equity interest of the IM Surviving LLC.

Section 2.11 No Fractional Shares. No certificates or scrip representing fractional shares of Parent Common Stock shall be issued upon the conversion of OUTD Common Stock pursuant to Section 2.1 or Section 2.2 or upon the conversion of IM Units pursuant to Section 2.7, and such fractional share interests shall not entitle the owner thereof to vote or to any rights of a holder of Parent Common Stock. All fractional shares to which a single record holder of OUTD Common Stock, on the one hand, or IM Units, on the other hand, would be

A-15

**Table of Contents**

otherwise entitled shall be aggregated and calculations shall be rounded to three decimal places. In lieu of any such fractional shares, each holder of OUTD Common Stock and/or IM Units who would otherwise be entitled to such fractional shares shall be entitled to an amount in cash, without interest, rounded down to the nearest cent, equal to the product of (A) the amount of the fractional share interest in a share of Parent Common Stock to which such holder is entitled and (B) an amount equal to the closing sale price of the Parent Common Stock as reported on The NASDAQ Stock Market on the first trading day immediately following the Closing Date.

Section 2.12 <u>Closing Actions</u>. At or prior to the Closing, the following actions shall be taken:

(a) Parent shall (or, in the case of clause (iii) below, cause the Borrower to) deliver:

(i) to the Exchange Agent, shares of Parent Common Stock and an amount of cash sufficient to be issued and paid pursuant to Section 2.1, Section 2.2 and Section 2.11;

(ii) to the holders of IM Units, shares of Parent Common Stock issued pursuant to Section 2.7 and Section 2.8; and

(iii) by wire transfer of immediately available funds to the account or accounts designated in writing by each person to whom any portion of the IM Credit Facilities Payoff Amount is owed (such designation to be made at least two (2) Business Days prior to the Closing Date), an amount in cash equal to the portion of the IM Credit Facilities Payoff Amount owing to such Person.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF OUTD

Except as set forth in the OUTD Disclosure Schedule or in the OUTD SEC Reports filed prior to the date of this Agreement (excluding any disclosure included in any such OUTD SEC Report that is predictive or forward-looking in nature and excluding any risk factor and similar cautionary statement), OUTD represents and warrants to Parent and IM that all of the statements contained in this Article III are true and correct. Each disclosure set forth in the OUTD Disclosure Schedule is identified by reference to, or has been grouped under a heading referring to, a specific individual section of this Agreement for convenience of reference only, and shall be deemed a qualification or exception to such section and any other section of the OUTD Disclosure Schedule (other than Section 3.5(c)) to which its applicability is reasonably apparent on the face of such disclosure regardless of whether or not such other section is specifically referenced.

Section 3.1 <u>Organization, Standing and Corporate Power; Charter Documents; Subsidiaries</u>.

(a) <u>Organization, Standing and Corporate Power</u>. OUTD, each of its "significant subsidiaries" (as such term is used in Rule 1-02 of Regulation S-X of the Exchange Act) (the "<u>OUTD Significant Subsidiaries</u>") and except as, individually or in the aggregate, has not had and would not reasonably be expected to have an OUTD Material Adverse Effect, each of the OUTD Subsidiaries (other than the OUTD Significant Subsidiaries), is a corporation or other legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of the jurisdiction in which it is incorporated or otherwise organized, and has all requisite corporate (or other entity) power and authority to own, lease and operate its properties and assets and to carry on its business as currently conducted. OUTD and each of its Subsidiaries is duly qualified or licensed to do business and is in good standing (with respect to jurisdictions that recognize such concept) in each other jurisdiction in which the nature or conduct of its business or the ownership, leasing or operation of its properties and assets makes such qualification, licensing or good standing necessary, in each case except for such failures to be duly qualified, licensed or in good standing that, individually or in the aggregate, have not had and would not reasonably be expected to have an OUTD Material Adverse Effect.

A-16

Table of Contents

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, all as of the date first written above.

<div style="margin-left:50%">

INTERMEDIA OUTDOOR HOLDINGS, INC.

By: /s/ InterMedia Outdoor Holdings, Inc. _____
     Name:
     Title:


OUTDOOR CHANNEL HOLDINGS, INC.

By: /s/ Outdoor Channel Holdings, Inc. _____
     Name:
     Title:


INTERMEDIA OUTDOORS HOLDINGS, LLC

By: /s/ InterMedia Outdoors Holdings, LLC _____
     Name:
     Title:


OUTDOOR MERGER CORP.

By: /s/ Outdoor Merger Corp. _____
     Name:
     Title:


OUTDOOR MERGER SUB, LLC

By: /s/ Outdoor Merger Sub, LLC _____
     Name:
     Title:

</div>

<div style="text-align:center">A-81</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 15**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————————

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

———————————

Filed by the Registrant ☒            Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to §240.14a-12

# OUTDOOR CHANNEL HOLDINGS, INC.
### (Name of Registrant as Specified In Its Charter)

###### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

     (1)   Title of each class of securities to which transaction applies:

        _____

     (2)   Aggregate number of securities to which transaction applies:

        _____

     (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

        _____

     (4)   Proposed maximum aggregate value of transaction:

        _____

     (5)   Total fee paid:

        _____

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

Amount Previously Paid:

_____

Form, Schedule or Registration Statement No.:

_____

Filing Party:

_____

Date Filed:

_____

**Table of Contents**

# Outdoor Channel Holdings, Inc.



## MERGER PROPOSED—YOUR VOTE IS VERY IMPORTANT

Dear Stockholder,

On November 15, 2012, the board of directors of Outdoor Channel Holdings, Inc., a Delaware corporation ("Outdoor Channel"), unanimously approved and Outdoor Channel signed a definitive Agreement and Plan of Merger (the "merger agreement") with InterMedia Outdoors Holdings, LLC, a Delaware limited liability company ("IMOTSC").

As part of the proposed transaction, Outdoor Channel and IMOTSC will become separate, indirect wholly owned subsidiaries of InterMedia Outdoor Holdings, Inc., a newly-created Delaware holding corporation ("IMOH"). IMOTSC is a privately held multimedia company focused on outdoor enthusiasts. As a result of the transactions contemplated in the merger agreement, InterMedia Partners VII, L.P. ("InterMedia Partners"), currently a controlling member of IMOTSC, and related parties of InterMedia Partners will hold approximately 67.6% of the outstanding common stock of IMOH, and current holders of Outdoor Channel's common stock will hold the remaining 32.4% of IMOH's common stock. IMOH is financing the cash portion of the merger consideration to be received by holders of Outdoor Channel common stock in part through a $140 million term loan facility. Following the consummation of the mergers, IMOH will also have access to a $10 million revolving credit facility. Outdoor Borrower, LLC, a Delaware limited liability company and wholly owned subsidiary of IMOH, has entered into a commitment letter with CIT Finance, LLC relating to the proposed debt financing. As a condition to completing the transaction, IMOH intends to apply for a listing of its common stock for trading on The Nasdaq Global Market ("NASDAQ"), and it is anticipated that its symbol will be "OUTD."

Upon the consummation of the mergers, each outstanding share of Outdoor Channel common stock will be automatically converted into and will represent the right to receive the following consideration, pursuant to an election made by each stockholder, subject to proration in certain circumstances as described below (and subject to certain adjustments for cash to be paid in lieu of any fractional shares and the like as set forth in the merger agreement): (x) $8.00 in cash, without interest, with respect to each share of Outdoor Channel common stock for which an election to receive cash has been made; (y) one share of IMOH common stock with respect to each share of Outdoor Channel common stock for which an election to receive stock has been made; or (z) with respect to each share of Outdoor Channel common stock for which an election to receive mixed stock and cash has been made or for each share of Outdoor Channel common stock for which no election has been made, a combination of (A) $4.46 in cash, without interest and (B) that portion of a share of IMOH common stock equal to 0.443. You will need to make an election regarding the consideration you will receive for your shares of Outdoor Channel by March 4, 2013. If you do not, then you will receive the mix of cash and stock of IMOH described in clause (z) of the preceding sentence if the merger agreement is adopted by the stockholders.

Upon the consummation of the mergers, holders of IMOTSC common units will be entitled to receive 23,854,227 shares of IMOH common stock in the aggregate in exchange for IMOTSC common units, subject to various adjustments set forth in the merger agreement. Shares of IMOH common stock shall be allocated among the holders of IMOTSC common units in accordance with the merger agreement and the IMOTSC limited liability company agreement.

At the special meeting, Outdoor Channel stockholders will be asked to vote on the adoption of the merger agreement described in this proxy statement/prospectus. Adoption of the merger agreement requires the affirmative vote of the holders of a majority of the outstanding shares of Outdoor Channel common stock entitled to vote.

Perry T. Massie, Thomas H. Massie, and entities affiliated with Messrs. Massie (collectively, the "Massie Parties") hold approximately 36% of the shares of outstanding Outdoor Channel common stock. In connection with the merger agreement, on November 15, 2012, IMOH entered into a support agreement (the "Support Agreement") with the Massie Parties, the members of the Outdoor Channel board of directors and the executive officers of Outdoor Channel (collectively, the "Supporting Parties"). Under the Support Agreement, the Supporting Parties have agreed to vote their shares of Outdoor Channel common stock (i) in favor of the adoption of the merger agreement; (ii) in favor of any proposal to adjourn or postpone any meeting of the Outdoor Channel stockholders if there are not sufficient votes for approval of the matters described in the preceding clause (i); and (iii) except with the written consent of IMOH, against (x) any Alternative Proposal (as defined in the merger agreement) with respect to Outdoor Channel that would impede the mergers or (y) any other action or proposal involving Outdoor Channel that would reasonably be expected to prevent or materially impede, interfere with or delay the mergers.

On November 15, 2012, the last full trading day before the merger agreement was signed, the closing sales price of Outdoor Channel common stock, which trades on NASDAQ under the symbol "OUTD," was $7.19 per share.

**Outdoor Channel's board of directors has unanimously determined that the merger agreement and the proposed transaction are advisable to and in the best interests of Outdoor Channel stockholders, and recommends that its stockholders vote "FOR" adoption of the merger agreement, "FOR" approval, on an advisory (non-binding) basis, of the "golden parachute" compensation payable or that could become payable to the named executive officers of Outdoor Channel in connection with the mergers and "FOR" approval of the proposal to adjourn the Outdoor Channel special meeting, if necessary, to solicit additional proxies if there are not sufficient votes at the time of the Outdoor Channel special meeting to adopt the merger agreement.** The proposed transaction is conditioned upon the adoption of the merger agreement by Outdoor Channel stockholders, receipt of applicable regulatory approvals and other conditions described in the attached proxy statement/prospectus.

It is important that your shares are represented at the special meeting, whether or not you plan to attend the meeting. Abstentions and failures to vote will have the same effect as votes "against" the proposal to adopt the merger agreement. **Accordingly, complete, date, sign and return promptly your proxy card or voting instruction card in the enclosed postage pre-paid envelope.** You may submit the special meeting and vote your shares in person if you wish, even though you have previously returned your proxy.

**This document describes the special meeting, the proposed transaction, the documents related to the proposed transaction and other related matters that an Outdoor Channel stockholder ought to know before voting on the proposals described herein and should be retained for future reference. Please carefully read this entire document, including the "Risk Factors" section beginning on page 34, for a discussion of the risks relating to the proposed transaction. You also can obtain information about Outdoor Channel from documents that it has filed with the Securities and Exchange Commission. See "Where You Can Find More Information" for instructions on how to obtain such information.**

Sincerely,
Perry T. Massie, Co-Chairman of the Board
*Outdoor Channel Holdings, Inc.*

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the common stock of IMOH to be issued under this proxy statement/prospectus or determined if this proxy statement/prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

**The date of this document is February 12, 2013 and it is first being mailed or otherwise delivered to Outdoor Channel stockholders on or about February 12, 2013.**

Table of Contents

# Outdoor Channel Holdings, Inc.

43455 Business Park Drive
Temecula, CA 92590
(951) 699-6991

-----

### NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
### TO BE HELD ON MARCH 13, 2013

Dear Stockholder:

    You are cordially invited to attend the special meeting of stockholders of Outdoor Channel Holdings, Inc., a Delaware corporation ("Outdoor Channel"). The meeting will be held on March 13, 2013, at 9:00 a.m., Pacific Time, at Outdoor Channel's broadcast facility located at 43455 Business Park Drive in Temecula, California, for the following purposes:

    1.   To consider and vote upon the adoption of the Agreement and Plan of Merger, dated as of November 15, 2012 (the "merger agreement"), by and among Outdoor Channel, InterMedia Outdoors Holdings, LLC, a Delaware limited liability company, InterMedia Outdoor Holdings, Inc., a Delaware corporation ("IMOH"), Outdoor Merger Sub, LLC, a Delaware limited liability company and an indirect wholly owned subsidiary of IMOH, and Outdoor Merger Corp., a Delaware corporation and an indirect wholly owned subsidiary of IMOH.

    2.   To consider and vote upon an advisory (non-binding) proposal to approve the "golden parachute" compensation payable or that could become payable to Outdoor Channel's named executive officers in connection with the mergers pursuant to pre-existing arrangements with those individuals.

    3.   To consider and vote upon an adjournment of the special meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the special meeting to vote in favor of adoption of the merger agreement.

    4.   To transact such other business as may properly come before the special meeting and any adjournment or postponement thereof.

**Outdoor Channel's board of directors has unanimously determined that the merger agreement and the proposed transaction are advisable to and in the best interests of Outdoor Channel stockholders, and recommends that its stockholders vote "FOR" adoption of the merger agreement, "FOR" approval on an advisory (non-binding) basis of the "golden parachute" compensation payable or that could become payable to the named executive officers of Outdoor Channel and "FOR" approval of the proposal to adjourn the Outdoor Channel special meeting, if necessary, to solicit additional proxies if there are not sufficient votes at the time of the Outdoor Channel special meeting to adopt the merger agreement.**

    The board of directors of Outdoor Channel has fixed January 25, 2013 as the record date for the determination of stockholders entitled to notice of, and to vote at, the special meeting and any adjournment or postponement thereof. Only holders of record of shares of Outdoor Channel common stock at the close of business on the record date are entitled to notice of, and to vote at, the special meeting. At the close of business on the record date, Outdoor Channel had 25,916,839 shares of common stock outstanding and entitled to vote.

    You have the option to revoke your proxy at any time prior to the meeting or to vote your shares personally on request if you attend the meeting.

**Your vote is important. The affirmative vote of the holders of a majority of the outstanding shares of Outdoor Channel common stock entitled to vote on the record date for the special meeting is required for adoption of the merger agreement (Proposal No. 1). If a quorum is present, the affirmative vote of the holders of a majority of shares present in person or represented by proxy and entitled to vote at the special meeting is being sought with respect to the advisory vote regarding certain executive compensation**

Table of Contents

**(Proposal No. 2). If a quorum is present, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote at the special meeting is required to approve an adjournment of the special meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the special meeting to vote in favor of adoption of the merger agreement (Proposal No. 3).**

**Whether or not you expect to attend the special meeting in person, please complete, date, sign and return the enclosed proxy card or voting instruction card as promptly as possible in order to ensure we receive your proxy with respect to your shares.** Instructions are shown on the proxy or voting instruction card. A return envelope (which is postage pre-paid if mailed in the United States) is enclosed for your convenience.

If you sign, date and mail your proxy card or voting instruction card without indicating how you wish to have your shares voted, the shares represented by the proxy will be voted in favor of adoption of the merger agreement (Proposal No. 1), in favor of the advisory (non-binding) vote on "golden parachute" compensation (Proposal No. 2) and in favor of an adjournment of the special meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the special meeting to vote in favor of adoption of the merger agreement (Proposal No. 3). If you fail to return your proxy card, or if your shares are held in "street name" and you do not instruct your broker how to vote your shares by failing to complete the voting instruction card, the effect will be as though you cast a vote "against" the adoption of the merger agreement. If you attend the special meeting and wish to vote in person, you may withdraw your proxy and vote in person prior to the close of voting at the special meeting. Please note, however, that if your shares are held of record by a broker, bank or other nominee and you wish to vote at the special meeting, you must obtain a proxy issued in your name from that record holder and present it at the special meeting.

Please do not send any stock certificates or documents representing your ownership of Outdoor Channel common stock at this time. If the merger agreement is adopted by the Outdoor Channel stockholders, you will receive a subsequent letter explaining what to do.

If you have any questions concerning the mergers or this proxy statement/prospectus, would like additional copies or need help voting your shares of Outdoor Channel common stock, please contact Outdoor Channel's proxy solicitor:

<div align="center">

**Georgeson Inc.**
199 Water Street, 26th Floor
New York, New York 10038
(888) 293-6812 (toll free)
(212) 440-9800 (banks and brokers)

</div>

BY ORDER OF THE BOARD OF DIRECTORS,

Perry T. Massie
Co-Chairman of the Board

Temecula, California
February 12, 2013

Table of Contents

IMOTSC's nor any other independent registered public accounting firms have examined, compiled or performed any procedures with respect to the accompanying prospective financial information and, accordingly, do not express an opinion or any other form of assurance with respect thereto. The Report of the Independent Public Registered Accounting Firm for IMOTSC included in this offering document and the Report of the Independent Registered Public Accounting Firm for Outdoor Channel incorporated by reference in this offering document relate to the historical financial information of IMOTSC and Outdoor Channel, respectively. Such reports do not extend to the prospective financial information and should not be read to do so.

### Outdoor Channel Financial Projections

The following is a summary of the Outdoor Channel financial projections prepared by Outdoor Channel's management and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor. The Outdoor Channel financial projections set forth below exclude projected financial results of Outdoor Channel's aerial cameras business, which are set forth below separately, given Outdoor Channel's announcement in June 2012 that it was exploring strategic alternatives for the business, which process is still ongoing.

| (in millions) | Fiscal Quarter Ending December 31, 2012E | Fiscal Years Ending December 31, | | | | |
| | | 2013E | 2014E | 2015E | 2016E | 2017E |
|---|---|---|---|---|---|---|
| Revenue | $ 19.9 | $70.5 | $74.0 | $77.6 | $81.2 | $85.1 |
| Adjusted EBITDA(1) | $ 2.9 | $10.6 | $11.9 | $13.2 | $14.5 | $15.9 |
| Unlevered Free Cash Flow(1) | $ 1.0 | $ 5.5 | $ 6.3 | $ 7.2 | $ 7.7 | $ 8.7 |

(1) Adjusted EBITDA, or earnings before interest, taxes, depreciation and amortization, and Unlevered Free Cash Flow, as used in the Outdoor Channel financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### Aerial Camera Financial Projections

The following is a summary of the financial projections of the aerial camera business of Outdoor Channel prepared by Outdoor Channel's management and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor.

| (in millions) | Fiscal Quarter Ending December 31, 2012E | Fiscal Years Ending December 31, | | | | |
| | | 2013E | 2014E | 2015E | 2016E | 2017E |
|---|---|---|---|---|---|---|
| Revenue | $ 6.2 | $11.7 | $12.1 | $12.6 | $13.1 | $13.6 |
| Adjusted EBITDA(1) | $ 2.0 | $ 1.2 | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.5 |
| Unlevered Free Cash Flow(1) | $ 0.9 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 |

(1) Adjusted EBITDA and Unlevered Free Cash Flow, as used in the Aerial Camera financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### IMOH Financial Projections

The following is a summary of the IMOH financial projections prepared by management of IMOTSC and Outdoor Channel, and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor. The IMOH financial projections reflect the business of IMOH on a pro forma basis assuming consummation of the mergers. The IMOH financial projections set forth below exclude projected financial results of Outdoor Channel's aerial cameras business, which are set forth above separately, given Outdoor Channel's announcement

82

Table of Contents

in June 2012 that it was exploring strategic alternatives for the business, which process is still ongoing. Further, the IMOH financial projections do not reflect estimated cost synergies, net of the cost to achieve such synergies, which are separately set forth below, and tax attributes with a net present value of approximately $38.0 to 40.3 million that are anticipated to be retained by IMOH due to IMOTSC's significant tax basis that will be amortized over a period of many years and net operating loss carryforwards.

|  | Fiscal Years Ending December 31, | | | | |
|---|---|---|---|---|---|
| (in millions) | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $181.8 | $191.0 | $204.2 | $220.4 | $239.5 |
| Adjusted EBITDA(1) | $ 41.4 | $ 46.0 | $ 53.7 | $ 63.1 | $ 74.9 |
| Unlevered Free Cash Flow(1) | $ 23.3 | $ 25.9 | $ 30.6 | $ 36.2 | $ 43.4 |

(1)   Adjusted EBITDA and Unlevered Free Cash Flow, as used in the IMOH financial projections, are financial measures that are not presented in accordance with GAAP and include stock-based compensation charges and exclude certain non-recurring charges.

### Net Cost Synergies Projections

The following is a summary of the projections of estimated cost synergies, net of integration and implementation costs and after taxes, anticipated to be realized by IMOH in the mergers as prepared by the management of IMOTSC and Outdoor Channel, and provided to the Outdoor Channel Board and Outdoor Channel's financial advisor.

|  | Fiscal Years Ending December 31, | | | | |
|---|---|---|---|---|---|
| (in millions) | 2013E | 2014E | 2015E | 2016E | 2017E |
| Net Cost Synergies | $(0.4) | $ 3.4 | $ 5.1 | $ 5.1 | $ 5.1 |

(1)   Net Cost Synergies, as used in the net cost synergies projections, is a financial measure that is not presented in accordance with GAAP.

### Opinion of Outdoor Channel's Financial Advisor

Outdoor Channel has retained Lazard to act as Outdoor Channel's financial advisor in connection with the mergers. As part of this engagement, Outdoor Channel's Board requested that Lazard evaluate the fairness, from a financial point of view, of the consideration to be paid in the Outdoor Channel merger to holders of Outdoor Channel common stock. On November 15, 2012, at a meeting of Outdoor Channel's Board held to evaluate the mergers, Lazard rendered to Outdoor Channel's Board an oral opinion, confirmed by delivery of a written opinion dated November 15, 2012, to the effect that, as of that date and based upon and subject to the assumptions, factors and qualifications set forth in such opinion, the consideration to be paid in the Outdoor Channel merger to holders of Outdoor Channel common stock (other than holders who are entitled to and properly demand an appraisal of their shares of Outdoor Channel common stock) was fair, from a financial point of view, to such holders.

The full text of Lazard's written opinion, dated November 15, 2012, to Outdoor Channel's Board, which sets forth, among other things, the procedures followed, assumptions made, matters considered and qualifications and limitations on the scope of review undertaken by Lazard in connection with its opinion, is attached to this proxy statement/prospectus as Annex B and is incorporated into this proxy statement/prospectus by reference. **Lazard's engagement and its opinion were for the benefit of Outdoor Channel's Board (in its capacity as such) and Lazard's opinion was rendered to Outdoor Channel's Board in connection with its evaluation of the Outdoor Channel merger consideration from a financial point of view and did not address any other aspects of the mergers. Lazard's opinion did not address the relative merits of the mergers as compared to any other transaction or business strategy in which Outdoor Channel might engage or the merits of the**

83

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 16**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION
3    NIC SALOMON,                    )
                                     )
4          Plaintiff                 )
                                     )
5    VS.                             )CIVIL ACTION
                                     )NO. 3:15-CV-666-M
6    KROENKE SPORTS & ENTERTAINMENT,  )
     LLC, OUTDOOR CHANNEL HOLDINGS,   )
7    INC., AND PACIFIC NORTHERN CAPITAL )
     LLC,                            )
8                                    )
           Defendants                )
9
10      -----------------------------------------
               VIDEOTAPED ORAL DEPOSITION OF
11
                     NICOLAS SALOMON
12
                     MAY 16, 2018
13      -----------------------------------------
14         VIDEOTAPED ORAL DEPOSITION OF NICOLAS SALOMON,
15    produced as a witness at the instance of the DEFENDANTS,
16    KROENKE SPORTS & ENTERTAINMENT, LLC, AND OUTDOOR CHANNEL
17    HOLDINGS, INC., and duly sworn, was taken in the
18    above-styled and numbered cause on the 16th day of
19    May, 2018, from 8:58 a.m. to 11:56 a.m., before
20    Kathryn R. Baker, CSR, RPR, in and for the State of Texas,
21    reported by machine shorthand, at the offices of Jackson
22    Walker, LLP, 2323 Ross Avenue, Suite 600, in the City of
23    Dallas, State of Texas, pursuant to the Federal Rules of
24    Civil Procedure.
25       Job No. CS2878358

Page 100

1           THE WITNESS:  I'm sorry.

2      Q.   (BY MR. EVANS)   -- and smack us both.

3           Were you aware whether there was a consent

4  provision in the Intermedia/Outdoor merger agreement?

5      A.   I don't recall --

6      Q.   Okay.

7      A.   -- sitting here today.

8      Q.   Would that have been of interest to you before

9  you signed the term sheet to know whether Intermedia had

10  to consent to the sale of the Aerial Camera Business?

11      A.   I guess -- my expectation is that if there was a

12  consent provision, that Outdoor Channel got consent to

13  sell before Mr. Hornish signed the term sheet.

14      Q.   Do you know that for a fact?

15      A.   I actually don't know that for a fact.

16      Q.   Okay.  You said the proxy statement -- you say

17  in Paragraph 29, The proxy statement expressly recognized

18  that the Aerial Camera Business would likely be sold.

19           Proxy statement didn't say that, did it,

20  would likely be sold?  It's not in quotes.  It's your

21  language.

22      A.   The quote is that it excluded the projected

23  financial results of the -- Outdoor's Aerial Camera

24  Business given Outdoor's announcement in June 2012 that it

25  was exploring strategic alternatives for the business,

Page 101

1    which process was still ongoing.

2        Q.   Right.

3              So it said it was exploring; didn't say

4    "would likely be sold," did it?

5        A.   That's correct.  But then after -- after

6    this -- but Mr. Hornish also had said that they were going

7    to spinoff the business.  And then -- and, obviously,

8    people's plans change, but then they signed a term sheet.

9        Q.   So you said Mr. Hornish said "would spinoff the

10   business"?

11       A.   That was from back in March of 2012, and then we

12   ran through an investment banking sale process.

13       Q.   Right.

14             To which you don't recall any potential

15   bidder actually making a bid?

16       A.   It would have been great to have a big strategic

17   partner for the business.  I mean, it wouldn't have been

18   great for the management team because people wanted to do

19   a buyout.

20       Q.   To which you don't recall any specific bidder

21   making a bid, right?

22       A.   Not that I can recall.

23       Q.   Okay.  And the proxy statement, Mr. Salomon, did

24   not use the words "the Aerial Camera Business would likely

25   be sold," did it?

Page 102

1          A.   No, but that's -- that's explained right after

2     that comment.

3          Q.   That's your language.  That's your

4     interpretation of the proxy statement, right?

5          A.   Well, but they, in fact, then signed a term

6     sheet to sell the business after this proxy statement.  I

7     mean, this proxy statement was two weeks before the term

8     sheet was signed, right?

9          Q.   "Would likely be sold" is your interpretation of

10    the prox- -- the language in the proxy statement, right?

11         A.   Yes.

12         Q.   Thank you.

13              And by the way, the term sheet that you

14    signed that's attached to your Second Amended Complaint

15    isn't a term sheet for the acquisition of all Outdoor

16    stock, is it?

17         A.   That's -- no, it's not.

18         Q.   Thank you.

19              Since you claim in Paragraph 29 that

20    Intermedia expected and acknowledged the Aerial Camera

21    Business would be sold to a third party, are you -- are

22    you saying -- is it your position in this case that

23    Intermedia made an offer for all Outdoor stock that was 12

24    percent less than the fair value of the Outdoor stock?

25         A.   I'm not understanding your question.

1          (Recess in the proceedings from 11:39 to

2          11:40 a.m.)

3          THE VIDEOGRAPHER:  We're back on the record

4     at 11:40 a.m.

5          Q.   (BY MR. EVANS)   Mr. Salomon, would you agree

6     with me that if the Aerial Camera Business had not been

7     sold, I'm talking about Intermedia -- in connection with

8     the Intermedia merger agreement.  So if the Aerial Camera

9     Business hadn't been sold and Outdoor had sold all of its

10    stock to Intermedia, Intermedia would have acquired the

11    Aerial Camera Business as part of the acquisition of all

12    Outdoor stock?

13         A.   I mean, I can't -- I don't know how to answer

14    that question because I think it requires a legal

15    conclusion.

16         Q.   No, it doesn't.  It's a yes-or-no answer.  It's

17    factual.  You -- you worked in the investment banking

18    industry for years, Mr. Salomon.  You're the president of

19    this company.  It's a real simple question.  If you don't

20    want to answer it, we can move on because I think you

21    understand the implications here.

22              But if the Aerial Camera Business had not

23    been sold and Intermedia had acquired all Outdoor stock,

24    Intermedia would have acquired the Aerial Camera Business,

25    right?

1      A.   Yeah, I mean, if there was no term sheet, and

2  there was no -- presumably a consent to sell that would

3  have been required under the agreement, and they acquired

4  Outdoor, they would get the assets underneath the parent

5  company.

6      Q.   Thank you.

7           We can do this one of two ways.  I can give

8  you the Intermedia/Outdoor merger agreement to review, or

9  you can tell me based upon your knowledge.  Let me ask you

10  the question; if you want to see the merger agreement,

11  I'll give it to you.

12      A.   Okay.

13      Q.   Would you agree with me that the merger

14  agreement between Outdoor and Intermedia that was signed

15  in November of 2012 does not say that it is excluding the

16  Aerial Camera Business from the sale of Outdoor stock?

17      A.   I don't know the answer to that question.

18      Q.   Would -- you want to review the Intermedia

19  merger agreement to answer that question?

20      A.   I mean, I've -- we've already identified the

21  proxy statement, which -- which discusses that it was

22  likely to be sold.  I don't know how it's relevant.  I

23  mean...

24      Q.   Well, you can -- you can debate the relevance.

25      A.   Outdoor Channel Holdings signed an agreement to

Page 108

1   sell the Aerial Camera Business to me and PNC.

2        Q.   Mr. Salomon, let me -- let me -- stay focused on

3   my question, okay?

4             The Intermedia/Outdoor merger agreement was

5   signed in November of 2012, right?

6        A.   That sounds about right, yes.

7        Q.   Three months before your term sheet, right?

8        A.   Yes.

9        Q.   Okay.  And you would agree with me that the

10  Intermedia/Outdoor merger agreement that was signed in

11  2012 does not exclude the Aerial Camera Business from the

12  sale of all Outdoor stock, does it?

13       A.   I don't know the answer to that question, and

14  I'm also not privy to the communications that were had

15  around that sale process.

16            MR. EVANS:  Go off the record.

17            THE VIDEOGRAPHER:  The time is 11:43 a.m.

18  We're off the record.

19            (Recess in the proceedings from 11:43 to

20            11:45 a.m.)

21            THE VIDEOGRAPHER:  Back on the record at

22  11:45 a.m.

23       Q.   (BY MR. EVANS)  So let's do it this way,

24  Mr. Salomon:  Would you agree with me that the best

25  evidence of whether the merger agreement between

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 17**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Page 122

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION
3    NIC SALOMON,                 §
                                  §
4    Plaintiff,                   §
                                  §
5    v.                           §
                                  §      CIVIL ACTION NO.
6    KROENKE SPORTS &             §        3:15-666-M
     ENTERTAINMENT, LLC,          §
7    OUTDOOR CHANNEL HOLDINGS,    §
     INC., and PACIFIC            §
8    NORTHERN CAPITAL, LLC,       §
                                  §
9        Defendants.              §
10
11
12           -----------------------------------
             ORAL AND VIDEOTAPED DEPOSITION OF
13
                       NICOLAS SALOMON
14
                        MAY 16, 2018
15
                         VOLUME 2
16           -----------------------------------
      Job No. CS2878358
17              VOLUME 2 OF ORAL AND VIDEOTAPED
18   DEPOSITION OF NICOLAS SALOMON, produced as a witness at
19   the instance of the DEFENDANT, and duly sworn, was taken
20   in the above-styled and numbered cause on the 16th day
21   of May, 2018, from 1:00 p.m. to 5:24, before TINA
22   TERRELL BURNEY, CSR in and for the State of Texas,
23   reported by machine shorthand, at the offices of JACKSON
24   WALKER L.L.P., 2323 Ross Avenue, Suite 600, Dallas, TX
25   75201, pursuant to the Federal Rules of Civil Procedure.

Page 128

1      A.   No.  It just says the intent to present.  I
2  mean, I think that's consistent with likely.
3      Q.   Okay.  It says you also notified Noble
4  Capital.  We talked about that.  And just so I'm clear
5  on that, you don't have a specific recollection of what
6  you discussed with anybody from Noble, right?
7      A.   No.  Obviously we reviewed that email as well.
8      Q.   And then you say, "Mr. Salomon's intent to
9  present an offer with PNC to buy the aerial camera
10  business was again discussed in later communications
11  that included Tom Allen and David Bolls."
12           Do you recall when those conversations
13  with Messrs. Allen and Bolls occurred and what was said?
14      A.   I do not.
15      Q.   If you'd turn to Exhibit A of the second
16  amended complaint, I think it's divided by some slip
17  sheets in there, so it's after the first slip sheet.
18      A.   Okay.
19      Q.   Is it fair to say that's the term sheet on
20  which you're basing your case?
21      A.   I mean, yes.  It's key to the case, yes.
22      Q.   Okay.  Who drafted this term sheet?
23      A.   I drafted it with PNC.  Obviously I had
24  counsel retained as well, and then it was also
25  negotiated with Outdoor Channel Holdings, Inc.

Page 130

1    Mr. Salomon, and Jeff Holowaty.

2        A.   Yes.

3        Q.   And this time Mr. Holowaty is using a

4    pacificncap.com email address.  Do you see that?

5        A.   Yes.

6        Q.   Are you aware of whether that's a legitimate

7    Pacific Northern Capital email address or whether that's

8    just an email address that uses the Pacific name in it?

9        A.   I have no reason to believe that that's not a

10   Pacific Northern email address, but, I mean, it's not

11   like a Gmail account.  It's a --

12       Q.   Right.  Okay.  So you're forwarding to Mr.

13   Holowaty the document that's attached that we looked at

14   a little bit earlier before lunch that starts with

15   Control Number 4542, correct?

16       A.   Yes.

17       Q.   All right.  Does that help refresh your

18   recollection that, at least for the draft summary and

19   proposed terms dated January 14, 2013, it was actually

20   prepared by you and sent to PNC?

21       A.   A draft of it, yes, but I believe that they

22   made changes to it before -- or they did make changes to

23   it before we jointly submitted it.

24       Q.   Subsequent to what you sent them, right?  I

25   mean, they didn't participate in the drafting of the

Page 131

1   proposed terms dated January 14, 2013, right?

2       A.   I don't believe so, no.

3       Q.   I mean, that's the way I interpreted your

4   first email.  "Please see attached with draft sheet I

5   prepared."

6       A.   Okay.

7       Q.   You mentioned in your email dated January 15,

8   2013 to Jeff Holowaty, "Jeff, please see attached for

9   draft term sheet I prepared with the provisions I think

10  would be good for you to include in your LOI."

11           What did you mean by your LOI?

12      A.   I mean, once again, I don't remember the -- my

13  thoughts in 2013, but I think that it would have been

14  letting him make the submission of the document.

15      Q.   I mean, you didn't say our LOI.  You said your

16  LOI, right?

17      A.   Well, we were obviously working together on

18  it, and I think I was -- I was wearing two -- I

19  obviously had two responsibilities at the business,

20  which was running the business and participating in this

21  process.  So, you know, having someone else lead the,

22  quote, unquote, deal from a process perspective is not

23  uncommon or unreasonable.

24      Q.   In fact, that's what you did, right?  You let

25  Pacific Northern Capital lead the discussions, right?

Page 132

1      A.    Some of that.  I mean, I was involved, but,

2   you know, it was a collaborative effort, and I was being

3   a good partner.  And they had resources to help do a

4   deal, and I -- and I wanted them to participate in that.

5      Q.    When it came to interaction with Outdoor or

6   Noble regarding the term sheet or LOI, as you call it,

7   was that primarily done by Pacific Northern because of

8   your position as president of the company?

9      A.    It was a mixed bag.  So sometimes they did.

10  Sometimes I did.

11     Q.    Do you recall specific instances when you did?

12     A.    I recall negotiating with Mr. Hornish on the

13  working capital adjustment.  I recall having some

14  communications with Noble in March of 2013 related to

15  the whole -- related to a communication with Cathy Lee

16  about trying to clarify some information that I had

17  heard from Jeff.  So it was -- it was mixed.

18     Q.    You say that you were going to have counsel

19  review tomorrow morning, "and I will let you know if

20  counsel has any material suggestions to sections you may

21  look to include."

22          Did you subsequently provide Pacific

23  Northern Capital with material suggestions?

24     A.    I believe that counsel provided the edits on

25  the document.

Page 133

1    Q.   And you forwarded those to PNC?

2    A.   I believe so, yes.

3    Q.   Are you aware of the fact in this litigation,

4    your previous lawyers produced those changes that were

5    suggested by your lawyers?

6    A.   I am aware that there were some documents that

7    had Fulbright's name on them that were produced as part

8    of the second amended complaint.  In terms of what was

9    produced by discovery, I'm not familiar with the

10   specific documents that they produced, I mean, in terms

11   of -- I mean, obviously I've been on emails that have

12   the list of like the privileged log and that sort of

13   thing, but in terms of reviewing those specific

14   documents and what got shared with you, I don't -- I

15   don't recall.

16            But I know that there were some emails

17   that were included in this complaint.

18   Q.   Right.  I'm talking now about production in

19   response to discovery requests.  Are you aware that your

20   lawyers produced emails with comments by Fulbright &

21   Jaworski to the term sheet?

22   A.   I've -- I did not know that.  I knew there

23   were some in here.

24            (Exhibit 22 marked.)

25   Q.   Let me show you what's been marked as Exhibit

Page 134

1   22.   This is an email from Jeff Holowaty to you with a

2   draft term sheet that looks to be -- first of all, it's

3   on Pacific Northern Capital letterhead, right, what

4   Mr. Holowaty sent to you?

5         A.   Yes.

6         Q.   And Mr. Holowaty is suggesting that he made --

7   at least Pacific Northern Capital made revisions to the

8   term sheet that you sent them, right?

9         A.   Yes.

10        Q.   The email from Jeff Holowaty to you dated

11  January 15 -- by the way, this bears Document Control

12  Number Salomon 002545 through 51.  It states at the top,

13  "Nic, attached is the revised term sheet.  I made some

14  changes but need to discuss a few things before we send

15  it to Tim, specifically the royalty.  I will call you

16  later."

17              Do you recall whether Jeff Holowaty did

18  in fact call you later that day?

19        A.   I don't recall.

20        Q.   So you wouldn't recall if he did call you,

21  what was discussed?

22        A.   I would not, no.

23        Q.   If you look at the last page -- or, excuse me,

24  the next to the last page, the last page is blank, the

25  next to the last page of the document, which is Page 4

Page 135

1    of the revised term sheet, do you see the nonbinding

2    provision there?

3        A.    I do.

4        Q.    In fact, what Mr. Holowaty did was take the

5    nonbinding provision that you had sent him and include

6    it verbatim in this term sheet, right?

7        A.    Correct.  And he also included the binding

8    section as well.

9        Q.    Correct.  Yeah, I'm not dealing with that yet.

10   I'm just dealing with the nonbinding.  I appreciate your

11   comment.

12              But he took your nonbinding provision and

13   added it, right, verbatim?

14       A.    I presume it's verbatim, so, yeah.  I have no

15   reason to believe otherwise.

16              (Exhibit 23 marked.)

17       Q.    Let me show you what's been marked as Exhibit

18   23.  This is Control Number Salomon 004556 through 4562.

19   We've seen the first two emails in the previous

20   exhibits, but the top email says on January 15, 2013,

21   "Jeff, please see attached for additional comments,

22   mostly from counsel.  None are really substantive.

23   Let's discuss the royalty and next steps at your

24   convenience.  I am on my cell.  Thanks."

25              Do you recall receiving this markup or

Page 136

1   sending this markup to Mr. Holowaty?

2       A.   I don't recall that, but, I mean, I obviously

3   did send it to him.

4       Q.   And the attachment, which starts on Page 4558,

5   those -- are those attachments from your counsel?  Are

6   those comments from your counsel?

7       A.   They are comments from counsel and from,

8   presumably, any other feedback I got that I might have

9   gotten from somebody like Hank.

10      Q.   Do you see that nonbinding section on Page

11  4561?  There's some comments that are made to that,

12  including the reference to the exclusivity being a

13  binding legal agreement.  Do you see that?

14      A.   Yes.

15      Q.   Where did those comments come from?

16      A.   I mean, either counsel or feedback from other

17  folks.

18      Q.   Who might the other folks have been?

19      A.   I would -- the only other person that probably

20  would have reviewed this in detail would have been Hank.

21      Q.   Okay.  And do you see that there's -- in

22  addition to the insertion at the beginning and some

23  changes in the middle, there's a paragraph that's added

24  to the nonbinding section?  Do you see that?

25      A.   Yes.

Page 137

1      Q.   And that says, "This letter of intent, "i" --

2  I think that's an "i" or 1, whatever -- "may not be

3  amended or modified except by in writing signed by each

4  of the parties hereto; ii, may be executed in one or

5  more counterparts, each of which will be deemed an

6  original, but all of which together shall constitute one

7  and the same instrument."

8           Do you see that?

9      A.   Yes.

10      Q.   And those are comments that you suggested

11  either through Mr. Steinbrecher or through your counsel,

12  correct?

13      A.   That's correct.

14           (Exhibit 24 marked.)

15      Q.   Let me show you what's been marked Exhibit 24.

16  This bears Control Number Salomon 004573 through 4584.

17  This, again, is dated January 15 of 2013, and is it fair

18  to say that you're sending Mr. Holowaty an attached

19  redline and clean version of the post term sheet?

20      A.   Yes.

21      Q.   And the changes to the nonbinding provision

22  appear on Page 4579.  Those are the same comments that

23  we just looked at in Exhibit 23, right?

24      A.   They look the same.

25      Q.   Okay.  All right.  Do you recall having a

Page 138

1   discussion with either Jeff Holowaty or Kelly Holowaty

2   after you sent this version?

3       A.   I don't recall.

4            (Exhibit 25 marked.)

5       Q.   Let me show you what's been marked as Exhibit

6   25.  This bears Salomon Control Number 004585 through

7   45911, again, same date.  My math tells me this is about

8   five minutes later after Exhibit 24 we just looked at.

9   And you're sending him a PDF copy.  And this is a clean

10  version, right?  This PDF is a clean version?

11      A.   Yes.

12      Q.   And if you look at the nonbinding section

13  which begins on 4590, it includes in a clean version PDF

14  the changes that you suggested to be made to the

15  nonbinding provision, correct?

16      A.   It does.

17           (Exhibit 26 marked.)

18      Q.   Okay.  Let me show you what's been marked as

19  Exhibit 26.  This bears Control Numbers Solamon

20  KSE/OC:000169 through 173.  And the first email, the

21  bottom email on the first page, is from Jeff Holowaty to

22  Tim McQuay at Noble Financial, with cc's to Robert

23  Campbell at Noble Financial, Kelly Holowaty and

24  yourself.  Do you see that?

25      A.   Yes.

Page 139

1      Q.   It says, "Tim, please find attached our term

2   sheet to acquire the ownership interest of Skycam and

3   Cablecam."

4              Is this the first draft of the term sheet

5   that was sent to Noble or Outdoor?

6      A.   I believe so, yes.

7      Q.   And then at the top, you forwarded the same

8   document to Tom Hornish and Tom Allen, right?

9      A.   Yes.

10     Q.   All right.  I've got another question on this

11   Exhibit 26.  The nonbinding section, which appears on

12   172 --

13     A.   Okay.

14     Q.   -- and flows over to 173, that is the exact

15   same provision that you had been exchanging with PNC,

16   right?

17     A.   That looks to be, yes.

18              (Exhibit 27 marked.)

19     Q.   Let me show you what's been marked as Exhibit

20   27.  It bears Control Numbers KSE/OC: 00174 through 175.

21   The emails at the bottom of the first page that flow

22   over to the second page we've already seen.  If you look

23   at the middle email on the first page from Tom Allen to

24   you and Mr. Hornish, "Nic, thanks for sending this to

25   us.  Tom and I are glad you hooked up with PNC to pursue

Page 151

1      A.   Yes.

2      Q.   Are those your handwritten comments?

3      A.   Yes.

4      Q.   Okay.  If you look at 4528, Control Number

5   4528 and 4529, you didn't make any changes to the

6   nonbinding provision, did you?

7      A.   I did not.

8           (Exhibit 32 marked.)

9      Q.   Let me show you what's been marked as Exhibit

10  32.  It bears Salomon Control Numbers 002521 through

11  2523, and the top email is dated February 5 from Jeff

12  Holowaty to you, cc'd Kelly Holowaty.

13          And he says, "Nic, attached is what I

14  plan to send to Tim.  Take one more look before I send.

15  Changes are 200 more cash at close, 100(k) contingency

16  litigation payment and revenue royalty."

17          Do you see that?

18      A.   I do.

19      Q.   Did you make any further comments on what

20  Mr. Holowaty had sent you?

21      A.   I don't recall.

22      Q.   If you look at the nonbinding provision that

23  appears on Control Number Page 2532 to 2533, would you

24  agree with me that's the verbatim provision that you had

25  initially provided to Mr. Holowaty at PNC?

Page 152

1        A.    That looks correct, yes.

2        Q.    Staying with that, I think that exhibit -- did

3    Mr. Holowaty send the term sheet that's attached to

4    Exhibit 32 to Tim McQuay?

5        A.    I believe he did.  I don't see that here, but

6    I have no reason to believe he didn't.

7                    (Exhibit 33 marked.)

8        Q.    Let me show you what's been marked as Exhibit

9    33.

10       A.    Actually back on your last -- sorry, on your

11   last question, I mean, the only caveat is, I don't know

12   if I replied to Jeff's question about take one more look

13   before I sent it so...

14       Q.    Okay.  33 bears Control Number Salomon 002534

15   through 2535.  And I wish I could have included with you

16   the changes, but I don't think they were produced to us.

17                    So do you see at the top of the first

18   page the email from Jeff Holowaty to you?  It says,

19   "Nic, attached are their changes.  Call me when you have

20   had a chance to review."

21                    Do you see that?

22       A.    Yes.

23       Q.    Do you recall whether you had a conversation

24   with Mr. Holowaty after you received this email?

25       A.    I don't recall.  Sorry.

Page 167

1      A.    Yes.

2      Q.    Okay.  And he's saying, "We'll try to catch up

3   to you -- will try to call you in an hour or so.

4                  Did he call you?

5      A.    I presume that he did.

6      Q.    Do you recall what was discussed?

7      A.    I do not.

8                  (Exhibit 35 marked.)

9      Q.    Okay.  Let me show you what's been marked as

10   Exhibit 45.  It bears Control Numbers KSE/OC 000223

11   through 224.  We've already looked at the email on the

12   bottom of the first page.

13                  So if I misspoke, if I identified this as

14   Exhibit 45, it's Exhibit 35.

15                  The top email, however, we haven't seen

16   yet.  This is an email about five days later from you to

17   Tom Hornish, with a copy to Roger Warner.  Do you recall

18   sending that email?

19      A.    I do not.

20      Q.    Do you recall what prompted that email?

21      A.    All I can do is -- there was a negotiation

22   over working capital with the business, basically cash

23   left in the business upon acquisition.

24      Q.    Do you recall having any discussions with

25   anyone at Outdoor or Noble after you sent this email

Page 168

1   about the contents of your email?

2       A.   I -- I recall at some point discussing working

3   capital with Tom Hornish, but I don't recall the

4   specifics or the date.

5       Q.   You copied Roger Warner on this.  Do you

6   recall having a conversation with Mr. Warner about the

7   term sheet around February 13?

8       A.   I don't -- I recall having -- it's possible

9   that I had a call with Roger at some point between like

10  late January and mid-February.  I don't recall the

11  specifics of it, but as we previously discussed, there

12  were concerns over this -- whether or not there was

13  going to be a transaction and how we were going to run

14  the business without the appropriate capital.

15      Q.   Your email refers to a change that was made or

16  suggested by Outdoor after the term sheet was already

17  agreed to.  Why did you think the term sheet had already

18  been agreed to?

19      A.   Well, I think -- I mean, it looks to me like

20  they came back and asked for something new in the

21  negotiation.

22           (Exhibit 36 marked.)

23      Q.   Let me show you what's been marked as Exhibit

24  36.  It bears Control Numbers KSE/OC 000225 through 231.

25  At the top email Mr. Holowaty writes to Mr. McQuay, "Per

Page 179

1    Q.   And if you look down even further on that

2  page, it looks like Mr. Holowaty had sent Tim McQuay

3  that same day the attached signed term sheet; is that

4  right?

5    A.   Yes.

6    Q.   Okay.  Did the post-LOI organizational call

7  take place?

8    A.   I don't recall.  I have no reason to believe

9  that it did not.

10    Q.   Do you recall what was discussed on that

11  organizational call?

12    A.   I do not.

13    Q.   I think we've already -- you've already

14  testified at the time you signed the term sheet -- you

15  think you signed it on February 26, and then PNC signed

16  it on February 27, 2013, right?

17    A.   I think so.

18    Q.   Okay.  And you've already stated that at the

19  time you signed that term sheet, you were aware of the

20  Intermedia/Outdoor merger agreement, correct, from

21  November of 2012?

22    A.   Yeah.  Yes.

23    Q.   Okay.  In the term sheet, as drafted by you

24  and sent to PNC and eventually sent to Outdoor, you

25  didn't say in the term sheet that if Outdoor sold its

Page 180

1   stock to Intermedia, Outdoor had to exclude the aerial

2   camera business from that stock sale, did you?

3       A.   The term sheet contained an exclusivity

4   provision.  It had a -- it covered both a direct or an

5   indirect transaction.  So I believe the indirect

6   language would specifically refer to a sale of the

7   parent as opposed to just the subsidiary.

8       Q.   You knew of the offer and the merger agreement

9   between Intermedia and Outdoor for all of Outdoor's

10  stock at the time you prepared and sent the term sheet

11  to Outdoor, and you didn't say -- you didn't

12  specifically say, expressly say, not interpreting

13  language, but expressly say in the term sheet that if

14  Outdoor sold its stocks to Intermedia, Outdoor had to

15  exclude the aerial camera business from that stock sale.

16            You didn't put that express provision in

17  there, did you?

18      A.   Well, I think that's what it says when it says

19  directly or indirectly.

20      Q.   That's how you interpret it, right?

21      A.   Well, I mean, what is an indirect sale of the

22  company, a sale of the parent company and indirect sale

23  of the company?  I believe that's the case.

24      Q.   Okay.  But you knew what was going on with

25  Intermedia, and you didn't say that, "If you sell your

Page 199

1    that particular provision in this document?

2         A.   Well, the March 21st document is the secret

3    agreement that was made between Tom Hornish and Kelly

4    Holowaty at Pacific Northern.  The case is -- one of the

5    key elements of the case is that this agreement was

6    signed secretly and hid from me on -- well, apparently

7    on March 21st, 2013.

8              I didn't receive a copy of this until

9    April 9th when I actually went to Fulbright and said --

10   well, when I went to go --

11        Q.   Mr. Salomon, we'll get there.  Can we just

12   answer my question?  I promise you we're going to get

13   there, but you're not answering my question.

14        A.   Sorry, I think that I was.  I think that I

15   was, sorry.

16        Q.   No, you weren't.  So I just want to make sure

17   that this March 21 document is the document you're

18   referring to in Paragraph 38 --

19        A.   Yes, it is.

20        Q.   -- which you call an amendment, which you now

21   want to call a secret amendment.  I get it.

22              Now let's go to Request for Admission 39.

23   Okay?

24        A.   Okay.

25        Q.   Which says, "Admit that because you did not

Page 203

1      A.   Understood.

2      Q.   All right.  So you personally have interests

3 and rights under this term sheet in your opinion, right?

4      A.   Yes.

5      Q.   So if we look at the last paragraph that your

6 lawyers asserted in the nonbinding section, and because

7 you have, in your opinion, rights, you say, this letter

8 of intent, one, may not be amended or modified except by

9 a writing signed by each of the parties hereto.  Okay?

10      A.   Okay.

11      Q.   You didn't sign the March 21, 2013 document,

12 did you?

13      A.   I did not.

14      Q.   Okay.  And, two, may be executed in one or

15 more counterparts, each of which will be deemed as an

16 original, but all of which together shall constitute one

17 and the same instrument.

18           Number 2 is not really relevant.  For our

19 purposes, it's Number 1.  Okay?  And that's why I asked

20 the question I did in request for Admission Number 39.

21      A.   Understood.

22      Q.   But because you didn't sign the March 21, 2013

23 document, the March 31 -- excuse me, the March 21, 2013

24 document did not amend or modify the term sheet with

25 you.  Okay?  And you admit that, right?

Page 204

1       A.   Yes.

2       Q.   So what is the exclusivity provision or period

3   in the original term sheet?

4       A.   That goes through April 15th.

5       Q.   Right.  Okay.  When did Outdoor enter into its

6   agreement, the final agreement, with KSE to sell all

7   Outdoor stock?

8       A.   The agreement was not finalized until, I

9   believe, May -- approximately May 17th, May 19th-ish.

10       Q.   Not when it closed.  When did Outdoor

11   accept -- you understand --

12       A.   Oh, okay.  They accepted -- they signed a

13   merger agreement, I believe, on approximately March

14   12th.

15       Q.   That was the original merger agreement, right?

16   You then recall --

17       A.   But that's when the breach of contract took

18   place.

19       Q.   Can I finish my question?

20       A.   Uh-huh.

21       Q.   You then recall that Intermedia came in and

22   upped the ante, so to speak, and then Outdoor said,

23   "Well, Intermedia's offer is superior to KSE's, so we're

24   going with Intermedia now."

25               You recall that, right?

Page 217

1           So, I mean, once again, I'm pointing out

2   that the agreement with respect to the definition of

3   parties has some complexity associated with it.

4       Q.   Okay.  Let's get to the purchaser then because

5   this is just gold.  The purchaser was never formed,

6   right?

7       A.   That's correct.

8       Q.   There -- was it going to be an LLC?  Was

9   it going to be a corporation?  Was it going to be an S

10  corp?  Was it going to be a PC?  What was it going to

11  be?

12      A.   I can't recall.  I think we were looking at an

13  LLC, but it's possible that we were going to go a

14  different route so...

15      Q.   Okay.  Well, let's stick with your

16  recollection of an LLC.  Who were going to be the

17  members of the LLC?

18      A.   I don't -- we had not gotten that far yet.

19      Q.   Okay.  How was the LLC going to be

20  capitalized?

21      A.   It was going to be PNC, being a -- the

22  majority investor and the LLC, and we were in

23  discussions for -- with the equity split for management,

24  as well as I had expressed interest in investing in the

25  purchaser, and we were talking about bringing in

Page 218

1   co-investors as well.

2       Q.   So it sounds to me there was no -- there was

3   no defined or agreed upon equity structure for the LLC.

4   There was just discussion about what might be, right?

5       A.   Well, there was a proposal up until the time

6   there was some secret agreement, which --

7       Q.   What was the proposal?  What was the proposal?

8       A.   The proposal is on page -- is an exhibit to

9   the second amended complaint, which is Exhibit

10  Number -- Exhibit G.

11      Q.   And is it your testimony here today -- knowing

12  that the Holowatys are going to be deposed, is it your

13  testimony here today that they agreed to that structure?

14      A.   No.  They did not agree to it.  They were

15  reviewing it.

16      Q.   Okay.  Did they disagree with it?  Did they

17  express that they were -- they had disagreements with

18  it?

19      A.   There were no -- the latest communication I

20  had on this is I sent it to them and they were reviewing

21  it, and that's the latest communications that I can

22  recall.

23      Q.   Okay.  Were there LLC paperwork prepared,

24  formation paperwork, formation documents?

25      A.   Not to my knowledge.

Page 219

1  Q.  So if there were no formation paperwork

2  prepared, then there was no filings made on behalf of

3  the company with the Texas Secretary or any other

4  Secretary of State's office, right?

5  A.  Not that I'm aware of.

6  Q.  So is it fair to say there was never a

7  purchaser actually formed?

8  A.  Correct.  There was no actual legal entity

9  created.

10  Q.  Was there a name that was contemplated for the

11  entity?

12  A.  There may have been a proposed name.  I can't

13  recall.  There was some due diligence documents that

14  were shared in the early March time frame, and there may

15  have been one in there.

16  Q.  What do you recall the name to have been?

17  A.  I don't recall.

18  Q.  How much were you going to contribute to the

19  purchaser?

20  A.  I hadn't determined that yet.

21  Q.  How much was PNC going to contribute to the

22  purchaser?

23  A.  I mean, at -- my understanding is that they

24  would backstop the whole deal if necessary.

25  Q.  They were going to contribute everything?  100

Page 286

1    exclusive term sheet to sell to me.

2         Q.   In fact, isn't it true, Mr. Salomon, that

3    Outdoor had agreed to sell all of its stock to KSE and

4    had agreed to try to come to terms with you and PNC to

5    sell the aerial camera business, correct?

6         A.   That's what their -- I believe that's

7    accurate, what you're saying their merger agreement

8    said, but their -- their agreement to do that with KSE

9    was at odds with the legally binding exclusivity

10   provision which prevented that.  So two obligations.

11        Q.   Of course, had you read the KSE/Outdoor merger

12   agreement, you would have seen that Outdoor could have

13   obtained consent from KSE to sell the aerial camera

14   business.

15        A.   Well, I mean, they -- they could have.

16        Q.   Assuming that you had presented them with a

17   definitive agreement to sign.  Did you and PNC ever

18   provide Outdoor Channel with a definitive APA?

19        A.   PNC and Outdoor Channel made sure that

20   couldn't happen and KSE was the beneficiary.

21        Q.   Mr. Salomon, did -- let me see if I can ask my

22   question again and get an answer to it.  Did you and

23   PNC -- let me break it up.

24             Did you and PNC ever sign a definitive

25   asset purchase agreement?

Page 287

1          A.   We did not.

2          Q.   Did you and PNC ever provide Outdoor Channel

3     with a signed definitive asset purchase agreement?

4          A.   Did we ever present them with one?

5          Q.   Yes, a signed APA.

6          A.   We did not.

7          Q.   Okay.  So is it fair to say then that KSA --

8     KSE was never in a position to review a signed asset

9     purchase agreement between you, PNC and Outdoor?

10         A.   Well, if we had signed a purchase agreement,

11    then there wouldn't be anything to review, correct?

12         Q.   If you signed a purchase agreement, there

13    wouldn't be anything to review.  I don't understand that

14    statement.  If you signed?

15         A.   If I had signed a purchase agreement to

16    acquire the assets, then KSE would no longer be involved

17    in that transaction.

18         Q.   The merger agreement said that KSE would

19    provide -- had to provide consent.

20         A.   Yeah, but they cut the secret deal before we

21    ever had an opportunity to do that.

22         Q.   My question, Mr. Salomon, was a little

23    different.  In fact, it was a lot different.  If you had

24    not -- you and PNC had not signed an asset purchase

25    agreement and presented it to Outdoor, KSE wouldn't be

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT 18

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**From:** Nic Salomon
**Sent:** Wednesday, January 16, 2013 7:20 AM
**To:** Tom Hornish;  (tallen@outdoorchannel.com)
**Subject:** FW: PNC Term Sheet
**Attachments:** Term Sheet 1-15-13.pdf

Tom / Tom,
Please see attached for the term sheet from PNC.

Regards,
Nic

**From:** jeff.holowaty@pacificncap.com [mailto:jeff.holowaty@pacificncap.com]
**Sent:** Wednesday, January 16, 2013 1:11 AM
**To:** tmcquay@noblefinancialgroup.com
**Cc:** rcampbell@noblefinancialgroup.com; kelly.holowaty@pacificnc.com; Nic Salomon
**Subject:** PNC Term Sheet

Tim - please find attached our term sheet to acquire the ownership interest of Skycam and Cablecam.  We would like to proceed with completing a transaction asap and therefore would like to have a completed term sheet signed by both parties by the end of the week.

Please call me with any questions.

Regards,

Jeff



EXHIBIT
26

1

KSE/OC:000169



PACIFIC
NORTHERN
CAPITAL
Investing Thoughtfully

PRIVATE AND CONFIDENTIAL

January 15, 2013

Mr. Tim McQuay
Managing Director
Noble Financial Capital Markets
355 South Grand Avenue
Suite 1750
Los Angeles, CA 90071

Dear Tim:

Pacific Northern Capital ("PNC") is pleased to have the opportunity to present this Term Sheet ("Term Sheet") in acquiring the ownership interests of Outdoor Channel Holdings, Inc.'s aerial cameras businesses SkyCam LLC and CableCam LLC (the "Company"). Based on our general knowledge of the business, the information provided to us, and the subsequent conversations we have had with you and management, we are impressed with the performance of the business over the last few years, the strength of the management team, and the potential opportunities to expand the business going forward. We are providing this Term Sheet to you to evidence the intention of PNC to proceed with negotiations designed to complete a purchase of the Company substantially in the manner outlined herein.

PNC is fully prepared to provide the resources, both financially and professionally, to pursue new growth opportunities with the Company, both through acquisitions and internal initiatives. PNC views the Company's existing management team as an instrumental asset in implementing the growth plan and ensuring the continued level of operating expertise, innovation, and professionalism.

<u>**Summary of Proposed Terms**</u>

**Company:**    SkyCam LLC and CableCam LLC ("Skycam and Cablecam" or collectively, the "Company")

**Purchaser:**    An Acquisition entity (the "Purchaser") to be formed by PNC in conjunction with Nic Salomon, current President of Skycam and Cablecam

**Purchase    Price:**    Purchaser is prepared to acquire certain assets of Skycam and Cablecam (the "Transaction") from Outdoor Channel Holdings, Inc. ("Outdoor Channel") for a total purchase price ("Purchase Price") of up to $4.05MM. The Purchase Price will be comprised of (i) $3.25MM in cash at close; (ii) the Litigation Payment as described below; and (iii) the Royalty as described below.

This Purchase Price is based on the Company having achieved estimated 2012 Adjusted Free Cash Flow of at least $0.9MM (calculated as 2012 Adjusted EBITDASC of at least $1.5MM, less projected annual Maintenance Capex of $0.6MM), prior to taking into account increases in SG&A for standalone finance, accounting and insurance costs. The Purchase Price contemplates that Purchaser may fund an additional estimated $2.5MM capital investment in the Company over 2 years for development of a next generation Skycam system and the creation of an engineering and operations infrastructure. The Purchaser's proposed Transaction includes the rights to the Company's IP for its government, military, security,

3218 East Holt Avenue
West Covina, CA 91791
Tel: (626) 214-2155
Fax: (917) 591-8517

544 San Antonio Road
Mountain View, CA 94040
Tel: (650) 559-8811
Fax: (650) 641-2982



agriculture and other non-sports markets.

This Purchase Price assumes that Skycam and Cablecam will be run in the ordinary course of business until Closing, including the continuation of all business development and government market development activities. The Company will deliver an adequate level of working capital consistent with the Company's past practices and projected revenue growth. To the extent that Company's working capital is below the necessary level, the Purchase Price would be reduced dollar-for-dollar. The working capital value will be mutually agreed upon between Purchaser and the Sellers after the completion of due diligence.

| | |
|---|---|
| **Structure:** | The Transaction will be structured as an asset purchase of operating assets and the Actioncam judgment but excluding certain assets as described below. Only accounts payable and other ordinary course liabilities will be assumed. |
| **Financing:** | The Transaction will primarily be financed by cash proceeds from PNC at Closing. |
| **Real Estate:** | Skycam's lease of the building in Tulsa (where there are currently no Company operations), associated liabilities and the accompanying sublease to another tenant will not be included as assets in the Transaction. |
| **Litigation Payment:** | The litigation claim will be included as an asset in the Transaction. However, Purchaser will provide Outdoor Channel with a retained 50 percent interest in the rights to economic recovery of the outstanding Actioncam litigation claim up to a maximum value of $500,000 to Outdoor Channel as further described below. Purchaser will retain the exclusive right to manage any ongoing litigation in the case. Outdoor Channel will cooperate in all aspects of the litigation as requested by Purchaser on a go forward basis. Any Purchaser-driven costs associated with the future Actioncam litigation will be the responsibility of Purchaser. Upon both the completion of the litigation and the expected liquidation of Actioncam LLC (or alternatively the sale of Actioncam to Purchaser), Purchaser will pay Outdoor Channel additional Transaction consideration of $500,000 (less any settlement proceeds already received by Outdoor Channel). Any costs incurred by Purchaser associated with the future Actioncam litigation will be deducted from any settlement proceeds prior to calculating the amount due to Outdoor Channel. |
| **Royalty:** | For a period of 12 months following the Closing, Purchaser will pay Outdoor Channel a 50% royalty on net profits from any incremental CBS regular season NFL and SEC events covered by Company, which have not been regularly covered by Company in the past. For purposes of specificity, Skycam and Cablecam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game. With an estimated 30 NFL and SEC "A" games on CBS during the regular season, this additional consideration over 12 months could exceed $300,000 to Outdoor Channel. |
| **Due Diligence Requirements:** | Due diligence will begin immediately upon execution of this term sheet (e.g. legal due diligence, review of existing contracts and litigation, and business due diligence). |
| **Conditions to Closing:** | • Verification of historical profitability and confirmation that Company has achieved 2012 Adjusted Free Cash Flow of at least $0.9MM;<br>• Completion of business, accounting and legal due diligence to Purchaser's satisfaction;<br>• Execution of definitive transaction documentation acceptable to each party in its sole discretion. |
| **Exclusivity:** | A. In consideration of Purchaser continuing to spend time and incur professional fees and other expenses related to the acquisition, each of Outdoor Channel and the |



Company agree that until March 15, 2013, that they and any of their directors, officers, affiliates and representatives will not, directly or indirectly:

(i)    Solicit, facilitate, encourage or accept any offers to acquire any equity or debt interest in Skycam or Cablecam or the whole or any material part of the assets of the business of Skycam or Cablecam, nor engage or procure any person to do so on their behalf;

(ii)   Negotiate or correspond with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of Skycam or Cablecam, other than to advise them that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed), nor engage or procure any person to do so on its behalf;

(iii)  Sell or agree to sell any equity or debt interest (including any new issue of debt or equity) in any part of the Company to any other party than Purchaser or its nominee, and Outdoor Channel and its subsidiaries will procure that their respective directors, officers, affiliates, employees, advisors and representatives will also act accordingly.

B.   Outdoor Channel and its subsidiaries jointly and severally undertake that they will forthwith cease any negotiations, discussions or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the Company by any other party than Purchaser or its nominee and that it will advise any such parties that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed).

C.   Each of these undertakings in this Exclusivity section shall be read and construed independently of all other undertakings and, if any undertaking is held to be invalid or unenforceable, the remaining undertakings shall continue to apply to the extent that they shall not also be found to be invalid.

D.   The parties agree that Purchaser shall be entitled to equitable relief, including injunction (without the necessity of posting bond) and specific performance, in the event of any breach of the provisions of this agreement, in addition to all other remedies available at law or in equity, including monetary damages, both actual and consequential.

**Transaction Timing:**

The parties will use their best efforts to achieve a signing of definitive documents and Closing no later than March 15, 2013.

Purchaser believes that because of its funding source and relationship to the management of Skycam and Cablecam, it is in a strong position relative to other interested parties in providing both speed and certainty of close. Purchaser believes the speed of a transaction is of the essence to preserve the value of the Company by ensuring capital availability for the development of a next generation Skycam system ahead of targeted prototype delivery in the Fall of 2013.

**Confidentiality:**

Both parties are covered by confidentiality agreements, which have already been put in place.

The Proposed Terms contained herein are contingent upon these Terms remaining confidential between the parties.

**Non-Binding:**

Except for the provisions of "Exclusivity" above, which is a binding legal agreement upon the parties, this Term Sheet is a statement of mutual intention; it is not intended to be legally binding, and does not constitute a binding contractual commitment with respect to any transaction.   Without limiting the foregoing, the failure of Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive agreements in accordance with this Term Sheet shall not be construed as a breach of this Term Sheet by any party hereto.  A legally binding obligation with respect to the investment contemplated hereby will arise only upon execution and delivery of



Page 4

definitive documents by Company and Purchaser, subject to the terms and conditions set forth therein. Accordingly, until definitive agreements are entered into, except as expressly set forth above, no party will be under any legal obligation with respect to this Term Sheet, and no withdrawal from or termination of negotiations for the transaction contemplated by this term sheet prior to signing definitive agreements, for whatever reason, or for no reason, shall be determined to be in bad faith and any such withdrawal or termination shall not give any party a cause of action against the other party.

This letter of intent (1) may not be amended or modified except by a writing signed by each of the parties hereto, and (ii) may be executed in one or more counterparts, each of which will be deemed an original but all of which together shall constitute one and the same instrument.

For the Purchaser on _____, 2013:                Accepted and Agreed on _____, 2013:

Nic Salomon                                            Outdoor Channel Holdings, Inc.
and Pacific Northern Capital

By: _____                           By: _____

    Nic Salomon                                            Tom Hornish
    Individually                                           CEO

                                                           Outdoor Channel Holdings, Inc.

By: _____

    Kelly Holowaty
    Managing Director
    Pacific Northern Capital

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NIC SALOMON,** | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §　　**CIVIL ACTION NO.** |
| | §　　**3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § |
| | § |
| Defendants. | § |

**EXHIBIT 19**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3

4    NIC SALOMON,

5          Plaintiff,

6    vs.                          CIVIL ACTION NO.
                                  3:15-CV-00666-M
7    KROENKE SPORTS & ENTERTAINMENT,
     LLC, OUTDOOR CHANNEL HOLDINGS,
8    INC., and PACIFIC NORTHERN
     CAPITAL LLC,

9

               Defendants.
10   _____

11

12

13                   CONFIDENTIAL
14       VIDEOTAPED DEPOSITION OF CATHY LEE
15                    VOLUME I
16            San Diego, California
17            Tuesday, June 12, 2018
18

19

20

21

22   Reported by:
     DENISE MARLOW
23   CSR No. 11631

24

25   Job No. CS2875080

CONFIDENTIAL

Page 42

1      Q.   Okay.  Would you characterize the changes

2   that you see as you flip through 108 as to be minor

3   changes or --

4      A.   Oh, no.  These -- these are very aggressive

5   changes.  They're very, very, very extensive.

6      Q.   Okay.  Now, Mr. Salomon -- I'll represent to

7   you that Mr. Salomon has said in this case that PNC

8   and himself were very close to finalizing an asset

9   purchase agreement with Outdoor.  Do you agree with

10   that statement?

11      A.   Oh, absolutely not.  There was no way

12   that -- they have made such extensive changes to the

13   form of agreement that I would not call this

14   anywhere close.  And the reps and warranties

15   specifically that are set forth in here, they're not

16   anything that Outdoor Channel would have ever agreed

17   to, so --

18      Q.   Okay.  Was -- was it fair to say that

19   between the date of this asset purchase agreement,

20   which if we look at 107, appears to be early March

21   of 2013 --

22      A.   Uh-huh.

23      Q.   -- and the time of the KSE acquisition in

24   May of 2013, that Outdoor was willing to continue to

25   try to negotiate or try to work with PNC and

CONFIDENTIAL

Page 43

1    Mr. Salomon to come to terms on an asset purchase

2    agreement?

3         A.   I would think so if we were going back and

4    forth.

5         Q.   I mean, do you recall Outdoor -- or Noble

6    through Outdoor ever telling Mr. Salomon or PNC,

7    Stop, we're not willing to continue to negotiate

8    with you?

9         A.   I don't recall that.

10        Q.   If I can get you to look at Exhibit 107.

11        A.   Okay.

12        Q.   This is the asset purchase agreement we

13   talked about a few moments ago --

14        A.   Yes.

15        Q.   -- the draft asset purchase agreement.  The

16   lead-in -- it's on control number page 036082 --

17        A.   Okay.

18        Q.   -- under the heading "Asset Purchase

19   Agreement" --

20        A.   Yes.

21        Q.   -- says, "This asset purchase agreement is

22   entered into as of March, blank, 2013, by and among

23   CableCam, LLC, a Delaware corporation, CableCam;

24   SkyCam, LLC, a Delaware corporation; SkyCam and

25   together with CableCam, the sellers; and blank, a

Page 45

1   shared the term sheet.

2       Q.  Would it -- would it -- the Outdoor

3   management team have shared an asset purchase

4   agreement if one had been entered into with the

5   board?

6       A.  Likely not also.

7       Q.  Okay.

8       A.  If anything, when we get to final

9   agreements, we would have summarized the terms of

10  the transaction.

11      Q.  At a board meeting?

12      A.  At a board meeting.

13          (Exhibit 109 marked)

14  BY MR. EVANS:

15      Q.  Yeah.  So we chatted a few minutes ago about

16  a company called InterMedia Outdoor Holdings, LL --

17  actually Outdoor Holdings, Inc.  Let me show you a

18  document that I promised I would show you -- show

19  you earlier that is the merger agreement with

20  InterMedia.  And we'll mark this as Exhibit 109.

21      A.  Thank you.

22      Q.  Yep.  Exhibit 109 is the agreement and plan

23  of merger by and among InterMedia Outdoor Holdings,

24  Inc.; Outdoor Merger Sub, LLC; Outdoor Merger Corp;

25  Outdoor Channel Holdings, Inc.; and InterMedia

CONFIDENTIAL

Page 46

1    Outdoor Holdings, LLC, dated as of November 15 of

2    2012.

3         Does that help refresh your recollection as

4    to when the merger agreement with InterMedia was

5    entered into?

6        A.  Yes.

7        Q.  And is it fair to say that that would have

8    been November 15 of 2012?

9        A.  That's correct.

10       Q.  So as of November 15 of 2012, there was an

11   agreement in place whereby InterMedia was to

12   purchase all Outdoor stock.  Is that fair?

13       A.  Yes.

14       Q.  And that's roughly three months before the

15   term sheet?

16       A.  Yes.

17       Q.  Okay.  So let me ask you then to turn to

18   Exhibit 44.  That should be in the first binder.

19   And Exhibit 44 is an e-mail from Mr. Salomon.  It's

20   dated March 7 of 2013.  It's to Tom Hornish with a

21   CC to you, and it says, "Good afternoon, Tom.  I saw

22   the press release this morning that a definitive

23   merger agreement with KSE has been fully negotiated.

24   Pursuant to our term sheet, I want to make sure that

25   Outdoor Channel has communicated to KSE that SkyCam

Page 60

```
 1    counsel to discuss the Kroenke merger agreement or
 2    the Kroenke offer to acquire all Outdoor stock?
 3        A.  No.
 4        Q.  Do you recall Mr. Salomon reaching out to
 5    you to discuss this concept that KSE had a
 6    contractual right of approval?
 7        A.  I don't -- I don't recall that.
 8            (Exhibit 111 marked)
 9    BY MR. EVANS:
10        Q.  Okay.  What I'd like you to do is -- yeah,
11    I'm going to mark this next document as Exhibit 111.
12        A.  Thank you.
13        Q.  Take a moment to look at that.
14            Exhibit 111 is a March 21, 2013, document to
15    Pacific Northern Capital.  It's signed by
16    Mr. Hornish on behalf of Outdoor and by Kelly
17    Holowaty on behalf of Pacific Northern Capital.  Do
18    you recall Exhibit 111?
19        A.  I do.
20        Q.  Do you recall who drafted Exhibit 111?
21        A.  Likely it would have been me, so -- but I
22    don't recall doing that specifically.
23        Q.  Okay.  Do you know whether KSE -- anyone
24    from KSE had any involvement in the drafting of
25    Exhibit 111?
```

CONFIDENTIAL

Page 61

1      A.   No.   I don't think that that would have been

2   the case.

3      Q.   Do you recall discussing with anyone at KSE

4   the contents of Exhibit 111?

5      A.   I don't recall that.

6      Q.   Okay.   What was the reason for Exhibit 111?

7      A.   I think the reason would have just basically

8   been to make it extremely clear that, you know,

9   Kroenke Sports & Entertainment has basically the

10  last say.   It would have been to support, if you

11  will, the agreement and plan of merger what we

12  agreed that we would do in there, which is to get

13  their prior written approval prior to entering into

14  any transaction.

15     Q.   Why is -- this was signed only by PNC and

16  Outdoor and not Mr. Salomon.   Do you recall why that

17  was?

18     A.   I believe that was an -- a inadvertent

19  omission.

20     Q.   Inadvertent that Mr. Salomon was not

21  included?

22     A.   Inadvertent in that Mr. Salomon was not

23  included.

24     Q.   And do you have -- do you recall why

25  Mr. Salomon wasn't included?

Page 62

1      A.   At some point during the negotiation

2   process, we were negotiating primarily with Pacific

3   Northern Capital, and Nic Salomon was no longer

4   involved.  And I think that the back and forth was

5   directly with Pacific Northern Capital.  So I think

6   it was just inadvertently forgot to include Nic, if

7   you will.

8      Q.   Was there any intent by Outdoor to deceive

9   Mr. Salomon?

10      A.   Absolutely not.

11      Q.   Was there any intent by Outdoor to conceal

12   anything from Mr.  Salomon?

13      A.   No.

14      Q.   Was there any intent by Outdoor to cut

15   Mr. Salomon out of the effort to acquire the Aerial

16   Camera Business?

17      A.   No.

18      Q.   Did -- is it fair to say that Outdoor

19   expected PNC to communicate the contents of Exhibit

20   111 with Mr. Salomon?

21      A.   Yes.

22      Q.   Can I get you to turn back to Exhibit 80?

23   This would be the --

24      A.   Yes.

25      Q.   -- term sheet.  And do you see the -- the

Page 80

1    negotiate a transaction.  That would include any and

2    all assets that the company owns.  So that -- that

3    second paragraph, or second sentence, is incorrect.

4        Q.  Okay.  If you skip down to the next to last

5    sentence in paragraph 8, Mr. Salomon says, "Desiring

6    to prevent Outdoor's sale of the two related

7    businesses from occurring, KSE induced Outdoor and

8    PNC contractually to position KSE to veto the sale

9    to Mr. Salomon and PNC."

10            What's your reaction to that sentence?

11       A.  I think that that's ridiculous.

12       Q.  And why do you say that?

13       A.  Because I am not aware of any efforts by KSE

14   to induce Outdoor Channel or PNC with respect to any

15   sale of the Aerial Camera Business, so --

16       Q.  Paragraph 9 says, "KSE obstructed and

17   interfered with Mr. Salomon's efforts to purchase

18   from Outdoor the Aerial Camera Business."  Are you

19   aware any of obstruction or interference by KSE?

20       A.  No.

21       Q.  Paragraph 10 says -- well, I'll ask

22   Mr. Hornish about paragraph 10.  That's a -- that's

23   a business-related issue, so I'll cover that with

24   him.

25            If you can look at paragraph 12 on page 4 --

CONFIDENTIAL

Page 84

1    exclusivity obligations in the term sheet, Outdoor

2    participated during the exclusivity period in

3    negotiations with other parties to sell the entire

4    business of outdoor, including SkyCam and CableCam."

5          What's your reaction to that comment by

6    Mr. Salomon?

7       A.   Again, I think it's ridiculous.  You know,

8    you -- there's never a situation where you're

9    selling a small asset of the company that -- where

10   that that would then prevent the larger parent

11   company from doing what it needs to do in order to

12   fulfill its fiduciary obligations.

13      Q.   The exclusivity provision of the term sheet,

14   which is Exhibit 80, talks about during the

15   exclusivity period up to April 15 of 2013, Outdoor

16   not negotiating or discussing for the sale of a debt

17   or equity interest in SkyCam or CableCam.

18      A.   Uh-huh.

19      Q.   Did Outdoor negotiate or discuss with KSE

20   KSE's acquisition of debt or equity interest in

21   SkyCam?

22      A.   No.  Outdoor only discussed with KSE the

23   acquisition of Outdoor Channel Holdings, Inc.'s

24   stock.

25      Q.   Okay.  And when KSE acquired Outdoor on

Page 87

1      Do you -- do you know whether, as of March

2   21 of 2013, Outdoor and PNC had, quote, worked out

3   most of the issues regarding the asset purchase

4   agreement?

5      A.   I don't think we did.

6      Q.   Okay.  You consider that to be an untrue

7   statement?

8      A.   I consider that to be an untrue statement,

9   yes.

10      Q.   Okay.  And you would know because you were

11   involved in those --

12      A.   I drafted those, and I was involved in all

13   of those negotiations.

14      Q.   Okay.  If you would take a look at paragraph

15   38, this -- on page 12, this paragraph refers to the

16   March 21, 2013, document that we've already

17   discussed at some length today.  It's signed by

18   Outdoor and by Pacific Northern Capital but not

19   Mr. Salomon.  It's Exhibit 111.

20      A.   Okay.

21      Q.   Mr. Salomon writes that that document

22   effectively eliminated the exclusive dealing

23   provision to the material detriment of Mr. Salomon

24   and gave their purported new purchaser KSE control

25   of the term sheet.

CONFIDENTIAL

Page 88

1      What's your reaction to -- to that

2   statement?

3      A.  Again, I think that's completely false and

4   wrong.

5      Q.  And why is -- why do you say that?

6      A.  Because KSE was not involved at all with

7   respect to, you know, what happened there in this

8   term sheet.  That amendment was something that we

9   intended to execute with PNC and -- you know, and at

10  the time definitely Nic Salomon as well.  I just --

11  he was inadvertently excluded.

12     Q.  Exhibit 56, if you could turn to that.

13  There's an e-mail that starts at the bottom of the

14  first page and flows over onto the second page.

15  It's an e-mail from Mr. Salomon dated May 17 of 2013

16  to Mr. Hornish, with CCs to Tom Allen and yourself.

17  And Mr. Salomon writes, "Tom, I'm still having a

18  difficult time understanding your continuing attempt

19  to tie in our letter of intent, which you amended

20  without my consent or participation, to my efforts

21  as an officer to advance SkyCam's business.  Just so

22  we're clear, I am reserving all of my rights in this

23  matter."  Do you recall receiving that e-mail?

24     A.  Vaguely.

25     Q.  Do you recall having any discussions with

Page 94

1    Q.  Okay.  Mr. Salomon also writes in paragraph

2   51 that Outdoor breached the term sheet's

3   exclusivity provision by, among other things,

4   agreeing to sell SkyCam and CableCam in the Aerial

5   Camera Business to KSE during the time period in

6   which Outdoor agreed to exclusively deal with

7   Mr. Salomon and PNC.

8        What's your reaction to that comment?

9    A.  Again, I think that this is incorrect

10  because we didn't agree on SkyCam or CableCam.  All

11  we talked about was selling the stock of Outdoor

12  Channel Holdings, Inc.

13   Q.  Mr. Salomon also says that Outdoor breached

14  the term sheet's exclusivity provision by failing to

15  cease negotiations and discussions with KSE

16  regarding the potential acquisition of an equity

17  interest in SkyCam, CableCam, and the Aerial Camera

18  Business.

19        What's your reaction to that?

20   A.  Again, we did not talk about any sort of

21  acquisition of an equity and trust in the Aerial

22  Cameras Business.  It was only for Outdoor Channel

23  Holdings, Inc.'s stock.

24   Q.  Mr. Salomon also writes that Outdoor

25  breached the term sheet's exclusivity provision by

Page 95

1    disclosing to KSE the existence of PNC and

2    Mr. Salomon and the details of the term sheet.

3              What's your reaction to that?

4         A.   Once again, you know, as part of the

5    diligence requirements in connection with any sale

6    of public company stock, you have to fully disclose

7    every aspect of your company, which includes assets

8    that you own relating to the Aerial Cameras

9    Business.  So it would be entirely appropriate to

10   include information about the Aerial Cameras

11   Business in the actual data room.

12        Q.   And in so doing, out -- was Outdoor

13   disclosing to a prospective purchaser of the Aerial

14   Camera Business the terms -- the details of the term

15   sheet?

16        A.   No.  So Outdoor Channel was basically

17   disclosing any and all aspects relating to all

18   assets it owned directly and indirectly.

19        Q.   And KSE wasn't a prospective purchaser of

20   the Aerial Camera Business?

21        A.   No, not at all.  It was only interested in

22   Outdoor Channel stock.

23        Q.   And then finally, in paragraph 51,

24   Mr. Salomon writes, "Outdoor breached the term

25   sheet's exclusivity provision by granting KSE the

CONFIDENTIAL

Page 96

1   right to veto the sale of the Aerial Camera Business

2   to PNC and plaintiff."

3        What's your reaction to that statement?

4        A.   Again, I think that this is false.  You

5   know, I think KSE was interested in buying all of

6   Outdoor Channel Holdings, Inc., the stock, and that

7   includes some assets direct -- indirectly held, and

8   so this is not correct.  There was no veto, if you

9   will, relating directly to the Aerial Camera

10  Business to PNC that we gave to KSE.

11       Q.   Do you remember the -- the term sheet

12  provided that PNC, Mr. Salomon, or Outdoor could

13  terminate negotiations for the sale or purchase of

14  the Aerial Camera Business for any reason or no

15  reason at all?

16       A.   That's correct, yes.

17       Q.   And it would not give rise to a liability?

18       A.   That's right.

19       Q.   So even if after -- even if the term sheet

20  were still -- the exclusivity provision of the term

21  sheet were still in existence as of May 17 of 2013,

22  KSE would have acquired the rights and obligations

23  of Outdoor.  Is that fair to say?

24       A.   Yes.

25       Q.   Including the right to terminate

CONFIDENTIAL

Page 97

1    negotiations with Mr. Salomon and PNC?

2        A.  Yes.

3        Q.  Okay.  Can I get you to turn to page 16?

4        A.  Okay.

5        Q.  Paragraph 58.  Excuse me, 55.  I'm sorry.

6        A.  Okay.

7        Q.  Mr. Salomon writes, "KSE willfully and

8    intentionally interfered with the term sheet's

9    exclusivity provision."  Do you see that?

10       A.  I do.

11       Q.  What's your reaction to that?

12       A.  Again, there's no willful intentional

13   interference on KSE's part with respect to the term

14   sheet.

15       Q.  Did KSE do anything in terms of attempting

16   to interfere with the term sheet between Outdoor,

17   PNC, and Mr. Salomon?

18       A.  No.

19       Q.  Mr. Salomon also writes that KSE induced or

20   caused Outdoor to breach its contractual obligations

21   to negotiate exclusively with PNC and plaintiff.

22          What's your reaction to that?

23       A.  Yeah, there -- that this is false.

24       Q.  And why do you say that?

25       A.  For the same reasons as before, there was

CONFIDENTIAL

Page 98

1   no -- basically in this case Outdoor Channel, in

2   connection with its potential sale of its stock, had

3   to go ahead and disclose everything.  There's --

4   this is nothing to do with sort of any breach of

5   contractual obligations.  There was no inducement

6   whatsoever.  So I -- yeah, it's false.

7       Q.  Is it fair to say -- and we've looked at

8   some documents already today -- that after

9   February 27, 2013, the date of the KSE offer,

10  Outdoor continued to negotiate with Mr. Salomon and

11  PNC?

12      A.  Yes.

13      Q.  We saw the draft asset purchase agreement,

14  for example?

15      A.  We did.

16      Q.  Did KSE at any point say to anybody from

17  Outdoor, Stop negotiating with Mr. Salomon and PNC?

18      A.  Not that I recall.

19      Q.  Mr. Salomon also writes, "KSE induced

20  Outdoor to discuss and negotiate the sale of the

21  Aerial Camera Business and grant KSE the right to

22  disapprove of the sale to plaintiff and PNC by

23  offering Outdoor upon information and belief

24  superior terms or other incentives."

25          Do you even understand what he's saying

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 20**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

EX-2.1 2 d501922dex21.htm EX-2.1

**Exhibit 2.1**

# AGREEMENT AND PLAN OF MERGER

## BY AND AMONG

## KROENKE SPORTS & ENTERTAINMENT, LLC,

## KSE MERGER SUB, INC.

### AND

## OUTDOOR CHANNEL HOLDINGS, INC.

### DATED AS OF MARCH 13, 2013

# AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of March 13, 2013 (this "Agreement"), is made by and among Kroenke Sports & Entertainment, LLC, a Delaware limited liability company ("Parent"), KSE Merger Sub, Inc., a Delaware corporation and a direct wholly-owned Subsidiary of Parent ("Merger Sub"), and Outdoor Channel Holdings, Inc., a Delaware corporation ("OUTD").

## W I T N E S S E T H :

WHEREAS, the members of Parent and the Board of Directors of each of Merger Sub and OUTD have approved the consummation of the business combination provided for in this Agreement, pursuant to which Merger Sub will merge with and into OUTD, with OUTD surviving (the "Merger"), whereby, upon the terms and subject to the conditions set forth herein, the shares of OUTD Common Stock will be converted into the right to receive the Merger Consideration;

WHEREAS, the members of Parent (the "Parent Members") have (i) determined that it is in the best interests of Parent and its members to enter into this Agreement and (ii) approved this Agreement and approved the execution, delivery and performance by Parent and Merger Sub of this Agreement and the consummation of the transactions contemplated hereby;

WHEREAS, the Board of Directors of OUTD (the "OUTD Board") has (i) determined that it is in the best interests of OUTD and its stockholders, and declared it advisable, to enter into this Agreement, (ii) approved this Agreement and approved the execution, delivery and performance by OUTD of this Agreement and the consummation of the transactions contemplated hereby, including the Merger, and (iii) resolved to recommend to OUTD's stockholders that they adopt this Agreement;

WHEREAS, the Board of Directors of Merger Sub has (i) determined that it is in the best interests of Merger Sub and its sole stockholder, and declared it advisable, to enter into this Agreement, (ii) approved this Agreement and approved the execution, delivery and performance by Merger Sub of this Agreement and the consummation of the transactions contemplated hereby, including the Merger and (iii) resolved to recommend to its sole stockholder that it approve the Merger and adopt this Agreement; and

WHEREAS, as a condition and inducement to Parent entering into this Agreement and incurring the obligations set forth herein, certain stockholders of OUTD concurrently with the execution and delivery of this Agreement, have entered into a Support Agreement, in the form attached as Exhibit A (as amended or modified from time to time in accordance with its terms, the "Support Agreement").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

# ARTICLE I

## THE MERGER

Section 1.1. <u>The Merger</u>.

(a) At the Effective Time, Merger Sub shall be merged with and into OUTD in accordance with the DGCL, and upon the terms set forth in this Agreement, whereupon the separate existence of Merger Sub shall cease and OUTD shall be the surviving corporation (the "<u>Surviving Corporation</u>").

(b) As soon as practicable on the Closing Date, the parties shall file a certificate of merger, certified by the Secretary of OUTD in accordance with the DGCL (the "<u>Merger Filing</u>"), with the Delaware Secretary of State and make all other filings or recordings required by the DGCL in connection with the Merger. The Merger shall become effective at the Effective Time. As used herein, the term "<u>Effective Time</u>" means the time set forth in the Merger Filing in accordance with the DGCL.

(c) From and after the Effective Time, the Merger shall have the effects set forth in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, the Surviving Corporation shall possess all the rights, powers, privileges and franchises and be subject to all of the obligations, liabilities, restrictions and disabilities of OUTD and Merger Sub, all as provided under the DGCL.

Section 1.2. <u>Closing</u>. The closing of the Merger (the "<u>Closing</u>") shall take place at 10:00 a.m., prevailing Eastern time, on a date to be specified by the parties, which shall be no later than the second Business Day after satisfaction or (to the extent permitted by applicable Law) waiver of all of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, it being understood that the occurrence of the Closing shall remain subject to the satisfaction or (to the extent permitted by applicable Law) waiver of such conditions at the Closing) at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, unless another time, date or place is agreed to in writing by the parties hereto). The date on which the Closing occurs is referred to herein as the "<u>Closing Date</u>."

Section 1.3. <u>Organizational Documents</u>. At the Effective Time, (i) the certificate of incorporation of OUTD in effect immediately prior to the Effective Time shall be amended by virtue of the Merger to be in a form reasonably acceptable to OUTD and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law, and (ii) the by-laws of OUTD shall be amended by virtue of the Merger to be in a form reasonably acceptable to OUTD and, as so amended, shall be the by-laws of the Surviving Corporation, until thereafter changed or amended as provided therein, in the certificate of incorporation of Merger Sub or by applicable Law.

Section 1.4. <u>Board Composition; Officers</u>. The directors of Merger Sub immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation and the officers of Merger Sub immediately prior to the Effective Time shall be the initial officers of the

-2-

Surviving Corporation, each to hold office in accordance with the certificate of incorporation and by-laws of the Surviving Corporation.

## ARTICLE II

### EFFECTS OF THE MERGERS ON THE CAPITAL STOCK
### OF OUTD; EXCHANGE OF CERTIFICATES

Section 2.1. Effect on OUTD Capital Stock. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any action on the part of Parent, Merger Sub, OUTD or the holders of any shares of OUTD Common Stock:

(a) Conversion of OUTD Common Stock. Each share of OUTD Common Stock issued and outstanding immediately prior to the Effective Time, other than any shares of OUTD Common Stock to be cancelled pursuant to Section 2.1(b) and Dissenting Shares, will be automatically converted into and will thereafter represent the right to receive $8.75 in cash, without interest (the "Merger Consideration"). From and after the Effective Time, the OUTD Common Stock converted into the Merger Consideration pursuant to this Section 2.1(a) will no longer remain outstanding and will automatically be cancelled and will cease to exist, and each holder of a certificate previously representing any such OUTD Common Stock or shares of OUTD Common Stock that are in non-certificated book-entry form (either case being referred to in this Agreement, to the extent applicable, as an "OUTD Certificate") will thereafter cease to have any rights with respect to such OUTD Common Stock except the right to receive the Merger Consideration.

(b) Cancellation of Certain Shares of OUTD Common Stock. Each share of OUTD Common Stock held by OUTD as treasury stock, each share of OUTD Common Stock held by any direct or indirect Subsidiary of OUTD, and each share of OUTD Common Stock owned by Parent, Merger Sub or any direct or indirect Subsidiary thereof, in each case as of immediately prior to the Effective Time, automatically shall be cancelled and cease to exist without any conversion thereof, and no consideration shall be paid with respect thereto.

(c) Notwithstanding any provision of this Agreement to the contrary, if and to the extent required by the DGCL, shares of OUTD Common Stock which are issued and outstanding immediately prior to the Effective Time and which are held by holders of such shares of OUTD Common Stock who have properly exercised appraisal rights with respect thereto (the "Dissenting Shares") in accordance with Section 262 of the DGCL, will not be converted into the right to receive the Merger Consideration, and holders of such Dissenting Shares will be entitled to receive in lieu of the Merger Consideration payment of the appraised value of such Dissenting Shares determined in accordance with the provisions of Section 262 of the DGCL unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to appraisal and payment under the DGCL. If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares will thereupon be treated as if they had been converted into and to have become exchangeable for, at the Effective Time, the right to receive the Merger Consideration, without any interest thereon. Notwithstanding anything to the contrary contained in this Section 2.1(c), if this Agreement is terminated prior to the Effective Time, then the right of any stockholder to be paid the fair value of such stockholder's

-3-

Dissenting Shares pursuant to Section 262 of the DGCL will cease. OUTD will give Parent (i) prompt notice of any written demands received by OUTD for appraisal of Dissenting Shares, withdrawals of such demands and any other instruments served pursuant to the DGCL which are received by OUTD relating to such holder's rights of appraisal, and (ii) the opportunity to direct all negotiations and proceedings with respect to demands for appraisal under the DGCL. OUTD will not, except with the prior written consent of Parent (not to be unreasonably withheld, conditioned or delayed), make any payment with respect to any demand for appraisal or offer to settle or settle any such demands, and Parent will not commit to make any such payment or enter into any such settlement prior to the Effective Time without the prior written consent of OUTD.

(d) If after the date hereof and prior to the Effective Time, OUTD pays a stock dividend in, splits, combines into a smaller number of shares, or issues by reclassification any shares of OUTD Common Stock, then the Merger Consideration and any other similarly dependent items, as the case may be, will be appropriately adjusted to provide to the holders of the OUTD Common Stock the same economic effect as contemplated by this Agreement prior to such action, and as so adjusted will, from and after the date of such event, be the Merger Consideration or other dependent item, as applicable, subject to further adjustment in accordance with this provision.

Section 2.2. Surrender and Payment.

(a) Prior to the Effective Time, Parent will appoint an exchange agent reasonably acceptable to OUTD (the "Exchange Agent") for the purpose of exchanging OUTD Certificates for Merger Consideration. As soon as reasonably practicable after the Effective Time, but in no event more than two Business Days following the Effective Time, Parent will send, or will cause the Exchange Agent to send, to each holder of record of shares of OUTD Common Stock, whose shares of OUTD Common Stock were converted into the right to receive the Merger Consideration, a letter of transmittal (which will specify that the delivery will be effected, and risk of loss and title will pass, only upon proper delivery of the OUTD Certificates (or effective affidavits of loss in lieu thereof) to the Exchange Agent) in such form as Parent and OUTD may reasonably agree, including instructions for use in effecting the surrender of OUTD Certificates (or effective affidavits of loss in lieu thereof) to the Exchange Agent in exchange for the Merger Consideration.

(b) At or prior to the Effective Time, Parent will cause to be deposited with the Exchange Agent, in trust for the benefit of the holders of shares of OUTD Common Stock, an amount of cash sufficient to be paid pursuant to Section 2.1, payable upon due surrender of the OUTD Certificates (or effective affidavits of loss in lieu thereof) pursuant to the provisions of this Article II. All cash deposited with the Exchange Agent is referred to in this Agreement as the "Exchange Fund." The Exchange Agent will, pursuant to irrevocable instructions, deliver the Merger Consideration out of the Exchange Fund. The Exchange Fund will not be used for any other purpose. The Exchange Agent will invest any cash included in the Exchange Fund as directed by Parent; provided, that no such investment or losses thereon will affect the Merger Consideration payable to holders of shares of OUTD Common Stock entitled to receive such consideration and Parent will promptly cause to be provided additional funds to the Exchange Agent for the benefit of holders of shares of OUTD Common Stock entitled to receive such consideration

-4-

in the amount of any such losses. Any interest and other income resulting from such investments will be the property of, and paid to, Parent.

(c) Each holder of shares of OUTD Common Stock that have been converted into the right to receive the Merger Consideration, upon surrender to the Exchange Agent of an OUTD Certificate (or effective affidavits of loss in lieu thereof), together with a properly completed letter of transmittal, duly executed and completed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Exchange Agent, will be entitled to receive in exchange therefor a check in the amount that such holder has the right to receive in cash, pursuant to Section 2.1 and this Article II. The Merger Consideration will be paid as promptly as practicable (by mail or, to the extent commercially practicable, made available for collection by hand if so elected by the surrendering holder of an OUTD Certificate) after receipt by the Exchange Agent of the OUTD Certificate and letter of transmittal in accordance with the foregoing, and in any event no later than three Business Days following the later to occur of (i) the Effective Time, and (ii) the Exchange Agent's receipt of the OUTD Certificate and letter of transmittal in accordance with the foregoing. No interest will be paid or accrued on any Merger Consideration or on any unpaid dividends and distributions payable to holders of OUTD Certificates.

(d) If any cash payment is to be made to a Person other than the Person in whose name the applicable surrendered OUTD Certificate is registered, it will be a condition of such payment that (i) the surrendered OUTD Certificate will be properly endorsed or otherwise be in proper form for transfer and (ii) the Person requesting such payment will pay any transfer or other similar Taxes required by reason of the making of such cash payment to a Person other than the registered holder of the surrendered OUTD Certificate or will establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable.

(e) After the Effective Time, there will be no further registration of transfers of shares of OUTD Common Stock. From and after the Effective Time, the holders of OUTD Certificates representing shares of OUTD Common Stock outstanding immediately prior to the Effective Time will cease to have any rights with respect to such shares of OUTD Common Stock except as otherwise provided in this Agreement or by applicable Law. If, after the Effective Time, OUTD Certificates are presented to the Exchange Agent or Parent, they will be cancelled and exchanged for the consideration provided for, and in accordance with the procedures set forth in this Article II. Notwithstanding anything to the contrary contained in this Agreement, the Surviving Corporation is obligated to pay any dividends or make any other distributions with a record date prior to the Effective Time which may have been declared or made by OUTD on shares of OUTD Common Stock in accordance with the terms of this Agreement prior to the date hereof and which remain unpaid at the Effective Time.

(f) Any portion of the Exchange Fund that remains unclaimed by the holders of shares of OUTD Common Stock one year after the Effective Time will be returned to Parent, upon demand, and any such holder who has not exchanged his or her shares of OUTD Common Stock for the Merger Consideration in accordance with this Article II prior to that time will thereafter look only to Parent for delivery of the Merger Consideration in respect of such holder's shares of OUTD Common Stock. Notwithstanding the foregoing, none of Parent, Merger Sub, the Surviving Corporation or OUTD will be liable to any holder of shares of OUTD Common

-5-

Stock for any Merger Consideration delivered to a public official pursuant to applicable abandoned property Laws. Any Merger Consideration remaining unclaimed by holders of shares of OUTD Common Stock immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Authority will, to the extent permitted by applicable Laws, become the property of Parent free and clear of any claims or interest of any Person previously entitled thereto.

(g) Parent and the Exchange Agent shall be entitled to deduct and withhold from any consideration payable pursuant to this Agreement to any Person who was a holder of OUTD Common Stock immediately prior to the Effective Time such amounts as Parent or the Exchange Agent is required to deduct and withhold with respect to the making of such payment under the Code or any other provision of federal, state, local or foreign Tax Law. To the extent that amounts are so withheld (and paid to the applicable Governmental Authority) by Parent or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom such consideration would otherwise have been paid.

(h) In the event any OUTD Certificates shall have been lost, stolen or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen or destroyed OUTD Certificates, upon the making of an affidavit of that fact by the holder thereof, such Merger Consideration as may be required pursuant to Section 2.1; provided, however, that Parent may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed OUTD Certificates to deliver an agreement of indemnification in form reasonably satisfactory to Parent, or, if reasonably required by Parent, a bond in such reasonable sum as Parent may direct, as indemnity against any claim that may be made against Parent or the Exchange Agent in respect of OUTD Certificates alleged to have been lost, stolen or destroyed.

Section 2.3. OUTD Equity Awards.

(a) At the Effective Time, each option to purchase OUTD Common Stock (each, an "OUTD Stock Option") outstanding immediately prior to the Effective Time granted under any equity or equity-based compensation plan or arrangement of OUTD (each, an "OUTD Incentive Plan"), whether vested or unvested, by virtue of the Merger and without any action by Parent, Merger Sub, OUTD or the holder of that OUTD Stock Option, shall be canceled and converted into the right to receive from Parent or the Surviving Corporation an amount in cash, without interest, equal to the product of (x) the excess, if any, of the Merger Consideration over the per share exercise price of such OUTD Stock Option and (y) the number of shares of OUTD Common Stock subject to such OUTD Stock Option.

(b) At the Effective Time, each restricted share of OUTD Common Stock and each other equity award (other than an OUTD Stock Option) entitling the holder thereof to acquire OUTD Common Stock pursuant to the OUTD Incentive Plan (each, an "OUTD Equity Award") outstanding immediately prior to the Effective Time, by virtue of the Merger and without any action by Parent, Merger Sub, OUTD or the holder of that OUTD Equity Award, (A) shall become vested to the extent not already vested and (B) shall be canceled and converted into the right to receive from Parent or the Surviving Corporation an amount in cash, without interest, equal to the product of (x) Merger Consideration and (y) the number of shares of OUTD Common Stock subject to such OUTD Equity Award.

-6-

(c) The payment of the amounts set forth in Section 2.3(a) and Section 2.3(b) in respect of the OUTD Stock Options and OUTD Equity Awards shall be reduced by any Tax withholding required under the Code or any applicable state, local or foreign Tax Law. To the extent that any amounts are so withheld and paid to the appropriate taxing authorities, those amounts shall be treated as having been paid to the holder of that OUTD Stock Option or OUTD Equity Award for all purposes under this Agreement.

(d) Prior to the Effective Time, the OUTD Board (or, if appropriate, any committee administering the OUTD Incentive Plan) shall adopt such resolutions or take such other actions as may be required to effect the foregoing.

Section 2.4. <u>Merger Sub Common Stock</u>. At the Effective Time, each share of capital stock of Merger Sub issued and outstanding prior to the Effective Time shall be cancelled and extinguished and converted into one validly issued, fully paid and non-assessable share of common stock of the Surviving Corporation.

Section 2.5. <u>Closing Actions</u>. At or prior to the Closing, Parent shall deliver to the Exchange Agent an amount of cash sufficient to be issued and paid pursuant to Section 2.1.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF OUTD

Except as set forth in the OUTD Disclosure Schedule or in the OUTD SEC Reports filed prior to the date of this Agreement (excluding any disclosure included in any such OUTD SEC Report that is predictive or forward-looking in nature and excluding any risk factor and similar cautionary statement), OUTD represents and warrants to Parent and Merger Sub that all of the statements contained in this Article III are true and correct. Each disclosure set forth in the OUTD Disclosure Schedule is identified by reference to, or has been grouped under a heading referring to, a specific individual section of this Agreement for convenience of reference only, and shall be deemed a qualification or exception to such section and any other section of the OUTD Disclosure Schedule (other than Section 3.5(c)) to which its applicability is reasonably apparent on the face of such disclosure regardless of whether or not such other section is specifically referenced.

Section 3.1. <u>Organization, Standing and Corporate Power; Charter Documents; Subsidiaries</u>.

(a) <u>Organization, Standing and Corporate Power</u>. Each of OUTD, its "significant subsidiaries" (as such term is used in Rule 1-02 of Regulation S-X of the Exchange Act) (the "<u>OUTD Significant Subsidiaries</u>") and except as, individually or in the aggregate, has not had and would not reasonably be expected to have an OUTD Material Adverse Effect, each of the OUTD Subsidiaries (other than the OUTD Significant Subsidiaries), is a corporation or other legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of the jurisdiction in which it is incorporated or otherwise organized, and has all requisite corporate (or other entity) power and authority to own, lease and operate its properties and assets and to carry on its business as currently conducted.

-7-

https://www.sec.gov/Archives/edgar/data/760326/000119312513105368/d501922dex21.htm

Section 9.8. <u>Governing Law</u>. This Agreement and any claim, controversy or dispute arising under or related thereto, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in Law or in equity, in contract, tort or otherwise, shall be governed by, and construed and interpreted in accordance with, the Laws of the State of Delaware, without regard to its rules regarding conflicts of Law to the extent that the application of the Laws of another jurisdiction would be required thereby.

Section 9.9. <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of Law or otherwise by either of the parties hereto without the prior written consent of the other party, provided that either of Parent or Merger Sub may assign any of its respective rights and obligations to any Affiliate of Parent, provided however that no such assignment shall relieve Parent or Merger Sub, as the case may be, of its obligations hereunder. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding two sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

Section 9.10. <u>Consent to Jurisdiction</u>. Each of the parties hereto hereby irrevocably agrees that any legal action or proceeding with respect to this Agreement or the Transaction, or for recognition and enforcement of any judgment in respect of this Agreement or the Transaction and obligations arising hereunder brought by any other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or the Transaction in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement or the Transaction, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve in accordance with this Section 9.10, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper or (iii) this Agreement or the Transaction or the subject matter hereof, may not be enforced in or by such courts.

Section 9.11. <u>Effect of Disclosure</u>. The disclosure of any matter in OUTD Disclosure Schedule or the Parent Disclosure Schedule shall expressly not be deemed to constitute an admission by OUTD or Parent, respectively, or to otherwise imply, that any such matter is material for the purpose of this Agreement.

Section 9.12. <u>Severability</u>. If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of Law or public policy by a court of competent jurisdiction, all other conditions and provisions of this Agreement shall

-59-

nevertheless remain in full force and effect, insofar as the foregoing can be accomplished without materially affecting the economic benefits anticipated by the parties to this Agreement. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the Transaction is fulfilled to the extent possible.

Section 9.13. <u>Waiver and Amendment; Remedies Cumulative</u>. Subject to applicable Law, (a) any provision of this Agreement (other than Section 7.1(a)) or any inaccuracies in the representations and warranties of any of the parties or compliance with any of the agreements or conditions contained in this Agreement may be waived or (b) the time for the performance of any of the obligations or other acts of the parties here may be extended at any time prior to Closing. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of the party against whom waiver is sought; provided, that any extension or waiver given in compliance with this Section 9.13 or failure to insist on strict compliance with an obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Subject to applicable Law, any of the provisions of this Agreement (other than Section 7.1(a) and the first sentence of this Section 9.13) may be amended at any time, whether before or after the receipt of the OUTD Stockholder Approval, by the mutual written agreement of Parent and OUTD; provided, however, that after the OUTD Stockholder Approval has been obtained, no such amendment shall be made which by law requires further stockholder approval without such approval. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or of any other right.

Section 9.14. <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION OR THE ACTIONS OF PARENT, OUTD OR MERGER SUB IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT.

Section 9.15. <u>Specific Performance</u>.

(a) The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at Law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached by any party. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches and/or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any federal court located in the State of Delaware or in Delaware state court, this being in addition to any other remedy to which they are entitled to at Law or in equity.

-60-

(b) Notwithstanding the parties' rights to specific performance or injunctive relief pursuant to this Section 9.15(a), each party may pursue any other remedy available to it at Law or in equity, including monetary damages.

Section 9.16. <u>Other</u>. In the event of a dispute between any of the parties hereto with respect to obligations under this Agreement, the prevailing party in any action or proceeding in connection therewith shall be entitled to recover from such other party its costs and expenses incurred in connection with such action or proceeding, including, without limitation, reasonable legal fees and associated costs.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-61-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, all as of the date first written above.

**KROENKE SPORTS & ENTERTAINMENT, LLC**

By:    /s/ James A. Martin
Name:  James A. Martin
Title:    President and Chief Executive Officer

**KSE MERGER SUB, INC.**

By:    /s/ James A. Martin
Name:  James A. Martin
Title:  President

**OUTDOOR CHANNEL HOLDING, INC.**

By:    /s/ Perry T. Massie
Name:  Perry T. Massie
Title:  Co-Chairman of the Board of Directors

[Signature Page to Agreement and Plan of Merger]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 21**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| **From:** | Tim McQuay <Tmcquay@noblefinancialgroup.com> |
| **Sent:** | Tuesday, March 05, 2013 9:43 AM |
| **To:** | Jeff Holowaty (jdholowaty@yahoo.com); Kelly Holowaty (kelly.holowaty@pacificnc.com); Nic Salomon |
| **Cc:** | Robert Campbell; Francisco Penafiel |
| **Subject:** | RE: Aerial cameras |
| **Attachments:** | AC Asset Purchase Agreement 3-5-13.doc |

Gentlemen, attached is the Asset Purchase Agreement.  Please give us your comments.

Thanks.

Tim McQuay

**From:** Tim McQuay
**Sent:** Monday, March 04, 2013 5:41 PM
**To:** Jeff Holowaty (jdholowaty@yahoo.com); Kelly Holowaty (kelly.holowaty@pacificnc.com); Nic Salomon (nic.salomon@cablecam.com)
**Cc:** Robert Campbell; Francisco Penafiel
**Subject:** Aerial cameras

We just spoke with the OUTD senior management.  They expect to have an asset purchase agreement (APA) to you by tomorrow.  Also, Nic has the majority of the additional information you requested.

We will send you the APA when we receive it.

**Tim McQuay**
**Managing Director, Investment Banking**
Noble Financial Capital Markets
355 South Grand Ave Suite 1750
Los Angeles, CA
http://www.noblefcm.com
Email: tmcquay@noblefcm.com
Direct Line: (213) 233-1521
Cell:(818) 406-6118

 



1

**CONFIDENTIAL**

KSE/OC:036080

App. 294

**ASSET PURCHASE AGREEMENT**

among:

**SKYCAM, LLC,**
a Delaware limited liability company

**CABLECAM, LLC,**
a Delaware limited liability company;

and

**PURCHASER, INC.,**
a _____ corporation

Dated as of March __, 2013

**CONFIDENTIAL**

KSE/OC:036081

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of March __, 2013, by and among: CABLECAM, LLC, a Delaware corporation ("*CableCam*"), SKYCAM, LLC, a Delaware corporation ("*SkyCam*" and together with CableCam, the "*Sellers*") and _____, a _____ corporation (the "*Purchaser*"). Certain capitalized terms used in this Agreement are defined in Exhibit A.

## RECITALS

A.      SkyCam owns certain assets used in its business of developing, operating, leasing, marketing, manufacturing and otherwise operating SkyCam's aerial camera suspension system (collectively, the "*SkyCam Business*").

B.      CableCam owns certain assets used in its business of developing, operating, leasing, marketing, manufacturing and otherwise operating CableCam's aerial camera suspension system (collectively, the "*CableCam Business*" and together with the SkyCam Business, the "*Businesses*").

C.      Each of the Sellers desire to sell substantially of its assets to the Purchaser and the Purchaser desires to purchase all or substantially all of the assets and operations of each of the Sellers, and assume certain specified liabilities of each Seller, as they pertain to the Purchased Assets (as defined herein) as of the Closing date (as defined herein) on the terms set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein and for good and valuable consideration, the parties to this Agreement, intending to be legally bound, agree as follows:

**1. SALE OF ASSETS; RELATED TRANSACTIONS.**

1.1 **Sale of Assets.** The Seller shall cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, at the Closing (as defined below), good and valid title to the Purchased Assets (as defined below), free of any Encumbrances, on the terms and subject to the conditions set forth in this Agreement. For purposes of this Agreement, "*Purchased Assets*" shall mean and include all of the following assets of the Sellers (excluding those assets excluded from this sale pursuant to Section 1.2):

(a) The "*SkyCam Assets*," which shall include, without limitation:

(i) all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the SkyCam System;

CONFIDENTIAL

KSE/OC:036082

(ii) all rights, titles and interests that SkyCam has or may have to Intellectual Property, including without limitation, the Intellectual Property owned, used, useful or developed in connection with the ownership of the SkyCam System and the operation of the SkyCam Business (the "*SkyCam Intellectual Property*"). The SkyCam Intellectual Property is set forth on Schedule 1.1(a)(ii).

(iii) the Actioncam Claim, as further contemplated in Section 5.3 herein;

(iv) all of SkyCam's rights in and to certain computer software used in the SkyCam Business, including but not limited to source and object codes for operating and controlling all aspects of the SkyCam System;

(v) all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the SkyCam System;

(vi) all real estate leasehold interests set forth in the Leases;

(vii) the contracts to which SkyCam is a party or beneficiary as listed on Schedule 1.1(a)(vi) ("*SkyCam Contracts*").

(viii) all other property, equipment, rights, interests, claims and assets which are related to, used or useful in connection with the operation of the SkyCam Business or the ownership, maintenance, development, exploitation or improvement of the SkyCam System.

(b) The "CableCam Assets," which shall include, without limitation:

(i) all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the CableCam System;

(ii) all rights, titles and interests that CableCam has or may have to Intellectual Property, including without limitation, Intellectual Property owned, used, useful or developed in connection with the ownership of the CableCam System and the operation of the CableCam Business (the "*CableCam Intellectual Property*"). The CableCam Intellectual Property is set forth on Schedule 1.1(b)(ii).

(iii) all of CableCam's rights in and to certain computer software used in the CableCam Business, including but not limited to source and object codes for operating and controlling all aspects of the CableCam System;

(iv) all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the CableCam System;

2

**CONFIDENTIAL**

**KSE/OC:036083**

(v) the contracts to which CableCam is a party listed on <u>Schedule 1.1(b)(v)</u> ("*CableCam Contracts*" and together with SkyCam Contracts, the "*Seller Contracts*")

(vi)   all other property, equipment, rights, interests, claims and assets which are related to, used or useful in connection with the operation of the CableCam Business or the ownership, maintenance, development, exploitation or improvement of the CableCam System.

**1.2**    **Excluded Assets.**  Other than the Purchased Assets, no other asset of any of the Sellers shall be transferred and sold to Purchaser pursuant to this Agreement, including, without limitation, the following (the "*Excluded Assets*"):

(a)  all rights that accrue or will accrue to any Seller under this Agreement;

(b)  Inventory and supplies used in connection with the Businesses which are disposed of in the ordinary course of business prior to the Closing Date;

(c)  Sellers' corporate record books containing minutes of meetings of the management committee and meetings of members and such other records as have to do exclusively with Sellers' organization or stock capitalization not related primarily to the Businesses;

(d)  all of the Sellers' rights to refunds of all or any part of any Taxes paid by Seller prior to, at or after the Closing Date;

(e)  all of the Sellers' Tax Returns;

(f)  all  documents relating to the formation, capitalization and borrowings of the Sellers; and all other financial records of the Sellers which do not relate exclusively to the Sellers' ownership and operation of the CableCam Assets, the SkyCam Assets or the Businesses;

(g)  all of Seller's Accounts Receivable and cash on hand, in bank accounts or otherwise as of the Closing Date; and

(h)  any other assets set forth on <u>Schedule 1.2(h).</u>

**1.3 Purchase Price, Payment and Related Matters.**

(a)     The total purchase price ("*Purchase Price*") for the Purchased Assets shall be up to \$4,050,000 and shall be comprised of (i) \$3,650,000 cash; (ii) the McAfee Injunction Success Fee; and (iii) the Royalty described in <u>Section 5.4</u> hereof.

(b) The Purchase Price shall be adjusted ("*Purchase Price Adjustments*") as follows:

(i) any deferred revenue received by the Sellers but not yet recognized or earned by the Sellers shall be deducted from the Purchase Price at Closing ("*Deferred Revenue*") as set forth on <u>Schedule 1.3(b)(i)</u>;

3

       (ii) any and all expenses prepaid by the Sellers relating to services to be rendered to Businesses after the Closing Date shall be added to the Purchase Price;

       (iii) the McAfee Injunction Success Fee, if paid by the Sellers or OUTD before the Closing Date, shall be added to the Purchase Price;

       (iv) working capital in the amount of $200,000, to be provided by Sellers, shall be deducted from the Purchase Price; and

       (v) Any Extraordinary Capital Expenditures shall be added to the Purchase Price.

    (c)    As consideration for the sale of the Assets to the Purchaser:

       (i) at the Closing, the Purchaser shall pay the Purchase Price after effecting the Purchase Price Adjustments, to the Sellers or its designated designee for the Assets and the Assumed Liabilities;

       (ii) at the Closing, the Purchaser shall assume the Assumed Liabilities by delivering to the Seller an Assumption Agreement in substantially the form of Exhibit B (the "*Assumption Agreement*").

    (d)    For purposes of this Agreement "Assumed Liabilities" shall mean only the following liabilities of the Sellers:

       (i) all accounts payable of the each of the Sellers that arose from bona fide transactions entered into in the Ordinary Course of Business that relate to services rendered after the Closing Date;

       (ii) the obligations arising on or after the Closing Date of each of the Sellers under the SkyCam Contracts and the CableCam Contracts as identified on Schedule 1.1(a)(vii) and Schedule 1.1(b)(vii) to the Agreement, including expressly the Leases;

       (iii) all obligations of OUTD under the McAfee Agreement, including payment of the McAfee Injunction Success Fee if such fee has not already been paid by OUTD prior to Closing;

       (iv) any Liability to any employee or former employee of the Sellers under or with respect to any Employee Benefit Plan or for severance pay that arises in connection with the consummation of this transaction or arises from a termination after Closing;

       (v) All of the liabilities and obligations of Sellers arising under Seller Contracts, solely to the extent such obligations and liabilities arise and relate to events, acts or omissions occurring after the Closing Date and become due and payable after the Closing;

<div align="center">4</div>

**CONFIDENTIAL**

KSE/OC:036085

*provided, however,* that notwithstanding the foregoing, and notwithstanding anything to the contrary contained in this Agreement, the "Assumed Liabilities" shall not include, and the Purchaser shall not be required to assume or to perform or discharge:

(A) any Liability of the Sellers associated with the Broken Arrow Lease;

(B) any Liability of any other Person, except for the Sellers;

(C) any Liability of the Sellers arising out of or relating to the execution, delivery or performance of any of the Transactional Agreements;

(D) any Liability of the Sellers for any fees, costs or expenses of the type referred to in Section 6.3 (Expense of Sale) of Agreement;

(E) any Liability of the Seller arising from or relating to any action taken by the Seller, or any failure on the part of the Seller to take any action, at any time after the Closing Date; and

(F) any Liability of the Seller for the payment of any Taxes incurred or assessable prior to the Closing Date.

**1.4    Sales and Use Tax**. Purchaser shall be responsible for all sales and use taxes, if any, arising out of the sale of the Purchased Assets to Purchaser pursuant to this Agreement. Purchaser hereby waives compliance by Sellers with the provisions of the bulk transfer laws of any state.

**1.5    Allocation.** No later than 90 days after the Closing Date, Purchaser shall provide to the Sellers a statement allocating the Purchase Price among the Purchased Assets of the Businesses. If the Sellers disagree with Purchaser's calculation of the Purchase Price allocation, the Sellers may, within 15 days after delivery of Purchaser's calculation of the Purchase Price allocation, deliver a notice to Purchaser disagreeing with such calculation and setting forth Sellers' proposed Purchase Price allocation. Sellers and Purchaser shall, during the 15 day period following delivery of Sellers' notice of disagreement, use their reasonable best efforts to resolve such dispute and reach a mutually agreed Purchase Price allocation. The parties shall (i) prepare and, where applicable, file each report relating to the federal, state, local, foreign and other Tax consequences of the purchase and sale contemplated hereby (including the filing of IRS Form 8594 where relevant) in a manner consistent with their mutually agreed allocation (or, if no such agreement is reached in accordance with this Section 1.5, in accordance with an allocation determined in the Purchaser or either Seller's sole discretion) and (ii) take no position in any Tax Return or other Tax filing, proceeding, audit or otherwise which is inconsistent with such allocation, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code or pursuant to any analogous foreign legislation.

**1.6    Closing.**

(a)    The closing of the purchase and sale contemplated by in this Agreement (herein called the "**_Closing_**") is occurring simultaneously with the execution and delivery of this

5

**CONFIDENTIAL**

**KSE/OC:036086**

Agreement on the date hereof (the "*Closing Date*"). The Closing shall be held at the offices of SkyCam and CableCam, or at such other place as may be agreed to by Purchaser and the Sellers.

(b) At the Closing:

(i) Sellers shall execute and deliver to the Purchaser a bill of sale duly executed by each Seller, substantially in the form of Exhibit C;

(ii) Purchaser shall pay to the Sellers the Purchase Price, adjusted for any Purchase Price Adjustments, payable by cashier's check or wire transfer as contemplated by Section 1.3(b);

(iii) the Purchaser shall execute and deliver to the Seller the Assumption Agreement which includes expressly, the assumption of the McAfee Agreement by Purchaser;

(iv) the Purchaser shall obtain and deliver to the Seller a fully executed Release from the applicable landlord, releasing OUTD from the Parent Guarantees and from any liabilities associated with the Leases, in a form mutually acceptable to the Parties;

(v) all employees of Sellers shall be terminated and shall become employed by Purchaser (each, a "*Continuing Employee*") and all employees of Sellers shall cease participation in Seller Benefit Plans;

(vi) the Purchaser shall have obtained employee benefit plans and insurance with sufficient coverage to permit the Purchaser to conduct the Businesses in substantially the same manner following the Closing Date, as was conducted by the Sellers prior to the Closing Date.

## 2.    REPRESENTATIONS AND WARRANTIES OF THE SELLER.

Each Seller, jointly and severally, hereby represents and warrants, subject to such exceptions as are specifically disclosed in writing (and that reference the specific representation that they qualify) in the disclosure schedule supplied by each Seller to Purchaser, as follows:

**2.1. Due Organization; No Subsidiaries; Etc.**  Such Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Such Seller has all requisite corporate authority and power to (1) own the Assets, (2) carry on the Businesses, and (3) execute and deliver this Agreement and consummate the transactions contemplated hereby and thereby. Such Seller has all material licenses, permits and other similar regulatory approvals or authorizations to own the Assets and conduct its business, as presently owned and conducted. Such Seller is duly qualified and in good standing in each of the jurisdictions in which it is required by the nature of its businesses or the ownership of the Assets to so qualify, except where the failure to be so qualified would not have a Material adverse effect on such Seller.

6

CONFIDENTIAL                    KSE/OC:036087

**2.2.    Title to Assets.** Such Seller owns, and has good and valid title to, all the SkyCam Assets and CableCam Assets, as applicable and purported to be owned by it. The Purchased Assets include all tangible and intangible assets and rights that are used or held for use in the operation or conduct of the Businesses, and are sufficient for the conduct of the Businesses by the Purchaser following the Closing in substantially the same manner as conducted by such Seller prior to the Closing Date.

**2.3.    Breach.** Neither the execution nor delivery of this Agreement by such Seller nor the consummation of the transactions contemplated hereby will cause such Seller to be in breach of any of the material terms or conditions of such Seller's organizational documents or any other agreement, contract, lease, license, instrument or commitment of such Seller.

**2.4.    Enforceability of Agreement.** This Agreement constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by general equitable principles, bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

**2.5.    Required Consents; No Violation of Law.** Except as set forth in Schedule 2.5, such Seller is not or will not be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with the execution and delivery of any of the Transactional Agreements or the consummation or performance of any of the Transactions. Such Seller has not violated any presently applicable federal, state, local foreign law, statute, order, rule or regulation, injunction, judgment or decree relating to the operation, conduct or ownership of the Assets or the business of such Seller.

**2.6.    Real Property.** The Leases constitute all of the interests in real property held for use in connection with, necessary for the conduct of, or otherwise material to such Seller's Businesses. There are no eminent domain or other similar proceedings pending or, to any such Seller's Knowledge, threatened affecting any portion of the real property currently under lease. There is no writ, injunction, decree, order or judgment outstanding nor any action, claim, suit or proceeding, pending or, to any such Seller's Knowledge, threatened, relating to the lease, use, occupancy or operation by any Person of any such real property. The use and operation of the leased real property in the present conduct of such Seller's Businesses do not violate in any material respect any instrument or agreement affecting such real property. There is no violation of any covenant, condition, restriction, easement or order of any governmental authority having jurisdiction over such property or of any other Person entitled to enforce the same affecting such real property or the use or occupancy thereof.

**2.7.    Litigation and Related Matters.** Except as set forth on Schedule 2.7, there are no legal, administrative, arbitration, investigatory, injunctive or other proceedings, or any other claims or controversies, pending or, to the best knowledge of such Seller, threatened against such Seller or relating in any manner to the Purchased Assets.

**2.8.    Contracts.** Such Seller is not in default under any Material Seller contract to which it is a party, and to such Seller's Knowledge, the other parties thereto are not in default and are valid and binding obligations of the parties thereto, in accordance with their terms.

7

**CONFIDENTIAL**                    **KSE/OC:036088**

**2.9.   Financial Condition**.

(a)      Financial Statements.  Schedule 2.9(a) sets forth the Seller Balance Sheet and the related statements of income and retained earnings for the period then ended.  The Seller Balance Sheet and the related statements of income and retained earnings (i) were prepared in accordance with GAAP; (ii) fairly present in all material respects such Seller's financial condition and the results of its operations as of the relevant dates thereof and for the periods covered thereby; (iii) contain and reflect all necessary adjustments and accruals for a fair presentation in all material respects of such Seller's financial condition and the results of its operations for the periods covered by said financial statements; (iv) contain and reflect adequate provisions for all reasonably anticipated liabilities for all Taxes, with respect to the period then ended and all prior periods; and (v) with respect to contracts and commitments for the sale of goods or the provision of services by such Seller, contain and reflect in all material respects adequate reserves for all reasonably anticipated material losses and costs and expenses in excess of expected receipts.

(b)      No Undisclosed Liabilities.  Except for (i) those liabilities specifically accrued or reserved against on the Seller Balance Sheet, (ii) those current liabilities for trade or business obligations incurred since the Seller Balance Sheet Date in the ordinary course of the business and consistent with past practices or (iii) those liabilities arising under Seller Contracts, Seller has, as of the date hereof, no direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, contingent or otherwise, which individually or in the aggregate are material to the financial condition, assets, liabilities, business or operations of Seller.

**2.10.  Intellectual Property.**

(a)      For purposes of this Agreement, "***Sellers' Intellectual Property***" shall mean collectively the SkyCam Intellectual Property and the CableCam Intellectual Property.  To such Seller's Knowledge, neither the use nor exploitation by the Purchaser of any of its Intellectual Property will infringe upon or violate any copyright, trade secret, patent, trademark, trade dress, or other proprietary right of any third party (within the United States or abroad) and no license of any third party intellectual property will be required by Buyer to lawfully implement, use or exploit its Intellectual Property.

(b)      To such Seller's Knowledge, such Seller has taken commercially reasonable steps to maintain the confidentiality of trade secrets and confidential information included in the Intellectual Property.

(c)      Such Seller has good and valid title to all of its Intellectual Property, free of any Encumbrances, and has a valid right to use and otherwise exploit, and to license others to use and otherwise exploit, all of its Intellectual Property.  Such Seller is not obligated to make any payment to any Person for the use or other exploitation of any of such its Intellectual Property.  Such Seller is free to use, modify, copy, distribute, sell, license or otherwise exploit its Intellectual Property on an exclusive basis (other than Intellectual Property consisting of

8

KSE/OC:036089

software licensed to such Seller under third party licenses generally available to the public, with respect to which such Seller's rights are not exclusive).

(d)     All patents, trademarks, service marks and copyrights that are registered with any Governmental Body and held by such Seller are valid and subsisting. None of such Seller's Intellectual Property infringes or conflicts with its Intellectual Property owned or used by any other Person. Such Seller is not infringing, misappropriating or making any unlawful use of, and such Seller has not at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of, such Seller's Intellectual Property owned or used by any other Person.  Except as disclosed in Schedule 2.10(d), to such Seller's Knowledge, no other Person is infringing, misappropriating or making any unlawful use of, its Intellectual Property.

(e)     To such Seller's Knowledge, its Intellectual Property being transferred, assigned and/or licensed to Purchaser in this transaction constitutes all of the Intellectual Property necessary for Purchaser to operate the Businesses as presently conducted by such Seller.  The Sellers have, and the Purchaser will acquire at the Closing, the right to use the names "SkyCam" and "CableCam" and variations thereof.

**2.11.   Insurance.**  Such Seller has not received (i) any notice of cancellation of any policy or binder of insurance or refusal of coverage thereunder; (ii) any notice that any issuer of such policy or binder has filed for protection under applicable bankruptcy or insolvency laws or is otherwise in the process of liquidating or has been liquidated; or (iii) any other indication that any such policy or binder may be unwilling or unable to perform its obligations thereunder.

**2.12.   Tax Matters.**

(a)     Such Seller has (i) filed all Tax Returns required to be filed by it on or prior to the date hereof and (ii) paid all Taxes due and payable in respect of all periods up to and including the date hereof.  Each Seller has timely and properly withheld or collected, paid over and reported all Taxes required to be withheld or collected by such Seller on or before the date hereof.

(b)     To such Seller's Knowledge: (i) No Tax Authority has asserted any adjustment that could result in an additional Tax for which such Seller is or may be liable or that could result in a Lien on any of the Purchased Assets (collectively, "***Tax Liability***"); (ii) there is no pending audit, examination, investigation, dispute, proceeding or claim (collectively, "***Tax Proceeding***") relating to any Tax Liability; (iii) no statute of limitations with respect to any Tax has been waived or extended (unless the period to which it has been waived or extended has expired); (iv) there is no outstanding power of attorney authorizing anyone to act on behalf of such Seller in connection with any Tax Liability, Tax Return or Tax Proceeding; (v) there is no outstanding closing agreement, ruling request, request to consent to change a method of accounting, subpoena or request for information with or by any Tax Authority with respect to such Seller, its income, assets or business, or any Tax Liability; (vi) such Seller is not a party to any Tax sharing or Tax allocation agreement, arrangement or understanding; and (vii) such

9

CONFIDENTIAL

Seller has not received any notice from a Tax Authority asserting that Seller should file a Tax Return in any jurisdiction where it does not file

**2.13    Employee and Labor Matters.**

(a)    Schedule 2.13(a) accurately sets forth, with respect to each employee of such Seller (including any employee who is on a leave of absence or on layoff status): (i) the name and title of such employee; (ii) the aggregate dollar amounts of the compensation (including wages, salary, commissions, director's fees, fringe benefits, bonuses, profit-sharing payments and other payments or benefits of any type) received by such employee from such Seller; (iii) such employee's annualized compensation as of the date of this Agreement; (iv) the number of hours of sick-time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof; and (v) the number of hours of vacation time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof.

(b)    Schedule 2.13(b) accurately identifies each former employee of such Seller who is receiving or is scheduled to receive (or whose spouse or other dependent is receiving or is scheduled to receive) any benefits from such Seller relating to such former employee's employment with such Seller; and Schedule 2.13(b) accurately describes such benefits.

(c)    Except as set forth in Schedule 2.13(c), such Seller is not a party to or bound by, and has never been a party to or bound by, any employment contract or any union contract, collective bargaining agreement or similar Contract.

(d)    Such Seller has provided to Purchaser accurate and complete copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials relating to the employment of the current and former employees of such Seller.

**2.14    Brokers.** Noble has acted as agent for Sellers in this transaction, and Sellers will be solely responsible for any fees or commissions payable to Noble. Except as so stated, no broker, finder, agent or similar intermediary has acted for or on behalf of Sellers or is entitled to a fee or commission in connection with this Agreement or the transactions contemplated hereby.

**2.15    Full Disclosure.** None of the Transactional Agreements contains or will contain any untrue statement of fact; and none of the Transactional Agreements omits or will omit to state any fact necessary to make any of the representations, warranties or other statements or information contained therein not misleading. All of the information set forth in the Disclosure Schedule, and all other information regarding such Seller and its business, condition, assets, liabilities, operations, financial performance, net income and prospects that has been furnished to the Purchaser or any of the Purchaser's Representatives by or on behalf of the Seller or by any Representative of the Seller, is accurate and complete in all respects.

**3.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.**

The Purchaser represents and warrants, to and for the benefit of the Seller, as follows:

10

**CONFIDENTIAL**                    KSE/OC:036091

App. 305

**3.1    Authority; Binding Nature Of Agreements.** The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its board of directors. The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under the Assumption Agreement, and the execution, delivery and performance of the Assumption Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its board of directors. This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms. Upon the execution and delivery of the Assumption Agreement at the Closing, the Assumption Agreement will constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their terms.

**3.2    Brokers.** The Purchaser has not become obligated to pay, and has not taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Transactions.

**3.3 Required Consents; No Violation of Law**. To the best of Purchaser's Knowledge, neither the execution nor delivery of this Agreement by Purchaser nor the consummation of the transactions contemplated hereby will require the consent or approval of any governmental or non-governmental third party.

## 4.    CLOSING DELIVERABLES

**4.1    Closing Deliverables of Sellers**. At the Closing, Sellers shall deliver to Purchaser the following documents:

(a)    Written evidence reasonably satisfactory that all Consents, authorizations, orders and approvals of any Governmental Body, if any, required in connection with the execution, delivery and performance of this Agreement has been obtained or made;

(b)    Written evidence reasonably satisfactory to Purchaser that any member or management committee approval required under applicable law and the Sellers' charter documents has been obtained;

(c)    Financial statements for the years ended December 31, 2012, December 31, 2011 and December 31, 2010;

(d)    Seller Contracts, with such assignments thereof and Consents to assignments as are required pursuant to the terms of such Seller Contracts and are necessary to assure the full benefit thereof.

(e)    The Businesses' Records and Sellers shall take all requisite steps to put Purchaser in actual possession and operating control of the Purchased Assets and the Businesses.

11

CONFIDENTIAL

KSE/OC:036092

**4.2** **Closing Deliverables of Purchaser**. At the Closing, Purchaser shall deliver to Sellers such other documents as are reasonably necessary for Sellers to effectuate and document the transactions contemplated hereby.

## 5. POST-CLOSING COVENANTS.

**5.1** **Access to Business Records**. After the Closing, Purchaser shall afford to Sellers and their accountants, attorneys and other representatives reasonable access to the Businesses' Records and shall permit Sellers to make extracts and copies therefrom for the purpose of preparing such tax returns, financial statements (including audited financial statements) and other reports and filings of Sellers as may be required after the Closing and for other proper purposes approved by Purchaser acting reasonably and in good faith.

**5.2** **Further Assurances**. Sellers from time to time after the Closing at the request of Purchaser (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of transfer and assignment, and take such other action as Purchaser may reasonably require to more effectively transfer and assign to, and vest in, Purchaser each of the Purchased Assets and to carry out the purposes of this Agreement. Purchaser from time to time after the Closing at the request of Sellers (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of assumption, and take such other action as Sellers may reasonably require to more effectively evidence the assumption by Purchaser of the Assumed Liabilities and to carry out the purposes of this Agreement.

**5.3** **Actioncam Claim**. Upon the final resolution of the Actioncam Litigation and/or the liquidation of the assets of Actioncam, LLC (or, alternatively, the sale of Actioncam or its assets to Purchaser), Purchaser shall pay OUTD fifty percent (50%) of the Net Litigation Award, such Net Litigation Award will not exceed one hundred thousand dollars ($100,000). For purposes herein, "Net Litigation Award" shall mean the difference between: (1) the aggregate award, damages, and/or recovery (whether sums or things of value are received pursuant to any demand upon or litigation against Actioncam, whether said sums are received pursuant to settlement, court proceedings, or otherwise), and/or the associated monetary value, awarded to SkyCam at the conclusion of the Actioncam Litigation; and (2) the aggregate reasonable attorneys' fees and costs incurred by Purchaser in connection with the Actioncam Litigation following the Closing Date. Notwithstanding the foregoing, after Closing: (i) Purchaser shall have the exclusive right to manage any ongoing litigation and OUTD shall cooperate in all aspects of the litigation as may reasonably be requested by the Purchaser; and (ii) any Actioncam Litigation related costs incurred by Purchaser shall be the sole responsibility of Purchaser.

**5.4** **Royalty**. For a period of 12 months following the Closing Date ("*Royalty Period*"), Purchaser shall pay OUTD a twenty percent (20%) fee ("*Royalty*") on revenue (excluding bill-back revenue from venue-driven charges and on site third party equipment rentals) from any incremental CBS regular season NFL and SEC events covered by the Purchaser which have not been regularly covered by Sellers in the past (more specifically, SkyCam and CableCam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game).

12

(a)      Purchaser shall make payments of Royalty to OUTD via wire transfer drawn on a United States bank designated by OUTD. Royalty payments shall accrue as billed and be paid monthly throughout the Royalty Period. Each monthly Royalty payment shall be made within thirty (30) days after the close of the foregoing month. All amounts not paid within forty-five (45) days of the due date shall bear interest at the rate of twelve percent (12%) per year, or the maximum permitted by law, whichever is less, from the date due until paid. All amounts expressed and due under this Agreement shall be in United States Dollars. Notwithstanding the foregoing, the first Royalty payment shall be for the period from the Closing Date through the end of the first calendar quarter that is at least three months from the Closing Date. For purposes of clarity, if the Closing Date is June 1, 2013, the first calendar quarter that is at least three months from the Closing Date will be September 30, 2013. Thereafter, Royalty payments shall be paid to OUTD on a monthly basis.

(b)      Concurrent with each Royalty payment, Purchaser shall deliver to OUTD via e-mail an itemized statement (the "*Monthly Report*") which is certified as accurate by an authorized representative of Purchaser. The Monthly Report shall set forth the following: (i) the date and description of the event; (ii) the amount billed (exclusive of the bill-backs and third party rentals); (iii) the calculation of the amount of the Royalty payment due to OUTD. Purchaser shall deliver a Monthly Report even if no payment is due.

5.4      **Consents**. To the extent any of the approvals, Consents or waivers required to consummate the transactions contemplated by this Agreement, including, without limitation, the Consents and approvals required to assign any of Material Seller Contracts to Purchaser, have not been obtained by any of the Sellers as of the Closing Date, such Seller shall use its commercially reasonable efforts to do the following:

(a) Cooperate with Purchaser in any reasonable and lawful arrangements designed to provide the benefits of such Material Contracts to Purchaser as long as Purchaser promptly reimburses such Seller for all out-of-pocket payments or chargers made by such Seller in connection therewith; and

(b) Enforce, at the request of Purchaser and at the expense and for the account of Purchaser, any and all rights of such Seller arising from such interest against the other party or parties thereto (including the right to elect to terminate such interest in accordance with the terms thereof upon the written advice of Purchaser).

5.4      **Use of "SkyCam" and "CableCam" Names**. Notwithstanding anything to the contrary contained herein, the Sellers shall be entitled to use the "SkyCam" and "CableCam" names for ninety (90) days after the Closing in connection with payroll and general administrative activities relating to its transition out of operating the Businesses.

5.5      **Confidentiality**. Except in connection with any dispute between the parties and subject to any obligation to comply with (a) any Applicable Law (b) any rule or regulation of any Authority or securities exchange or (c) any subpoena or other legal process to make information available to the Persons entitled thereto, all information obtained by any party about any other or any Affiliate of the other, and all of the terms and conditions of this Agreement, shall, for a period of one (1) year after the date of this Agreement, be kept in confidence by each party, and

13

**CONFIDENTIAL**

**KSE/OC:036094**

each party shall cause its shareholders, members, partners, directors, officers, managers, employees, agents and attorneys to hold such information confidential.  Such confidentiality shall be maintained to the same degree as such party maintains its own confidential information and shall be maintained until such time, if any, as any such data or information either is, or becomes, published or a matter of public knowledge; provided, however, that from and after the Closing, Purchaser shall be under no obligation to maintain confidential any such information concerning Sellers.  In the event either party becomes legally compelled to disclose any such information, it shall promptly provide the other with written notice of such requirement so that the other may seek a protective order or other remedy.

**5.6     Publicity.**  No publicity release or announcement concerning this Agreement or the transactions contemplated herein shall be issued without advance written approval of the form and substance thereof by Purchaser and Sellers; provided, however, that such restrictions shall not apply to any disclosure required by Authorities, Applicable Law or the rules of any securities exchange which may be applicable.  After the Closing Date, the parties shall consult with each other before issuing any press release or public statement with respect to this Agreement or the transactions contemplated herein, and, except as may be required by Applicable Law or the rules of any securities exchange which may be applicable, will not issue any such press release or public statement prior to such consultation.  Notwithstanding the foregoing, Purchaser and Sellers shall not be prevented or restricted in any way from notifying third parties at any time following the Closing that it has purchased the Businesses and the Purchased Assets and introducing itself as successor.

## 6.     MISCELLANOUS.

**6.1     Survival of Representations and Covenants.**  Except for Section 2.2 (title), which shall survive for twelve (12) months following the Closing, none of the representations and warranties made by the Parties in this Agreement and in the certificates, documents and schedules delivered hereto shall survive the consummation of the transactions contemplated hereunder.

**6.2     Disclaimer of Warranties.**  EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT, SELLERS ARE SELLING THE PURCHASED ASSETS (AND THE BUSINESSES REPRESENTED THEREBY) ON AN "AS IS, WHERE IS" BASIS AND DISCLAIM ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTEES, WHETHER EXPRESS OR IMPLIED.  SELLERS MAKE NO IMPLIED REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO OTHER IMPLIED WARRANTIES WHATSOEVER.

**6.3     Expenses of Sale.**  Each party shall bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and related Transactional Agreements, and the consummation and performance of the transactions contemplated herein and therein.  Any and all transfer, sales, use, documentary and similar taxes and recording and filing fees incurred in connection with the transactions contemplated herein shall be borne by Purchaser (and not by Sellers).

14

**CONFIDENTIAL**

**6.4    Further Assurances.** Each party hereto shall execute and/or cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the Transactions.

**6.5    Notices.** Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

> if to the Sellers:
>
>> SkyCam, LLC or
>> CableCam, LLC
>> c/o Outdoor Channel Holdings, Inc.
>> 43445 Business Park Drive.
>> Temecula, CA 92590
>> Attn: General Counsel
>> Facsimile: 951-719-8975

> if to the Purchaser:
>
>> _____
>> _____
>> _____
>> Facsimile: _____

**6.6    Time Of The Essence.** Time is of the essence of this Agreement.

**6.7    Headings.** The underlined headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

**6.8    Counterparts.** This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

**6.9    Governing Law; Venue.**

(a) This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of California (without giving effect to principles of conflicts of laws).

15

**CONFIDENTIAL**

(b) Except as set forth in the last sentence of this <u>Section 6.9</u>, any claim or controversy arising out of or relating to this Agreement shall be settled by binding arbitration in Riverside, California under the auspices of the American Arbitration Association, in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator shall be final and binding and may be entered in any court having jurisdiction. The arbitrator shall have the power to order discovery reasonably necessary to enable the parties to participate effectively in the evidentiary hearing. The fees of the arbitrator and all other costs charged by the AAA shall be borne equally by the Sellers and Purchaser. All attorneys' fees and costs incurred by each party shall be paid by each party.

(c) This Agreement and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon the parties and their respective successors, assigns and legal representatives. Neither this Agreement, nor any rights or obligations of any party hereunder, may be assigned by a party without the prior written consent of the other party.

**6.10   Waiver.**

(a) No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b) No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

**6.11   Amendments.** This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Purchaser and the Seller.

**6.12   Severability.** In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**6.13   Entire Agreement.** The Transactional Agreements set forth the entire understanding of the parties relating to the subject matter thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter thereof.

**CONFIDENTIAL**                                                     KSE/OC:036097

### 6.14   Construction.

(a) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural; and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b) The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

17

CONFIDENTIAL

KSE/OC:036098

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of.

**SkyCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

**CableCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

**[PURCHASER],** a _____ corporation

By: _____

Its: _____

**CONFIDENTIAL**

KSE/OC:036099

App. 313

## EXHIBIT A

### CERTAIN DEFINITIONS

For purposes of the Agreement (including this Exhibit A):

**Accounts Receivable.** "Accounts Receivable" shall mean accounts receivable, whether billed or unbilled, generated in connection with the Businesses prior to and through the Closing Date.

**Actioncam Claim.** "Actioncam Claim" means those certain claims that SkyCam has against Actioncam, LLC and Patrick J. Bennett (collectively "*Actioncam*") in connection with the Actioncam Litigation.

**Actioncam Litigation**. "Actioncam Litigation" shall refer to that certain cause of action against Actioncam for damages in connection with misappropriation of trade secrets, breach of contract, and false representations as more specifically set out in Case No. 09-CV-294-GKF-FHM, pending in the Northern District of Oklahoma.

**Agreement.** "Agreement" shall mean the Asset Purchase Agreement to which this Exhibit A is attached (including the Disclosure Schedule), as it may be amended from time to time.

**Broken Arrow Lease.** "Broken Arrow Lease" shall mean that certain Lease Agreement by and between Case SkyCam, LLC and SkyCam, LLC dated February 13, 2006, as amended on July 1, 2006.

**Code**. "Code" shall mean the Internal Revenue Code of 1986, as amended.

**Consent**. "Consent" shall mean any approval, consent, ratification, permission, waiver or authorization.

**Contract.** "Contract" shall mean any written, oral, implied or other agreement, contract, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, certificate, purchase order, work order, insurance policy, benefit plan, commitment, covenant, assurance or undertaking of any nature.

**Encumbrance.** "Encumbrance" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, equity, trust, equitable interest, claim, preference, right of possession, lease, tenancy, license, encroachment, covenant, infringement, interference, Order, proxy, option, right of first refusal, preemptive right, community property interest, legend, defect, impediment, exception, reservation, limitation, impairment, imperfection of title, condition or restriction of any nature (including any restriction on the transfer of any asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset).

**CONFIDENTIAL**

**Entity**. "Entity" shall mean any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**ERISA**. "ERISA" shall mean the Employee Retirement Income Security Act of 1974.

**Excluded Assets.** "Excluded Assets" shall mean the assets identified on Exhibit C (to the extent owned by the Seller on the Closing Date).

**Extraordinary Capital Expenditures.** "Extraordinary Capital Expenditures" shall mean any non-budgeted capital expenditures funded by OUTD, in amounts up to a maximum of $80,000 that occur between February 26, 2013 and the Closing Date, as determined to be necessary and in the best interests of the Sellers by Nic Salomon in his role as President of the Sellers.

**GAAP**. "GAAP" shall mean generally accepted accounting principles.

**Governmental Authorization.** "Governmental Authorization" shall mean any: (a) permit, license, certificate, franchise, concession, approval, consent, ratification, permission, clearance, confirmation, endorsement, waiver, certification, designation, rating, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

**Governmental Body.** "Governmental Body" shall mean any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any, court or other tribunal); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

**Intellectual Property.** "Intellectual Property" shall mean any patent, patent application, trademark (whether registered or unregistered and whether or not relating to a published work), trademark application, trade name, fictitious business name, service mark (whether registered or unregistered), service mark application, copyright (whether registered or unregistered), copyright application, trade secret, know-how, customer list, franchise, system, computer software, invention, design, blueprint, business methodology, engineering drawing, proprietary product, technology, proprietary right or other intellectual property right or intangible asset required to operate the equipment and perform Sellers' obligations pursuant to the Seller Contracts.

2

**CONFIDENTIAL**

**Leases.** "Leases" shall collectively refer to the (i) Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Legal Requirement.** "Legal Requirement" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Liability.** "Liability" shall mean any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

**Material.** "Material" shall mean (i) with respect to any item, fact, condition or circumstance of a party, that such item, fact, condition or circumstance, individually or in the aggregate with other items, facts, conditions or circumstances affecting such party, would cause an adverse effect of Twenty-Five Thousand ($25,000) Dollars or more to the other party subsequent to the closing of the transactions contemplated by this Agreement or (ii) with respect to any contract or series of related contracts that in the aggregate represents the payment or receipt by any party thereto of Twenty-Five Thousand ($25,000) Dollars or more.

**McAfee Agreement.** "McAfee Agreement" shall mean that certain Contingent Fee Agreement between Outdoor Channel Holdings, Inc. and its affiliated entities, including without limitation, SkyCam, LLC and McAfee & Taft, a professional corporation of Oklahoma.

**McAfee Injunction Success Fee.** "McAfee Injunction Success Fee" shall mean that certain $75,000 that becomes immediately due and owed by SkyCam to McAfee & Taft pursuant to the McAfee Agreement upon: (1) a ruling by the federal court denying Actioncam's motion for new trial; or (2) by the federal court's lifting the stay on the injunction, as described in the federal court's final judgment.

**Order.** "Order" shall mean any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, writ or award issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Body or any arbitrator or arbitration panel; or (b) Contract with any Governmental Body entered into in connection with any Proceeding.

**OUTD.** "OUTD" shall mean Outdoor Channel Holdings, Inc., the ultimate parent company of the Sellers.

CONFIDENTIAL                    KSE/OC:036102

**Parent Guarantees.** "Parent Guarantees" refer collectively to (i) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to 650 North Freeway, Ltd. in connection with the Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to Tindall Properties, Ltd. in connection with the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Person**. "Person" shall mean any individual, Entity or Governmental Body.

**Proceeding.** "Proceeding" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding and any informal proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or any arbitrator or arbitration panel.

**Representatives.** "Representatives" shall mean officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

**Seller Contract.** "Seller Contract" shall mean any Contract relating to the customers set forth on Schedule 1.1(a)(v) and Schedule 1.1(b)(v): (a) to which the Seller is a party; (b) by which the Seller or any of its assets is or may become bound or under which the Seller has, or may become subject to, any obligation; or (c) under which such Seller has or may acquire any right or interest.

**Sellers' Intellectual Property.** "Seller's Intellectual Property" or a "Seller's Intellectual Property" shall refer to CableCam Intellectual Property and SkyCam Intellectual Property owned by, licensed to the Sellers (or a Seller), or otherwise used by the Sellers (or a Seller).

**Seller Benefit Plans.** "Seller Benefit Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, any deferred compensation, bonus, stock option, profit sharing, retirement, medical, health or life insurance, disability, sick leave, cafeteria or flexible spending, vacation or severance agreements, arrangements, programs or plans maintained by any Seller.

**Sellers' Knowledge.** "Sellers' Knowledge" or a "Seller's Knowledge" means the actual knowledge of any of Nicolas Salomon, Thomas Hornish and Thomas Allen obtained in the ordinary course of the performance of their respective duties as officers of the Sellers.

**Tax.** "Tax" shall mean any tax (including any income tax, franchise tax, capital gains tax, estimated tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, occupation tax, inventory tax, occupancy tax, withholding tax or payroll tax), levy, assessment, tariff, impost, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), that is, has been or may in the future be (a) imposed, assessed or collected by or under the authority of any Governmental Body, or (b) payable pursuant to any tax-sharing agreement or similar Contract.

4

**Tax Return.** "Tax Return" shall mean any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**Transactional Agreements.** "Transactional Agreements" shall mean: (a) the Agreement; (b) the Assumption Agreement; and (c) the Bill of Sale.

**Transactions.** "Transactions" shall mean (a) the execution and delivery of the respective Transactional Agreements, and (b) all of the transactions contemplated by the respective Transactional Agreements, including: (i) the sale of the Purchased Assets by the Sellers to the Purchaser in accordance with the Agreement; (ii) the assumption of the Assumed Liabilities by the Purchaser pursuant to the Assumption Agreement; and (iii) the performance by the Sellers and the Purchaser of their respective obligations under the Transactional Agreements, and the exercise by the Sellers and the Purchaser of their respective rights under the Transactional Agreements.

CONFIDENTIAL

KSE/OC:036104

App. 318

## EXHIBIT B

ASSUMPTION AGREEMENT

CONFIDENTIAL

## EXHIBIT C

BILL OF SALE

CONFIDENTIAL

KSE/OC:036106

**SCHEDULE 1.1(a)(ii)**

SKYCAM INTELLECTUAL PROPERTY

## SCHEDULE 1.1(a)(vii)

SKYCAM CONTRACTS

## SCHEDULE 1.1(b)(ii)

CABLECAM INTELLECTUAL PROPERTY

## SCHEDULE 1.1(b)(v)

CABLECAM'S CONTRACTS

KSE/OC:036110

## SCHEDULE 1.2(h)

**EXCLUDED ASSETS**

**SCHEDULE 1.3(b)(i)**

**DEFERRED REVENUES**

Any amounts received from ESPN or NBC or any other network, or from AMEWAS related to the Navair project, for which services not been fully performed as of the date of the closing, less any payments towards those related costs of revenues, shall be deducted as a credit to the Purchase Price at closing.

**CONFIDENTIAL**

## SCHEDULE 1.5

## ALLOCATION

2

CONFIDENTIAL

KSE/OC:036113

App. 327

## SCHEDULE 2.5

### REQUIRED CONSENTS

2

KSE/OC:036114

## SCHEDULE 2.7

## LITIGATION

CONFIDENTIAL

## SCHEDULE 2.10(a)

### FINANCIAL STATEMENTS

CONFIDENTIAL

KSE/OC:036116

## SCHEDULE 2.10(d)

### INTELLECTUAL PROPERTY DISCLOSURE

CONFIDENTIAL

KSE/OC:036117

## SCHEDULE 2.13

### EMPLOYEE AND LABOR MATTERS

CONFIDENTIAL

KSE/OC:036118

**SCHEDULE 1.4**

ALLOCATION

1.

**CONFIDENTIAL**

**KSE/OC:036119**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 22**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL
HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# ASSET PURCHASE AGREEMENT

among:

**SKYCAM, LLC,**
a Delaware limited liability company;

**CABLECAM, LLC,**
a Delaware limited liability company;

**OUTDOOR CHANNEL HOLDINGS, INC.,**
a Delaware corporation;

_and

**PURCHASER, INC.,**
a _____ corporation

Dated as of March __, 2013



## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of March __, 2013, by and among: CABLECAM, LLC, a Delaware corporation ("*CableCam*"), SKYCAM, LLC, a Delaware corporation ("*SkyCam*" and together with CableCam, the "*Sellers*"), and OUTDOOR CHANNEL HOLDINGS, INC., a Delaware corporation (the "*Parent*" and collectively with the Sellers, the "*Seller Parties*"), and _____, a _____ corporation (the "*Purchaser*"). Certain capitalized terms used in this Agreement are defined in Exhibit A.

### RECITALS

A.   SkyCam owns certain assets used in its business of developing, deploying operating, ~~leasing~~servicing, marketing, manufacturing and otherwise operating SkyCam's aerial camera suspension system (collectively, the "*SkyCam Business*").

B.   CableCam owns certain assets used in its business of developing, depolying operating, ~~leasing~~servicing, marketing, manufacturing and otherwise operating CableCam's aerial camera suspension system (collectively, the "*CableCam Business*" and together with the SkyCam Business, the "*Businesses*").

C.   The Sellers are each wholly-owned subsidiaries of Parent.

~~C.~~D.   Each of the Sellers desire to sell ~~substantially of its assets~~the Purchased Assets (as defined below) to the Purchaser and the Purchaser desires to purchase ~~all or substantially all of the assets and operations of each of~~the Purchased Assets from the Sellers, and assume ~~certain specified liabilities of each Seller, as they pertain to~~ the ~~Purchased Assets~~Assumed Liabilities (as defined ~~herein~~below) as of the Closing ~~date~~Date (as defined herein) on the terms set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein and for good and valuable consideration, the parties to this Agreement, intending to be legally bound, agree as follows:

**1.   Sale of Assets; Related Transactions~~.~~.**

1.1   **Sale of Assets~~.~~.**   The Seller shall cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, at the Closing (as defined below), good and valid title to the Purchased Assets ~~(as defined below).~~. free of any Encumbrances, on the terms and subject to the conditions set forth in this Agreement.  For purposes of this Agreement, "*Purchased Assets*" shall mean and include all of the following assets of the Sellers (excluding those assets excluded from this sale pursuant to Section 1.2):

(a)   The "*SkyCam Assets*," which shall include, without limitation:

(i)     all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the SkyCam System;

(ii)     all rights, titles and interests that SkyCam has or may have to Intellectual Property, including without limitation, the Intellectual Property owned, used, useful or developed in connection with the ownership of the SkyCam System and the operation of the SkyCam Business (the "*SkyCam Intellectual Property*").   The SkyCam Intellectual Property is set forth on Schedule 1.1(a)(ii).

(iii)     the Actioncam Claim, as further contemplated in Section 5~~5~~4.3 herein;

(iv)     all of SkyCam's rights in and to certain computer software, including but not limited to such computer software that is set forth on Schedule 1.1(a)(iv), used in the SkyCam Business, including but not limited to source and object codes for operating and controlling all aspects of the SkyCam System;

(v)     all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the SkyCam System;

(vi)     all real estate leasehold interests set forth in the Leases;

(vii)     ~~-~~the contracts to which SkyCam is a party or beneficiary as listed on Schedule 1.1(a)(~~vi~~vii) ("*SkyCam Contracts*"~~).~~");

(viii)     all other property, equipment, rights, interests, claims and assets ~~which,~~ including but not limited to such other property, equipment, rights, interests, claims and assets that are ~~related to,~~ set forth on Schedule 1.1(a)(viii), that relate to, are used or are useful in connection with the operation of the SkyCam Business or the ownership, maintenance, development, exploitation or improvement of the SkyCam System~~.~~; and

(ix)     and such other assets of SkyCam that are necessary and required to run the SkyCam Business as presently conducted.

(b)     The "*CableCam Assets*," which shall include, without limitation:

(i)     all right, title and interest in and to the equipment, tools, plans, specifications, designs, improvements, bills of material, inventory and parts (including spare parts inventory) work in progress and supplies representing the CableCam System;

(ii)     all rights, titles and interests that CableCam has or may have to Intellectual Property, including without limitation, Intellectual Property owned, used, useful or developed in connection with the ownership of the CableCam System and the operation of the CableCam Business (the "*CableCam Intellectual Property*").   The CableCam Intellectual Property is set forth on Schedule 1.1(b)(ii).

       (iii)    all of CableCam's rights in and to certain computer software, including but not limited to such computer software that is set forth on Schedule 1.1(b)(iii), used in the CableCam Business, including but not limited to source and object codes for operating and controlling all aspects of the CableCam System;

       (iv)    all documents, blueprints and other materials, whether in written, magnetic, digital or other form, relating to the CableCam System;

       (v)    the contracts to which CableCam is a party listed on Schedule 1.1(b)(v) ("**CableCam Contracts**" and together with SkyCam Contracts, the "**Seller Contracts**")", and each a "**Seller Contract**");

       (vi)    all other property, equipment, rights, interests, claims and assets which, including but not limited to such other property, equipment, rights, interests, claims and assets that are related to.set forth on Schedule 1.1(b)(vi) that relate to, are used or are useful in connection with the operation of the CableCam Business or the ownership, maintenance, development, exploitation or improvement of the CableCam System.; and

       (vii)    and such other assets of CableCam that are necessary and required to run the CableCam Business as presently conducted.

**1.2**    **Excluded Assets.**  Other than the Purchased Assets, no other asset of any of the Sellers shall be transferred and sold to Purchaser pursuant to this Agreement, including, without limitation, the following (the "**Excluded Assets**"):

       (a)    all rights that accrue or will accrue to any Seller under this Agreement;

       (b)    Inventoryinventory and supplies used in connection with the Businesses which are disposed of in the ordinary course of business prior to the Closing Date;

       (c)    Sellers' corporate record books containing minutes of meetings of the management committee and meetings of members and such other records as have to do exclusively with Sellers' organization or stock capitalization not related primarily to the Businesses;

       (d)    all of Sellers' Accounts Receivable as of the Closing Date as set forth on Schedule 1.2(d);

       (d)(e)    all of the Sellers' rights to refunds of all or any part of any Taxes paid by Seller prior to, at or after the Closing Date;

       (e)(f)    all of the Sellers' Tax Returns;

       (f)(g)    all documents relating to the formation, capitalization and borrowings of the Sellers; and all other financial records of the Sellers which do not relate exclusivelyprimarily to the Sellers' ownership and operation of the CableCam Assets, the SkyCam Assets or the Businesses;

(h)      all ~~of Seller's Accounts Receivable and~~ cash ~~on hand, in~~ ;

~~(g)~~(i)     all bank accounts ~~or otherwise as of the Closing Date~~ ; and

~~(h)~~(j)     any other assets set forth on Schedule 1.2(~~h~~).j).

**~~1.3~~ Purchase Price, Payment and Related Matters.**

**1.3      .** The ~~total~~ purchase price (**"*~~Purchase Price~~*"**)to be paid to the Sellers for the Purchased Assets ~~shall be up to $4,050,000 and~~ (the **"*Purchase Price*"**) shall be ~~comprised~~the sum of ~~(i) $~~:

(a)      [Three Million Fifty Thousand  and 00/100 Dollars ($3,~~650~~050,000.00]) (the "***Closing Payment***") that shall be paid to the Sellers in an account designated in writing by the Sellers at the Closing by wire transfer of immediately available funds;

(b)      [Six Hundred Thousand and 00/100 Dollars ($600,000.00]) (the "***Escrow Amount***") in cash~~; (ii) the McAfee Injunction Success Fee~~; shall be deferred by Purchaser, and ~~(iii)~~ subject to the provisions of Section 7 hereof.  At the Closing, Purchaser shall, by wire transfer of immediately available funds, transfer to the account of [                    ] (the "***Escrow Agent***") the Escrow Amount (and together with all interest, dividends, and other income earned thereon, the "***Escrow Funds***") to be held in escrow and subject to the terms of Section 7 of this Agreement.  The Sellers shall pay all fees charged by the Escrow Agent in the performance of its duties hereunder.  The Escrow Funds shall be held and disbursed by Escrow Agent in accordance with the terms of that certain escrow agreement, in the form of Exhibit D attached hereto (the "***Escrow Agreement***"), which Purchaser and the Sellers shall execute and deliver to the Escrow Agent simultaneously with the execution and delivery of this Agreement. Subject to the terms and conditions of the Escrow Agreement, on the below-described Escrow Termination Date, all of the Escrow Funds, less any amounts that have been claimed by Purchaser pursuant to Section 7 hereof, shall be released to the Sellers.  For purposes of Section 7 hereof, claims may be made against the Escrow Funds until the eighteen (18) month anniversary of the Closing Date (the "***Escrow Termination Date***"), in accordance with the terms of the Escrow Agreement.  Purchaser covenants and agrees to provide the Sellers with prompt written notice of any claims made by Purchaser pursuant to Section 7 hereof; provided however, that the failure to promptly notify shall not relieve the Sellers from any liability it may have under Section 7 except to the extent the Sellers are actually prejudiced by such delay; and

~~(a)~~(c)    the Royalty described in Section ~~5~~4.4 hereof.

~~(b)~~(d)    The Purchase Price shall be adjusted ("***Purchase Price Adjustments***") as follows:

(i)      any deferred revenue received by the Sellers but not yet recognized or earned by the Sellers shall be deducted from the Purchase Price at Closing ("***Deferred Revenue***") as set forth on Schedule 1.3(d)(i);

~~(i)~~(ii)   any and all expenses prepaid by the Sellers relating to services to be rendered to Businesses after the Closing Date as set forth on Schedule 1.3(d)(ii) shall be added to the Purchase Price;

(ii)(iii) the McAfee Injunction Success Fee, if paid by the Sellers or ~~OUTD~~Parent before the Closing Date, shall be added to the Purchase Price;

(iii)(iv) ~~working capital in the amount of~~ $200,000~~, to be provided by Sellers,~~ shall be deducted from the Purchase Price as a credit for working capital; and

(iv)(v) Any Extraordinary Capital Expenditures shall be added to the Purchase Price.

~~(c)      As consideration for the sale of the Assets~~[Note to ~~the Purchaser:~~

~~(i)      at the Closing, the Purchaser shall pay the~~draft: **Purchase Price** ~~after effecting the Purchase Price Adjustments,~~**Adjustment Mechanism** to ~~the Sellers or its designated designee for the Assets and the Assumed Liabilities;~~ **be discussed among the parites.**]

~~(ii) at the Closing, the Purchaser shall assume the Assumed Liabilities by delivering to the Seller an Assumption Agreement in substantially the form of Exhibit B (the "Assumption Agreement").~~

**[NTD: All Closing Deliverables moved to Section 1.6(b)]**

(d)(e) For purposes of this Agreement "*Assumed Liabilities*" shall mean only the following liabilities of the Sellers:

(i)      Payment of the McAfee Injunction Success Fee (to the extent not paid prior to the Closing); and

(ii)     All of the liabilities and obligations of each of the Sellers arising under the under the SkyCam Contracts and the CableCam Contracts as identified on Schedule 1.1(a)(vii) and Schedule 1.1(b)(v) to the Agreement, including expressly the Leases.

(f)      Notwithstanding anything to the contrary contained in this Agreement, except as expressly provided in Section 1.3(f), Purchaser shall not assume, or be required to perform or discharge, nor in any way be liable or responsible for, and Purchaser expressly disclaims, all duties, responsibilities, commitments, expenses, obligations or liabilities, whether direct or indirect, absolute, fixed or contingent or accrued, known or unknown, due or to become due, warranties, obligations or claims, of the Sellers, including but not limited to those relating to the Purchased Assets or the Businesses (or which may be asserted against or imposed upon Purchaser as a successor or transferee of the Sellers or as an acquirer of the Purchased Assets or the Businesses or otherwise as a matter of Law), other than the Assumed Liabilities.  Without limitation of the foregoing, all of the following will be considered "*Excluded Liabilities*" for purposes of the Agreement:

(i)      Any Liability based upon, arising under or with respect to any Seller Contract that:  (i) subject to Section 1.7, was not capable of being assigned to Purchaser as of the Closing until such time as such contract has effectively been assigned to Purchaser; (ii) is required by the terms thereof to be discharged on or prior to the Closing; or (iii) relates to or

arises out of a breach or default by either of the Sellers on or prior to the Closing (including any event occurring at or prior to the Closing that with the lapse of time or the giving of notice, or both, would become a breach or default) under any Assumed Contract;

(ii)   any customer warranty obligation or other Liability for refunds to customers;

(iii)   any Liability of the Sellers for Taxes;

(iv)   any Liability under the Seller Contracts that, as of the Closing Date, is past due;

(v)   any Liability to the extent the existence of which constitutes a breach of any representation or warranty of the Sellers contained in or made pursuant to this Agreement;

(vi)   any Liability based upon or with respect to the operation of the Sellers, the ownership or operation of the Businesses, or the ownership, operation or use of the Purchased Assets, in each case, prior to the Closing arising by operation of law under any common law or statutory doctrine (including successor liability or de facto merger) and any other obligation or liability arising out of or relating to events or conditions occurring at or prior to the Closing;

(vii)   any infringement or misappropriation or alleged infringement or misappropriation of the rights of any other Person arising out of the use of any Intellectual Property in connection with the Businesses prior to the Closing Date;

(viii)   any rights of any other Person relating to the Intellectual Property pursuant to any license, sublicense or agreement required to be disclosed and not so disclosed;

(ix)   any Liability for any Indebtedness;

(x)   any Liability for any Environmental Liability;

(xi)   any Liability based upon, arising under or with respect to the Excluded Assets or the ownership, operation or use of any of the businesses or assets of the Sellers or any of its respective Affiliates, other than the Businesses, whether before, at or after the Closing;

(xii)   any Liability under the Broken Arrow Lease;

(xiii)   any Liability of any other Person, except for the Sellers;

(A)(xiv)   any Liability of the Sellers arising out of or relating to the execution, delivery or performance of any of the Transactional Agreements;

              (xv)    any Liability of the Sellers for any fees, costs or expenses of the type referred to in Section 8.1 (Expense of Sale) of Agreement;

              (ii)(xvi)       all accounts payable of the each of the Sellers that arose from bona fide transactions entered into in the Ordinary Course of Business that relate to services rendered after the Closing Date; as set forth on Schedule 1.3(f)(xvi);

              (iii)the obligations arising on or after the Closing Date of each of the Sellers under the SkyCam Contracts and the CableCam Contracts as identified on Schedule 1.1(a)(vii) and Schedule 1.1(b)(vii) to the Agreement, including expressly the Leases;

              (iv)(xvii)     all obligations of OUTDParent under the McAfee Agreement, including (except payment of the McAfee Injunction Success Fee if such fee has not already been paid by OUTD prior to Closing;pursuant to Section 1.3(e)(i)); and

              (v)(xviii)     any Liability to any employee or former employee of the Sellers under or with respect to any Employee Benefit Plan or for severance pay that arises in connection with the consummation of this transaction or arises from a termination after Closing; and

              (vi)All of the liabilities and obligations of Sellers arising under Seller Contracts, solely to the extent such obligations and liabilities arise and relate to events, acts or omissions occurring after the Closing Date and become due and payable after the Closing;

*provided, however,* that notwithstanding the foregoing, and notwithstanding anything to the contrary contained in this Agreement, the "Assumed Liabilities" shall not include, and the Purchaser shall not be required to assume or to perform or discharge:

              (A)any Liability of the Sellers associated with the Broken Arrow Lease;

              (B)any Liability of any other Person, except for the Sellers;

              (C)(xix)     any Liability of the Sellers arising out of or relating to the execution, delivery or performance of any of the Transactional Agreements;

              (D)any Liability of the Sellers for any fees, costs or expenses of the type referred to in Section 6.3 (Expense of Sale) of Agreement;

              (E)(xx) any Liability of the Seller arising from or relating to any action taken by the Seller, or any failure on the part of the Seller to take any action, at any time after the Closing Date; and.

              (F) any Liability of the Seller for the payment of any Taxes incurred or assessable prior to the Closing Date.

**1.4**    ~~Sales and Use Tax.  Purchaser~~. Sellers shall be responsible for all transfer, documentary, sales, use, stamp, registration, recording and other such Taxes and ~~use taxes~~governmental fees, if any, arising out of the sale of the Purchased Assets to Purchaser pursuant to this Agreement. [Purchaser hereby waives compliance by Sellers with the provisions of the bulk transfer laws of any state~~.~~.]

**1.5**    **Allocation.**  No later than 90 days after the Closing Date, Purchaser shall provide to the Sellers a statement allocating the Purchase Price among the Purchased Assets of the Businesses. If the Sellers disagree with Purchaser's calculation of the Purchase Price allocation, the Sellers may, within 15 days after delivery of Purchaser's calculation of the Purchase Price allocation, deliver a notice to Purchaser disagreeing with such calculation and setting forth Sellers' proposed Purchase Price allocation. Sellers and Purchaser shall, during the 15 day period following delivery of Sellers' notice of disagreement, use their reasonable best efforts to resolve such dispute and reach a mutually agreed Purchase Price allocation. The parties shall (i) prepare and, where applicable, file each report relating to the federal, state, local, foreign and other Tax consequences of the purchase and sale contemplated hereby (including the filing of IRS Form 8594 where relevant) in a manner consistent with their mutually agreed allocation (or, if no such agreement is reached in accordance with this Section 1.5, in accordance with an allocation determined in the Purchaser or either Seller's sole discretion) and (ii) take no position in any Tax Return or other Tax filing, proceeding, audit or otherwise which is inconsistent with such allocation, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code or pursuant to any analogous foreign legislation.

**1.6**    **Closing.**

(a)    The closing of the purchase and sale contemplated by in this Agreement (herein called the "***Closing***") is occurring simultaneously with the execution and delivery of this Agreement on the date hereof (the "***Closing Date***").  The Closing shall be held at the offices of SkyCam and CableCam, or at such other place as may be agreed to by Purchaser and the Sellers.

(b) At the Closing:

~~(i) Sellers shall execute and deliver to the Purchaser a bill of sale duly executed by each Seller, substantially in the form of Exhibit C;~~

(i)    Purchaser shall pay to the Sellers the ~~Purchase Price~~Closing Payment, adjusted for any Purchase Price Adjustments, payable ~~by cashier's check or~~ to Sellers in an account designated in writing by the Sellers at the Closing by wire transfer of immediately available funds;

(ii)    Purchaser shall provide to the Escrow Agent, the Escrow Funds as contemplated by ~~Section 1.3(b);~~the Escrow Agreement;

~~the~~

~~(iii)Purchaser shall execute and deliver to the Seller the Assumption Agreement which includes expressly, the assumption of the McAfee Agreement by Purchaser;~~

(iv)(iii) the Purchaser shalluse commercially reasonable efforts to obtain and deliver to the Seller a fully executed Release from the applicable landlord, releasing OUTDParent from the Parent Guarantees and from any liabilities associated with the Leases, in a form mutually acceptable to the Partiesparties;

(v)(iv) all employees of Sellers shall be terminated by Sellers and shall become employed by Purchaser (each, a "*Continuing Employee*") and all employees of Sellers shall cease participation in SellerEmployee Benefit Plans; and

(vi)(v) the Purchaser shall have obtained employee benefit plans and insurance with sufficient coverage to permit the Purchaser to conduct the Businesses in substantially the same manner following the Closing Date, as was conducted by the Sellers prior to the Closing Date.; and

(vi)    each of the parties to this Agreement shall provide the additional Closing deliverables as required by Sections 5 and 6 of this Agreement, including without limitation the execution and delivery of the other Transactional Agreements.

**1.7    Assignment of Contracts.** Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an assignment of any claim, contract, license, franchise, lease, commitment, sales order, sales contract, supply contract, service agreement, purchase order, or purchase commitment if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder.  If such consent is not obtained, or if any attempt at an assignment thereof would be ineffective or would affect the rights of the Sellers thereunder so that Purchaser would not in fact receive all such rights, the Sellers shall reasonably cooperate with Purchaser in any reasonable and lawful arrangements designed to provide the benefits under such claim, contract, license, franchise, lease, commitment, sales order, sales contract, supply contract, service agreement, purchase order, or purchase commitment, including subcontracting all rights and obligations thereunder to Purchaser as long as Purchaser promptly reimburses such Seller for all out of pocket payments or charges made by such Seller in connection therewith and enforcement for the benefit of, at the request of, and at the expense of Purchaser of any and all rights of the Sellers arising from such interest against the other party or parties thereto (including the right to elect to terminate such interest in accordance with the terms thereof upon the written request of Purchaser.

**2.    REPRESENTATIONS AND WARRANTIES OF THE SELLERSELLERS.**

Each of the Seller Parties, jointly and severally, hereby represents and warrants, subject to such exceptions as are specifically disclosed in writing (and that reference the specific representation that they qualify) in the disclosure schedule supplied by each SellerSellers to Purchaser, as follows:

**2.1. Due Organization; No Subsidiaries; Etc.** Such Seller is a corporationlimited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Such Seller has all requisite corporatecompany authority and power to (1) own, lease

and operate its assets and properties, including the Purchased Assets, (2) carry on the Businesses, and (3) execute and deliver this Agreement and consummate the transactions contemplated hereby and thereby.  Such Seller has all material licenses, permits and other similar regulatory approvals or authorizations to own the Purchased Assets and conduct its businessBusiness, as presently owned and conducted.  Such Seller is duly qualified and in good standing in each of the jurisdictions listed in Schedule 2.1 in which it is required by the nature of its businesses or the ownership of the Assets to so qualify, except where the failure to be so qualified would not have a Material adverse effectAdverse Effect on such Seller.

**2.2. Title to Assets. Such Seller owns; Inventory.** The Sellers own, and hashave good and , valid and marketable title to, all the SkyCam Assets and CableCamCable Cam Assets, as applicable and purported to be owned by it.them free and clear of any Encumbrances.  The Purchased Assets include all tangible and intangible assets and rights that are used or held for use in the operation or conduct of the Businesses, and are sufficient for the conduct of the Businesses by the Purchaser following the Closing in substantially the same manner as conducted by such Seller prior to the Closing Date. Sellers prior to the Closing Date.  At the Closing, the Sellers shall have conveyed to Purchaser good and marketable title to all of the Purchased Assets, free and clear of all Encumbrances.  The Purchased Assets are in good operating condition and repair, normal wear and tear excepted, and have been maintained in accordance with all applicable specifications and warranties and normal industry practice.  All equipment and all inventory of merchandise that are included in the Purchase Assets consist of a quality and quantity usable, rentable, or saleable in the ordinary course of business of the Sellers, except for obsolete items and items of below-standard quality, all of which have been written off, written down, or adequately reserved against to their net realizable value in the Seller Balance Sheet.  All such inventory not written off has been recorded at the lower of cost or net realizable value, and depreciated consistent with the economic life of such inventory.

**2.3.    Breach.**  Neither the execution nor delivery of this Agreement by such Seller nor the consummation of the transactions contemplated hereby will cause such Seller to be in breach of any of the material terms or conditions of such Seller's organizational documentsSellers' certificates of formation or limited liability company operating agreements or any other agreement, contract, lease, license, instrument or commitment of such Seller.

**2.4.    Enforceability of Agreement.**  This Agreement constitutes a legal, valid and binding obligation of suchhas been, and upon the execution and delivery thereof by the Sellers, each of the other Transactional Agreements to which the Sellers are or will be a party shall be, duly and validly executed and delivered by the Sellers. This Agreement and the other Transactional Agreements constitute the legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by general equitable principles, bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

**2.5.    Capitalization**.  Schedule 2.5 sets forth, with respect to each Seller: the ownership of each Seller including the percentage interests of each class of equity owned by each of the members of the Sellers. There are no outstanding or authorized rights, options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, or other

agreements or commitments of any kind that could require the Sellers to issue or sell any equity securities (or securities convertible into or exchangeable for equity securities).  There are no outstanding unit appreciation, phantom stock, profit participation, or other similar rights with respect to the Sellers.  Other than as set forth herein, there are no proxies, voting rights, or other agreements or understandings with respect to the voting or transfer of the membership interests of the Sellers.  The Sellers are not obligated to redeem or otherwise acquire any of their outstanding shares of capital stock.

**2.6.     Subsidiaries**.  The Sellers do not own, directly or indirectly, any outstanding voting securities of or other interest in, or control, any other corporation, partnership, joint venture or other business entity.

~~2.5.~~**2.7.**Required Consents; No Violation of Law.**  Except as set forth in Schedule 2.~~5~~7, which shall contain a list prepared by the Sellers of the Consents required for the transfer to Purchaser of the Purchased Assets and Assumed Liabilities described herein, such Seller is not or will not be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with the execution and delivery of any of the Transactional Agreements or the consummation or performance of any of the Transactions. ~~Such Seller has not violated~~  The performance by each Seller of its obligations hereunder and thereunder and the consummation by the Sellers of the transactions contemplated hereunder and thereunder will not (i) violate any presently applicable federal, state, local foreign law, statute, order, rule or regulation, injunction, judgment or decree relating to the operation, conduct or ownership of the Assets or the ~~business of such Seller.~~Business of such Seller, (ii) conflict with, result in any breach of, or constitute a default under or give rise to a right to terminate, amend, modify abandon, or accelerate or require any notice, consent, authorization, approval or waiver under, any Seller Contract, (iii) result in or require the creation or imposition of any Encumbrance upon or with respect to any of the Purchased Assets; or (iv) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effect described in clauses (i) through (iii) of this Section 2.7.

~~2.6.~~**2.8.**Real Property.**  The Leases constitute all of the interests in real property held for use in connection with, necessary for the conduct of, or otherwise material to such Seller's Businesses.  As of the Closing Date, the Sellers do not own any real property.  There are no eminent domain or other similar proceedings pending or, to any such Seller's Knowledge, threatened affecting any portion of the real property currently under lease.  There is no writ, injunction, decree, order or judgment outstanding nor any action, claim, suit or proceeding, pending or, to any such Seller's Knowledge, threatened, relating to the lease, use, occupancy or operation by any Person of any such real property.  The use and operation of the leased real property in the present conduct of such Seller's Businesses do not violate in any material respect any instrument or agreement affecting such real property.  There is no violation of any covenant, condition, restriction, easement or order of any ~~governmental authority~~Governmental Body having jurisdiction over such property or of any other Person entitled to enforce the same affecting such real property or the use or occupancy thereof.  The real property subject to the Leases and their condition is suitable for their current use by the Businesses.  All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included

in the Leases are (x) in good condition, ordinary wear and tear excepted and (y) are suitable for their current use.

2.7.   Litigation and Related Matters.   Except as set forth on Schedule 2.79, there are no actions, suits or other legal, administrative, arbitration, investigatory, injunctive or other proceedings, governmental or otherwise, or any other claims or controversies, pending or, to the best knowledgeKnowledge of such Seller, threatened against such Seller or relating in any manner to the Purchased Assets.

2.8.2.9.Contracts.  Such Seller is not in default under any Material Seller contract to which it is a party, and to such Seller's Knowledge, the other parties theretoBusinesses, the ownership of any of the equity of the Sellers or which questions the validity or enforceability of this Agreement or the transactions contemplated hereby, and there is no basis for any of the foregoing.  There are not in default and are valid and binding obligations of the parties thereto, in accordance with their termsno outstanding orders, decrees, stipulations or agreements issued by any Governmental Body in any proceeding or agreed to by the Sellers to which the Sellers are or were a party which have not been complied with in full.

2.10.   Contracts.   Schedule 2.10 sets forth a list of each Contract to which a Seller is a party or by which it or its properties and assets are bound and which is material to its business, assets, properties, or prospects (the "*Material Contracts*"), true, correct and complete copies (in the case of written Contracts) and summaries (in the case of oral Contracts) of which have been provided to Purchaser.   Such Material Contracts include: (a) any mortgage, indenture, note, installment obligation or other Contract for or relating to any Indebtedness of the Sellers; (b) any guaranty, direct or indirect, primary or secondary, by the Sellers of any obligation for Indebtedness or otherwise; (c) any Contract granting any Person an Encumbrance on any of the Purchased Assets; (d) any Contract to which the Sellers are a party or by which any of its assets are bound or otherwise subject made other than in the ordinary course consistent with past practice; (e) any Contract providing for the grant of any rights or options to purchase or lease any of the Purchased Assets; (f) any collective bargaining agreement with any labor union to which any employees of the Sellers are subject; (g) any confidentiality or non-disclosure or non-solicitation agreement to which the Sellers are a party or by which any of its assets are bound or otherwise subject; (h) any Contract to which the Sellers are a party or by which any of its assets are bound or otherwise subject with a term in excess of six months or providing for aggregate payments (contingent or otherwise, including milestones, earn-outs, contingent payments and other future payment obligations) in excess of $10,000; (i) any Contract to which the Sellers are a party or by which any of its assets are bound or otherwise subject (A) containing non-competition, non-solicitation or other limitations restricting the conduct of the Business, or the ability of the Sellers or any Affiliate of the Business to compete with any Person or to solicit the employees or customers of any Person, (B) that grants to the other party or any Person "most favored nation" status or pricing or (C) that grants to the other party or any Person any exclusive right or rights or in which any third party grants the Sellers any exclusive right or rights; (j) any Contract imposing any restriction or limitation on the sale or other transfer of any of the Purchased Assets; (k) any partnership, joint venture or similar agreement to which the Sellers are a party or by which any of its assets are bound or otherwise subject; (l) any Contract providing for the sale, lease, license or control of, or otherwise relating to any Intellectual Property to or from the

Sellers, including any Contract relating to nondisclosure or appropriation of Intellectual Property by the Sellers' current or former employees, consultants or contractors; (m) any Contract that purports to bind the Purchaser or any of its Affiliates after the consummation of the Closing; (n) any Contracts involving any obligation or liability of the Sellers (whether direct or indirect, fixed or contingent, known or unknown, due or to become due, accrued or otherwise, and whether or not determined or determinable) as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person; (o) any Contract containing or providing for any Tax sharing, Tax allocation or Tax indemnification; and (p) any Contract to which the Sellers are a party or by which any of its assets are bound or otherwise subject relating to the acquisition or disposition of any business or any assets with a value in excess of $10,000. Each Material Contract is a legal, valid, and binding obligation of the Sellers and the other parties thereto, enforceable against the Sellers and the other parties thereto in accordance with their respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at Law or in equity. The copy of each written Material Contract or summary of each oral Material Contract furnished to Purchaser is a true and complete copy of the document it purports to represent or summary, as the case may be, and reflects all amendments thereto made through the date of this Agreement. The Sellers have not violated any of the terms or conditions of any Material Contract or any term or condition which would permit termination or modification of any Material Contract, and all of the covenants to be performed by any other party thereto have been fully performed, and there are no claims for breach or indemnification or notice of default or termination under any Material Contract. There are no unresolved disputes under any of the Seller Contracts. No event has occurred which constitutes, or after notice or the passage of time, or both, would constitute, a default by the Sellers under any Material Contract, and to the knowledge of the Sellers no such event has occurred which constitutes or would constitute a default by any other party.

**~~2.9.~~2.11.**     **Financial Condition**.

(a)    Financial Statements. Schedule 2.~~9~~11(a) sets forth the Seller Balance Sheet and the related statements of income and retained earnings for the period then ended. The Seller Balance Sheet and the related statements of income and retained earnings (i) were prepared in accordance with GAAP; (ii) fairly present in all material respects such Seller's financial condition and the results of its operations as of the relevant dates thereof and for the periods covered thereby; (iii) contain and reflect all necessary adjustments and accruals for a fair presentation in all material respects of such Seller's financial condition and the results of its operations for the periods covered by said financial statements; (iv) contain and reflect adequate provisions for all reasonably anticipated liabilities for all Taxes, with respect to the period then ended and all prior periods; and (v) with respect to contracts and commitments for the sale of goods or the provision of services by such Seller, contain and reflect in all material respects adequate reserves for all reasonably anticipated material losses and costs and expenses in excess of expected receipts.

(b)    Books and Records. The books of account, minute books and other similar records of the Sellers with respect to the Businesses are true, complete and correct in all material

respects and have been maintained in accordance with reasonable business practice. The Sellers have made and kept books, records and accounts that, in reasonable detail, accurately and fairly reflect its transactions and the disposition of its assets.

(c)     There are no off-balance sheet transactions, arrangements or other relationships relating to the Sellers, the Businesses or the Purchased Assets between and/or among the Sellers or any of their Affiliates and any unconsolidated Person in which the Sellers or any of their Affiliates has any direct or indirect interest, including any structured finance, special purpose or limited purpose entity.

(d)     The accounts payable and other accrued expenses including among the liabilities of the Sellers represent bona fide obligations incurred by the Sellers in the ordinary course consistent with past practice.  None of such accounts payable and other accrued expenses are past due.

(e)     To the Sellers' Knowledge, no employee of Sellers has provided or is providing information to any law enforcement agency regarding the commission or possible commission of any crime or the violation or possible violation of any Law, rule, regulation, order, decree or injunction.  Neither the Sellers, or to the Sellers' Knowledge, any contractor, subcontractor or agent of the Sellers or the Business has discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against an employee of the Sellers in the terms and conditions of employment because of any act of such employee described in 18 U.S.C. § 1514A(a).

(b)(f)   No Undisclosed Liabilities.  Except for (i) those liabilities specifically accrued or reserved against on the Seller Balance Sheet, (ii) those current liabilities for trade or business obligations incurred since the Seller Balance Sheet Date in the ordinary course of the business and consistent with past practices or (iii) those liabilities arising under Seller Contracts, Seller has, as of the date hereof, no direct or indirect indebtednessIndebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, contingent or otherwise, which individually or in the aggregate are material to the financial condition, assets, liabilities, business or operations of Seller.

**2.12.   Changes Since the Seller Balance Sheet Date.**  Except as set forth on Schedule 2.12, since the date of the Seller Balance Sheet, the Sellers have operated the Businesses only in the ordinary course consistent with past practice and there has been no:

(a)     sale or issuance of any capital stock or other securities of either Seller;

(b)     development, change, event or occurrence that, individually or in the aggregate, has had, or is reasonably likely to have, a Material Adverse Effect;

(c)     creation, incurrence or assumption by the Sellers of any Indebtedness or loan or advance made by either Seller to any Person;

(d)     mortgage, pledge or subjection to any Encumbrance of any of the Purchased Assets;

(e)     amendment or modification to, or waiver of any rights by the Sellers or any other Person under, any Seller Contract;

(f)     sale or transfer of any of the Purchased Assets (including Intellectual Property);

(g)     acquisition of assets by the Sellers;

(h)     establishment or adoption of, entering into, amendment to increase in benefits under, or termination of, any:  (i) collective bargaining agreement covering employees of the Sellers; or (ii) benefit plan or compensation plan, arrangement or agreement (including, without limitation, bonuses, profit sharing, stock option, restricted stock, pensions, retirement benefits, deferred compensation, severance or termination benefits) for any employees or other individuals who perform services for or on behalf of the Businesses;

(i)     increase in the base salary of, or payment of any bonus or other compensation or benefits to, any employee or other individual who performs services for or on behalf of the Sellers;

(j)     transaction between the Sellers and any Insider or payment made to, or received by the Sellers from, any Insider;

(k)     change in any method of accounting or accounting practice or Tax calculating or Tax reporting methods or practice;

(l)     material Tax election or change in Tax accounting;

(m)     change or modification to any of the following:  (i) billing and collection policies, procedures and practices with respect to receivables or unbilled charges; (ii) policies, procedures and practices with respect to the provision of discounts, rebates or allowances; or (iii) payment policies, procedures and practices with respect to accounts payable;

(n)     entrance into any material transaction;

(o)     amendment or modification of the certificates of formation or limited liability operating agreements of the Sellers;

(p)     physical damage, destruction or loss in an amount exceeding $10,000 in the aggregate affecting the Sellers, the Businesses or the Purchased Assets;

(q)     payment with respect to, or discharge, compromise or settlement of, any action, suit, proceeding, claim or demand; or

(r)     any authorization, approval, agreement or commitment to do any of the foregoing.

**2.10.2.13**       **Intellectual Property.**

(a)       For purposes of this Agreement, "*Sellers' Intellectual Property*" shall mean collectively the SkyCam Intellectual Property and the CableCam Intellectual Property.  To such Seller's Knowledge, neither the use nor exploitation by the Purchaser of any of its Intellectual Property infringes upon or will infringe upon or violate any copyright, trade secret, patent, trademark, trade dress, or other proprietary right of any third party (within the United States or abroad) and no license of any third party intellectual property is or will be required by Buyer to lawfully implement, use or exploit its Intellectual Property.

(b)       To such Seller's Knowledge, such Seller has taken commercially reasonable steps to maintain the confidentiality of trade secrets and confidential information included in the Intellectual Property.

(c)       Such Seller has good and valid title to all of its Intellectual Property, free of any Encumbrances, and has a valid right to use and otherwise exploit, and to license others to use and otherwise exploit, all of its Intellectual Property.  Such Seller is not obligated to make any payment to any Person for the use or other exploitation of any of such its Intellectual Property. Such Seller is free to use, modify, copy, distribute, sell, license or otherwise exploit its Intellectual Property on an exclusive basis (other than Intellectual Property consisting of software licensed to such Seller under third party licenses generally available to the public, with respect to which such Seller's rights are not exclusive).

(d)       All patents, trademarks, service marks and copyrights that are registered with any Governmental Body and held by such Seller are valid and subsisting. None of such Seller's Intellectual Property infringes or conflicts with its Intellectual Property owned or used by any other Person. Such Seller is not infringing, misappropriating or making any unlawful use of, and such Seller has not at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of, such Seller's Intellectual Property owned or used by any other Person.   Except as disclosed in Schedule 2.1013(d), to such Seller's Knowledge, no other Person is infringing, misappropriating or making any unlawful use of, its Intellectual Property.

(e)       To such Seller's Knowledge, its Intellectual Property being transferred, assigned and/or licensed to Purchaser in this transaction constitutes all of the Intellectual Property necessary for Purchaser to operate the Businesses as presently conducted by such Seller.  The Sellers have, and the Purchaser will acquire at the Closing, the right to use the names "SkyCam" and "CableCam" and variations thereof.

**2.11.2.14**       **Insurance.**   Such Seller has not received (i) any notice of cancellation of any policy The Sellers are covered by valid, outstanding and enforceable policies of insurance covering their respective properties, assets and Businesses against risks of the nature normally insured against by companies in the same or similar lines of business and in coverage amounts typically and reasonably carried by such Sellers (the "*Insurance Policies*").  Such Insurance

Policies are in full force and effect, and all premiums due thereon have been paid.  Such Seller has not received (i) any notice of cancellation of any Insurance Policy or binder of insurance or refusal of coverage thereunder; (ii) any notice that any issuer of such policy or binder has filed for protection under applicable bankruptcy or insolvency laws or is otherwise in the process of liquidating or has been liquidated; or (iii) any other indication that any such policy or binder may be unwilling or unable to perform its obligations thereunder.  Schedule 2.14 contains a complete and correct list of all Insurance Policies and amendments and riders thereto that cover the Businesses or any Purchased Assets (copies of which have been provided to Purchaser), and identifies the insurer, type of coverage, and policy period for each policy.

2.12.2.15     **Tax Matters.**

(a)     Such Seller has (i) filed all Tax Returns required to be filed by it on or prior to the date hereof and (ii) paid all Taxes due and payable in respect of all periods up to and including the date hereof.  Each Seller has timely and properly withheld or collected, paid over and reported all Taxes required to be withheld or collected by such Seller on or before the date hereof.

(b)     To such Seller's Knowledge: (i) No Tax AuthorityGovernmental Body has asserted any adjustment that could result in an additional Tax for which such Seller is or may be liable or that could result in a Lienan Encumbrance on any of the Purchased Assets (collectively, "***Tax Liability***"); (ii) there is no pending audit, examination, investigation, dispute, proceeding or claim (collectively, "***Tax Proceeding***") relating to any Tax Liability; (iii) no statute of limitations with respect to any Tax has been waived or extended (unless the period to which it has been waived or extended has expired); (iv) there is no outstanding power of attorney authorizing anyone to act on behalf of such Seller in connection with any Tax Liability, Tax Return or Tax Proceeding; (v) there is no outstanding closing agreement, ruling request, request to consent to change a method of accounting, subpoena or request for information with or by any Tax AuthorityGovernmental Body with respect to such Seller, its income, assets or business, or any Tax Liability; (vi) such Seller is not a party to any Tax sharing or Tax allocation agreement, arrangement or understanding; and (vii) such Seller has not received any notice from a Tax AuthorityGovernmental Body asserting that Seller should file a Tax Return in any jurisdiction where it does not file

2.13.2.16     **Employee and Labor Matters.**

(a)     Schedule 2.1316(a) accurately sets forth, with respect to each employee of such Seller (including any employee who is on a leave of absence or on layoff status): (i) the name and title of such employee; (ii) the aggregate dollar amounts of the compensation (including wages, salary, commissions, director's fees, fringe benefits, bonuses, profit-sharing payments and other payments or benefits of any type) received by such employee from such Seller; (iii) such employee's annualized compensation as of the date of this Agreement; (iv) the number of hours of sick-time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof; and (v) the number of hours of vacation time which such employee has accrued as of the date hereof and the aggregate dollar amount thereof.

(b)     Schedule 2.~~13~~16(b) accurately identifies each former employee of such Seller who is receiving or is scheduled to receive (or whose spouse or other dependent is receiving or is scheduled to receive) any benefits from such Seller relating to such former employee's employment with such Seller; and Schedule 2.~~13~~16(b) accurately describes such benefits.

(c)     Except as set forth in Schedule 2.~~13~~16(c), such Seller is not a party to or bound by, and has never been a party to or bound by, any employment contract or any union contract, collective bargaining agreement or similar Contract and there has been no effort by any labor union during the twenty-four (24) months prior to the date hereof to organize any employees of the Sellers into on or more collective bargaining units.  There are no pending or threatened labor dispute, strike or other work stoppage with affects or which my affect the Businesses or which may interfere with continued operations.  There has been no strike, walkout or work stoppage involving any of the employees of the Sellers during the twenty-four months prior to the date hereof.

(d)     Such Seller has provided to Purchaser accurate and complete copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials relating to the employment of the current and former employees of such Seller.

(e)     Except as set forth on Schedule 2.16(e), the Sellers are not party or subject to any employment agreements, non-compete agreements or consulting agreements.

## 2.17    Employee Benefit Plans

(a)     Schedule 2.17 contains a true and complete list of each employee benefit plan as defined in Section 3(2) of ERISA, employee welfare benefits plan as defined in Section 3(1) of ERISA, and each deferred compensation, stock option, stock purchase, bonus, medical, welfare, disability, severance or termination pay, insurance or incentive plan, and each other employee benefit plan, program, agreement or arrangement, (whether funded or unfunded, written or oral, qualified or nonqualified), sponsored, maintained or contributed to or required to be contributed to by the Sellers or by any trade or business, whether or not incorporated, that together with the Sellers would be deemed a "single employer" within the meaning of Section 4001 of ERISA (a "*Seller ERISA Affiliate*"), for the benefit of any employee, terminated employee, leased employee or former leased employee, director, officer, shareholder or independent contractor of the Sellers or any Seller ERISA Affiliate (the "*Employee Benefit Plans*").   Schedule 2.17 identifies each plan that is an "employee benefit plan," within the meaning of Section 3(3) of ERISA.  The Sellers have no liability with respect to any plan, arrangement or practice of the type described in this Section 2.17 other than the Employee Benefit Plans set forth on Schedule 2.17.

(b)     The Sellers do not participate currently and have never participated in and is not required currently and has never been required to contribute to or otherwise participate in any "multi-employer plan," as defined in Sections 3(37)(A) and 4001(a)(3) of ERISA and Section 414(f) of the Code or any "multiple employer plan" within the meaning of Section 210(a) of ERISA or Section 413(c) of the Code.

(c)     No Employee Benefit Plan is or at any time was a "defined benefit plan" as defined in Section 3(35) of ERISA or a pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Code.  The Sellers do not participate currently and has never participated in and is not required currently and has never been required to contribute to or otherwise participate in any plan, program, or arrangement subject to Title IV of ERISA.

(d)     With respect to each Employee Benefit Plan of the Sellers: (i) each has been administered in compliance with its terms and with all applicable laws including, without limitation, ERISA and the Code; (ii) no actions, suits, claims or disputes are pending or threatened against any such plan, the trustee or fiduciary of any such plan, the Sellers or any assets of any such plan; (iii) no audits, proceedings, claims or demands are pending with any Governmental Body including, without limitation, the Internal Revenue Service and the Department of Labor; (iv) all reports, returns and similar documents required to be filed with any Governmental Body or distributed to any such plan participant have been duly or timely filed or distributed; (v)  no "prohibited transaction", within the meaning of ERISA or the Code, or breach of any duty imposed on "fiduciaries" pursuant to ERISA has occurred; (vi) all required or discretionary (in accordance with historical practices) payments, premiums, contributions, reimbursements or accruals for all periods ending prior to or as of the Closing shall have been made or properly accrued on the Seller Balance Sheet or will be properly accrued on the books and records of the Sellers as of the Closing; and (vii) no such plan has any unfunded liabilities which are not reflected on the Seller Balance Sheet or the books and records of the Sellers.

(e)     True and accurate copies of each Employee Benefit Plan of the Sellers have been furnished to Purchaser.  In the case of any unwritten Employee Benefit Plan, a written description of such plan has been furnished to Purchaser.  To the Knowledge of the Sellers, all amendments required to bring any Employee Benefit Plan into conformity with any applicable provisions of ERISA and the Code have been duly adopted.

(f)     To the Knowledge of the Sellers, with respect to each Employee Benefit Plan of the Sellers intended to qualify under Code Section 401(a) or 403(a): (i) the Internal Revenue Service has issued a favorable determination letter, which has not been revoked, that any such plan is tax-qualified and each trust created thereunder has been determined by the Internal Revenue Service to be exempt from federal income tax under Code Section 501(a); (ii) nothing has occurred or will occur through the Closing which would cause the loss of such qualification or exemption or the imposition of any penalty or tax liability; (iii) no reportable event (within the meaning of Section 4043 of ERISA) has occurred; and (iv) the present value of all liabilities under any such plan will not exceed the current fair market value of the assets of such plan (determined using the actuarial assumption used for the most recent actuarial valuation for such plan).

(g)     To the Knowledge of the Sellers, no Employee Benefit Plan obligates the Sellers to pay separation, severance, termination, or similar benefits as a result of any transaction contemplated by this Agreement or solely as a result of a "change of control" (as defined in Section 280G of the Code) and no individual shall accrue or receive any additional benefits, service or accelerated rights to payments of benefits under any Employee Benefit Plan as a result of the actions contemplated by this Agreement.

(h)      No Employee Benefit Plan provides medical or dental benefits for any current or former employees of the Sellers or its predecessors after termination of employment other than the rights that may be provided by Law.

(i)      To the Knowledge of the Sellers, there are no leased employees or independent contractors within the meaning of Section 414(n) of the Code who perform services for the Sellers.

(j)      The Sellers have complied with the notice and continuation of coverage requirements of Section 4980B of the Code, and the regulations thereunder, and Part 6 of Title I of ERISA ("*COBRA*") and has complied with the Health Insurance Portability and Accountability Act of 1996 ("*HIPAA*") with respect to any group health plan within the meaning of Code Section 5000(b)(1).  The Sellers will be responsible for the continued compliance with COBRA and HIPAA with respect to all of its current and former employees at the time of the Closing.

(k)      Purchaser will not suffer any loss, cost or liability as a result of any claim that the Sellers or any entity that would be aggregated with the Sellers under Code Section 414(b), (c), (m) or (o), has not complied with the provisions of this Section 2.17 with respect to each Employee Benefit Plan maintained by any such entity.

**2.18   Environmental Matters**. The Sellers are in compliance with all Environmental Laws. There is no Environmental Claim pending or, to the Knowledge of the Sellers, threatened, by any Governmental Body or any other Person with respect to the Businesses.  Except as disclosed on Schedule 2.18, the Sellers have not engaged in any activity that has resulted in the release of a Hazardous Substance into the environment, nor have the Sellers been, or formally alleged to have been, at any time, a "generator" or "transporter" of any Hazardous Substance at any "facility," within the meaning given those terms under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) ("*CERCLA*").  In addition, and without limitation of the foregoing representations in this Section 2.18, (i) to the Knowledge of the Sellers, there are no currently existing and uncorrected violations of any Environmental Law emanating from, occurring on, under or in any way related to, any real property at any time owned or leased by the Sellers, (ii) to the Knowledge of the Sellers, the real property leased by the Sellers is not, and while the Sellers have leased it has not been, contaminated with Hazardous Substances such that remediation has been, may be or is required by Environmental Laws, (iii) the Sellers have not handled any Hazardous Substance, except in accordance with Environmental Laws, and (iv) no oral or written notification of a release of a Hazardous Substance has been filed by or on behalf of the Sellers with any Governmental Body.

**2.19   Compliance with Laws**.  The Sellers are and have been in compliance with all Laws, regulations and orders applicable to it, its business and operations (as conducted by it now and in the past), the Purchased Assets, and any other properties and assets (in each case owned or used by it now or in the past).  Neither the Sellers, nor any of their employees or agents, has made any payment of funds in connection with the Businesses which is prohibited by Law, and no funds have been set aside to be used in connection with the business of the Sellers for any payment prohibited by Law.

**2.20    Licenses and Permits**.  The Sellers possess all Business Permits for the Businesses, and Schedule 2.20 contains a true and complete list of all such Business Permits.  All such Business Permits are valid and in full force and effect, the Sellers are in full compliance with the respective requirements thereof, and no event has occurred which permits, or upon the giving of notice or lapse of time or otherwise would permit, revocation, early termination or non-renewal of any of the Business Permits, except where to do so would not be a Material Adverse Effect.  No proceeding is pending or, to the Knowledge of the Sellers, threatened to revoke or amend any of them.  To the Knowledge of the Sellers, none of such Business Permits is or will be impaired or in any way affected by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**2.21    Relationships with Customers and Suppliers**.  The Sellers  have not violated any of the terms or conditions of any of its customer contracts, and to the Knowledge of the Sellers all of the covenants to be performed by any other party thereto have been fully performed and there are no claims for breach or indemnification or notice of default or termination thereunder.  To the Sellers' Knowledge: (a) no event, occurrence or fact has occurred or is likely to occur which has threatened to or is likely to adversely and materially affect the Sellers' arrangements with Sellers' customers, suppliers and vendors; (b) no event, occurrence, or fact has occurred or is likely to occur which has lead it to believe or is likely to lead it to believe that any of such customers, suppliers or vendors will not continue to purchase from the Sellers (in the case of customers) or supply the current level and type of materials, supplies, merchandise, services and other goods currently being purchased from or provided to the Sellers, as the case may be (in the case of suppliers and vendors), in each case on substantially similar terms and conditions.  To the Sellers' Knowledge, there are no currently pending warranty claims by any customer or any basis therefor.

~~2.14~~**2.22**    **Brokers.**  Noble has acted as agent for Sellers in this transaction, and Sellers will be solely responsible for any fees or commissions payable to Noble. Except as so stated, no broker, finder, agent or similar intermediary has acted for or on behalf of Sellers or is entitled to a fee or commission in connection with this Agreement or the transactions contemplated hereby.

~~2.15~~**2.23**    **Full Disclosure.** None of the Transactional Agreements contains or will contain any untrue statement of fact; and none of the Transactional Agreements omits or will omit to state any fact necessary to make any of the representations, warranties or other statements or information contained therein not misleading. All of the information set forth in the Disclosure Schedule, and all other information regarding such Seller and its business, condition, assets, liabilities, operations, financial performance, net income and prospects that has been furnished to the Purchaser or any of the Purchaser's Representatives by or on behalf of the Seller or by any Representative of the Seller, is accurate and complete in all respects.

**2.24    Names; Prior Acquisitions.**  All names under which the Sellers have done business through the date hereof are specified on Schedule 2.24.  The Sellers have not changed their name or used any assumed or fictitious name, or been the surviving entity in a merger, acquired any business, or changed its principal place of business or chief executive office, within the past three (3) years.

**2.25    Transactions with Insiders.**  Schedule 2.25 contains, other than loans by or advances to Insiders that have been satisfied on or prior to the date of this Agreement:  (a) a list and description of all Contracts to which two or more of the following are a party: the Sellers, any Affiliate of the Sellers, any owner of the Sellers, any Affiliates of the owners (each an "***Insider***"); and (b) a description of all Contracts and other transactions in excess of $5,000 individually or $25,000 in the aggregate that are not the subject of the Contracts described in clause (a) above and relate to the Businesses (the "***Insider Transactions***") between the Sellers, on the one hand, and any Insider, on the other hand, that have occurred since December 31, 2009.  No Insider has any interest in any of the Purchased Assets.

**2.26    Restrictions on Business Activities.**   The Sellers are not subject to any Contract to which the Businesses are parties or any injunction to which the Businesses are subject which restricts the continued operation of the Businesses or the expansion thereof to other geographical areas, customers and suppliers or lines of business. Except for this Agreement, there is no Contract or any order from a Governmental Body binding upon the Sellers that has or could reasonably be expected to have the effect of prohibiting or impairing any business practice of the Sellers, acquisition of property by the Sellers, or the conduct of the Businesses of the Sellers as presently conducted.

3.    **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.**

The Purchaser represents and warrants, to and for the benefit of the Seller, as follows:

**3.1    Authority; Binding Nature Of Agreements.** The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its [board of directors.managers]. The Purchaser has the absolute and unrestricted right, power and authority to enter into and perform its obligations under the Assumption Agreement, and the execution, delivery and performance of the Assumption Agreement by the Purchaser have been duly authorized by all necessary action on the part of the Purchaser and its board of directors. This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms. Upon the execution and delivery of the Assumption Agreement at the Closing, the Assumption Agreement will constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their terms.

**3.2    Brokers.** The Purchaser has not become obligated to pay, and has not taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Transactions.

**3.3 Required Consents; No Violation of Law**.  To the best of Purchaser's Knowledge, neither the execution nor delivery of this Agreement by Purchaser nor the consummation of the transactions contemplated hereby will require the consent or approval of any governmental or non-governmental third party.

4.    ~~CLOSING DELIVERABLES~~

~~4.1    Closing Deliverables of Sellers.  At the Closing, Sellers shall deliver to Purchaser the following documents:~~

~~(a)    Written evidence reasonably satisfactory that all Consents, authorizations, orders and approvals of any Governmental Body, if any, required in connection with the execution, delivery and performance of this Agreement has been obtained or made;~~

~~(b)    Written evidence reasonably satisfactory to Purchaser that any member or management committee approval required under applicable law and the Sellers' charter documents has been obtained;~~

~~(c)    Financial statements for the years ended December 31, 2012, December 31, 2011 and December 31, 2010;~~

~~(d)    Seller Contracts, with such assignments thereof and Consents to assignments as are required pursuant to the terms of such Seller Contracts and are necessary to assure the full benefit thereof.~~

~~(e)    The Businesses' Records and Sellers shall take all requisite steps to put Purchaser in actual possession and operating control of the Purchased Assets and the Businesses.~~

~~4.2 Closing Deliverables of Purchaser.  At the Closing, Purchaser shall deliver to Sellers such other documents as are reasonably necessary for Sellers to effectuate and document the transactions contemplated hereby.~~

**~~5.~~  4.   POST-CLOSING COVENANTS.**

**~~5.1~~ 4.1  Access to Business Records**.  After the Closing, Purchaser shall afford to Sellers and their accountants, attorneys and other representatives reasonable access to the Businesses' Records and shall permit Sellers to make extracts and copies therefrom for the purpose of preparing such tax returns, financial statements (including audited financial statements) and other reports and filings of Sellers as may be required after the Closing and for other proper purposes approved by Purchaser acting reasonably and in good faith.

**~~5.2~~ 4.2  Further Assurances**.  Sellers from time to time after the Closing at the request of Purchaser (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of transfer and assignment, and take such other action as Purchaser may reasonably require to more effectively transfer and assign to, and vest in, Purchaser each of the Purchased Assets and to carry out the purposes of this Agreement. Purchaser from time to time after the Closing at the request of Sellers (acting reasonably and in good faith) and without further consideration shall execute and deliver further instruments of assumption, and take such other action as Sellers may reasonably require to more effectively evidence the assumption by Purchaser of the Assumed Liabilities and to carry out the purposes of this Agreement.

**5.3~~4.3~~ Actioncam Claim**.  ~~Upon the final resolution of the Actioncam Litigation and/or the liquidation of the assets of Actioncam, LLC (or, alternatively, the sale of Actioncam or its assets to Purchaser), Purchaser shall pay OUTD fifty percent (50%) of the Net Litigation Award, such Net Litigation Award will not exceed one hundred thousand dollars ($100,000).  For purposes herein, "Net Litigation Award" shall mean the difference between: (1) the aggregate award, damages, and/or recovery (whether sums or things of value are received pursuant to any demand upon or litigation against Actioncam, whether said sums are received pursuant to settlement, court proceedings, or otherwise), and/or the associated monetary value, awarded to SkyCam at the conclusion of the Actioncam Litigation; and (2) the aggregate reasonable attorneys' fees and costs incurred by Purchaser in connection with the Actioncam Litigation following the Closing Date.  Notwithstanding the foregoing, after Closing: (i) Purchaser shall have the exclusive right to manage any ongoing litigation and OUTD shall cooperate in all aspects of the litigation as may reasonably be requested by the Purchaser; and (ii) any Actioncam Litigation related costs incurred by Purchaser shall be the sole responsibility of Purchaser.~~  In order to assist Parent in satisfying its obligations under the McAfee Agreement, following the final resolution of the Actioncam Claim, any monetary recovery (and for the avoidance of doubt, such recovery must be received in a cash payment and not in a recovery of other assets) actually received by Purchaser will be allocated as follows: (i) to the Purchaser in an amount necessary to pay all legal fees incurred by Purchaser in regards to the Actioncam Claim after the Closing Date; (ii) $[281,902-NUMBER TO BE CONFIRMED] to McAfee & Taft; (iii) $100,000 to Parent (such amount to be reduced by the McAfee Injunction Success Fee) (the "***Actioncam Payment***"); and (iv), any remaining amounts shall be split 50/50 between Purchaser and McAfee & Taft.

**5.4~~4.4~~ Royalty**.  For a period of twelve (12) months following the Closing Date ("***Royalty Period***"), Purchaser shall pay ~~OUTD~~Parent a twenty percent (20%) fee ("***Royalty***") on revenue (excluding bill-back revenue from venue-driven charges and on site third party equipment rentals) ~~from~~directly attributable to any incremental CBS regular season NFL and SEC events covered by the Purchaser which have not been regularly covered by Sellers in the past (more specifically, SkyCam and CableCam have not regularly covered CBS SEC college football games nor CBS regular season NFL games with the exception of the CBS Thanksgiving NFL game).~~-~~  **[NTD: Example to be provided for discussion purposes]**

(a)  Purchaser shall make payments of Royalty to ~~OUTD~~Parent via wire transfer drawn on a United States bank designated by ~~OUTD.~~Parent.  Royalty payments shall accrue as billed and be paid monthly throughout the Royalty Period.  Each monthly Royalty payment shall be made within thirty (30) days after the close of the foregoing month.  ~~All amounts not paid within forty-five (45) days of the due date shall bear interest at the rate of twelve percent (12%) per year, or the maximum permitted by law, whichever is less, from the date due until paid.~~  All amounts expressed and due under this Agreement shall be in United States Dollars.  Notwithstanding the foregoing, the first Royalty payment shall be for the period from the Closing Date through the end of the first calendar quarter that is at least three months from the Closing Date.  For purposes of clarity, if the Closing Date is June 1, 2013, the first calendar quarter that is at least three months from the Closing Date will be September 30, 2013.  Thereafter, Royalty payments shall be paid to ~~OUTD~~Parent on a monthly basis.

(b)     Concurrent with each Royalty payment, Purchaser shall deliver to ~~OUTD~~Parent via e-mail an itemized statement (the "***Monthly Report***") which is certified as accurate by an authorized representative of Purchaser.  The Monthly Report shall set forth the following:  (i) the date and description of the event; (ii) the amount billed (exclusive of the bill-backs and third party rentals); (iii) the calculation of the amount of the Royalty payment due to ~~OUTD.~~ Parent. Purchaser shall deliver a Monthly Report even if no payment is due.

~~5.5     Consents.  To the extent any of the approvals, Consents or waivers required to consummate the transactions contemplated by this Agreement, including, without limitation, the Consents and approvals required to assign any of Material Seller Contracts to Purchaser, have not been obtained by any of the Sellers as of the Closing Date, such Seller shall use its commercially reasonable efforts to do the following:~~

~~(a) Cooperate with Purchaser in any reasonable and lawful arrangements designed to provide the benefits of such Material Contracts to Purchaser as long as Purchaser promptly reimburses such Seller for all out-of-pocket payments or chargers made by such Seller in connection therewith; and~~

~~(b) Enforce, at the request of Purchaser and at the expense and for the account of Purchaser, any and all rights of such Seller arising from such interest against the other party or parties thereto (including the right to elect to terminate such interest in accordance with the terms thereof upon the written advice of Purchaser).~~

**~~5.6~~4.5  Use of "SkyCam" and "CableCam" Names**.  Notwithstanding anything to the contrary contained herein, the Sellers shall be entitled to use the "SkyCam" and "CableCam" names for ninety (90) days after the Closing in connection with payroll and general administrative activities relating to its transition out of operating the Businesses~~.~~

~~5.5     Confidentiality.  Except in connection with any dispute between the parties and subject to any obligation to comply with (a) any Applicable Law (b) any rule or regulation of any Authority or securities exchange or (c) any subpoena or other legal process to make information available to the Persons entitled thereto, all information obtained by any party about any other or any Affiliate of the other, and all of the terms and conditions of this Agreement, shall, for a period of one (1) year after the date of this Agreement, be kept in confidence by each party, and each party shall cause its shareholders, members, partners, directors, officers, managers, employees, agents and attorneys to hold such information confidential.  Such confidentiality shall be maintained to the same degree as such party maintains its own confidential information and shall be maintained until such time, if any, as any such data or information either is, or becomes, published or a matter of public knowledge; provided, however, that from and after the Closing, Purchaser shall be under no obligation to maintain confidential any such information concerning Sellers.  In the event either party becomes legally compelled to disclose any such information, it shall promptly provide the other with written notice of such requirement so that the other may seek a protective order or other remedy.~~

**~~5.8~~4.6  Publicity**.  No publicity release or announcement concerning this Agreement or the transactions contemplated herein shall be issued without advance written approval of the form

App. 360

and substance thereof by Purchaser and Sellers; provided, however, that such restrictions shall not apply to any disclosure required by ~~Authorities, Applicable~~Governmental Bodies, applicable Law or the rules of any securities exchange which may be applicable.  After the Closing Date, the parties shall consult with each other before issuing any press release or public statement with respect to this Agreement or the transactions contemplated herein, and, except as may be required by ~~Applicable~~applicable Law or the rules of any securities exchange which may be applicable, will not issue any such press release or public statement prior to such consultation. Notwithstanding the foregoing, Purchaser and Sellers shall not be prevented or restricted in any way from notifying third parties at any time following the Closing that it has purchased the Businesses and the Purchased Assets and introducing itself as successor.

~~**5.7**   **Deferred Revenues**.  During the period from the Closing Date through December 31, 2013, the parties hereby agree that any revenues collected by Seller but attributable to games or events that are fully performed by Sellers after the Closing Date shall be paid by Seller to Purchaser three (3) business days prior to the game or event.  Purchaser shall deliver notice and proof of such scheduled events to Sellers no sooner than ten (10) days prior to such events or games.  Seller shall remit and pay Purchaser by wire transfer or check the revenues attributable to such events no later than three (3) business days prior to the game or event.~~

~~**6.**   **MISCELLANOUS.**~~

**4.7**   ~~**Survival of Representations and**~~ **Restrictive** Covenants.  ~~Except for Section 2.2 (title), which shall survive for twelve (12) months following the Closing, none of the representations and warranties made by the Parties in~~ Notwithstanding any other provision of this Agreement ~~and in the certificates, documents and schedules delivered hereto shall survive the consummation~~to the contrary, in order to assure that Purchaser will realize the benefits of the transactions contemplated hereby, the Sellers agree that they will not:

(a)   for a period of [five (5)] years following the Closing Date  (the "***Noncompete Period***"), directly or indirectly, alone or as a partner, joint venturer, consultant, agent, independent contractor, lender or security holder, of any company or business, engage in or aid others to engage in the Businesses, anywhere in the United States (the "***Territory***"); provided, however, that the beneficial ownership of less than five percent (5%) of any class of securities of any entity having a class of equity securities actively traded on a national securities exchange or over-the-counter market shall not be deemed, in and of itself, to violate the prohibitions of this Section 4.7;

~~6.1~~(b) during the Noncompete Period, directly or indirectly: (i) induce any customer acquired hereunder~~.~~ or any other customer of  Purchaser or any of its subsidiaries, successors or assigns (as used in this Section 4.7, the "***Purchaser Companies***") to patronize any business which is directly or indirectly in competition with the Business conducted by any of the Purchaser Companies; (ii) canvass, solicit or accept from any Person which is a customer of the Business conducted by any of the Purchaser Companies, any such competitive business; or (iii) recommend, request or advise any customer of the Business conducted by any of the Purchaser Companies to reduce withdraw, curtail, or cancel any such customer's business with the Purchaser Companies or their successors;

~~6.2     Disclaimer of Warranties.   EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT, SELLERS ARE SELLING THE PURCHASED ASSETS (AND THE BUSINESSES REPRESENTED THEREBY) ON AN "AS IS, WHERE IS" BASIS AND DISCLAIM ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTEES, WHETHER EXPRESS OR IMPLIED.   SELLERS MAKE NO IMPLIED REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO OTHER IMPLIED WARRANTIES WHATSOEVER.~~

(c)     during the Noncompete Period, directly or indirectly, solicit for employment, recruit, employ or enter into any arrangement to pay salary, bonus or other compensation to any person who was employed by the Purchaser Companies during the previous six (6) months, or in any manner seek to induce any employee of the Purchaser Companies to leave his or her employment; and

(d)     at any time following the Closing Date, directly or indirectly, in any way utilize, disclose, copy, reproduce or retain in their possession any of the Purchaser Companies' proprietary rights or records acquired hereunder, including, but not limited to, any customer lists.

**4.8     Confidentiality**.  From and after the date of this Agreement, the Seller Parties shall, and shall cause their respective affiliates to, maintain the confidentiality of, and shall not use for the benefit of itself or others, any information or materials concerning this Agreement and the transactions contemplated hereby, the Purchaser, the Businesses, the Purchased Assets or the Assumed Liabilities (the **_"Confidential Information"_**); provided, however, that "Confidential Information" shall be deemed not to include information that (a) is or becomes generally available to the public other than as a result of a disclosure, in violation of this Agreement, by or on behalf of the Seller Parties or any other Person or (b) is or becomes available to the Seller Parties on a non-confidential basis from a source that is entitled to disclose it.  In the event that the Seller Parties are required by applicable Law, interrogatories, requests for information or documents, subpoenas or similar process to disclose any Confidential Information, such party shall provide Purchaser with prompt prior written notice of such request or requirement so that Purchaser may seek an appropriate protective order (and if Purchaser seeks such an order, such party will provide such cooperation as Purchaser shall reasonably request).  If, in the absence of a protective order, the Seller Parties are nonetheless legally required to disclose Confidential Information, such party may disclose only that portion of the Confidential Information on pain of censure that such party is legally compelled to disclose, and such party shall exercise his or its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information.

**4.9     Remedies**.  If any Seller Party breaches or threatens to commit a breach of Section 4.7 or Section 4.8, Purchaser shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Purchaser under this Agreement, at Law or in equity: (a) the right and remedy to seek an injunction or otherwise in order to have Section 4.7 and Section 4.8 specifically enforced by any court of competent

jurisdiction, it being agreed that any breach or threatened breach of Section 4.7 and Section 4.8 would cause irreparable injury to Purchaser and that money damages would not provide an adequate remedy; and (b) the right and remedy to require the Seller Parties to account for and pay over to Purchaser any profits, monies, accruals, increments or other benefits derived or received by such Seller Party as the result of any actions or transactions constituting a breach of Section 4.7 and Section 4.8.

**4.10    Employees.**

(a)    Purchaser shall  make offers of employment to the employees of the Sellers listed on Schedule 4.10 (such employees who are offered employment and accept the terms and conditions of such offer and who are employed by Purchaser are hereinafter referred to as "*Hired Employees*").  The Sellers agree to accept the resignation of any Hired Employees effective at the time of the Closing or the time they accept an offer of employment from Purchaser, whichever is later.  Purchaser shall at its discretion establish the initial terms and conditions of employment for all Hired Employees; provided that Purchaser's offer of employment to the Hired Employees will be at the same base salary or base hourly wage rate for such employee in effect as of [March 1, 2013] and with the standard benefits that the Purchaser offers its current employees that are in a similar position.  The Sellers shall remain solely responsible for all employees that are not Hired Employees and all claims related thereto.

(b)    The Sellers shall pay or shall cause to be paid (or arrange for its insurance carriers to pay) all Hired Employees or their dependents for all amounts due and owing to such employees or their dependents through the Closing Date, including amounts due for wages or salary, on account of severance or separation payment rights that are triggered by the change of employment, if any, health benefit claims, bonus, accrued vacation or personal leave, and other benefits or amounts due under any Employee Benefit Plan through the Closing Date, when and as the same become due.

(c)    The active participation by all Hired Employees in the Employee Benefit Plans of the Sellers or their Affiliates will cease as of the Closing Date.  Buyer will not assume or continue, and will have no responsibility or liability to the Hired Employees or any other Person under or with respect to, any of the Employee Benefit Plans of the Sellers or their Affiliates.

(d)    Sellers shall continue to make or shall cause to be made all required contributions to any Employee Benefits Plan on behalf of the employees of the Businesses in respect of all periods through the Closing Date, and will fully vest the Hired Employees under any such Employee Benefits Plan as of the Closing Date.  The Sellers shall take or shall cause to be taken all actions as may be legally required to so vest such employees.  To the extent applicable, the Sellers shall take or cause to be taken all steps necessary to amend the 401(k) or similar plan so that any employee loan balances will not become due as a result of the Closing or the separation of the Hired Employees from employment with the Sellers, and to permit any such outstanding loan balances to be rolled over to Purchaser's corresponding 401(k) plan.

(e)    The provisions of this Agreement are for the benefit of Purchaser and the Sellers only, and no employee of the Sellers or any other Person shall have any rights hereunder.

Nothing herein expressed or implied shall be deemed an amendment of any Employee Benefit Plan or to otherwise confer upon any employee of the Sellers or any other Person, or any legal representatives or beneficiaries thereof, any rights or remedies, including any right to employment or continued employment for any specified period or to be covered under or by any employee benefit plan or arrangement, or shall cause the employment status of any employee to be other than terminable at-will.

**4.11    Notification of Certain Events**

    (a)    Prior to Closing, the Sellers shall promptly notify Purchaser, and Purchaser shall promptly notify the Sellers, in writing of: (a) the discovery by the Sellers or the Purchaser, as applicable, of any event, condition, fact or circumstance that occurred or existed on or prior to the date of this Agreement and that caused or constitutes a material inaccuracy in any representation or warranty made by such party in this Agreement; (b) any event, condition, fact or circumstance that occurs, arises or exists after the date of this Agreement and that would cause or constitute a material inaccuracy in any representation or warranty made by such party in this Agreement if (i) such representation or warranty had been made as of the time of the occurrence, existence or discovery of such event, condition, fact or circumstance, or (ii) such event, condition, fact or circumstance had occurred, arisen or existed on or prior to the date of this Agreement; (c) any event, condition, fact or circumstance hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in a Disclosure Schedule hereto; (d) any material breach of any covenant or obligation of the Sellers or Purchaser, as applicable; and (e) any event, condition, fact or circumstance that would make the timely satisfaction of any of the conditions set forth in Sections 5 or 6, as applicable, impossible or unlikely or that has had or could reasonably be expected to have a Material Adverse Effect on the Sellers or Purchaser, as applicable.  Except as set forth in Section 4.11(b) below, no notification given pursuant to this Section 4.11(a) shall limit or otherwise affect (A) any representations, warranties, covenants or obligations contained in this Agreement or (B) any of Purchaser's or Sellers' rights with respect to any inaccuracy or breach of such representations, warranties, covenants or obligations of the Sellers or Purchaser contained in this Agreement.

    (b)    If any event, condition, fact or circumstance that is required to be disclosed pursuant to Section 4.11(a) requires any change in the Disclosure Schedules hereto, or if any such event, condition, fact or circumstance would require such a change assuming such Disclosure Schedule was dated as of the date of the occurrence, existence or discovery of such event, condition, fact or circumstance, then the Sellers shall promptly deliver to Purchaser an update to such Schedule(s) specifying such change.  No such update shall be deemed to supplement or amend the Sellers' Schedules for the purpose of (a) determining the accuracy of any of the representations and warranties made by the Sellers in this Agreement, or (b) determining whether any of the conditions set forth in Section 5 has been satisfied.

**4.12    Purchaser Access to Business Records**.    After the Closing, Sellers shall afford to Purchaser and their accountants, attorneys and other representatives reasonable access to the Businesses' Records and shall permit Purchaser to make extracts and copies therefrom for the purpose of preparing such tax returns, financial statements (including audited financial

statements) and other reports and filings of Purchaser as may be required after the Closing and for other proper purposes approved by Seller acting reasonably and in good faith.

**4.13    Transition Services.**  For a period of sixty (60) days after the Closing, the Seller Parties will provide Purchaser with information technology, finance and accounting services and support as reasonably requested by Purchaser to facilitate the transition of the Businesses as set forth in the Transition Services Agreement. Pursuant to the Transition Services Agreement, an additional thirty (30) days of support, if needed, will be made available at the written request of Purchaser.

**5.       CONDITIONS TO THE OBLIGATIONS OF PURCHASER.**  The obligation of Purchaser to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions, any or all of which may be waived in whole or in part in writing by Purchaser:

**5.1    Accuracy of the Sellers' Representations.**

(a)    Subject to Section 5.1(b), each of the Sellers' representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement and will be accurate in all material respects as of the Closing Date.

(b)    Each of the Sellers' representations and warranties that contains an express materiality or Material Adverse Effect qualification shall have been accurate in all respects as of the date of this Agreement and will be accurate in all respects as of the Closing Date.

**5.2    Sellers' Performance.**  The covenants and obligations that the Sellers are required to perform or to comply with pursuant to the Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.

**5.3    Officer's Certificate.**  Purchaser will have received a certificate executed by a duly authorized officer of each of the Sellers confirming (a) the accuracy of the Sellers' representations and warranties as of the Closing Date in accordance with Section 5.1(a) and (b) the performance of and compliance with the Sellers' covenants and obligations to be performed or complied with as of the Closing Date in accordance with Section 5.2.

**5.4    Corporate Certificate.**  The Sellers shall have delivered to Purchaser: (i) copies of the certificates of formation and limited liability operating agreements of the Sellers in effect immediately prior to the Closing Date, (ii) copies of resolutions adopted by the [board of managers] and/or the [members] of the Sellers authorizing the transactions contemplated by this Agreement, and (iii) a certificate of good standing of the Sellers issued by the Secretary of State of Delaware as of a date not more than ten (10) days prior to the Closing Date, certified in the case of subsections (i) and (ii) of this Section as of the Closing Date by the President of the Sellers as being true, correct, and complete.

**5.5    FIRPTA Certificate.**  The Sellers shall have delivered to Purchaser a certificate, dated the Closing Date and sworn to under penalty of perjury, setting forth the name, address and

federal tax identification number of each of the Sellers and stating that each of the Sellers is not a "foreign person" within the meaning of Section 1445 of the Code, such certificate to be in the form set forth in the Treasury Regulations thereunder.

**5.6     Delivery of Purchased Assets.**  At the Closing, the Sellers shall duly execute and deliver to Purchaser (or its assignee) the Assumption Agreement, and such other instruments of transfer of title as are necessary to transfer to Purchaser (or its assignee) good and marketable title to the Purchased Assets (including endorsed titles for unencumbered vehicles transferred hereunder) free and clear of any Encumbrances other than the Assumed Liabilities, and shall deliver to Purchaser (or its assignee) immediate possession of the Purchased Assets.

**5.7     Consents.**  The Sellers shall have received all necessary permits, licenses, franchises, approvals and consents to the transactions contemplated hereby, including but not limited to the Consents listed on Schedule 2.8, and waivers of rights to terminate or modify any rights or obligations of the Sellers from any Person from whom such consent or waiver is required under any Contract to which the Sellers or the Purchased Assets are bound as of a date not more than ten (10) days prior to the Closing Date, or who, as a result of the transactions contemplated hereby, would have such rights to terminate or modify such Contracts, either by the terms thereof or as a matter of Law.

**5.8     Other Closing Documents.**  The Sellers and their Affiliates and the other applicable parties shall have executed and delivered the Transactional Agreements, and such other closing documents reasonably necessary to consummate the transactions contemplated by this Agreement.

**6.     CONDITIONS TO THE OBLIGATIONS OF THE SELLERS.**  The obligations of the Sellers to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions, any or all of which may be waived in whole or in part in writing by the Sellers:

**6.1     Accuracy of the Purchaser's Representations.**

(a)     Subject to Section 6.1(b), the Purchaser's representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement and will be accurate in all material respects as of the Closing Date.

(b)     The Purchaser's representations and warranties that contains an express materiality or Material Adverse Effect qualification shall have been accurate in all respects as of the date of this Agreement and will be accurate in all respects as of the Closing Date.

**6.2     Purchaser's Performance.**  The covenants and obligations that the Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.

**6.3     Purchase Price.**  At the Closing, Purchaser shall pay to the Sellers the Closing Payment, purchase the Purchased Assets and assume the Assumed Liabilities.

**6.4    Closing Documents.**  Purchaser shall have executed and delivered the Transactional Agreements and such other closing documents reasonably necessary to consummate the Acquisition.

# 7    SURVIVAL OF REPRESENTATIONS, WARRANTIES, AND COVENANTS; INDEMNIFICATION

**7.1    Survival.**  The representations, warranties, and covenants of the parties contained herein shall survive the Closing, and shall expire, together with any associated right of indemnification for breaches thereof, as follows:

(a)    Except as otherwise specifically provided herein:

(i)    the representations and warranties (collectively, the "***Fundamental Representations***") set forth in Section 2.1 (Due Organization); Section 2.2 (Title to Assets); Section 2.3 (Breach); Section 2.4 (Enforceability of Agreement); Section 2.5 (Capitalization); Section 2.6 (Subsidiaries); Section 2.7 (Required Consents, No Violation); Section 3.1 (Authority); and Section 3.3 (Required Consents, No Violation) shall survive Closing indefinitely;

(ii)    the representations and warranties (collectively, the "***Statutory Representations***") set forth in Section 2.15 (Tax Matters); Section 2.16 (Employee and Labor Matters); Section 2.17 (Employee Benefit Plans); Section 2.18 (Environmental Matters); Section 2.22 (Brokers); and Section 3.2 (Brokers) shall survive the Closing until the expiration of the applicable statute of limitations; and

(iii)    all other representations and warranties of the parties shall survive the Closing through the twenty four (24) month anniversary of the Closing.

(b)    Except as otherwise specifically provided herein, the covenants of the parties shall survive Closing without limitation as to time until such covenants shall be performed in full.

The parties shall not have any liability under Sections 7.2 and 7.3, respectively, or otherwise have any liability under this Agreement or otherwise in connection with the transactions contemplated by this Agreement unless a claim for Losses, liabilities or damages for which indemnification is sought thereunder is asserted by the Purchaser Indemnified Parties or the Seller Indemnified Parties (as defined below), as the case may be, within the survival period set forth above, and notwithstanding any applicable statute of limitations, no action for any breach of such representations and warranties may be filed or brought after the survival periods set forth above; provided, however, that the timely written assertion prior to the end of the applicable survival period of any claim by any such party against the other parties hereunder with respect to the breach or alleged breach of any representation, warranty, or covenant (or of a series of facts which would support such claim) shall extend the survival period with respect to such claim through the date such claim is conclusively resolved.

**7.2    Indemnification by Sellers.**

(a)      After the Closing, subject to the limitations set forth in Section 7.2(b) below, the Seller Parties, jointly and severally, hereby agree to indemnify and hold Purchaser, its Affiliates, and their respective stockholders, partners, members, officers, directors, employees, agents, representatives, any of their successors or assigns and any third party validly claiming by or through any of them (individually, an "*Purchaser Indemnified Party*," and collectively, the "*Purchaser Indemnified Parties*"), as the case may be, harmless from and against and with respect to, and shall reimburse any of them for, any and all Losses (including, without limitation, any and all reasonable out-of-pocket costs and expenses, including reasonable legal fees and expenses, incident to the items listed below or to any action, suit, proceeding, claim, demand, assessment or judgment in connection with the items listed below or reasonably incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity) resulting from, arising out of, or relating to:

(i)      The misrepresentation or breach of any representation or warranty in this Agreement or any other Transactional Agreements to which the Seller Parties are a party; provided however, that, for the purposes of this Section 7, any dollar amount thresholds, Knowledge qualifiers, materiality qualifiers and Material Adverse Effect qualifiers contained in any representation or warranty herein shall be disregarded for the purpose of (A) determining whether there is a misrepresentation or breach of any representation or warranty and (B) calculating any Losses from such misrepresentation or breach;

(ii)      the non-fulfillment or breach of or failure by the Seller Parties to perform, any covenant or agreement of the Seller Parties under this Agreement, any Transaction Document or any certificate, agreement or other document delivered pursuant thereto, in each case, required to be taken at or prior to the Closing;

(iii)      any and all liabilities that are not Assumed Liabilities; or

(iv)      the failure to comply with any provision of applicable bulk sales or any other Laws in connection with the transactions contemplated hereby.

(b)      The obligation of the Seller Parties to indemnify the Purchaser Indemnified Parties shall be subject to the following limitations:

(i)      The Seller Parties shall not be obligated to indemnify the Purchaser Indemnified Parties under Section 7.2(a)(i) (with respect to a breach of any representation or warranty made by the Sellers in this Agreement or in any other Transaction Document) until the aggregate amount of all Losses pursuant to Section 7.2(a)(i) exceed [Twenty-Five Thousand and 00/100 Dollars ($25,000.00)] (the "*Indemnification Threshold*") at which time, and thereafter, the Seller Parties shall be liable for all such Losses of the Purchaser Indemnified Parties including the Indemnification Threshold; provided, however, that the foregoing limitation shall not apply with respect to any Losses of the Purchaser Indemnified Parties resulting from, arising out of, or related to any breach of any of the Fundamental Representations, the Statutory Representations, fraud on the part of the Sellers, or indemnification under Section 7.2(a)(ii).

(ii)     Except for Losses resulting from, arising out of, or related to any breach of any of the Fundamental Representations or fraud, willful misconduct or intentional misrepresentation on the part of the Seller Parties, the maximum liability of the Seller Parties for Losses resulting from, arising out of, or related to any indemnification under this Article X shall be an amount equal to [One Million and 00/100 Dollars ($1,000,000.00)] (the "*Indemnification Cap*"). Notwithstanding anything to the contrary contained in this Agreement or otherwise, with respect to Losses resulting from, arising out of, or related to any breach of any of the Fundamental Representations or fraud, willful misconduct and intentional misrepresentations, the Seller Parties' maximum aggregate liability to the Purchaser Indemnified Parties shall not exceed the proceeds received by the Sellers pursuant to this Agreement.

(c)     A Purchaser Indemnified Party shall be entitled, at its sole discretion, to recover any damages payable by the Seller Parties under this Section 7 through one or more of the following, none of which shall be a Purchaser Indemnified Party's sole recourse: (i) through a claim against the Escrow Funds, (ii) by setting off and holding back from the Actioncam Payment and/or Royalty amounts necessary to offset any claims for indemnification hereunder, and/or (iii) a reduction of any other amounts due to the Sellers from the Purchaser to the extent that any amounts are then or will in the future become payable to the Sellers from the Purchaser.

(d)     Notwithstanding any other provision of this Agreement, the amount of any indemnification payable under this Section 7 shall be reduced by the amount of any insurance proceeds actually received by the indemnified party on account of the indemnified Losses less any corresponding premium increases directly resulting from such insurance claim.  The parties hereto agree that in seeking indemnification payable under this Section 7, each such party shall use commercially reasonable efforts: (i) to not take any action, or omit to take any action, that would jeopardize or prejudice the interests of an indemnified party, and (ii) to pursue all rights and remedies of an indemnified party (including the Sellers in the case of the Purchaser Indemnified Parties) under any insurance policy or any other obligation of indemnification in its favor.

**7.3     Indemnification by Purchaser.**

(a)     After the Closing, Purchaser hereby agrees to indemnify and hold the Sellers, Parent and their partners, shareholders, members, officers, directors, employees, agents, representatives, any of their successors or assigns and any third party validly claiming by or through any of them (collectively, the "*Seller Indemnified Parties*"), as the case may be, harmless from and against and with respect to, and shall reimburse any of them for any and all Losses (including, without limitation, any and all reasonable out-of-pocket costs and expenses, including reasonable legal fees and expenses, incident to the items listed below or to any action, suit, proceeding, claim, demand, assessment, or judgment in connection with the items listed below or reasonably incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity) resulting from, arising out of, or relating to:

(i)     any breach of any representation or warranty of Purchaser made in Section 3 of this Agreement; and

(ii)    the nonfulfillment or breach of, or any failure by Purchaser to perform, any covenant of Purchaser set forth in this Agreement.

(b)    Purchaser's obligation to indemnify the Seller Indemnified Parties shall be subject to the following limitations:

(i)    Purchaser shall not be obligated to indemnify the Seller Indemnified Parties under Section 7.3(a)(i) until the aggregate amount of all Losses pursuant to Section 7.3(a)(i) exceeds the Indemnification Threshold, at which time, and thereafter, Purchaser shall be liable for all such Losses of the Seller Indemnified Parties including the Indemnification Threshold.

(ii)    Except for Losses resulting from, arising out of, or related to breach of the Fundamental Representations or fraud, the maximum liability of Purchaser for Losses under Section 7.3(a) shall be an amount equal to the Indemnification Cap.

**7.4    Procedure for Indemnification**. The procedure for indemnification pursuant to this Section 7 shall be as follows:

(a)    It is understood and agreed that a party may be entitled to indemnification, in accordance with the provisions hereof, whether based on a claim directly between the parties or based on a claim brought by a third party. The party claiming indemnification (the "***Claimant***") acting in good faith shall promptly give notice to the party from which indemnification is claimed (the "***Indemnifying Party***") of any claim, whether between the parties or brought by a third party, specifying in reasonable detail the factual basis for the claim to the extent known, the amount thereof, estimated in good faith, and the method of computation of the amount of such claim, all with reasonable particularity and containing a reference to the provisions of this Agreement in respect of which such indemnification claim shall have occurred. If the claim relates to a claim, action, suit, or proceeding filed by a third party against Claimant (a "***Third Party Action***"), such notice shall be given by Claimant within a reasonable period of time after Claimant receives notice of such Third Party Action, which in any event shall be no later than ten (10) business days after Claimant receives written notice of such Third Party Action provided however, that the failure to promptly notify shall not relieve the Indemnifying Party from any liability it may have under Section 7 except to the extent the Indemnifying Party is actually prejudiced by such delay.

(b)    With respect to claims solely between the parties, following receipt of notice from the Claimant of a claim, the Indemnifying Party shall have thirty (30) days to make such investigation of the claim as the Indemnifying Party deems necessary or desirable. For the purposes of such investigation, the Claimant agrees to make available to the Indemnifying Party and its authorized representatives the information relied upon by the Claimant to substantiate the claim, and such other information as the Indemnifying Party may reasonably require to determine the legitimacy of the claim, including information relating to the Claimant's purported damages. If the Claimant and the Indemnifying Party agree at or prior to the expiration of such thirty (30)-day period (or any mutually agreed upon extension thereof) to the validity and amount of such claim, the Indemnifying Party shall immediately pay to the Claimant the full amount of

the claim (or such other amount as the parties shall mutually agree upon), subject to the terms hereof (including Sections 7.2(b)and 7.3(b)); provided, however, that if the Indemnifying Party is one of the Sellers, the amount of any such claim shall be paid pursuant to the terms of Section 7.2(c).  If the Claimant and the Indemnifying Party do not agree within such thirty (30)-day period (or any mutually agreed upon extension thereof), the Claimant may seek appropriate remedies at Law or equity, as applicable, subject to the terms of this Agreement, including the limitations of Sections 7.2(b), 7.3(b), and 7.7.

(c)    With respect to third party claims, the Indemnifying Party will be entitled, at its sole expense and liability, to exercise full control of the payment, defense, compromise, or settlement of any such Third Party Actions, provided that the Indemnifying Party, within thirty (30) business days after the giving of such notice by the Claimant (but in no event later than such time as would result in the Claimant's rights being materially and adversely affected by a failure to give notice earlier): (a) notifies the Claimant in writing that the Indemnifying Party will indemnify the Claimant, to the extent provided in this Agreement, from and against any Losses with respect to which such Claimant is entitled to indemnification under this Agreement, (b) notifies the Claimant in writing of the Indemnifying Party's intention to assume such defense, (c) provides evidence reasonably satisfactory to the Claimant of the Indemnifying Party's ability to pay the amount, if any, for which the Indemnifying Party may be liable as a result of such Third Party Actions, (d) retains legal counsel reasonably satisfactory to the Claimant to conduct the defense of such Third Party Actions, and (e) at all times acts reasonably and diligently in such defense.

(d)    Each party will cooperate with the other party in connection with the payment, defense, compromise, or settlement of any such Third Party Actions in accordance with this Agreement in any manner that reasonably may be requested and shall keep the other party reasonably informed as to the progress of such claim.  If the Indemnifying Party so assumes the defense of any such Third Party Actions, the Claimant will have the right to employ separate counsel and to participate in (but not control) the defense, compromise or settlement of the Third Party Actions, but the fees and expenses of such counsel will be at the expense of the Claimant, unless: (A) the Indemnifying Party has agreed to pay such fees and expenses, (B) any relief other than the payment of money damages is sought against the Claimant, or (C) the Claimant has been advised by its counsel that there may be one or more defenses available to it which are different from or additional to those available to the Indemnifying Party or that actual or potential conflicts of interest would make the representation of both the Indemnifying Party and the Claimant by the same counsel inadvisable.  In such case, that portion of the fees and expenses of such separate counsel that are reasonably related to matters covered by the foregoing clauses (A) - (C) shall be paid by the Indemnifying Party.

(e)    No Claimant will settle or compromise any such Third Party Actions for which it is entitled to indemnification under this Agreement without the prior written consent of the Indemnifying Party, such consent not to be unreasonably withheld, conditioned or delayed, unless the Indemnifying Party has failed, after reasonable notice, to undertake control of such Third Party Actions in the manner provided in Section 7.4(c).  No Indemnifying Party will settle or compromise any such Third Party Action in which any relief other than the payment of money damages is sought against any Claimant or for which the Indemnifying Party shall not be fully

responsible hereunder, unless the Claimant consents in writing to such compromise or settlement (such consent not to be unreasonably withheld or delayed) and unless an unconditional term thereof is the giving by the plaintiff to the Claimant of a release from all liability in respect of such claim

    (f)    Notwithstanding anything to the contrary contained herein, prior to initiating any litigation or legal action between any of the parties to this Agreement before any court to enforce the provisions of this Section 7, the parties shall negotiate in good faith for a period of thirty (30) days to resolve the related dispute among them; provided, however, that no party to this Agreement shall have any obligation so to negotiate if such negotiation or any delay in initiating litigation or legal action related to such dispute as a result of such negotiation would cause such party to breach a Legal Requirement or adversely affect such party in such litigation or legal action.

    (g)    Any indemnification payment by an Indemnifying Party to a Claimant pursuant to this Section 7 shall be effected by a payment from the Escrow Account, cashier's or certified check or by wire transfer of immediately available funds to an account designated by the Claimant within ten (10) days after the final determination of the indemnification amounts; provided, however, that if the Indemnifying Party is one of the Sellers, the amount of any such claim shall be paid pursuant to the terms of Section 7.2(c).

**7.5**    **Effect of Investigation.**    The representations, warranties and covenants of the Indemnifying Party, and the Claimant's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Claimant (including by any of its representatives) or by reason of the fact that the Claimant or any of its representatives knew or should have known that any such representation or warranty is, was, or might be inaccurate or by reason of the Claimant's waiver of any conditions to closing set forth herein. Accordingly, any disclosures set forth on the Schedules to this Agreement with respect to representations and warranties shall not result in any disclaimer of liability or affect the Indemnifying Party's liability under or Section 7.2(a)(ii) of this Agreement.

**7.6**    **Scheduled Disclosures**.    Disclosure of any matter, fact or circumstance in a section of the Schedules to this Agreement shall not be deemed to be disclosure thereof for purposes of any other sections of such Schedules, except to the extent: (a) that is it reasonably obvious on the face of any such section of the Schedules to this Agreement that the matters, facts or circumstances disclosed therein are applicable to another section of the Schedules to this Agreement, or (b) such disclosure is cross-referenced to in such other section of the Schedules to this Agreement.

**7.7**    **Delivery of Escrow Funds**.    Purchaser shall direct the Escrow Agent to release to the Seller, pursuant to the terms of Section 1.3(b) and the Escrow Agreement, any Escrow Funds then held by it unless at the time such release of Escrow Funds is due there then remains unresolved any claim for Indemnifiable Damages or other damages hereunder as to which notice has been given, in which event the Purchaser shall direct the Escrow Agent that any of the Escrow Funds remaining on deposit after such claim shall have been satisfied shall be released by the Escrow Agent to the Sellers promptly after the time of satisfaction.

## 8      MISCELLANEOUS.

6.38.1  **Expenses of Sale.**  Each party shall bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and related Transactional Agreements, and the consummation and performance of the transactions contemplated herein and therein.  Any and all transfer, sales, use, documentary and similar taxes and recording and filing fees incurred in connection with the transactions contemplated herein shall be borne by Purchaser (and not by Sellers).

6.48.2  **Further Assurances.** Each party hereto shall execute and/or cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the Transactions.

6.58.3  **Notices.** Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

if to the Sellers:

SkyCam, LLC or
CableCam, LLC
c/o Outdoor Channel Holdings, Inc.
43445 Business Park Drive.
Temecula, CA 92590
Attn: General Counsel
Facsimile: 951-719-8975

With a copy to:

Royer Cooper Cohen Braunfeld LLC
101 W. Elm Street, Suite 220
Conshohocken, PA 19428
Attn: Roger Braunfeld, Esq
Facsimile: 484-362-2630

if to the Purchaser:

_____

_____

_____

Facsimile: _____

**6.68.4  Time Of The Essence.** Time is of the essence of this Agreement.

**6.78.5  Headings.** The underlined headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

**6.88.6  Counterparts.** This Agreement may be executed in severalone or more counterparts, each of which shall constitute an original and all of which, when taken together, shall constitutebe considered one and the same agreement, and will become effective when one or more counterparts have been signed by a party and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy, telefax, or emailed .pdf or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 8.6.

**6.98.7  Governing Law; Venue.**

(a) This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of CaliforniaDelaware (without giving effect to principles of conflicts of laws).

(b) Except as set forth in the last sentence of this Section 6.98.7, any claim or controversy arising out of or relating to this Agreement shall be settled by binding arbitration in Riverside, California under the auspices of the American Arbitration Association, in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator shall be final and binding and may be entered in any court having jurisdiction.  The arbitrator shall have the power to order discovery reasonably necessary to enable the parties to participate effectively in the evidentiary hearing.  The fees of the arbitrator and all other costs charged by the AAA shall be borne equally by the Sellers and Purchaser.  All attorneys' fees and costs incurred by each party shall be paid by each party.

(c) This Agreement and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon the parties and their respective successors, assigns and legal representatives.  Neither this Agreement, nor any rights or obligations of any party hereunder, may be assigned by a party without the prior written consent of the other party.

**6.108.8       Waiver.**

(a)       (a) No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b)   (b) No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

6.11 8.9   **Amendments.** This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Purchaser and the Seller Sellers.

6.12 8.10   **Severability.** In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law Law.

6.13 8.11   **Entire Agreement.** The Transactional Agreements set forth the entire understanding of the parties relating to the subject matter thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter thereof.

6.14 8.12   **Construction.**

(a) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural; and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b) The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of.

**SkyCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

**CableCam, LLC,** a Delaware limited liability company

By: _____

Its: _____

~~[PURCHASER]~~,Outdoor Channel Holdings, Inc., a ~~_____~~Delaware corporation

_____By: _____

Its: _____

**[PURCHASER]**, a _____ corporation

By: _____

Its: _____

# EXHIBIT A

## CERTAIN DEFINITIONS

For purposes of the Agreement (including this Exhibit A):

**Accounts Receivable.** "Accounts Receivable" shall mean accounts receivable, whether billed or unbilled, generated in connection with the Businesses prior to and through the Closing Date.

**Actioncam Claim.** "Actioncam Claim" means those certain claims that SkyCam has against Actioncam, LLC and Patrick J. Bennett (collectively "*Actioncam*") in connection with the Actioncam Litigation.

**Actioncam Litigation.** "Actioncam Litigation" shall refer to that certain cause of action against Actioncam for damages in connection with misappropriation of trade secrets, breach of contract, and false representations as more specifically set out in Case No. 09-CV-294-GKF-FHM, pending in the Northern District of Oklahoma.

**Affiliate.** "Affiliate" shall have the meaning ascribed to it in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended, as in effect on the date hereof.

**Agreement.** "Agreement" shall mean the Asset Purchase Agreement to which this Exhibit A is attached (including the Disclosure Schedule), as it may be amended from time to time.

**Assumption Agreement.** "Assumption Agreement shall mean the assignment and assumption agreement attached hereto as Exhibit B.

**Bill of Sale.** "Bill of Sale" shall mean the bill of sale attached hereto as Exhibit C.

**Broken Arrow Lease.** "Broken Arrow Lease" shall mean that certain Lease Agreement by and between Case SkyCam, LLC and SkyCam, LLC dated February 13, 2006, as amended on July 1, 2006.

**Code.** "Code" shall mean the Internal Revenue Code of 1986, as amended.

**Consent.** "Consent" shall mean any approval, consent, ratification, permission, waiver or authorization.

**Contract.** "Contract" shall mean any written, oral, implied or other agreement, contract, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, certificate, purchase order, work order, insurance policy, benefit plan, commitment, covenant, assurance or undertaking of any nature.

**Encumbrance.** "Encumbrance" shall mean any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, equity, trust, equitable interest, claim, preference, right

of possession, lease, tenancy, license, encroachment, covenant, infringement, interference, Order, proxy, option, right of first refusal, preemptive right, community property interest, legend, defect, impediment, exception, reservation, limitation, impairment, imperfection of title, condition or restriction of any nature (including any restriction on the transfer of any asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset).

**Entity**. "Entity" shall mean any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**Environment.** "Environment" means soil, surface waters, ground water, land, surface or subsurface strata and ambient air.

**Environmental Claim.** "Environmental Claim" shall mean any claim, Proceeding, Order, directive, summons, complaint or citation, from any Governmental Body relating to Environmental Laws or Hazardous Substances.

**Environmental Law.** "Environmental Law" means all foreign, federal, state and local laws, regulations, rules, codes, ordinances, common law, Orders and consent agreements relating to pollution, Hazardous Substances or the discharge, emission or release of materials into the Environment.

**Environmental Liability.** "Environmental Liability" means any and all liabilities and obligations relating to or arising out of environmental matters or claims relating to or arising from events or occurrences taking place or conditions existing (whether known or unknown) prior to the Closing Date or relating to or arising from events or occurrences taking place or conditions existing (whether known or unknown) on or after the Closing Date to the extent such matters relate to or arise from the Sellers' actions on any premises on which the Businesses were conducted, including, without limitation, (i) any violation or alleged violation of any Environmental Laws including the obligations thereunder to investigate or remediate or otherwise undertake removal of Hazardous Substances or (ii) any actual or alleged Handling or Discharging of Hazardous Substances.

**ERISA**. "ERISA" shall mean the Employee Retirement Income Security Act of 1974.

~~**Excluded Assets.** "Excluded Assets" shall mean the assets identified on Exhibit C (to the extent owned by the Seller on the Closing Date).~~

**Extraordinary Capital Expenditures.** "Extraordinary Capital Expenditures" shall mean any non-budgeted capital expenditures funded by ~~OUTD~~Parent, in amounts up to a maximum of $80,000 that occur between February 26, 2013 and the Closing Date, as determined to be necessary and in the best interests of the Sellers by Nic Salomon in his role as President of the Sellers.

**GAAP**. "GAAP" shall mean generally accepted accounting principles.

**Governmental Authorization.** "Governmental Authorization" shall mean any: (a) permit, license, certificate, franchise, concession, approval, consent, ratification, permission, clearance, confirmation, endorsement, waiver, certification, designation, rating, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

**Governmental Body.** "Governmental Body" shall mean any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any, court or other tribunal); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

**Hazardous Substance**. "Hazardous Substance" shall mean any substance which is a "hazardous substance," "hazardous waste," "toxic substance," "toxic waste," "pollutant," "contaminant" or words of similar import under any Environmental Law including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), and the Clean Air Act (42 U.S.C. §7401 et seq.), and including, without limitation, any substance which contains polychlorinated biphenyls or gasoline, diesel fuel or other petroleum hydrocarbons or volatile organic compounds.

**Indebtedness** "Indebtedness" of any entity means all obligations of such entity: (i) which, in accordance with GAAP, should be classified upon a balance sheet of such entity as indebtedness, (ii) whether or not contingent, for borrowed money or purchase money financing which has been incurred in connection with the acquisition of property or services, guaranties, letters of credit, or deferred purchase price, (iii) secured by any lien or other charge upon property or assets owned by such entity, even though such entity has not assumed or become liable for the payment of such obligations, (iv) created or arising under any conditional sale or other title retention agreement with respect to property acquired by such entity, whether or not the rights and remedies of the lender or lessor under such agreement in the event of default are limited to repossession or sale of the property, or (v) for remaining payments under any leases (including, but not limited to, equipment leases, operating leases and capital leases), or rental purchase options, in each case including, without limitation, accrued and unpaid interest, and prepayment or early termination payments or penalties associated with any of the foregoing items (i) through (v) whether mandatory or optional.

**Intellectual Property.** "Intellectual Property" shall mean any patent, patent application, trademark (whether registered or unregistered and whether or not relating to a published work), trademark application, trade name, fictitious business name, service mark (whether registered or unregistered), service mark application, copyright (whether registered or unregistered), copyright application, trade secret, know-how, customer list, franchise, system, computer software, invention, design, blueprint, business methodology, engineering drawing, proprietary product, technology, proprietary right or other intellectual property right or intangible asset required to operate the equipment and perform Sellers' obligations pursuant to the Seller Contracts.

**Knowledge of the Sellers.** "Knowledge of the Sellers" or "to the Sellers' Knowledge" or words of similar import means the actual knowledge of Sellers, [INSERT INDIVIDUAL NAMES], and such knowledge that Seller and such individuals reasonably should have after reasonable due inquiry.

**Law.** "Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Body.

**Leases.** "Leases" shall collectively refer to the (i) Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Legal Requirement.** "Legal Requirement" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Liability.** "Liability" shall mean any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

**Losses.** "Losses" shall mean any and all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, penalties, fines, obligations, Taxes, lost Tax benefits, Encumbrances, losses, liabilities, damages, diminution in value, costs, fees and expenses (whether absolute, accrued, conditional, incidental, consequential, punitive or otherwise and whether or not resulting from third party

claims), including all reasonable fees and disbursements of counsel incurred in the investigation or defense of any of the same or in asserting any of their respective rights hereunder.

**Material.** "Material" shall mean (i) with respect to any item, fact, condition or circumstance of a party, that such item, fact, condition or circumstance, individually or in the aggregate with other items, facts, conditions or circumstances affecting such party, would cause an adverse effect of Twenty-Five Thousand ($25,000) Dollars or more to the other party subsequent to the closing of the transactions contemplated by this Agreement or (ii) with respect to any contract or series of related contracts that in the aggregate represents the payment or receipt by any party thereto of Twenty-Five Thousand ($25,000) Dollars or more.

**Material Adverse Effect** "Material Adverse Effect" shall mean a change (or effect), in the condition (financial or otherwise), properties, assets, liabilities, rights, obligations, operations, business or prospects, which change (or effect), individually or in the aggregate, is materially adverse to such condition, properties, assets, liabilities, rights, obligations, operations, business or prospects.

**McAfee & Taft** "McAfee & Taft" shall mean McAfee & Taft, a professional corporation of Oklahoma.

**McAfee Agreement**. "McAfee Agreement" shall mean that certain Contingent Fee Agreement between Outdoor Channel Holdings, Inc. and its affiliated entities, including without limitation, SkyCam, LLC and McAfee & Taft, a professional corporation of Oklahoma.

**McAfee Injunction Success Fee.** "McAfee Injunction Success Fee" shall mean that certain $75,000 that becomes immediately due and owed by SkyCam to McAfee & Taft pursuant to the McAfee Agreement upon: (1) a ruling by the federal court denying Actioncam's motion for new trial; or (2) by the federal court's lifting the stay on the injunction, as described in the federal court's final judgment.

**Order**. "Order" shall mean any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, writ or award issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Body or any arbitrator or arbitration panel; or (b) Contract with any Governmental Body entered into in connection with any Proceeding.

**OUTD.** "OUTD" shall mean Outdoor Channel Holdings, Inc., the ultimate parent company of the Sellers.

**Parent Guarantees.** "Parent Guarantees" refer collectively to (i) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to 650 North Freeway, Ltd. in connection with the Surface Lease Agreement for the 2.48 acres north of the premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102; and (ii) that certain Guaranty provided by Outdoor Channel Holdings, Inc. to Tindall Properties, Ltd. in connection with the Commercial Lease Agreement for premises located at 630 North Freeway, Suite 350, Fort Worth, TX 76102.

**Person**. "Person" shall mean any individual, Entity or Governmental Body.

**Proceeding.** "Proceeding" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding and any informal proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or any arbitrator or arbitration panel.

**Representatives.** "Representatives" shall mean officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

**Seller Contract.** "Seller Contract" shall mean any Contract relating to the customers set forth on Schedule 1.1(a)(v) and Schedule 1.1(b)(v): (a) to which the Seller is a party; (b) by which the Seller or any of its assets is or may become bound or under which the Seller has, or may become subject to, any obligation; or (c) under which such Seller has or may acquire any right or interest.

**Sellers' Intellectual Property.** "Seller's Intellectual Property" or a "Seller's Intellectual Property" shall refer to CableCam Intellectual Property and SkyCam Intellectual Property owned by, licensed to the Sellers (or a Seller), or otherwise used by the Sellers (or a Seller).

~~**Seller Benefit Plans.** "Seller Benefit Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, any deferred compensation, bonus, stock option, profit sharing, retirement, medical, health or life insurance, disability, sick leave, cafeteria or flexible spending, vacation or severance agreements, arrangements, programs or plans maintained by any Seller.~~

**Sellers' Knowledge.** "Sellers' Knowledge" or a "Seller's Knowledge" means the actual knowledge of any of Nicolas Salomon, Thomas Hornish and Thomas Allen obtained in the ordinary course of the performance of their respective duties as officers of the Sellers.

**Tax.** "Tax" shall mean any tax (including any income tax, franchise tax, capital gains tax, estimated tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, occupation tax, inventory tax, occupancy tax, withholding tax or payroll tax), levy, assessment, tariff, impost, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), that is, has been or may in the future be (a) imposed, assessed or collected by or under the authority of any Governmental Body, or (b) payable pursuant to any tax-sharing agreement or similar Contract.

**Tax Return.** "Tax Return" shall mean any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the

administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**Transactional Agreements.** "Transactional Agreements" shall mean: (a) the Agreement; (b) the Assumption Agreement; and (c) the Bill of Sale; (d) the Escrow Agreement; and (e) the Transition Services Agreement.

**Transition Services Agreement.** "Transition Services Agreement" shall mean the transition services agreement attached hereto as Exhibit E.

**Transactions.** "Transactions" shall mean (a) the execution and delivery of the respective Transactional Agreements, and (b) all of the transactions contemplated by the respective Transactional Agreements, including: (i) the sale of the Purchased Assets by the Sellers to the Purchaser in accordance with the Agreement; (ii) the assumption of the Assumed Liabilities by the Purchaser pursuant to the Assumption Agreement; and (iii) the performance by the Sellers and the Purchaser of their respective obligations under the Transactional Agreements, and the exercise by the Sellers and the Purchaser of their respective rights under the Transactional Agreements.

# EXHIBIT B

ASSUMPTION AGREEMENT

## __EXHIBIT C__

BILL OF SALE

# EXHIBIT D

## ESCROW AGREEMENT

**EXHIBIT E**

TRANSITION SERVICES AGREEMENT

## SCHEDULE 1.1(a)(ii)

SKYCAM INTELLECTUAL PROPERTY

## SCHEDULE 1.1(a)(vii)

SKYCAM CONTRACTS

## SCHEDULE 1.1(b)(ii)

CABLECAM INTELLECTUAL PROPERTY

### SCHEDULE 1.1(b)(v)

CABLECAM'S CONTRACTS

## SCHEDULE 1.2(h)

## EXCLUDED ASSETS

## SCHEDULE 1.53(b)(i)

## ALLOCATION

# ~~SCHEDULE 2.5~~

## ~~REQUIRED CONSENTS~~

## ~~SCHEDULE 2.7~~

### ~~LITIGATION~~

## ~~SCHEDULE 2.10(a)~~

## ~~FINANCIAL STATEMENTS~~

## ~~SCHEDULE 2.10(d)~~

## ~~INTELLECTUAL PROPERTY DISCLOSURE~~

# SCHEDULE 2.13

## EMPLOYEE AND LABOR MATTERS

## ~~SCHEDULE 1.4~~

### ~~ALLOCATION~~DEFERRED REVENUES

Any amounts received from ESPN or NBC or any other network, or from AMEWAS related to the Navair project, for which services not been fully performed as of the date of the closing, less any payments towards those related costs of revenues, shall be deducted as a credit to the Purchase Price at closing.

00069835.v5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |


**EXHIBIT 23**


**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
<u>**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

March 21, 2013

Pacific Northern Capital
3218 East Holt Avenue
West Covina, CA 91791

Ladies and Gentlemen:

This letter amendment (*"Amendment"*), effective as of March 21, 2013, amends that Term Sheet (the *"Term Sheet"*) between Outdoor Channel Holdings, Inc. and Pacific Northern Capital (*"PNC"*) concerning PNC's proposed acquisition of certain assets of SkyCam, LLC and CableCam, LLC (*"Proposed Transaction"*). Unless otherwise noted, all defined terms in this Amendment shall have the same meanings as set forth in the Term Sheet.

The parties hereto, intending to be legally bound hereby, agree as follows:

1.  Extension of Exclusivity. The exclusivity section set forth on page 3 of the Term Sheet shall be amended as follows:

    a.  The date "April 15, 2013," referenced in the third line of paragraph A shall be deleted in its entirety and shall be replaced with "May 15, 2013 ("Exclusivity End Date")."

    b.  The following sentence shall be added as the last sentence of paragraph B:

    "If PNC determines in good faith that (i) the parties have agreed to substantially all of the terms and conditions governing the Proposed Transaction and (ii) the Proposed Transaction is proceeding towards completion, then the Exclusivity End Date shall be extended to June 15, 2013 upon PNC's delivery of written notice of such determination to Outdoor Channel."

    c.  The following sentence shall be added in its entirety, as a new paragraph, at the end of the Exclusivity section:

    "E.  The parties agree that if, at any point during the exclusivity period, Kroenke Sports & Entertainment, LLC concludes that it will not consent to the Proposed Transaction, PNC shall release Outdoor Channel from its exclusivity obligations and PNC shall forever waive its rights, if any, under the Term Sheet to seek equitable relief or any other remedies available at law or in equity."

Except as expressly modified by this Amendment, the Term Sheet shall remain unmodified and in full force and effect. This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument

EXHIBIT 38
App. '402

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date set forth above.

OUTDOOR CHANNEL HOLDINGS, INC.

By: _____

Tom Hornish, President and CEO

AGREED TO AND ACCEPTED
as of the date first above written:

PACIFIC NORTHERN CAPITAL

By: _____
Name: Kelly Holcomb
Title: Managing Director

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |


**EXHIBIT 24**


**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

CONFIDENTIAL

Page 302

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION
3    NIC SALOMON,                  §
                                   §
4                  Plaintiff,      §
                                   §
5    VS.                           §  CIVIL ACTION
                                   §
6    KROENKE SPORTS &              §  NO. 3:15-CV-666-M
     ENTERTAINMENT, LLC,           §
7    OUTDOOR CHANNEL HOLDINGS,      §
     INC., and PACIFIC NORTHERN    §
8    CAPITAL, LLC,                 §
                                   §
9                  Defendants.     §
        --------------------------------------------
10      CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF
11                      NIC SALOMON
12                      MAY 17, 2018
13                     VOLUME 3 OF 3
14      --------------------------------------------
      Job No. CS2878362
15        CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF NIC
16   SALOMON, produced as a witness at the instance of the
17   DEFENDANTS, and duly sworn, was taken in the
18   above-styled and numbered cause on May 17, 2018, from
19   9:05 a.m. to 1:06 p.m., before Delanie Schreiber, CSR
20   No. 9375 in and for the State of Texas, reported by
21   stenographic method, at the offices of Jackson Walker,
22   L.L.P., 2323 Ross Avenue, Suite 600, Dallas, Texas,
23   75201, pursuant to the Federal Rules of Civil Procedure
24   and the provisions stated on the record or attached
25   hereto. Job No. 2878362

Page 364

1    stock, right?

2         A.  As far as I know, yes.

3         Q.  Okay.  Are you aware of any agreement between

4    Outdoor and KSE whereby KSE was to purchase only the

5    Aerial Camera Business?

6         A.  No.

7         Q.  Okay.  Paragraph 54 is on page 16.  Second

8    sentence of that paragraph says, "KSE had knowledge of

9    facts and circumstances that would lead a reasonable

10   person to believe that there was a contract regarding

11   the sale by Outdoor of SkyCam and CableCam, its wholly

12   owned subsidiaries and the Aerial Camera Business in

13   which Mr. Salomon had an interest."  What contract are

14   you referring to there?

15        A.  The Term Sheet -- the exclusivity contract in

16   the Term Sheet.

17        Q.  Okay.  So that's the -- you're talking about

18   the exclusivity provision, right?

19        A.  Correct.

20        Q.  Okay.  Paragraph 55, the first sentence.  You

21   say "KSE wilfully and intentionally interfered with the

22   Term Sheet's exclusivity provision."  What evidence do

23   you have on which you're basing your claim that KSE

24   willfully and intentionally interfered with the Term

25   Sheet's exclusivity provision?

CONFIDENTIAL

Page 365

1    A.  Well, they -- they signed a merger agreement

2    without excluding the Aerial Camera Business and they

3    sent Mr. Gluck into the facility to have a conversation

4    which was violation of the Term Sheet.  And they were

5    involved with the proxy -- the April proxy statement

6    which told shareholders that the sale process was still

7    ongoing.  And they closed their merger agreement.

8        Q.  Okay.  The second sentence of paragraph 55

9    says, "KSE induced our caused Outdoor to breach its

10   contractual obligations to negotiate exclusively with

11   PNC and Plaintiff."  What evidence do you have in which

12   you support your claim that KSE induced or caused

13   Outdoor to breach its contractual obligations to

14   negotiate exclusively with PNC and you?

15       A.  A similar answer.  They signed a merger

16   agreement without excluding the Aerial Camera Business

17   and they -- they sent Mr. Gluck into the facility to

18   have a conversation about the business in violation of

19   the agreement.  They closed their merger agreement with

20   the company.  And they were the beneficiaries of the

21   secret agreement, the -- the secret amendment that was

22   agreed.

23       Q.  Anything else?

24       A.  Not that I can recall.

25       Q.  Okay.  The next sentence you say, "KSE induced

Page 389

1    relationship among you, PNC and Outdoor would be reduced

2    to a formal contract or business relationship."  That's

3    the second sentence of paragraph 58.

4         A.  Okay.

5         Q.  So which one was it?  Either you thought on

6    April 9 that you weren't going to be able to proceed

7    with PNC or it's your accusation in paragraph 58 that

8    there was a reasonable probability that a business

9    relationship would be reduced to a formal contract or a

10   formal business relationship.  Which one -- which one

11   was it?

12        A.  Well, the reasonable probability was before

13   they signed a secret agreement.

14        Q.  Okay.  So after February 9 -- or after April 9

15   rather you're telling me that there was not a reasonable

16   probability that you would enter into an -- you could

17   enter into an agreement that involved you and PNC?

18        A.  It was unlikely.

19        Q.  Okay.

20        A.  I mean, I -- I wanted to -- to hear from

21   Mr. Kroenke.

22        Q.  Well, I'm just talking about PNC at the moment.

23   Let's turn to paragraph 72 of your Second Amended

24   Complaint.  This is on page 20.  This is the account

25   where you allege a civil conspiracy.  What is your

Page 392

1      A.  And --

2      Q.  You didn't --

3      A.  And he refused to have a conversation, right?

4  Refused --

5      Q.  You didn't -- you didn't own the business, the

6  Aerial Camera Business between February 27 and May 17,

7  did you?

8      A.  I did not.

9      Q.  What obligation did KSE or InterMedia for that

10  matter have to consult you about anything?

11      A.  Well, I mean, I -- KSE -- I had signed a

12  pre-existing contract before K -- before KSE was

13  involved.

14      Q.  The only binding provision in that contract is

15  the exclusivity provision, right?

16      A.  Which is what was breached?

17      Q.  Right.  Which expired on April 15th, right?

18      A.  Yes.

19      Q.  Thank you.  Paragraph 78.  What is your

20  evidence that KSE "acted with fraud malice and/or gross

21  negligence" towards you?

22      A.  The secret amendment, hide -- hiding it from

23  me.

24      Q.  But you just testified --

25      A.  Telling -- telling -- telling shareholders --

Page 415

1  10, Plaintiff met with Jeff Holowaty in Fort Worth and

2  discussed concerning equity and key people in the Aerial

3  Camera Business."  Tell me what specifically you and

4  Mr. Holowaty discussed sometime between February 27 and

5  March 10 on those topics.

6       A.  I don't remember the -- the specifics of the

7  conversation but generally, you know, I think they

8  wanted a lower equity deal than -- than what I was --

9  what I eventually proposed but it was -- it was -- it

10 was a loose conversation and we talked about the -- the

11 key people in the business but I don't remember the --

12 the specifics of that.  I mean, the -- the -- the

13 management team that's outlined in the materials.

14      Q.  You -- you would agree with me that this

15 meeting took place after the signing of the Term Sheet,

16 right?

17      A.  I believe so, yes.

18      Q.  Okay.  And so was there -- did -- did you and

19 PNC have disagreement on the equity structure?

20      A.  I mean, they -- I -- I was looking for

21 something more in the, you know, the -- the -- I was

22 looking for a higher amount of equity than they were but

23 we had -- it was a preliminary conversation about it.

24      Q.  How much equity were you looking for?

25      A.  I mean, I think I -- typical private equity

Page 416

1  deals are in the range of like 20 percent.  I think, you

2  know they were -- I think they wanted it to be

3  significantly lower.

4       Q.  So there was a significant difference of

5  opinion on that?

6       A.  Yeah, but, I mean, it -- it seemed pretty

7  standard and -- and then when I actually prepared the

8  equity structure, I -- I structured it as kind of a

9  equity option structure that had -- had additional

10  equity based on meeting significant growth hurdles.

11       Q.  Can you point me to a single document where PNC

12  said they were in agreement to what you proposed?

13       A.  I cannot.

14       Q.  And as -- and in between February 27 and March

15  10 which, by the way, you would -- you would agree with

16  me predates March 21, 2013 purported amendment, correct?

17       A.  Correct.

18       Q.  There was a -- as you call it, a significant

19  deference between the equity structure that you were

20  proposing and the equity structure that the Holowatys

21  were looking at?

22       A.  Correct.  It was -- it was a negotiation and

23  this also predates the KSE --

24       Q.  Uh-huh.

25       A.  -- Outdoor merger agreement.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT 25

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
2    DALLAS DIVISION
     --------------------------------x
3    NIC SALOMON,
4                    Plaintiff,
5    vs.                    Civil Action No. 3:15-CV-666-M
                            Date:  June 7, 2018
6    KROENKE SPORTS & ENTERTAINMENT,
     LLC, OUTDOOR CHANNEL HOLDINGS,
7    INC., AND PACIFIC NORTHERN CAPITAL
     LLC,
8
                    Defendants.
9    --------------------------------x
10
11              DEPOSITION OF ROGER WERNER
12
         The deposition of Roger Werner was taken on
13
     June 7, 2018, beginning at 9:07 a.m., at the One
14
     Landmark Square, Stamford, Connecticut before Susan
15
     Wandzilak, Registered Professional Reporter and Notary
16
     Public in the State of Connecticut.
17
18
19
20              Susan Wandzilak  License No. 377
21
22
23
24
25

Page 43

1  me.

2      Q.   Okay.

3      A.   That makes sense to me and it sort of --

4  again my recollections are a little bit hazy here on

5  this.  But because it was a very small element in the

6  overall transaction, but this seems logical that we

7  would -- that we would need the parent company's

8  approval to actually dispose of the assets if a formal

9  offer were forthcoming.

10      Q.   In this case, I am going to represent to you

11  an allegation that Mr. Salomon has made in light of

12  what we just looked at and get your reaction as a

13  former board member -- and, by the way, you were

14  cochairman of the board.  Right?

15      A.   Yes.

16      Q.   Mr. Salomon claims that Outdoor through its

17  board violated that terms sheet that we have looked at

18  which is Exhibit 80 by accepting the KSE offer to

19  purchase all Outdoor stock and then entering into the

20  merger agreement on March 13 during the due diligence

21  exclusivity period.

22           What is your reaction to Mr. Salomon's claim

23  as a former member of the board?

24      A.   As a former member of the board and recalling

25  the chronology of all this, I think that's an invalid

Page 44

1   argument.  I think the documentation you have shown me

2   today kind of confirms in my mind that we, we as a

3   board, certainly had our primary duty, fiduciary duty

4   to the public shareholders of the company and were

5   bound to try to get them the best deal.

6         At the time we thought that the Kroenke

7   organization might not be interested in the aerial

8   camera assets.  And so, you know, there was a

9   discussion about a hypothetical or potential

10  transaction with the PNC Group.  But it would -- it

11  would have been contingent upon -- any deal, any

12  formal deal that might have emerged for the aerial

13  camera business post the closing on the primary

14  transaction would have had to be undertaken with the

15  KSE Group's full sort of involvement and approval as

16  the new owners of the business.

17        But I think my recollection is that there

18  wasn't any conflict or any attempt by the board to do

19  anything like what, you know, Mr. Salomon has alleged

20  here.

21        Q.   Okay.

22        A.   And indeed I think, I think Nic was aware of

23  the fact that if the transaction with KSE closed and

24  that KSE was no longer interested or wanted to dispose

25  of the aerial camera assets that he and his group

Page 51

1      Q.   So I want to show you a document that is

2   actually an article and see if that sounds roughly

3   correct in your mind in terms of various offers that

4   were going back and forth.

5      A.   Um-uh.

6           (Whereupon, Werner Exhibit No. 84 was marked

7   for identification.)

8   BY MR. EVANS:

9      Q.   All right.  So I have shown you what has been

10  marked as Exhibit 84, bears control numbers

11  KSE/OC:000386 through 390.  The cover page is an

12  e-mail from Mr. Salomon dated May 10, 2013 to a

13  gentleman called Chris Phelen.  And it says InterMedia

14  Outdoor bidding is done.

15          And if you flip to the second page, there is

16  actually an article dated May 9 of 2013 that talks

17  about the bidding war, if you will.  And on the first

18  page of that article underneath the Outdoor Channel

19  logo it talks about the various offers that were going

20  back and forth between InterMedia and KSE during that

21  time period.

22     A.   Yeah.

23     Q.   Does that sound or does that appear to be

24  correct in your recollection in terms of the various

25  offers that were being made and counter offers that

Page 52

1    were being made?

2        A.    Yes, there were a series of offers and

3    counter offers that the board had to consider.  And we

4    did consider them carefully.  And the transaction was

5    ultimately done at the 10.25 a share that Mr. Kroenke

6    offered.

7            I don't recall this article but it certainly

8    seems to sync up with my recollection of how things,

9    how things went down.

10       Q.    Okay.  I want to show -- do you recall that

11   at one point in this exchange of counter offers

12   between InterMedia and KSE that the board actually

13   found one of InterMedia's counter offers to be

14   superior to the existing offer of KSE?

15       A.    I think yes, at one point they improved their

16   offer and we, we did draw that conclusion.

17       Q.    Okay, let me show you a document that we will

18   mark as Exhibit 85 that hopefully might refresh your

19   recollection in that regard.

20           (Whereupon, Werner Exhibit No. 85 was marked

21   for identification.)

22   BY MR. EVANS:

23       Q.    So Exhibit 84 (sic) is a schedule 14A SEC

24   filing by Outdoor Channel Holdings.  And I will direct

25   your attention to actually the third page of this

Page 109

1    kind of get into a discussion about a definitive

2    agreement.  If a definitive agreement doesn't happen,

3    I don't think anybody has any rights or would be asked

4    to waive rights or assert rights under a non-binding,

5    you know, terms sheet.  That's why I don't think it

6    would be logical that I would have tried to give him

7    advice on rights to be waived or not waived.

8        Q.   I want to ask you to turn back -- I am going

9    to need the documents again for this.  You don't have

10   it, Exhibit 80.  So I am asking you to turn back to

11   Exhibit 80.  This is the March -- excuse me, the

12   February 26, dated 2013 what we call the terms sheet

13   in the case.

14       A.   Right.

15       Q.   And in page 3 there is a provision called

16   exclusivity?

17       A.   Right.

18       Q.   And, by the way, I will represent to you that

19   the exclusivity portion of this agreement and the non-

20   binding portion of this agreement were drafted in

21   their entirety by Mr. Salomon and PNC.  Outdoor made

22   no revisions to these sections.

23            The exclusivity provision refers to

24   prohibitions up to April 15 of 2013?

25       A.   Right.

Page 110

1      Q.   And the prohibitions relate to such things as

2   offers to acquire any equity or debt interest in

3   Skycam or Cablecam, negotiations with anyone to

4   acquire, you know, any debt equity or interest in

5   Skycam or Cablecam.

6           Did the InterMedia and the KSE offers in your

7   mind constitute offers to acquire equity or debt in

8   Skycam or Cablecam?

9      A.   No, that they would not have.  They would

10  have been essentially transfers of ownership of the

11  overall parent company enterprise.  You know, no one

12  was negotiating specifically for these assets.

13          MR. EVANS:  Okay.  All right.  Last document

14      I want to show you, we will mark as 104.

15          (Whereupon, Werner Exhibit 104 was marked for

16      identification.)

17  BY MR. EVANS:

18      Q.   And Exhibit 104 is the Outdoor Channel Inc.

19  employee handbook as of October of 2009 and it bears

20  control numbers KSE/OC:027994 through 028042.

21      A.   Yeah.

22      Q.   And before I get into the question, a couple

23  of questions I had on this, Mr. Werner, I wanted to

24  ask you, are you aware that Mr. Salomon imaged and

25  took the entire hard drive of his aerial camera

Page 114

1      Q.   This property should be provided to your

2   immediate supervisor of human resources.

3      A.   Right.

4      Q.   Any reason to believe Salomon wasn't aware of

5   that obligation?

6      A.   No, I would assume he was aware of it.

7      Q.   And would you consider his taking of his

8   entire hard drive immediately prior to his termination

9   to run afoul of that provision?

10     A.   Yes, I would.

11          MR. EVANS:   Okay, can we go off the record

12     for about five minutes and then I think I may be

13     done.

14          THE VIDEOGRAPHER:   The time is 12:07 p.m., we

15     are going off the record.

16          (Whereupon, a brief recess was taken.)

17          THE VIDEOGRAPHER:   The time is 12:13 p.m., we

18     are back on the record.

19   BY MR. EVANS:

20     Q.   Just a few followup questions, Mr. Werner.

21   Is it fair to say that the board as a whole had

22   fiduciary obligations to the shareholders of Outdoor

23   Channel?

24     A.   Absolutely, a public company.

25     Q.   And in your opinion the board fulfilled those

Page 115

1    fiduciary obligations to the company?

2        A.    To the very best of our ability and to the

3    letter and spirit of the securities law, yeah.

4        Q.    And in so doing, do you believe that the

5    company or the board trampled or violated any rights

6    that Mr. Salomon believes he had under the terms

7    sheet?

8        A.    I don't believe so, no.

9        Q.    Would you agree with me that it would have

10   been inappropriate for the board as a fiduciary matter

11   to hold the sale of all Outdoor stock hostage to the

12   terms sheet?

13       A.    No, that wouldn't have been realistic or

14   reasonable or really consistent with our fiduciary

15   duties.  We had essentially a non-binding terms sheet

16   which might or might not have resulted in some sort of

17   transaction.  We also had potential bidders for the

18   overall company that might or might not have had

19   interest in keeping those assets, you know, long term

20   and quite possibly would have divested themselves of

21   those assets.

22           So I think our feeling was that after the

23   overall transaction was done, we could deal with a

24   hypothetical, you know, transaction on the aerial

25   camera business and that Nic Salomon and his group

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 26**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**From:** Nic Salomon
**Sent:** Friday, May 10, 2013 6:08 PM
**To:** Chris Phelen
**Subject:** Re: InterMedia: Outdoor Bidding is Done

Thanks

On May 10, 2013, at 7:03 PM, "Chris Phelen" <chris.phelen@gmail.com> wrote:

Here is the article with the Kern quote.

http://www.multichannel.com/networks/intermedia-outdoor-bidding-done/143203



1

BROADCASTING AND CABLE | TV TECHNOLOGY | TVB EUROPE | RATINGS INTELLIGENCE | NYC TELEVISION WEEK | MORE

TRANSACTIONS

# InterMedia: Outdoor Bidding is Done

### Sportsman Parent Says Will Focus on Growing Existing Network

5/09/2013 8:35 AM Eastern

 By: Mike Farrell

 {0} Tweet 0





HOW TO THRIVE IN THE ONLINE VIDEO WORLD

DOWNLOAD NOW

PARKS ASSOCIATES

In the end, the man with the biggest checkbook appears to have prevailed in the ongoing bidding war for Outdoor Channel.

In an interview Thursday, InterMedia Partners managing partner Peter Kern said the Sportsman Channel parent will not stand in the way of billionaire Stan Kroenke's Kroenke Sports & Entertainment's latest offer for Outdoor – a $10.25 per share all cash bid that was launched Wednesday evening.

"I suppose this is the end," Kern said in an interview. "It's getting ridiculous."

Kroenke Sports' offer trumped a $9.75 per share offer from InterMedia and was the sixth bid made for the channel since November, when InterMedia agreed to acquire Outdoor in a cash and stock deal valued at $8 per share. That deal was trumped by an unsolicited all-cash offer by Kroenke for $8.75 per share in March. When that deal appeared headed for the altar, InterMedia lobbed in a competing all-cash bid for $9.15 per share on April 30, which started a near daily volley of offers between the parties – Kroenke made a $9.35 per share offer on May 2, followed by InterMedia's $9.75 offer on May 3.

Outdoor Channel said in a statement that it has unanimously approved the latest merger agreement and recommends that its shareholders vote in favor of the Kroenke deal at a special meeting which the board anticipates will be held next week.

Outdoor Channel founders Thomas and Perry Massie have agreed to vote their 41% interest in the channel in favor of the KSE merger even if Outdoor's board of directors changes its recommendation.

Lazard is serving as exclusive financial advisor to Outdoor Channel in connection with the transaction. Wilson Sonsini Goodrich & Rosati. P.C. is legal advisor to Outdoor Channel in

NEWSLETTER SIGNUP

## Free E-Newsletters

Subscribe to our FREE eNewsletters

ENTER YOUR EMAIL ADDRESS　SUBSCRIBE

Jeff Baumgartner
"Here's a pic of the roof of one of these hub..."

connection with the transaction.

It appears that shareholders were still holding out hope that the bidding war would continue, driving Outdoor shares up 31 cents each (3.1%) to $10.45 per share in early trading Thursday.

## Want to read more stories like this?
## Get our Free Newsletter Here!

**TAGS:**

SHARE THIS POST          0      Tweet   0

FOLLOWS NIKKI ALEXANDER'S UNIQUE AND CHAOTIC MODERN FAMILY IN "IT TAKES A SI

**0 Comments**       Multichannel                                    Login

♥ Recommend      ⤴ Share                                        Sort by Best



Be the first to comment.

ALSO ON MULTICHANNEL                              WHAT'S THIS?

**FCC Approves Post-Auction Channel Sharing**

— This is bad news for anyone who likes reliable over the air Digital TV reception. I sure hope my local channels

**FCC Votes to Add Broadband to Lifeline**

— The FCC DID NOT vote to restructure Lifeline; it voted to launch a proceeding seeking public comment.

**Fixing Cable's Customer Experience Conundrum**

— The TV service providers Industry has struggled over the past few years. According to our 2015 Temkin Experience ...

**TWC 'Well-Positioned' to Bring 1-Gig Across L.A.**

— Don't get suckered by TWC LA, you need FTTH in the end or will end up behind long term. Every city needs FTTH.

---

Wireless ISP Unleashes 100-Meg Service ·

John
'My voice activation button doesn't work. Why not?'

Comcast Brings Voice Control to X1 Remote ·

Jeff Baumgartner
'Not sure who played him here, but some of my...'

Top 5 TV Spider Men ·

VernonDozier
'Maybe secretly, during the day, John Legere...'

T-Mobile Tries to Block AT&T Low-Band Spectrum Buy ·

View All →



RELATED STORIES

There are no related stories

SUBSCRIBE NOW



                                          See All Events →

**AUGUST**
**Cloud Summit**
Aug 05, 2015

**OCTOBER**
**NYC Television Week**
Oct 20, 2015
Park Central Hotel, New York, New York

**DECEMBER**
**Next TV Summit San Francisco**
Dec 01, 2015

# FREEZE FRAME

     

| REMEMBERING RALPH ROBERTS | ACC FORUM 2015 | 2015 ACC BEACON AWARDS | ONDEMAND SUMMIT | FREEZE FRAME -- JUNE 8, 2015 | FREEZE JUNE 1, |

See All →



**BECOME A MEMBER**
PRINT, WEB, DIGITAL, iPAD/iPHONE ACCESS

## B&C

**House Passes DOTCOM Act**

**Study: Promotional Tweets Boosted 'Empire' Audience**

**'Dancing With the Stars,' 'Modern Family' Receive Got Your 6 Certification**

**APTS Praises Level Funding for Noncoms**

**Meredith Broadcast Monitors With Volicon**

## RatingsIntelligence

**The Past Is Alive! (Viewership Of Period Dramas)**

**"Top Shows" – Monday, June 22 2015**

**The Weekly Top 100: Warriors Lift Trophy and Ratings**

**"Top 100 Shows" – Sunday, June 21 2015**

**"Top 100 Shows" – Saturday, June 20 2015**

## CREATIVE PLANET NETWORK

**Get Your Face on a Times Square Billboard**

**Elastic Evokes California Noir for 'True Detective' Season 2 Titles**

**INK Visualizes Data for Land Rover Video**

**"Yvonne" Shot with Samsung NX1 Camera**

**'Avengers: Age of Ultron' Calls On Pocket Cinema Cameras**

## TVTechnology

**Back to Basics: Spectrum 101**

**OTT Tennis Channel's Up 400 Percent Y/Y**

**Comcast Founder Ralph Roberts Dies at 95**

**Kathie Lee Gifford Celebrates B&C Hall of Fame Induction**

**Big Four to FCC: Impose Local-Into-Local on DirecTV-AT&T Merger**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT 27

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
<u>**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S RULE 12 (b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT

TO THE HONORABLE BARBARA M. G. LYNN, UNITED STATES DISTRICT COURT JUDGE

By:

Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone:  (214) 953-6000
Facsimile:  (214) 953-5822
Email:  pwatler@jw.com
       steicher@jw.com

Kevin D. Evans
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone:  (720) 200-0676
Facsimile:   (720) 200-0679
Email:  kdevans@armstrongteasdale.com

Attorneys for Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC.

September 15, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.      INTRODUCTION .................................................................................... 1

II.     CASE HISTORY ..................................................................................... 2

III.    APPLICABLE LEGAL STANDARD ...................................................... 4

IV.     SALIENT ALLEGATIONS DEMONSTRATING IMPLAUSIBILITY OF
        PLAINTIFF'S CLAIMS ........................................................................... 4

V.      ARGUMENT .......................................................................................... 7

        A.      PLAINTIFF FAILS TO PLEAD A PLAUSIBLE BREACH OF CONTRACT CLAIM
                AGAINST OUTDOOR ..................................................................... 7

        B.      PLAINTIFF FAILS TO PLEAD A PLAUSIBLE TORTIOUS INTERFERENCE WITH
                EXISTING CONTRACT CLAIM AGAINST KSE ................................. 10

        C.      PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM OF TORTIOUS
                INTERFERENCE WITH PROSPECTIVE RELATIONS AGAINST KSE ............. 12

        D.      PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM FOR INDUCEMENT OF AND
                ASSISTANCE IN (AIDING AND ABETTING) BREACH OF FIDUCIARY DUTIES
                AGAINST KSE AND OUTDOOR ...................................................... 14

        E.      EVEN IF UNJUST ENRICHMENT IS RECOGNIZED AS AN INDEPENDENT CLAIM
                FOR RELIEF, PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM AGAINST
                KSE AND OUTDOOR ..................................................................... 15

        F.      PLAINTIFF'S CIVIL CONSPIRACY CLAIM AGAINST KSE AND OUTDOOR IS
                BARRED ..................................................................................... 17

VI.     CONCLUSION ..................................................................................... 17

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint      i

App. 430

# TABLE OF AUTHORITIES

## Cases

*Abilene Sav. Ass'n v. Westchester Fire Ins. Co.*, 461 F.2d 557 (5th Cir. 1972) ............................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................. 4, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................... 4

*Bell v. Philadelphia Int'l Records*, 981 F. Supp. 2d 621 (S.D. Tex. 2013) ................... 9

*Bonn Operating Co. v. Devon Energy Prod. Co.,* Civil Action No. 4:06-CV-734-Y,
    2009 WL 484218 (N.D. Tex. Feb. 26, 2009) ....................................... 9

*Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 716 (N.D. Tex. 2011) ........... 15

*Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 720 (Tex. App.—Dallas 2015, no pet.) ...................... 16

*Collier v. CitiMortgage, Inc.*, No. 3:14-CV-906-M-BN, 2014 WL 4181449 (N.D. Tex.
    Aug. 22, 2014) ................................................. 4

*Greater Houston Transp. Co. v. Uber Techs., Inc.*, Civil Action No 4:14-0941, 2015 WL
    1034254 (S.D. Tex. Mar. 10, 2015) ........................................ 12-13

*Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539 (N.D. Tex. 2009) ................................ 15

*I Love Omni, LLC v. Omnitrition Int'l, Inc.*, Civil Action No. 3:16-CV-2410-G, 2017 WL
    3086035 (N.D. Tex. July 20, 2017) ....................................... 13

*In re Parkcentral Global Litig.*, Civil Action No. 3:09-CV-0765-M (LEAD CASE), 2010
    WL 3119403 (N.D. Tex. Aug. 5, 2010) ........................................ 14

*Ingram v. Beneficial Fin., Inc.*, Civil Action No. 3:13-CV-4037-L, 2015 WL 1443110
    (N.D. Tex. Mar. 30, 2015) ....................................... 15

*Juhl v. Airington*, 936 S.W.2d 640 (Tex. 1996) ............................................. 17

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) ............................... 14

*Mowbray v. Avery*, 76 S.W.3d 663 (Tex. App.—Corpus Christi 2002, pet. denied) ............. 15, 16

*Pepi Corp. v. Galliford*, 254 S.W.3d 457 (Tex. App.—Houston [1st. Dist.] 2007, pet.
    denied) ......................................... 16

*Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC*, 117 F. Supp. 3d 879
    (N.D. Tex. 2015) ........................................ 16

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          ii

App. 431

*ThermoTek, Inc. v. WMI Enters., LLC*, Civil Action No. 3:10-CV-2618-D, 2011
    WL 1485421 (N.D. Tex. Apr. 19, 2011) ............................................................. 10-11, 12

*Walker v. Cotter Props., Inc.,* 181 S.W.3d 895 (Tex. App.—Dallas 2006, no pet.) .................... 16

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001) ..................................................... 13

*Whitfield v. Nelson*, No. 3:13-CV-2230-BN, 2014 WL 1243805 (N.D. Tex. Mar. 26,
    2014) ................................................................................................................................. 17

Defendants Kroenke Sports & Entertainment, LLC And Outdoor Channel
Holdings, Inc.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint            iii

App. 432

Defendants Kroenke Sports & Entertainment, LLC ("KSE") and Outdoor Channel Holdings, Inc. ("Outdoor"), by and through their attorneys and pursuant to Fed. R. Civ. P. 12(b)(6), respectfully move this Court to dismiss all claims asserted against them in Plaintiff Nic Salomon's ("Plaintiff") Second Amended Complaint ("SAC") (ECF #63) with prejudice.

## I.     INTRODUCTION

This is Plaintiff's third bite at the apple.  KSE and Outdoor moved to dismiss Plaintiff's Original and Amended Complaints on both standing and Rule 12(b)(6) grounds.  The Court dismissed Plaintiff's first two pleadings for lack of standing, and as a result found that it did not need to consider the Rule 12(b)(6) arguments.  Despite the detailed explanations in the previous motions to dismiss as to why Plaintiff also failed to state a claim as a matter of law, Plaintiff has done nothing in the SAC to cure his fundamental pleading deficiencies—precisely because there is nothing he can say that would make his claims in the least bit plausible.

As explained below, the Term Sheet in question dealt only with potential sale of Outdoor subsidiaries SkyCam, LLC and CableCam, LLC (the "Aerial Camera Business").  It did not preclude, in fact it could not preclude given the pre-existing offer and merger agreement between Outdoor and Intermedia Outdoors Holdings, LLC ("Intermedia") for all Outdoor stock, the sale of the entire company of Outdoor.  And that is exactly what KSE acquired; it made a competing offer to purchase all Outdoor stock (not the Aerial Camera Business), and as the superior offer to that of Intermedia, KSE in fact acquired all Outdoor stock.

Defendants Kroenke Sports & Entertainment, LLC And Outdoor Channel Holdings, Inc.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint                    1

App. 433

Moreover, the Term Sheet expressly stated that Outdoor (as well as "Purchaser"[1]) could withdraw from or terminate negotiations for sale of the Aerial Camera Business, "for whatever reason, or for no reason," and that "any such withdrawal or termination shall not give any party a cause of action against the other party." (SAC Ex. A at p. 4). Simply put, while Plaintiff may be disappointed that he did not acquire the Aerial Camera Business (assuming he ever could have put together a deal to do so in the first place), his claims against KSE and Outdoor premised on his disheartenment are utterly implausible. He has failed to state any claim on his third try, and it is time for this saga to end. The SAC should be dismissed with prejudice.

## II.     CASE HISTORY

Plaintiff filed his Original Complaint (ECF #1) in this case on February 27, 2015. KSE and Outdoor moved to dismiss (ECF #14) the Complaint on May 5, 2015 pursuant to FED. R. CIV. P. 12(b)(1), 17(a), 12(b)(6), and 9(b). On July 16, 2015, the Court granted the Motion To Dismiss (ECF #26), and issued a corresponding Memorandum Opinion And Order (ECF #30) on September 29, 2015. In the Memorandum Opinion And Order (p. 5), the Court found that "Salomon's Original Complaint fails to allege sufficient facts to establish that Salomon has prudential standing or is the real party in interest. Because standing is a threshold issue, the Court does not reach the other issues raised in connection with KSE and Outdoor's joint Motion to Dismiss." In granting the Motion To Dismiss, the Court gave Plaintiff leave to replead "in an effort to establish his standing and/or status as the real party in interest." (*Id.*)

Plaintiff filed his Amended Complaint (ECF #31) on October 13, 2015. On October 30, 2015, KSE and Outdoor moved to dismiss the Amended Complaint (ECF #34) under FED. R.

---

[1] Defined in the Term Sheet as an "Acquisition entity . . . to be formed by PNC [Pacific Northern Capital] in conjunction with Nic Salomon." (SAC Ex. A at p. 1).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint     2

App. 434

Civ. P. 8(a)(2), 12(b)(1), 12(b)(6), and 17(a)(1).[2]  In its August 12, 2016 Memorandum Opinion And Order (ECF #53) granting that Motion To Dismiss (p. 14–15), the Court noted that "Plaintiff's Amended Complaint fails to establish that he has Article III standing.  It further fails to show that he has prudential standing or is the real party in interest . . . ."  Accordingly, the Court dismissed the Amended Complaint for lack of subject matter jurisdiction, and as a result the Court did not consider the bases raised by KSE and Outdoor for dismissal under Rule 12(b)(6).

On September 9, 2016, Plaintiff filed his Motion To Alter Or Amend The Judgment (ECF #55), and attached the SAC that he requested leave to file.  KSE and Outdoor opposed Plaintiff's Motion (ECF #56).  On August 31, 2017, the Court issued a Memorandum Opinion And Order (ECF #62) in which it vacated its Final Judgment and granted Plaintiff leave to file the SAC.  In so doing, the Court said on pages 9–10 that the allegations first made by Plaintiff in the SAC "are sufficient to allege that Plaintiff was a promoter of the Purchaser, and thus has plausibly alleged that he has constitutional and prudential standing to bring the claims asserted in this lawsuit."

While the Court found that Plaintiff now has made sufficient allegations to survive a motion to dismiss on standing grounds, Plaintiff has done nothing in the SAC to avoid dismissal on Rule 12(b)(6) grounds, and the Court has not yet considered KSE and Outdoor's Rule 12(b)(6) arguments.  Plaintiff even continues to assert a claim that this Court (and others) have found is not a claim at all.  Accordingly, as explained below, Plaintiff's SAC must be dismissed for failure to state a claim on which relief can be granted.

---

[2]  Because Plaintiff dropped his alleged fraud claim, KSE and Outdoor did not move under Rule 9(b).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          3

## III.    APPLICABLE LEGAL STANDARD

When considering a motion to dismiss a complaint, " '[t]he court does not evaluate the plaintiff[']s likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim.' " *Collier v. CitiMortgage, Inc.*, No. 3:14-CV-906-M-BN, 2014 WL 4181449, at *2 (N.D. Tex. Aug. 22, 2014) (citation omitted).  That said, the plaintiff "must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  As noted by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) :

> *A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged*. . . .  The plausibility standard is not akin to a "probability requirement," but it asks for *more than a sheer possibility that a defendant has acted unlawfully*.  . . .  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " [Emphasis added; quoting *Twombly*]

For the reasons explained below, the claims asserted by Plaintiff in the SAC are implausible on their face.

## IV.    SALIENT ALLEGATIONS DEMONSTRATING IMPLAUSIBILITY OF PLAINTIFF'S CLAIMS

The following allegations in Plaintiff's SAC, for the reasons noted in the Sections below, demonstrate the implausibility of each of Plaintiff's claims against KSE and Outdoor:

➢ Outdoor commenced efforts to sell the Aerial Camera Business in March 2012.  (*See* SAC ¶¶ 10, 16).

➢ In November 2012, Outdoor signed a merger agreement with Intermedia, *pursuant to which Intermedia agreed to purchase all stock of Outdoor*.  (*See* SAC ¶ 29 & Ex. B). Intermedia was acquiring the entire company, not only the Aerial Camera Business

Defendants Kroenke Sports & Entertainment, LLC And Outdoor Channel Holdings, Inc.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          4

App. 436

subsidiaries of Outdoor.  Plaintiff notes that Outdoor informed Intermedia that Outdoor "was exploring strategic alternatives for the [Aerial Camera Business], which process [was] still ongoing" at the time of the Intermedia merger agreement.  (*See* SAC Ex. B). Still, the Intermedia offer was for *all* stock of Outdoor.

➢ The Intermedia merger agreement was signed over ***three months before*** the Term Sheet between Outdoor, Plaintiff, and Pacific Northern Capital ("PNC").  (*See* SAC Ex. A).

➢  Plaintiff and PNC drafted the Term Sheet and then sent it to Outdoor on PNC letterhead. Tellingly, the Term Sheet does ***not*** preclude Outdoor from negotiating or selling the stock of Outdoor to anyone, nor could it since Outdoor already had entered into the merger agreement with Intermedia three months earlier.  (*See* SAC Ex. A).  In fact, had Plaintiff and PNC attempted in the Term Sheet to preclude the sale of Outdoor stock, ***they*** would have tortiously interfered with those ongoing efforts.

➢ The Term Sheet provides that other than the Exclusivity provision  (*see infra* at 7–8), "until definitive agreements are entered into, . . . no party will be under any legal obligation with respect to this Term Sheet, and no withdrawal from or termination of negotiations for the transaction contemplated by this term sheet prior to signing definitive agreements, for whatever reason, or for no reason, shall be determined to be in bad faith ***and any such withdrawal or termination shall not give any party a cause of action against the other party***."  (*See* SAC Ex. A at p. 4 (emphasis added)).

➢ On the very same day as execution of the Term Sheet, KSE made an ***unsolicited*** offer, in competition with that of Intermedia, to purchase all of the stock of Outdoor.  (*See* SAC ¶ 30).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint                    5

➢ Intermedia then countered the KSE offer for all Outdoor stock, and the Outdoor board found Intermedia's revised offer superior; the Outdoor board then notified KSE of its intent to terminate the March 13, 2013 merger agreement with KSE, subject to KSE's opportunity to counter. (*See* SAC ¶ 43 & Exs. O and P). Notwithstanding the fact that Plaintiff claims to have devoted efforts between March 2013 and the Intermedia counter in May 2013 in furtherance of his efforts to acquire the Aerial Camera Business (*see* SAC ¶¶ 34, 36, 37, 40), Plaintiff does not, and indeed cannot, allege that the counter by Intermedia for all Outdoor stock was improper. After all, the initial Intermedia offer preceded the Term Sheet by over three months.

➢ Following an additional counter by KSE for all Outdoor stock, the Outdoor board found the KSE counter superior to that of Intermedia, and KSE acquired all of the stock of Outdoor on May 17, 2013. (*See* SAC ¶¶ 46–47 & Ex. Q). Plaintiff does not allege, nor can he, that KSE acquired only the Aerial Camera Business from Outdoor.

➢ Nowhere in the SAC does Plaintiff allege that Outdoor entered into discussions or negotiations with anyone or any entity other than Plaintiff and PNC after February 27, 2013 to sell the Aerial Camera Business; indeed, any such allegation would be false. Rather, Outdoor continued the efforts which began with the Intermedia merger agreement in November 2012 (over three months before the Term Sheet) to sell all Outdoor stock.

➢ Nowhere in the SAC does Plaintiff allege that Outdoor sold the Aerial Camera Business to anyone; again, any such allegation would be false. In fact, as Plaintiff concedes throughout the SAC, at the time of the KSE acquisition of all Outdoor stock on May 17, 2013, Outdoor still owned the Aerial Camera Business. Thus, by virtue of its acquisition of all Outdoor stock, KSE acquired all Outdoor subsidiaries, including the Aerial Camera

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          6

Business, just as Intermedia would have done had it been the successful bidder and had it then acquired the Outdoor stock.

## V. ARGUMENT

Plaintiff alleges the following causes of action against KSE and Outdoor: i) breach of contract against Outdoor in Count 1; ii) tortious interference with existing contract against KSE in Count 2; iii) tortious interference with prospective relations against KSE in Count 3; iv) inducement of and assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor in Count 4; v) unjust enrichment against KSE and Outdoor (and PNC) in Count 6 [3]; and civil conspiracy against KSE and Outdoor (and PNC) in Count 7. Particularly in light of the facts set forth above in Section IV, and for the reasons below, each of Plaintiff's claims against KSE and Outdoor is inherently implausible. [4]

## A. PLAINTIFF FAILS TO PLEAD A PLAUSIBLE BREACH OF CONTRACT CLAIM AGAINST OUTDOOR

Plaintiff alleges that Outdoor breached the Exclusivity provision of the Term Sheet. (*See* SAC ¶¶ 50–51). [5] The Exclusivity provision is found on page 3 of the Term Sheet. (*See* SAC Ex. A). That provision provides that "[i]n consideration of Purchaser continuing to spend time

---

[3] In Count 5, Plaintiff asserts a breach of fiduciary duty claim against PNC.

[4] Plaintiff attached to the SAC communications with his attorneys at Fulbright & Jaworski. (*See* SAC Exs. F & H). Plaintiff also communicated with lawyers at Fulbright & Jaworski about the subject matter of this case and his purported personal interests using his computer at the Aerial Camera Business. Accordingly, Plaintiff has waived the attorney-client privilege, and if this case proceeds, KSE and Outdoor intend to pursue all such communications regarding the subject matter of this case. Counsel for KSE and Outdoor have sent a letter to Norton Rose Fulbright US LLP requesting it to preserve and retain all such communications.

[5] In light of the termination provision (*see supra* at 5), Plaintiff is precluded from asserting a breach of any other portion of the Term Sheet.

---

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          7

and incur professional fees and other expenses related to the acquisition," Outdoor will refrain from certain activities until April 15, 2013, including: (1) "[s]olicit[ing], facilitat[ing], encourag[ing] or accept[ing] any offers to acquire any equity or debt interest in *[the Aerial Camera Business]* or the whole or any material part of the assets of the business of *[the Aerial Camera Business]*"; (2) "[n]egotiat[ing] or correspond[ing] with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the business of *[the Aerial Camera Business]*"; (3) "[s]ell[ing] or agree[ing] to sell any equity or debt interest . . . in any part of *[the Aerial Camera Business]* to any party other than Purchaser." That provision also states that Outdoor would "forthwith cease any negotiations, discussions or correspondence which they are having, whether directly or indirectly, in relation to the potential acquisition of an equity or debt interest in the *[Aerial Camera Business]* by any other party than Purchaser or its nominee"; recall that Outdoor had been in discussions with other entities since around mid-2012 regarding potential sale of the Aerial Camera Business (*see* SAC ¶ 16).

By its very terms, as drafted by Plaintiff and PNC, while the Exclusivity provision restricted Outdoor's ability to pursue a separate sale of *the Aerial Camera Business*, it did not prohibit the sale of all of Outdoor's stock, nor could it given the pre-existing Intermedia merger agreement. For Plaintiff to suggest otherwise would mean that Plaintiff would admit to interfering with the pre-existing Intermedia agreement.

The only plausible interpretation of the Term Sheet is that Outdoor agreed during a certain period to negotiate exclusively with "Purchaser" for sale of the Aerial Camera Business to the "Purchaser." It strains credulity (indeed, we submit it is ridiculous), particularly in light of the pre-existing Intermedia merger agreement, to suggest that a prospective purchaser *of all of*

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint        8

App. 440

*Outdoor*—i.e., Intermedia or KSE—should be deemed a "third party" with whom Outdoor agreed not to "negotiate or correspond."

In fact, the plain language of the Exclusivity provision reveals that it relates only to the sale of the *Aerial Camera Business*, not the sale of all of Outdoor. (*See* SAC ¶¶ 25–26 and Ex. A at p. 3 (specifically referencing the Aerial Camera Business)). And of particular import, Plaintiff does not (and cannot) allege that Outdoor negotiated with anyone other than Plaintiff and PNC after February 27, 2013 regarding sale of the Aerial Camera Business. KSE's communications and negotiations with Outdoor (like those of Intermedia) to acquire all Outdoor stock simply was outside the scope of the Exclusivity provision. As "contracts are to be applied as written to give effect to the parties' intent" (*Bonn Operating Co. v. Devon Energy Prod. Co.*, Civil Action No. 4:06-CV-734-Y, 2009 WL 484218, at *8 (N.D. Tex. Feb. 26, 2009), and the Exclusivity provision as drafted by Plaintiff and PNC is plainly limited to the Aerial Camera Business, alleged discussions between Outdoor and KSE pertaining to, and KSE's acquisition of, all Outdoor stock (just like the post-February 27, 2013 discussions and negotiations between Outdoor and Intermedia) were not barred by the Exclusivity provision. *See Abilene Sav. Ass'n v. Westchester Fire Ins. Co.*, 461 F.2d 557, 561 (5th Cir. 1972) ("Where the parties have bargained freely and on equal terms their contract ought not be extended by implication or enlarged by construction beyond the actual terms . . . entered into by the parties."); *Bell v. Philadelphia Int'l Records*, 981 F. Supp. 2d 621, 629 (S.D. Tex. 2013) ("The court cannot rewrite the clear terms of the contract under the guise of interpretation.").

Apparently, Plaintiff attempts to avoid the damning implications of the November 2012 Intermedia merger agreement, and the May 2013 counter by Intermedia to the KSE offer, by conclusorily claiming that "Intermedia was not merging with Outdoor to acquire the Aerial

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          9

Camera Business," and that "Intermedia expected and acknowledged that the Aerial Camera Business would be sold to a third party, either before or after the merger." (SAC ¶ 29). Plaintiff then goes on to acknowledge, however, that Intermedia upped its offer following the KSE offer, and offered a higher price than KSE for all stock of Outdoor. (*See* SAC ¶ 43). The fact that the KSE offer was for all Outdoor stock, and thus included all Outdoor subsidiaries (nowhere does Plaintiff attempt to suggest otherwise), and that Intermedia countered with a higher price, demonstrates the facially implausible nature of Plaintiff's effort to avoid the significance of the November 2012 Intermedia merger agreement on Plaintiff's suggested claims.

It also should be noted that under the Term Sheet (*see* SAC Ex. A at p. 4), Outdoor (just like "Purchaser") had the absolute right to withdraw from or terminate negotiations for sale of the Aerial Camera Business, for any reason or no reason at all, and without liability or recourse, prior to the signing of "definitive agreements." (*See also id.* ("[T]he failure of Outdoor Channel and Purchaser to reach agreement on the terms and conditions of definitive agreements in accordance with this Term Sheet shall not be construed as a breach of this Term Sheet by any party hereto.")).

Simply put, Plaintiff fails to state a plausible claim against Outdoor for breach of contract, and Count 1 of the SAC should be dismissed with prejudice.

**B.     PLAINTIFF FAILS TO PLEAD A PLAUSIBLE TORTIOUS INTERFERENCE WITH EXISTING CONTRACT CLAIM AGAINST KSE**

Under Texas law, "[t]he elements of tortious interference with existing contracts are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that such interference proximately caused injury; and (4) that actual damage or loss occurred." *ThermoTek, Inc. v. WMI Enters., LLC*, Civil Action No. 3:10-CV-

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint                    10

2618-D, 2011 WL 1485421, at *8 (N.D. Tex. Apr. 19, 2011). Plaintiff's allegations fail to support a plausible tortious interference with an existing contract claim.

KSE's unsolicited offer to purchase all stock of Outdoor (like the November 2012 offer and merger agreement of Intermedia three months earlier) was a bona fide exercise of its own rights, in competition with the pre-existing Intermedia agreement, and cannot form the basis of a tortious interference with an existing contract claim predicated on the Exclusivity provision. This is particularly true since, as explained above, it is facially implausible for Plaintiff to suggest that the Term Sheet precluded KSE (or anyone for that matter) from negotiating with Outdoor for the acquisition of all Outdoor stock.

Plaintiff also overreaches when he states that "there was a contract regarding the sale by Outdoor of [the Aerial Camera Business] in which Mr. Salomon had an interest." (SAC ¶ 54). In truth, the Term Sheet drafted by Plaintiff and PNC expressly said that there was no "binding legal agreement," other than the Exclusivity provision. (*See* SAC Ex. A at p. 4 ("Except for the provisions of 'Exclusivity' above, which is a binding legal agreement upon the parties, this Term Sheet is a statement of mutual intention; it is not intended to be legally binding, and does not constitute a binding contractual commitment with respect to any transaction.")).

Plaintiff further pleads that "KSE willfully and intentionally interfered with the . . . Exclusivity Provision" by "induc[ing] or caus[ing] Outdoor to breach its contractual obligations to negotiate exclusively with PNC and Plaintiff." (SAC ¶ 55). However, Plaintiff does not and cannot allege that Outdoor negotiated with anyone other than Plaintiff and PNC after February 27, 2013 in connection with any sale of the Aerial Camera Business; in other words, Plaintiff fails to allege any facts (and cannot do so) that KSE caused Outdoor to negotiate with anyone other than Plaintiff and PNC.

Defendants Kroenke Sports & Entertainment, LLC And Outdoor Channel Holdings, Inc.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint            11

Plaintiff's allegation that "KSE induced or caused Outdoor to breach its contractual obligations to negotiate exclusively with PNC and Plaintiff" (SAC ¶ 55) also is belied by Plaintiff's allegations in the SAC. Plaintiff alleges that in late March 2012, he, PNC and Nobel Financial (Outdoor's investment banker) exchanged drafts of an asset purchase agreement and had conversations about it. (*See* SAC ¶¶ 33, 37). The fact that no definitive agreement was reached does not provide a basis for any claim according to the express provisions of the Term Sheet. (*See* SAC Ex. A at p. 4).

For each of these reasons, Plaintiff's claim of tortious interference against KSE is implausible and fails as a matter of law. Accordingly, this claim also must be dismissed with prejudice.

### C.  PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM OF TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS AGAINST KSE

In Texas, the elements of tortious interference with prospective business relations are:

(1) there was a reasonable probability that [the plaintiff] would have entered a contractual relationship with a third party; (2) the defendants committed an independently tortious or unlawful act that prevented the contract from being formed; (3) the defendants' tort was committed with a conscious desire to prevent formation of the contract; and (4) that the plaintiff suffered actual harm as a result.

*ThermoTek*, 2011 WL 1485421, at *8.

Again, the KSE unsolicited offer and merger agreement for all Outdoor stock, in competition with the pre-existing Intermedia merger agreement, was a lawful act based on free market principles and cannot form the basis for Plaintiff's tortious interference with prospective relations claim. *See Greater Houston Transp. Co. v. Uber Techs., Inc.*, Civil Action No 4:14-0941, 2015 WL 1034254, at *19–20 (S.D. Tex. Mar. 10, 2015) (finding "tortious interference . . . requires that the plaintiff show independently tortious or unlawful conduct by the defendant" and

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint                    12

App. 444

granting defendant's motion to dismiss tortious interference with prospective relations claim); *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, Civil Action No. 3:16-CV-2410-G, 2017 WL 3086035, at *3 (N.D. Tex. July 20, 2017) (same). *See also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) ("[H]arm that results only from lawful competition is not compensable by the interference tort.").

Furthermore, Plaintiff's allegations in the SAC demonstrate the facially implausible nature of this claim. Plaintiff says that "KSE induced Outdoor to breach its contractual obligation to negotiate exclusively with Mr. Salomon and PNC and then caused the execution of the Amendment [with PNC], which purported to grant KSE the right to disavow the sale of the Aerial Camera Business." (SAC ¶ 58). Once again, however, nowhere does Plaintiff allege (nor can he) that Outdoor negotiated with anyone other than Plaintiff and PNC for sale of the *Aerial Camera Business* after the February 27, 2013 Term Sheet. As far as the amendment with PNC goes, nowhere does Plaintiff allege (nor can he) that Plaintiff, PNC and Outdoor reached definitive agreements (let alone signed them), and that KSE then "disavowed" any sale.

Plaintiff also conveniently ignores the Term Sheet provision that he and PNC drafted, which states that either party could withdraw from or terminate negotiations "for whatever reason, or for no reason." (*See* SAC Ex. A at p. 4). This means that Outdoor could withdraw from or terminate negotiations with Plaintiff and PNC if Outdoor determined that it was in its best interest to do so given the merger agreements with Intermedia and then KSE, which called for the purchase of all Outdoor stock. Indeed, Outdoor's General Counsel previously had communicated to Plaintiff on March 4, 2013 (four days after execution of the Term Sheet and well before the "amendment" on which Plaintiff places so much stock) that "the interest of

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint            13

App. 445

Outdoor to accept an offer to purchase all the stock of the entire company took precedence over the sale of the Aerial Camera Business." (SAC ¶ 31).

For each of these reasons, Plaintiff's claim of tortious interference with prospective relations against KSE is implausible and fails as a matter of law. It too must be dismissed with prejudice.

### D. PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM FOR INDUCEMENT OF AND ASSISTANCE IN (AIDING AND ABETTING) BREACH OF FIDUCIARY DUTIES AGAINST KSE AND OUTDOOR

Under Texas law, Plaintiff's claim for aiding and abetting (assisting and encouraging) a breach of fiduciary duty requires Plaintiff to demonstrate that KSE knowingly participated in an alleged breach. *In re Parkcentral Global Litig.*, Civil Action No. 3:09-CV-0765-M (LEAD CASE), 2010 WL 3119403, at *9 (N.D. Tex. Aug. 5, 2010). To state a claim for knowing participation in a breach of fiduciary duty, the "plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citation omitted).

As a preliminary matter, PNC previously explained why there was no fiduciary or partnership relationship between PNC and Salomon. (*See* PNC's Motion To Dismiss (ECF #33) at pp. 8–9).

Plaintiff's claim here is founded on the following utterly conclusory statement: "The Amendment purported to grant to the prospective purchaser KSE the right to reject the sale of the Aerial Camera Business to Mr. Salomon and PNC. Such assistance and encouragement was a substantial factor in causing PNC's breach of fiduciary duties to Mr. Salomon." (SAC ¶ 62). Yet Plaintiff offers no factual allegation as to how the March 21, 2013 "amendment" caused

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          14

PNC to breach supposed fiduciary duties to Plaintiff.  As noted by the Supreme Court in *Iqbal*, 556 U.S. at 678:  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Not only is there a dearth of such factual content, there is none.  Indeed, at the same time as the "amendment," Plaintiff, PNC and Outdoor's investment banker were exchanging and discussing drafts of an asset purchase agreement.  (*See* SAC ¶ 37).

As for Plaintiff and PNC's interactions after the "amendment," Plaintiff still makes no factual (as opposed to conjectural) allegations that PNC did anything vis-à-vis its relationship with Plaintiff based on anything that KSE or Outdoor said or did.  Plaintiff simply makes conclusory assertions that PNC breached its fiduciary duties to him by signing the March 21, 2013 "amendment" (*see* SAC ¶ 66), and that KSE and Outdoor aided and abetted that breach.

"Rule 8 . . . does not unlock the doors of discovery for a plaintiff" "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678–79.  Plaintiff fails to state a plausible claim for relief and this claim too must be dismissed with prejudice.

E.    **EVEN IF UNJUST ENRICHMENT IS RECOGNIZED AS AN INDEPENDENT CLAIM FOR RELIEF, PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM AGAINST KSE AND OUTDOOR**

In *Ingram v. Beneficial Fin., Inc.*, Civil Action No. 3:13-CV-4037-L, 2015 WL 1443110 (N.D. Tex. Mar. 30, 2015), the court ruled that "[u]njust enrichment is [a] theory of liability, not an independent cause of action under Texas law."  *Id.* at *13 (citing *Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 716, 724-26 (N.D. Tex. 2011); *Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009); *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied)).  Moreover, this Court also has held under Texas

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          15

App. 447

law that unjust enrichment is not an independent cause of action. *See Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC*, 117 F. Supp. 3d 879, 904 (N.D. Tex. 2015) (citing *Walker v. Cotter Props., Inc.,* 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) (" 'Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay.' ")).[6]

Even if Plaintiff is permitted to plead unjust enrichment as an independent cause of action, recovery is limited to situations where "the defendant has wrongfully secured or passively received a benefit from another that would be unconscionable to retain, and the defendant obtained the benefit from the plaintiff by fraud, duress, or the taking of an undue advantage." *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 720 (Tex. App.—Dallas 2015, no pet.). Here, Plaintiff merely asserts that "Defendants have unjustly enriched themselves, to Mr. Salomon's detriment, by the acts, omissions, and torts described in this Complaint." (SAC ¶ 69). These threadbare allegations and conclusory statements are devoid of any facts to support a plausible theory or claim for unjust enrichment.

Plaintiff also fails to allege that Outdoor or KSE wrongfully secured or passively received a benefit from Plaintiff that would be unconscionable to retain. Indeed, Plaintiff himself alleges that KSE made an unsolicited offer for all of Outdoor's stock (as Intermedia did prior to the Term Sheet and KSE's unsolicited offer). Plaintiff does not (and cannot) allege facts

---

[6] In previous briefing (ECF #19 at p. 20), Plaintiff noted that Texas Courts of Appeal are divided on whether unjust enrichment is a cause of action or merely a theory of recovery, comparing *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st. Dist.] 2007, pet. denied) (holding that "[u]njust enrichment is an independent cause of action") with *Mowbray* 76 S.W.3d at 679 (holding that "unjust enrichment is not a distinct independent cause of action but simply a theory of recovery")).

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          16

App. 448

that plausibly suggest it was unconscionable for KSE to purchase all Outdoor stock, or that KSE or Outdoor obtained the benefit of the purchase from Plaintiff by fraud,[7] duress, or the taking of an undue advantage.  For all of these reasons, Plaintiff's claim is implausible and fails to state a cause of action; it should be dismissed with prejudice.

## F.  PLAINTIFF'S CIVIL CONSPIRACY CLAIM AGAINST KSE AND OUTDOOR IS BARRED

" 'The essential elements of a civil conspiracy claim are:  1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result.' " *Whitfield v. Nelson*, No. 3:13-CV-2230-BN, 2014 WL 1243805, at *3 (N.D. Tex. Mar. 26, 2014) (citation omitted). "[M]erely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish . . . civil conspiracy." *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (citation omitted).  "Instead, civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Id.* (citation omitted).

"[L]iability for a civil conspiracy depends on participation in an underlying tort." *Whitfield*, 2014 WL 1243805, at *3 (citation omitted).  "If the underlying tort claim fails, so, too, does the civil conspiracy claim." *Id.*  Here, Plaintiff fails to plead plausible claims for each of the alleged torts that underlie his civil conspiracy claim.  Thus, Count 7 against KSE and Outdoor should be dismissed with prejudice.

## VI.  CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC. respectfully request that the

---

[7] Plaintiff has omitted the fraud claim previously pled as Count 4 of his Original Complaint.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint        17

App. 449

Court grant the foregoing Motion and:  (1) dismiss Counts 1, 2, 3, 4, 6 and 7 of Plaintiff NIC SALOMON's Second Amended Complaint against them with prejudice; and (2) award Defendants KROENKE SPORTS & ENTERTAINMENT, LLC and OUTDOOR CHANNEL HOLDINGS, INC. such other and further relief as the Court deems appropriate.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint                    18

App. 450

Respectfully submitted,

<div style="text-align:center">JACKSON WALKER L.L.P.</div>

Date:  September 15, 2017

By:   /s/Shannon Zmud Teicher
Paul C. Watler
State Bar No. 00784334
Shannon Zmud Teicher
State Bar No. 24047169
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  (214) 953-6000
Facsimile:  (214) 953-5822
Email:  pwatler@jw.com
           steicher@jw.com

and

Kevin D. Evans
*Admitted pro hac vice*
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone:  (720) 200-0676
Facsimile:  (720) 200-0679
Email:  kdevans@armstrongteasdale.com

Attorneys for Defendants KROENKE SPORTS &
ENTERTAINMENT, LLC and
OUTDOOR CHANNEL HOLDINGS, INC.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint          19

App. 451

## CERTIFICATE OF SERVICE

This is to certify that on this 15th day of September, 2017, I electronically submitted the foregoing **DEFENDANT KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT** with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically as authorized by Rule 5(b)(2) of the FEDERAL RULES OF CIVIL PROCEDURE.

/s/*Shannon Zmud Teicher*
Shannon Zmud Teicher

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Rule 12(b)(6) Motion To Dismiss Second Amended Complaint    20

App. 452

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 28**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-00666-M |
| | § | |
| KROENKE SPORTS & ENTERTAINMENT, | § | JURY TRIAL DEMANDED |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

---

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

**GRAY REED & MCGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
CLEVELAND G. CLINTON
State Bar No. 04399900
WILLIAM B. CHANEY
State Bar No. 04108500
JIM MOSELEY
State Bar No. 14569100
WILLIAM N. DRABBLE
State Bar No. 24074154
Telephone: 214-954-4135
Facsimile: 214-953-1332
cclinton@grayreed.com
wchaney@grayreed.com
jmoseley@grayreed.com
wdrabble@grayreed.com

ATTORNEYS FOR PLAINTIFF
NIC SALOMON

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS                    PAGE 1 OF 29
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

App. 454

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. 3

SUMMARY OF THE ARGUMENT ..................................................................... 7

FACTUAL AND PROCEDURAL BACKGROUND .............................................. 7

    I.      Outdoor's Aerial Camera Business ......................................................... 7

    II.     Salomon, PNC, and Outdoor Execute the Term Sheet. ........................... 8

    III.    Outdoor and PNC Execute an Amendment to the Term Sheet ............... 9

    IV.    Salomon Sues KSE, Outdoor, and PNC. ............................................... 11

ARGUMENT & AUTHORITIES .......................................................................... 12

    I.      Standard of Review ............................................................................... 12

    II.     Salomon's Amended Complaint States Plausible Claims for Relief Against
        KSE and Outdoor. ............................................................................... 13

        A.     Outdoor Breached the Exclusivity Provision. .......................... 13

        B.     KSE Tortiously Interfered with the Exclusivity Provision. ...... 16

        C.     KSE Tortiously Interfered with the Planned Sale of the Aerial Camera
             Business. ................................................................................. 18

        D.     KSE and Outdoor Participated and Assisted in PNC's

             Breach of Fiduciary Duties. .................................................... 21

        E.     Regardless of the Nature of the Claim, Salomon Is Entitled to Relief
             Because KSE, Outdoor, and PNC Were Unjustly Enriched. .... 23

        F.     Because Salomon Has Pled Plausible Tort Claims Against KSE, Outdoor,
             and PNC, Dismissal of the Civil Conspiracy Claim is Improper. ............ 26

    III.    The Court Has Already Rejected KSE and Outdoor's Contentions that the
        Second Amended Complaint Fails to Plead Plausible Claims for Relief. ........... 26

CONCLUSION & PRAYER FOR RELIEF ........................................................... 28

CERTIFICATE OF SERVICE ............................................................................. 29

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**           **PAGE 2 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 455

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)............................................................................................12, 13, 23

*Argyle ISD ex rel. Bd. of Trustees v. Wolf*,
 234 S.W.3d 229 (Tex. App.—Fort Worth 2007, no pet.)......................................24

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)............................................................................................12, 13, 23

*Bowles v. Fickas*,
 167 S.W.2d 741 (Tex. 1943)....................................................................................19

*Butnaru v. Ford Motor Co.*,
 84 S.W.3d 198 (Tex. 2002)......................................................................................17

*Casstevens v. Smith*,
 269 S.W.3d 222 (Tex. App.—Texarkana 2008, pet. denied) ................................24

*City of The Colony v. N. Tex. Mun. Water Dist.*,
 272 S.W.3d 699 (Tex. App.—Fort Worth 2008, pet. dism'd)................................14

*Clark v. Dillard's, Inc.*,
 460 S.W.3d 714 (Tex. App.—Dallas 2015, no pet.)..............................................24

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
 417 S.W.3d 909 (Tex. 2013)....................................................................................19

*In re ConAgra Foods, Inc.*,
 No. CV 11-05379 MMM, 2012 WL 5995454 (C.D. Cal. Nov. 15, 2012) ............25

*Darocy v. Abildtrup*,
 345 S.W.3d 129 (Tex. App.—Dallas 2011, no pet.)..............................................21

*Davis v. Hydpro*,
 839 S.W.2d 137 (Tex. App.—Eastland 1992, writ denied)....................................17

*Elledge v. Friberg-Cooper Water Supply Corp.*,
 240 S.W.3d 869 (Tex. 2007) (per curiam)..............................................................24

*Erickson v. Pardus*,
 551 U.S. 89 (2007) (per curiam)........................................................................12, 23

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**  **PAGE 3 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 456

*Guiterrez v. Yancey*,
    650 S.W.2d 169 (Tex. App.—San Antonio 1983, no writ) .................................................... 21

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
    637 F.3d 787 (5th Cir. 2007) .......................................................................................... 13

*HECI Expl. Co. v. Neel*,
    982 S.W.2d 881 (Tex. 1998) ........................................................................................... 24

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
    832 S.W.2d 39 (Tex. 1992) ............................................................................................. 24

*Ingram v. Beneficial Fin., Inc.*,
    Civil Action No. 3:13-CV-4037-L, 2015 WL 1443110 (N.D. Tex. Mar. 30,
    2015) ........................................................................................................................... 25

*Kinzbach Tool Co. v. Corbett–Wallace Corp.*,
    160 S.W.2d 509 (Tex. 1942) ........................................................................................... 21

*Kirby v. Cruce*,
    688 S.W.2d 161 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) ................................................. 22

*Leal v. McHugh*,
    731 F.3d 405 (5th Cir. 2013) .......................................................................................... 12

*Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*,
    809 F. Supp. 582 (N.D. Tex. 2011) ................................................................................. 16

*Mary E. Bivins Found. v. Highland Capital Mgmt, L.P.*,
    451 S.W.3d 104 (Tex. App.—Dallas 2014, no pet.) ............................................................ 26

*Mowbray v. Avery*,
    76 S.W.3d 663 (Tex. App.—Corpus Christi 2002, pet. denied) ............................................ 24

*Nat'l Health Res. Corp. v. TDF Fin., L.L.C.*,
    429 S.W.3d 125 (Tex. App.—Dallas 2014, no pet.) ............................................................ 13

*Newington, Ltd. v. Forrester*,
    No. 3:08-CV-0864, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008) .................................. 24, 25

*Pepsi Corp. v. Galliford*,
    254 S.W.3d 457 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) .................................... 24

*Plains Builders, Inc. v. Steel Source, Inc.*,
    408 S.W.3d 596 (Tex. App,—Amarillo 2013, no pet) ......................................................... 14

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**        **PAGE 4 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 457

*Prophet Capital Mgmt., Ltd. v. Prophet Equity, L.L.C.*,
No. A-09-CA-316-LY, 2009 WL 3199115 (W.D. Tex. Sept. 25, 2009)................................25

*Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC*,
117 F. Supp. 3d 879 (N.D. Tex. 2015) ................................................................................25

*R.M. Dudley Constr. Co. v. Dawson*,
258 S.W.3d 694 (Tex. App.—Waco 2008, pet. denied)........................................................24

*Rankin v. Naftalis*,
557 S.W.2d 940 (Tex. 1977)................................................................................................21

*Robey v. Sun Record Co.*,
242 F.2d 684 (5th Cir. 1957) ..............................................................................................17

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
802 F.3d 732 (5th Cir. 2015) ..............................................................................................19

*Tex. Gas Utils. Co. v Barrett*,
460 S.W.2d 409 (Tex. 1970)................................................................................................13

*Texaco, Inc. v. Pennzoil Co.*,
729 S.W.2d 768 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)............................17

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
262 S.W.3d 773 (Tex. 2008)................................................................................................14

*Valence Operating Co. v. Dorsett*,
164 S.W.3d 656 (Tex. 2005)................................................................................................15

*Vanegas v. Am. Energy Servs.*,
302 S.W.3d 299 (Tex. 2009)................................................................................................13

*w. Bell Tel. Co. v. Mktg. on Hold Inc.*,
308 S.W.3d 909 (Tex. 2010)................................................................................................23

*Wal-Mart Stores, Inc. v. Sturges*,
52 S.W.3d 711 (Tex. 2001)..................................................................................................20

*Walker v. Cotter Props.*,
181 S.W.3d 895 (Tex. App.—Dallas 2006, no pet.)............................................................24

*Warner v. Winn*,
197 S.W.2d 338 (Tex. 1946)................................................................................................22

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**          **PAGE 5 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 458

**Rules**

Fᴇᴅ. R. Cɪᴠ. P. 8(a)........................................................................................................23

Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6).........................................................7, 12, 16, 23, 25, 27, 28, 29

## Other Authorities

Bʟᴀᴄᴋ's Lᴀᴡ Dɪᴄᴛɪᴏɴᴀʀʏ (10th ed. 2014) ...............................................................15

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**     **PAGE 6 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 459

TO THE HONORABLE BARBARA M.G. LYNN, CHIEF DISTRICT JUDGE:

Pursuant to FED. R. CIV. P. 12(b)(6), Plaintiff NIC SALOMON files this Response and Brief in Support to Defendants KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE"), and OUTDOOR CHANNEL HOLDINGS, INC.'s ("Outdoor") Rule 12(b)(6) Motion to Dismiss Salomon's Second Amended Complaint (the "Rule 12(b)(6) Motion to Dismiss"). Salomon respectfully requests that the Court deny KSE and Outdoor's Motion to Dismiss for the following reasons:

## SUMMARY OF THE ARGUMENT

By basing their Rule 12(b)(6) Motion to Dismiss on the very grounds this Court already rejected in its Memorandum Opinion and Order (ECF No. 62), KSE and Outdoor impermissibly seek a second bite at the dismissal apple. Moreover, and as this Court has already confirmed, Salomon's Second Amended Complaint supplies any requisite allegations previously missing from his earlier pleadings. Consequently, the Court should deny KSE and Outdoor's Rule 12(b)(6) Motion to Dismiss because Salomon' Second Amended Complaint plausibly alleges: (1) breach of contract against Outdoor; (2) tortious interference with existing contract against KSE; (3) tortious interference with prospective relations against KSE; (4) inducement of and assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor; (5) unjust enrichment against KSE, Outdoor, and Pacific Northern Capital, LLC ("PNC"); and (6) civil conspiracy against KSE, Outdoor, and PNC.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Outdoor's Aerial Camera Business.

Beginning in 2006, Salomon managed the finances and operations of the Aerial Camera Business, and served formally as the President of the Aerial Camera Business beginning in 2009.

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS          PAGE 7 OF 29
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

App. 460

(ECF No. 63, ¶ 10). SkyCam and CableCam currently operate from shared facilities in Fort Worth, Texas. Salomon worked to consolidate the Aerial Camera Business and to develop or acquire the patents necessary to do so. The Aerial Camera Business principally provides suspended aerial camera services to media networks for the production of sporting and entertainment events. SkyCam and CableCam design, manufacture, and operate movable aerial platforms, including the research and development of new technology related to these platforms. They are engaged in the business of providing suspended aerial camera service to media networks for the production and broadcast of sporting and entertainment events. (*Id*. ¶ 14).

After Outdoor decided to sell the Aerial Camera Business in 2012, its chief executive officer, Tom Hornish, encouraged Salomon to enlist other investors to offer to purchase the companies. (*Id*. ¶ 16). Salomon subsequently contacted PNC about providing capital for purchase or other investment. (*Id*. ¶ 17). After performing its due diligence, PNC agreed to finance and participate in a joint bid with Salomon. (*Id*. ¶¶ 18–21).

## II.    Salomon, PNC, and Outdoor Execute the Term Sheet.

On February 27, 2013, Salomon, PNC, and Outdoor executed the Term Sheet that set forth the parameters of Outdoor's intended sale of the Aerial Camera Business. (*Id*. ¶ 22). Salomon and PNC would form an acquisition entity referred to as the "Purchaser" to buy the Aerial Camera Business for $4.05 million. (*See id.*, Ex. A, at 1). The purchase price was $3.65 million in cash at closing, payments related to pending litigation, and a twenty percent royalty payable to Outdoor over twelve months. (*Id*. at 1–3). The Term Sheet further stated that the parties would use their best efforts to achieve the negotiation and execution of definitive transaction documents by April 15, approximately forty-five days later. (*Id*. at 3).

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 8 OF 29

App. 461

Indeed, the Term Sheet contained an Exclusivity Provision precluding Outdoor from, directly or indirectly, soliciting, negotiating, or accepting any competing offers to purchase the Aerial Camera Business before April 15th. (*Id.*). Outdoor also agreed to refrain from negotiating or corresponding with third parties regarding offers to acquire the Aerial Camera Business. (*Id.*). The Exclusivity Provision required Outdoor to inform any interested third parties that exclusive discussions were underway but not to reveal the Purchaser's identity. (*Id.*). In contrast to the remainder of the Term Sheet, the parties expressly agreed that the Exclusivity Provision was a "binding legal agreement upon the parties," which included consideration of the "Purchaser continuing to spend time and incur professional fees and other expense related to the acquisition." (*Id.*). In the event of Outdoor's breach, the Exclusivity Provision permits the recovery of monetary damages or equitable relief, including but not limited to specific performance and injunctive relief. (*Id.*).

Hornish signed the Term Sheet as Outdoor's chief executive officer. (*Id.* at 4). Salomon and Kelly Holowaty, as managing director of PNC, signed the Term Sheet "[f]or the Purchaser." (*Id.*). Salomon and PNC, however, had not formed the Purchaser as of February 27, 2013. (*Id.* ¶ 22).

## III. Outdoor and PNC Execute an Amendment to the Term Sheet.

Before it signed the Term Sheet, Outdoor signed a merger agreement with Intermedia Outdoor Holdings, LLC ("Intermedia"). (*Id.* ¶ 29). On February 27, 2013, Outdoor received an unsolicited offer from KSE to purchase all of Outdoor's stock. (*Id.* ¶ 30).

Notwithstanding its obligation to deal exclusively with Salomon and PNC, Outdoor allowed KSE to exercise authority and control over the sale of the Aerial Camera Business.

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 9 OF 29

App. 462

Outdoor's general counsel informed Salomon on March 1 that Outdoor was disregarding the Term Sheet in light of KSE's offer. (*Id.* ¶ 27). On March 21 (within the exclusivity period), Outdoor and PNC, only, signed an Amendment to the Term Sheet, extending the exclusivity period for one month. (*See generally id.*, at Ex. B). Even though KSE had not yet acquired Outdoor's stock, the Amendment granted KSE the right to terminate the Exclusivity Provision and the sale:

> The parties agree that if, at any point during the exclusivity period, [KSE] concludes that it will not consent to the Proposed Transaction, PNC shall release [Outdoor] from its exclusivity obligations and PNC shall forever waive its rights, if any, under the Term Sheet to seek equitable relief or any other remedies available at law or in equity.

(*Id.*). However, neither PNC nor Outdoor informed Salomon of the Amendment until April 9. (*Id.* ¶ 41).

Four days after the Amendment's effective date and within the original exclusivity period, Hornish directed Salomon to contact David Gluck, KSE's current executive vice-president for new business development. (*Id.* ¶ 39). Gluck arranged to visit SkyCam and CableCam's shared facility in Fort Worth to learn more about the Aerial Camera Business. (*Id.*). During his conversation with Salomon, Gluck disclosed that, despite Outdoor's exclusivity obligation and prohibition against disclosing the Purchaser's identity, he was aware of the Term Sheet but that KSE was allegedly undecided on its plans concerning the sale of the Aerial Camera Business to Salomon and PNC. (*Id.*).

Before the end of the exclusivity period, KSE prevented Outdoor from honoring its obligation to use its best efforts to close the transaction described in the Term Sheet. (*Id.* ¶ 48). Because KSE and Outdoor refused to consummate the sale of the Aerial Camera Business, Salomon and PNC never formed the Purchaser. (*Id.*).

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**      **PAGE 10 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 463

On May 8, 2013, Outdoor's shareholders approved KSE's merger agreement. (*Id.* ¶ 47). As a result, Outdoor became a wholly owned subsidiary of KSE, and KSE owned and controlled all of Outdoor's business—including the Aerial Camera Business. (*See id.*).

## IV.    Salomon Sues KSE, Outdoor, and PNC.

On February 27, 2015, Salomon sued KSE, Outdoor, and PNC, asserting, inter alia, that Outdoor had breached the Exclusivity Provision and that KSE had tortiously interfered with both the Exclusivity Provision and the intended sale of the Aerial Camera Business. (ECF No. 1).

KSE and Outdoor moved to dismiss Salomon's original complaint (ECF No. 14). Finding that Salomon had not pled facts sufficient to demonstrate his standing to sue, the Court granted KSE and Outdoor's motion but also granted Salomon the opportunity to replead. (ECF Nos. 26. 30). Salomon subsequently filed his amended complaint. (ECF No. 31). KSE and Outdoor again moved to dismiss, arguing that Salomon lacked standing, was not the real party in interest, and failed to state a claim upon with relief can be granted. (ECF No. 35). The Court granted the second motion to dismiss and rendered a final judgment of dismissal, finding that Salomon failed to establish constitutional or prudential standing. (ECF No. 53–54). Salomon moved to alter the final judgment and sought leave to file his Second Amended Complaint. (ECF No. 55). KSE and Outdoor opposed, incorporating the earlier allegations in their motion to dismiss Salomon's amended complaint (ECF No. 35) that he failed to plead plausible claims for relief against KSE and Outdoor. (ECF No. 56, at 20–21).

The Court granted Salomon's motion to amend, allowing him leave to file his Second Amended Complaint, and found that he pled facts sufficient to "plausibly alleg[e] that he has constitutional and prudential standing to bring the claims asserted in this lawsuit." (ECF No. 62,

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**          **PAGE 11 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 464

at 10). The Court also found that, "[t]o the extent the Court [previously] determined [Salomon] failed to allege sufficient facts to show he had standing to bring a tortious interference claim against KSE because the [a]mended [c]omplaint failed to demonstrate a reasonable probability that the Purchaser and Outdoor would have entered into a contractual relationship, ***the Court finds that the Second Amended Complaint supplies the missing allegations***." (ECF No. 62, at 10 (emphasis added)). Accordingly, the Court granted Salomon leave to amend (ECF No. 62), and he filed his Second Amended Complaint. (ECF No. 63).

Once again, and despite the Court's ruling that Salomon pled sufficient facts in his Second Amended Complaint to plausibly allege tortious interference with prospective contractual relations against KSE, both Outdoor and KSE moved to dismiss Salomon's Second Amended Complaint under Rule 12(b)(6) (ECF No. 74). This most recent dismissal dispute is now before the Court.

## ARGUMENT & AUTHORITIES

Because Salomon's Second Amended Complaint contains sufficient facts to plausibly allege his entitlement to relief for his claims against KSE, Outdoor, and PNC, the Court should deny KSE and Outdoor's Rule 12(b)(6) Motion to Dismiss.

## I.     Standard of Review.

Given the liberal notice-pleading policies, motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013). Dismissal is only proper when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard does not require the plaintiff to plead detailed and specific facts. *Id.*; *see also Erickson v. Pardus*,

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**     **PAGE 12 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 465

551 U.S. 89, 93 (2007) (per curiam) ("Specific facts are not necessary ...."). Nor is it akin to a probability requirement. *Iqbal*, 556 U.S. at 678. Instead, the complaint's factual allegations need only "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*, and "raise a reasonable expectation that discovery will reveal evidence of [illegality]." *See Twombly*, 550 U.S. at 556. In determining whether the plaintiff's complaint satisfies this threshold standard, the court must assume that all well-pleaded facts are true and must indulge all inference in the plaintiff's favor. *See id.*; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 637 F.3d 787, 803 n.44 (5th Cir. 2007).

## II. Salomon's Amended Complaint States Plausible Claims for Relief Against KSE and Outdoor.

Salomon's Second Amended Complaint contains sufficient facts to give rise to an entitlement to relief for his claims against KSE, Outdoor, and PNC.

### A. Outdoor Breached the Exclusivity Provision.

Salomon's Second Amended Complaint states a breach-of-contract claim against Outdoor. To prevail on that claim, Salomon must prove that: (1) Salomon and Outdoor are parties to a valid and enforceable contract; (2) Salomon performed or tendered performance under the contract; (3) Outdoor breached the contract; and (4) Salomon sustained damages as a result of Outdoor's breach. *See Nat'l Health Res. Corp. v. TDF Fin., L.L.C.*, 429 S.W.3d 125, 131 (Tex. App.—Dallas 2014, no pet.).

The Exclusivity Provision is a valid and enforceable bilateral contract. A bilateral contract must be supported by consideration or, in other words, mutuality of obligation. *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009); *see Tex. Gas Utils. Co. v Barrett*, 460 S.W.2d 409, 412 (Tex. 1970) ("mutuality of obligation"). Consideration is a bargained-for

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 13 OF 29

App. 466

exchange that may consist of either a benefit to the promisor or a detriment to the promisee. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 790–91 (Tex. 2008). Additionally, "[t]he existence of a written contract presumes consideration for its execution." *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 725 (Tex. App.—Fort Worth 2008, pet. dism'd); *Plains Builders, Inc. v. Steel Source, Inc.*, 408 S.W.3d 596, 602 (Tex. App,—Amarillo 2013, no pet). The party alleging lack of consideration bears the burden of rebutting that presumption. *Plains Builders*, 408 S.W.3d at 602–03.

Outdoor cannot satisfy its burden. In the Term Sheet, the Purchaser promised to "continu[e] to spend time and incur professional fees and other expenses related to the acquisition" of the Aerial Camera Business. (ECF No. 63, Ex. A, at 3). Because the Purchaser had not been formed, that obligation fell on Salomon and PNC, as the Exclusivity Provision implicitly recognized by stating that time, professional fees, and expenses would "continu[e]" to be incurred. Outdoor's promise that it would not discuss, solicit, or accept any alternative offers to purchase the Aerial Camera Business until April 15, 2013 induced Salomon and PNC's promised expenditures of time and expenses to conclude the transaction. Consequently, the consideration for the Exclusivity Provision is not illusory, and it is a valid bilateral contract.

The factual allegations in Salomon's Second Amended Complaint also demonstrate that Outdoor breached the Exclusivity Provision. Outdoor promised to deal exclusively with Salomon concerning the Aerial Camera Business until April 15, 2013. The Exclusivity Provision not only prevented Outdoor from accepting other offers to purchase the Aerial Camera Business, it also precluded Outdoor from "negotiate[ing] or correspond[ing] with third parties regarding existing or unsolicited offers to acquire any equity or debt interest or any part of [the Aerial Camera

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**      **PAGE 14 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 467

Business].” (*Id.*, Ex. A, at 3). Outdoor also promised to immediately "cease any negotiations, discussions, or correspondence" related to the acquisition of any equity or debt interest in [the Aerial Camera Business] by any party other than the Purchaser. (*Id.*). Outdoor further agreed that it would advise any interested parties that exclusive discussions were being pursued but would not disclose the Purchaser's identity. (*Id.*).

In their Motion, KSE and Outdoor improperly attempt to create an exception to the Exclusivity Provision. They argue that, in light of Intermedia's merger offer, "It strains credulity (indeed, we submit it is ridiculous), particularly in light of the pre-existing Intermedia merger agreement, to suggest that a prospective purchaser ***of all of Outdoor***—i.e., Intermedia or KSE— should be deemed a 'third party' with whom Outdoor agreed not to 'negotiate or correspond.'" (ECF No. 74, at 8–9 (emphasis removed)). The Exclusivity Provision, however, prohibited Outdoor from negotiating or corresponding with "third parties." (ECF No. 63, Ex. A, at 3). "Third party," left undefined by the Term Sheet, carries its ordinary meaning: "[a] person who is not a party to [an] ... agreement, or other transaction but is usually somehow implicated by it." *Third Party*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself show them to be used in a technical or difference sense."). KSE was not party to the Term Sheet and, hence, was a "third party." Furthermore, the Exclusivity Provision contained no exceptions, even though Outdoor was entertaining merger offers at the time it was signed. (ECF No. 63, Ex. A, at 3). Regardless, factual determinations like whether KSE was a third party to the Term Sheet are inappropriate for determination under Rule 12(b)(6). *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 809 F. Supp. 582, 592

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**      **PAGE 15 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 468

(N.D. Tex. 2011). Consequently, the Exclusivity Provision precluded Outdoor from negotiating or corresponding with KSE regarding the sale of the Aerial Camera Business.

However, Outdoor breached its promise to deal exclusively with Salomon and PNC. It discussed the planned sale of the Aerial Camera Business with KSE and then granted KSE the authority to interfere with and terminate the transaction. On March 25, 2013, during the exclusivity period, Gluck disclosed to Salomon that he was aware of the Term Sheet and that KSE was allegedly undecided on its plans concerning the planned sale. In addition, the Amendment demonstrates that Outdoor permitted KSE to interlope in the planned sale of the Aerial Camera Business. In pertinent part, the Amendment provides that "if, at any point during the exclusivity period, *[KSE] concludes that* it will not consent to the Proposed Transaction, PNC shall release [Outdoor] from its exclusivity obligations and PNC shall forever waive its rights, if any under the Term Sheet ...." (*Id.*, Ex. B, at 1 (emphasis added)). Importantly, the Amendment gave KSE the right to veto the sale and effectively eliminate the Exclusivity Provision and unilaterally terminate the planned sale outlined in the Term Sheet *before* KSE had acquired any of Outdoor's stock. (ECF No. 63, ¶¶ 39, 42).

Accordingly, Salomon's Second Amended Complaint demonstrates that Outdoor breached the Exclusivity Provision.

## B. KSE Tortiously Interfered with the Exclusivity Provision.

Salomon's Second Amended Complaint also states a claim against KSE for tortiously interfering with the Exclusivity Provision. The essential elements of a claim for tortious interference with an existing contract are: "(1) the existence of a contract subject to interference; (2) the occurrence of an act of interference that was willful and intentional; (3) the act was a

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

**PAGE 16 OF 29**

App. 469

proximate cause of the plaintiff's damage; and (4) actual loss or damage occurred." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

The factual allegations in Salomon's Second Amended Complaint demonstrate that KSE willfully and intentionally interfered with an existing contract—the Exclusivity Provision. A defendant tortiously interferes with a contract by actively inducing or persuading one of the parties to breach its obligations by, for example, offering superior terms or other incentives. *See Robey v. Sun Record Co.*, 242 F.2d 684, 687 (5th Cir. 1957) (applying Texas law); *Davis v. Hydpro*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992, writ denied) (quoting *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 803 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)). Here, contrary to KSE and Outdoor's Motion, the act of interference was not KSE's mere offer to purchase all of Outdoor's stock and thereby Outdoor. Instead, KSE interfered with the Exclusivity Provision by inducing Outdoor to breach its obligations to negotiate exclusively with Salomon and PNC. As discussed above, the Term Sheet required Outdoor to cease any negotiations, discussion, or correspondence with third parties related to the acquisition of the Aerial Camera Business until April 15, 2013. (ECF No. 63, Ex. A, at 3).

Salomon's Second Amended Complaint alleges that KSE induced Outdoor to disregard those promises and allow it to interlope in the exclusive dealings by offering Outdoor superior terms or other incentives. The Amendment confirms that Outdoor permitted an outsider—KSE— to decide whether Outdoor would sell the Aerial Camera Business to Salomon and PNC. Even if Salomon and PNC had satisfied all conditions to closing, Outdoor allowed KSE to disavow the intended sale, defeating the Exclusivity Period's purpose. The Amendment, coupled with Gluck's statements to Salomon, also demonstrates that Outdoor had discussed and negotiated the

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

**PAGE 17 OF 29**

App. 470

acquisition of the Aerial Camera Business as part of KSE's bid to purchase Outdoor. When viewed in the light most favorable to Salomon, those facts raise a reasonable inference that KSE induced Outdoor to breach the Exclusivity Provision.

Furthermore, the effective date of the Amendment was March 21, 2013, before Outdoor's shareholder approved the plan of merger and KSE purchased all of Outdoor's stock. During this time, Outdoor entertained competing offers from KSE and InterMedia. (*See* ECF No. 63, ¶¶ 43–48). KSE made the offer, which Outdoor's board recommended accepting. The Amendment was signed afterward. InterMedia subsequently countered. (*Id.* ¶ 43). Outdoor's board changed its mind and recommended accepting InterMedia's counter. (*Id.*). Thus, at one point, KSE had the authority to cancel the sale while Outdoor was planning to merge with InterMedia.

Consequently, KSE's argument that Outdoor's obligations were preserved following the merger fail.

### C.     KSE Tortiously Interfered with the Planned Sale of the Aerial Camera Business.

Salomon's Second Amended Complaint states a claim that KSE tortiously interfered with the prospective contract to purchase and sell the Aerial Camera Business. To recover for tortious inference with a prospective contract, the plaintiff "must establish that: (1) there was a reasonable probability that [he] would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Sanger*

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS          PAGE 18 OF 29
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

App. 471

*Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 748 (5th Cir. 2015) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)).

First, for the reasons discussed above, Salomon's Second Amended Complaint demonstrates a reasonable probability that Outdoor would have executed a contract to sell the Aerial Camera Business to the Purchaser absent KSE's interference. The Term Sheet demonstrates that the parties were in the final stages of negotiations and already agreed to the sale's essential terms, such as the price ($4.05 million) and the method by which the Purchaser would acquire the Aerial Camera Business (sale of substantially all of the assets).

The Mutual Termination Language is too slender a reed to support KSE and Outdoor's arguments to the contrary. In their Motion, KSE and Outdoor rely on the Term Sheet's statement that it was not legally binding and that the parties could withdraw from or terminate the negotiations. Of course, a "binding commitment" is not necessary to support a claim for tortious interference with a ***prospective contract***. Additionally, parties are always free to withdraw from negotiations before entering into a contract. *See, e.g.*, *Bowles v. Fickas*, 167 S.W.2d 741, 742–43 (Tex. 1943) (stating that an offeror had "the absolute right to withdraw the offer at any time before [the offeree] accepted same in the manner prescribed"). Accepting the argument that there was no reasonable probability of a contract due to one contracting party's right to withdraw would mean that a party could never state a claim for tortious interference with a prospective contract.

Second, Salomon has pled that KSE interfered with the prospective contract to sell the Aerial Camera Business by committing an independent tort. "[T]o recover for tortious interference with a prospective business relation, a plaintiff must prove that the defendant's conduct was independently tortious or wrongful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**      **PAGE 19 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 472

(Tex. 2001). The plaintiff need not prove an independent tort but rather that "the defendant's conduct would be actionable under a recognized tort." *Id.* Here, KSE's offer to purchase Outdoor's stock is not the act of interference. Instead, Salomon's claim is based on KSE's action after it made the offer and before that offer was accepted by Outdoor's shareholders. During that period, KSE subverted the planned sale of the Aerial Camera Business by inducing Outdoor to breach its obligations under the Exclusivity Provision and inducing PNC to breach its fiduciary duties to Salomon. KSE's efforts culminated in the Amendment—signed by Outdoor and PNC but kept a secret from Salomon—which purported to grant KSE a veto over the planned sale of the Aerial Camera Business. Interfering with an existing contract and aiding a breach of fiduciary duties are independently tortious acts.

In its Motion, KSE attempts to evade liability by arguing that the Amendment was not effective because Salomon did not agree to it. While correct, KSE's contention is beside the point. Regardless of its legal effect, the Amendment demonstrates that KSE insisted and Outdoor and PNC agreed to allow KSE to interlope in the exclusive negotiations concerning the acquisition of the Aerial Camera Business.

Finally, KSE disregards entirely this Court's express ruling that Salomon's Second Amended Complaint supplied the allegations it previously determined were missing sufficient to show a "reasonable probability that Purchaser and Outdoor would have entered into a contractual relationship." (ECF No. 62, at 10). Specifically, the Court has already found that:

> The Second Amended Complaint details the manner in which [Salomon] continued to spend time and incur expenses related to the purchase of the Camera Business. [Salomon]'s efforts constitute the type of action that the Exclusivity Provision requires as consideration. The Second Amended Complaint further alleges that Outdoor had competing merger offers under consideration at the same time with KSE and Intermedia Outdoors Holdings, LLC ("Intermedia"). Intermedia's offer

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 20 OF 29

App. 473

allegedly did not include an offer to acquire the Camera Business. [Salomon] alleges that Outdoor continued to negotiate with [Salomon] and PNC as long as it was pursuing negotiations with Intermedia, including going so far as to participate in drafting an asset purchase agreement between the Purchaser and Outdoor. Taken together, the additional facts—which the Court assumes to be true—are sufficient to allege a reasonable probability that the Purchaser and Outdoor would have entered into a contractual relationship.

(*Id.* (citations omitted)).

### D.    KSE and Outdoor Participated and Assisted in PNC's Breach of Fiduciary Duties.

Salomon's Second Amended Complaint also states a claim for KSE and Outdoor's inducement of and assistance in PNC's breach of its fiduciary duties. A defendant is jointly liable for a third party's breach of its fiduciary duties if: (1) a third party owed fiduciary duties to the plaintiff; (2) the defendant knew of that fiduciary relationship; and (3) the defendant was aware that it was participating in the third party's breach of its fiduciary duties. *See Darocy v. Abildtrup*, 345 S.W.3d 129, 137–38 (Tex. App.—Dallas 2011, no pet.) (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 160 S.W.2d 509, 513–14 (Tex. 1942)). The factual allegations, when construed in the light most favorable to Salomon, show that KSE and Outdoor knowingly participated in PNC's breach of its duties to Salomon.

PNC owed fiduciary duties to Salomon as a joint venturer. *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977). A joint venture arises when two or more persons "engage in the joint prosecution of a particular transaction for profit." *Guiterrez v. Yancey*, 650 S.W.2d 169, 171 (Tex. App.—San Antonio 1983, no writ). After Outdoor encouraged Salomon to make an offer to purchase the Aerial Camera Business, Salomon contacted PNC about providing the capital for or investing in the purchase. Salomon and PNC then submitted a joint bid, as reflected in the Term Sheet. Salomon and PNC both intended to own an interest in the Purchaser after its formation.

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 21 OF 29

App. 474

Accordingly, Salomon and PNC were both members of a joint venture in connection with the acquisition of the Aerial Camera Business.

In addition, Outdoor and KSE were aware of that fiduciary relationship created by the joint venture. Salomon informed Outdoor's employees that he intended to submit a joint bid with PNC for the purchase of the Aerial Camera Business. And, of course, Salomon and PNC each signed the Term Sheet, which memorialized the parameters of their bid and their intended ownership interest in the Purchaser. PNC and Salomon's joint venture was apparent from the Term Sheet's face, and both the Amendment and Gluck's statements to Salomon show that KSE knew of the Term Sheet.

Furthermore, Outdoor and KSE knowingly participated in PNC's breach of its fiduciary duties to Salomon. As a joint venturer, PNC owed Salomon a "duty of 'utmost good faith and scrupulous honesty' and a corresponding duty to 'make good faith disclosures of all facts relevant to the transaction.'" *Kirby v. Cruce*, 688 S.W.2d 161, 165 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (quoting *Warner v. Winn*, 197 S.W.2d 338 (Tex. 1946)). PNC breached its duties by executing the Amendment without Salomon's knowledge or consent. In that Amendment, PNC agreed to (1) release Outdoor of its obligations under the Exclusivity Provision at the election of a third party—KSE, and to (2) waive any right to seek equitable relief or any other remedies. (*See generally* ECF No. 63, Ex. B). In return, PNC received an illusory promise to extend the exclusivity period. Although KSE's and Outdoor's activities are shrouded and will remain so unless Salomon can conduct discovery, the factual allegations raise a reasonable inference that Outdoor and KSE encouraged and induced PNC to execute the Amendment in an attempt to deprive Salomon of his rights under the Exclusivity Provision.

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 22 OF 29

App. 475

KSE and Outdoor's argument that Salomon's Second Amended Complaint is defective because it does not describe his communications with PNC runs afoul of Rule 8(a)'s notice-pleading standards. Even after the Court's decisions in *Iqbal* and *Twombly*, a complaint need not contain "detailed factual allegations" to survive a motion to dismiss under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Twombly*, 550 U.S. at 570 (stating that the plausibility standard does not require "heightened fact pleading of specifics"). "Specific facts are not necessary; the [complaint] need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555).

Here, the Second Amended Complaint provides fair notice of Salomon's claim and alleges facts raising a reasonable inference that KSE and Outdoor encouraged PNC to execute the Amendment without Salomon's knowledge or consent. Rule 8(a) does not require the detailed discussion of Salomon's communications with PNC that KSE and Outdoor demand.

### E.     Regardless of the Nature of the Claim, Salomon Is Entitled to Relief Because KSE, Outdoor, and PNC Were Unjustly Enriched.

Salomon's Second Amended Complaint states a claim for relief for unjust enrichment. Contrary to KSE and Outdoor's assertions, a party can recover for unjust enrichment under Texas law.

The Texas Supreme Court has repeatedly referred to unjust enrichment as an independent cause of action, claim, and theory of recovery. *See*, *e.g.*, *w. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010) (theory of recovery); *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007) (per curiam) ( determining "unjust enrichment claims are governed by the two-year statute of limitations"); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex.

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS                                    PAGE 23 OF 29
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

App. 476

1998) (cause of action). In turn, the Texas courts of appeals are split regarding whether unjust enrichment is an independent cause of action as opposed to a remedy for fraud or other improper conduct. *See*, *e.g.*, *Casstevens v. Smith*, 269 S.W.3d 222, 229 (Tex. App.—Texarkana 2008, pet. denied) (not an independent cause of action); *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied) (same); *Argyle ISD ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229, 246 (Tex. App.—Fort Worth 2007, no pet.) (same); *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied) (same). *But see*, *e.g.*, *Pepsi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (is an independent cause of action). The Dallas Court of Appeals has held both positions. *Compare Walker v. Cotter Props.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) (not an independent cause of action), *with Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 720–21 (Tex. App.—Dallas 2015, no pet.) (discussing when unjust enrichment claims accrue and the applicable statute of limitation).

Regardless of whether unjust enrichment is a cause of action or merely a theory of recovery, Texas courts provide the plaintiff with relief when the defendant was unjustly enriched. *See*, *e.g.*, *Newington, Ltd. v. Forrester*, No. 3:08-CV-0864, 2008 WL 4908200, at *4 (N.D. Tex. Nov. 13, 2008). The Texas Supreme Court has unequivocally stated that "[a] party may recover under an unjust enrichment theory ...." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Accordingly, federal courts making an "*Erie* guess" have generally declined to dismiss unjust-enrichment causes of action under Rule 12(b)(6). As this Court stated, "Texas courts may waffle about whether unjust-enrichment is a theory of recovery or an independent cause of action, but, either way, it has provided the plaintiff with relief when the defendant has been unjustly

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

**PAGE 24 OF 29**

App. 477

enriched." *Forrester*, 2008 WL 4908200, at *4; *see also Prophet Capital Mgmt., Ltd. v. Prophet Equity, L.L.C.*, No. A-09-CA-316-LY, 2009 WL 3199115, at *2 n.2 (W.D. Tex. Sept. 25, 2009) (agreeing with *Newington* and stating that the fact that unjust enrichment is not an independent cause of action would not be an appropriate basis for dismissal). The dispute, therefore, is "largely academic." *In re ConAgra Foods, Inc.*, No. CV 11-05379 MMM (AGRx), 2012 WL 5995454, at *17 (C.D. Cal. Nov. 15, 2012) (applying Texas law).

The recent decisions cited by KSE and Outdoor in their Motion do not hold otherwise. In both cases, this Court stated that the unjust enrichment is not an independent cause of action. *See Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC*, 117 F. Supp. 3d 879, 904 (N.D. Tex. 2015); *Ingram v. Beneficial Fin., Inc.*, Civil Action No. 3:13-CV-4037-L, 2015 WL 1443110, at *13 (N.D. Tex. Mar. 30, 2015). But the Court did not dismiss the claims on that basis. Instead, it dismissed the claims because the claimant could not produce sufficient evidence that its opponent was unjustly enriched. *Provident Precious Metals,* 2015 WL 4522923, at *18 ("[I]n light of the Court's findings regarding [the counter-plaintiff's] trademark, trade dress, and copyright claims, [the counter-plaintiff] cannot prove a claim for unjust enrichment ...."); *Ingram*, 2015 WL 1443110, at *13 ("Even assuming that Plaintiff has a valid independent cause of action, she would not be entitled to recover under the theory of unjust enrichment because she has not shown that [Defendants] obtained a benefit from her by fraud, duress, or taking of an undue advantage by her.").

Conversely, here, Salomon's Second Amended Complaint contains sufficient facts to state an unjust-enrichment claim. "Unjust enrichment occurs when the person sought to be charged has wrongfully secured or passively received a benefit that would be unconscionable to retain. To

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**    **PAGE 25 OF 29**

4253295.1

App. 478

prevail, the plaintiff must show that the defendant obtained a benefit from plaintiff by fraud, duress, or the taking of undue advantage." *Mary E. Bivins Found. v. Highland Capital Mgmt, L.P.*, 451 S.W.3d 104, 111–12 (Tex. App.—Dallas 2014, no pet.). Salomon was in the final stages of negotiating the purchase of the Aerial Camera Business, and Outdoor agreed not to negotiate with any other parties. KSE, however, induced Outdoor to breach its promise to deal exclusively with Salomon and PNC and to grant KSE the authority to make the final decision of whether to sell the Aerial Camera Business. KSE and Outdoor then persuaded PNC to breach its fiduciary duties by executing the Amendment to the Term Sheet, which allowed KSE to terminate the Exclusivity Provision at its option and veto the sale. Because KSE acquired the Aerial Camera Business by taking of an undue advantage, Salomon has stated an unjust-enrichment claim.

### F. Because Salomon Has Pled Plausible Tort Claims Against KSE, Outdoor, and PNC, Dismissal of the Civil Conspiracy Claim is Improper.

Finally, this Court should deny KSE and Outdoor's request to dismiss Salomon's civil-conspiracy claim. KSE and Outdoor's argument is based solely on their contention that Salomon failed to plead a plausible claim for the torts upon which his conspiracy claim is premised. Because this Court should deny KSE and Outdoor's Motion with regard to Salomon's tort claims, it should also deny their motion with regard to the civil-conspiracy claim.

### III. The Court Has Already Rejected KSE and Outdoor's Contentions that the Second Amended Complaint Fails to Plead Plausible Claims for Relief.

Each of KSE and Outdoor's contentions in their Rule 12(b)(6) Motion to Dismiss that Salomon's Second Amended Complaints fails to plead plausible claims for relief has already been presented to and rejected by this Court in KSE and Outdoor's opposition to Salomon's motion to

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**   **PAGE 26 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 479

amend. Accordingly, the Court should reject KSE and Outdoor's attempt at a second (or even third) shot at dismissing Salomon's plausible claims.

KSE and Outdoor opposed Salomon's motion to amend, expressly incorporating the earlier allegations in their motion to dismiss Salomon's Second Amended Complaint (ECF No. 35), which asserted that Salomon failed to plead plausible claims for: (1) breach of contract against Outdoor; (2) tortious interference with existing contract against KSE; (3) tortious interference with prospective relations against KSE; (4) inducement of and assistance in (aiding and abetting) breach of fiduciary duties against KSE and Outdoor; (5) unjust enrichment against KSE, Outdoor, and PNC; and (6) civil conspiracy against KSE, Outdoor, and PNC. (ECF No. 56, at 20–21). Because they called the Second Amended Complaint "futile," KSE and Outdoor urged the Court to deny Salomon's request for leave. (*Id.* at 20).

This Court did not agree that Salomon's Second Amended Complaint was futile because it declined to accept KSE and Outdoor's invitation to deny him leave to file it. (*See* ECF No. 62). In fact, the Court specifically stated that, "[i]n view of the new allegations [in Salomon's Second Amended Complaint], the Court determines that the proposed amendment ***would not be futile***." (ECF No. 62, at 10 (emphasis added)). In so doing, and because KSE and Outdoor expressly incorporated the bases for its motion to dismiss Salomon's Second Amended Complaint into their opposition to Salomon's motion to amend, the Court rejected those grounds by granting leave. Now, KSE and Outdoor base their Rule 12(b)(6) Motion to Dismiss on the same grounds they previously alleged in their motion to dismiss Salomon's Second Amended Complaint and incorporated into their opposition to Salomon's motion to amend. (*Compare* ECF No. 35 and ECF No. 56, at 20–21, *with* ECF No. 74).

**PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS**      **PAGE 27 OF 29**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND**
**OUTDOOR CHANNEL HOLDINGS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT**
4253295.1

App. 480

As a result, the Court should not allow KSE and Outdoor a second or even third bite at the dismissal apple after having already rejected their arguments. (ECF No. 62).

## CONCLUSION & PRAYER FOR RELIEF

For the foregoing reasons, Salomon has pled sufficient facts to show that he is entitled to relief on his claims against KSE, Outdoor, and PNC. Accordingly, Salomon requests that this Court deny KSE and Outdoor's Rule 12(b)(6) Motion to Dismiss.

Dated: October 6, 2017.

GRAY REED & McGRAW LLP

By:   */s/ Cleveland G. Clinton*
     CLEVELAND G. CLINTON
     State Bar No. 04399900
     WILLIAM B. CHANEY
     State Bar No. 04108500
     JIM MOSELEY
     State Bar No. 14569100
     WILLIAM N. DRABBLE
     State Bar No. 24074154

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: 214-954-4135
Facsimile: 214-953-1332
     cclinton@grayreed.com
     wchaney@grayreed.com
     jmoseley@grayreed.com
     wdrabble@grayreed.com

ATTORNEYS FOR PLAINTIFF NIC SALOMON

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 28 OF 29

App. 481

## CERTIFICATE OF SERVICE

I certify that on October 6, 2017, I electronically filed Plaintiff's Response and Brief in Support to KSE and Outdoor's Rule 12(b)(6) Motion to Dismiss using the Court's CM/ECF Filing System. The Clerk of the Court will send notification of the filing to counsel of record, which constitutes service under Local Rule 5.1(d).

*/s/ Cleveland G. Clinton*
CLEVELAND G. CLINTON

PLAINTIFF'S RESPONSE AND BRIEF IN SUPPORT TO DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND
OUTDOOR CHANNEL HOLDINGS, INC.'S
RULE 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
4253295.1

PAGE 29 OF 29

App. 482

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 29**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| NIC SALOMON,<br><br>　　　　　Plaintiff,<br><br>　　　vs.<br><br>KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL HOLDINGS, INC. AND PACIFIC NORTHERN CAPITAL LLC,<br><br>　　　　　Defendants. | **Civil Action No. 3:15-CV-00666-M** |

## PLAINTIFF'S SECOND AMENDED INITIAL DISCLOSURES

TO:　*Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.,* by and through their attorneys of record, Kevin D. Evans, Armstrong Teasdale, LLP, 4643 South Ulster Street, Suite 800, Denver, Colorado, 80237 and Shannon Z. Teicher, Jackson Walker, L.L.P., 2323 Ross Avenue, Suite 600, Dallas, Texas 75201.

In accordance with Federal Rule of Civil Procedure 26(a)(1), Plaintiff Nic Salomon (Salomon) serves the following initial disclosures:

**(i)**　　**The name and, if known, the address and telephone number of each individual likely to have discoverable information-along with the subjects of that information-that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

<u>RESPONSE:</u> Salomon identifies the following individuals as likely to have discoverable information:

Nie Salomon
c/o Avenatti, LLP
520 Newport Center Dr., Suite 1400
Newport Beach, CA 92660
Telephone: 949.706.7000

Mr. Salomon is the Plaintiff in this case. He has knowledge of his agreement with Pacific Northern Capital, LLC (PNC) to jointly bid to purchase SkyCam, LLC and CableCam, LLC (collectively, the Aerial Camera Business), the negotiations with Outdoor Channel Holdings, Inc.

**Plaintiff's Second Amended Intial Disclosures**

(Outdoor) regarding the purchase of the Aerial Camera Business, the February 27, 2013 Term. Sheet signed by Salomon, PNC, and Outdoor, and his efforts to consummate the sale of the Aerial Camera Business in accordance with the Term Sheet.

Outdoor Channel Holdings, Inc.
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Outdoor is a Defendant in this case. It has knowledge of the Term Sheet, its negotiations with Salomon and PNC to purchase the Aerial Camera Business, the merger negotiations with Kroenke Sports & Entertainment, LLC (KSE) and Intermedia Outdoor Holdings, Inc. (Intermedia), and the March 21, 2013 Amendment to the Term Sheet (Amendment).

Tom Hornish
12235 El Camino Real
San Diego, CA 92130
Telephone: 858.775.5678

Mr. Hornish is Outdoor's former President and Chief Executive Officer. He signed the Term Sheet and the Amendment on Outdoor's behalf. He has knowledge of the Term Sheet, Outdoor's negotiations with Salomon and PNC to purchase the Aerial Camera Business, disclosures in violation of the Term Sheet to KSE, and Outdoor's merger negotiations with KSE and Intermedia.

Cathy Lee
Senomyx, Inc.
4767 Nexus Center Drive
San Diego, California 92121
Telephone: 858.646.8300

Ms. Lee is Outdoor's former General Counsel. She has knowledge of the Term Sheet and Outdoor's negotiations with Salomon and PNC to purchase the Aerial Camera Business, and disclosures in violation of the Term Sheet to KSE

Tom Allen
68 Peacevine
Irvine, CA 92618
Telephone Unknown

Mr. Allen is Outdoor's former Chief Financial Officer.  He has knowledge of Salomon and PNC's joint bid to purchase the Aerial Camera Business, and disclosures in violation of the Term Sheet to KSE.

David Bolls

Leigh Law Group
44 7 Battery Street,
San Francisco, California 94111
Telephone: 415.399.9155

Mr. Bolls is Outdoor's former Deputy General Counsel. He has knowledge of Salomon and PNC's joint bid to purchase the Aerial Camera Business.

Roger Werner
10 Barnstable Lane
Greenwich, Connecticut 06830
Telephone: 203.861.7585

Mr. Werner is a former member of Outdoor's board of directors. He has knowledge of Salomon and PNC's joint bid to purchase the Aerial Camera Business.

Kroenke Sports & Entertainment, LLC
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 8023 7
Telephone: 720.200.0676

KSE is a Defendant in this case. It has knowledge of the Term Sheet, the Amendment, and its merger negotiations with Outdoor.

David Gluck
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Gluck is KSE's Vice-President for Business Development. He has knowledge of the Term Sheet and the Amendment, and disclosures in violation of the Term Sheet to KSE.

Pacific Northern Capital, LLC
c/o Lucy Gao
3218 E. Holt Avenue, Suite 101
West Covina, California 91791
Telephone: 626.214.2149

PNC is a Defendant in this case. It has knowledge of its joint bid with Salomon to purchase the Aerial Camera Business, the Term Sheet, the Amendment, and the efforts to consummate the sale of the Aerial Camera Business in accordance with the Term Sheet.

Lucy Gao
3218 E. Holt Avenue, Suite 101

West Covina, California 91 791
Telephone: 626.214.2149

Ms. Gao is a former member of PNC. She may have knowledge of PNC's joint bid with Salomon to purchase the Aerial Camera Business, the Term Sheet, and the Amendment.

Kelly Holowaty
Address Unknown
Telephone: 614.403.2874

Mr. Holowaty is former Managing Director of PNC. He signed the Term Sheet and the Amendment on PNC's behalf. Mr. Holowaty has knowledge of the joint bid with Salomon to purchase the Aerial Camera Business, the Term Sheet, the Amendment, and the efforts to consummate the sale of the Aerial Camera Business in accordance with the Term Sheet.

Jeff Holowaty
Address Unknown
Telephone: 917.597.0861

Mr. Holowaty was a representative of PNC. He has knowledge of the efforts to consummate the sale of the Aerial Camera Business in accordance with the Term Sheet.

Bennie Kirk
2648 East Workman Avenue, #3001-263
West Covina, California 91 791
Telephone: 626.506.4648

Mr. Kirk was a representative of PNC. He may have knowledge of PNC's joint bid with Salomon to purchase the Aerial Camera Business.

Tim McQuay
355 South Grand Avenue, Suite 1750
Los Angeles, California
Telephone: 213.233.1521

Mr. McQuay was employed by Noble Financial Capital Markets, which was retained by Outdoor to explore alternatives for the Aerial Camera Business. Mr. McQuay may have knowledge of PNC and Salomon's joint bid to purchase the Aerial Camera Business.

Hank Steinbrecher
3397 Foxes Den Dr.
Tucson, AZ 85745
Telephone: 630.750.9266

Mr. Steinbrecher has knowledge of Salomon and PNC's joint bid to purchase the Aerial Camera Business.

**Plaintiff's Second Amended Intial Disclosures**

Leo J. Hindery, Jr.
InterMedia Advisors, LLC
405 Lexington Ave, 48th Floor
New York, NY 10174
Telephone: 212.503.2850

Mr. Hindery is an executive with InterMedia. He may have knowledge of lnterMedia's merger negotiations with Outdoor.

Peter Kern
InterMedia Advisors, LLC
405 Lexington Ave, 48th Floor
New York, NY 10174
Telephone: 212.503.2850

Mr. Kern is an executive with Inter Media. He may have knowledge of Inter Media's merger negotiations with Outdoor.

Steve Wharton
Address Unknown
Telephone: 719.963.4150

Mr. Wharton is SkyCam, LLC's current Chief Technology Officer and former Vice President of Engineering. He may have knowledge of PNC and Salomon's joint bid to purchase the Aerial Camera Business.

Ben Simpson
745 N. Beechnut Drive
Chandler, AZ 85248
Telephone: 817.455.6780

Mr. Simpson was SkyCam, LLC's former Vice President of Operations. He may have knowledge of PNC and Salomon's joint bid to purchase the Aerial Camera Business.

E. Stanley Kroenke
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Kroenke owns KSE. He is believed to have knowledge of PNC and Salomon's joint bid to purchase the Aerial Camera Business and the Term Sheet, and disclosures in violation of the Term Sheet to KSE. He may also have knowledge of the Amendment. He also has knowledge of KSE's bids to acquire, and successful acquisition of, Outdoor Channel, which includes the Aerial Camera Business. He also has knowledge concerning Plaintiff's damages by

virtue of his knowledge of the value he placed on the Aerial Camera Business and decision to retain the Aerial Camera despite the advice he received from Outdoor Channel management and his own advisors to sell the business to Salomon and PNC.

James A. Martin
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Martin is the President and CEO of KSE.  He is believed to have knowledge of PNC and Salomon's joint bid to purchase the Aerial Camera Business and the Term Sheet, and disclosures in violation of the Term Sheet to KSE.  He may also have knowledge of the Amendment.

Scott Long
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Long is an executive of the Aerial Camera Business.  He is believed to have knowledge of the finances and operations of the Aerial Camera Business.

Lazard Freres & Co., LLC (including Louis G. Zachary, Jr., Ajay Yadav, Joshua Lustbader, and the Custodian of Records)

1999 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Telephone:  310.601.3400

Lazard was engaged as the investment bank representing Outdoor Channel Holdings, Inc. in the transaction to sell all of its shares.  Lazard is believed to have knowledge of the Term Sheet, disclosures in violation of the Term Sheet to KSE, and Salomon's damages (including the valuation of the Aerial Camera Business).

Matthew Hutchings
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Hutchings is the Executive Vice President and Chief Operating Officer of KSE, and President and CEO of KSE Media Ventures, LLC.  He is believed to have knowledge of the finances and operations of the Aerial Camera Business.

Nick Parsons
c/o Armstrong Teasdale, LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676

Mr. Parsons is the Director of Information Technology for Outdoor Channel Holdings, Inc.  He is believed to have knowledge of the company's plan to purge electronic documents from its information technology systems.

All persons listed on Defendants' Initial Disclosures, and supplements thereto

In addition, Salomon reserves the right to supplement with disclosure of identities of additional persons to the extent necessary and permitted by the Court and Federal Rule of Civil Procedure 26(e). Plaintiff incorporates by reference and for all purposes any and all persons identified by Defendants, including any and all persons identified by supplementation.

**(ii)    A copy-or description by category and location-of all documents, electronically stored information, and tangible things that the disclosing party has in its possession custody, and control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

**RESPONSE:** Salomon identifies the following categories of documents supporting each of his claims:

| Description | Location |
|---|---|
| February 26, 2013 Term Sheet | Defendants already possess |
| March 21, 2013 Term Sheet | Defendants already possess |
| Outdoor's filings with the Securities and Exchange Commission (SEC) regarding plans of merger with Intermedia and KSE | Publicly available |
| Email correspondence between Salomon and representatives of PNC regarding the acquisition of the Aerial Camera Business | Can be obtained by request to counsel for Salomon; Defendants may already possess, *see* KSE's and Outdoor's October 3, 2017 Rule 26(a)(1) Initial Disclosures. |
| Drafts of the Asset Purchase Agreement | Can be obtained by request to counsel for Salomon; Defendants may already possess, see KSE's and Outdoor's October 3, 2017 Rule 26(a)(l) Initial Disclosures. |

| | |
|---|---|
| Documents reflecting the proposed equity structure for the "Purchaser" | Can be obtained by request to counsel for Salomon; Defendants may already possess, see KSE's and Outdoor's October 3, 2017 Rule 26(a)(l) Initial Disclosures. |
| Documents reflecting the "due diligence" for the acquisition of the Aerial Camera Business by the "Purchaser" | Can be obtained by request to counsel for Salomon; Defendants may already possess, see KSE's and Outdoor's October 3, 2017 Rule 26(a)(l) Initial Disclosures. |
| Email correspondence between Salomon and representatives of Outdoor regarding the acquisition of the Aerial Camera Business | Can be obtained by request to counsel for Salomon; Defendants may already possess, see KSE's and Outdoor's October 3, 2017 Rule 26(a)(l) Initial Disclosures. |

Salomon reserves the right to amend and supplement this response as further discovery and proceedings are conducted as allowed by Federal Rule of Civil Procedure 6(e).

**(iii)    A computation of each category of damages claimed by the disclosing party-who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of the injuries suffered.**

**RESPONSE:** At this stage in discovery, Salomon has not computed all of the damages incurred, but he will amend and supplement this response as further discovery and proceedings are conducted. In addition, Salomon seeks to recover his reasonable and necessary costs and attorney's fees. Salomon will supplement this disclosure as necessary to support its calculation of attorney's fees.  In particular, Plaintiff notes that his damages are a matter for expert testimony and the deadline for disclosing expert opinions has not expired.

Subject to the foregoing qualifications, Plaintiff seeks to recover his costs and expenses incurred in working on the transaction, his lost compensation in terms of salary and bonuses, benefit of the bargain damages for the lost opportunity to benefit from receiving the value of the Aerial Camera Business, lost profits, the value of any benefit that PNC received as a result of executing the Secret Amendment, and exemplary damages.  Exact quantification of Plaintiff's damages and the amount of those damages is subject to expert testimony and will be disclosed at the appropriate time.  By way of example, Plaintiff is not able to provide quantification of damages such as benefit of the bargain damages or lost profits in the absence of expert testimony and thus cannot and is not required to provide those calculations at this time.

Nevertheless, subject to additional quantification and explanation through expert testimony, Plaintiff seeks at least the following:

Plaintiff seeks compensation for lost salary and bonuses. As of 2013, Plaintiff's base salary was $252,881. Plaintiff was also eligible for cash incentives in the form of an annual bonus based on whether he met certain criteria. During the year 2013, Plaintiff's target bonus was 45% of his base salary ($113,797) and he was in fact paid $34,139. During the year 2012, Plaintiff's base salary was $247,680 and his bonus was $78,019 which amounted to 70% of the $111,456 target. In 2011, Plaintiff's base salary was $240,000. He was paid a bonus of $97,200 which amounted to 100% of his target bonus. In 2010, Plaintiff's base salary was $225,000 and he was paid a $90,000 bonus which also amounted to 100% of the target.

Plaintiff left the Aerial Camera Business on or about May 5, 2014. But for the conduct of Defendants described in the Second Amended Complaint, Plaintiff would be in at least the same position (as President of the Aerial Camera Business). Plaintiff would thus be earning at least the same base salary he was receiving at the time of his termination (i.e., $252,881) and at least the same bonus he received for the calendar year 2013 (i.e., $34,139). This translates to a daily salary rate of $692.82 and a daily bonus rate of $93.53. This is a conservative estimate of lost compensation because it assumes Plaintiff would not be receiving a raise (even though his prior salary history demonstrates he received raises every year) and because it assumes a relatively low bonus rate (even though his prior bonus history shows he regularly received higher bonuses). Accordingly, for the period between May 6, 2014 and the start of trial on February 4, 2019, Plaintiff's lost compensation is as follows:

| Dates | Lost Base Salary | Lost Bonus |
|---|---|---|
| May 6, 2014-Dec. 31, 2014 (239 days) | $165,585 | $22,354 |
| Jan. 1, 2015-Dec. 31, 2015 | $252,881 | $34,139 |
| Jan. 1, 2016-Dec. 31, 2016 | $252,881 | $34,139 |
| Jan. 1, 2017-Dec. 31, 2017 | $252,881 | $34,139 |
| Jan. 1, 2018-Dec. 31, 2018 | $252,881 | $34,139 |
| Jan. 1, 2019-Feb. 4, 2019 (34 days) | $23,556 | $3,180 |
| TOTAL | $1,200,665 | $162,090 |

This comes out to a total lost compensation for the period between May 6, 2014 and February 4, 2019 of $1,362,755. In addition, Plaintiff also seeks recovery of future lost wages for a reasonable period of time, reduced to its net present value. This additional quantification of Plaintiff's compensation for lost wages will be presented in connection with expert discovery.

Plaintiff further seeks compensation for out of pocket losses incurred in connection with attorneys' fees and other costs paid in connection with the transaction and during the exclusivity period. Those fees incurred through May of 2013 total $12,622. Plaintiff reserves the right to seek recovery of additional attorneys' fees based on any applicable statutory or legal entitlement.

Discovery is on-going and expert discovery has not yet commenced. Plaintiff reserves the right to supplement this response as necessary and reserves the right to seek any and all

damages that are the subject of expert testimony, regardless of whether those damages are quantified or set forth in this response.

**(iv)      For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all of part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

**<u>RESPONSE</u>:** Salomon has not identified any insurance agreements applicable to this suit.

Salomon reserves the right to amend and supplement this response as further discovery and proceedings are conducted as allowed by Federal Rule of Civil Procedure 26(e).

Respectfully submitted,

Dated:  August 24, 2018                    /s/ Keith Wier
                                           Keith Wier, Esq.
                                           State Bar No. 21436100
                                           MAURICE WUTSCHER LLP
                                           6136 Frisco Square Blvd., Suite 400
                                           Frisco, Texas 75035
                                           Tel: (469) 375-6792
                                           Email: kwier@mauricewutscher.com

                                           /s/ Ahmed Ibrahim
                                           Michael J. Avenatti (*Pro Hac Vice application forthcoming)*
                                           CA Bar Number 206929
                                           Ahmed Ibrahim (*Admitted Pro Hac Vice*)
                                           CA Bar Number:  238739
                                           AVENATTI LLP
                                           520 Newport Center Drive, Suite 1400
                                           Newport Beach, CA 92660
                                           Tel:  (949) 706-7000
                                           Email: mavenatti@eaganavenatti.com
                                                      aibrahim@eaganavenatti.com

**Plaintiff's Second Amended Intial Disclosures**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this second amended initial disclosures is being served upon all counsel of record via email and U.S. Mail.

DATED:  August 24, 2018       /s/ Ahmed Ibrahim
                                         Michael J. Avenatti (*Pro Hac Vice application forthcoming*)
                                         CA Bar Number 206929
                                         Ahmed Ibrahim (Admitted *Pro Hac Vice*)
                                         CA Bar Number:  238739
                                         AVENATTI LLP
                                         520 Newport Center Drive, Suite 1400
                                         Newport Beach, CA 92660
                                         Tel:  (949) 706-7000
                                         Email: mavenatti@eaganavenatti.com
                                                            aibrahim@eaganavenatti.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 30**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| NIC SALOMON, <br><br>     Plaintiff, <br><br>    vs. <br><br> KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL HOLDINGS, INC. AND PACIFIC NORTHERN CAPITAL LLC, <br><br>     Defendants. | **Civil Action No. 3:15-CV-00666-M** |

**PLAINTIFF'S THIRD SUPPLEMENTAL ANSWERS AND OBJECTIONS TO
FIRST SET OF INTERROGATORIES OF DEFENDANTS KROENKE SPORTS &
ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.**

TO: *Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.,* by and through their attorneys of record, Paul C. Watler and Shannon Z. Teicher, Jackson Walker L.L.P., 2323 Ross Avenue, Suite 600, Dallas, Texas 75201, and Kevin D. Evans, Armstrong Teasdale LLP, 4643 South Ulster Street, Suite 800, Denver, Colorado 80237.

   Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff NIC SALOMON ("Plaintiff" or "Salomon") serves these third supplemental answers and objections to Defendants KROENKE SPORTS & ENTERTAINMENT, LLC ("KSE") and OUTDOOR CHANNEL HOLDINGS, INC.'s ("Outdoor") First Set of Interrogatories. Nothing contained in Plaintiff's responses and no information produced by Plaintiff is intended to be, or shall be construed as, a waiver of privilege, protection or immunity from production.

          MAURICE WUTSCHER LLP
          Keith Wier, Esq.
          State Bar No. 21436100
          6136 Frisco Square Blvd., Suite 400
          Frisco, Texas 75035
          Tel: (469) 375-6792
          Email: kwier@mauricewutscher.com

AVENATTI LLP
Michael J. Avenatti (*Pro Hac Vice
Application forthcoming)*
CA Bar Number 206929
Ahmed Ibrahim (admitted *Pro Hac Vice*)
CA Bar Number:  238739
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:  (949) 706-7000
Email: mavenatti@eaganavenatti.com
          aibrahim@eaganavenatti.com

ATTORNEYS FOR PLAINTIFF
NIC SALOMON

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Plaintiff generally objects to these interrogatories to the extent that they can be interpreted as seeking information subject to the attorney-client privilege, work-product protection, the consulting-expert privilege, and other trial preparation exemptions or privileges.
Plaintiff intends to withhold information that is subject to those privileges.

Plaintiff also objects to the instruction contained within the interrogatories to the extent that they deviate from or create a greater burden on Plaintiff than that imposed by the Federal Rules of Civil Procedure.

Plaintiff further objects to the definitions of "InterMedia," "KSE," "Noble," "Outdoor," "PNC," and "Salomon" as vague, ambiguous, overly broad, and unduly burdensome. In answering KSE and Outdoor's interrogatories, Salomon will construe "InterMedia," "KSE," "Noble," "Outdoor," "PNC," and "Salomon" as meaning InterMedia Outdoor Holdings, LLC, Kroenke Sports & Entertainment, LLC, Noble Financial Capital Markets, Outdoor Channel Holdings, Inc., Pacific Northern Capital, LLC, and Nic Salomon, respectively, and their respective agents acting within the scope of their agency.

Subject to the foregoing objections, and without waiving or limiting the same, Plaintiff objects and responds to KSE and Outdoor's First Set of Interrogatories as follows:

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

24.   Set forth in detail each category of damages that You seek in this case, including the amounts of such damages and the facts that You claim support your request for such damages.

**ANSWER:** Plaintiff objects to this interrogatory as cumulative and duplicative of his initial disclosures.  Plaintiff also objects to this interrogatory because it seeks to require Plaintiff to marshal its evidence.  Plaintiff further objects to this interrogatory as premature, as discovery is on-going.  Plaintiff's damages are a matter for expert testimony, and the deadline for disclosing expert opinions has not expired.  Plaintiff further objects to this interrogatory, because a request requiring Plaintiff to list all facts supporting his allegation is overly broad and unduly burdensome.  In responding to this request, Plaintiff will provide the principal or material facts.

Subject to the foregoing objections, Plaintiff seeks to recover his costs and expenses incurred in working on the transaction, his lost compensation in terms of salary and bonuses, benefit of the bargain damages for the lost opportunity to benefit from receiving the value of the

Page 1

**Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories**
**Of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.**

App. 498

Aerial Camera Business, lost profits, the value of any benefit that PNC received as a result of executing the Secret Amendment, and exemplary damages. Exact quantification of Plaintiff's damages and the amount of those damages is subject to expert testimony and will be disclosed at the appropriate time. By way of example, Plaintiff is not able to provide quantification of damages such as benefit of the bargain damages or lost profits in the absence of expert testimony and thus cannot and is not required to provide those calculations at this time.

Nevertheless, subject to additional quantification and explanation through expert testimony, Plaintiff seeks at least the following:

Plaintiff seeks compensation for lost salary and bonuses. As of 2013, Plaintiff's base salary was $252,881. Plaintiff was also eligible for cash incentives in the form of an annual bonus based on whether he met certain criteria. During the year 2013, Plaintiff's target bonus was 45% of his base salary ($113,797) and he was in fact paid $34,139. During the year 2012, Plaintiff's base salary was $247,680 and his bonus was $78,019 which amounted to 70% of the $111,456 target. In 2011, Plaintiff's base salary was $240,000. He was paid a bonus of $97,200 which amounted to 100% of his target bonus. In 2010, Plaintiff's base salary was $225,000 and he was paid a $90,000 bonus which also amounted to 100% of the target.

Plaintiff left the Aerial Camera Business on or about May 5, 2014. But for the conduct of Defendants described in the Second Amended Complaint, Plaintiff would be in at least the same position (as President of the Aerial Camera Business). Plaintiff would thus be earning at least the same base salary he was receiving at the time of his termination (i.e., $252,881) and at least the same bonus he received for the calendar year 2013 (i.e., $34,139). This translates to a daily salary rate of $692.82 and a daily bonus rate of $93.53. This is a conservative estimate of lost compensation because it assumes Plaintiff would not be receiving a raise (even though his prior salary history demonstrates he received raises every year) and because it assumes a relatively low bonus rate (even though his prior bonus history shows he regularly received higher bonuses). Accordingly, for the period between May 6, 2014 and the start of trial on February 4, 2019, Plaintiff's lost compensation is as follows:

| Dates | Lost Base Salary | Lost Bonus |
| --- | --- | --- |
| May 6, 2014-Dec. 31, 2014 (239 days) | $165,585 | $22,354 |
| Jan. 1, 2015-Dec. 31, 2015 | $252,881 | $34,139 |
| Jan. 1, 2016-Dec. 31, 2016 | $252,881 | $34,139 |
| Jan. 1, 2017-Dec. 31, 2017 | $252,881 | $34,139 |
| Jan. 1, 2018-Dec. 31, 2018 | $252,881 | $34,139 |
| Jan. 1, 2019-Feb. 4, 2019 (34 days) | $23,556 | $3,180 |
| TOTAL | $1,200,665 | $162,090 |

This comes out to a total lost compensation for the period between May 6, 2014 and February 4, 2019 of $1,362,755. In addition, Plaintiff also seeks recovery of future lost wages for a reasonable period of time, reduced to its net present value. This additional quantification of Plaintiff's compensation for lost wages will be presented in connection with expert discovery.

*Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories*
*Of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.*

Plaintiff further seeks compensation for out of pocket losses incurred in connection with attorneys' fees and other costs paid in connection with the transaction and during the exclusivity period. Those fees incurred through May of 2013 total $12,622. Plaintiff reserves the right to seek recovery of additional attorneys' fees based on any applicable statutory or legal entitlement.

Discovery is on-going and expert discovery has not yet commenced. Plaintiff reserves the right to supplement this response as necessary and reserves the right to seek any and all damages that are the subject of expert testimony, regardless of whether those damages are quantified or set forth in this response.

Respectfully submitted,

Dated:  August 24, 2018          /s/ Keith Wier
                                 Keith Wier, Esq.
                                 State Bar No. 21436100
                                 MAURICE WUTSCHER LLP
                                 6136 Frisco Square Blvd., Suite 400
                                 Frisco, Texas 75035
                                 Tel: (469) 375-6792
                                 Email: kwier@mauricewutscher.com

                                 /s/ Ahmed Ibrahim
                                 Michael J. Avenatti (*Pro Hac Vice application
                                 forthcoming*)
                                 CA Bar Number 206929
                                 Ahmed Ibrahim (*Admitted Pro Hac Vice*)
                                 CA Bar Number:  238739
                                 AVENATTI LLP
                                 520 Newport Center Drive, Suite 1400
                                 Newport Beach, CA 92660
                                 Tel:  (949) 706-7000
                                 Email: mavenatti@eaganavenatti.com
                                        aibrahim@eaganavenatti.com

**Page 3**

**Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories**
**Of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NIC SALOMON, | |
| Plaintiff, | |
| vs. | |
| KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL HOLDINGS, INC. AND PACIFIC NORTHERN CAPITAL LLC, | Civil Action No. 3:15-CV-00666-M |
| Defendants. | |

## DECLARATION OF NICOLAS A. SALOMON

I, Nicolas A. Salomon, declare under penalty of perjury under the laws of the United States of America, that the following is true and correct:

My name is Nicolas A. Salomon. I am over twenty-one years of age, of sound mind, and have never been convicted of a crime involving a dishonest act or false statement. I have read Plaintiff's Third Supplemental Answers and Objections to Defendants' First Set of Interrogatories in this case. Those answers are true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on this 24 day of August, 2018.

NICOLAS A. SALOMON

**Declaration of Nicolas A. Salomon**

**Page 1**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of this discovery response is being served upon all counsel of record via email and U.S. Mail.

DATED:  August 24, 2018          /s/ Ahmed Ibrahim                  

Michael J. Avenatti (*Pro Hac Vice application forthcoming*)
CA Bar Number 206929
Ahmed Ibrahim (Admitted *Pro Hac Vice*)
CA Bar Number:  238739
AVENATTI LLP
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:  (949) 706-7000
Email: mavenatti@eaganavenatti.com
        aibrahim@eaganavenatti.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |


**EXHIBIT 31**


**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
<u>**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

NIC SALOMON,

      Plaintiff,

      vs.

KROENKE SPORTS & ENTERTAINMENT,
LLC, OUTDOOR CHANNEL HOLDINGS,
INC. AND PACIFIC NORTHERN CAPITAL
LLC,

      Defendants.

**Civil Action No. 3:15-CV-00666-M**

**EXPERT REPORT OF KEVIN KREITZMAN, MBA**

TABLE 1
SALOMON SCENARIO 1

| Total Benefit of the Bargain Damages ($) | | **1,023,808.88** |
|---|---|---|
| Prejudgment @ 5% ($) | | 201,587.97 |
| **Total ($)** | | **1,225,386.85** |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| **Total ($)** | | **2,760,928.92** |

TABLE 2
SALOMON SCENARIO 2A

| Total Benefit of the Bargain Damages ($) | | **705,753.12** |
|---|---|---|
| Prejudgment @ 5% ($) | | 138,962.72 |
| **Total ($)** | | **844,715.91** |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| **Total ($)** | | **2,380,257.98** |

TABLE 3
SALOMON SCENARIO 2B

| Total Benefit of the Bargain Damages ($) | | **935,683.02** |
|---|---|---|
| Prejudgment @ 5% ($) | | 184,235.99 |
| **Total ($)** | | **1,119,917.01** |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| **Total ($)** | | **2,655,459.08** |

TABLE 4
SALOMON SCENARIO 3

| Total Benefit of the Bargain Damages ($) | | **397,277.00** |
|---|---|---|
| Prejudgment @ 5% ($) | | 78,224.00 |
| **Total ($)** | | **475,501** |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| **Total ($)** | | **2,011,043.00** |

5

13.     Disgorgement of profits of Outdoor Channel Holdings LLC. Outdoor benefitted from the competitive bidding when Outdoor accepted KSE bids that included the sale of the Aerial Camera Business. Absent the acceptance of the KSE bids, Outdoor's shareholders would have likely approved the sale to InterMedia for $8.00 a share. Instead, the price was bid up to $10.25 per share. The $2.25 per share gain in price times 25.84 million, the number of outstanding shares of Outdoor stock resulted in a gain of $58.14 million. With prejudgment interest of $11.45 million, the total gain is **$69.59 million**.

14.     Disgorgement of KSE profits. I would measure the gain to KSE as the difference between the value of Outdoor to KSE and the price paid by KSE for Outdoor. However, I have not found information regarding KSE's assessment of Outdoor's value or the value of synergies expected by Outdoor.

**Comment [KK1]:**

D.     *Material Relied Upon*

15.     In the course of my work, I was provided with access to and have incorporated into my analyses contemporaneous business records, communications, and studies generated by the Defendants that were useful in my understanding of the facts of the case and in forming my opinions. I also have researched publicly available information. I also was provided with, and have reviewed and considered, transcripts of depositions and exhibits to those depositions. Counsel for Plaintiffs have provided me with access to records of documents produced by Defendants in this case. A detailed list of the materials and resources I reviewed or considered in the preparation of this report is contained in Appendix II.

II.     BACKGROUND

A.     *Background*

16.     In this lawsuit, Plaintiff asserts that he, along with his partner PNC, negotiated a term sheet with defendant Outdoor Channel for the purchase of CableCam and SkyCam

6

80.     My opinion that the $475,501 be construed as a floor on the value of the Aerial Camera Business is also supported by the fact that Mr. Stan Kroenke, the chairman and ultimate owner of KSE and Outdoor Channel, elected not to sell the Aerial Camera Business even though he was apparently being advised that it was a weak business and should be sold.  My opinion concerning the value of the Aerial Camera Business would benefit from additional information on this point from Mr. Kroenke concerning the reasons why he elected not to sell the business.  I understand there is presently an attempt to depose Mr. Kroenke and that Defendants have filed a motion to prevent the deposition. If the deposition occurs, I will supplement my opinion if necessary to incorporate Mr. Kroenke's testimony.

G.     *Disgorgement of Outdoor Channel Profits*

81.     Outdoor had agreed to sell its stock to InterMedia for $8 per share. This transaction was approved by the board, recommended by its financial advisor and a vote to approve the transaction by stockholders was scheduled. The Intermedia transaction would have respected the sale of the Aerial Camera Business. The contract is alleged to have been breached when Outdoor considered and accepted a competing offer by KSE that included an offer to buy the Aerial Camera Business despite the agreement by Outdoor in the term sheet not to consider such offers. Outdoor received considerable benefit by entertaining and accepting the competitive bidding that resulted from the KSE offers, the transaction price of the Outdoor stock increased from $8.00 per share to $10.25 per share. Outdoors gain from its actions was $2.25 per share, a benefit of $58.14 million (25.84 million shares times $2.25 gain per share).  This analysis is reflected in Table 20.

30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT 32**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

1          DISCLAIMER

2   THE STENOGRAPHIC NOTES TAKEN IN THIS PROCEEDING ARE

3   BEING TRANSLATED INSTANTANEOUSLY INTO THEIR ENGLISH

4   EQUIVALENT THROUGH AN AUTOMATED PROCESS CALLED REALTIME

5   TRANSLATION.  THIS TRANSCRIPT HAS BEEN NEITHER EDITED

6   NOR PROOFREAD BY THE COURT REPORTER.  THE REALTIME DRAFT

7   IS UNEDITED AND UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

8   STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S NOTE, A

9   MISSPELLED PROPER NAME AND/OR NONSENSICAL WORD

10   COMBINATIONS, DEPENDING UPON THE COMPLEXITY OF THE

11   DEPOSITION AND THE SPEED OF THE QUESTIONS AND ANSWERS.

12   ALL SUCH ENTRIES WILL BE CORRECTED ON THE FINAL

13   CERTIFIED TRANSCRIPT, WHICH WE WILL DELIVER TO YOU IN

14   ACCORDANCE WITH OUR STANDARD DELIVERY TERMS, OR ON AN

15   EXPEDITED BASIS, SHOULD YOU DESIRE FASTER DELIVERY.

16   DUE TO THE NEED TO CORRECT ENTRIES PRIOR TO

17   CERTIFICATION, THIS ROUGH REALTIME DRAFT CAN ONLY BE

18   USED FOR THE PURPOSE OF AUGMENTING COUNSEL'S NOTES AND

19   NOT TO USE OR CITE IT IN ANY COURT PROCEEDING OR TO

20   DISTRIBUTE IT TO ANY OTHER PARTIES.

21

22

23

24

25

1

1   Wednesday, October 24, 2018

2   9:00 a.m.

3   Deposition of Kevin Kreitzman

4

5   Appearances:

6   Karyl Van Tassell by phone.

7

8          THE VIDEOGRAPHER:  Good morning, we are on

9   video record on October 24th, 2018, and the time is

10   9:10:00 a.m.  This is the video recorded deposition of

11   Kevin Kreitzman.

12          THE WITNESS:  Kreitzman, yes.

13          THE VIDEOGRAPHER:  In the matter of Nic Salomom

14   versus Kroenke Sports and Entertainment LLC and Outdoor

15   Channel Holdings.  It's being heard before the

16   U.S. District Court for the Northern District of Texas,

17   Dallas Division, and the case number is 315 CV 00666 m.

18          We are located today at Wilson, Sonsini in

19   San Francisco.

20          My name is Cyril Suszckiewicz, I'm the

21   videographer, and the Court Reporter is Rachel Ferrier.

22   We are both here representing Veritext.

23          Counsel, would you please identify yourself for

24   the record.

App. 510

22  BY MR. EVANS:

23      Q   You did.  You did, okay?  I just found the

24  objection humerus so I wanted to play around with it a

25  little bit.

114

1          So let's take a look at the last sentence of

2   paragraph '81 of your report.

3       A   Okay.

4       Q   Are you there?

5       A   Went too far.  Okay.

6       Q   And that sentence reads Outdoor's gain from its

7   actions was 225 per share a benefit of 58.14 million,

8   25.84 million shares times $2.25 gain per share, okay?

9       A   Yes.

10      Q   Did I read that right?

11      A   Yes.

12      Q   What's the difference between the $1025 sent

13  offer made by KSE and the 975 offer made by intermediate

14  yeah isn't that $0.50 a share?

15      A   That particular one, yes.

16      Q   Yeah and as you testified intermediate yeah as

17  you say would have he is respected the sale of the

18  aerial camera business; right?

19      A   Yes.

21   to 58.1 $4 million in does /TKORPBLG meant is that your

22   testimony?

23        MR. IBRAHIM:  Objection; misstates the

24   testimony.

25        THE WITNESS:  Again what I'm referring to in

115

1   the disgorgement argument is that by accepting competing

2   offers that didn't respect the deal, the price was bid

3   up from $8.00 to 225.  Typically in a bidding situation

4   you would get a better price so that would be the

5   motivation for wanting to be in the bidding situation is

6   very high.  Okay so this is what Outdoor gained by being

7   willing to not honor that transaction was 225.  And had

8   they done the deal at a higher price then they would

9   have and they would have respected it we wouldn't be

10   here.  Okay but it is the competitive bidding process.

11   BY MR. EVANS:

12        Q   Who received the benefit of the increase in the

13   share price?

14        A   Well, that was money that went to Outdoor.

15        Q   You understand Outdoor was publicly traded;

16   right?

17        A   Yes.

18        Q   So -- who?

App. 512

20   names.

21      Q   Matthews?

22      A   Matthews.

23      Q   So Outdoor didn't Outdoor itself as the entity

24   didn't receive the benefit at least the 59 percent of

25   the benefit, the Outdoor shareholders received that

116

1   benefit; right?

2      A   Well, I wouldn't make a difference here.

3      Q   Okay.

4      A   The company -- the company received the

5   benefit.  The fact that the company gave that to the

6   shareholders, that the shareholders had gotten it

7   doesn't change the fact that it was Outdoor acting in

8   the interest of Outdoor and money went to the

9   shareholders and I guess are you making a difference

10   between previous shareholders and current shareholders

11   or your point that somehow these are different?

12      Q   You are saying Outdoor should does George 58.1

13   $4 million?

14      A   Yes, Outdoor received that much more money.

15      Q   And that money went right into Outdoor's

16   account and no one else's account is that what you are

17   saying?

App. 513