**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS KROENKE**
**SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL**
**HOLDINGS, INC'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

| Exhibit No. | App. No. | Document Description |
|---|---|---|
| 1 | App.001 – App. 003 | Affidavit Of Kevin D. Evans In Support Of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc.'s Motion Pursuant to Fed. R. Evid. 702 to Exclude Testimony of Kevin Kreitzman |
| 1-A | App. 004– App. 061 | Copy of September 14, 2018 Expert Report of Kevin Kreitzman |
| 1-B | App. 062– App. 100 | Excerpted Transcript of the October 24, 2018 Deposition of Kevin Kreitzman |
| 1-C | App. 101– App. 140 | Copy of October 12, 2018 Rebuttal Expert Report of Karyl Van Tassel |
| 1-D | App. 141– App. 146 | Excerpted Transcript of the July 17, 2018 Deposition of Jeff Holowaty |
| 1-E | App. 147– App. 149 | Excerpted Transcript of the May 16, 2018 Deposition of Nicolas Salomon |
| 1-F | App. 150– App. 153 | Excerpted Transcript of the May 17, 2018 Deposition of Nicolas Salomon |

| **Exhibit No.** | **App. No.** | **Document Description** |
|---|---|---|
| 1-G | App. 154–App. 158 | Excerpted Transcript of the June 20, 2018 Deposition of Thomas Allen |
| 1-H | App. 159–App. 162 | Excerpted Transcript of the August 30, 2018 Deposition of James Martin |
| 1-I | App. 163–App. 166 | Excerpted Transcript of the June 7, 2018 Deposition of Roger Werner |
| 1-J | App. 167–App. 170 | Excerpted Transcript of the September 5, 2018 30(b)(6) Deposition of Scott Long |

Respectfully submitted,

Date:  November 13, 2018                    By:     s/Kevin D. Evans
                                                   Kevin D. Evans
                                                   *Admitted pro hac vice*
                                                   Nicholas W. Dowd
                                                   *Admitted pro hac vice*
                                                   ARMSTRONG TEASDALE LLP
                                                   4643 South Ulster Street, Suite 800
                                                   Denver, CO 80237
                                                   Telephone:  720.200.0676
                                                   Facsimile:  720.200.0679
                                                   Email:  kdevans@armstrongteasdale.com
                                                           ndowd@armstrongteasdale.com

                                                   and

                                                   Paul C. Watler
                                                   State Bar No. 00784334
                                                   Shannon Zmud Teicher
                                                   State Bar No. 24047169
                                                   JACKSON WALKER L.L.P.
                                                   2323 Ross Avenue, Suite 600
                                                   Dallas, Texas 75201
                                                   Telephone:  214.953.6000
                                                   Facsimile:  214.953.5822
                                                   Email:  pwatler@jw.com
                                                           steicher@jw.com

                                                   Attorneys for Defendants KROENKE SPORTS
                                                   & ENTERTAINMENT, LLC and
                                                   OUTDOOR CHANNEL HOLDINGS, INC.

<u>**Certificate Of Service**</u>

This is to certify that on this 13th day of November, 2018, I caused the foregoing **APPENDIX IN SUPPORT OF DEFENDANTS KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR CHANNEL HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT** to be electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.

<u>/s/*Kevin D. Evans*</u>
Kevin D. Evans

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF DEFENDANTS
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC'S MOTION PURSUANT TO FED. R. EVID. 702 TO
EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

| | |
|---|---|
| STATE OF COLORADO | § |
| | § |
| CITY AND COUNTY OF DENVER | § |

I, Kevin D. Evans, declare under penalty of perjury as follows:

1.     I am lead counsel of record for Defendants KROENKE SPORTS & ENTERTAINMENT,

LLC ("KSE") and OUTDOOR CHANNEL HOLDINGS, INC. ("Outdoor") (collectively,

"Defendants"). The purpose of my Affidavit is to provide support for Defendants' Motion

Pursuant To FED. R. EVID. 702 To Exclude Testimony Of Kevin Kreitzman And Request For

Hearing.

2.     On September 14, 2018, Plaintiff served on Defendants the Expert Report of

Kevin Kreitzman, MBA. A copy of this report, as subsequently corrected by Plaintiff to address

pagination issues, is attached hereto as Exhibit A.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Motion Pursuant to FED. R. EVID. 702 to Exclude Testimony of Kevin
Kreitzman and Request for Hearing

App. 001

3.      Mr. Kreitzman's deposition was taken in this action on October 25, 2018. Excerpts of the transcript of Mr. Kreitzman's deposition are attached hereto as Exhibit B.

4.      On October 12, 2018, Defendants served Plaintiff with the Rebuttal Expert Report of Karyl M. Van Tassel. A copy of Ms. Tassel's report is attached hereto as Exhibit C.

5.      On July 17, 2017, the deposition of Jeff Dean Holowaty was taken in this action. Excerpts of the transcript of Mr. Holowaty's deposition are attached hereto as Exhibit D.

6.      The deposition of Plaintiff Nicolas Salomon was taken in this action on May 16, 2018, and continuing through May 17, 2018. Excerpts of the transcript of Mr. Salmon's deposition on May 16 are attached hereto as Exhibit E. Excerpts of the transcript from May 17 are attached hereto as Exhibit F.

7.      On June 20, 2018, the deposition of Thomas D. Allen was taken in this action. Excerpts of the transcript of Mr. Allen's deposition are attached hereto as Exhibit G.

8.      On August 30, 2018, the deposition of James A. Martin was taken in this action. Excerpts of the transcript of Mr. Martin's deposition are attached hereto as Exhibit H.

9.      On June 7, 2017, the deposition of Roger Werner was taken in this action. Excerpts of the transcript of Mr. Werner's deposition are attached hereto as Exhibit I.

10.     On September 5, 2018, the 30(b)(6) deposition of Scott M. Long, representative of Defendant KSE, was taken in this action. Excerpts of the transcript of Mr. Long's deposition are attached hereto as Exhibit J.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL HOLDINGS, INC.'s Motion Pursuant to FED. R. EVID. 702 to Exclude Testimony of Kevin Kreitzman and Request for Hearing                                                          2

App. 002

Dated:  November 13, 2018

Kevin D. Evans

Subscribed and Sworn
Before me this 13 day of
November, 2018

Notary Public

ALYSSA R GILLIAM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184004126
MY COMMISSION EXPIRES JANUARY 24, 2022

Defendants KROENKE SPORTS & ENTERTAINMENT, LLC And OUTDOOR CHANNEL
HOLDINGS, INC.'s Motion Pursuant to FED. R. EVID. 702 to Exclude Testimony of Kevin
Kreitzman and Request for Hearing                                                          3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT A**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR**
**CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NIC SALOMON,

       Plaintiff,

       vs.

KROENKE SPORTS & ENTERTAINMENT,
LLC, OUTDOOR CHANNEL HOLDINGS,
INC. AND PACIFIC NORTHERN CAPITAL
LLC,

       Defendants.

Civil Action No. 3:15-CV-00666-M

**EXPERT REPORT OF KEVIN KREITZMAN, MBA**



EXHIBIT

165

10/24/18

TABLE OF CONTENTS

I.    INTRODUCTION AND OVERVIEW ............................................................................... 1
   A.   *Qualifications* ................................................................................................. 1
   B.   *Purpose and Scope of Work* ........................................................................... 2
   C.   *Summary of Conclusions* ............................................................................... 2
   D.   *Material Relied Upon* .................................................................................... 6

II.   BACKGROUND .......................................................................................................... 6
   A.   *Background* ..................................................................................................... 6
   B.   *Chronology of Events* ..................................................................................... 7

III.  BUSINESS ANALYSIS ............................................................................................... 12
   A.   *The Aerial Camera Business* ....................................................................... 12
   B.   *Industry - Competition* ................................................................................ 14

IV.   FINANCIAL ANALYSIS ............................................................................................. 14
   A.   *Historical Performance* ............................................................................... 14
   B.   *Historical Financials* ................................................................................... 14
   C.   *Projections* ................................................................................................... 16
   D.   *Lost Compensation* ....................................................................................... 16
   E.   *Legal Fees and Costs Incurred in Relation to the Proposed Transaction* ..... 17
   F.   *Benefit of the Bargain Losses* ..................................................................... 18
      i.    *Scenario 1: Valuation of Aerial Camera Business Based on Projected Cash Flows* . 18
      ii.   *Scenario 2: Valuation of Aerial Camera Business Based on Valuation Performed
            by Financial Advisor of Outdoor Channel* ............................................... 33
      iii.  *Scenario 3: Valuation Based on Actual Price of Proposed Acquisition of Aerial
            Camera Business* .......................................................................................... 36
   G.   *Disgorgement of Outdoor Channel Profits* ................................................ 39
   H.   Punitive Damages .......................................................................................... 40

APPENDIX I: RESUME ..................................................................................................... 43

APPENDIX II: DOCUMENTS RELIED UPON ..................................................................... 47

APPENDIX III: PUBLICATIONS ........................................................................................ 55

I.   INTRODUCTION AND OVERVIEW

   A.   *Qualifications*

   1.   My name is Kevin Kreitzman. I currently hold the position of Director at Berkeley Research Group ("BRG"). Over the past thirty years, my academic and professional research has focused largely on valuation, financial modeling, and the assessment of commercial damages. Prior to joining BRG, I served as a Principal at the ERS Group, Director in the Forensics and Litigation practice at KPMG LLP and as a Senior Economist at LECG. Throughout the 1980s and 1990s, I held a number of senior officer and other management positions at various firms participating in the industries for telecommunications, investment banking and investment management, and insurance. I have also been a lecturer at several universities in the San Francisco Bay Area, most recently at the University of California at Berkeley, where I developed and taught courses in Corporate Finance, Business Valuation, and Estimating Damages in Litigation for the University of California at Berkeley Extension. I hold an MBA degree in Finance from the University of Wisconsin at Milwaukee.

   2.   I have previously testified as an expert witness and have conducted complex damages studies in cases involving such issues as bankruptcy, intellectual property and patent infringement, fraud and fraudulent conveyance, distributor termination, breach of contract, breach of fiduciary responsibility, tax liability, employee stock ownership plans, mergers and acquisitions, and antitrust. In the current matter, BRG is being compensated for my services at my standard billing rate of $400 per hour, and that compensation is not dependent on the outcome of this matter. A recent copy of my *curriculum vitae* is attached to this report as Appendix I.

1

B.      *Purpose and Scope of Work*

3.      I have been asked to provide a reasonable estimate and calculation of economic losses incurred by Plaintiff Nic Salomon ("Plaintiff" or "Mr. Salomon") as a result of the wrongdoing he alleges was committed by defendants Outdoor Channel Holdings, Inc. ("Outdoor Channel") and Kroenke Sports and Entertainment, LLC ("KSE"). As set forth in this opinion, these losses include (a) lost compensation, (b) benefit of the bargain losses, (c) legal expenses incurred in connection with attempting to purchase SkyCam and CableCam (together referred to as the "Aerial Camera Business"), and (d) disgorgement of profits. For benefit of the bargain damages, I present three alternate scenarios. Scenario 1 involves a valuation which is based on the projected cash flows of the Aerial Camera Business. Alternatively, I present Scenario 2 which is based on the Lazard Frères valuation of the Aerial Camera Business of between $7 and $9 million. Scenario 3 assumes that the price of the proposed acquisition by Mr. Salomon and PNC is the value of the Aerial Camera Business. My primary conclusions are summarized as follows. In addition, I provide a preliminary opinion regarding punitive damages, which will be supplemented if the jury determines punitive damages are warranted.

C.      *Summary of Conclusions*

4.      This section summarizes my findings and conclusions to date. Because the report contains a detailed analysis, the following summary does not reflect all of my findings and conclusions or all of the bases for those findings and conclusions. I may revise my analyses in light of any additional facts or evidence that comes to light later in these proceedings. The facts or data upon which I am basing the opinions and inferences discussed in this report are of a type reasonably relied upon by damages experts.

2

5.      Plaintiff claims lost compensation totaling $1,362,755 through February 4, 2019, the date of the start of the trial. The prejudgment interest on these wages is $157,679 and the total lost wages damages are $1,520,434.[1]

6.      Plaintiff incurred legal expenses and other costs paid in connection with the transaction of $12,622. The prejudgment interest (5% for 3.94 years) on these costs is $2,486 and the total legal expenses and costs are $15,108.[2]

7.      The Benefit of the bargain damages Scenario 1, based on the value of the Aerial Camera business using management projections are $1,023,809. Prejudgment interest from the time of the filing of the lawsuit (February 27, 2015) to the time of the trial (5% for 3.94 years) is $201,588 and total damages plus prejudgment interest is $1,225,397.

8.      Total Damages under Scenario 1 are: **$2,760,939,** which includes benefit of the bargain damages (plus prejudgment interest) of $1,225,397, lost compensation (plus prejudgment interest) of $1,520,434 and legal expenses and costs (plus prejudgment interest) of $15,108.

9.      The range of benefit of the bargain damages for Scenario 2, based on the values of the Aerial Camera business using the valuation range provided by Lazard Frères is between $705,753 and $935,683. Prejudgment interest from the time of the filing of the lawsuit to the time of the trial (5% for 3.94 years) is between $138,963 and $184,236. Total damages plus prejudgment interest is between $844,716 and $1,119,919.

10.     Total Damages under Scenario 2 range from **$2,380,258 to $2,655,461,** which includes benefit of the bargain damages (plus prejudgment interest) between $844,716 and

---

[1] Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories of Defendants *Kroenke Sports & Entertainment, LLC* and *Outdoor Channel Holdings, Inc.*, p. 2.

[2] Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories of Defendants *Kroenke Sports & Entertainment, LLC* and *Outdoor Channel Holdings, Inc.*, p. 3.

3

$1,119,919, lost compensation (plus prejudgment interest) of $1,520,434 and legal expenses (plus prejudgment interest) of $15,108. I have described the lower and upper range of these damages as Scenario 2A and 2B, respectively.

11.    Scenario 3 benefit of the bargain losses are $397,277. This assumes that the price of the proposed terms of the sale set forth in the term sheet of the Aerial Camera assets is the value. Prejudgment interest from the time of the filing of the lawsuit to the time of the trial (5% for 3.94 years) is $78,224 and total damages plus prejudgment interest is $475,501. My opinion that the $475,501 be construed as a floor on the value of the Aerial Camera Business is also supported by the fact that Mr. Stan Kroenke elected not to sell the Aerial Camera Business even though he was being advised that it was a weak business and should be sold.

12.    Total Damages under Scenario 3 are: **$2,011,043,** which includes benefit of the bargain damages (plus prejudgment interest) of $475,501, lost compensation (plus prejudgment interest) of $1,520,434 and expenses (plus prejudgment interest) of $15,108.

4

TABLE 1
SALOMON SCENARIO 1

| Total Benefit of the Bargain Damages ($) | | 1,023,808.88 |
|---|---|---|
| Prejudgment @ 5% ($) | | 201,587.97 |
| Total ($) | | 1,225,386.85 |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| Total ($) | | 2,760,928.92 |

TABLE 2
SALOMON SCENARIO 2A

| Total Benefit of the Bargain Damages ($) | | 705,753.12 |
|---|---|---|
| Prejudgment @ 5% ($) | | 138,962.72 |
| Total ($) | | 844,715.91 |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| Total ($) | | 2,380,257.98 |

TABLE 3
SALOMON SCENARIO 2B

| Total Benefit of the Bargain Damages ($) | | 935,683.02 |
|---|---|---|
| Prejudgment @ 5% ($) | | 184,235.99 |
| Total ($) | | 1,119,917.01 |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| Total ($) | | 2,655,459.08 |

TABLE 4
SALOMON SCENARIO 3

| Total Benefit of the Bargain Damages ($) | | 397,277.00 |
|---|---|---|
| Prejudgment @ 5% ($) | | 78,224.00 |
| Total ($) | | 475,501 |
| Lost Wages Plus Interest ($) | | 1,520,433.71 |
| Expenses Plus PJ interest ($) | | 15,108.36 |
| Total ($) | | 2,011,043.00 |

5

13. Disgorgement of profits of Outdoor Channel Holdings LLC. Outdoor benefitted from the competitive bidding when Outdoor accepted KSE bids that included the sale of the Aerial Camera Business. Absent the acceptance of the KSE bids, Outdoor's shareholders would have likely approved the sale to InterMedia for $8.00 a share. Instead, the price was bid up to $10.25 per share. The $2.25 per share gain in price times 25.84 million, the number of outstanding shares of Outdoor stock resulted in a gain of $58.14 million. With prejudgment interest of $11.45 million, the total gain is **$69.59 million**.

14. Disgorgement of KSE profits. I would measure the gain to KSE as the difference between the value of Outdoor to KSE and the price paid by KSE for Outdoor. However, I have not found information regarding KSE's assessment of Outdoor's value or the value of synergies expected by Outdoor.

      D.    *Material Relied Upon*

15. In the course of my work, I was provided with access to and have incorporated into my analyses contemporaneous business records, communications, and studies generated by the Defendants that were useful in my understanding of the facts of the case and in forming my opinions. I also have researched publicly available information. I also was provided with, and have reviewed and considered, transcripts of depositions and exhibits to those depositions. Counsel for Plaintiffs have provided me with access to records of documents produced by Defendants in this case. A detailed list of the materials and resources I reviewed or considered in the preparation of this report is contained in Appendix II.

II.    BACKGROUND

      A.    *Background*

16. In this lawsuit, Plaintiff asserts that he, along with his partner PNC, negotiated a term sheet with defendant Outdoor Channel for the purchase of CableCam and SkyCam

6

(together referred to as the "Aerial Camera Business"). The term sheet contained a binding exclusivity clause precluding Outdoor Channel from taking a number of actions relating to the Aerial Camera Business, including negotiating with others concerning the business and selling the business, directly or indirectly, to anyone else. As a result, Plaintiff was deprived of the opportunity to purchase the Aerial Camera Business. Plaintiff contends that Outdoor Channel breached the term sheet in its handling of the negotiations for the sale of the Aerial Camera Business, its purported amendment of the term sheet with PNC behind Mr. Salomon's back, and its ultimate decision to permit the sale of the Aerial Camera Business, to Defendant KSE following KSE's offer to purchase all of Outdoor Channel, including the Aerial Camera Business. Plaintiff asserts causes of action for (1) breach of contract against Outdoor Channel, (2) tortious interference with existing contract and (3) tortious interference with prospective economic relations against KSE, (4) aiding and abetting breach of fiduciary duties against Outdoor Channel and KSE, (5) breach of fiduciary duty against PNC, and (6) unjust enrichment and (7) civil conspiracy against all defendants.

B.     *Chronology of Events*

17.     The Aerial Camera business was acquired by Outdoor on January 12, 2009 when Outdoor acquired the assets of Winnercomm, a production, development, and marketing of outdoor related programming company that own CableCam and SkyCam.[3]

18.     In 2011 the Aerial Camera business was segregated from Winnercomm and was treated as a separate segment of Outdoor's business.[4]

---

[3] Outdoor Channel Holdings, Inc. 10-K (FYE March, 9, 2012), p. 4, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312512107271/d294572d10k.htm

[4] Outdoor Channel Holdings, Inc. 10-Q (FYE November 9, 2012), p. 16, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312512463463/d398759d10q.htm.

7

19.     In April 2012, Mr. Salomon and PNC executed a Non-Disclosure Agreement to permit PNC to evaluate the purchase of the Aerial Camera Business.[5]

20.     In June 2012, Outdoor retained Noble Financial Capital Markets to explore strategic alternatives for the Aerial Camera Business.

21.     In November 15, 2012, Outdoor Channel Holdings entered into a merger agreement with InterMedia Outdoor Holdings ("InterMedia"). According to the agreement, each share of Outdoor Channel issued and outstanding prior to the effective date will be converted into the right to receive either (1) $8.00 in cash (2) one share of InterMedia common stock or (3) a combination of $4.46 and 0.443 shares of InterMedia common stock. The InterMedia agreement contains a "fiduciary-out" provision that would allow Outdoor Channel to participate in unsolicited discussions related to a "Superior Proposal" by a third party as well as a breakup fee of $6.5 million payable to InterMedia.

22.     Concurrently with the execution of the Merger Agreement, Thomas H. Massie, Perry T. Massie and certain of their affiliated entities, the members of the Outdoor Channel board and the executive officers of Outdoor Channel representing approximately 41% of the voting outstanding stock, entered into a Support Agreements with Parent. Pursuant to this agreement the parties agreed, among other things, to vote their shares of Outdoor Channel common stock in favor of the adoption of the Merger Agreement and the approval of the Outdoor Channel Merger.[6]

---

[5] *Nic Salomon v. Kroenke Sports & Entertainment, LLC, Outdoor Channel Holdings, Inc., and Pacific Northern Capital LLC*, Plaintiff's Second Amended Complaint (August 31, 2017) (hereinafter "Plaintiff's Second Amended Complaint"), p.7.

[6] Outdoor Channel Holdings, Inc. 8-K (FYE November 16, 2012), Item 1.01 Entry into a Material Definitive Agreement, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312512474248/d440083d8k.htm.

23.     My understanding is that the InterMedia Outdoor merger agreement excludes the Aerial Camera Business in its financial projections, and that this exclusion of Aerial Camera from the Outdoor projections is consistent with an expectation that InterMedia was not intending to interfere with the negotiations and contemplated sale of the Aerial Camera Business.[7]

24.     On November 21, 2012, InterMedia filed a registration statement with the SEC related to the proposed merger with Outdoor Channel.[8]

25.     On, November 27, 2012, InterMedia disclosed details of the terms of the Support Agreement.[9]

26.     On January 2013, Mr. Salomon notified Outdoor of his intent to present an offer with PNC to buy the Aerial Camera Business.[10]

27.     On February 26, 2013, Outdoor announced that Institutional Shareholder Services Inc. an independent U.S. proxy advisory firm, recommended that Outdoor Channel stockholders vote in favor of the proposed merger with InterMedia.[11]

28.     On February 27, 2013, Mr. Salomon, PNC and Outdoor executed a term sheet for the purchase of the assets of the Aerial Camera Business from Outdoor for a price of up to $4.05 million, which included $3.65 million in cash at closing and additional payments for ongoing royalties. The term sheet contains an exclusivity provision which precluded Outdoor, SkyCam

---

[7] Outdoor Channel Holdings, Inc. 8-K (FYE November 16, 2012), *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312512474248/d440083d8k.htm.

[8] InterMedia Outdoor Holdings, Inc. S-4 (FYE November 21, 2012), *available at* https://www.sec.gov/Archives/edgar/data/1562300/000119312512478810/d440728ds4.htm.

[9] Outdoor Channel Holdings, Inc. SC 13D/A EX-99.1 Form of Support Agreement (FYE November 27, 2012), *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312512482263/d445324dex991.htm.

[10] Plaintiff's Second Amended Complaint, p. 6.

[11] Outdoor Channel Holdings, Inc. 425 (FYE February 27, 2013), *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513078245/d493273d425.htm.

and CableCam from negotiating or agreeing to sell any equity interest in the Aerial Camera Business or any material part of the Aerial Camera Business to ant party other than Mr. Salomon and PNC, or their designated purchaser. Within the binding exclusivity provision, the term sheet also provides for "monetary damages, both actual and consequential" in the event of a breach.[12]

29.     On March 4, 2013, Outdoor Channel announces that it has received an unsolicited, unbinding proposal from Kroenke Sports & Entertainment, LLC to acquire all of Outdoor Channel's outstanding shares in an all-cash price of $8.75 per share.[13] InterMedia sent a letter to the Board stating its belief its offer was more valuable than the KSE proposal because of an increase in the value of the equity portion of its offer. InterMedia cites an increase in value of the comparable companies in the Lazard Frères fairness opinion.[14] It is my understanding that Mr. Salomon asserts that Outdoor's General Counsel informed Mr. Salomon that it was in Outdoor's position to disregard the term sheet because it was Outdoor's interest to accept KSE's offer to purchase the entire company.[15]

30.     On March 7, 2013, Outdoor announces that the board has unanimously determined that the KSE proposal was a Superior Proposal.[16]

31.     On March 10, 2013, Mr. Salomon provided PNC with a proposed equity structure for the purchaser.

---

[12] Plaintiff's Second Amended Complaint, pp. 7-8.

[13] Outdoor Channel Holdings, Inc. 8-K EX 99.2 (FYE March 4, 2013), *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513089245/d495755dex992.htm.

[14] Outdoor Channel Holdings, Inc. 425, (FYE March 4, 2013), *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513089246/d495755d8k.htm.

[15] Plaintiff's Second Amended Complaint, p. 10.

[16] Outdoor Channel Holdings, Inc. 425 (FYE March 7, 2013), p. 1, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513095853/d498630d425.htm.

10

32.     On March 13, 2013, Outdoor disclosed that it and KSE had entered into a definitive Agreement and Plan Merger pursuant to which KSE would acquire all the shares of Outdoor Channel for $8.75 in cash. Prior to entering into the KSE Merger Agreement, Outdoor terminated the InterMedia Merger Agreement and paid a termination fee of $6.5 million to InterMedia.[17]

33.     It is my understanding that on March 21, 2013, PNC and Outdoor purported to amend the Term Sheet, without Mr. Salomon's knowledge or consent, to give effective control of the term sheet to KSE by means of a provision releasing Outdoor Channel from exclusivity obligations if KSE did not consent to a proposed transaction regarding the Aerial Camera Business.[18]

34.     On March 28, 2013, Mr. Salomon emailed PNC to request PNC provide a proposed capitalization table.[19]

35.     On March 28, 2013, Mr. Salomon learned of, and objected to the purported amendment to, the term sheet giving KSE de facto control over the sale of the Aerial Camera Business.[20] Outdoor CEO Hornish requested a "side letter Agreement and Amendment," which Mr. Salomon refused.

---

[17] Outdoor Channel Holdings, Inc. 8-K (FYE March 13, 2013), p. 2, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513105366/d501922d8k.htm.

[18] Plaintiff's Second Amended Complaint Exhibit L

[19] Plaintiff's Second Amended Complaint Exhibit M.

[20] Plaintiff's Second Amended Complaint, p. 13.

11

36.     On April 11, 2013, Outdoor filed a definitive proxy statement, announcing that a special meeting of the stockholders would be held on May 8, 2013, where stockholders would vote upon a proposal to adopt the Kroenke Merger Agreement.[21]

37.     On May 2, 2013, Outdoor and KSE entered into Amendment No.1 to the Kroenke Merger Agreement, pursuant to which KSE would acquire the shares for $9.35 per share in cash. Outdoor disclosed that on April 30, 2013, InterMedia delivered a written proposal to Outdoor to acquire all shares of Outdoor Channel for $9.15 per share.[22]

38.     On May 3, 2013, InterMedia delivered a written proposal to Outdoor Channel to acquire the shares of Outdoor for $9.75 in cash.[23]

39.     On May 8, 2013, Outdoor and KSE entered into Amendment No. 2 to the Kroenke Merger Agreement, pursuant to which KSE would purchase all shares of Outdoor for $10.25.[24]

40.     On May 17, 2013, Outdoor disclosed that it completed the merger with KSE.[25]

III.   BUSINESS ANALYSIS

A.   *The Aerial Camera Business*

41.     The Aerial Camera Business, which consists of CableCam and SkyCam were part of the 2009 Winnercom acquisition.[26]SkyCam and CableCam are similar companies that provide

---

[21] Outdoor Channel Holdings, Inc. DEFM14A (FYE April 11, 2013), p. 3, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513150322/d505077ddefm14a.htm.

[22] Outdoor Channel Holdings, Inc. DEFA14A (FYE May 2, 2013), p. 3, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513196482/d531626ddefa14a.htm.

[23] Outdoor Channel Holdings, Inc. DEFA14A (FYE May 6, 2013), p. 3, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513201776/d533118ddefa14a.htm.

[24] Outdoor Channel Holdings, Inc. 8-K (FYE May 9, 2013), p. 2, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513210485/d536065d8k.htm.

[25] Outdoor Channel Holdings, Inc. 8-K (FYE May 17, 2013), p. 2, *available at* https://www.sec.gov/Archives/edgar/data/760326/000119312513226195/d540683d8k.htm.

suspended aerial camera systems, primarily for sports and entertainment events. Other potential uses for the core technology include border and port security.[27] The SkyCam technology uses a proprietary fiber optic support cable and a 4-winch system. CableCam employs a 3-winch system that can carry heavier, higher quality cameras. In general, the SkyCam system is less expensive and easier to install.[28]

42.    The core Aerial Camera Business is capital intensive. Growth in the ability to service additional events requires the purchase of additional expensive equipment and development of new technologies. Suspended mobile aerial cameras are still an emerging technology, and early mover advantages are possible since barriers to entry may be increasing as companies acquire intellectual property, tie-up scarce specialized resources, establish a track record and enter into multi-year contracts with limited venues. SKYCAM had multiple patents[29] at the time of the breach and has successfully defended its intellectual property in court and has favorable verdicts in the Actioncam litigation.[30]

43.    In addition to the core business, SKYCAM was exploring ways to monetize its technology. For example, SKYCAM developed a second screen technology that would allow end users to view the live content from above a game on a laptop, tablet or handheld device. Such an application could generate targeted sponsorship revenue and unlike the core business it would not have growth tied to capital expenditures. SKYCAM had a patent pending for SKYCAM

---

[26] KSE/OC:056591.

[27] KSE/OC:056683.

[28] KSE/OC:056691.

[29] KSE/OC:056707.

[30] KSE/OC:056712.

acquisition and delivery to second screens.[31] Although it is possible these opportunities could generate large amounts of revenue, I cannot estimate the value of this lost opportunity without additional information.

B.    *Industry - Competition*

44.    SKYCAM is the market leader and is dominant in the US market.[32] Its largest competitor in the US market is Actioncam, which covers approximately one quarter the number of events as SKYCAM. Actioncam was the subject of the litigation won by SKYCAM for breach of contract, misappropriation of trade secrets and unfair competition. Other minor competitors include Spidercam and Flycam. Spidercam covers mostly soccer concerts and rugby and is the dominant firm in the European market.

IV.    FINANCIAL ANALYSIS

A.    *Historical Performance*

45.    SKYCAM sales had increased from $3.1 million in 2004 to $12 million in 2012. To fuel this growth, SKYCAM invested $8.6 million in new equipment. SKYCAM has had negative cash flow during this period, a trend that was expected to continue.

B.    *Historical Financials*

---

[31] KSE/OC:052707

[32] KSE/OC:052706

14

TABLE 5
SKYCAM HISTORICAL FINANCIALS

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue (Recurring) ($ MM)** | 3.1 | 4.2 | 6.0 | 7.9 | 7.5 | 7.4 | 9.1 | 8.7 | 12.0 |
| % growth | | 35.7% | 42.2% | 31.2% | -4.8% | -0.8% | 22.2% | -4.4% | 38.7% |
| **Events** | 62 | 86 | 145 | 183 | 194 | 165 | 188 | 202 | 219 |
| **Gross Profit (Recurring) ($MM)** | 2.0 | 2.7 | 3.8 | 5.2 | 4.7 | 4.2 | 4.9 | 4.4 | 4.7 |
| % margin | 64.9% | 63.5% | 63.7% | 66.1% | 62.7% | 56.3% | 54.0% | 50.8% | 39.3% |
| **EBITDA (Recurring) ($ MM)** | 1.3 | 1.5 | 1.3 | 1.8 | 1.3 | 0.7 | 1.5 | 1.2 | 1.4 |
| % margin | 40.7% | 35.7% | 21.3% | 23.1% | 17.8% | 9.9% | 16.1% | 13.5% | 11.6% |
| **Capital Expenditures ($ MM)** | 0.1 | 1.2 | 1.7 | 0.9 | 0.6 | 1.0 | 0.6 | 0.6 | 1.9 |

Notes: Excludes corporate overhead; Maintenance capex (included in Capital Expenditures) is estimated at $600K per year.

15

C.    *Projections*

46.    There have been several projections reflecting various business plans produced in this litigation. I have chosen to use the projections prepared by Nic Salomon that was attached to the May 17, 2013 e-mail sent to David Gluck at KSE.[33] I believe these projections best reflect the business plan that would have been implemented absent the alleged breach of the terms of the term sheet and other wrongdoing alleged in this litigation.

TABLE 6
SKYCAM FINANCIAL PROJECTIONS

| | Budget | 5 Year Forecast | | | | |
|---|---|---|---|---|---|---|
| **SKYCAM Core Business Lines** | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E |
| **Revenue ($ MM)** | 12.7 | 15.5 | 22.0 | 35.0 | 42.4 | 52.2 |
| % growth | 5.7% | 21.7% | 42.1% | 59.3% | 21.3% | 23.0% |
| **Events** | 228 | 269 | 331 | 586 | 700 | 844 |
| **Gross Profit ($ MM)** | 5.2 | 6.4 | 8.9 | 15.8 | 19.2 | 24.1 |
| % margin | 40.8% | 41.5% | 40.3% | 45.1% | 45.3% | 46.2% |
| **EBITDA ($ MM)** | 1.2 | 1.5 | 3.4 | 9.2 | 12.2 | 16.5 |
| % margin | 9.2% | 9.4% | 15.4% | 26.3% | 28.6% | 31.6% |
| **Capital Expenditures ($ MM)** | 0.7 | 1.5 | 8.5 | 3.5 | 4.9 | 7.9 |
| **Systems in Operation** | 17 | 20 | 26 | 48 | 59 | 78 |

Notes: Excluded corporate overhead; Maintenance Capex (included in Capital Expenditures) is estimated at $600K per year.

D.    *Lost Compensation*

47.    As noted above, Plaintiff claims lost compensation totaling $1,362,755 through February 4, 2019, the date of the start of the trial. This consists of lost salary and bonuses. I understand that Plaintiff's claim to this lost compensation is based on his assertion that but for the conduct of Defendants described in the Second Amended Complaint, Plaintiff would be in at least the same position as President of the Aerial Camera Business and would therefore be

---

[33] KSE/OC: 000414

16

earning at least the same base salary he was receiving at the time of his termination (i.e., $252,881) and at least the same bonus he received for the calendar year 2013 (i.e., $34,139). The calculation for this lost compensation is set forth in Plaintiff's Third Supplemental Answers and Objections to Defendants' First Set of Interrogatories. I have reviewed these calculations and they appear to be accurate based on the assumptions made therein. I performed a calculation of the prejudgment interest on these wages from the time the lawsuit was filed on February 27, 2015, and the prejudgment interest is $157,679. Therefore, the total lost compensation damages are $1,362,755.[34]

E.     *Legal Fees and Costs Incurred in Relation to the Proposed Transaction*

48.     As noted above, I understand that Plaintiff incurred legal expenses and other costs paid in connection with the transaction to purchase the Aerial Camera Business through May of 2013 of $12,622.[35] These damages are set forth in Plaintiff's Third Supplemental Answers and Objections to Defendants' First Set of Interrogatories. I have reviewed the underlying legal bills associated with this calculation and the number appears to be accurate. I performed a calculation of the prejudgment interest on these legal expenses and costs from the time the lawsuit was filed on February 27, 2015, and the prejudgment interest is $2,486. Therefore, the total lost compensation damages for legal fees and costs incurred in relation to the proposed transaction are $15,108.

---

[34] Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories of Defendants *Kroenke Sports & Entertainment, LLC* and *Outdoor Channel Holdings, Inc.*, p. 2.

[35] Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories of Defendants *Kroenke Sports & Entertainment, LLC* and *Outdoor Channel Holdings, Inc.*, p. 3.

F.    *Benefit of the Bargain Losses*

49.    One method of measuring losses to Mr. Salomon is to determine his benefit of the bargain damages. This would be an element of Mr. Salomon's economic damages, including the "monetary damages, both actual and consequential" referenced in the term sheet. The purpose of this measure of damages is to restore Mr. Salomon as the injured party to the economic position he would have been in had the contract been performed, or had it not been interfered with. I have been instructed by counsel that benefit of the bargain damages under Texas law are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made. Because the value received by Mr. Salomon is zero in that he was denied the opportunity to participate in the purchase of the Aerial Camera Business and thus received no value, Mr. Salomon's benefit of the bargain losses would be measured as the value he would have received—meaning the value of the Aerial Camera Business—had the purchase been completed and had he then become a part owner of the business with PNC. In valuing the Aerial Camera Business, the present value of lost cash flows can be synonymous with lost value, since the value of a firm is considered to be the present value of expected cash flows.

     i.     *Scenario 1: Valuation of Aerial Camera Business Based on Projected Cash Flows*

50.    Scenario 1 is a valuation of the projections made by management in the normal course of business around the time of the acquisition. Below I explain the various methods that are typically used for this purpose, why I chose the methods used and how key parameters used in the valuation were derived. In scenario 1, I concluded that the value of the Aerial Camera Business was $9.75 million.

18

51.     There are various methods of valuing a business. The business valuation discipline recognizes three general methodologies to arrive at an estimate of value of a business enterprise - the Capital Market method, the Income Method and the Cost Method. These methodologies, although separate and distinct, are commonly used jointly to corroborate findings and support conclusions. I have used only the Income Method to determine the value of the Aerial Camera Business. I include the results of Capital Market Method for illustration only as I am not convinced that the price to EBITDA ratio for the Entertainment Tech companies is sufficiently comparable to the unique business model of SKYCAM. I do not believe the Cost Method would provide a useful indication of value.

52.     The Income Method requires that the earning capacity of the subject company be investigated and the resultant indicator of expected earning capacity, whether it be derived from past, current or projected earnings streams, be discounted at a rate sufficient to satisfy the investment and business risk of ownership. The application of this approach is enhanced when sufficient earnings history is available and relevant to the entity's future, in order to provide a clear indication of expected future performance. The Discounted Cash Flow (DCF) method is a direct application of the universal valuation definition; the value of a security is equal to the present value of expected cash flows. If the cash flows and discount rate were known then the value of the security would be a mathematical identity.

53.     The Capital Market Method is predicated on the theory that the market value of a closely held company can be estimated based on prices investors pay for the stocks of similar publicly traded companies. In this method, we compare market value with other measures of financial performance or metrics. The investment market's valuation of these similar companies provides a guide for determining the range from which the appropriate market multiples should

19

be selected, and applies this range to the subject entity's relevant metric (such as different measures of earnings, cash flow or revenue). The Market Multiple Approach is useful when prices of similar comparable companies can be observed.

54.    The Cost Method considers the assets and liabilities of the subject entity where appraised values are substituted for book values and the estimated liquidation value is the net value of assets realizable through sales of individual business assets. It does not consider earnings, goodwill or going concern values because it is presumed that the business enterprise will no longer be a going concern. Estimated liquidation value is applicable when the underlying assets are worth more if the business is terminated and the assets are sold individually, rather than as the underlying parts of a going concern. Because the Aerial Camera Business has intangible value, I have not used the Cost Method. Instead, I have utilized the Income (DCF) and Capital Market Methods in my determination of the present value of its equity.

55.    These approaches can result in values at either the enterprise level or equity level. Enterprise value is for an entire firm and includes the market value of both its equity and interest-bearing debt, while equity value is a measure of value for the common shareholders' claim on the entire firm. In the case of the Aerial Camera business, there is no distinction between enterprise value and equity value because the company has no interest-bearing debt. Using the DCF method and considering the Capital Market Methods I compute enterprise value to arrive at the equity value.

56.    The Discounted Cash Flow Method ("DCF") is based upon the premise that the value of future benefits can be derived from the present worth of these future benefits through the ownership of the subject property. In this method, the terms "income" or "profits" are used in a broad sense encompassing all monetary benefits to investors. A rate of return is used to convert

20

a series of future income amounts into present value. The key elements comprising the income approach are:

- the stream of benefits the owner of the assets expects to receive;
- the timing of the receipt of these benefits; and
- the risk borne by the owner.

57.   **The Benefit Stream and Timing:** The future benefits can be characterized in terms of future cash flows. The available cash flow of an entire firm is the operating income that can be distributed, once the operational needs of a firm, prior to financing costs, have been met. The present worth of future benefits can be determined on a single-period or multi-period basis. A common methodology employed is a two-stage model comprising a series of cash flows (typically three to five years or over a forecast period provided by the Company's management) and a terminal on-going cash flow.

58.   **Risk:** Risk is generally defined as the uncertainty regarding the expected rate of return from an investment. The financial principle that underlies this concept is opportunity cost, which is the return that could be obtained by investing in other assets with similar levels of uncertainty. In summary, DCF is a well-accepted valuation methodology based on the income approach and is widely used and accepted by valuation professionals. The value for an enterprise is based on projected cash flows, utilizing a discount factor to adjust all future cash flows to their present value which compensates investors for the risk associated with receiving those cash flows.

a.    *The Benefit Stream: Cash Flows*

59.    To employ the DCF method, we must first calculate the business's free cash flow. **Free cash flow** is cash flow generated by the business before debt servicing charges that is in excess of the amount needed for reinvestment purposes. It is measured as

$$Free\ Cash\ Flow = Net\ Operating\ Profits\ After\ Taxes - Change\ in\ Capital$$

60.    To estimate the free cash flow of Aerial Camera business, I used the forecast of EBITDA and subtracted cash operating taxes, depreciation to calculate after-tax operating profits before subtracting the net change in capital. Under this method, the cash flow is available to all claimants of capital and therefore is a measure of the value of the operations of the enterprise.

61.    In applying the Discounted Cash Flow methodology, I used management's forecast that were developed in the normal course of business and were provided to financial institutions outside of the firm.

TABLE 7
EXPANDED FORECAST WITH OPERATING TAX RATE[/1] = 20.67%

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Revenue ($ MM)[/2] | 12.70 | 15.50 | 22.00 | 35.00 | 42.40 | 52.20 |
| EBITDA ($ MM)[/2] | 1.20 | 1.50 | 3.40 | 9.20 | 12.20 | 16.50 |
| Depreciation ($ MM)[/3] | 0.91 | 1.04 | 2.77 | 2.94 | 3.39 | 4.44 |
| Pre-tax Operating Profit ($ MM) | 0.29 | 0.46 | 0.63 | 6.26 | 8.81 | 12.06 |
| Taxes @ 20.67% ($ MM) | 0.06 | 0.09 | 0.13 | 1.29 | 1.82 | 2.49 |
| NOPAT ($ MM) | 0.23 | 0.36 | 0.50 | 4.97 | 6.99 | 9.57 |
| Beginning Capital ($ MM) | 5.71 | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 |
| Beginning WC ($ MM)[/4] | 2.50 | 2.64 | 3.23 | 4.58 | 7.29 | 8.83 |
| Change in WC ($ MM)[/5] | 0.15 | 0.58 | 1.35 | 2.71 | 1.54 | 2.04 |
| Ending WC ($ MM)[/5] | 2.64 | 3.23 | 4.58 | 7.29 | 8.83 | 10.87 |
| Beg PPE ($ MM)[/4] | 3.21 | 3.00 | 3.46 | 9.19 | 9.75 | 11.26 |
| Capital investment ($ MM)[/6] | 0.70 | 1.50 | 8.50 | 3.50 | 4.90 | 7.90 |
| Depreciation ($ MM) | 0.91 | 1.04 | 2.77 | 2.94 | 3.39 | 4.44 |
| Ending PPE ($ MM) | 3.00 | 3.46 | 9.19 | 9.75 | 11.26 | 14.73 |

22

| Ending Capital ($ MM) | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 | 25.60 |

Note:

[1] Effective tax rate for profitable companies, entertainment services industry January 1, 2013, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

[2] KSE/OC:052707.

[3] Estimated using straight line depreciation using the implied historical average life of 4.32 years.

[4] January 31,2013 Outdoor Holdings and subsidiaries Consolidated Financial Sheets Bates: KSE/OC:052479.

[5] Working capital based on the ratio of sales to working capital KSE/OC:052479.

23

TABLE 8
EXPANDED FORECAST WITH OPERATING TAX RATE[1] = 40.00%

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Revenue ($ MM)[2] | 12.70 | 15.50 | 22.00 | 35.00 | 42.40 | 52.20 |
| EBITDA ($ MM)[2] | 1.20 | 1.50 | 3.40 | 9.20 | 12.20 | 16.50 |
| Depreciation ($ MM)[3] | 0.91 | 1.04 | 2.77 | 2.94 | 3.39 | 4.44 |
| Pre-tax Operating Profit ($ MM) | 0.29 | 0.46 | 0.63 | 6.26 | 8.81 | 12.06 |
| Taxes @ 40%% ($ MM) | 0.12 | 0.18 | 0.25 | 2.50 | 3.52 | 4.83 |
| NOPAT ($ MM) | 0.18 | 0.27 | 0.38 | 3.76 | 5.28 | 7.24 |
| Beginning Capital ($ MM) | 5.71 | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 |
| Beginning WC ($ MM)[4] | 2.50 | 2.64 | 3.23 | 4.58 | 7.29 | 8.83 |
| Change in WC ($ MM)[5] | 0.15 | 0.58 | 1.35 | 2.71 | 1.54 | 2.04 |
| Ending WC ($ MM)[5] | 2.64 | 3.23 | 4.58 | 7.29 | 8.83 | 10.87 |
| Beg PPE ($ MM)[4] | 3.21 | 3.00 | 3.46 | 9.19 | 9.75 | 11.26 |
| Capital investment ($ MM)[6] | 0.70 | 1.50 | 8.50 | 3.50 | 4.90 | 7.90 |
| Depreciation ($ MM) | 0.91 | 1.04 | 2.77 | 2.94 | 3.39 | 4.44 |
| Ending PPE ($ MM) | 3.00 | 3.46 | 9.19 | 9.75 | 11.26 | 14.73 |
| Ending Capital ($ MM) | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 | 25.60 |

Notes:
[1] Effective tax rate for profitable companies, entertainment services industry January 1, 2013, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.
[2] KSE/OC:052707
[3] Estimated using straight line depreciation using the implied historical average life of 4.32 years.
[4] January 31,2013 Outdoor Holdings and subsidiaries Consolidated Financial Sheets Bates: KSE/OC:052479.
[5] Working capital based on the ratio of sales to working capital KSE/OC:052479.

62.     **Weighted Average Cost of Capital in Risk:** The appropriate rate to use in discounting corporate free cash flows is known as the Weighted Average Cost of Capital ("WACC"). As its name implies, the WACC combines the after tax cost of debt and equity into a weighted average overall cost of capital. The weights are based on the proportion of the firm's capital structure accounted for by each source of capital in the company's target capital structure. The WACC is used to discount the corporate free cash flows, ignoring financing charges such as interest payments. It explicitly takes into account the different financing sources employed by the firm and their costs. This approach is based on the notion that for an investment to be acceptable to its investors, it must generate a stream of returns sufficient to compensate the suppliers of

24

capital in proportion to the amount and cost of the capital supplied by each. This minimum return is the cost of capital for the business. In general, the WACC is computed as:

$$WACC = K_E(\%E) + K_D(1-t)(\%D)$$

Where:

$K_E$   =   Cost of Equity

$K_D$   =   Cost of Debt

$\%D$   =   Target Percent Total Debt

$\%E$   =   Target Percent Total Equity

$t$   =   Tax Rate

Where:

$$K_E = r_f + \beta_e(r_m - r_f) + SSp$$

$\beta_e$   =   the equity beta coefficient, measured as $\sigma_{em}/\sigma_m^2$, where $\sigma_{em}$ stands for the covariance between returns on equity and returns on the market, and $\sigma_m^2$ is the variance of returns on the market portfolio

$r_m$   =   required rate of return on the market portfolio, the market is typically defined as the S&P 500

$r_f$   =   risk-free interest rate, usually measured as the yield to maturity on a U.S. Treasury bond in order to match the maturity of the investment with the maturity of the bond

$SS_p$   =   "small stock" liquidity premium, and adjustment to reflect the difference in returns observed between companies of different size; presumably a reflection of the relatively higher transaction costs incurred by smaller companies.

25

b.    *The Cost of Equity*

63.    I applied the Capital Asset Pricing Model (CAPM) to The Aerial camera business, yielding an estimated cost of equity capital ($K_E$) of 15.01% as of March 5th 2013.

64.    **Risk-Free Rate:** The risk-free rate ($r_f$) is estimated as the yield on a long-term U.S. Treasury security. As such, I used the yield on ten (10) year Treasury bonds as of March 5, 2013. The observed rate was 2.72%.

65.    **Beta:** To estimate SKYCAM's beta, I used the equity beta for the Entertainment Tech industry found in New York University's Damodaran database. Beta was calculated based on the weighted comparable companies' weekly covariance with the S&P 500 index over two and five years through 2012.[36]

66.    **Market Risk Premium:** The market risk premium is not susceptible to simple estimation as it is based on unobservable expectations. Often, this risk premium is be estimated using the historical differential between the actual return on the market portfolio and the risk-free Treasury bond rate (Treasury bond yields) over a time period from 1928 to present. Although such a method is commonly used to estimate the expected return on the market portfolio, I do not employ this approach because it lacks a theoretical basis and is populated with data from capital markets that do not resemble modern markets. An alternative approach is to estimate the implied market risk premium by calculating the return on equity that would cause expected cash flows to the holders of the S&P 500 index in the form of dividends and stock buybacks to equal the value. I used the 2012 implied market risk premium estimate from Damodaran of 5.78%.[37]

---

[36] totalbeta12xls, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

[37] NYU Stern School of Business, "Damodaran Online", available at http://pages.stern.nyu.edu/~adamodar/.

26

67.   **Small Stock Premium:** The final parameter for estimating cost of equity capital is the "small stock premium." Like the market risk premium, this parameter cannot be obtained through simple estimation as it is based on unobservable expectations. The small company premium is based on the observation that the historical returns of small companies, measured by total returns were consistently higher than those of large companies. This terminology persists even though Amihud and Mendelson demonstrated that the "small stock effect" was an illusion caused by the higher transaction costs incurred by small companies.[38] In order to estimate the effect of transaction costs on the cost of capital for Aerial Camera Business, I calculated a small stock or transaction cost premium by calculating the transaction costs as a percentage of proceeds.

---

[38] Yakov Amihud and Hiam Mendelson (1989), 'The Effects of Beta, Bid Ask Spread, Residual Risk and size on Stock Returns," *The Journal of Finance*.

27

TABLE 9
WACC

| Risk Free Rate [1] | 2.72% |
|---|---|
| Beta [2] | 1.33 |
| Expected Market Return [3] | 5.78% |
| Rf + (Beta)*Expected Market Return | 10.41% |
| "Small Stock Premium" Transaction Costs as a % Proceeds [4] | 4.65% |
| WACC (all equity) | 15.06% |

Notes:
[1] 20-year T-bill Rate March 5, 2013 (U.S. Department of the Treasury).
[2] Unleveraged Beta Entertainment Tech 2012, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.
[3] Historical Implied Market Risk Premiums 2013, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.
[4] Plaintiff's Second Amended Complaint Exhibit "H".

c.     *Valuation*

68.    In estimating the value of the Aerial Camera business using the income method, I employed two variations to value the projections. First, I discounted the free cash flow at the cost of capital. I assumed no additional value creation after that point and used the invested capital as the terminal value. Also, I employed an economic profit model. Similarly, I assumed no additional economic profit after the term of the forecast. I ran two scenarios, one with a standard 40% tax rate and one with the industry average effective tax rate of 20.69%. The value assuming a 40% tax rate was $8.37 million and the value assuming the Entertainment Tech industry average tax rate 20.69% was $11.13 million. I choose and average of values of $9.75 million for the value of the core Aerial Camera Business.

28

TABLE 10
VALUATION 20.69% TAX RATE (WACC = 15.1%)

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| NOPAT ($ MM) | 0.23 | 0.36 | 0.50 | 4.97 | 6.99 | 9.57 |
| Beginning Capital ($ MM) | 5.71 | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 |
| Return on Capital ($ MM) | 4% | 6% | 7% | 36% | 41% | 48% |
| Normal Profit ($ MM) | 0.86 | 0.85 | 1.01 | 2.07 | 2.57 | 3.03 |
| Economic Profit ($ MM) | -0.63 | -0.49 | -0.51 | 2.89 | 4.42 | 6.54 |
| PV of Economic Profit ($MM) | -0.54 | -0.37 | -0.33 | 1.65 | 2.19 | 2.82 |
| Sum PV Economic Profit ($ MM) | 5.42 | | | | | |
| Beginning Capital ($ MM) | 5.71 | | | | | |
| PV Economic Profit ($ MM) | 5.42 | | | | | |
| **Value ($ MM)** | **11.13** | | | | | |
| NOPAT ($ MM) | 0.23 | 0.36 | 0.50 | 4.97 | 6.99 | 9.57 |
| Ending Capital ($ MM) | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 | 25.60 |
| Change in Capital ($ MM) | -0.06 | 1.04 | 7.08 | 3.27 | 3.05 | 5.51 |
| Free Cash Flow ($ MM) | 0.29 | -0.68 | -6.58 | 1.70 | 3.94 | 4.07 |
| PV FCF ($ MM) | 0.25 | -0.51 | -4.32 | 0.97 | 1.95 | 1.75 |
| Sum PV FCF ($ MM) | 0.09 | | | | | |
| PV Terminal Value ($ MM) | 11.03 | | | | | |
| **Value ($ MM)** | **11.13** | | | | | |

29

TABLE 11
VALUATION 40% TAX RATE (WACC = 15.1%)

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| NOPAT ($ MM) | 0.18 | 0.27 | 0.38 | 3.76 | 5.28 | 7.24 |
| Beginning Capital ($ MM) | 5.71 | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 |
| Return on Capital ($ MM) | 3% | 5% | 6% | 27% | 31% | 36% |
| Normal Profit ($ MM) | 0.86 | 0.85 | 1.01 | 2.08 | 2.57 | 3.03 |
| Economic Profit ($ MM) | -0.69 | -0.58 | -0.63 | 1.68 | 2.71 | 4.20 |
| PV of Economic Profit ($MM) | -0.60 | -0.44 | -0.41 | 0.96 | 1.34 | 1.81 |
| **Sum PV Economic Profit ($ MM)** | **2.66** | | | | | |
| Beginning Capital ($ MM) | 5.71 | | | | | |
| PV Economic Profit ($ MM) | 2.66 | | | | | |
| **Value ($ MM)** | **8.37** | | | | | |
| NOPAT ($ MM) | 0.18 | 0.27 | 0.38 | 3.76 | 5.28 | 7.24 |
| Ending Capital ($ MM) | 5.65 | 6.69 | 13.77 | 17.04 | 20.09 | 25.60 |
| Change in Capital ($ MM) | -0.06 | 1.04 | 7.08 | 3.27 | 3.05 | 5.51 |
| Free Cash Flow ($ MM) | 0.24 | -0.77 | -6.71 | 0.49 | 2.24 | 1.73 |
| PV FCF ($ MM) | 0.21 | -0.58 | -4.40 | 0.28 | 1.11 | 0.75 |
| **Sum PV FCF ($ MM)** | **-2.64** | | | | | |
| PV Terminal Value ($ MM) | 11.01 | | | | | |
| **Value ($ MM)** | **8.37** | | | | | |

69.    In order to determine the losses incurred by Mr. Salomon used the capitalization table exchanged between Mr. Salomon and PNC. The proposed structure provided Mr. Salomon with 8% of the initial stock and stock options with strike prices of 1X, 2X and 3X times the initial stock price. Based on my experience, I consider these terms to be reasonable and typical of the types of terms given to key management in private equity transactions. In order to allocate the share of the value attributable to Mr. Salomon, I used an iterative Black Scholes model.

TABLE 12
BLACK SCHOLES CALL PRICE SCENARIO 1

| Underlying Price ($) | Strike Price ($)[1] | Risk Free Rate[2] | Maturity | Volatility[3] | Black Scholes Call Price ($) |
|---|---|---|---|---|---|
| 852.06 | 562.50 | 0.0077 | 5.00 | 0.49 | 466.47 |
| 852.06 | 1,125.00 | 0.0077 | 5.00 | 0.49 | 295.09 |
| 852.06 | 1,687.50 | 0.0077 | 5.00 | 0.49 | 203.61 |

Notes:
[1] Plaintiff's Second Amended Complaint.
[2] 5 Year treasury March 5, 2013 (U.S. Department of the Treasury).
[3] Optionvar12.xls, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

31

App. 037

70.     Applying the analysis above, we can come up with a total valuation of the Aerial

Camera Business, including an allocation of the value of Mr. Salomon's shares of the business,

along with an allocation of the value of other investors' shares. As shown below in Table 13, the

valuation of Mr. Salomon's shares would be $1,023,808.88. Under Scenario 1, this is the benefit

of the bargain Mr. Salomon lost as a result of being deprived of the opportunity to participate in

the purchase of the Aerial Camera Business. The prejudgment interest on this amount, based on

the rate of 5 percent from the date the lawsuit was filed (February 27, 2015) is $201,588. The

total benefit of the bargain damages under Scenario 1 is thus $1,225,397.

TABLE 13
ALLOCATION OF VALUE SCENARIO 1

| | | |
|---|---|---|
| Value Salomon Shares ($) | 870 | 681,648.00 |
| Salomon Options 1X ($) | 639 | 238,459.00 |
| Salomon Options 2X ($) | 284 | 58,663.86 |
| Salomon Options 3X ($) | 316 | 45,038.02 |
| **Total Salomon ($)** | | **1,023,808.88** |
| Founder Options 1X ($) | 1,279 | 477,291.17 |
| Founder Options 2X ($) | 1,137 | 234,862.00 |
| Founder Options 3X ($) | 1,263 | 180,009.56 |
| Investor's Shares ($) | 10,000 | 7,838,952.00 |
| **Total ($)** | | **9,754,923.61** |

71.     I also applied a market comparable approach using average multiples for the

entertainment tech sector in 2012. I applied the EBITDA multiple of 7.97X to the 2012 EBITDA

of $1.4 million. This method yielded a value of $11.16 million. I include this for illustration

only, since the Aerial Camera Business is quite unique.

TABLE 14
EBITDA VALUE

| | |
|---|---|
| EBITDA[/1] | 1.4 MM |
| P/EBITDA[/2] | 7.97 |
| **Value** | **11.16 MM** |

32

Notes:
/1 KSE/OC:052706
/2 VerbitDal12.xls, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

> ii.     *Scenario 2: Valuation of Aerial Camera Business Based on Valuation*
> *Performed by Financial Advisor of Outdoor Channel*

72.     Another reasonable basis for measuring what the value of the Aerial Camera Business was near the time of the alleged breach of the term sheet and other wrongdoing by Defendants is what Lazard Freres, the investment bank financial advisor to Defendant Outdoor in connection with the sale of Outdoor, deemed the value to be. This is what I will present as Scenario 2 (split as Scenario 2A and Scenario 2B).

73.     There has been at least one other valuation around the same time period. A valuation done by Lazard Frères, the financial advisor for Outdoor Channel in connection with the sale of Outdoor Channel, for the transaction was performed as part of the valuation of Outdoor based on a different business plan and set of projections. The value was estimated to be between $7 million and $9 million.[39] More specifically, in connection with one of Intermedia's offers to purchase Outdoor and as part of the valuation of Outdoor with regards to that offer, Lazard Freres offered a valuation of the Aerial Camera Business that was based on a different business plan and set of projections. The value was estimated to be between $7 million and $9 million, and was apparently derived from a discounted cash flow analysis. The lower and upper range of these valuations are utilized for Scenario 2A and Scenario 2B damages, respectively. According to the filing, "[i]n performing its discounted cash flow analysis of aerial camera, Lazard calculated the estimated present value of the standalone unlevered, after-tax free cash flows that aerial camera was forecasted to generated during the fourth quarter of the fiscal year

---

[39] KSE/OC: 028443-028445.

ending December 31, 2012 through the full fiscal year December 31, 2017 utilizing financial forecasts and other estimates and data of aerial camera prepared by Outdoor Channel's management."[40] Because this assessment was reported in an SEC filing (i.e. a Proxy Statement), both Outdoor and Lazard had an incentive to ensure correct reporting and that a reliable analysis was performed. Further, the valuation was based on figures provided by Defendant Outdoor's own management. I thus have no reason to believe that Lazard's analysis was inaccurate, or based on a deficient methodology or set of assumptions. In fact, the upper range of Lazard's assessment is not significantly different from the valuation I came up with in Scenario 1.

74.    As with Scenario 1, in order to allocate the share of the value attributable to Mr. Salomon for Scenarios 2A and 2B, I used an iterative Black Scholes model, as reflected in Tables 15 and 16.

TABLE 15
BLACK SCHOLES CALL PRICE SCENARIO 2A

| Underlying Price ($) | Strike Price ($)[1] | Risk Free Rate[2] | Maturity | Volatility[3] | Black Scholes Call Price ($) |
|---|---|---|---|---|---|
| 627.54 | 562.50 | 0.0077 | 5.00 | 0.49 | 287.83 |
| 627.54 | 1,125.00 | 0.0077 | 5.00 | 0.49 | 165.56 |
| 627.54 | 1,687.50 | 0.0077 | 5.00 | 0.49 | 107.00 |

Notes:
[1] Plaintiff's Second Amended Complaint
[2] 5 Year treasury March 5, 2013 (U.S. Department of the Treasury)
[3] Optionvar12.xls, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

---

[40] KSE/OC: 028443-028445.

34

TABLE 16
BLACK SCHOLES CALL PRICE SCENARIO 2B

| Underlying Price ($) | Strike Price ($)[1] | Risk Free Rate[2] | Maturity | Volatility[3] | Black Scholes Call Price ($) |
|---|---|---|---|---|---|
| 791.16 | 562.50 | 0.0077 | 5.00 | 0.49 | 416.33 |
| 791.16 | 1,125.00 | 0.0077 | 5.00 | 0.49 | 257.60 |
| 791.16 | 1,687.50 | 0.0077 | 5.00 | 0.49 | 175.03 |

Notes:
[1] Plaintiff's Second Amended Complaint
[2] 5 Year treasury March 5, 2013 (U.S. Department of the Treasury)
[3] Optionvar12.xls, "Damodaran Online," *NYU Stern School of Business, available at* http://pages.stern.nyu.edu/~adamodar/.

75.     Continuing with the analysis utilizing the Lazard analysis, I came up with an allocation of the value of Mr. Salomon's shares of the business, along with an allocation of the value of other investors' shares. As shown below in Tables 17 and 18 the valuation of Mr. Salomon's shares under Scenarios 2A and 2B would be $705,753.12 and $935,683.02, respectively. Therefore, under Scenario 2, this is the benefit of the bargain Mr. Salomon lost as a result of being deprived of the opportunity to participate in the purchase of the Aerial Camera Business. The prejudgment interest on these amounts, based on the rate of 5 percent from the date the lawsuit was filed (February 27, 2015) is $138,963 and $184,236. The total benefit of the bargain damages under Scenario 2A and 2B is thus $844,716 and $1,119,918.

TABLE 17
ALLOCATION OF VALUE SCENARIO 2A

| Value Salomon Shares ($) | 870 | 502,032.32 |
|---|---|---|
| Salomon Options 1X ($) | 639 | 147,138.76 |
| Salomon Options 2X ($) | 284 | 32,912.54 |
| Salomon Options 3X ($) | 316 | 23,669.50 |
| **Total Salomon ($)** | | **705,753.12** |
| Founder Options 1X ($) | 1,279 | 294,507.79 |
| Founder Options 2X ($) | 1,137 | 131,766.03 |
| Founder Options 3X ($) | 1,263 | 94,603.11 |
| Investor's Shares ($) | 10,000 | 5,773,371.68 |
| **Total ($)** | | **7,000,001.73** |

35

TABLE 18
ALLOCATION OF VALUE SCENARIO 2B

| | | |
|---|---|---|
| Value Salomon Shares ($) | 870 | 632,928.00 |
| Salomon Options 1X ($) | 639 | 212,828.29 |
| Salomon Options 2X ($) | 284 | 51,210.96 |
| Salomon Options 3X ($) | 316 | 38,715.77 |
| **Total Salomon ($)** | | **935,683.02** |
| Founder Options 1X ($) | 1,279 | 425,989.65 |
| Founder Options 2X ($) | 1,137 | 205,024.16 |
| Founder Options 3X ($) | 1,263 | 154,740.57 |
| Investor's Shares ($) | 10,000 | 7,278,672.00 |
| **Total ($)** | | **9,000,109.40** |

*iii.      Scenario 3: Valuation Based on Actual Price of Proposed Acquisition of Aerial Camera Business*

76.      A third basis for measuring the value of the Aerial Camera Business at the time of the alleged breach and other wrongdoing is the most conservative one—namely, to assume that the value of the business is simply the price that was offered to purchase the business. This will be Scenario 3. This measure does not take into account the variables discussed above in connection with Scenarios 1 and 2 and, therefore, does not account for a participant in a transaction obtaining a discount on an asset that deviates from its actual intrinsic market value as possibly could have occurred here had Mr. Salomon and PNC been able to complete the transaction. However, the actual transaction price is defensible as a measure of valuation under the fundamental economic principle that an asset's value is based on the intersection of what a willing buyer is willing to pay for an asset and what a willing seller is willing to sell that asset for.

77.      Here, we have the actual proposed transaction price for the purchase of the Aerial Camera Business by Mr. Salomon and PNC. According to the term sheet, the price for the Aerial

36

Camera Business was $4.05 million.  $4.05 million would thus be the value of the Aerial Camera Business under Scenario 3.

78.     Assuming this to be the case, in order to allocate the share of the value attributable to Mr. Salomon for Scenario 3, I used an iterative Black Scholes model.

37

79.     As with Scenarios 1 and 2, I came up with an allocation of the value of Mr. Salomon's shares of the business, along with an allocation of the value of other investors' shares. As shown below in Table 19, the valuation of Mr. Salomon's shares under Scenario 3 would be $397,277. Therefore, under Scenario 3, this is the benefit of the bargain Mr. Salomon lost as a result of being deprived of the opportunity to participate in the purchase of the Aerial Camera Business. The prejudgment interest on this amount, based on the rate of 5 percent from the date the lawsuit was filed (February 27, 2015) is $78,224. The total benefit of the bargain damages under Scenario 3 is thus $475,501.

TABLE 19
ALLOCATION OF VALUE SCENARIO 3

| Value Salomon Shares ($) | | 870 | 295,320 |
|---|---|---|---|
| Salomon Options 1X ($) | | 639 | 75,384 |
| Salomon Options 2X ($) | | 284 | 15,752 |
| Salomon Options 3X ($) | | 316 | 10,821 |
| **Total Salomon ($)** | | | **$397,277** |
| Founder Options 1X ($) | 1,279 | | 150,885 |
| Founder Options 2X ($) | 1,137 | | 63,062 |
| Founder Options 3X ($) | 1,263 | | 43,251 |
| Investor's Shares ($) | 10,000 | | 3,396,180 |
| **Total ($)** | | | **4,050,654** |

38

80.     My opinion that the $475,501 be construed as a floor on the value of the Aerial Camera Business is also supported by the fact that Mr. Stan Kroenke, the chairman and ultimate owner of KSE and Outdoor Channel, elected not to sell the Aerial Camera Business even though he was apparently being advised that it was a weak business and should be sold. My opinion concerning the value of the Aerial Camera Business would benefit from additional information on this point from Mr. Kroenke concerning the reasons why he elected not to sell the business. I understand there is presently an attempt to depose Mr. Kroenke and that Defendants have filed a motion to prevent the deposition. If the deposition occurs, I will supplement my opinion if necessary to incorporate Mr. Kroenke's testimony.

G.     *Disgorgement of Outdoor Channel Profits*

81.     Outdoor had agreed to sell its stock to InterMedia for $8 per share. This transaction was approved by the board, recommended by its financial advisor and a vote to approve the transaction by stockholders was scheduled. The Intermedia transaction would have respected the sale of the Aerial Camera Business. The contract is alleged to have been breached when Outdoor considered and accepted a competing offer by KSE that included an offer to buy the Aerial Camera Business despite the agreement by Outdoor in the term sheet not to consider such offers. Outdoor received considerable benefit by entertaining and accepting the competitive bidding that resulted from the KSE offers, the transaction price of the Outdoor stock increased from $8.00 per share to $10.25 per share. Outdoors gain from its actions was $2.25 per share, a benefit of $58.14 million (25.84 million shares times $2.25 gain per share). This analysis is reflected in Table 20.

TABLE 20
GAIN FROM COMPETITIVE BIDS

|  | Price ($) | Shares | Total ($) |
|---|---|---|---|
| Price Prior to Competitive Bid | 8.00 | 25.84 | **206.71** |
| Competitive Bid Price | 10.25 | 25.84 | **264.85** |
| Gain from Competitive Bid |  |  | **58.14** |

H.    Punitive Damages

82.    In the event the jury determines that punitive damages are appropriate, I anticipate supplementing this opinion with additional opinions regarding Defendants' ability to pay and Defendants' financial conditions, assets, liabilities, available credit and indebtedness. I also anticipate offering an opinion concerning whether Outdoor Channel and KSE's respective financial condition enables each of them to pay and withstand a substantial punitive damage award. Because they are private companies, I will need to rely on discovery from Defendants. I understand that Plaintiff has requested documents relevant to this analysis from Defendants, but that Defendants objected to Plaintiff's request as overbroad and premature. I imagine that Defendants will be required to turn over these materials in the event the jury determines that punitive damages are appropriate. I would thus anticipate at that time supplementing this opinion with additional opinions regarding Defendants' ability to pay and Defendants' financial conditions, assets, liabilities, available credit, and indebtedness. However, my preliminary opinion is that Defendants KSE would, in fact, be able to pay and withstand a substantial punitive damage award in excess of $100 million. I base this on the following description of KSE from its own website: "Denver-based Kroenke Sports & Entertainment (KSE) is one of the world's leading ownership, entertainment and management groups. As owners and operators of Pepsi Center, the Paramount Theatre, Dick's Sporting Goods Park, the Colorado Avalanche (NHL), Denver Nuggets (NBA), Colorado Mammoth (NLL) and Colorado Rapids (MLS), KSE's

40

sports and entertainment assets are second to none. Additional properties under KSE's umbrella include Altitude Sports & Entertainment, a 24-hour regional television network; Altitude Authentics, the company's official retail provider; and Altitude Tickets, the official ticketing provider for KSE teams and venues."[41] Forbes places a value on the Denver Nuggets alone at $1.125 Billion based on revenues of $202 Million and operating income of $49 Million.[42]

83.    I also may have rebuttal opinions of experts retained by defendants and I reserve the right to supplement this expert report and/or the opinions stated herein.  In addition, my calculations are capable of being adjusted in the event one or more of the variables included in the analyses set forth above have to be changed for any reason.

---

[41] Pepsi Center, "About KSE," *available at* https://www.pepsicenter.com/kse/company/about-kse/.

[42] Forbes, "The Business Of Basketball," *available at* https://www.forbes.com/nba-valuations/list/#tab:overall.

September 14, 2018

Kevin Kreitzman

APPENDIX I: RESUME

## KEVIN KREITZMAN

Kevin Kreitzman has been a director at Berkeley research Group from 2010 through the present time. He has over 25 years of financial-economic consulting experience in both litigation and non-litigation environments. He has testified in both federal and state court and before the Department of Justice. He has conducted damages studies for litigation matters, including insurance sales practices, "vanishing premiums," fraud, mergers and acquisitions, 10(b) 5 class actions, mutual funds, distributor termination, environmental, insurance coverage, solvency, fraudulent conveyance, breach of contract, patent infringement, trade secrets, professional malpractice, sales practices, breach of fiduciary responsibility, tax liabilities, Employee Stock Ownership Plans (ESOPs), antitrust, and intellectual property. Mr. Kreitzman has management experience in investment banking, investment management and insurance. He has conducted valuations of businesses, intellectual property, securities, and options, and has structured transactions using financial engineering tools.

## EMPLOYMENT HISTORY

### ERS Group

•Principal (March 2005 to 2009)

Provided expert witness testimony in both state and federal courts, arbitration proceedings and before the Department of Justice. Provided analyses related to securities fraud, antitrust issues, intellectual property disputes, professional malpractice, derivative securities and investment funds. Testified in Bankruptcy Court regarding solvency and fraudulent conveyance and estimated the value of asbestos liabilities that would have been known at different points in time.

### KPMG LLP

•Director KPMG Forensics/Economic and Valuation Services (January 2000- March 2005)

Provided expert witness testimony in deposition and trial, led forensic investigations of alleged accounting and other fraud, evaluated investment fund performance and compliance, performed royalty audits, and provided and examined contract compliance for insurance companies and other financial institutions. Served on the business valuation technical committee which developed internal valuation guidelines and set policies and standards for methodologies used or accepted by KPMG LLP.

### LECG
•Senior Economist (November 1997 – January 2000)

43

Provided litigation support and consulting services to law firms and companies engaged in a variety of complex litigation, including insurance sales practices and damages issues. Developed an economic profit- based financial performance measurement model for a large nonprofit organization

**San Francisco Telecom Inc.**

•CFO (January 1995 –March 1997)

Served as CFO of San Francisco Telecom until its acquisition by Level One Communications. He also implemented an ISO 9000 quality control program and obtained ISO 9000 certification and designed and tested an integrated financial and cost accounting system for SFT and Level One Communications using Oracle applications software.

**Focal Financial Consulting Inc.**

•Vice President (1989 November 1997)

Provided litigation support services to attorneys, business valuations to companies and ESOP trustees, and consulting services to fiduciaries and trustees.

**Kreitzman & Co., Inc**

•President (1986 - 1989)

Developed proprietary models for credit enhancement using financial engineering tools. Obtained venture financing and entered into joint venture agreements with various established financial consulting firms to market structures and sell securities through the major investment banks. Worked with life insurance companies to design life insurance policies.

**Kelso & Company**

•Vice President, Kelso Insurance Services (1995 - 1996)

Evaluated the feasibility of proposed ESOP LBO transactions, developed actuarial models to estimate potential recoveries from defined benefit pension plan termination, and designed cash flow based programs to create internal secondary markets for ESOP stock in privately held corporations. Provided communication programs for ESOP-LBO related transactions to management and employees of client companies.

**Callan Associates, Inc.**

•Investment Portfolio Analyst (1985)

44

Developed an asset allocation paradigm for security and manager selection. Evaluated fund manager performance, modeled transaction costs to include soft dollar payments and trading efficiency, and estimated the cost of divesting South African investments for a large public pension fund.

**MGIC Investment Corporation**

•Assistant Portfolio Manager (1983 -1984)

Analyzed and selected hedged common stock and call option positions, designed models for financial market research, and provided financial analysis for the management buyout of MGIC.

## EDUCATION

MBA, University of Wisconsin – Milwaukee, 1982

B.S. Medical Technology, University of Wisconsin – Milwaukee, 1978

## SPECIALIZATION

Analysis of damages arising in securities, commercial and intellectual property disputes; class certification issues; valuation of companies, interests, credit guarantees, contract provisions, liquidity, marketability, control, limited partnerships, financial institutions, commercial properties, derivative and convertible securities; analysis of investment fund performance and compliance with stated objectives, rules and contractual agreements; analysis of accounting, financial economic and capital market data; analysis of solvency, investigation of accounting fraud and Employee Stock Ownership Plans (ESOPs).

Industry Experience includes investment banking, hotels, computer hardware and software, biotechnology, semiconductors, telecommunications, financial institutions, insurance, pension funds, medical products, real estate and energy.

## PRESENTATIONS AND PROFESSIONAL MEETINGS

"Evaluating and Valuing Intellectual Property," Practicing Law Institute, 2003.

"Deposition Training Seminar" San Francisco Bar Association, 2003, 2005.

"Expert Examination Seminar" San Francisco Bar Association, 2004

"Damages Estimates in Securities Litigation," Portland Bar Association 2002.

## PREVIOUS ACADEMIC APPOINTMENTS

45

**University of California Berkeley** "Business Valuation" and "Corporate Finance." Seminar: "Estimating Damages in Litigation."
**San Francisco State University**
•Lecturer – "Corporate Finance"
**University of San Francisco**
• Lecturer – "Investment Management & Securities Analysis"
**St. Mary's College, Moraga CA**
• Lecturer – "Corporate Finance" and "Financial Accounting"
**Armstrong University**
• Associate Professor - "Corporate Finance," "Capital Markets" and "Insurance & Risk Management"
**Golden Gate University**
• Lecturer – "Corporate Finance"
**University of Wisconsin - Milwaukee**
• Adjunct Professor – "Business Statistics" and "Mathematical Modeling"

46

APPENDIX II: DOCUMENTS RELIED UPON

**Academic Articles & Books (non-exhaustive)**

Yakov Amihud and Hiam Mendelson (1989), 'The Effects of Beta, Bid Ask Spread, Residual Risk and size on Stock Returns," *The Journal of Finance*

**Bates Numbered Documents and Other Confidential Documents**

Copy of optvar12.xls

Copy of taxrate12.xls

Copy of totalbeta12.xls

Copy of vebitda12.xls

histimpl.xls

indname.xls

KSE/OC:000413

KSE/OC:000414

KSE/OC:000415

KSE/OC:000416

KSE/OC:028348

KSE/OC:028349

KSE/OC:028350

KSE/OC:028351

KSE/OC:028352

KSE/OC:028353

KSE/OC:028354

KSE/OC:028355

KSE/OC:028356

KSE/OC:028436

KSE/OC:028437

KSE/OC:028438

KSE/OC:028439

KSE/OC:028440

KSE/OC:028441

47

KSE/OC:028442

KSE/OC:028443

KSE/OC:028444

KSE/OC:028445

KSE/OC:029024-412

KSE/OC:029657

KSE/OC:029658

KSE/OC:030645

KSE/OC:030646

KSE/OC:038563

KSE/OC:038564

KSE/OC:038565

KSE/OC:043867-875

KSE/OC:044055

KSE/OC:044194

KSE/OC:044362

KSE/OC:044945

KSE/OC:045487

KSE/OC:046171

KSE/OC:046295

KSE/OC:046409

KSE/OC:046525

KSE/OC:046617

KSE/OC:046858

KSE/OC:047050

KSE/OC:047247

KSE/OC:047545

KSE/OC:047705

KSE/OC:047849

KSE/OC:048000

48

KSE/OC:048139

KSE/OC:048266

KSE/OC:048439

KSE/OC:048613

KSE/OC:048799

KSE/OC:048956

KSE/OC:049129

KSE/OC:049353

KSE/OC:049551

KSE/OC:049679

KSE/OC:049781

KSE/OC:049982

KSE/OC:050157

KSE/OC:050348

KSE/OC:050536

KSE/OC:050793

KSE/OC:050999

KSE/OC:051183

KSE/OC:051428

KSE/OC:051826

KSE/OC:052105

KSE/OC:052404

KSE/OC:052472-480

KSE/OC:052706

KSE/OC:052707

KSE/OC:053255

KSE/OC:053347

KSE/OC:053443

KSE/OC:053444

KSE/OC:053647

49

KSE/OC:053799

KSE/OC:053918

KSE/OC:054069

KSE/OC:054195

KSE/OC:054338

KSE/OC:054518

KSE/OC:054654

KSE/OC:054802

KSE/OC:055039

KSE/OC:055250

KSE/OC:055455

KSE/OC:055708

KSE/OC:056589

KSE/OC:056591

KSE/OC:056683

KSE/OC:056691

KSE/OC:056707

KSE/OC:056712

KSE/OC:057075

KSE/OC:057116

KSE/OC:057772

KSE/OC:058029

KSE/OC:058772

KSE/OC:059123

KSE/OC:059954

KSE/OC:060373

SALOMON500000-500046

**Depositions and Exhibits**

30(b)(6) Deposition Exhibit 361

30(b)(6) Deposition Exhibit 362

50

30(b)(6) Deposition Exhibit 363

30(b)(6) Deposition Exhibit 364

30(b)(6) Deposition Exhibit 365

30(b)(6) Deposition Exhibit 366

Amended Deposition Notice of KSE

Deposition Notice of Defendant Outdoor Channel Holdings, Inc.

Exhibit 300

Exhibit 301

Exhibit 302

Exhibit 303

Exhibit 304

Exhibit 305

Exhibit 306

Exhibit 307

Exhibit 308

Exhibit 309

Exhibit 310

Exhibit 311

Exhibit 312

Exhibit 313

Exhibit 314

Exhibit 315

Exhibit 316

Exhibit 317

Exhibit 318

Exhibit 319

Exhibit 320

Exhibit 321

Exhibit 322

Exhibit 323

51

Exhibit 324
Exhibit 325
Exhibit 326
Exhibit 327
Exhibit 328
Exhibit 329
Exhibit 330
Exhibit 331
Exhibit 332
Exhibit 333
Exhibit 334
Exhibit 335
Exhibit 336
Exhibit 337
Exhibit 338
Exhibit 339
Exhibit 340
Exhibit 341
Exhibit 342
Exhibit 343
Exhibit 344
Exhibit 345
Exhibit 346
Exhibit 347
Exhibit 348
Exhibit 349
Exhibit 350
Exhibit 351
Exhibit 352
Exhibit 353

Exhibit 354

Exhibit 355

Exhibit 356

Exhibit 357

Exhibit 358

Exhibit 359

Exhibit 360

**Pleadings, Submissions, Complaints, and Orders**

*Nic Salomon v. Kroenke Sports & Entertainment, LLC, Outdoor Channel Holdings, Inc., and Pacific Northern Capital LLC,* Plaintiff's Second Amended Complaint (August 31, 2017)

Outdoor's Response to Plaintiff's RFA No.1

Plaintiff's Third Supplemental Answers and Objections to First set of Interrogatories of Defendants *Kroenke Sports & Entertainment, LLC* and *Outdoor Channel Holdings, Inc.*

Transcript of S. Long, KSE LLC (September 5, 2018)

**Other**

Forbes, "The Business Of Basketball," available at https://www.forbes.com/nba-valuations/list/#tab:overall

InterMedia Outdoor Holdings, Inc. S-4 (FYE November 21, 2012), available at https://www.sec.gov/Archives/edgar/data/1562300/000119312512478810/d440728ds4.htm

NYU Stern School of Business, "Damodaran Online", available at http://pages.stern.nyu.edu/~adamodar/

Outdoor Channel Holdings, Inc. 10-K (FYE March, 9, 2012), available at https://www.sec.gov/Archives/edgar/data/760326/000119312512107271/d294572d10k.htm

Outdoor Channel Holdings, Inc. 10-Q (FYE November 9, 2012), available at https://www.sec.gov/Archives/edgar/data/760326/000119312512463463/d398759d10q.htm

Outdoor Channel Holdings, Inc. 425 (FYE February 27, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513078245/d493273d425.htm

Outdoor Channel Holdings, Inc. 425 (FYE March 4, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513089246/d495755d8k.htm

Outdoor Channel Holdings, Inc. 425 (FYE March 7, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513095853/d498630d425.htm

Outdoor Channel Holdings, Inc. 8-K (FYE May 17, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513226195/d540683d8k.htm

Outdoor Channel Holdings, Inc. 8-K (FYE March 13, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513105366/d501922d8k.htm

Outdoor Channel Holdings, Inc. 8-K (FYE May 9, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513210485/d536065d8k.htm

Outdoor Channel Holdings, Inc. 8-K (FYE November 16, 2012), available at https://www.sec.gov/Archives/edgar/data/760326/000119312512474248/d440083d8k.htm

Outdoor Channel Holdings, Inc. 8-K EX 99.2 (FYE March 4, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513089245/d495755dex992.htm

Outdoor Channel Holdings, Inc. DEFA14A (FYE May 2, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513196482/d531626ddefa14a.htm

Outdoor Channel Holdings, Inc. DEFA14A (FYE May 6, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513201776/d533118ddefa14a.htm

Outdoor Channel Holdings, Inc. DEFM14A (FYE April 11, 2013), available at https://www.sec.gov/Archives/edgar/data/760326/000119312513150322/d505077ddefm14a.htm

Outdoor Channel Holdings, Inc. SC 13D/A EX-99.1 Form of Support Agreement (FYE November 27, 2012), available at https://www.sec.gov/Archives/edgar/data/760326/000119312512482263/d445324dex991.htm

Pepsi Center, "About KSE," available at https://www.pepsicenter.com/kse/company/about-kse/

54

APPENDIX III: PUBLICATIONS

*UC Davis Business Law Journal* (Spring 2010), Volume 10

Michael A. Williams, Kevin Kreitzman, Melanie Stallings Williams, & William M. Havens, *Estimating Monopoly Power with Economic Profits*, pp.125 - 150

*BRG Review* (Winter 2011), Volume 1 Issue 1

Kevin Kreitzman, THE VALUE OF CONTROL: CONTROL PREMIUMS, MINORITY INTEREST DISCOUNTS, AND THE FAIR MARKET VALUE STANDARD, PP. 10 - 24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| NIC SALOMON, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §   CIVIL ACTION NO. |
| | §   3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § |
| | § |
| Defendants. | § |

**EXHIBIT B**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR**
**CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF TEXAS

3                  DALLAS DIVISION

4

_____

5                              )

NIC SALOMON,                   )

6                              )

         Plaintiff,            )

7                              )

         vs.                   )CIVIL ACTION NO.:

8                              )3:15-CV-00666-M

KROENKE SPORTS &               )

9   ENTERTAINMENT, LLC, OUTDOOR  )

CHANNEL HOLDINGS, INC., and    )

10  PACIFIC NORTHERN CAPITAL,      )

LLC,                           )

11                             )

         Defendants.           )

12  _____)

13

14

15

16      VIDEOTAPED DEPOSITION OF KEVIN KREITZMAN

17              San Francisco, California

18            Wednesday, October 24, 2018

19                    Volume 1

20

21

Job No. CS3059264

22

23  Reported by:

RACHEL FERRIER, CSR No. 6948

24  Job No. 3059264

25  PAGES 1 - 246

Veritext Legal Solutions

CONFIDENTIAL

Page 65

1    BY MR. EVANS:

2        Q   Is it fair to say, Mr. Kreitzman, that the only

3    deposition you reviewed prior to issuing your report was

4    the deposition of Scott Long?

5        A   Yes.

6        Q   Okay.  Did you speak or interview with Mr. -- did

7    you speak with Mr. Salomon prior to issuing your report?

8        A   Yes, I did.

9        Q   How many times?

10       A   Twice.

11       Q   Was Mr. Ibrahim present during that conversation?

12       A   I believe he was on the line, yes.

13       Q   Can I get you to look at Exhibit 165 again?  And

14   I'd ask you to turn to Exhibit 2 to your report, which I

15   think -- or Appendix 2.  I'm sorry.  They're -- they're

16   called appendix -- appendices, and I think it starts on

17   page 47?

18       A   Mm-hmm.

19       Q   And so what I would like you to do is look at

20   page 47, 48, 49, 50, 51, and 52, and my question for you

21   is:  Does that list of documents -- is that a

22   comprehensive list of the documents that you reviewed

23   for purposes of forming your opinions in this case?

24           MR. IBRAHIM:  And 53, by the way.

25           MR. EVANS:  Well, I was talking -- okay.  You're

Page 71

1    discussion of PNC providing -- or perhaps it was

2    somewhere else, but.

3        Q   Aside from the term sheet and based upon the

4    documents and the other information that you have looked

5    at for purposes of forming your opinions in this case,

6    have you seen any reference in any document that PNC was

7    going to fund the entire acquisition price for the

8    aerial camera business?

9        A   No.

10       Q   Since -- I take it you have not read

11   Mr. Holowaty's deposition either; is that correct?

12       A   No.

13       Q   So you don't know what Mr. Holowaty testified to

14   under oath regarding that point, whether PNC was going

15   to fund the entire acquisition price, do you?

16       A   No, I don't.

17       Q   Does it concern you that you don't know what

18   Mr. Holowaty testified to under oath about PNC and its

19   funding of the acquisition price?  Does that concern you

20   at all?

21           MR. IBRAHIM:  Form objection --

22           THE WITNESS:  No.

23           MR. IBRAHIM:  -- argumentative.

24   BY MR. EVANS:

25       Q   It doesn't concern you?

CONFIDENTIAL

Page 74

1          THE WITNESS:  No, I haven't --

2          MR. EVANS:  Okay.

3          THE WITNESS:  -- looked at specifics.

4   BY MR. EVANS:

5      Q    Okay.  I want to talk about the specific opinions

6   that you have offered in what we have now marked as

7   Exhibit 165, which is the corrected pagination version?

8      A    Mm-hmm.

9      Q    -- of your report.

10          And one of the things, if I -- if I understand

11   your report correctly, that you looked at was what you

12   call "loss compensation to Mr. Salomon"; is that

13   correct?

14      A    Yes.

15      Q    Okay.  What information did you rely upon in

16   forming your opinions on that issue of lost

17   compensation?

18      A    Well, what I did, I looked in the

19   interrogatories, and there was a section on loss

20   compensation based on historical payments.  And when I

21   looked at this, it was, well, there -- if this

22   transaction had happened and there was bus- -- business

23   that Mr. Salomon was a part of, he would have a salary.

24   And I reasoned that the best estimate of that would have

25   been what he was earning before in a similar position.

CONFIDENTIAL

Page 75

1    Q    So is it fair to say you made an assumption that

2    Mr. Salomon would be compensated at the same level after

3    an acquisition of the aerial camera business as he had

4    been compensated before acquisition of the aerial camera

5    business?

6    A    Yes.  And that was, I thought, a reasonable

7    expectation because that was the best -- the best

8    comparison I would have about what he would have earned

9    is what he did earn.

10   Q    And -- and was your assumption based upon

11   anything other than Mr. Salomon's answers to my client's

12   interrogatories, or did you also consider something

13   else?

14   A    Well, I just considered what would be the best

15   estimate of what it would be, and that was -- those are

16   the only numbers I -- I had seen provided, and I

17   believed it was a very reasonable assumption that he

18   would be paid at a similar rate.

19   Q    Did -- do you know whether Mr. Salomon and PNC

20   agreed on what Mr. Salomon's position would be with the

21   aerial camera business had there been an acquisition?

22   A    Well, everything I've seen was that Mr. Salomon

23   would have been the president of the company.  Again, I

24   don't recall seeing any final agreements because I don't

25   think that happened.

CONFIDENTIAL

Page 76

1    Q   You said everything that you looked at led you to

2    believe that Mr. Salomon would be the president of the

3    business.

4         What did you see that led you to believe that

5    any -- post any acquisition, Mr. Salomon would have

6    been -- or remained president of the company?

7    A   Well, there were a few things that talk- --

8    discussed the company going forward.  First of all, that

9    he was the president previously continuing.  There

10   was -- in the agreement, he was also part of the

11   agreement.  He signed it along with PNC.  I think if he

12   had been unimportant, he would not have been part of

13   that.

14   Q   And your recollection is that Mr. Salomon and PNC

15   signed that term sheet on behalf of some unnamed

16   purchaser; right?

17   A   Yes.  Company that had not yet been formed.

18   Q   Right.

19        And that was never formed, to your knowledge;

20   right?

21   A   Right.

22   Q   Okay.  Do you know whether PNC and Mr. Salomon

23   had an agreement on what his compensation would be in

24   the event there had been an acquisition?

25   A   I'm not aware of any such -- such agreement.  I

Page 77

1    would have used it if I found it.

2        Q    Did your -- did the opinion that you have offered

3    in terms of loss compensation to Mr. Salomon -- did that

4    take -- did that opinion that you have given take into

5    consideration Mr. Salomon's performance as president of

6    the aerial camera business?

7            MR. IBRAHIM:   Form objection.

8            THE WITNESS:   Well, I think that, you know,

9    historically, there was -- a portion of his compensation

10   was bonus that I would say was related to some measure

11   of performance they had.

12   BY MR. EVANS:

13       Q    Is that --

14       A    I think, in general, someone's -- someone's

15   compensation would be related to performance.

16       Q    Well, but did your opinion take into

17   consideration Mr. -- the -- the performance of the

18   aerial camera business from January 2009 through 2013?

19       A    What do you -- what do you mean by "the

20   performance"?

21       Q    You don't know what I mean by "performance"?

22       A    No.

23            Do you mean --

24       Q    Financial performance.

25       A    -- are you referring -- are you referring to the

CONFIDENTIAL

Page 87

1      A    No.

2      Q    Okay.  Have you seen any evidence to support your

3    assumption that there were other investors who were

4    going to contribute money to the operations of the

5    aerial camera business?

6      A    No, but that would be a -- a company will

7    sometimes, if they are going to grow, reach a point

8    where they go back to the market and get more funding.

9    It's not an unusual estimate.  You certainly wouldn't

10   identify who these people might be ahead of time.  It's

11   not normal.  It simply makes sense.

12     Q    So you are assuming there would be other

13   investors in the future; is that right?

14     A    Possibility.

15     Q    Possibility.  Okay.

16          And were you aware of the fact, Mr. Kreitzman, as

17   Mr. Holowaty testified in a deposition you didn't read,

18   that PNC attempted to find other investors prior to

19   May 17th of 2013?

20          MR. IBRAHIM:  Objection; lacks foundation, calls

21   for speculation.

22          MR. EVANS:  I can understand why you would think

23   it lacks foundation, because you weren't at the

24   deposition.

25     Q    But were you aware of that fact?

CONFIDENTIAL

Page 90

1    they would go into the market.

2    BY MR. EVANS:

3        Q    But you can't tell me, as you sit here today, a

4    single person, a single entity, a single investor who

5    had agreed to invest funds in the aerial camera business

6    after May 17th of 2013, can you?

7            MR. IBRAHIM:   Form objection.

8            THE WITNESS:   Again, I didn't look for specific

9    companies making specific investments in this company.

10   BY MR. EVANS:

11       Q    So the answer to my question is:   No, you can't

12   tell me that; right?

13       A    I think I answered your question.

14       Q    No, you really didn't.

15           You can't tell me the name of a single person or

16   a single entity who would have invested funds in the

17   aerial camera business after May 17, 2013; right?

18           MR. IBRAHIM:   Form objection.

19           THE WITNESS:   Okay.   Let me look at the -- my

20   timeline here, so May 17th.   Okay.   So this was Outdoor

21   disclose completed merger with KSE.   No.

22   BY MR. EVANS:

23       Q    Okay.   On paragraph 3 of your report, page 2, I'm

24   switching gears, by the way, just off the --

25       A    Okay.

CONFIDENTIAL

Page 92

1    I had seen in terms of what the equity would be, so --

2        Q    Okay.

3        A    -- if you look at this, it's typical that someone

4    in the position Mr. Salomon was in would get an equity

5    position as part of a transaction.  It's also typical

6    there would be options involved, and this was the only

7    information I've seen anywhere talking about this.

8            And I also had spoken to Mr. Salomon, and I asked

9    him if his -- if there had been any objections, at least

10   to the proposed structure that he's aware of.  He said

11   no.

12       Q    Okay.  Let me show you what's been marked as

13   Exhibit 140 in this case.  Sorry, it's been -- it was

14   marked in a previous deposition, and I'm going to ask

15   you:  Is that the chart that you were just referring to?

16       A    Yes.

17       Q    Okay.  Now, in the course of performance -- or,

18   excuse me, in the course of your review of information

19   and the provision of your opinions on the benefit of the

20   bargain damages in this case, have you seen any evidence

21   at all stating that PNC agreed to the proposed equity

22   structure reflected in Exhibit 140?

23           MR. IBRAHIM:  Form objection.

24           THE WITNESS:  And I think I already said that,

25   but, no, he had -- he had proposed it, and PNC had not

CONFIDENTIAL

Page 93

1   replied, and this was --

2          MR. EVANS:  Well, I know --

3          THE WITNESS:  -- something that happened -- yeah.

4   BY MR. EVANS:

5      Q   I know what you've told me what Mr. Salomon told

6   you --

7      A   Yeah.

8      Q   -- but I'm asking:  Have you seen anything

9   anywhere else, other than what Mr. Salomon shared with

10  you, where PNC agreed to the proposed equity structure

11  reflected in Exhibit 140?

12         MR. IBRAHIM:  Form objection.

13         THE WITNESS:  No, I have not seen any agreement

14  by PNC.

15  BY MR. EVANS:

16     Q   So -- so, then, why did you use -- without an

17  agreement between Mr. Salomon and PNC, why did you use

18  Mr. Salomon's proposed equity structure in computing or

19  determining the benefit of the bargain losses in your

20  opinions?

21         MR. IBRAHIM:  Form objection.

22         THE WITNESS:  Again, remember that this -- this

23  company was never formed, and in -- in terms of what the

24  structure would be, I needed to come up with something.

25  I think that zero equity for Mr. Salomon would not be a

CONFIDENTIAL

Page 94

1   reasonable expectation, and this one is a document that

2   was out there.  It's certainly reasonable the, you know,

3   8 percent equity position, the terms of the options.

4   These are, you know, very typical for things that I

5   would have seen in similar types of transactions.  This

6   is a -- you know, a very typical proposal.  I didn't see

7   anything on the other side.  This is -- this is what

8   there was.  I had to rely on something.

9   BY MR. EVANS:

10      Q    So you are assuming that PNC would have agreed to

11  this proposed equity structure; right?

12      A    Well, I'm assuming that this is a representation

13  of what it would be.  Could it have been modified or

14  changed in some ways through a negotiation?  Possibly.

15  This is my best estimate of what the equity structure

16  would be.

17      Q    How much equity was Mr. Salomon contributing --

18  was Mr. Salomon going to contribute to the acquisition

19  of the aerial camera business?

20          MR. IBRAHIM:  Form objection.

21          THE WITNESS:  Again, I'm not aware that he was

22  putting -- you are talking about -- equity, you are

23  talking about cash and not --

24          MR. EVANS:  Dollars.

25          THE WITNESS:  -- in terms of --

CONFIDENTIAL

Page 96

1    Q   So I understand your --

2        MR. IBRAHIM:   Objection; argumentative.

3    BY MR. EVANS:

4    Q   I understand your situation.   Okay?

5        Can you give me another example of a situation

6    where a person who's contributing zero cash to the

7    acquisition of an entity receives 8 percent or more

8    equity in that ac- -- in that acquired company?

9        MR. IBRAHIM:   Form objection.

10       THE WITNESS:   I can't think of a name.   I know

11   I've seen them.

12   BY MR. EVANS:

13   Q   We just have to trust your recollection; right?

14   You can't name -- you can't give me a specific instance?

15   A   Well, I gave you the instance of myself --

16   Q   Other than yourself.

17   A   -- 60 percent.

18   Q   Other than yourself.

19   A   Yeah.

20   Q   Fair to say you can't -- you can't give me a

21   specific instance other than yourself; right?

22   A   As I sit here now, no.

23   Q   Okay.   Stick- -- sticking with your three

24   scenarios on what you call the "benefit of the bargain

25   losses," is it fair to say that your three scenarios are

Page 97

1   also based, at least in part, on -- on your valuation of

2   the aerial camera business?

3       A    On my valuation?

4       Q    Did you do an analysis of the valuation of the

5   aerial camera business?

6       A    Yes.

7       Q    And -- and you used that valuation in arriving at

8   the damages under the benefit of the bargain losses in

9   your opinion; right?

10      A    For Scenario 1.

11      Q    Right.  Good point.  For Scenario 1.

12      A    Yes.

13      Q    You didn't -- you didn't use that for Scenario 2?

14      A    No.

15      Q    You didn't use that for Scenario 3?

16      A    No.

17      Q    So let's stick, then, with Scenario 1, and

18  explain to me the revenue projections that you used.

19      A    Okay.  So the revenue projections that I used

20  were -- revenue projections were things that I had

21  found, I believe, prepared by Mr. Salomon while at KSE.

22  It was the closest ones I could find to the time.  And

23  he had several of them.  The earliest one is the one

24  that I used.

25      Q    Well, I want to know each one -- each projection

Page 98

1    you relied upon to arrive at your opinion for the

2    benefit of the bargain losses in Scenario 1.

3        A    Okay.  So in Scenario 1, I relied on the

4    projections prepared in 2013, and these were, you know,

5    done within the normal course of business.  I know that

6    they had -- I had seen that they had been circulated

7    within KSE, and I believe they were also shown to third

8    parties in the company, so these were projections that

9    were done within the normal course of business at around

10   the time.

11       Q    Can you turn to page 16 in your report, please,

12   which is Exhibit 165.  There's a table reflected on that

13   page.

14       A    Yes.

15       Q    Are those the projections you are referring to?

16       A    Yes.

17       Q    All right.  If you look at paragraph 46 of your

18   report on page 16, it's under subsection C,

19   "Projections" --

20       A    Mm-hmm.

21       Q    -- you say, "There have been several projections

22   reflecting various business plans produced in this

23   litigation."  Let's stop there.

24            Tell me the projections that you have seen

25   reflecting various business plans produced in this

CONFIDENTIAL

Page 106

1    Q    Exactly.

2    A    And I assume that.

3    Q    Thank you.

4         And so did you -- do you have an understanding,

5    as you sit here today, how many NFL teams are built

6    in use -- let me strike the question.  Start again.

7    A    Yeah.

8    Q    Do you have an understanding, as you sit here

9    today, how many permanent installs are assumed in the

10   table under "SKYCAM Management Projections"?

11        MR. IBRAHIM:  Objection; irrelevant.

12        MR. EVANS:  You may think so, Ahmed.

13        THE WITNESS:  I don't recall the details of the

14   number of permanent versus temporary.  I remember

15   reading through all that, but, no, I couldn't tell you

16   what the assumption is for permanent.

17   BY MR. EVANS:

18   Q    So -- but -- so, Mr. Kreitzman, this is your

19   language; right?  You say, "I believe these projections

20   best reflect the business plan that would have been

21   implemented."

22   A    Mm-hmm.

23   Q    How can you possibly sit here today and tell me

24   this reflects the best -- the business plan that would

25   have been implemented when there's only two NFL teams

Page 107

1    today with permanent installs of the aerial camera

2    business?

3         MR. IBRAHIM:   Objection; argumentative, lacks

4    foundation.

5         THE WITNESS:   Two very different things.

6    BY MR. EVANS:

7    Q    Why are they different?

8    A    One is expectations at the time, which would have

9    gone to the value at the time, and the other is what

10   happened with KSE owning the company, and we can't

11   assume that the two things would converge.

12   Q    It's your assumption Mr. Salomon and PNC would

13   have done a better job in managing -- than KSE in

14   managing the aerial camera business; right?

15   A    I didn't really look at it.  I have no opinion

16   about what KSE did with the business.  I didn't -- I

17   don't think they have been forthcoming in information --

18   Q    Well, I appreciate the party line --

19   A    Yeah.

20   Q    -- but your opinion is based on the assumption --

21   it has to be, Mr. Kreitzman.  It has to be.

22        Your opinion is based on the assumption that PNC

23   and Mr. Salomon would have done a better job in

24   operating the aerial camera business than KSE; right?

25        MR. IBRAHIM:   Objection to the gratuitous comment

Page 108

1    as argumentative.

2          THE WITNESS:  Again, I have not evaluated what

3    KSE has done with the aerial camera business.

4    BY MR. EVANS:

5       Q    Okay.  So your opinion was formed, what, two

6    months ago?  Within the last two months; right?

7       A    Yes.

8       Q    It wasn't formed back in -- on May 17 of 2013;

9    right?

10      A    Right.

11      Q    And we have already talked about the fact that

12   when you are using -- when you valued present value cash

13   flow in these other instances that you testified to this

14   morning, you used historical information; right?

15      A    Yeah.

16         MR. IBRAHIM:  Form objection.

17   BY MR. EVANS:

18      Q    Well, you are ignoring the historical information

19   here in terms of how many in- -- permanent installs

20   there are in NFL stadiums, aren't you?

21      A    Well, I think we're -- we're probably using this

22   term differently.

23      Q    Well, tell me how.

24      A    Okay.  So if we have the valuation -- because, in

25   fact, we have projections, and the projections, at this

                                                  Page 115

1    AFTERNOON SESSION                                   1:17 P.M.

2

3         THE VIDEOGRAPHER:  Okay.  We are back on the

4    record, then, at 1:17.

5    BY MR. EVANS:

6      Q   Mr. Kreitzman, I just want to make sure that -- I

7    may have misunderstood part of your testimony earlier,

8    so I just want to ask this question, see if I -- if I

9    truly did misunderstand it or if I'm -- if I got it

10   accurate.

11        Let me -- is it -- is it your testimony that the

12   financial results between -- on the aerial camera

13   business --

14     A   Yeah.

15     Q   -- between 2013 and the time of your report you

16   did a few weeks ago --

17     A   Yeah.

18     Q   -- are not relevant to your damage analysis?

19     A   Not relevant to the valuation.  So what's

20   relevant is the expectations at the time, not what

21   happened in -- controlled by a different entity.

22     Q   So does that mean they are not relevant to your

23   ultimate damages -- benefit-of-the-bargain damage

24   analysis?

25     A   I'm trying to think if there's any way it would

CONFIDENTIAL

Page 116

1    be relevant.  Not really.

2        Q    Okay.  So I didn't misunderstand.  I just wanted

3    to make sure of that.

4             Can I get you to look at -- go back to

5    Exhibit 165.  That's your report, page 16.  I think you

6    already have it open.

7             So if you take a look at your chart, the 2013

8    estimate of revenue is 12.7 million.

9             Do you see that?

10       A    Mm-hmm.

11       Q    And the 2018 estimate of revenue is 52.2 million?

12       A    Yes.

13       Q    Do you understand what the -- what the basis for

14   that jump in almost $40 million in revenue over five

15   years was?

16       A    That would be based primarily on increasing the

17   number of events, the number of cameras and systems.

18       Q    And do you know whether those assumptions

19   happened?

20            MR. IBRAHIM:  Objection; form and relevance.

21            THE WITNESS:  Well, you just -- just showed me

22   something that was 2018 that was a different number.

23   BY MR. EVANS:

24       Q    So?

25       A    So they did not happen there, no.

CONFIDENTIAL

Page 124

1   from KSE, which didn't include the sale of the aerial

2   camera business.

3      Q   So you are not -- you don't know one way or the

4   other whether, for instance, disgorgement is even an

5   available remedy under the claims alleged by

6   Mr. Salomon, do you?

7      A   No.  It sounds like a legal opinion.  What I'm

8   doing is simply saying:  What did they gain?  And that's

9   pretty clear, so $2.25 a share.

10     Q   Well, let's test that pretty clear.

11         You say that the intermediate transaction would

12  have respected the sale of the aerial camera business.

13         You say that in paragraph 81; right?

14     A   Yes.

15     Q   And, in fact, that's your second sentence in

16  paragraph 81; right?

17     A   Mm-hmm.

18     Q   And you are referring there to the InterMedia

19  offer reflected in the November 2012 merger agreement

20  between InterMedia and Outdoor; right?

21     A   Okay.  Let me look at my timeline and I can --

22     Q   Okay.

23     A   Yes.

24     Q   What was the offer made by InterMedia per share

25  in November of 2012?

Page 129

1          THE WITNESS:  Again, what I'm referring to in the

2     disgorgement argument is that by accepting competing

3     offers that didn't respect the deal, the price was bid

4     up from $8.00 to 2.25.  Typically in a bidding

5     situation, you would get a better price, so that would

6     be -- the motivation for wanting to be in the bidding

7     situation is very high.

8          Okay.  So this is what Outdoor gained by being

9     willing to not honor that transaction, was 2.25.  And

10    had they done the deal at a higher price and they would

11    have respected it, we wouldn't be here.  Okay?  But it

12    is the competiting -- competitive bidding process.

13    BY MR. EVANS:

14    Q   Who received the benefit of the increase in the

15    share price?

16    A   Well, that was money that went to Outdoor.

17    Q   You -- you understand Outdoor was publicly

18    traded; right?

19    A   Yes.

20    Q   Okay.  So who --

21    A   41 percent into --

22    Q   Right.

23    A   -- 41 percent privately held by the -- I forget

24    their names.

25    Q   Matthews?

CONFIDENTIAL

Page 147

1      The financial results are, you know, a company at

2   a time.  That is, investing.  They spent a lot of money

3   protecting their intellectual property.  If they never

4   changed anything -- okay? -- it stayed exactly the same

5   way it was and continued to not have positive cash,

6   well, that wouldn't make any sense to continue the

7   business at that point.  If that was the expectation,

8   that they are never going to make any money, no one

9   would be making any money on it.  That wasn't the

10  expectation.

11  BY MR. EVANS:

12     Q   Do you have any evidence that PNC would have

13  accepted continued performance of the aerial camera

14  business such as the results obtained during 2009

15  through 2013?

16     A   No, and I see no reason why that would even be

17  something you would consider.  You're not -- you don't

18  expect that this is going to continue simply because --

19  you know, if this business never made money, you

20  wouldn't continue to put money into it.

21     Q   Right.

22      You would hope you could attract additional

23  investors to fund additional capital expenditures to

24  increase equipment, increase events; right?

25      MR. IBRAHIM:  Form objection.

Page 150

1    2013, assuming they acquired the aerial camera business?

2         MR. IBRAHIM:  Form objection.

3         THE WITNESS:  Well, again, going back to the term

4    sheet, I believe PNC said they had -- were willing to

5    provide the financing.  If you are looking for

6    additional financing, a lot of things go into that, and

7    not unusual for someone to approach a company and have a

8    project not be in their -- in the type of things that

9    they would normally invest in.  So if they had

10   approached someone and they said "no," I wouldn't worry

11   too much about that.  That happens all the time.  You

12   don't need everyone to say "yes."  You just need someone

13   to say "yes."

14   BY MR. EVANS:

15      Q   You hope someone will say "yes"; right?

16          MR. IBRAHIM:  Objection; form.

17          THE WITNESS:  Well, I guess if you are looking

18   for financing, you hope someone says "yes" to financing.

19   BY MR. EVANS:

20      Q   But you don't have any evidence, as you sit here

21   today, to give me the name of a single investor that

22   Mr. Salomon and PNC hoped to attract additional

23   investment from, do you?

24      A   No.

25      Q   Okay.  Can you look at page 7 -- paragraph 17 on

Page 155

1    Q   I understand what you were asked to do.  We have

2    exhausted that pretty --

3    A   Yeah.

4    Q   -- extensively here, Mr. Kreitzman, but that

5    wasn't my question.

6        My question was -- and I'll read it back -- Does

7    hearing what Mr. Holowaty testified to during his

8    deposition -- okay?

9    A   Mm-hmm.

10   Q   -- concern you in any way regarding the

11   assumptions you were asked to make in forming your

12   opinions?

13       MR. IBRAHIM:  Form objection; asked and answered.

14       THE WITNESS:  You know, again, no, because that

15   was -- that was a whole area that I didn't explore

16   because I wasn't looking at the liability and was -- was

17   this -- was this transaction going to happen or not.  I

18   assumed the transaction would happen, and one piece of

19   information in isolation that seems to contradict what I

20   had seen in other places would not necessarily say,

21   well, you know, I'm concerned about this.  I'm not -- I

22   made that assumption that this would -- that this would

23   happen, period.

24       MR. EVANS:  Can we go off the record for a

25   second?

CONFIDENTIAL

Page 168

1    Q   And you saw no agreements with anybody -- PNC or

2    any other employee -- prospective employee about

3    engaging them as management of the aerial camera

4    business should PNC and Mr. Salomon acquire that

5    business?

6    A   No, I did not look for particular things.

7        On the other hand, we do have, again, PNC views

8    the company's existing management team as an

9    instrumental asset in implementing the growth.

10   Q   What's your evidence that the current management

11   team that was in place at the time agreed to stay on if

12   PNC and Mr. Salomon were to acquire the aerial camera

13   business?

14       MR. IBRAHIM:  Form objection.

15       THE WITNESS:  As I sit here, I can't tell you who

16   was going to stay or go.

17   BY MR. EVANS:

18   Q   Okay.  Can I get you to look at paragraph 28, I

19   have the same type of questions.

20   A   Okay.  What relevant data didn't I consider?

21   Q   Well, I'm asking:  Do you agree or disagree with

22   that?  Do you think you considered all relevant data?

23   A   I think I used the best information available.

24   Q   Okay.  Well, you see where she says you didn't

25   consider the depositions of key witnesses -- of other

CONFIDENTIAL

Page 169

1   witnesses, such as Jeff Holowaty, Roger Werner, Cathy

2   Lee, Tom Hornish, Tom Allen, James Martin, and even

3   Mr. Salomon.

4        Did you even read Mr. Salomon's deposition?

5   A    Did not read Mr. Salomon's deposition.

6   Q    You didn't think it was necessary to read your

7   own client's deposition before you issued an opinion in

8   this case?

9   A    No.  I had a narrow -- a narrow -- a narrow focus

10  of what I was looking for.

11  Q    Take a look at paragraph 31, if you would.  I'm

12  going to have the same questions.

13  A    Mm-hmm.

14       Okay.  So I read it, yeah.

15  Q    Do you agree or disagree with the statements made

16  by Ms. Van Tassel?

17  A    Well, I agree if you have a history that

18  represents what's expected going forward, it's good to

19  have that information, which is what this highlighted

20  sentence, I believe, is trying to say.

21  Q    I'm sorry.  What highlighted sentence?

22  A    Well, there's one that's in bold:  "When

23  sufficient earnings history is available" --

24  Q    Oh, okay.  That one, okay.

25  A    I believe that's what you were referring to here.

CONFIDENTIAL

Page 188

1   reading of this document?

2      A    That I read it that this was within KSE and they

3   were --

4      Q    And not a stand-alone.

5           You understood that; right?

6           MR. IBRAHIM:  Form objection.

7           THE WITNESS:  I certainly understood that this

8   was done during the time when it was with KSE --

9           MR. EVANS:  Wasn't my question.

10          THE WITNESS:  -- yes.

11          MR. EVANS:  Wasn't my question.

12     Q    Please listen to my question, because it's an

13  important question.  Okay?

14     A    Okay.

15     Q    You understood, did you not, that the projections

16  set forth by Mr. Salomon in Exhibit 54 were projections

17  assuming that the aerial camera business was a part of

18  KSE?  Did you not?

19     A    I think you could in- -- possibly infer that,

20  given that it was within KSE, yes.

21     Q    Okay.

22     A    I don't -- I don't know that -- again, what --

23  what the assumptions of this structure were and what

24  KSE's plans were.  I know very little bit about --

25  little about what KSE wanted to do with this company.

Page 189

1    Q    Then why, Mr. Kreitzman, did you feel it

2    appropriate to utilize projections prepared by

3    Mr. Salomon on the assumption that the aerial camera

4    business was -- remained a part of KSE?  Why did you

5    think it appropriate to use those same assumptions in

6    forming your valuation and damage opinion on a stand --

7    for a stand-alone company?

8    A    Because of the choices I had, I thought those

9    were the most relevant.

10    Q    Why?

11        MR. IBRAHIM:  Asked and answered.

12        THE WITNESS:  Okay.  And, again, these were

13    projections that included new investments where the

14    others, for example, in Outdoor seemed to assume no

15    investment in the company.

16    BY MR. EVANS:

17    Q    Investments by whom?

18    A    By whomever.

19    Q    By KSE; right?  Because this was prepared while

20    he was an employee of KSE based upon the aerial camera

21    business being a part of KSE; right?

22    A    It was -- it was business based on a business

23    model of growing the company.

24    Q    While the aerial camera business was a part of

25    KSE; right?

CONFIDENTIAL

Page 190

1    A    And it was done by --

2    Q    Right?

3    A    -- him, yes, when he was at KSE.

4         So why would I use this?  This is -- these were

5    the only projections that were consistent with a company

6    that is set up to grow this business.

7    Q    And you didn't ask your client, Mr. Salomon, for

8    any projections prior to the acquisition of the aerial

9    camera -- the Outdoor Channel and assumption of the

10   aerial camera business by KSE, did you?  You didn't ask

11   Mr. -- Mr. Salomon for any projections?

12        MR. IBRAHIM:  Form objections.

13        THE WITNESS:  I did ask, Are there any other

14   projections?

15   BY MR. EVANS:

16   Q    Well, I'm not asking --

17   A    Yeah.

18   Q    -- did you ask, Are there any?

19   A    Yeah.

20   Q    Did you ask him for it?

21   A    No, and I don't think that that would have been

22   very acceptable.  This is something done during the

23   normal course of business as opposed to something done

24   for the litigation.  I tend to avoid those things if

25   possible.

CONFIDENTIAL

Page 199

1     A   By him, within -- within the context of what he

2   thought was likely to happen.

3     Q   Yeah, what he thought.

4         Where's PNC in the picture?  Did they agree to

5   this?  You said no already, so why is that not

6   speculative?

7         MR. IBRAHIM:  Form objection.

8         THE WITNESS:  I think I just answered that.

9         Okay.  And so what would have PNC agreed to?  We

10  will never know.

11  BY MR. EVANS:

12    Q   Because they didn't agree to anything with them;

13  right?  You haven't seen any agreement between PNC and

14  Mr. Salomon for shares and options; right?

15    A   No.  This company was never formed.

16    Q   So why didn't you use the actual shares and

17  equity that he had at the time of the term sheet instead

18  of basing your calculation on something Mr. Salomon

19  claims he should have been given?

20    A   There were no --

21        MR. IBRAHIM:  Form objection.

22        THE WITNESS:  There were no shares of Newco at

23  the time.

24  BY MR. EVANS:

25    Q   I'm not talking about Newco.  We have already

CONFIDENTIAL

Page 203

1  situation, that it was appropriate to rely only on

2  Mr. Salomon's proposal; right?

3      A    Again, that was the -- the best information I

4  could find regarding that, and these other companies,

5  you know, what they did or didn't do, wouldn't relate to

6  the situation at hand.

7      Q    And did you make any effort to contact Jeff

8  Holowaty or Kelly Holowaty to ask them what they thought

9  of Mr. Salomon's proposal and whether that would have

10  been something that might have been acceptable to them?

11     A    No.

12         MR. IBRAHIM:  Form objection.

13  BY MR. EVANS:

14     Q    You just took Mr. Salomon's word?

15         MR. IBRAHIM:  Form objection.

16         THE WITNESS:  I used -- I used that document.

17  BY MR. EVANS:

18     Q    Can I get you to look at paragraph 39 of

19  Ms. Van Tassel's rebuttal report.

20     A    Mm-hmm.

21     Q    Do you agree or disagree with that sentence in

22  paragraph 39?

23     A    What, specifically, is she referring to with

24  removing the overhead charges?  If we look at 54, the

25  numbers, and it says:  Includes SkyCam stand-alone

CONFIDENTIAL

Page 228

1    A    Mm-hmm.

2         Okay.

3    Q    Do you disagree with anything Ms. Van Tassel says

4    in paragraph 49?

5    A    $8.00, 10.25 -- this is quote from my report.  I

6    hope I agree with it, but -- no.  51.  Okay.

7         And para 49 it's -- it's not really consistent

8    with what I did and what I assumed.  I didn't attribute

9    anything to ACB.  I simply said, by accepting competing

10   offers, Outdoor was able to raise its price from 8.00 to

11   10.25 a share, and, therefore, they gained that amount

12   by accepting the competing offers.

13   Q    And you think your methodology is appropriate,

14   even though InterMedia made a $9.75 per-share offer,

15   which was accepted by the board, which, in your

16   testimony, would have respected the sale of the aerial

17   camera business?

18   A    Yes, because, remember, the -- what I'm referring

19   to here is the -- is the fact that this was a

20   competitive bid.

21   Q    I understand.

22   A    No competitive bid, it was $8.00, and everything

23   points to that.  If there were no competitive bid, this

24   would have gone for 8.00.

25   Q    Do you understand that a board has a fiduciary

CONFIDENTIAL

Page 229

1   obligation to its shareholders?

2       A    Yes.

3       Q    Okay.  Do you think a board has a fiduciary

4   obligation to accept a superior offer?

5           MR. IBRAHIM:  Form objection; calls for legal

6   conclusion.

7           THE WITNESS:  Yes.

8           MR. EVANS:  Okay.

9           THE WITNESS:  If -- if -- if they are allowed to

10  do so, if they haven't signed anything to the contrary.

11  BY MR. EVANS:

12      Q    And so you think the board --

13      A    All things being equal, yes.

14      Q    You think the board had a fiduciary obligation,

15  when InterMedia made its offer of $9.75 per share on

16  May 3 of 2013, which it deemed superior to be that -- to

17  that of KSE, to accept that offer?

18          MR. IBRAHIM:  Objection; calls for legal

19  conclusion and calls for speculation.

20          THE WITNESS:  Okay.  So you are referring to the

21  bidding process and things that happened in the

22  interim --

23  BY MR. EVANS:

24      Q    I'm referring to the InterMedia offer.

25      A    -- and, you know, the -- you know, the board, of

CONFIDENTIAL

Page 232

1  Lazard Freres' --

2      A    Yeah.

3      Q    -- valuation.

4          Is it fair to say that you haven't -- you don't

5  know what's included in that valuation because you

6  haven't seen it; right?

7      A    Well, I know some things.

8          MR. IBRAHIM:  Misstates the testimony.

9          THE WITNESS:  Yeah, I know some thing -- I think

10  I talked about this earlier.  They -- there was an

11  explanation of some of the things that it assumed.  It

12  used -- he uses projections for management.  It had

13  methodology that they discussed they used.  It showed

14  the assumptions for terminal value that they -- they

15  used, and it showed the assumptions for cost of capital

16  that they used.

17          MR. EVANS:  Right.

18      Q   You haven't seen the report -- the Lazard Freres'

19  report; right?

20      A    No, I haven't seen the report itself.

21      Q   Okay.  Also, getting back to this Black-Scholes

22  model that we were talking about a few moments ago,

23  would you agree with me that if we were to use the

24  assumptions in the Black-Scholes model and came -- and

25  came to your assumptions --

CONFIDENTIAL

Page 219

1    A    Okay.

2    Q    Do you know anything about it?

3    A    Well, if I read paragraph 47 here --

4    Q    Mm-hmm.  That's where I'm going.  Read the last

5    sentence.

6         Do you know about that?

7    A    Okay.  And this was in -- back in '08?

8    Q    October of 2008, $2 million.

9    A    No, I don't know about that.  A lot has happened

10   since then.

11   Q    Yeah, five years later, he makes a cash offer of

12   3.65 with PNC; right?

13   A    Mm-hmm.  Or as much as 405-, yeah.

14   Q    Well, yeah, contingent purchase price; right, of

15   405-; right?

16   A    Yeah.

17   Q    Do you have any idea as to what the realistic

18   expectation was of those other two contingencies

19   happening?

20   A    I don't recall right now exactly what they were.

21   I believe they were --

22   Q    Well, one was a litigation --

23   A    -- collection litigation proceeds --

24   Q    Did that ever happen?

25        MR. IBRAHIM:  Form objection.

CONFIDENTIAL

Page 220

1   BY MR. EVANS:

2       Q    Did they ever collect the roy- -- the payments

3   from Actioncam?

4            MR. IBRAHIM:   Form objection.

5            THE WITNESS:   Again, I don't -- I don't know what

6   happened after this time period within KSE.

7   BY MR. EVANS:

8       Q    So you don't know anything about the

9   contingencies, whether they happened or didn't happen;

10  right?

11      A    No.

12      Q    Did you ever ask Mr. Salomon why he made a

13  $2 million offer for the aerial camera business in

14  October of 2008?

15      A    No.

16      Q    So I take it, then, that since you never talked

17  to him about it, that didn't form a part of your

18  valuation and opinion in this case in terms of damages?

19      A    No.   It's somewhat stale information.

20      Q    Was it irrelevant information?

21      A    Just from the standpoint of other offers, it was

22  apparently not -- not accepted, so that doesn't make it

23  a price.  You know, and it's old.  It's a different

24  company in '08 than it is in '13.

25      Q    Was it irrelevant information?

Page 239

1   there was the liability in the case.  When I went

2   through the -- the chronology of everything, it was very

3   consistent with that idea.  Okay?  So I didn't simply

4   assume what I was told.  The -- the information that I

5   did find on my own through publicly available

6   information lined up behind that, so I wasn't simply

7   making that assumption without looking at anything.

8   BY MR. EVANS:

9      Q   But, yet, you looked at no deposition testimony,

10  other than Scott Long.  You looked -- you didn't look at

11  Mr. Hornish's deposition testimony, did you?

12     A   No.

13         MR. IBRAHIM:  Objection --

14  BY MR. EVANS:

15     Q   You didn't look at Mr. Warner's deposition

16  testimony --

17     A   No.

18     Q   -- did you?

19         You didn't look at Ms. Lee's deposition

20  testimony, did you?

21     A   No.

22     Q   You didn't look at Mr. Martin's deposition

23  testimony, did you?

24     A   No.

25     Q   So you don't know whether -- as you sit here

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT C

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO
<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

**IN THE UNITED STATES DISTICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-00666-M |
| | § | |
| KROENKE SPORTS & | § | |
| ENTERTAINMENT, LLC, OUTDOOR | § | |
| CHANNEL HOLDINGS, INC., AND | § | |
| PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | | |

_____

**REBUTTAL EXPERT REPORT OF KARYL M. VAN TASSEL, CPA**
_____

1

**Table of Contents**

Introduction ................................................................................................................................... 3

Summary of Opinions Related to the Kreitzman Report ................................................................. 3

Qualifications .................................................................................................................................... 4

Information Relied Upon .................................................................................................................. 4

Opinion 1 .......................................................................................................................................... 4

Opinion 2 .......................................................................................................................................... 6

Opinion 3 ......................................................................................................................................... 10

Opinion 4 ......................................................................................................................................... 16

## Introduction

1.  I have been retained by Armstrong Teasdale LLP ("Counsel") on behalf of Kroenke Sports & Entertainment, LLC ("KSE") and Outdoor Channel Holdings, Inc. ("Outdoor").  Collectively, I refer to KSE and Outdoor as the "Defendants."

2.  I have been asked to express my opinions regarding the Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018 ("Kreitzman Report").  Nothing is my report should be interpreted as agreement with Mr. Salomon's allegations regarding purported liability; I was not asked to and do not opine on any such issues. The fact that a particular statement contained in the Kreitzman Report is not addressed in this Rebuttal Report does not reflect my agreement with that statement. I have addressed the opinions of the Kreitzman Report overall, not necessarily each statement contained in his opinions.  This Rebuttal Report is based upon the information that has been provided to me as of the date of this report.   I reserve the right to update this report should additional information become available.

## Summary of Opinions Related to the Kreitzman Report

3.  My opinions related to the Kreitzman Report are as follows:

    (1)  The amount of claimed lost compensation is unsupported by evidence, has no basis in methodology and cannot be relied upon.

    (2)  The estimations of the benefit of the bargain damages in the Kreitzman Report do not meet the legal thresholds for economic damages, which require a reasonable degree of certainty.  For instance, Mr. Kreitzman does not adequately set forth, address and/or misapplies the key elements of the valuation standards which should be considered in preparing a business valuation, including important qualitative factors which must be considered.  In fact, the Kreitzman Report omits the qualitative factors most relevant in this matter,  which when those factors are considered, reveal that the Kreitzman Report lacks sufficient evidence to support using the  valuation of a business as a measure of damages.  The Kreitzman Report, therefore, does not provide any reasonable basis for his opinion.

    (3)  Even if you assumed incorrectly that Mr. Kreitzman met the standards for utilizing the valuation of a business as a measure of economic damages in this case, his approach is not supportable due to inappropriate valuation techniques, inclusion of option pricing (based entirely on shares and options proposed by Mr. Salomon) for a large portion of the damages making the valuation speculative, and misapplication of otherwise reliable sources of valuation data.

    (4)  The disgorgement of Outdoor profits in any amount, let alone of $58.14 million, has not been established, through the necessary fundamental business valuation or forensic accounting analysis, by Mr. Kreitzman with a reasonable degree of certainty given that there is no analysis

3

of the factors that would be required before rendering such an opinion. It assumes disgorgement would be an available remedy, and is based on a thoroughly flawed premise that the entire increase in purchase price between InterMedia's first offering price and KSE's last was due to the ACB.  Additionally, the methodology premise is also flawed completely since the increased offering price for the merger did not benefit Outdoor, but the shareholders who held the stock at the time of the transaction, so there was no benefit by Outdoor which could be disgorged. This renders the opinion speculative and unreliable.   It also does not reflect in any way the profits achieved post-merger with KSE.

4.    The work in preparation of this report was performed either by myself or by my staff at BDO under my direction.  The work performed is not an attest engagement as defined by the rules of the American Institute of Certified Public Accountants ("AICPA") but rather under the Statement on Standards for Consulting Services No. 1.

5.    My opinions presented in this report are based on information and documents available to me as of the date of this report.  Should additional information or documents become available, I reserve the right to amend or supplement my opinions.

## Qualifications

6.    I have attached my current curriculum vitae as Appendix 1 for full details on my experience and background, including, my expert testimony experience.

7.    BDO is compensated for my work in this matter at an hourly rate of $650.  No part of BDO's compensation is dependent on the outcome of this matter.

## Information Relied Upon

8.    I have relied on various types of information in formulating my opinions, including deposition testimony transcripts.  I have provided a list of this information as Appendix 2.

## Opinion 1 - The amount of claimed lost compensation is unsupported by evidence, has no basis in methodology and cannot be relied upon.

9.    The Kreitzman Report provides no basis or proven methodology for the calculation of lost compensation presented therein.  In his report, Mr. Kreitzman relies on Mr. Salomon's own calculation of his lost base salary and bonus from May 6, 2014 to February 4, 2019 (the date of the beginning of the trial in this case).[1]  In this calculation, Mr. Salomon assumes, and Mr. Kreitzman accepts, that he would continue to be employed as the President of the Aerial Camera Business

---

[1] Plaintiff's Third Supplemental Answers and Objections to First Set of Interrogatories of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc., served August 24, 2018, page 2.

4

(the "ACB")[2] and that the compensation structure and bonus calculation would be the same or similar.  By continuing to use the same base salary and bonus amounts for his calculation, Mr. Kreitzman relies on Mr. Salomon's claim that using these amounts results in a "conservative" approach. Using an approach you believe to be conservative does not justify using a damage analysis that is unsupported.

10.   The Kreitzman Report does not provide a basis for the continued underlying assumption of the salary and bonus from previous periods after Mr. Salomon's termination.  The calculation also does not account for the performance metrics of the business under Mr. Salomon in years prior to the KSE merger. Table 1 below shows the historical revenue amounts in comparison to the base salary and bonus amounts received by Mr. Salomon.  The Kreitzman Report contains no justification for assuming that Mr. Salomon would have continued to be employed by ACB after May 5, 2014, or the "Newco" and/or that he would have received the same base salary and bonus structure, particularly in light of the financial results previous to his departure.  There is no evidence that PNC would have accepted such continued performance under Mr. Salomon if PNC and Mr. Salomon had acquired the ACB or that there would be sufficient capital to continue to fund the losses incurred historically under his leadership.

**Table 1 - Mr. Salomon's Compensation Compared with ACB Financial Results**

| Year Ended | Revenues | EBITDA | Income (Loss) from Operations | Salary[3] | Bonus[3] | Total Compensation |
|---|---|---|---|---|---|---|
| 2010[4] | $ 9,140,000 | (320,000) | $ (1,243,000) | $ 225,000 | $ 90,000 | $ 315,000 |
| 2011[4] | 8,663,000 | (744,000) | (1,634,000) | 240,000 | 97,200 | 337,200 |
| 2012[5] | 12,018,000 | 913,000 | (123,000) | 247,680 | 78,019 | 325,699 |
| 2013[6] | 13,077,000 | (384,000) | (1,774,000) | 252,881 | 34,139 | 287,020 |

11.   In addition, subsequent to the March 21, 2013 letter between Pacific Northern Capital, LLC ("PNC") and Outdoor[7], Mr. Salomon said he could not work with PNC[8], and PNC/Mr. Salomon

---

[2] The Kreitzman Report is unclear whether his lost compensation claim is based upon Mr. Salomon continuing as an employee at KSE or at the "Newco" to be formed if PNC and Mr. Salomon acquired the ACB.

[3] Based on actuals for the period through 2013 presented in the Plaintiff's Third Supplemental Answers and Objections to First Set of Interrogatories of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc., served August 24, 2018, page 2.

[4] Form 10-K, December 31, 2011, Outdoor Channel Holdings, Inc.

[5] Form 10-K, December 31, 2012, Outdoor Channel Holdings, Inc.

[6] Exhibit 363.

[7] Exhibit 304: KSE/OC:028341-028342.

[8] Deposition of Nicolas Salomon dated May 16, 2018, Volume 2, 383:19 to 384:3.

5

did not have additional or other funding in place to purchase the ACB at that time.   Ultimately Mr. Salomon was terminated from KSE on or about May 5, 2014.[9]

12. Therefore, the lost compensation analysis in the Kreitzman Report is unsubstantiated, speculative, and should not be relied upon.


**Opinion 2 - The estimations of the benefit of the bargain damages in the Kreitzman Report do not meet the legal thresholds for economic damages, which require a reasonable degree of certainty.  For instance, Mr. Kreitzman does not adequately set forth, address and/or misapplies the key elements of the valuation standards which should be considered in preparing a business valuation, including important qualitative factors which must be considered.  In fact, the Kreitzman Report omits the qualitative factors most relevant in this matter,  which when those factors are considered, reveal that the Kreitzman Report lacks sufficient evidence to support using the  valuation of a business as a measure of damages.  The Kreitzman Report, therefore, does not provide any reasonable basis for his opinion.**


*Legal Thresholds for Economic Damages*

13. Economic damages must be proven with a reasonable degree of certainty and using methodologies which are reasonably relied upon by damages experts.[10]  Mr. Kreitzman acknowledges that standard and states in paragraph 4 of his report that he bases his opinions on data and analyses which are "reasonably relied upon by damage experts."  However, Mr. Kreitzman's benefit of the bargain calculations are not supported by evidence available in this case, do not follow valuation standards, and do not meet the standard of reasonable degree of economic certainty.

14. Even though economic experts are generally not offering a legal opinion, they must understand the legal burden that is to be applied to economic damages.  Section 352 of the *Restatement (Second) of Contracts (1981)* states, "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[11]  The Kreitzman Report lacks evidence that the data used to calculate the valuation of Mr. Salomon's purported portion of the ACB was objective and reliable.  In some cases he has not provided a bases at all in his report for his opinions.  He must analyze and establish the causal link between the alleged wrongful actions and the economic damages and has not done so, which is explained more fully below.

---

[9] Deposition of James Martin dated August 30, 2018, 213:10-20.
[10] Weil, Roman L., Daniel G. Lentz, and Elizabeth A. Evans. (2017). Litigation Services Handbook: The Role of the Financial Expert. Sixth Edition. Hoboken, New Jersey: John Wiley & Sons, Inc. Page 9.
[11] Ibid.

6

*Valuation Standards*

15.  Mr. Kreitzman references that the definition of damages in this case provided by counsel for Plaintiff is benefit of the bargain damages "calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made."[12] Using this, his definition, he attempted several valuation scenarios in his analysis.  Therefore, an understanding of the principles of valuation is important to explaining the ways in which Mr. Kreitzman's work does not meet those standards.

16.  Guidance is provided by each of the valuation credentialing organizations, including the National Association of Certified Valuation Analysts ("NACVA"), the American Institute of Certified Public Accountants ("AICPA") and the American Society of Appraisers ("ASA"), providing standards to be followed in developing a conclusion of value. While Mr. Kreitzman is not a member of these organizations, the standards put forth by each organization provide similar guidance and the key considerations in estimating a conclusion of value. According to these standards, the standard of value in legal cases with benefit of the bargain is fair market value ("FMV"), "[t]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[13,14]

17.  For example, the NACVA guidance[15] indicates that the following elements should be identified to define the assignment and determine the scope of work:
   a.  Subject to be valued;
   b.  Interest to be valued;
   c.  Valuation date;
   d.  Purpose and use of the valuation;
   e.  Standard of value;
   f.  Premise of value;
   g.  Intended users;
   h.  Valuation approaches or methods;
   i.  Assumptions, limiting conditions and scope limitations;
   j.  Ownership size, nature, restrictions and agreements;
   k.  Sources of information; and
   l.  Other factors that may influence value when appropriate in the opinion of the member.

---

[12] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 49.

[13] https://s3.amazonaws.com/web.nacva.com/TL-Website/PDF/Glossary.pdf

[14] The International Glossary of Business Valuation Terms is a joint effort of the American Institute of Certified Public Accountants, American Society of Appraisers, Canadian Institute of Chartered Business Valuators, National Association of Certified Valuation Analysts, and the Institute of Business Appraisers.

[15] http://web.nacva.com/TL-Website/PDF/NACVA_Professional_Standards_Incl_Review_Stnds_Effective_8-1-15_Final.pdf

18. For a conclusion of value, NACVA indicates that one must obtain and analyze applicable information, as available, pertaining to the following:
    a. The nature of the business and the history of the enterprise;
    b. The economic outlook in general and the condition and outlook of the specific industry in particular;
    c. The adjusted book value of the interest to be valued and the financial condition of the enterprise;
    d. The earning capacity of the enterprise;
    e. The dividend paying capacity of the enterprise;
    f. Whether or not the enterprise has goodwill or other intangible value;  Prior sale of interests in the enterprise being valued;
    g. Size of interest to be valued and its control, liquidity and marketability characteristics;
    h. The market price of interests or enterprises engaged in the same or a similar line of business having interests actively traded in a free and open market;
    i. Hypothetical conditions appropriate for the circumstances; and
    j. All other information deemed by the member to be relevant.

*Insufficient Application of Valuation Standards, Lack of Evidence and Basis of Opinion*

19. In regards to the elements per the NACVA guidance stated above, Mr. Kreitzman only includes the valuation date, valuation approaches, and intended users.[16] As to the information and analysis required for a valuation conclusion, Mr. Kreitzman has either not adequately addressed items or has not addressed them at all.  The Kreitzman Report does not address the following:
    a. Subject to be valued– The Kreitzman Report's subject to be valued is the ACB.  However, since the purchase of the ACB assets was to have occurred through an entity yet to be formed, the subject of the valuation has not been sufficiently addressed to ensure that the valuation elements and assumptions are reflective of the entity to be formed, such as the appropriate tax rate based upon the corporate structure.  Since the entity was never formed it is impossible to have a clear definition of the subject to be valued;
    b. Interest to be valued – Mr. Salomon proposed an equity structure for the business, but it was never agreed upon.  Nevertheless, he utilizes the purported structure without sufficient evidence supporting the equity and future options he assumes;
    c. Standard of value;
    d. Premise of value;
    e. Assumptions, limiting conditions and scope limitations;
    f. Ownership size, nature, restrictions and agreements.
    Mr. Kreitzman does provide some sources of information in his report.  However, as noted throughout the report below, there are many areas in which no basis is provided, and we have not been able to locate it in the documents available.  The Kreitzman Report does not address the limits of sources of data and any impact they would have on his calculations.

---

[16] The adequacy of the valuation approaches are analyzed separately in this report in paragraphs 28 through 48.

20.   The omissions in addressing elements and information necessary for an expert conclusion follow, including those areas most relevant in this matter.

21.   A valuation analysis must consider both quantitative and qualitative factors. The qualitative factors are those referred to in the NACVA elements under "Other factors that may influence value when appropriate in the opinion of the member" and "[a]ll other information deemed by the member to be relevant" in the information necessary for a conclusion.

*Qualitative Factors Insufficiently Analyzed*

22.   While Mr. Kreitzman refers to a partial list of qualitative factors in the "Business Analysis" section of his report, he does not properly set forth the impact of these items on the valuation he performs. By not considering adequately the qualitative factors specific to this matter that impact meeting the burden of reasonable certainty, the damages are speculative.

23.   In paragraph 41 of the Kreitzman Report, Mr. Kreitzman outlines his understanding of the business at a very high level without determining the key drivers of the business value.

24.   Mr. Kreitzman discusses barriers to entry in paragraph 42 of his report and indicates the ACB is capital intensive, which would provide a higher barrier to entry.  Throughout his report, Mr. Kreitzman provides insufficient analysis on how the capital requirements would impact the business valuation on forecasted revenue.  Also in paragraph 42, Mr. Kreitzman determines that "suspended mobile aerial cameras are still an emerging technology with possibility of early mover advantages possible" because of barriers to entry.  However, the Kreitzman Report provides no substantiation for how first mover advantage impacts the analysis in any way except that is could potentially have an impact.  Mr. Kreitzman had several documents available that reflect ACB had at least four competitors already.[17]  He performs no specific analysis of competitive impacts except that he states there are competitors.  Mr. Kreitzman addresses opportunities in addition to ACB's core business and states that "it is possible" these opportunities could generate large amounts of revenue, but he cannot estimate without additional information.

*Qualitative Factors Ignored in the Kreitzman Report*

25.   One qualitative factor ignored by the Kreitzman Report is the availability of financing to purchase the ACB.  Mr. Kreitzman does not address the availability of capital for the purchase of the business by PNC or others.  Mr. Holowaty, an Advisor to PNC, stated in his deposition that PNC did not plan to entirely fund the purchase price of the ACB.  He notes that they anticipated other investors and discussed the opportunity with some of these potential investors[18], but nothing materialized.[19]  Mr. Holowaty reiterates later in his deposition that PNC did not intend to fund the

---

[17] Exhibit 354: KSE/OC:052736-052765 at KSE/OC:052752.

[18] One of the parties interested in the transaction was IMAX but they did not commit to help fund the investment. Deposition of Jeff Dean Holowaty, dated July 17, 2017, 111:8 to 111:17.

[19] Deposition of Jeff Dean Holowaty, dated July 17, 2018, 51:2 to 52:23.

entire cash at the closure of the deal.[20]  Further, Mr. Salomon agreed in his testimony that while
other potential investors had been solicited, none of them had agreed to provide funding.[21]

26.   The Kreitzman Report also does not discuss the impact of the Terms Sheet at issue.  PNC originally
submitted a Letter of Interest ("LOI") on September 28, 2012.[22]  PNC and Mr. Salomon then signed,
on behalf of an unnamed "Purchaser," and provided a Term Sheet to Outdoor on February 26 or
27, 2013.[23]  The Term Sheet states it is non-binding and it is my understanding that with the
exception of the exclusivity agreement, is not legally enforceable.  The Term Sheet specifically says
that until such time as definitive agreements were signed, any party could terminate negotiations
for any or for no reason, and without liability. Further, and as discussed in paragraph 37, the
acquisition entity was never formed.  The formation of "Newco" was a requirement in order to
complete the deal but was never accomplished.

27.   Another factor to consider in a valuation analysis is the sufficiency of management.  This
consideration would evaluate whether sufficient management is in place to support the financial
quantification using forecasted projections.  Mr. Holowaty stated in his deposition that Mr.
Salomon would have been in a similar role at the new ACB if the sale had taken place.[24]  Historical
information suggest that Mr. Salomon's performance did not result in positive financial results in
his role as President of the ACB.[25]  Comparing financial performance results prior and subsequent
to May 2014 reflect that the company did better after Mr. Salomon's departure.   The Kreitzman
Report fails to provide the necessary analysis of management at all or its sufficiency to achieve the
projected results included in the Kreitzman Report.    Further, there is no evidence that the
management team had been determined and was in place and so adequacy of a non-identified
management team, therefore, is speculative.

**Opinion 3 - Even if you assumed incorrectly that Mr. Kreitzman met the standards for
utilizing the valuation of a business as a measure of economic damages in this case, his
approach is not supportable due to inappropriate valuation techniques, inclusion of option
pricing (based entirely on shares and options proposed by Mr. Salomon) for a large portion
of the damages making the valuation speculative, and misapplication of otherwise reliable
sources of valuation data.**

28.   In order to perform a proper valuation analysis, all available relevant and reliable data for the
analysis should be considered.  Mr. Kreitzman did not use all of the relevant information available
for his analysis.  For example, the only deposition which was considered in the Kreitzman Report

---

[20] Ibid. 74:14 to 74:20.

[21] Deposition of Nicolas Salomon, dated May 16, 2018, 270:5 to 270:21.

[22] Exhibit 106.

[23] Exhibit 302: KSE/OC:000947-000950.

[24] Deposition of Jeff Holowaty, dated July 17, 2018, 47:3 to 47:7.

[25] First Supplemental Answers of Outdoor Channel Holdings, Inc. to Plaintiff Nic Salomon's First Set of
Interrogatories, dated May 4, 2018, Answer to Interrogatory Number 12.

was that of Scott Long, the 30(b)(6) deposition witness designated by KSE and Outdoor.  However, he ignores relevant information in the depositions of other witnesses in this matter including Jeff Holowaty, Roger Werner, Cathy Lee, Tom Hornish, Tom Allen, James Martin, and Nicolas Salomon (his own client).  This omission excludes relevant data that makes his analysis unreliable had he chosen to review them, or if they had been provided to him.

29.   Regarding methodology of valuation, the Kreitzman Report identifies three methodologies that are typically considered when doing a valuation analysis – Capital Market, Income Method and Cost Method.[26]  Mr. Kreitzman indicates that the Cost Method (also referred to as the Asset Approach) would not provide a reasonable indicator of value.[27]

30.   The Kreitzman Report conclusions do include the Capital Market approach but is included for illustrative purposes only because he is uncertain that the selected guideline companies are comparable.  Again, he gives no supporting information for this statement for us to evaluate his claim[28] yet he includes it anyway.

31.   Ultimately, Mr. Kreitzman relies on the Income Method, described as the earning capacity of the subject company, derived from past, current or projected earnings streams "discounted at a rate sufficient to satisfy the investment and business risk of ownership.  The application of this approach is enhanced **when sufficient earnings history is available and relevant to the entity's future** [emphasis added], in order to provide a clear indication of expected future performance."[29]  Although Mr. Kreitzman himself includes this definition in his report, his report contains nothing to address the historical earnings sufficiency and the relationship to future projections.  In fact, as noted below, his report is internally inconsistent with this statement. At the time of potential purchase of the ACB, the company was part of a large, publicly traded company with a market capitalization of $226.1 million as of March 28, 2013[30] and with infrastructure to support it.  The "but for" company apparently would be a stand-alone entity containing only the ACB.

32.   For the Income Method, Mr. Kreitzman relies upon projections for the business which were provided by Mr. Salomon, in his capacity as President of the ACB, to Mr. David Gluck[31] at KSE.[32]  Mr. Kreitzman indicates "I believe these projections best reflect the business plan that would have been implemented absent the alleged breach of the terms of the term sheet and other wrongdoing alleged in this litigation."[33]  This is the only mention he makes of the reasoning for using what is by

---

[26] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 51.

[27] Ibid.

[28] Ibid.

[29] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 52.

[30] March 31, 2013 was Easter Sunday, so the last day of trading in March 2103 was on Thursday, March 28, 2013.  I used the weighted average common shares outstanding on the March 31, 2013 10-Q to calculate this amount.

[31] David Gluck is Executive Vice President, KSE Media, LLC and KSE Outdoor Sportsman Group, LLC.

[32] KSE/OC000413-000416.

[33] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 46.

far the highest projections available and not remotely reflective of the business' historical operations and results.

**Table 2 - Revenue Projections Comparison**

| Year Ended | Revenue Projected by Kreitzman[34] | Revenue Projected by KSE[35] | Actual Revenue[36] |
|---|---|---|---|
| 2014 | $        15,500,000 | $        11,153,000 | $        12,567,000 |
| 2015 | 22,000,000 | 11,376,000 | 11,854,000 |
| 2016 | 35,000,000 | 11,604,000 | 11,443,000 |
| 2017 | 42,400,000 | 11,836,000 | 11,271,000 |

33.  The Kreitzman Report projections include 17 systems in operation in 2013, increasing up to 78 in 2018.[37]  For events, there are 228 in 2013 increasing to 844 in 2018.[38]  Increasing the systems and events results in increased revenues from $12.7 million in 2013 to $52.2 million in 2018 resulting in an increase of compound annual growth rate (CAGR) of 33% in the projections versus 18% historical actual.[39]  Mr. Kreitzman fails to address the fact that the historical earnings history is grossly inconsistent with the projected future earnings that has a growth rate almost double the historical rate of increase.  Also, there is no semblance of the "but-for" stand-alone company compared to the reality post-merger with the ACB continuing as a segment of an established, and successful company in sports industry.

34.  The actual ACB revenue for 2017 was $11.2 million and only $1.72 million through June 30, 2018[40] (note that the full year amount would have to consider seasonal aspects).  Using the same percent of revenue for the full year of 2017 compared to the six months of January 31, 2017 through June 30, 2017, the extrapolated total 2018 amount is $14.4 million.

35.  The 2013 projections used in the Kreitzman Report include selling into the NFL teams extensively.  Per Scott Long, the ACB only has two NFL teams as customers, even today.[41]  The ACB did have 17-18 games for Monday Night football under contract since 2013, but also lost ESPN games in that period of time.[42]  No explanation of the divergence is provided by Mr. Kreitzman.

---

[34] KSE/OC 000413-416. Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, Table 6.

[35] Exhibit 360: KSE/OC:062679-062680.

[36] Exhibit 363.

[37] KSE/OC 000415.

[38] Ibid.

[39] Calculated based on the actuals used in Table 5 of the Kreitzman Report.  KSE/OC 000414.

[40] Exhibit 363.

[41] Rule 30(b)(6) Deposition of Scott M. Long, Kroenke Sports & Entertainment, LLC, dated September 5, 2018, 44:19 to 44:24.

[42] Ibid., 49:24 to 50:13.

36.  Historical margins were declining between 2004 and 2012[43], from a high of 66.1% in 2007 to 39.3% in 2012, reflecting an erosion to the gross margin even as the revenues increases.  However, the projections in the Kreitzman Report reflect increasing gross profit margins from 40.8% in 2013 and 46.2% in 2018[44].  No explanation is provided as to these conflicting trends in gross margin historically compared to the future estimated performance.

37.  Adding to the speculative nature of the economic damages in the Kreitzman Report is the fact that much of the value allocated to Mr. Salomon is based not on the equity he may have had at the time of the purchase but on shares and options he might have received, based on his proposal, in the future.  This compounds the unreliability of the analysis.  PNC and Mr. Salomon never agreed on the "Newco" equity structure for the purchase of the ACB, let alone any shares and options that might have been allocated in the future.

38.  The Federal Rules of Civil Procedure require an expert to provide his or her opinions and the bases therefore.  There are many examples where we have been unable to determine the basis for Mr. Kreitzman's projections and analysis, including the calculation of capital expenditures and working capital.  These amounts are taken from the projections of Mr. Salomon, but based upon the limited explanation of the calculations, we cannot recalculate the amounts.

39.  Mr. Kreitzman removes the KSE overhead charge from the projections without any substantiation as to his understanding of the nature of the services that were provided benefitting the ACB and what a stand-alone "Newco" would require to cover those same services.

40.  Prior to 2018, legal fees are reimbursed by insurance at 85% and the reimbursement is reflected in the historical amounts.  However, as of June 30, 2018, the year to date legal, accounting and professional fees is $834,000[45] which is overstated compared to prior years because no insurance reimbursement is reflected.  Mr. Kreitzman does not reflect any analysis of this fact nor provide an adjustment in his analysis.

41.  Table 5 in the Kreitzman Report refers to revenue, gross profit, and EBITDA as "recurring".  No description of recurring expenses is provided.  Mr. Kreitzman does not provide information on why he has limited his analysis to "recurring" and if there are any "non-recurring" expenses to consider.

42.  The selected tax rate in the valuation analysis has significant impact on the resulting value. One scenario of the valuation in the Kreitzman Report uses a tax rate well below 40% based upon an effective tax rate for entertainments services companies, while most corporations in the United States face a marginal corporate tax rate of up to 40% or greater after consideration of Federal, state and local taxes.  A corporation may pay an effective tax rate significantly below 40%.  The lower rate would be driven by a number of company specific factors. For example, a company with

---

[43] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, Table 5.  KSE/OC:000414.
[44] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, Table 6.  KSE/OC:000415.
[45] Exhibit 363.

global operations may have income taxed at different rates in different locales; a company may receive tax credits or benefit from offsetting taxable income with net operating losses; or realize a reduction in taxes due to tax benefits of depreciation or amortization, all of which would vary by company and the impact of which may only be for a finite period of time. The Kreitzman Report relies upon the data from the Damodaran online without any further diligence to assess whether the selected tax rate is applicable in this case.  Further, it is noted on the Damodaran website that *"In valuing a firm, should you use the marginal or the effective tax rates? If the same tax rate has to be applied to earnings every period, the safer choice is the marginal tax rate because none of the reasons noted above can be sustained in perpetuity"*[46].

43. Mr. Kretizman estimates a Weighted Average Cost of Capital ("WACC") to apply in present valuing the cash flows with the discounted cash flows analysis.  In estimating a WACC, the Capital Asset Pricing Model ("CAPM") is one method used to determine the estimated cost of equity.  In using this approach, a valuation appraiser will typically give consideration to a "small – stock premium" and "size premium", to reflect the impact of the size of the business on the risk of the cash flows.  It should be noted that typically size premiums are used most often by valuation analysts, to reflect the excess returns required on smaller securities after accounting for the systematic risk captured in the beta. [47] Data on size premiums is published in the Ibbotson SBBI Valuation Handbook and provides estimated size premiums determined by the company's equity. The Kreitzman Report shows no consideration of such data and the impact an appropriate size premium would have on the estimated WACC.  In this calculation, the small stock premium usually refers to the size of the business, but he provides no explanation for the use of the small stock premium considering that the use of the business size may have increased the rate.

44. The Kreitzman Report does not reflect adequate consideration of a company specific risk premium required in valuation standards to capture unsystematic risks of the particular industry and/or the company, including projection risks. Projection risks would include risks inherent within the forecast which may include, but not be limited to, risk in acquiring market share, achieving stated revenue through new customer acquisition and strategic partnerships and alliances, and achieving margin growth through operating efficiencies and fixed cost leverage.

45. There are multiple methodologies that can be considered to estimate the cost of equity in calculating the WACC, or to help corroborate the estimated WACC. No other approaches to calculating WACC were considered by Mr. Kreitzman. Further, venture capital rates of return can also be relied upon to assess risk and return commensurate with the stage of the business. Indicated venture capital rates of return vary from 20% up to 100% depending on the stage of development[48]. In other words, Mr. Kreitzman describes the ACB as an "emerging business" and it was to be funded by private equity.  A much higher discount rate would be indicated by such analysis, reducing the damages in all scenarios.

---

[46] http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/taxrate.htm
[47] James R. Hitchner, *"Financial Valuation, Application and Models"*. 3rd Edition. Pg. 202.
[48] *Valuation of Privately Held Company Equity Securities Issued as Compensation*, Practice Aid, Working Draft, 2012, American Institute of Certified Public Accountants, p. 114.

46.  The Kreitzman Report uses the Lazard Freres report without having sufficient information to evaluate its appropriateness for use in a damage quantification.[49]  Without the Lazard Freres report, no analyst would have sufficient information to assess the assumptions included therein. Absent that information, it is inappropriate to consider it to value any economic damages in this matter.

47.  The offer by PNC and Mr. Salomon should be the most relevant valuation to be used in estimating any purported economic damages in this case as it was prepared contemporaneously with information available at the time, and was made by Mr. Salomon as then President of the ACB. The offer was up to $4.05 million, including $3.65 million at closing, and potential litigation and royalty payments as described in the Term Sheet.  Although the offer was included in one of Mr. Kreitzman's damage analyses in his report, he does not give it any more significant weight than the other scenarios.  Additionally, the 2013 offer was not the only one made by Mr. Salomon; in October 2008 he provided an offer of only $2 million for the ACB.[50] Mr. Kreitman does not consider this fact.

48.  The AICPA practice aid on the Valuation of Privately-Held-Company Equity Securities Issued as Compensation (the "AICPA Practice Aid") provides guidance on estimating the fair market value of common stock of private companies. The AICPA Practice Aid indicates that the Black Scholes option-pricing method ("OPM") is most appropriate in situations in which the enterprise's value depends on how well it follows an uncharted path through its various opportunities and challenges. However, proper consideration needs to be given to the capital structure of the business and the rights and preferences of each share class.   The OPM treats the securities in a company's capital structure as a series of call options on the enterprise's value, with exercise prices based on the liquidation preferences and conversion values of the securities.  Value is allocated to the subject interest based upon the order of liquidation and the resulting incremental call option values. It is unclear in the Kreitzman Report how the order of liquidation and rights and preferences of each share class are considered. Further, given that the equity structure was never finalized, it is speculative to use any method, as there is uncertainty in what the rights and preferences would be for each share class, a key assumption to allocating value.  Inconsistent with Federal rules, no information is provided by Mr. Kreitzman that allows us to recreate his analysis from his report.

---

[49] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraphs 72 to 75 and tables 16 to 18.
[50] SALOMON500073.

**Opinion 4 - The disgorgement of Outdoor profits in any amount, let alone of $58.14 million, has not been established, through the necessary fundamental business valuation or forensic accounting analysis by Mr. Kreitzman with a reasonable degree of certainty given that there is no analysis of the factors that would be required before rendering such an opinion. It assumes disgorgement would be an available remedy, and is based on a thoroughly flawed premise that the entire increase in purchase price between InterMedia's first offering price and KSE's last was due to the ACB.  Additionally, the methodology premise is also flawed completely since the increased offering price for the merger did not benefit Outdoor, but the shareholders who held the stock at the time of the transaction, so there was no benefit by Outdoor which could be disgorged. This renders the opinion speculative and unreliable. It also does not reflect in any way the profits achieved post-merger with KSE.**

49.   Mr. Kreitzman's short articulation for the $58.14 million disgorgement amount is based upon the difference in sales price between the original InterMedia agreement for $8 per share and the KSE merger agreement for $10.25 per share.  The InterMedia agreement purportedly "respected the sale of the Aerial Camera Business"[51] presumably referring to the hypothetical "Newco" to be created by PNC and Mr. Salomon.  Meanwhile the KSE merger agreement, according to Mr. Kreitzman, included all of Outdoor, including its subsidiaries.  Therefore, Mr. Kreitzman attributes the entire increase of $2.25 per share to the ACB.  The total amount of this difference on 25.84 million shares equals the $58.14 million in additional profits according to the Kreitzman Report.

50.   The Kreitzman Report fails to provide any analysis of the competing offers and what differences drove the value by either party.  There are no valuations to evaluate what those drivers were.  These additional steps are necessary to determine the appropriateness of the methodology.  Without the analysis, there is no basis on which to use the methodology because he has not established a causal link between the alleged wrongful actions and the economic damages calculated.

51.   Mr. Kreitzman also provides no such analysis or understanding of the factors driving the $8 or $10.25 per share value by InterMedia and KSE, respectively, nor the other offers that were made throughout the negotiation period.  Based on the limited description provided by Mr. Kreitzman, the only difference he assumes is the inclusion or exclusion of the ACB and without explanation infers that the ACB drives the entire difference.  By doing so, Mr. Kreitzman fails to recognize facts and data that indicate that the difference in the values is not related to the ACB.

52.   Mr. Kreitzman's flawed analysis compares the original bid of $8.00 per share to the $10.25 per share bid by KSE to determine his disgorgement amount.  However, he failed to take into account that on May 3, 2013 InterMedia increased its offer to $9.75 per share[52].  Given that Mr. Kreitzman's logic, however flawed, is that the InterMedia offer excluded the ACB, it would have consistently

---

[51] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 81.
[52] Schedule 14A, May 6, 2013, Outdoor Channel Holdings, Inc.

excluded it in the $8.00 and $9.75 per share offers.  Therefore, InterMedia increased its offer by 22% without any change in the assumptions related to the ACB.

53.   Another flaw in the disgorgement of Outdoor profits is that Outdoor itself did not receive the benefits which the Kreitzman Report seeks to disgorge.  The proceeds of the transaction price at any level inured to the shareholders of Outdoor, at the time a partially publicly traded company with 41% of the shares held private.   Therefore, there is no basis for the opinion since the benefit to disgorge any amount related to an increased offering price does not exist.

54.   The ACB was a very small business segment within the total stock purchase contemplated by the InterMedia and KSE offers.  It is unreasonable and unsupported to infer that the ACB would drive this much difference in values.  The data reflects that for the three years prior to the sale of the business, 2010 to 2012, the ACB division was only 11%, 12% and 16%, respectively, compared to total Outdoor Channel revenues.  See Table 3 below for the ACB revenues compared to the Outdoor revenues.

**Table 3 - ACB and Outdoor Revenues**

| Year Ended | ACB | Outdoor | % of Total Outdoor |
|---|---|---|---|
| 2010[53] | $ 9,140,000 | $   83,342,000 | 10.97% |
| 2011[53] | 8,663,000 | 71,855,000 | 12.06% |
| 2012[54] | 12,018,000 | 77,322,000 | 15.54% |

55.   To further illustrate this point, James Martin, President and CEO of KSE, testified that he never even discussed the term sheet for the sale of the ACB with Mr. Kroenke because it was not material.[55]  In response to a query to Roger Werner, Outdoor CEO until January 2012, regarding his interest in investing with Mr. Salomon and PNC, he indicated that his interest was not particularly high because the ACB was a low margin, capital intensive business that was challenging.[56]

56.   Despite the inference by Mr. Kreitzman that the ACB drove the increase in offers by the two competing companies for the stock of $58.14 million, evidence indicates that there was no valuation done of the ACB during the period from February 27, 2013 to May 16, 2013.[57]  If in fact the ACB was the driver to the offers being made, it is unlikely a valuation would not have been performed.

---

[53] Form 10-K, December 31, 2011, Outdoor Channel Holdings, Inc.

[54] Form 10-K, December 31, 2012, Outdoor Channel Holdings, Inc.

[55] Deposition of James A. Martin, dated August 30, 2018, 85:15 to 86:5.

[56] Deposition of Roger Werner, dated June 7, 2018, 68:7 to 69:4.

[57] Rule 30(b)(6) Deposition of Scott M. Long, Kroenke Sports & Entertainment, LLC, dated September 5, 2018, 119:25 to 120:15.

57. Absent a valuation of the ACB at the time, Mr. Kreitzman could have considered the bids which were submitted in an effort to purchase the ACB. PNC and Mr. Salomon, with the access to contemporaneous information at the time, submitted a bid valuing the purchase of up to $4.05 million.[58] Other contemporaneous offers included offers from Aspen Group on February 24, 2013[59] and SF Captial Group on February 26, 2013[60]. Both of these offers were for $4.5 million. No explanation or reconciliation is provided in the Kreitzman Report for the 13 to 14 times increase in value in the purchase by KSE.

58. During the course of this proceeding, Mr. Salomon requested and received in response to his interrogatories a chart of EBITDA and Unlevered Free Cash Flow for the years 2009 through 2017. For pre-sale period (2009 through 2012), cumulative EBITDA and Unlevered Free Cash Flow was ($2,323,000) and ($5,613,000), respectively. Post sale for the period 2013 – 2017, the cumulative EBITDA and Unlevered Free Cash Flow was $5,568,000 and $212,000 respectively. Mr. Kreitzman does not explain how such a low performing company could create $58.14 million of value to Outdoor.

59. Mr. Kreitzman's failure to consider these factors does not establish a causal link on which Mr. Kreitzman can establish any amount under disgorgement, and there certainly is no substantial analysis to support the sum of $58.14 million. In fact, the evidence within the Kreitzman Report for the purported value of the ACB in the benefit of the bargain damages section of his report, which is itself flawed and unreliable, is completely inconsistent with this amount, reflecting no more than $1,023,809[61].


*Karyl N. Van Tassel*

_____

October 12, 2018


---

[58] Exhibit 302: KSE/OC:000947-000950.

[59] Deposition of Thomas D. Allen, dated June 20, 2018, 43:14 to 45:8. And related exhibit number 122.

[60] Ibid., 48:21 to 49:24. And related exhibit number 123.

[61] Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018, paragraph 7.

**BDO**



kvantassel@bdo.com
Direct:    713-407-3878
Mobile:   713-504-8778

2929 Allen Parkway, 20th
Floor
Houston, Texas 77019

Tel:      713-960-1706
Fax:      713-960-9549
www.bdo.com

# KARYL M. VAN TASSEL, CPA

Managing Director

## EXPERIENCE

Karyl Van Tassel, Managing Director in the Houston office of BDO, has over thirty years of experience providing dispute and investigative services.  She works with clients to address financial damages, forensic accounting, economic and valuation challenges they face in a wide variety of litigation and investigation matters including securities, intellectual property, breach of contract, antitrust, lender liability, fraud, forensic accounting and wrongful terminations.

Karyl has a proven track record of working with clients to deliver high-value solutions to their most complex litigation and financial challenges.  Audit committees and companies have retained her to assist in investigating allegations of accounting and financial improprieties.  She has appeared before the Department of Justice and the Securities and Exchange Commission to deliver investigation findings.  Court appointed receivers have also relied on her to provide financial consulting services.

Prior to joining BDO she held various positions at international accounting and consulting firms, including as a partner at PricewaterhouseCoopers (PwC) in the Advisory Forensic Services practice where she was also the Forensic Energy Sector leader based in Houston.  Prior to joining PwC, she was a Senior Managing Director in the FTI Consulting Forensic and Litigation Consulting practice.  She was a former partner in KPMG's Forensic Dispute Advisory Services practice as well.   Early in her career she provided audit and tax services to oil and gas companies, manufacturing facilities, high technology companies, auto dealerships, construction clients and governmental agencies.  Karyl has also provided accounting services and investment analysis to financial institutions.

Forensic Accounting

- Retained by court appointed receiver in one of the largest alleged Ponzi schemes in the U.S to lead the forensic accounting investigation and data preservation efforts. Led a team of over 100 professionals from the inception of the receivership to identify assets of the financial institution and more than 100 related companies, trace cash movements between the entities, monetize assets for investors, as well as to preserve information, data and assets of the estate.  She assisted in the establishment of the claims process for several thousand investors.  Assisted various regulators including the DOJ, SEC, IRS, and US Postal Service among others by providing information obtained during the course of the investigation.  Provided over forty declarations and affidavits in cases pending in several domestic and foreign jurisdictions.  Provide testimony in deposition and hearings related to sources of assets, the characteristics of a Ponzi scheme, cash tracing and sources of funds within the various organizations.

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company. Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company. After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources. Worked with receiver on monetizing assets recovered.

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms.



- Performed various forensic "audits" based upon contract requirements, regulatory requirements, and/or standard industry practices for energy sector clients.  These involve preparing direct expert and rebuttal reports, and testifying in arbitration and trial.  These involve royalty disputes, analysis of joint interest billing (JIB), take or pay contracts, as well as other contract and regulatory issues.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures. Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings. As a result of our work, have reported to head of enforcement at the Department of Justice. With the three-year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by audit committee of a drilling company to investigate issues related to potential FCPA violations. One issue involved potential payments by the company to paramilitary groups in a Latin American country for protection of its rigs against attack. Work involved determining whether payments were made by false invoices from an authorized vendor, the authenticity of the endorsements and bank accounts used for payments to these vendors, and the background investigatory work to determine ultimate recipient of funds. Additionally, investigated payments made in a West African country to a freight handler and potential governmental authorities. Analyzed invoices and payments, traced cash used to fund payments to the various entities to determine source of the funds, determined completeness through general ledger testing, and compiled findings for reporting to the Department of Justice.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements. Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates. Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options. Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved. Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans. Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates.  Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

Appendix 1



- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regard to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Retained by a lender to the defendant in a case involving an alleged Ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials. Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

## Energy Industry

Having led forensic and dispute practices in both Denver and Houston, Ms. Van Tassel's thirty-year career in accounting and consulting has continually focused on the oil and gas sector, including global integrated oil and gas companies, oil field services, refineries, petro-chemical and mid-stream companies.  She has provided auditing, consulting, expert witness and investigatory services for the industry.

- Early in her career, she audited various oil and gas companies, involving knowledge of oil and gas accounting in all facets of the audit.  Stemming from this audit experience and with knowledge attained by subsequent accounting matters, she has also provided consulting and expert witness services on accounting issues, including COPAS, Generally Accepted Accounting Principles (GAAP), International Accounting Standards (IAS) and International Financial Reporting Standards (IFRS).



- Throughout her career, she has been retained by major independent oil and gas companies to analyze royalty claims brought by various leaseholders on properties in Louisiana, Oklahoma, Texas, Kansas and Colorado.

Select case examples include:

- Analyzed joint-interest-billing processes, controls and accounting to determine whether sufficient systems, policies and procedures were in place to provide accurate JIB accounting for multiple parties.

- Analyzed the costs related to gas gathering systems in a dispute by joint venture partners related to technical system issues.

- Analyzed economic damages and provided financial analyses in many contract disputes for oil and gas and related companies including take or pay contracts, gas contract price revisions and JIB accounting issues.

- Analyzed damages sustained by a company due to imbalances in production of petro-chemicals.   Provided various analyses regarding different economic outcomes based on proposed business settlements between the parties.

- In the Eagleford shale play, retained by global energy company to analyze contractual agreements with joint venture partners related to thousands of leasehold interests, including costs to obtain leases, drilling and operation costs, royalty payments and tracing cash distribution.

-  Provided services to major energy company in regards to the issues in the California energy grid cases for compliance with regulatory issues and allegations of impropriety in delivery contracts.

- Consulted with companies on managing and implementing systems to appropriately monitor leasehold interests, royalty payments and contractual terms.

- Provided services to various companies and boards of directors related to round trip trading in the oil and gas industry, including analyzing back, middle and front office practices to determine potential control weaknesses and volume of potential "round trip" transactions and impact on financial reporting.  Presented findings to the Department of Justice and Securities and Exchange Commission.

- Performed an investigation into the accounting for oil and gas reserves by a major independent upstream oil and gas company.

Contract Disputes

- Analyzed payments made under agreements between joint venture partners or under third party contracts for the pricing of natural gas, oil, chemicals, feedstock and other products in the energy sector.

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

-  Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third-party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.



- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

## Intellectual Property

- Analyzed the economic damages allegedly sustained by companies alleging theft of trade secrets in the energy, high tech manufacturing, and telecommunications sectors.  Calculated losses on a variety of bases based upon the circumstances of the case including the Plaintiff's losses, Defendant's profits (unjust enrichment), reasonable royalty and other methods for payment of property misappropriated.   Performed detailed analysis of client overlaps, working with industry experts as needed.

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of non-infringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.



- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser device used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers' decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a non-compete agreement as well as infringing use of trademarks.



- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000 and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

Insurance Claims

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightning strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several businesses related to extended power outages related to a major train derailment.

Post-Acquisition Disputes

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.



## Construction Industry

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.

## Telecommunications

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period.

- Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block" license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

## Miscellaneous

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.

- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

Appendix 1



- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

Publications

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Total Tape Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

Speaking Engagements

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

- FCPA/Anti-Corruption Basic Training

- FCPA/Anti-Corruption Due Diligence

- Current SEC/DOJ Recent Developments

## PROFESSIONAL AFFILIATIONS

Certified Public Accountant, Texas

American Institute of Certified Public Accountants

Texas Society of Certified Public Accountants

## EDUCATION

Bachelor of Science, Business Administration-Accounting         University of Northern Colorado



| Summary of Testimony | | | |
|---|---|---|---|
| **Case** | **Case Number** | **Type of Testimony** | **Year** |
| *SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc.* v. *Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer* | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | 2004 |
| *David Graben and Frank Strickler* v. *Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton* | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | 2005 |
| *Rodney Montello, et al* v. *Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation* | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | 2006 |
| *Bencor, Inc.* v. *The Variable Annuity Life Insurance Company* | AAA Arbitration | Arbitration | 2006 |
| *Highland Crusader Offshore Partners, L.P. et al* v. *Motient Corporation* | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | 2007 |
| *Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium)* v. *Punch Technix N.V. (The Netherlands), et al* | In the International Chamber of Commerce Court of Arbitration | Arbitration | 2008 |
| *Fair Isaac Corporation* v. *Texas Mutual Insurance Company* | Civil Action No. 4:05-CV-03007 in the United States District Court for the Southern District of Texas Houston Division | Deposition | 2008 |



| Summary of Testimony | | | |
|---|---|---|---|
| **Case** | **Case Number** | **Type of Testimony** | **Year** |
| *RCA Holdings, Ltd, et al., v. Commonwealth Insurance Company, et al.* | Cause No. 2004-02048 in the 61st Judicial District Court of Harris County Texas | Deposition | 2010 |
| *Arthur R. Hausmann; Arthur R. Hausmann P.C. Defined Benefit Pension Plan; and Arthur R. Hausmann P.C. Defined Benefit Pension Plan Trust* v. *Union Bank of California, N.A. Investment Services LLC; The Hartford Life and Annuity Insurance Company; Christopher Montagna; William Fortner; Economic Concepts, Inc. ("ECI"); and DOES 1-100* | Case Number: SA CV 07-1436 AHS (MLGx) in the United States District Court, Central District of California | Deposition | 2010 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v. James R. Alguire, et al* | Case No. 3:09-CV-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2010 |
| *Laura Pendergest-Holt, et al. v. Certain Underwriters at Lloyd's of London, et al.* | Case No. 3:09-cv-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2010 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v James R. Alguire, et al* | Case No. 03:09-CV-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2011 |
| *In re Stanford International Bank, Ltd., Debtor in a Foreign Proceeding* | Case No. 3:09-cv-0721-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2011 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v Dillon Gage Inc. of Dallas and Dillon Gage Inc.* | Case No. 03:10-cv-01973-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2012 |



| Summary of Testimony | | | |
|---|---|---|---|
| **Case** | **Case Number** | **Type of Testimony** | **Year** |
| *Securities and Exchange Commission v Daniel Bogar, Bernerd E. Young, and Jason T. Green* | Administrative Proceeding File No. 3-15003 before the Securities and Exchange Commission of the United States of America | Testimony | 2013 |
| *Ralph S. Janvey, in his Capacity as Court-Appointed receiver for the Stanford International Bank Ltd., et al. and the Official Stanford Investors Committee v. Peter F. Romero* | Case No. 3:11-cv-00297-N-BG in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2014 |
| *Ralph S Janvey, In his capacity as court-appointed receiver for the Stanford International Bank, LTD. ET AL., and the official Stanford Investors Committee, Plaintiffs, VS. the University of Miami* | Cause  No.3:11-cv-00041 in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2015 |
| *Ralph S. Janvey, in his Capacity as Court-Appointed receiver for the Stanford International Bank LTD., ET AL. and the Official Stanford Investors Committee vs. Peter F Romero* | Civil Action No. 3:11-cv-00297-N-BG In the United States District Court for the Northern District of Texas Dallas Division | Testimony | 2015 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v Dillon Gage Inc. of Dallas and Dillon Gage Inc.* | Case No. 03:10-cv-01973-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition (2) | 2015 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v Dillon Gage Inc. of Dallas and Dillon Gage Inc.* | Case No. 03:10-cv-01973-N in the United States District Court for the Northern District of Texas Dallas Division | Trial Testimony | 2015 |



| Summary of Testimony | | | |
|---|---|---|---|
| **Case** | **Case Number** | **Type of Testimony** | **Year** |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al. and the Official Stanford Investors Committee v. Adams & Reese, LLP, et al.* | Case No. 3:12-cv-0495- N-BL in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2015 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al. v. James R. Alguire, et al.* | Case No. 3:09-CV-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2015 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al. v. Patricia Maldonado* | Case No. 03:14-cv-2826-N in the United States District Court for the Northern District of Texas Dallas Division | Trial Testimony | 2015 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v. GMAG LLC, Magness Securities LLC, and Gary D. Magness, Individually and in His Capacity as Trustee of the Gary D. Magness Irrevocable Trust* | Case No. 3:15-CV-0401- N-BG in the United States District Court for the Northern District of Texas Dallas Division | Depositions (4) | 2016 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al. v. Daniel T. Bogar, et al.* | Case No. 3:14-CV-3635- N-BG in the United States District Court for the Northern District of Texas Dallas Division | Deposition | 2016 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al v. GMAG LLC, Magness Securities LLC, and Gary D. Magness, Individually and in His Capacity as Trustee of the Gary D. Magness Irrevocable Trust* | Case No. 3:15-CV-0401- N-BG in the United States District Court for the Northern District of Texas Dallas Division | Trial Testimony | 2017 |



| Summary of Testimony | | | |
|---|---|---|---|
| Case | Case Number | Type of Testimony | Year |
| *Tech Pharmacy Services, LLC v. Alixa Rx LLC and Golden Gate National Senior Care LLC d/b/a Golden Living Centers* | Civil Action No. 4:14-cv00766-ALM in the United States District Court for the Eastern District of Texas, Sherman Division | Deposition Trial Testimony | 2017 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, and Thomas V. Sjoblom* | Civil Action No. 3:13-cv-00477-N in the United States District Court for the Northern District of Texas, Dallas Division | Deposition | 2018 |
| *Peggy Roif Rotstain, et al. and the Official Stanford Investors Committee v. Trustmark National Bank, et al.* | Civil Action No. 3:09-cv-2384-N in the United States District Court for the Northern District of Texas, Dallas Division | Deposition | 2018 |
| *Harlow Management, L.L.C. and Minaki Capital Investments, LLC v. Stites Management, L.L.C, Dale Stites, Michael T. Stites, East Texas Precast Co., Ltd., Gulf Shore Erectors, LLC, and Gulf Coast Precast Erectors, LLC v. Robert Diakiw, Richard Schultz, Tom Haines, Hussein Sinjari, Pat Cooledge, Jeronimo Trejo, Helen Huereca, Construction Materials and Building Services, LLC, Southwest Commodities Brokers, LLC, Legacy Precast, LLC and Legacy Precast Administrative Group, LLC* | Cause No. 2013-25191 in the District Court of Harris County, Texas, 133rd Judicial District | Deposition | 2018 |

App. 133

Bates Numbered Documents

KSE/OC:000413-000416
KSE/OC:001369-001372
KSE/OC:028348-028687
KSE/OC:029024-029562
KSE/OC:029657-029658
KSE/OC:030645-030646
KSE/OC:030917-030956
KSE/OC:038407-038565
KSE/OC:043867-043874
KSE/OC:043875-044054
KSE/OC:044055-044193
KSE/OC:044194-044361
KSE/OC:044362-044944
KSE/OC:044945-045486
KSE/OC:045487-046170
KSE/OC:046171-046294
KSE/OC:046295-046408
KSE/OC:046409-046524
KSE/OC:046525-046616
KSE/OC:046617-046857
KSE/OC:046858-047049
KSE/OC:047050-047246
KSE/OC:047247-047244
KSE/OC:047545-047704
KSE/OC:047705-047848
KSE/OC:047849-047999
KSE/OC:048000-048138
KSE/OC:048139-048265
KSE/OC:048266-048438
KSE/OC:048439-048612
KSE/OC:048613-048798
KSE/OC:048799-048595
KSE/OC:048956-049128
KSE/OC:049129-049352
KSE/OC:049353-049550
KSE/OC:049551-049678
KSE/OC:049679-049780
KSE/OC:049781-049981
KSE/OC:049982-050156
KSE/OC:050157-050347
KSE/OC:050348-050535
KSE/OC:050536-050792
KSE/OC:050793-050998
KSE/OC:050999-051182
KSE/OC:051183-051427
KSE/OC:051428-051825
KSE/OC:051826-052104
KSE/OC:052105-052403
KSE/OC:052404
KSE/OC:052472-052480
KSE/OC:052706
KSE/OC:052707
KSE/OC:053255-053346
KSE/OC:053347-053442
KSE/OC:053443
KSE/OC:053444-053646
KSE/OC:053647-053798

Bates Numbered Documents

KSE/OC:053799-053917
KSE/OC:053918-054068
KSE/OC:054069-054194
KSE/OC:054195-054337
KSE/OC:054338-054517
KSE/OC:054518-054653
KSE/OC:054654-054801
KSE/OC:054802-055038
KSE/OC:055039-055249
KSE/OC:055250-055454
KSE/OC:055455-055707
KSE/OC:055708-056588
KSE/OC:056589-057074
KSE/OC:057075-057115
KSE/OC:057116-057771
KSE/OC:057772-058028
KSE/OC:058029-058771
KSE/OC:058772-059122
KSE/OC:059123-059953
KSE/OC:059954-060372
KSE/OC:060373-060430
Salomon005000-005046
SALOMON500071-500075

Deposition Transcripts

Deposition Transcript of David Brian Gluck, dated August 22, 2018
Deposition Transcript of Henry Steinbrecher, dated June 26, 2018
Deposition Transcript of Cathy Lee, dated June 12, 2018
Deposition Transcript of Thomas E. Hornish, dated June 13, 2018
Deposition Transcript of Thomas D. Allen, dated June 20, 2018
Deposition Transcript of James A. Martin, dated August 30, 2018
Rule 30(b)(6) Deposition Transcript of Scott M. Long for Kroenke Sports & Entertainment, LLC, dated September 5, 2018
Deposition Transcript of Nic Salomon, dated May 16, 2018
Deposition Transcript of Roger Werner, dated June 7, 2018
Deposition Transcript of Jeff Dean Holowaty, dated July 17, 2018
Deposition Transcript of Nic Salomon, dated March 1, 2018

| Deposition Exhibit Number | Bates Number |
| --- | --- |
| Exhibit 01 | Salomon003247-003252 |
| Exhibit 02 | Salomon002097 |
| Exhibit 03 | Salomon006964 |
| Exhibit 04 | Salomon006965 |
| Exhibit 05 | Salomon007070 |
| Exhibit 06 | No bates |
| Exhibit 07 | KSE/OC:000033 |
| Exhibit 08 | KSE/OC:000039 |
| Exhibit 09 | KSE/OC:000042-000043 |
| Exhibit 10 | KSE/OC:000040-000041 |
| Exhibit 11 | Salomon002692-002696 |
| Exhibit 12 | KSE/OC:000053-000059 |
| Exhibit 13 | KSE/OC:031081-031082 |
| Exhibit 14 | Salomon004717-004723 |
| Exhibit 15 | KSE/OC:000073-000075 |
| Exhibit 16 | KSE/OC:000082-000085 |
| Exhibit 17 | KSE/OC:000120 |
| Exhibit 18 | KSE/OC:000122 |
| Exhibit 19 | KSE/OC:000124 |

| Deposition Exhibit Number | Bates Number |
|---|---|
| Exhibit 20 | Salomon004545-004549 |
| Exhibit 21 | Salomon004550-004555 |
| Exhibit 22 | Salomon002545-002551 |
| Exhibit 23 | Salomon004556-004562 |
| Exhibit 24 | Salomon004573-004584 |
| Exhibit 25 | Salomon004585-004591 |
| Exhibit 26 | KSE/OC:000169-000173 |
| Exhibit 27 | KSE/OC:000174-000175 |
| Exhibit 28 | Salomon004542-004544 |
| Exhibit 28 | KSE/OC:000181 |
| Exhibit 30 | KSE/OC:000198-000205 |
| Exhibit 31 | Salomon004520-004529 |
| Exhibit 32 | Salomon002521-002533 |
| Exhibit 33 | Salomon002534-002535 |
| Exhibit 34 | KSE/OC:000219-000220 |
| Exhibit 35 | KSE/OC:000223-000224 |
| Exhibit 36 | KSE/OC:000225-000231 |
| Exhibit 37 | KSE/OC:000232-000234 |
| Exhibit 38 | KSE/OC:000235-000237 |
| Exhibit 39 | KSE/OC:000238-000239 |
| Exhibit 40 | KSE/OC:000240-000245 |
| Exhibit 41 | KSE/OC:000246-000247 |
| Exhibit 42 | KSE/OC:000261-000264 |
| Exhibit 43 | No bates |
| Exhibit 44 | KSE/OC:000278 |
| Exhibit 45 | KSE/OC:000291-000293 |
| Exhibit 46 | KSE/OC:000369-000370 |
| Exhibit 47 | KSE/OC:000371-000373 |
| Exhibit 48 | Salomon000067-000068 |
| Exhibit 49 | KSE/OC:000279-000281 |
| Exhibit 50 | KSE/OC:000384-000385 |
| Exhibit 52 | No bates |
| Exhibit 53 | Salomon000106-000107 |
| Exhibit 54 | KSE/OC:000413-000416 |
| Exhibit 55 | KSE/OC:000418 |
| Exhibit 56 | KSE/OC:000419-000426 |
| Exhibit 57 | Salomon007120 |
| Exhibit 58 | KSE/OC:000429-000430 |
| Exhibit 59 | KSE/OC:000435-000436 |
| Exhibit 60 | KSE/OC:000439-000441 |
| Exhibit 61 | KSE/OC:000443-000446 |
| Exhibit 62 | KSE/OC:000447-000448 |
| Exhibit 63 | KSE/OC:000466-000467 |
| Exhibit 64 | Salomon007117-007119 |
| Exhibit 65 | No bates |
| Exhibit 66 | KSE/OC:028055 |
| Exhibit 67 | KSE/OC:028076 |
| Exhibit 68 | KSE/OC:028056-028057 |
| Exhibit 69 | KSE/OC:028078 |
| Exhibit 70 | KSE/OC:028077 |
| Exhibit 71 | KSE/OC:028058 |
| Exhibit 72 | KSE/OC:028059-028063 |
| Exhibit 73 | KSE/OC:028064 |
| Exhibit 74 | KSE/OC:028080 |
| Exhibit 75 | KSE/OC:028083-028087 |
| Exhibit 76 | KSE/OC:028065-028066 |
| Exhibit 77 | KSE/OC:028079 |

| Deposition Exhibit Number | Bates Number |
|---|---|
| Exhibit 78 | KSE/OC:028081-028082 |
| Exhibit 79 | KSE/OC:030917; KSE/OC:030927 |
| Exhibit 80 | KSE/OC:000947-000950 |
| Exhibit 81 | KSE/OC:030880-030883 |
| Exhibit 82 | W/2069321 |
| Exhibit 83 | W/2069708 |
| Exhibit 84 | KSE/OC:000386-000390 |
| Exhibit 85 | No bates |
| Exhibit 86 | w/2105847 |
| Exhibit 87 | No bates |
| Exhibit 88 | No bates |
| Exhibit 89 | KSE/OC:000013 |
| Exhibit 90 | KSE/OC:000040-000041 |
| Exhibit 91 | KSE/OC:000044 |
| Exhibit 92 | KSE/OC:036630 |
| Exhibit 93 | KSE/OC:036521 |
| Exhibit 94 | Salomon004717-004722 |
| Exhibit 95 | KSE/OC:000109-000110 |
| Exhibit 96 | KSE/OC:000105-000108 |
| Exhibit 97 | KSE/OC:000116-000119; Salomon004614-004617 |
| Exhibit 98 | KSE/OC:000123 |
| Exhibit 99 | KSE/OC:000178-000180; Salomon004542-004544 |
| Exhibit 100 | KSE/OC:000223-000224 |
| Exhibit 101 | KSE/OC:000371-000373 |
| Exhibit 102 | No bates |
| Exhibit 103 | KSE/OC:000405-000412 |
| Exhibit 104 | KSE/OC:027994-028042 |
| Exhibit 105 | No bates |
| Exhibit 106 | No bates |
| Exhibit 107 | KSE/OC:036080-036119 |
| Exhibit 108 | No bates |
| Exhibit 109 | No bates |
| Exhibit 110 | w/2069708 |
| Exhibit 111 | KSE/OC:000907-000908 |
| Exhibit 112 | KSE/OC:000374 |
| Exhibit 113 | KSE/OC:030894 |
| Exhibit 114 | KSE/OC:030896 |
| Exhibit 115 | No bates |
| Exhibit 116 | No bates |
| Exhibit 117 | No bates |
| Exhibit 118 | No bates |
| Exhibit 119 | No bates |
| Exhibit 120 | KSE/OC:000391-000396 |
| Exhibit 121 | No bates |
| Exhibit 122 | No bates |
| Exhibit 123 | No bates |
| Exhibit 124 | No bates |
| Exhibit 125 | No bates |
| Exhibit 126 | No bates |
| Exhibit 127 | No bates |
| Exhibit 128 | No bates |
| Exhibit 129 | No bates |
| Exhibit 130 | No bates |
| Exhibit 131 | No bates |
| Exhibit 132 | No bates |
| Exhibit 133 | KSE/OC:000015-000025 |
| Exhibit 134 | KSE/OC:000014 |

| Deposition Exhibit Number | Bates Number |
|---|---|
| Exhibit 135 | KSE/OC:000039 |
| Exhibit 136 | KSE/OC:042488-042489 |
| Exhibit 137 | KSE/OC:000042-000043 |
| Exhibit 138 | KSE/OC:000045-000046 |
| Exhibit 139 | KSE/OC:000060-000062 |
| Exhibit 140 | KSE/OC:000282-000283 |
| Exhibit 141 | KSE/OC:000299-000300 |
| Exhibit 142 | KSE/OC:000376-000377 |
| Exhibit 143 | KSE/OC:000431-000432 |
| Exhibit 144 | No bates |
| Exhibit 145 | No bates |
| Exhibit 146 | No bates |
| Exhibit 147 | No bates |
| Exhibit 148 | No bates |
| Exhibit 149 | No bates |
| Exhibit 150 | No bates |
| Exhibit 151 | No bates |
| Exhibit 152 | No bates |
| Exhibit 153 | No bates |
| Exhibit 154 | No bates |
| Exhibit 155 | No bates |
| Exhibit 156 | No bates |
| Exhibit 157 | No bates |
| Exhibit 158 | No bates |
| Exhibit 159 | No bates |
| Exhibit 160 | No bates |
| Exhibit 161 | No bates |
| Exhibit 300 | KSE/OC:030880-030883 |
| Exhibit 301 | KSE/OC:042936 |
| Exhibit 302 | KSE/OC:000947-000950 |
| Exhibit 303 | KSE/OC:030894 |
| Exhibit 304 | KSE/OC:028341-028342 |
| Exhibit 305 | KSE/OC:052782-052783 |
| Exhibit 306 | KSE/OC:000608-000611 |
| Exhibit 307 | KSE/OC:052784 |
| Exhibit 308 | KSE/OC:000375 |
| Exhibit 309 | KSE/OC:030896 |
| Exhibit 310 | KSE/OC:052805-052811 |
| Exhibit 311 | KSE/OC:052812-052819 |
| Exhibit 312 | KSE/OC:030235 |
| Exhibit 313 | KSE/OC:052405-052411 |
| Exhibit 314 | KSE/OC:000413-000416 |
| Exhibit 315 | KSE/OC:052418-052420 |
| Exhibit 316 | KSE/OC:052997-052999 |
| Exhibit 317 | KSE/OC:032939-032943 |
| Exhibit 318 | KSE/OC:052516-052517 |
| Exhibit 319 | KSE/OC:052518-052519 |
| Exhibit 320 | KSE/OC:052520-052527 |
| Exhibit 321 | KSE/OC:052538-052541 |
| Exhibit 322 | KSE/OC:053015-053016 |
| Exhibit 323 | KSE/OC:000443-000446 |
| Exhibit 324 | KSE/OC:053051-053052 |
| Exhibit 325 | KSE/OC:053063-053064 |
| Exhibit 326 | KSE/OC:000449-000451 |
| Exhibit 327 | KSE/OC:052670-052675 |
| Exhibit 328 | KSE/OC:052889-052892 |

| Deposition Exhibit Number | Bates Number |
| --- | --- |
| Exhibit 329 | KSE/OC:052680 |
| Exhibit 330 | KSE/OC:001985 |
| Exhibit 331 | KSE/OC:027980-027981 |
| Exhibit 332 | KSE/OC:001986-001987 |
| Exhibit 333 | KSE/OC:052705-052709 |
| Exhibit 334 | KSE/OC:000477-000491 |
| Exhibit 335 | KSE/OC:000987 |
| Exhibit 336 | KSE/OC:000495 |
| Exhibit 337 | KSE/OC:000518-000523 |
| Exhibit 338 | KSE/OC:000700-000703 |
| Exhibit 339 | KSE/OC:052431-052432; KSE/OC:053187-053254 |
| Exhibit 340 | KSE/OC:052471-052509 |
| Exhibit 341 | KSE/OC:000947-000950 |
| Exhibit 342 | KSE/OC:061154-061156 |
| Exhibit 343 | KSE/OC:043020-043021 |
| Exhibit 344 | KSE/OC:030896 |
| Exhibit 345 | KSE/OC:030235 |
| Exhibit 346 | KSE/OC:052405-052411 |
| Exhibit 347 | KSE/OC:052418-052420 |
| Exhibit 348 | KSE/OC:062208-062210 |
| Exhibit 349 | KSE/OC:052558-052559 |
| Exhibit 350 | KSE/OC:052613-052614 |
| Exhibit 351 | KSE/OC:031070-031080 |
| Exhibit 352 | KSE/OC:053139-053142 |
| Exhibit 353 | KSE/OC:053151-053155 |
| Exhibit 354 | KSE/OC:052736-052765 |
| Exhibit 355 | KSE/OC:037798-037799 |
| Exhibit 356 | KSE/OC:000900-000950 |
| Exhibit 357 | KSE/OC:000877-000878 |
| Exhibit 358 | KSE/OC:062676-062678 |
| Exhibit 359 | KSE/OC:000735-000737 |
| Exhibit 360 | KSE/OC:062679-062680 |
| Exhibit 361 | No bates |
| Exhibit 362 | KSE/OC:043867-043874 |
| Exhibit 363 | No bates |
| Exhibit 364 | No bates |
| Exhibit 365 | KSE/OC:052404 |
| Exhibit 366 | KSE/OC:029657-029658 |
| Salomon March 2018 Depo Exhibit 1 | No bates |
| Salomon March 2018 Depo Exhibit 2 | No bates |
| Salomon March 2018 Depo Exhibit 3 | No bates |
| Salomon March 2018 Depo Exhibit 4 | No bates |
| Salomon March 2018 Depo Exhibit 5 | No bates |
| Salomon March 2018 Depo Exhibit 6 | No bates |

Legal Filings

Amended Plantiff Nic Salomon's Notice of Videotaped Deposition of Defendant Kroenke Sports & Entertainment, LLC Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, dated August 16, 2018

Plaintiff Nic Salomon's Notice of Videotapes Deposition of Outdoor Channel Holdings, Inc. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, dated August 17, 2018

Plaintiff's Second Amended Complaint, filed August 31, 2017

Responses of Outdoor Channel Holdings, Inc. to Plantiff Nic Salomon's First Set of Requests for Admission, dated December 18, 2017

Plaintiff's Third Supplemental Answers and Objections to First Set of Interrogatories of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc., dated August 24, 2018

First Supplemental Answers of Outdoor Channel Holdings, Inc. to Plantiff Nic Salomon's First Set of Interrogatories, dated May 4, 2018

Appendix 2-B Documents Considered

Legal Filings

Plaintiff's Fourth Supplemental Answers and Objections to First Set of Interrogatories of Defendants Kroenke Sports & Entertainment, LLC and Outdoor Channel Holdings, Inc., dated October 1, 2018

Other Reports

Expert Witness Report of David C. Buck, dated September 13, 2018

Expert Report of Kevin Kreitzman, MBA, dated September 14, 2018

Publically Available Information

Weil, Roman L., Daniel G. Lentz, and Elizabeth A. Evans. (2017). Litigation Services Handbook: The Role of the Financial Expert. Sixth Edition. Hoboken, New Jersey: John Wiley & Sons, Inc.

https://s3.amazonaws.com/web.nacva.com/TL-Website/PDF/Glossary.pdf

http://web.nacva.com/TL-Website/PDF/NACVA_Professional_Standards_Incl_Review_Stnds_Effective_8-1-15_Final.pdf

http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/taxrate.htm

James R. Hitchner, "*Financial Valuation, Application and Models*". 3rd Edition.

*Valuation of Privately Held Company Equity Securities Issued as Compensation*, Practice Aid, Working Draft, 2012, American Institute of Certified Public Accountants.

Form 10-K, December 31, 2009, Outdoor Channel Holdings, Inc.

Form 10-K, December 31, 2010, Outdoor Channel Holdings, Inc.

Form 10-K, December 31, 2011, Outdoor Channel Holdings, Inc.

Form 10-K, December 31, 2012, Outdoor Channel Holdings, Inc.

Form 10-K/A, December 31, 2012, Outdoor Channel Holdings, Inc.

Form 425, February 27, 2013, Outdoor Channel Holdings, Inc.

Form 8-K, March 4, 2013, Outdoor Channel Holdings, Inc.

Form 425, March 7, 2013, Outdoor Channel Holdings, Inc.

Form 8-K, March 13, 2013, Outdoor Channel Holdings, Inc.

Schedule 14A, April 11, 2013, Outdoor Channel Holdings, Inc.

Schedule 14A, May 2, 2013, Outdoor Channel Holdings, Inc.

Schedule 14A, May 6, 2013, Outdoor Channel Holdings, Inc.

Form 8-K, May 8, 2013, Outdoor Channel Holdings, Inc.

Form 8-K, May 16, 2013, Outdoor Channel Holdings, Inc.

Form 8-K, November 15, 2012, Outdoor Channel Holdings, Inc.

Schedule 13D, November 15, 2012, Outdoor Channel Holdings, Inc.

Form 10-Q, September 30, 2012, Outdoor Channel Holdings, Inc.

Form 10-Q, March 31, 2012, Outdoor Channel Holdings, Inc.

Form S-4 Registration Statement, November 21, 2012, Intermedia Outdoor Holdings, Inc.

https://www.pepsicenter.com/kse/company/about-kse/

http://pages.stern.nyu.edu/~adamodar/New_Home_Page/home.htm

https://www.forbes.com/nba-valuations/list/#tab:overall

optvar12.xls

taxrate12

totalbeta12.xls

vebitda12.xls

histimpl.xls

indname.xls

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **NIC SALOMON,** | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §   **CIVIL ACTION NO.** |
| | §   **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § |
| | § |
| Defendants. | § |


# EXHIBIT D

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR**
**CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

NIC SALOMON,                          )
                                      )
                Plaintiff,            )
                                      )
        vs.                           ) CIVIL ACTION NO.
                                      ) 3:15-CV-00666-M
KROENKE SPORT &                       )
ENTERTAINMENT, LLC, OUTDOOR           )
CHANNEL HOLDINGS, INC., and           )
PACIFIC NORTHERN CAPITAL,             )
LLC,                                  )
                                      )
                Defendants.           )
_____)


    VIDEOTAPED DEPOSITION OF JEFF DEAN HOLOWATY,

taken on behalf of the Defendants at 17332

Irvine Boulevard, Suite 220, Tustin, California,

commencing at 9:01 a.m., on Tuesday, July 17, 2018,

before Penny Sander, C.S.R. No. 4769, a Certified

Shorthand Reporter within and for the State of

California.

1  cash proceeds from PNC."

2          What did you mean by "primarily will be

3  financed"?

4      A.  The cash proceeds -- it was the intention

10:04 5  from PNC the whole time, the entire time, to not

6  completely fund all of the transaction from PNC.  It

7  was our anticipation that we would have multiple

8  other partners to participate in the equity portion

9  of the -- of the proceeds that would go towards the

10:05 10 purchase price.

11     Q.  That's exactly what I wanted to ask you

12  about, because Mr. Salomon has been making

13  representations throughout this case, I'll just

14  refer -- or represent to you that if -- in the event

10:05 15 that other investors were not able to be obtained,

16  PNC was prepared to front the entire price,

17  acquisition price.

18          Was PNC ever prepared to fund the entire

19  acquisition price?

10:05 20     A.  No.

21     Q.  Did PNC and Mr. Salomon ever secure

22  additional funding sources?

23     A.  No.

24     Q.  Was this an effort to do that?

10:05 25     A.  There was an effort internally outside of

51

1    Mr. Salomon to work with our partners to gather

2    interest to participate in the cash proceeds required

3    to purchase the business.

4        Q.   Were outside funding sources contacted by

10:05  5    either PNC or Mr. Salomon in an effort to obtain

6    equity funding?

7        A.   Not Mr. Salomon, but internally we were --

8    internally at PNC, I should say, there was an effort

9    to have discussions with potential interested

10:06 10   parties, if you will.

11       Q.   Do you recall who those potential interested

12   parties were?

13       A.   I do not off the top of my head, no.

14       Q.   Were there -- or was there an outreach to

10:06 15   those potentially interested parties by PNC?

16       A.   We did have conversations with -- with

17   individuals, yes.

18       Q.   And did anybody express an interest in

19   contributing to the potential purchase price?

10:06 20       A.   Interest, yes, but formalized to agree upon

21   it, no.  There was no formal agreement that we

22   entered into as the transaction didn't lead us to go

23   down that path.

24       MR. EVANS:  Let me -- there seems to have been a

10:07 25   flurry of activity on the 15th.  Let me show you a

1        A.  Just like -- sorry.  Just like to point out

2   these were conversations that I had with Tim McQuay

3   on my own.  Nic was not involved in any of these

4   conversations.

10:41  5        Q.  That was going to be a question I was going

6   to get to, but thanks.  That helps.

7            Had anybody told you, either from Noble or

8   Mr. Salomon, up to this point in time that another

9   company interested in potentially acquiring the

10:41 10  aerial camera business had offered more money?

11       A.  I don't know about offering more, but I

12   believe Tim had indicated to me that there were

13   additional parties interested at this point.

14       Q.  So now we're at February 5 in the sequence

10:41 15  of events, and we're talking about a 3.65 million

16   cash at close.  I know I asked you this question

17   before in connection with a previous draft, but was

18   it PNC's intention to fund, if this deal were to

19   close, the entire cash at close?

10:42 20       A.  No.

21       Q.  Do you recall whether you had any

22   discussions with Mr. Salomon about the February 5

23   draft term sheet before you sent it to Mr. McQuay?

24       A.  I don't recall specifically.  Presumably we

10:42 25  did, yes.  Because, again, at that point we were, you

                                                              74

1          Q.  Do you recall what the -- Mr. Schneider and

2     Mr. Woechsler's reaction was?

3          A.  I don't.  I don't recall who set it up or

4     how we -- I don't believe PNC had an existing

11:39  5     relationship with Mr. Schneider or Mr. Woechsler, but

6     I vaguely recall having that meeting in New York,

7     yes.

8          Q.  Did Mr. Schneider, Mr. Woechsler at IMAX

9     agree to invest in the potential acquisition of the

11:39 10     aerial camera business?

11          A.  No, they did not agree to it.  Did they

12     express interest, yes.

13          Q.  What happened?  Do you know what happened

14     after their expression of interest?

11:39 15          A.  No.  Initially they were interested, but I'm

16     not sure why they weren't going forward or why we

17     weren't interested in having them as partners.

18          Q.  If you look two down, there's an entry

19     March 14, 2013 where Mr. Salomon writes that he spoke

11:39 20     with Jeff Holowaty.  "Jeff Holowaty had heard from

21     McQuay, who communicated that KSE was not interested

22     in the Aerial Camera Business."

23          Do you recall Mr. McQuay ever telling you

24     that KSE was not interested in the aerial camera

11:40 25     business?

                                                          111

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT E

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO
<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

Page 122

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3    NIC SALOMON,                §
                                  §
 4    Plaintiff,                  §
                                  §
 5    v.                          §
                                  §       CIVIL ACTION NO.
 6    KROENKE SPORTS &            §         3:15-666-M
      ENTERTAINMENT, LLC,         §
 7    OUTDOOR CHANNEL HOLDINGS,   §
      INC., and PACIFIC           §
 8    NORTHERN CAPITAL, LLC,      §
                                  §
 9        Defendants.             §
10
11
12            ----------------------------------
              ORAL AND VIDEOTAPED DEPOSITION OF
13
                        NICOLAS SALOMON
14
                        MAY 16, 2018
15
                          VOLUME 2
16            ----------------------------------
       Job No. CS2878358
17             VOLUME 2 OF ORAL AND VIDEOTAPED
18    DEPOSITION OF NICOLAS SALOMON, produced as a witness at
19    the instance of the DEFENDANT, and duly sworn, was taken
20    in the above-styled and numbered cause on the 16th day
21    of May, 2018, from 1:00 p.m. to 5:24, before TINA
22    TERRELL BURNEY, CSR in and for the State of Texas,
23    reported by machine shorthand, at the offices of JACKSON
24    WALKER L.L.P., 2323 Ross Avenue, Suite 600, Dallas, TX
25    75201, pursuant to the Federal Rules of Civil Procedure.
```

Page 270

1    was -- and they at one point mentioned some contacts

2    with either Live Nation or Bruckheimer or some people in

3    the media entertainment industry based on their

4    relationships.

5        Q.   Did you and PNC meet with any other investors

6    together?

7        A.   We did not, but we -- we were interested in

8    having Roger Warner invest if he was interested, and we

9    were also interested in seeking an investment from the

10   NFL Venture Capital Fund, which had just been created

11   around this time.

12       Q.   And none of those -- Roger Warner or the NFL

13   Investment Capital Fund, IMAX, none of those invested?

14       A.   Well, I mean, we never had the opportunity to

15   complete an investment.

16       Q.   They never agreed that they would invest?

17       A.   That's correct; however, with the -- with the

18   NFL Venture Capital Fund, that became a continued

19   dialogue where I actually worked with Fulbright to put

20   together a prospectus for soliciting the NFL's -- an

21   investment from the NFL and this technology company.

22       Q.   I appreciate that.  Thank you.  And there was

23   never any agreement by the NFL to invest, right?

24       A.   I don't know.  Maybe that's why Mr. Kroenke

25   bought Outdoor Channel.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT F**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO
EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

CONFIDENTIAL

Page 302

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION
3    NIC SALOMON,                   §
                                    §
4                  Plaintiff,       §
                                    §
5    VS.                            § CIVIL ACTION
                                    §
6    KROENKE SPORTS &               § NO. 3:15-CV-666-M
     ENTERTAINMENT, LLC,            §
7    OUTDOOR CHANNEL HOLDINGS,      §
     INC., and PACIFIC NORTHERN     §
8    CAPITAL, LLC,                  §
                                    §
9                  Defendants.      §
     ---------------------------------------------------
10       CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF
11                      NIC SALOMON
12                     MAY 17, 2018
13                    VOLUME 3 OF 3
14   ---------------------------------------------------
     Job No. CS2878362
15       CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF NIC
16   SALOMON, produced as a witness at the instance of the
17   DEFENDANTS, and duly sworn, was taken in the
18   above-styled and numbered cause on May 17, 2018, from
19   9:05 a.m. to 1:06 p.m., before Delanie Schreiber, CSR
20   No. 9375 in and for the State of Texas, reported by
21   stenographic method, at the offices of Jackson Walker,
22   L.L.P., 2323 Ross Avenue, Suite 600, Dallas, Texas,
23   75201, pursuant to the Federal Rules of Civil Procedure
24   and the provisions stated on the record or attached
25   hereto. Job No. 2878362

CONFIDENTIAL

Page 383

1      A.  Yes.

2      Q.  A lot?

3      A.  Yes.

4      Q.  Did you call them?  Did you call one of the

5   Holowatys?

6      A.  Well, I had talked -- I had spoke with Jeff and

7   there was -- there was -- I believe there was some sort

8   of voice mail communication with Kelly either him to me

9   or me to him but I can't remember.  So...

10     Q.  Well, what did -- what did --

11     A.  Maybe he called me and I didn't call him --

12  maybe he left me a voice mail.  I didn't call him back.

13  I didn't -- I don't remember the...

14     Q.  Well, you were so upset you didn't call him

15  back?  Is that what you're saying?

16     A.  I'm saying I don't remember.  There was -- the

17  only thing I remember after that would be from what I

18  saw in an e-mail from that.  So...

19     Q.  This is so devastating to you and you were so

20  upset that you don't recall what you said to

21  Mr. Holowaty or what Mr. Holowaty said to you?

22     A.  I remember that after that I didn't want to

23  have further communication with them about -- I mean,

24  about -- I -- I didn't -- I didn't see how I could do a

25  business transaction with them after what happened.

Page 384

1      Q.  So as of April 9, you basically had determined
2  to yourself that you couldn't go forward with PNC?
3      A.  I mean, it was not likely.  But I wanted to
4  know what happened.
5      Q.  Do you see that you didn't sign the Term Sheet
6  -- or the amendment, the March 21 document?
7      A.  Correct.
8      Q.  You knew you didn't sign it, right?
9      A.  I didn't -- I didn't sign it.  And then they
10  had this game that got played where they tried to get me
11  to -- to sign another Term Sheet amendment that
12  reattached that to the secret amendment and, you know,
13  it was -- and that -- that -- and that went on for
14  months.
15      Q.  Well, let's stick with my question.  My
16  question was you didn't sign -- you saw when you got the
17  document, you didn't sign it, right?  And you knew the
18  nonbinding provision in the Term Sheet that you drafted
19  said that any document purporting to amend the Term
20  Sheet was not valid unless all parties signed, right?
21  And you knew you didn't sign the term -- amendment,
22  right?
23      A.  Well, I mean --
24      Q.  Right?  You knew you didn't sign it?
25      A.  Like we discussed, that's a legal -- I mean,

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT G**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO
<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

3

4    NIC SALOMON,

5           Plaintiff,

6      vs.                        No. 3:15-CV-00666-M

7    KROENKE SPORTS & ENTERTAINMENT,

     LLC, OUTDOOR CHANNEL HOLDINGS,

8    INC., and PACIFIC NORTHERN

     CAPITAL, LLC,

9

            Defendants.

10

11

12    _____

13

14        VIDEOTAPED DEPOSITION OF THOMAS D. ALLEN

15              Irvine, California

16          Wednesday, June 20, 2018

17                 VOLUME I

18

19    TRANSCRIPT MARKED CONFIDENTIAL - ATTORNEYS' EYES ONLY

20

21    Reported by:

     WINDY PICARD

22    CSR No. 12879

23    Job No. 2875084

24

25    PAGES 1-160

            CONFIDENTIAL - ATTORNEYS' EYES ONLY        1

CONFIDENTIAL

Page 43

1    above-referenced entities."

2          And while I can't find any date on that

3    particular e-mail from Ms. Meyers, Mr. McQuay, on

4    February 25, 2013, then forwards Ms. Meyers' e-mail and

5    attachment to you and Mr. Hornish, along with

6    Francisco Penafiel and Robert Campbell.

7          Do you remember Mr. Penafiel?

8      A   I do.  He was an analyst at Noble.

9      Q   How about Mr. Campbell?

10     A   He was one of the two aforementioned senior

11   bankers at Noble that we were working with.

12     Q   He and Mr. McQuay?

13     A   Yes.

14     Q   So Mr. McQuay writes to you and Mr. Hornish,

15   "This just arrived.  Bob and I are in a meeting

16   beginning at 2:00, so can we talk around 4:00?"

17         And then attached to this e-mail chain is a

18   February 24, 2013 e-mail from the Aspen Group.  It's

19   "Re: Letter of Intent for the purchase Of Cablecam, LLC

20   and Skycam, LLC Assets."

21         Do you see that?

22     A   I do.

23     Q   And then at the bottom of the first page of

24   that LOI, letter of intent, there's a section called

25   "4.  Purchase Price."

CONFIDENTIAL - ATTORNEYS' EYES ONLY        43

CONFIDENTIAL

Page 44

1          Do you see that?

2      A    I do.

3      Q    And it says the purchase price being

4    $4,500,000.  Do you see that?

5      A    I do.

6      Q    Do you recall any discussions with

7    Noble Financial about the Aspen Group offer -- or

8    letter of intent, I should say?

9      A    I don't have a specific recollection of the

10   phone call that is implied to have happened later that

11   day, which I'm assuming probably did happen.  I know

12   that they were one of the companies we were talking to.

13          But I note -- and this is just by way of

14   jogging my memory -- that one of the parties that were

15   CCed by Steffani Meyers' -- note to Tim that we

16   referenced earlier -- or e-mail -- is a person whose

17   e-mail address is psmauder@actioncamerahd.

18          That was -- I think his -- I think his first

19   name is -- in fact, it's noted.  It's Phil Smauder.

20   Phil was a principal at Actioncam, which was one of the

21   companies that we had sued.  And I believe Phil was a

22   former employee of our aerial camera business.

23          In looking at the LOI, I noticed, in .12, it's

24   titled -- in the section titled "Confidentiality," that

25   there's reference to obligating the company not to

CONFIDENTIAL - ATTORNEYS' EYES ONLY        44

Page 45

1    disclose this offer to Nic Salomon.

2            And I believe -- this is recollection.  But I

3    believe that we were not terribly confident that this

4    company could raise the money to buy -- to buy the

5    aerial camera business because of the potential claims

6    that we had secured in court against Actioncam.

7            That's about as much as I recall about this

8    particular buyer.

9        Q   And is that the reason why Outdoor Channel

10   didn't pursue negotiations or -- or efforts with

11   Aspen Group to sell or attempt to sell the aerial

12   camera business to them?

13       A   I don't have a clear recollection as to what

14   we collectively decided, but I do have confidence that

15   we would have had a conversation about assessing their

16   ability to close and sincerity of their offer.

17       Q   And was Mr. Salomon -- do you recall

18   Mr. Salomon being involved in those decisions related

19   to the LOI of Aspen Group?

20       A   I do not believe he was.  And that is probably

21   not a unique statement relative to the Aspen Group.

22   That any discussions with any buyer group, we did not

23   normally include Nic in those, because we understood

24   that he was conflicted.

25       Q   And conflicted in what sense?

               CONFIDENTIAL - ATTORNEYS' EYES ONLY      45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:15-CV-666-M |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC., and PACIFIC NORTHERN CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT H

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF
KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR
CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO
<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CIVIL ACTION NO. 3:15-CV-00666-M

_____

VIDEOTAPE DEPOSITION OF:   JAMES A. MARTIN
                           AUGUST 30, 2018

_____

NIC SALOMON,

PLAINTIFF,

V.

KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL
HOLDINGS, LLC, AND PACIFIC NORTHERN CAPITAL, LLC,

DEFENDANTS.

_____

          PURSUANT TO NOTICE, THE VIDEOTAPE
DEPOSITION OF JAMES A. MARTIN WAS TAKEN ON BEHALF OF
THE PLAINTIFF AT 4643 SOUTH ULSTER STREET, SUITE 800,
DENVER, COLORADO 80237, ON AUGUST 30, 2018, AT
10:06 A.M., BEFORE TINA M. STUHR, REGISTERED
PROFESSIONAL REPORTER AND NOTARY PUBLIC WITHIN
COLORADO.

JOB NO. 137826

85

11:57:06  1    to the transaction?

11:57:07  2          A.    No.

11:57:08  3          Q.    And so isn't it true that the only way

11:57:11  4    for that to happen would be for PNC and Mr. Salomon to

11:57:17  5    agree to an amendment of the term sheet?

11:57:20  6                MR. EVANS:   Objection to form.   Legal

11:57:22  7    conclusion.

11:57:24  8          A.    I don't know if that's the only way it

11:57:26  9    could happen or not.

11:57:29 10          Q.    (BY MR. IBRAHIM)   That's one of the ways

11:57:30 11    it could happen, correct?

11:57:31 12                MR. EVANS:   Same objection.

11:57:34 13          A.    I wouldn't think that's one of the ways

11:57:36 14    it could happen.

11:57:38 15          Q.    (BY MR. IBRAHIM)   Now, when did

11:57:39 16    Mr. Kroenke find out about the term sheet?

11:57:44 17          A.    I -- I'm not sure he knows even now that

11:57:51 18    there was a term sheet.   Well, I take that back.   I

11:57:55 19    believe he knows there was at the time and up through

11:58:00 20    the transaction.   I never discussed it with him.   It

11:58:05 21    was not material.

11:58:07 22          Q.    Okay.   Let me unpack that a little bit.

11:58:09 23    You testified that "I believe he knows there was at

11:58:14 24    the time."   What do you mean by that?

11:58:21 25          A.    I don't think that's what I meant to say.

86

11:58:23  1    I believe he knows now, because we're involved in this

11:58:27  2    lawsuit, that there was a term sheet.  I do not

11:58:31  3    believe he knew -- and I would be pretty certain at

11:58:34  4    the time he had no idea.  I know I never discussed it

11:58:40  5    with him.  It was not material.

11:58:41  6         Q.   When did you sit down and have the

11:58:43  7    conversation with Mr. Kroenke to find out when he

11:58:47  8    first learned about the term sheet?

11:58:50  9              MR. EVANS:  Objection to form.  Misstates

11:58:51 10    the testimony.

11:58:55 11         A.   I don't believe I ever asked him when he

11:58:57 12    found out about it.

11:58:58 13         Q.   (BY MR. IBRAHIM)  And so you don't know

11:58:59 14    the answer to that question, do you?

11:59:01 15         A.   I know I never discussed it with him.

11:59:18 16         Q.   I'm going to show you what's been

11:59:20 17    previously marked as 305.

11:59:32 18              MR. IBRAHIM:  And I don't have the marked

11:59:33 19    copy, Kevin.  I'd like to try to keep --

11:59:38 20              MR. EVANS:  That's all right.

11:59:39 21              MR. IBRAHIM:  -- the numbering.

11:59:41 22              MR. EVANS:  That's all right.  As long as

11:59:43 23    you're representing it's 305.

11:59:46 24              MR. IBRAHIM:  Yeah.

12:00:09 25              Actually, do you mind just marking it

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT I**


**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR**
**CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING**

Page 1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF TEXAS
2   DALLAS DIVISION
    -------------------------------x
3   NIC SALOMON,
4                   Plaintiff,
5   vs.                   Civil Action No. 3:15-CV-666-M
                          Date:  June 7, 2018
6   KROENKE SPORTS & ENTERTAINMENT,
    LLC, OUTDOOR CHANNEL HOLDINGS,
7   INC., AND PACIFIC NORTHERN CAPITAL
    LLC,
8
                    Defendants.
9   -------------------------------x
10
11              DEPOSITION OF ROGER WERNER
12
       The deposition of Roger Werner was taken on
13
    June 7, 2018, beginning at 9:07 a.m., at the One
14
    Landmark Square, Stamford, Connecticut before Susan
15
    Wandzilak, Registered Professional Reporter and Notary
16
    Public in the State of Connecticut.
17
18
19
20              Susan Wandzilak  License No. 377
21
22
23
24
25

Page 68

1   will need to set up a disinterested committee on the
2   board.
3        Mr. Salomon has testified that the Roger he
4   is referring to here was, that Mr. Hornish was
5   referring to here was you.
6   A.   Right.
7   Q.   And during his deposition Mr. Salomon
8   testified, and this is a quote, he meaning you did
9   tell me that he would, that he had an interest in
10  investing in the business. Do you recall a
11  conversation with Mr. Salomon where you said you had
12  an interest in investing in the business?
13  A.   On a hypothetical level I think that
14  discussion happened a couple of times, never got
15  really serious from my point of view. But Nic had
16  asked me whether I would, you know, whether I would
17  include myself in the group and if I had an interest.
18  And I think I responded a couple of times I possibly
19  would be, you know, possibly.
20  Q.   Okay.
21  A.   At the end of the day, as I mentioned, the
22  business, the business was a challenged business. It
23  was a relatively low margin capital intensive business
24  so my interest, my interest in it wasn't extremely
25  high. But from time to time I had thought that maybe

Page 69

1    we could improve the business, change the business

2    model and make it into something bigger and better.

3        Q.   Okay.

4        A.   But never really got anywhere.

5        Q.   So Mr. Hornish is referring to the setup of a

6    disinterested committee on the board.

7        A.   Um-uh.

8        Q.   Do you recall whether a disinterested

9    committee of the board was set up?

10       A.   I don't think so because I wasn't at that

11   time, you know, when we started actually transacting

12   for the overall business, my interest in the aerial

13   camera business sort of subsided and I didn't think

14   there was any need for it.

15       Q.   Okay.

16            (Whereupon, Werner Exhibit No. 91 was marked

17   for identification.)

18   BY MR. EVANS:

19       Q.   So Exhibit 91 bears control Nos.

20   KSE/OC:000044.  It's from Nic Salomon.  It's dated

21   June 19, 2012 and the e-mail address on this is Roger

22   LW at Roger L. Baron at Yahoo dot com.  Do you know

23   who that is?

24       A.   Yeah, rlbaron@yahoo.com is my -- is a

25   personal e-mail of mine.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NIC SALOMON,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | **3:15-CV-666-M** |
| **KROENKE SPORTS & ENTERTAINMENT,** | § | |
| **LLC, OUTDOOR CHANNEL HOLDINGS,** | § | |
| **INC., and PACIFIC NORTHERN CAPITAL LLC,** | § | |
| | § | |
| Defendants. | § | |

**EXHIBIT J**

**AFFIDAVIT OF KEVIN D. EVANS IN SUPPORT OF**
**KROENKE SPORTS & ENTERTAINMENT, LLC AND OUTDOOR**
**CHANNEL HOLDINGS, INC.'S MOTION PURSUANT TO FED. R. EVID. 702 TO**
**<u>EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND REQUEST FOR HEARING</u>**

1       IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
2                 DALLAS DIVISION

3    CIVIL ACTION NO. 3:15-CV-00666-M

4    _____

        RULE 30(B)(6) VIDEOTAPE DEPOSITION OF:
5         SCOTT M. LONG - SEPTEMBER 5, 2018
         KROENKE SPORTS & ENTERTAINMENT, LLC
6    _____

7    NIC SALOMON,

8    PLAINTIFF,

9    V.

10   KROENKE SPORTS & ENTERTAINMENT, LLC, OUTDOOR CHANNEL
     HOLDINGS, INC., AND PACIFIC NORTHERN CAPITAL, LLC,
11
     DEFENDANTS.
12   _____

13
              PURSUANT TO NOTICE, THE RULE 30(B)(6)
14   VIDEOTAPE DEPOSITION OF SCOTT M. LONG, KROENKE
     SPORTS & ENTERTAINMENT, LLC, WAS TAKEN ON BEHALF OF
15   THE PLAINTIFF AT 4643 SOUTH ULSTER STREET, SUITE 800,
     DENVER, COLORADO 80237, ON SEPTEMBER 5, 2018, AT
16   10:13 A.M., BEFORE TRACY C. MASUGA, REGISTERED
     PROFESSIONAL REPORTER, CERTIFIED REALTIME REPORTER,
17   AND NOTARY PUBLIC WITHIN COLORADO.

18

19

20

21

22   JOB NO. 137838

23

24

25

30(b)(6)
SCOTT ACKERMAN - 08/08/2018

13:40:04  1          A.   I would need to review the documents.  I

13:40:06  2   know there were -- it was a back-and-forth bidding war

13:40:09  3   before it finally settled, and I would not -- I would

13:40:12  4   need to refer to whatever the document -- the SEC

13:40:15  5   filings at that time.

13:40:15  6          Q.   So I want you to assume for the sake of

13:40:19  7   my questioning that the offer was for $8.75 a share.

13:40:24  8   Do you have that assumption in mind?

13:40:25  9          A.   Okay.  8.75 a share.

13:40:28 10          Q.   What portion of that $8.75-a-share offer

13:40:37 11   was attributable to the aerial camera business?

13:40:42 12               MR. EVANS:  Objection.  It's beyond the

13:40:44 13   scope of topic 15.  The witness has already testified

13:40:48 14   to this.  He's not here as an expert, and he's not

13:40:52 15   going to give you his opinion.

13:40:53 16          Q.   (BY MR. IBRAHIM)  You may answer.

13:40:54 17          A.   So as I said before, there was not a

13:40:56 18   specific valuation made of the individual pieces.  The

13:40:59 19   valuation -- the offer was made for the entire assets

13:41:02 20   of the company, and there was not a specific amount.

13:41:07 21          Q.   And there were various offers made

13:41:09 22   between February 27, 2013, up until the time of the

13:41:14 23   closing, May 17, 2013.  You recall that?

13:41:17 24          A.   I believe that's correct, yes.

13:41:18 25          Q.   Okay.  And so your testimony, if I

13:41:21  1    understand it correctly, is that with regards to all

13:41:24  2    of those offers, not just the February 27, 2013,

13:41:27  3    offer, but with regards to all of the offers that KSE

13:41:31  4    made, KSE did not make any determination of what

13:41:37  5    portion of that offer was attributable to the aerial

13:41:43  6    camera business; am I correct?

13:41:44  7           A.    That is correct.

13:41:45  8           Q.    And at no point in time during that time

13:41:48  9    period between February 27, 2013, and May 16, 2013,

13:41:54 10    did KSE ever make a determination of what the monetary

13:41:58 11    value of the aerial camera business was, at any point

13:42:02 12    during that time period?

13:42:03 13           MR. EVANS:  Objection, asked and

13:42:05 14    answered.

13:42:05 15           A.    Yes, there was none done.

13:42:07 16           Q.    (BY MR. IBRAHIM)  Okay.  So it's open to

13:42:08 17    interpretation, right?

13:42:10 18           MR. EVANS:  Objection.  You're not here

13:42:11 19    as an expert.  You're here to give opinion -- or not

13:42:15 20    here to give opinions.  You're here to testify as a

13:42:18 21    30(b)(6) witness.  That's an opinion question, and I'm

13:42:21 22    instructing you not to answer.

13:42:23 23           MR. IBRAHIM:  Excuse me.  The witness

13:42:24 24    testified that it's open to interpretation, and so I'm

13:42:26 25    just confirming his earlier testimony.