## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NIC SALOMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:15-cv-0666-M |
| | § | |
| KROENKE SPORTS & ENTERTAINMENT, | § | |
| LLC, OUTDOOR CHANNEL HOLDINGS, | § | |
| INC. AND PACIFIC NORTHERN CAPITAL | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## SEALED ORDER[1]

This dispute arises from an exclusivity provision in an agreement executed by Plaintiff Nic Salomon, Defendant Pacific Northern Capital LLC ("PNC"), and Defendant Outdoor Channel Holdings, Inc., which, among other things, prohibited Outdoor from selling two of its wholly-owned subsidiaries, SkyCam LLC and CableCam LLC (together, "Aerial Camera Business") to anyone other than Plaintiff and PNC for a specific time period. During the time period covered by the exclusivity provision, Defendant Kroenke Sports & Entertainment, LLC ("KSE") made an offer to acquire all of Outdoor's stock, and KSE and Outdoor subsequently entered into a merger agreement.

Plaintiff brings this lawsuit against Outdoor, KSE, and PNC, claiming that the negotiations between KSE and Outdoor and the merger of Outdoor and KSE violated the

---

[1] Because this Order cites to and quotes Appendices that were filed under seal, this Order will be initially filed under seal. If a party believes that any portion of the Order should be permanently sealed, the party should file, by March 7, 2019, a motion to seal those portions of the Order, identifying the portions to be sealed and explaining why those portions should be sealed. Opposing parties may file a response to any motion to seal by March 14, 2019. If no motions to seal are filed by March 7, 2019, the Court will unseal the Order.

exclusivity provision.  Plaintiff argues that KSE interfered with the exclusivity provision between Outdoor, Plaintiff, and PNC, and with the potential sale of the Aerial Camera Business to Plaintiff and PNC.  Plaintiff asserts that KSE and Outdoor assisted PNC in breaching fiduciary duties it owed to Plaintiff, were unjustly enriched, and participated in a civil conspiracy against Plaintiff.  KSE and Outdoor move for summary judgment on all counts against them.

The Court concludes that Outdoor did not breach the exclusivity provision because the merger of Outdoor and KSE was not a sale of the Aerial Camera Business to KSE.  Further, Plaintiff did not submit evidence to create a genuine issue of material fact: (1) that KSE and Outdoor interfered with the exclusivity provision or with the potential sale of the Aerial Camera Business, (2) that KSE and Outdoor assisted in breaching a fiduciary duty owed by PNC to Plaintiff, (3) that KSE and Outdoor were unjustly enriched, or (4) that KSE and Outdoor participated in a civil conspiracy against Plaintiff.  Thus, the Court grants summary judgment for KSE and Outdoor with respect to all claims brought by Plaintiff against KSE and Outdoor.

## I.      Background

Outdoor owns and operates Outdoor Channel, a cable television channel that provides programming related to outdoor activities, including hunting and fishing.  (ECF No. 245 at App. 140).  The Aerial Camera Business is comprised of two wholly-owned subsidiaries of Outdoor. They provide remote-controlled aerial camera services used in the production of sporting events. (*Id.* at App. 148, App. 161)  Plaintiff was the President of the Aerial Camera Business from 2009 until May 2014.  (ECF No. 257 at App. 374).

In 2012, Outdoor was considering selling the Aerial Camera Business.  (ECF No. 245 at App. 161–62).  Outdoor retained Noble Financial Capital Markets, an investment banking firm, to assist it with finding potential buyers.  (*Id.* at App. 163; ECF No. 257 at App. 375).  Plaintiff

and Outdoor discussed the possibility of Plaintiff acquiring the Aerial Camera Business, if

Plaintiff could assemble an investment group to buy it.  (ECF No. 245 at App. 173; ECF No. 257

at App. 374).  Plaintiff worked with PNC[2], a private equity company, to try to finance the

acquisition.  (*Id.* at App. 374–75).

On November 15, 2012, Outdoor entered into a merger agreement with InterMedia

Outdoor Holdings, LLC, pursuant to which InterMedia would acquire all of Outdoor's

outstanding common stock for $8 per share (the "InterMedia Merger Agreement").  (ECF No.

245 App. 199–212).  On February 12, 2013, Outdoor issued a Proxy Statement about the

InterMedia Merger Agreement, which stated that Outdoor was "exploring strategic alternatives

for the [Aerial Camera Business], which process is still ongoing."  (*Id.* at App. 219).

On January 16, 2013, PNC sent Noble an initial draft of a term sheet to acquire the Aerial

Camera Business.  (*Id.* at App. 240–41; ECF No. 257-3 at App. 15).  Plaintiff forwarded the draft

term sheet to Outdoor the same day.  (ECF No. 245 at App. 257; ECF No. 257-3 at App. 14).

Following negotiations, on February 6, 2013, PNC sent Noble a revised draft.  (ECF No. 245 at

App. 242–43; ECF No. 257-3 at App. 18).  Noble replied with a revision on February 8, 2013,

and negotiations continued.  (ECF No. 245 at App. 244–45; ECF No. 257-3 at App. 17).  On

February 27, 2013, Outdoor, Plaintiff, and PNC executed a Term Sheet.  (ECF No. 245 at App.

32–35).  The Term Sheet stated that its purpose was to "evidence the intention of PNC to proceed

with negotiations designed to complete a purchase of the Company substantially in the manner

outlined herein."  (*Id.* at App. 32).  The Term Sheet stated that the "Purchaser," defined as an

acquisition entity to be formed by PNC and Plaintiff, would acquire the "Company," defined as

---

[2] On November 3, 2017, Plaintiff moved for entry of default against PNC, and the Clerk entered a default.
(ECF No. 84).  Plaintiff stated that he could not move for default judgment until "discovery has been had
sufficient [sic] to develop evidence regarding the requisite damages at issue."  (ECF No. 83 at 4).

SkyCam LLC and CableCam LLC, for a purchase price of up to $4.05 million. (*Id.*). The Term

Sheet included the following Exclusivity Provision:

A.  In consideration of Purchaser continuing to spend time and incur professional fees
    and other expenses relating to the acquisition, each of Outdoor Channel and the
    Company agree that until April 15, 2013, that [sic] they and any of their directors,
    officers, affiliates and representatives will not, directly or indirectly:

    (i) Solicit, facilitate, encourage, or accept any offers to acquire any equity or
    debt interest in Skycam or Cablecam or any material part of the assets of the
    business of Skycam or Cablecam, nor engage or procure any person to do so
    on their behalf;

    (ii) Negotiate or correspond with third parties in relation to existing or
    unsolicited offers to acquire the equity or debt interest or any part of the
    business of Skycam or Cablecam, other than to advise them that exclusive
    discussions are being pursued with another party (but in no event shall
    Purchaser's identity be disclosed), nor engage or procure any person to do so
    on its behalf;

    (iii) Sell or agree to sell any equity or debt interest (including any new issue of
    debt or equity) in any part of the Company to any other party than Purchaser
    or its nominee, and Outdoor Channel and its subsidiaries will procure that their
    respective directors, officers, affiliates, employees, advisors and
    representatives will also act accordingly.

B.  Outdoor Channel and its subsidiaries jointly and severally undertake that they will
    forthwith cease any negotiations, discussions or correspondence which they are
    having, whether directly or indirectly, in relation to the potential acquisition of an
    equity or debt interest in the Company by any other party than Purchaser or its
    nominee and that it will advise any such parties that exclusive discussions are being
    pursued with another party (but in no event shall Purchaser's identity be disclosed).

(*Id.* at App. 34).  The Term Sheet also included a Non-Binding Provision, which states:

Except for the provisions of "Exclusivity" above, which is a binding legal
agreement upon the parties, this Term Sheet is a statement of mutual intention; it is
not intended to be legally binding, and does not constitute a binding contractual
commitment with respect to any transaction. Without limiting the foregoing, the
failure of Outdoor Channel and Purchaser to reach agreement on the terms and
conditions of definitive agreements in accordance with this Term Sheet shall not be
construed as a breach of this Term Sheet by any party hereto . . . . Accordingly,
until definitive agreements are entered into, except as expressly set forth above, no
party will be under any legal obligation with respect to this Term Sheet, and no
withdrawal from or termination of negotiations for the transaction contemplated by

4

this [T]erm [S]heet prior to signing definitive agreements, for whatever reason, or for no reason, shall be determined to be in bad faith and any such withdrawal or termination shall not give any party a cause of action against the other party.

(*Id.* at App. 35).

On February 27, 2013, the same day that the Term Sheet was executed, Defendant KSE, a sports and entertainment holding company based in Denver, Colorado, made an offer to purchase all of Outdoor's outstanding public stock for $8.75 per share.  (ECF No. 245 at App. 167–68, 281–84; ECF No. 257-5 at App. 259–60, App. 265).   On March 5, 2013, Jim Martin, the President and CEO of KSE, and David Gluck, an employee of KSE, had a meeting with Outdoor, its financial advisor, Lazard Freres, and others.  (ECF No. 257-5 at App. 262–64).  At the meeting, the Term Sheet and the potential sale of the Aerial Camera Business to Plaintiff and PNC was discussed.  (*Id.* at App. 266–69).  Also on March 5, 2013, Outdoor provided Plaintiff and PNC with a draft Asset Purchase Agreement.  (ECF No. 245 at App. 294; ECF No. 257 at App. 74).

On March 7, 2013, Outdoor announced that its Board of Directors found KSE's offer to be superior to InterMedia's offer.  (ECF No. 245 at App. 168; ECF No. 257-4 at App. 76–78).  Outdoor terminated the InterMedia Merger Agreement, and on March 13, 2013, KSE and Outdoor entered into a merger agreement ("KSE Merger Agreement").  (ECF No. 245 at App. 280–92).

Outdoor continued to negotiate the potential sale of the Aerial Camera Business with Plaintiff and PNC.  (*Id.* at App. 279).  On March 21, 2013, Outdoor and PNC signed a letter ("March 21 Letter") extending the Term Sheet's exclusivity period from April 15, 2013, to May 15, 2013.  (*Id.* at App. 402–03).  The March 21 Letter states that, "if, at any point during the exclusivity period, [KSE] concludes that it will not consent to [the sale of the Aerial Camera

Business to Plaintiff and PNC], PNC shall release Outdoor [ ] from its exclusivity obligations. . . ." (*Id.* at App. 402). Plaintiff did not sign the March 21 Letter, and the evidence before the Court is that he did not know about the March 21 Letter until April 9, 2013. (*Id.* at App. 403; ECF No. 257-6 at App. 382).

On April 30, 2013, InterMedia made another offer to acquire Outdoor. (ECF No. 245 at App. 416–17, App. 424). In response, on May 2, 2013, KSE increased its offer. (*Id.* at App. 424). Between May 3 and May 8, 2013, KSE and InterMedia made further competing offers to acquire Outdoor. (*Id.*). On May 8, 2013, Outdoor's Board of Directors determined that KSE's offer of $10.25 per share was in the best interest of Outdoor's shareholders and accepted KSE's offer. (*Id.*). On May 17, 2013, Outdoor's stockholders voted in favor of the KSE Merger Agreement, and KSE acquired all of Outdoor's stock. (*Id.* at App. 038–39, App. 44–45, App. 424).

Sometime after May 17, 2013, KSE decided that Outdoor would not sell the Aerial Camera Business to Plaintiff and PNC or anyone else. (*Id.* at App. 40–42). Plaintiff remained the President of the Aerial Camera Business until May 2014, when KSE terminated Plaintiff because "he was constantly not doing what he was asked to do to the point of almost insubordination," among other reasons. (*Id.* at App. 155–56).

In his Second Amended Complaint ("SAC"), Plaintiff asserts that Outdoor breached the Exclusivity Provision of the Term Sheet by negotiating with KSE and by accepting KSE's offer to purchase Outdoor's stock. Plaintiff claims that KSE and Outdoor (1) interfered with the Exclusivity Provision, (2) assisted PNC in breaching fiduciary duties it owed to Plaintiff, (3) were unjustly enriched, and (4) participated in a civil conspiracy against Plaintiff. On November 5, 2018, KSE and Outdoor filed a Motion for Summary Judgment on all counts

against them in the Complaint.  (ECF No. 243).  On November 13, 2018, KSE and Outdoor

moved, pursuant to Federal Rule of Evidence 702, to exclude testimony of Kevin Kreitzman.

(ECF No. 247).  On November 16, 2018, Plaintiff moved to exclude opinions and testimony of

David Buck.  (ECF No. 250).  On January 9, 2019, the Court held a *Daubert* hearing.  In this

Order, the Court will address the parties' *Daubert* Motions and then will address KSE and

Outdoor's Motion for Summary Judgment.

## II.     *Daubert* Motions

## A.     Legal Standard

The trial court acts as a "gatekeeper" to exclude expert testimony that does not meet the

relevancy and reliability threshold requirements.  *See American Imaging Servs., Inc. v. Autodesk,*

*Inc.*, 2013 WL 5405396, at *1 (N.D. Tex. Sep. 26, 2013) (Lynn, J.).  In this role, the trial court

determines the admissibility of expert testimony based on Federal Rule of Evidence 702 and

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Accordingly, opinion

testimony is not admissible unless: (1) the witness is qualified "as an expert by knowledge, skill,

experience, training, or education;" (2) the witness's reasoning or methodology underlying the

opinion testimony is scientifically reliable; and (3) the testimony is relevant—that is, it assists the

trier of fact to understand the evidence or to determine a fact at issue.  Fed. R. Evid. 702;

*Daubert*, 509 U.S. at 591–93.  The burden is on the proponent of expert testimony to establish its

admissibility, by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n. 10.

B.      **Analysis**

1.      **KSE and Outdoor's Motion to Exclude Testimony of Kevin Kreitzman**

KSE and Outdoor move to exclude the testimony of Plaintiff's proposed damages expert,

Kevin Kreitzman, because it is unreliable.  Mr. Kreitzman identifies four categories of damages:

(1) lost compensation, (2) benefit of the bargain, (3) disgorgement of profits, and (4) legal

expenses.  As an initial matter, the Court finds that damages based on disgorgement of profits are

not available in this case.  *See Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st

Dist.] 2010, no pet.) ("Disgorgement of profits is not a measure of damages available in a breach

of contract action.").  This finding is not disputed by Plaintiff.  At the January 9 *Daubert* hearing,

Plaintiff's counsel stated that it would no longer be pursuing damages under a disgorgement

theory.  (*Daubert* Hearing Tr. 4:7–8).

a.      **Lost Compensation**

Plaintiff claims $1,362,755 in lost compensation, plus prejudgment interest, based on his

assertion that but for the conduct of Defendants, Plaintiff would have continued to be the

President of the Aerial Camera Business.  (ECF No. 248 at App. 9).  Mr. Kreitzman's calculation

for Plaintiff's lost compensation is based on "at least the same base salary [Plaintiff] was

receiving at the time of his termination [$252,881] and at least the same bonus he received for the

calendar year 2013 [$34,139]."  (*Id.* at App. 23).

KSE and Outdoor urge that Mr. Kreitzman's opinion is speculative because his

assumption that Plaintiff and PNC's purchase of the Aerial Camera Business would have

occurred if not for KSE and Outdoor's actions is contrary to the record, which shows "that there

were serious obstacles to completing this transaction that Plaintiff had no ability to overcome."

(ECF No. 247 at 6).

The Court finds that Mr. Kreitzman's assumption that Plaintiff would have remained the head of the Aerial Camera Business if the sale to Plaintiff and PNC had occurred is not unreasonable based on the record before the Court, so it will not be excluded.

### b.    Benefit of the Bargain

Mr. Kreitzman describes three scenarios to measure Plaintiff's benefit of the bargain damages, which are intended "to restore [Plaintiff] as the injured party to the economic position he would have been in had the contract been performed, or had it not been interfered with." (ECF No. 248 at App. 24).   Mr. Kreitzman states that he was "instructed by [Plaintiff's] counsel that benefit of the bargain damages under Texas law are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made." (*Id.*).   In each scenario, Mr. Kreitzman assumes that Plaintiff would have been entitled to 8% of the equity of the Aerial Camera Business if the sale to Plaintiff and PNC had gone through.   (*Id.* at App. 36, App. 40, App. 43) ("The proposed structure provided [Plaintiff] with 8% of the initial stock and stock options with strike prices of 1X, 2X, and 3X times the initial stock price.").   The only evidence Plaintiff provides as support for this proposed structure is an email that Plaintiff sent to PNC on March 10, 2013, in which Plaintiff proposed an equity structure where he would own 8% of the Aerial Camera Business.   (ECF No. 63 at Ex. G.; *Daubert* Hearing Tr., 9:18–11:23).   In his declaration, Plaintiff states,

> On or about March 10, 2013, I sent a proposed equity structure to PNC for the purchaser [sic] of the Aerial Camera Business under the proposed transaction.   In a response e-mail, Jeff Holowaty [of PNC] thanked me for sending this to him and advised, "[w]e will review."   However, there was no dispute that arose between me and PNC regarding this proposal;   I sent it to [PNC] and [PNC] never expressed objection to me about it—and indeed, did not have occasion to express any informed objection to me after KSE and Outdoor signed the [KSE Merger Agreement] . . . .

(ECF No. 259-2 at App. 369).  There is no evidence that PNC ever agreed to Plaintiff's proposal or that any further discussion occurred about Plaintiff's proposed structure.

Because Mr. Kreitzman's benefit of the bargain calculations are based on an equity structure that Plaintiff proposed but that PNC never agreed to or even discussed, the Court finds those calculations to be unreliable so Mr. Kreitzman's opinion regarding benefit of the bargain damages is excluded under Rule 702 and *Daubert*.

### c.   Legal Fees

Mr. Kreitzman states that Plaintiff incurred $12,622 plus prejudgment interest in "legal expenses and other costs paid in connection with the transaction to purchase the Aerial Camera Business through May of 2013 . . . ."  (ECF No. 248 at App. 23).  KSE and Outdoor argue that this opinion is not helpful to the factfinder because it only requires "rudimentary arithmetic." (ECF No. 247 at 25).  The Court agrees that this testimony will not be helpful to the trier of fact. Mr. Kreitzman's opinion with respect to legal fees is excluded.

For the reasons above, KSE and Outdoor's Motion to Exclude Testimony of Kevin Krietzman is GRANTED IN PART and DENIED IN PART.

### 2.   Plaintiff's Motion to Exclude Expert Testimony of David Buck

Plaintiff moves to exclude the opinions and testimony of KSE and Outdoor's proposed expert, David Buck.  Mr. Buck is a corporate attorney and partner at Sidley Austin LLP.  KSE and Outdoor present Mr. Buck as "an expert in the area of public company merger and acquisition transactions, experienced with term sheets and letters of intent, as well as the fiduciary obligations of a public company's officers and directors to the company's shareholders." (ECF No. 258 at 2).  Mr. Buck considers three issues:

10

     (1)     Did the Exclusivity Provision prohibit either negotiations, discussions or correspondence by Outdoor relating to the KSE Merger, or the disclosure of the Term Sheet by Outdoor with or to KSE or InterMedia?

     (2)     Did the Exclusivity Provision prohibit Outdoor's execution of the KSE Merger Agreement, or the exchange of equity of Outdoor for cash pursuant to the KSE Merger?

     (3)     Does the Non-Binding Provision apply to the sentence in the Term Sheet that provides: "The parties will use their best efforts to achieve a signing of definitive documents and Closing no later than April 15, 2013."?

(ECF No. 250-1, App. 6). Mr. Buck also describes Section 251 of the Delaware General Corporation Law and the course of dealings between Outdoor and Plaintiff and interprets the terms "directly or indirectly" and "sell or agree to sell" in the Term Sheet. (*Id.* at App. 11–23).

Experts have been permitted to testify about the proper interpretation of contract terms, an issue of law, when the meaning depends on trade practice. *See, e.g., Kona Tech. Corp. v. S. Pac. Transp. Co.,* 225 F.3d 595, 611 (5th Cir. 2000) (expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry). But such expert testimony is admissible only if the contract language is ambiguous or involves a specialized term of art, science or trade. *See Coregis Insurance Co. v. Bell,* 1999 WL 244097 (E.D. La. April 21, 1999) *aff'd* 203 F.3d 828 (5th Cir. 1999) (trial court rejected use of English language expert to interpret contract provisions, but indicated that the result might be different if the language at issue was a term of art, science or trade); *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 279–80 (5th Cir. 1987) *cert. denied,* 484 U.S. 851 (1987) (affirming trial court's admission of expert testimony to explain accounting provisions of unambiguous farmout agreement, because those provisions had a specialized usage and meaning within the oil and gas industry); *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996) (interpretation of unambiguous contract is a question of law for the court).

11

The parties agree that the Exclusivity Provision in the Term Sheet is not ambiguous.  (*See* ECF No. 266 at 11 ("The Exclusivity [Provision] is not ambiguous"); ECF No. 257-1 at 21 ("Here, the terms of the Exclusivity Provision unambiguously establish that Outdoor breached.")).  Further, Mr. Buck's testimony consists of legal conclusions, interpretations of law, and terms that are not of art, science, or trade.  *See Implicit Oil & Gas, L.P. v. GoMex Energy Offshore, Ltd*., 3:10-CV-827-P, 2012 WL 13094057, at *3 (N.D. Tex. Jan. 9, 2012) ("Federal courts have consistently held that expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and jury.") (internal citation omitted).  For these reasons, the Court GRANTS Plaintiff's Motion to Exclude Expert Testimony of David Buck.

## III.    KSE and Outdoor's Motion for Summary Judgment

## A.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual issue is material "if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co*., 340 F.3d 233, 235 (5th Cir. 2003).  A factual dispute is "'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).  The Court is required to view all facts and draw all reasonable inferences in the light most favorable to the non-moving party and to resolve all disputed factual controversies in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Boudreaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir. 2005).

B.      **Analysis**

1.      **Plaintiff's Breach of Contract Claim Against Outdoor**

Under Texas law, the elements of a breach of contract claim are "(1) the existence of a

valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the

contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach."

*Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (internal citation omitted).

The parties dispute whether Outdoor breached the Exclusivity Provision and whether Plaintiff

suffered damages as a result of any breach.

a.      **Whether Outdoor Breached the Term Sheet**

Section A of the Exclusivity Provision prohibits Outdoor from "directly or indirectly:

(i) Solicit[ing], facilitat[ing], encourag[ing] or accept[ing] any offers to acquire any
equity or debt interest in Skycam or Cablecam or any material part of the assets of
the business of Skycam or Cablecam . . . . ;

(ii) Negotiat[ing] or correspond[ing] with third parties in relation to existing or
unsolicited offers to acquire the equity or debt interest or any part of the business
of Skycam or Cablecam, other than to advise them that exclusive discussions are
being pursued with another party (but in no event shall Purchaser's identity be
disclosed) . . . .;

(iii) Sell[ing] or agree[ing] to sell any equity or debt interest (including any new
issue of debt or equity) in any part of the Company to any other party than Purchaser
or its nominee . . . .

(ECF No. 245 at App. 34).

Section B of the Exclusivity Provision states that:

Outdoor Channel and its subsidiaries jointly and severally undertake that they will
forthwith cease any negotiations, discussions or correspondence which they are
having, whether directly or indirectly, in relation to the potential acquisition of an
equity or debt interest in the Company by any other party than Purchaser or its
nominee and that it will advise any such parties that exclusive discussions are being
pursued with another party (but in no event shall Purchaser's identity be disclosed).

(*Id.*).

13

Plaintiff argues that Outdoor breached the Exclusivity Provision in the following ways:

(1)    Outdoor negotiated with KSE about the sale of Outdoor's stock in violation of sections (A)(i), (A)(ii), and (B) of the Term Sheet.  Outdoor agreed to sell Outdoor's stock to KSE in violation of Section (A)(iii).  (ECF No. 257-1 at 22–24).

(2)    Outdoor disclosed the Term Sheet and the identities of Plaintiff and PNC to KSE in violation of sections (A)(i), (A)(ii), and (B).  Outdoor discussed the pending sale of the Aerial Camera Business with KSE in violation of sections (A)(i), (A)(ii), and (B).  (*Id.*)

(3)    Outdoor signed the March 21 Letter, which "effectively eliminate[d] the exclusive dealing provision by giving KSE control of the fate of the negotiation for the Aerial Camera Business" and "therefore 'encourage[d]' KSE's offer to acquire an equity interest in the Aerial Camera Business" in violation of section (A)(i).  (*Id.*)

### i.    Outdoor's Negotiations with KSE and the KSE Merger

KSE and Outdoor claim that Outdoor's negotiations with KSE about acquiring Outdoor, and KSE's eventual acquisition of Outdoor, do not constitute a breach of the Term Sheet because the Exclusivity Provision prohibits Outdoor from negotiating the sale of and/or selling the Aerial Camera Business, not Outdoor's stock.  (ECF No. 244 at 17–18).  KSE and Outdoor rely on Texas and Fifth Circuit law that states that the sale of the stock of a parent corporation is not a sale of the stock or assets of a subsidiary of the parent corporation.  (*Id.*)  Applying that law here, KSE and Outdoor argue that because the Aerial Camera Business is a subsidiary of Outdoor, the sale of Outdoor's stock to KSE was not the sale of the stock or assets of the Aerial Camera Business.  (*Id.* at 21–30).  KSE and Outdoor claim that Outdoor never sold the stock or assets of the Aerial Camera Business, and therefore did not breach the Exclusivity Provision.  (*Id.*).

14

It is fundamental under Texas corporate law that a parent corporation and its subsidiaries are distinct legal entities. *Pulaski Bank & Trust Co. v. Texas Am. Bank, N.A.*, 759 S.W.2d 723, 731 (Tex. App.—Dallas 1988, writ denied). A parent company and its subsidiary maintain their independence even when all capital stock of a subsidiary corporation is owned by its parent corporation. *Rimes v. Club Corp.*, 542 S.W.2d 909, 911 (Tex. Civ. App.—Dallas 1976, writ ref'd n.r.e.). Further, Texas law is that "a purchase of stock in a corporation does not constitute a purchase of the corporate assets," and that "a sale of all the stock in a corporation does not constitute a sale of the corporation's assets." *Docudata Records Mgmt. Servs., Inc. v. Wieser*, 966 S.W.2d 192, 197 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 641–42 (Tex. 1996)); *see also M.D. Mark, Inc. v. Nuevo Energy Co.*, 988 S.W.2d 463, 465 (Tex. App.—Houston [1st Dist.] 1999, no pet.) ("The purchaser of stock in a corporation does not purchase any of the corporation's assets, nor is a sale of all the stock of a corporation a sale of the physical properties of the corporation.") (internal citation omitted); *Murphy v. Am. Rice, Inc.*, 01-03-01357-CV, 2007 WL 766016, at *12 n.36 (Tex. App.—Houston [1st Dist.] Mar. 9, 2007, no pet.) ("[A] parent corporation's merely owning stock in its subsidiary does not make the parent the owner of the subsidiary's assets.").

In *Tenneco*, five companies owned stock in a company that owned a natural gas liquids fractionation plant. Operations of the plant were governed by an agreement, which provided the owners a preferential right to purchase an ownership interest in the plant when "any Owner should desire to sell, transfer or assign all or any part of its Ownership Interest" in the plant. One of the owners, Tenneco, sold its stock in the plant to a non-owner, without allowing the other owners to exercise their right of first refusal. The Texas Supreme Court held that the sale of a

15

company's stock does not include a sale of the company's assets, and that the transaction was not a transfer of Tenneco's ownership interest in the fractionation plant.  *Id.* at 645.

In *Docudata*, the court held that a former employee, Wieser, of a parent corporation, LRS, could not recover under a bonus provision in his employment contract triggered by a sale of the parent company's subsidiary, Docudata.  966 S.W.2d at 198–99.  The court determined that the transfer of 100% of LRS's stock to another corporation "did not effectuate a sale of Docudata," because "LRS continued to own 100% of Docudata's stock."  *Id.* at 198.  Wieser asked the court "to look behind these corporate formalities and look at what actually happened," arguing that "because [the transfer of LRS's stock] shifted control away from the LRS shareholders to [the other corporation], a sale [of LRS and Docudata], as it is commonly understood, occurred."  *Id.*  The court rejected this argument, stating "the issue of control is not dispositive," and concluded that "LRS did not transfer Docudata's stock to any purchaser; nor did it sell Docudata's assets."  *Id.*  (citing *Capital Parks, Inc. v. Southeastern Advertising and Sales Sys., Inc.*, 30 F.3d 627 (5th Cir. 1994)).

The Fifth Circuit has similarly held that "the transfer of the parent corporation's stock and assets . . . does not affect the ownership of assets held by the subsidiary."  *Capital Parks*, 30 F.3d at 629 (citing *Engel v. Teleprompter Corp.*, 703 F.2d 127, 131 (5th Cir. 1983)).  In *Capital Parks*, the plaintiff and the defendant entered into an option contract, which granted the plaintiff a right of first refusal "with respect to the purchase of all the issued and outstanding capital stock or substantially all of the operating assets" of a wholly-owned subsidiary of the defendant.  *Id.* at 628.  A non-party made an offer to the defendant to purchase "all the issued and outstanding shares of" the defendant "together with all of the real estate and business assets used in connection with the operation of [the defendant's] business and owned individually by the

16

shareholders." *Id.*  The plaintiff filed suit, arguing that the defendant breached the option

contract by failing to advise the plaintiff in writing of the non-party's offer.  *Id.* at 629.  The Fifth

Circuit found that the offer to purchase the defendant's stock and assets was not an offer to

purchase the assets held by the defendant's wholly-owned subsidiary.  *Id.*  ("[The non-party's]

offer to [the defendant's] shareholders contemplates only a transfer of the control, but not the

ownership, of [the defendant's wholly-owned subsidiary's] stock and assets.).

Here, the Exclusivity Provision prohibited Outdoor from "directly or indirectly"

discussing offers to sell or selling "the equity or debt interest or any part of the business of [the

Aerial Camera Business.]"  It is undisputed that Outdoor sold Outdoor's stock to KSE.  Based on

Texas law, the sale of Outdoor's stock to KSE was not the sale of the stock or assets of the

Aerial Camera Business, which, as a wholly-owned subsidiary of Outdoor, is a legally distinct

entity from Outdoor.  Therefore, by discussing the sale of Outdoor's stock and by selling

Outdoor's stock to KSE, Outdoor did not breach the Exclusivity Provision.

Plaintiff argues that this case is distinguishable from the case law discussed above

because the Exclusivity Provision's "language is significantly broader and more open-ended"

than the relevant contract language in *Capital Parks* and *Tenneco*.  (ECF No. 257 at 26).

Plaintiff states that "the terms of the Exclusivity Provision are not nearly so narrow as to require

a sale of all the assets of the Aerial Camera [B]usiness for its terms to have been violated."  (*Id.*).

In *Capital Parks*, the plaintiff had a right of first refusal "with respect to the purchase of all the

issued and outstanding capital stock or substantially all of the operating assets of [the defendant

corporation's subsidiary.]"  30 F.3d at 628.  In *Tenneco*, the agreement's right to purchase clause

was triggered when "any Owner should desire to sell, transfer or assign all or any part of its

Ownership Interest" in the fractionation plant.  925 S.W.2d at 644.  The Court finds that the

language from these cases is not narrower than the Exclusivity Provision, which prohibits the negotiation or sale of "the equity or debt interest or any part of the business of [the Aerial Camera Business]."  Further, *Capital Parks* and *Tenneco* clearly hold the purchaser of stock in a corporation does not purchase the corporation's assets.

Plaintiff argues that the offer to acquire Outdoor "includ[ed] any and all ownership interests Outdoor had in the Aerial Camera Business."  (ECF No. 257-1 at 9).  Plaintiff submits evidence that KSE and Outdoor understood that KSE's purchase of Outdoor's stock was also a purchase of the Aerial Camera Business, including the following testimony from Mr. Gluck of KSE:

> Q. And so when KSE made an offer to purchase all
> shares of Outdoor Channels -- Outdoor Channel Holdings,
> Inc. that included any and all ownership interests that
> Outdoor Channel Holdings, Inc. had in any of its
> subsidiaries, correct?
>
> [ . . . ]
>
> A.  I believe so.
>
> [ . . . ]
>
> Q.  When the offer was made by KSE to purchase all
> of the shares of Outdoor Channel Holdings, Inc. did the
> offer that was made by KSE exclude [the Aerial Camera Business]?
>
> A.  No, it did not.

(ECF No. 257-5 at App. 260–61).  As a matter of law, KSE's offer to acquire, and its subsequent acquisition of, Outdoor was not an offer to acquire, or an acquisition of, the Aerial Camera Business.  KSE never made an offer to acquire and never acquired the Aerial Camera Business and therefore Outdoor did not violate the Exclusivity Provision, which prohibited Outdoor from negotiating with "third parties in relation to . . . offers to acquire" the Aerial Camera Business

and from selling the Aerial Camera Business to anyone other than Plaintiff and PNC.  (ECF No. 245 at App. 34).

Plaintiff asserts that KSE's acquisition of Outdoor constituted an "indirect" sale of the Aerial Camera Business, in violation of section A(iii), which prohibits Outdoor from "directly or indirectly . . . sell[ing] or agree[ing] to sell" any part of the Aerial Camera Business to a party other than Plaintiff and PNC.  (ECF No. 257-1 at 30).  Under the principles discussed in *Tenneco* and *Capital Parks*, the sale of Outdoor's stock to KSE did not constitute a "direct[ ] or indirect[ ]" sale of the equity or debt interest in the Aerial Camera Business.  The Aerial Camera Business was not sold.

The Court finds that Outdoor did not breach the Exclusivity Provision by negotiating with KSE about the acquisition of Outdoor or by accepting KSE's offer to acquire Outdoor's stock.

### ii. Disclosure of Term Sheet and Identities of Plaintiff and PNC to KSE

Plaintiff argues that Outdoor breached the Exclusivity Provision when it discussed with KSE the Term Sheet and the potential sale of the Aerial Camera Business to Plaintiff and PNC . (ECF No. 257-1 at 33).  Section A(ii) of the Exclusivity Provision prohibits Outdoor from "negotiat[ing] or correspond[ing] with third parties in relation to existing or unsolicited offers to acquire the equity or debt interest or any part of the [Aerial Camera Business], other than to advise them that exclusive discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed) . . . ."  Section B states that Outdoor will "cease any negotiations . . .  in relation to the potential acquisition of . . . [the Aerial Camera Business] by any other party than Purchaser . . . and that it will advise any such parties that exclusive

discussions are being pursued with another party (but in no event shall Purchaser's identity be disclosed)."  (ECF No. 245 at App. 34).

These sections prohibit Outdoor from disclosing Plaintiff and PNC's identities and their potential acquisition of the Aerial Camera Business to third parties with whom Outdoor is having negotiations "in relation to the potential acquisition" of the Aerial Camera Business.  As discussed above, Outdoor did not negotiate with KSE about acquiring the Aerial Camera Business, and therefore, the disclosure requirements in sections A(ii) and B do not apply.

### iii.     The March 21 Letter

Plaintiff argues that by executing the March 21 Letter, Outdoor gave KSE the right to veto the sale of the Aerial Camera Business to Plaintiff and PNC in violation of section A(i) of the Exclusivity Provision.  (ECF No. 257-1 at 33–34).  The March 21 Letter states "if, at any point during the exclusivity period, [KSE] concludes that it will not consent to [the sale of the Aerial Camera Business to PNC], PNC shall release [Outdoor] from its exclusivity obligations and PNC shall forever waive its rights, if any under the Term Sheet."  (ECF No. 257-4 at App. 95–96).  It is undisputed that the March 21 Letter was never effective because Plaintiff did not sign it.  (ECF No. 245 at App. 249–50).

Plaintiff claims that by signing the March 21 Letter, Outdoor "'encourage[d]' KSE's offer to acquire an equity interest in the Aerial Camera Business."  (ECF No. 257-1 at 24).  KSE did not offer to acquire an equity interest in the Aerial Camera Business.   Plaintiff has failed to show a fact issue exists as to whether Outdoor breached the Exclusivity Provision by signing the March 21 Letter.

The Court finds that there is no genuine issue of material fact as to whether Outdoor breached the Exclusivity Provision or any other part of the Term Sheet.

### b.      Whether Plaintiff Suffered Damages

Because there is no genuine issue of material fact regarding Outdoor's breach of the

Term Sheet, the Court need not address KSE and Outdoor's argument that Plaintiff has failed to

establish a fact issue that Plaintiff suffered damages as a result.

### 2.      Plaintiff's Tortious Interference Claim With An Existing Contract Against KSE

Under Texas law, a party alleging tortious interference with an existing contract must

prove four elements to sustain its claim: (1) that a contract subject to interference exists; (2) that

the alleged act of interference was willful and intentional; (3) that the willful and intentional act

proximately caused damage; and (4) that actual damage or loss occurred.  A plaintiff can prove

tortious interference by establishing that the defendant intentionally induced or caused a third

party to breach its contract with the plaintiff.  *John Paul Mitchell Sys. v. Randalls Food Markets,*

*Inc.*, 17 S.W.3d 721, 730–31 (Tex. App.—Austin 2000, pet. denied).  Inducing a third party to do

what it had a right to do does not constitute tortious interference.  *ACS Inv'rs, Inc. v.*

*McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (internal citation omitted).

In the SAC, Plaintiff alleges that KSE "willfully and intentionally interfered with the

Term Sheet's Exclusivity Provision by . . . induc[ing] or caus[ing] Outdoor to breach its

contractual obligations to negotiate exclusively with PNC and Plaintiff . . . [and by] induc[ing]

Outdoor to discuss and negotiate the sale of the Aerial Camera Business and grant KSE the right

to disapprove of the sale to Plaintiff and PNC, by offering Outdoor . . . superior terms or other

incentives."  (ECF No. 63 ¶ 55).

As discussed above, Outdoor did not breach the Exclusivity Provision by: negotiating

with KSE about the acquisition of Outdoor, disclosing the Term Sheet or the identities of

Plaintiff and PNC to KSE, or attempting to execute the March 21 Letter.  Even assuming that

KSE induced Outdoor to take those actions, KSE's inducement would not constitute tortious interference because Outdoor had a right to take those actions under the Exclusivity Provision. *See ACS Inv'rs*, 943 S.W.2d at 430.

Plaintiff asserts that "KSE held up the sales process from continuing with Plaintiff and PNC," and submits evidence that "Outdoor, PNC, and Plaintiff all understood that the deal to purchase the Aerial Camera Business was not progressing because they were waiting on answers from KSE." (ECF No. 257-1 at 39). Plaintiff primarily relies on an email dated March 21, 2013, from Outdoor's CEO Tom Hornish to Outdoor's CFO Tom Allen describing a conversation between Mr. Hornish and PNC:

> Was a good call, with agreement that it's likely we can work out all of the terms [sic] However, real gating item is Kroenke. And both we and PNC are in the dark. If we get his consent, then we will all try to close ASAP. If he says no, then we all go our separate ways.

(ECF No. 257-5 at App. 183). Neither this email nor Plaintiff's other evidence shows that KSE prevented further negotiations with Plaintiff and PNC about the acquisition of the Aerial Camera Business.

Plaintiff also states that, "[t]he fact that the [March 21 Letter] was even drafted is proof that KSE tortiously interfered with the contract at issue." (ECF No. 257-1 at 49). The record shows that KSE did not know about the March 21 Letter at the time it was signed. Catherine Lee, Outdoor's former general counsel, testified that she drafted the March 21 Letter without ever discussing it with KSE. (ECF No. 245 at App. 268–69, App. 273–74). Mr. Gluck of KSE testified that he found out about the March 21 Letter, "not more than a couple of months" after it was signed. (ECF No. 245 at App. 152).

The evidence Plaintiff submits to show that KSE knew of the March 21 Letter at the time that it was signed is: (1) Mr. Martin of KSE's testimony that he "thinks" he saw the March 21

Letter prior to KSE's acquisition of Outdoor on May 17, 2013, but is "not positive," (ECF No. 257-5 at App. 357); (2) KSE's admission that Mr. Gluck of KSE "learned in April 2013, via an email from [Outdoor], that the Term Sheet had been amended, and that at some point prior to KSE's acquisition of all Outdoor stock, KSE learned that the Exclusivity period had been extended," (ECF No. 257-4 at App. 173); and (3) Mr. Gluck's testimony that he "thought it would be cleaner" if Plaintiff signed an acknowledgment of the March 21 Letter that was sent to Plaintiff by Outdoor on June 6, 2013. (ECF No. 257-5 at App. 302–03). This evidence is not sufficient to create a fact issue that KSE knew of the March 21 Letter when it was signed. Because KSE was not involved in the drafting or execution of the March 21 Letter, the Court rejects Plaintiff's claim that the preparation of the March 21 Letter is proof that KSE tortiously interfered with the Exclusivity Provision.

Plaintiff has failed to show that a genuine issue of material fact exists as to his claim for tortious interference with an existing contract.

### 3.   Plaintiff's Tortious Interference With Prospective Business Relations Claim Against KSE

Under Texas law, the elements of tortious interference with prospective business relations are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did the act with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the interference. *Cmty. Initiatives, Inc. v. Chase Bank of Texas*, 153 S.W.3d 270, 283–84 (Tex. App.—El Paso 2004, no pet.).

In the SAC, Plaintiff alleges that KSE "induced Outdoor to breach its contractual obligation to negotiate exclusively with [Plaintiff] and PNC and then caused the execution of the [March 21 Letter], which purported to grant KSE the right to disavow the sale of the Aerial Camera Business."  (ECF No. 63 ¶ 58).  With respect to the second element of his claim, Plaintiff argues that KSE committed independently tortious or unlawful acts by interfering with the Exclusivity Provision, inducing Outdoor to breach its obligations under the Exclusivity Provision, and inducing PNC to breach its fiduciary duties to Plaintiff.  (ECF No. 257-1 at 44).  As explained in Sections III.B.2 and III.B.4 of this Order, this conduct by KSE is not actionable because nothing prohibited such conduct by KSE and the Aerial Camera Business could still have been sold.

### 4.     Plaintiff's Aiding and Abetting Breach of Fiduciary Duty Claim Against KSE and Outdoor

Under Texas law, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett–Wallace Corp*., 160 S.W.2d 509, 514 (Tex. 1942).  To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.  *See Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717 (Tex. App.—Austin 2001, pet. denied).

In the SAC, Plaintiff claims that KSE and Outdoor "knowingly assisted, encouraged, and participated in PNC's breach of its fiduciary duties owed to [Plaintiff] in connection with their purchase of the Aerial Camera Business by inducing PNC to sign the [March 21 Letter] without [Plaintiff's] knowledge or consent."  (ECF No. 63 ¶ 62).  There is no evidence that KSE

participated in, or was aware of any participation in, an alleged breach of a fiduciary duty owed by PNC to Plaintiff.  As discussed above, the record shows that KSE did not know about the March 21 Letter at the time it was signed.  Plaintiff asserts that by "intentionally omit[ting Plaintiff] from the Term Sheet,[3]" Outdoor participated in, and was aware that it participated in, PNC's alleged breach of a fiduciary duty owed to Plaintiff.  (ECF No. 257-1 at 45–46).  KSE and Outdoor submit evidence that Outdoor's failure to obtain Plaintiff's signature on the March 21 Letter was an oversight.  For example, Ms. Lee, Outdoor's former general counsel, testified that Outdoor had been "negotiating primarily with PNC, and [Plaintiff] was no longer involved," so Outdoor "inadvertently forgot" to obtain Plaintiff's signature.  (ECF No. 245 at App. 270).  Ms. Lee further testified that by executing the March 21 Letter, Outdoor did not intend to deceive Plaintiff, conceal anything from Plaintiff, or "to cut [Plaintiff] out of the effort to acquire the Aerial Camera Business."  (*Id.*).

To support his assertion that Outdoor's omission of Plaintiff's signature was intentional, Plaintiff, submits evidence that: (1) Plaintiff's declaration that PNC told him "[w]e did something you wouldn't agree with," in reference to PNC signing the March 21 Letter, (2) an email from Mr. Hornish of Outdoor to PNC attaching the March 21 Letter and stating, "Attached is the [March 21 Letter] to extend the exclusivity to May 15, option to extend another 30 days if needed, but an out if Kroenke decides he won't consent," and (3) the email from Mr. Hornish to Mr. Allen of Outdoor that states that the "real gating item is Kroenke . . . . If he says no, then we all go our separate ways."  (ECF No. 257-6 ¶ 35; ECF No. 257-4 at App. 118; ECF No. 257-5 at App. 183, App 366–37).

---

[3] The Court assumes Plaintiff is referring to the March 21 Letter here.

This evidence does not conflict with KSE and Outdoor's evidence that Outdoor's failure to obtain Plaintiff's signature on the March 21 Letter was unintentional. Thus, Plaintiff has failed to create a genuine issue of material fact with respect to whether KSE and Outdoor were aware that they were participating in a breach of the duty that PNC allegedly owed Plaintiff.

### 5.   Plaintiff's Unjust Enrichment Claim Against KSE and Outdoor

Texas courts are divided on whether unjust enrichment is a separate cause of action, but "[m]ost of the Texas courts of appeals and federal courts that have considered the question under Texas law have rejected the existence of an independent cause of action for unjust enrichment." *Mission Trading Co., Inc. v. Lewis*, CV H-16-3368, 2017 WL 6935824, at \*6 (S.D. Tex. July 31, 2017), *report and recommendation adopted*, CV H-16-3368, 2017 WL 4941408 (S.D. Tex. Nov. 1, 2017) (internal citation omitted). The Texas Supreme Court has yet to directly rule on whether unjust enrichment is an independent cause of action under Texas law. *See Davis v. OneWest Bank, N.A.*, No. 02-14-00264-CV, 2015 WL 1623541, at \*1 (Tex. App.—Fort Worth, Apr. 9, 2015, pet. denied).

Assuming that Plaintiff has a valid independent cause of action for unjust enrichment, Plaintiff fails to create a genuine issue of material fact on such a theory to survive summary judgment. "Unjust enrichment occurs when the person sought to be charged has wrongfully secured or passively received a benefit that would be unconscionable to retain. To prevail, the plaintiff must show that the defendant obtained a benefit from plaintiff by fraud, duress, or the taking of undue advantage." *Mary E. Bivins Found. v. Highland Capital Mgmt. L.P.*, 451 S.W.3d 104, 111–12 (Tex. App.—Dallas 2014, no pet.) (internal citation omitted).

Plaintiff again argues that KSE induced Outdoor to breach the Exclusivity Provision and to grant KSE the authority to veto the sale of the Aerial Camera Business to Plaintiff and PNC,

and that KSE and Outdoor persuaded PNC to breach its fiduciary duties by executing the March

21 Letter.  (ECF No. 251-1 at 48).  Plaintiff concludes that "[b]ecause KSE acquired the Aerial

Camera Business by the taking of an undue advantage, there is a genuine issue of material fact as

to Plaintiff's unjust-enrichment claim."  (*Id.*; *see also* ECF No. 63 ¶ 69 (stating "[d]efendants

have unjustly enrichment themselves, to [Plaintiff's] detriment, by the acts, omissions, and torts

described in this Complaint").

Plaintiff's unjust enrichment claim fails for two reasons.  First, "there can be no recovery

for unjust enrichment under a quasi-contract or contract implied-in-law theory when a valid,

express contract covers the subject matter of the parties' dispute."  *Patterson v. Long Beach*

*Mortg. Co*., CIV.A.3:07CV1602OBH, 2009 WL 4884151, at *8 (N.D. Tex. Dec. 15, 2009).

Here, because the subject matter of the parties' dispute is the Exclusivity Provision of the Term

Sheet, which the Court finds is a valid, enforceable contract, Plaintiff cannot recover under an

unjust enrichment theory.  Second, as discussed above, the Court concludes that KSE did not

acquire the Aerial Camera Business as part of the KSE Merger.  Plaintiff has failed to show that

KSE or Outdoor obtained any benefit from their alleged taking of an undue advantage.  The

Court grants summary judgment on Plaintiff's unjust enrichment claim.

### 6.      Plaintiff's Civil Conspiracy Claim Against KSE and Outdoor

In Texas, the elements of civil conspiracy are (1) two or more persons, (2) an object to be

accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more

unlawful, overt acts, and (5) damages as a proximate result.  *Tri v. J.T.T*., 162 S.W.3d 552, 556

(Tex. 2005).  Under Texas law, civil conspiracy is a derivative tort.  *Meadows v. Hartford Life*

*Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007).  If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails.  *Id.*

The Court has granted summary judgment for KSE and Outdoor on all of Plaintiff's tort claims.  Because Plaintiff has not provided sufficient evidence to create a fact issue that KSE and Outdoor committed a tort, the Court also grants summary judgment for KSE and Outdoor as to Plaintiff's civil conspiracy claim.

IT IS ORDERED that KSE and Outdoor's Motion to Exclude Testimony of Kevin Krietzman (ECF No. 247) is GRANTED IN PART and DENIED IN PART.  Plaintiff's Motion to Exclude Expert Testimony of David Buck (ECF No. 250) is GRANTED.

IT IS FURTHER ORDERED that KSE and Outdoor's Motion for Summary Judgment (ECF No. 243) is GRANTED.

IT IS FURTHER ORDERED that, within thirty days of the date of this Order, Plaintiff shall either (1) move to dismiss his claims with prejudice against PNC, or (2) move for default judgment against PNC, if Plaintiff believes that, despite the Court's findings in this Order, seeking a default judgment against PNC is not frivolous.

**SO ORDERED**.

February 27, 2019.

BARBARA M. G. LYNN
CHIEF JUDGE